Shawn M. Lindsay
shawn@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KATERINA B. EYRE, TIM FREEMAN, MAZAMA SPORTING GOODS, NATIONAL SHOOTING SPORTS FOUNDATION, and OREGON STATE SHOOTING ASSOCIATION, | Case No. 3:22-cv-1862 |
| Plaintiffs, | COMPLAINT |
| v. | |
| ELLEN F. ROSENBLUM, Attorney General of Oregon, and TERRI DAVIE, Superintendent of the Oregon State Police, | |
| Defendants. | |

## **COMPLAINT**

Katerina B. Eyre, Tim Freeman, Mazama Sporting Goods, National Shooting Sports Foundation, and Oregon State Shooting Association (collectively, "Plaintiffs") bring this complaint against Ellen F. Rosenblum, Attorney General of Oregon, and Terri Davie, Superintendent of the Oregon State Police (collectively, "Defendants"). Plaintiffs bring this complaint based on personal knowledge as to all Plaintiff facts, and on information and belief as to all other matters.

<u>**PRELIMINARY STATEMENT**</u>

1.      The Second Amendment to the U.S. Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. In a matter of days, however, law-abiding citizens of Oregon may no longer be able to exercise that right at all.

2.      This fall, Oregon voters narrowly adopted Ballot Measure 114, the "Changes to Firearm Ownership and Purchase Requirements Initiative." Measure 114 imposes severe and unprecedented burdens on individuals seeking to exercise perhaps the most basic right guaranteed by the Second Amendment: the right to lawfully acquire a firearm.

3.      Although Measure 114 bills itself as creating a "shall issue" licensing regime that awards applicants a five-year "permit-to-purchase" firearms, in reality it erects a Kafkaesque regime that finds no support in history, tradition, or even modern regulation and that suffers from literally every defect the Supreme Court just identified as antithetical to the Second Amendment.

4.      Under Measure 114, an individual must obtain a "permit-to-purchase" before she may acquire a firearm by any means. Obtaining this permit is no mean feat. To start, before an individual can even submit an application for the new permit, she first must complete a "firearms training course" that satisfies various strict new criteria. §4(1)(b)(D), (8)(a), (c)(A)-(D). But the state does not provide any such courses, and none that satisfies its demanding new criteria currently exists.

5.      Even if one managed to take this as-yet-non-existent course, there would still be many hurdles yet to clear. Next up is submitting to fingerprinting and photographing by the sheriff or police chief, who must then ask the Department of State Police ("DSP") to conduct a criminal background check. §4(1)(e). That alone could delay any ability to exercise Second Amendment rights indefinitely, since Measure 114 neither imposes any time constraint on DSP to conduct the check nor creates a mechanism to force DSP to act.

6.　　　And a standard background check is still not enough.  By agreeing to complete the required background check, an individual invites a potential fishing expedition:  The sheriff or police chief not only may demand "any additional information determined necessary by department rules," §4(1)(c), but retains discretion to deny a permit on the back end even if the applicant passes the background check, §§4(1)(b)(C), 5(2).  Even if the sheriff or police chief *does* choose to award the permit required to obtain a firearm, moreover, the permit need not issue for 30 days.  §4(3)(a).  In the meantime, the applicant cannot lawfully obtain a firearm.

7.　　　With a "permit-to-purchase" in hand, an individual might think that she would (finally) be "permitted" to "purchase" the firearm that the Second Amendment entitles her to keep and bear.  But she would be wrong.  "Once a permit holder wants to buy a gun, state police [then] conduct its usual firearms purchase background check"—"and that check would have to be completed before any gun were sold or transferred, under the measure."  Maxine Bernstein, *Oregon Gun Control Measure 114 Attracts National Attention as One of Strictest in U.S.*, The Oregonian (Oct. 15, 2022), https://bit.ly/3guiU3r.  So while Measure 114 requires an individual to present a permit whenever she seeks to acquire a gun, successfully running the gauntlet required to secure one *does not actually entitle an individual to purchase a firearm*.  Even if an individual comes to a licensed gun dealer with a "permit-to-purchase" in hand, the dealer must take that individual's thumbprint again, §§6(2)(c), 10(a), 11, verify that her permit is, in fact, valid by cross-referencing a state database, §6(2)(d), and, finally, ask DSP to perform *another* background check and assign a "unique approval number" if the individual passes, §6(2)(d), which likewise can take an eternity.

8.　　　One might think that a state bent on imposing such a novel and burdensome permitting regime would at least take the time to make sure it had the infrastructure and resources in place to ensure that it would operate as smoothly as possible.  But Oregon is not even willing to

do that. Instead, the state has rushed the effective date of its new law to December 8, 2022—before the vote on Measure 114 has even been certified, and before the mechanisms to comply with it will be anywhere close to in place.

9. The net result is that, come just one week from now, *no one will be able to lawfully purchase a firearm in Oregon*. *See* Dac Collins, *Oregon Prepares to Freeze Gun Sales in "De Facto Gun Ban,"* Outdoor Life (Nov. 23, 2022), https://bit.ly/3gBmQ2f ("Law enforcement leaders are telling local news outlets that *they expect all gun sales in the state to freeze* when a new ballot measure goes into effect early next month." (emphasis added)); *see also id.* ("The ballot measure … introduc[es] the Permit-to-Purchase program, which requires any person who wants to purchase a firearm to obtain a state-issued permit before doing so.… [But] the state is not currently prepared to issue these permits.").

10. Measure 114 is radically out of step with the historical and even modern-day tradition of firearms regulation in this country—not to mention with the Supreme Court's recent and unambiguous pronouncements on what kinds of permitting regimes are and are not consistent with the Second Amendment. And by erecting a Byzantine regime that is a necessary prerequisite to exercising a fundamental constitutional right but that no one can currently satisfy, Measure 114 violates due process to boot.

11. In addition to effectively prohibiting people from obtaining firearms, Measure 114 bans commonplace magazines and even confiscates them from those who have already lawfully obtained them, turning law-abiding citizens into criminals virtually overnight.

12. Magazines that hold more than 10 rounds of ammunition are commonly owned by millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. These magazines have long come standard-issue with many of the most popular firearms

on the market. Today, Americans own roughly 115 million of them, accounting for "approximately half of all privately owned magazines in the United States." *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022).

13.     Under Measure 114, however, magazines capable of holding more than 10 rounds will soon be contraband in Oregon.

14.     Measure 114 creates the brand-new "crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines." §11(2). This new crime is punishable by up to 364 days in prison and a $6,250 fine. *See* §11(6) (classifying the new crime as "a class A misdemeanor"); Or. Rev. Stat. §161.615(1) (setting maximum prison sentence at 364 days for class A misdemeanors); Or. Rev. Stat. §161.635(1)(a) (setting maximum fine at $6,250 for class A misdemeanors).

15.     That ban on ubiquitous magazines likewise violates the Second Amendment. Magazines are plainly arms within the meaning of the Second Amendment; after all, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). The textual right to keep and bear arms thus necessarily includes the right to keep and bear ammunition and related products that render ammunition capable of being fired by a firearm. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century sources recognizing that "[t]he possession of arms also implied the possession of ammunition"). And the Supreme Court has made clear that the Second Amendment protects arms in common use today, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022), which magazines capable of holding more than ten rounds unquestionably are.

16.     Unsurprisingly, there is no historic tradition of regulating these types of arms. In fact, while arms with similar capacity have been around longer than the United States, it was not

until the 1990s that a handful of states began imposing novel restrictions on magazine capacity, and those laws are all serious outliers. Oregon's new magazine ban thus violates the Second Amendment's explicit command that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; *see also Bruen*, 142 S.Ct. at 2131 ("The test … requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").

17. Making matters worse, Measure 114 imposes criminal liability not only on individuals and businesses who use, sell, or manufacture such magazines, but on individuals and businesses who merely possess such magazines—even if the individual or business lawfully acquired them well before Measure 114 was proposed, let alone took effect.

18. For "licensed gun dealer[s]" in Oregon, nearly all of whom currently possess thousands of the soon-to-be-banned magazines in their stores and warehouses, the only options to avoid criminal liability are to send all of their lawfully acquired magazines out of state, render all of them inoperable (and thus unsalable), or dispossess of them altogether—and to do so within 180 days. That violates the Takings Clause of the Fifth Amendment as well.

19. There are many virtues to direct democracy and the referenda process, but the Framers viewed certain rights as too fundamental to be left to shifting majorities. The Supreme Court has left no doubt that the Second Amendment is among those fundamental rights where the Framers have done all the necessary balancing, and the democratic process must respect that judgment or be swiftly invalidated. Measure 114 plainly fails to respect fundamental constitutional rights as old as the Republic and reaffirmed by the Supreme Court as recently as this June.

20.     Plaintiffs thus seek, among other things, declaratory and injunctive relief to prevent Oregon, including Defendants Rosenbaum and Davie, and all of their respective agents and assigns, from enforcing Measure 114 against Plaintiffs or any of their members.

## THE PARTIES

21.     Plaintiff Katerina B. Eyre is a natural person and a citizen of the United States. Eyre is a resident of Washington County, Oregon. She served as an Oregon State Representative from 2011 to 2013. Before the adoption of Measure 114, Eyre was in the process of obtaining a concealed handgun license ("CHL") in Oregon, and she purchased a number of magazines capable of holding more than 10 rounds of ammunition. But for Measure 114, Eyre would acquire more in the future.

22.     Plaintiff Tim Freeman is a natural person and a citizen of the United States. Freeman is a resident of Douglas County, Oregon. He served as an Oregon State Representative from 2009 to 2015; before that he was a member of the Roseburg City Council for five years. Freeman has held a CHL in Oregon since 1995. Before the adoption of Measure 114, Freeman purchased a number of magazines capable of holding more than 10 rounds of ammunition. But for Measure 114, Freeman would acquire more in the future.

23.     Plaintiff Mazama Sporting Goods ("Mazama"), dba of Sitatunga Services, LLC, is a family-owned sporting goods store that sells firearms, fishing gear, and related products, including ammunition and magazines. Mazama has only one location, in Eugene, Oregon.

24.     Plaintiff National Shooting Sports Foundation ("NSSF") is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut. It is the trade association for the firearm, ammunition, and hunting and shooting sports industry. It has a membership of more than 10,000 individuals and entities, including manufacturers, distributors,

and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States. NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage. NSSF is authorized by its board of directors to bring this action on its members' behalf, in light of the injuries Measure 114 is causing and will cause NSSF members if allowed to take effect.

25. Plaintiff Oregon State Shooting Association ("OSSA") is an Oregon not-for-profit corporation. Its principal place of business is 12210 SW Main Street, Portland, Oregon 97223. OSSA's organizational objectives include promoting, in every lawful way, all types of legal firearms activities in the State of Oregon; raising the general proficiency in the use of firearms; supporting the Second Amendment to the Constitution of the United States; educationally imparting to the citizens of good repute a better knowledge in the safe handling and proper care of firearms; encouraging the sport of competitive marksmanship and target shooting; and coordinating and encouraging efforts of member clubs and individuals in the field of firearm safety, marksmanship training and all types of recreational shooting.

26. Defendant Ellen F. Rosenblum is the Attorney General of Oregon. She is "the chief law officer for the state and all its departments." Or. Rev. Stat. §180.210. Attorney General Rosenblum is a resident of Oregon, and her principal place of business is 1162 Court Street NE, Salem, Oregon. At all relevant times, Attorney General Rosenblum, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

27. Defendant Terri Davie is the Superintendent of the Oregon State Police ("OSP"). As Superintendent, Davie is "the executive and administrative head of the" OSP, Or. Rev. Stat. §181A.030, which is "charged with the enforcement of … all criminal laws," including by "institut[ing] criminal proceedings," *id.* §181A.080(1)(a), (2)(c). Superintended Davie is a resident of Oregon, and her principal place of business is 3565 Trelstad Avenue SE, Salem, Oregon 97317. At all relevant times, Superintendent Davies, as well as those subject to her supervision, direction, or control, are and will be acting under color of law.

## BACKGROUND

**Oregon Enacts One of the Strictest Gun Laws in the Country—Measure 114—Adding a Duplicative "Permit to Purchase" Regime and Banning "Large Capacity" Magazines.**

28. In June of this year, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen.* *Bruen* confirmed that the Second Amendment means what it says—it confers an individual right "to keep and bear Arms," whether inside or outside of the home—and reiterated that this guarantee is no "second-class right" subject to a unique set of rules or available only to those with "special need" to exercise it. 142 S.Ct. at 2134-35, 2156. The Court also went out of its way to explicate the proper analysis courts must undertake when evaluating laws that impose burdens on Second Amendment rights:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

29.     In short, under Supreme Court precedent, a state law that burdens the right to keep and bear arms is unconstitutional unless the government can "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127; *see also id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").

30.     Not long after *Bruen*, advocates in Oregon proposed Measure 114. Measure 114 turns the *Bruen* decision on its head and adds some of the very restrictions the Supreme Court had just signaled run afoul of the Constitution, including a firearm permitting regime that is shall-issue in name only and that will result in at least weekslong delays in the very best of circumstances, a as well as a flat ban on commonplace arms.

31.     Despite these infirmities, Oregon voters approved Measure 114 by a narrow margin on November 8, 2022. *See Ballot Measures: Measure 114*, Oregonian, https://bit.ly/3U2ZOz4 (last visited Nov. 28, 2022) (50.7% supporting (969,215 votes) versus 49.3% opposed (942,161 votes)); Lillian Mongeau Hughes, *Oregon Gun Access Measure Narrowly Passes, Bringing Joy and Sadness*, OPB (Nov. 11, 2022), https://bit.ly/3F2CoFQ.

32.     As of the date of this filing, the final vote tally has not yet been certified.

**Measure 114 Erects a Kafkaesque Permitting Regime.**

33.     Under Measure 114, an individual cannot lawfully acquire a firearm without a "permit-to-purchase." Such a permit is always required for an individual to acquire a firearm, whether via a commercial purchase from a licensed gun dealer, §6(2)(a), (2)(d), (3)(c); in a private transfer from one individual to another, §7(3)(a), (3)(d)(B); or at a gun show, §§8(2), 9(2).

34.     To obtain a "permit-to-purchase," an individual must apply to a "county sheriff or police chief which jurisdiction over the [applicant's] residence," §4(1)(a), and pay the required fee,

§4(3)(b).  Before she can do that, however, she must complete a "firearms training course." §4(1)(b)(D).  That sounds straightforward, but it is not.  Oregon does not provide these courses itself; instead, it expects individuals to obtain training from private instructors (at their own cost). *See* §4(8)(a).  And not just any training course will suffice; to qualify under Measure 114, a training course must cover federal and state firearms law; safe use, transportation, and storage; and the prevention of firearms abuse, §4(8)(c)(A)-(C); include an "in-person demonstration" of proficiency with a firearm, §4(8)(c)(D); and "utilize[e] instructors certified by a law enforcement agency," §4(8)(a).  Most existing safety courses do not contain live components, so the new law anticipates that individuals may need to take (and pay for) two courses.  *See* §4(8)(c)(D).

35.    If an applicant makes it through these hoops, she must then submit to fingerprinting and photographing by the sheriff or police chief, who then asks DSP to conduct a complete criminal background check.  §4(1)(e).

36.    Unlike under federal law, which allows licensed dealers to transfer firearms if they "contact[] the national instant criminal background check system established under [federal law]" for a customer but do not receive "noti[ce]" from the system within "3 business days" that "the receipt of a firearm by such [customer] would violate [federal], or State, local, or Tribal law," 18 U.S.C. §922(t)(1)(B)(ii), Measure 114 imposes no time constraint on DSP's investigation, and it creates no mechanism to force DSP to act.  *Cf.* §§6(3)(b), 7(3)(d)(B).

37.    And the discretion and delay do not stop there.  By agreeing to complete the background check, an individual invites a fishing expedition:  The sheriff or police chief can demand "any additional information determined necessary by department rules."  §4(1)(c).  On top of that, the sheriff or police chief retains discretion to exercise on-the-spot judgment about whether to deny a permit, *even if the applicant passes the background check*.  §§4(1)(b)(C), 5(2).

38.     If an individual runs that gauntlet and secures a "permit-to-purchase," the process still is not over.  That is because "[a] permit-to-purchase issued under this section *does not create any right of the permit holder to receive a firearm*."  §4(6)(a) (emphasis added).  If an individual comes to a licensed gun dealer with a "permit-to-purchase" in hand, the process essentially starts all over again.  The dealer must take her thumbprint, §§6(2)(c), 10(a), 11; verify that her permit is, in fact, valid by cross-referencing a state database, §6(2)(d); and, finally, ask DSP to perform *another* background check and assign a "unique approval number" if the individual passes, §6(2)(d).  The dealer cannot transfer the firearm until DSP gives the green light, and—again— there is no time limit for DSP to act.  The same duplicative hurdles apply at gun shows.  *See* §§8(2), 9(2).  And private individuals seeking to transfer a firearm between themselves in a non-commercial setting may not do so on their own *at all*; they must appear in person before a licensed gun dealer, where the transferee must present a permit-to-purchase—but, once again, the dealer must ask DSP to conduct another background check and await a "unique approval number"; and if the results are delayed or unknown, the transfer is off.  §7(3)(a), (3)(c), (3)(d)(A), (3)(d)(B).

**Measure 114 Makes it a Crime to Possess, Sell, or Manufacture Commonplace Arms.**

39.     Measure 114 imposes a blanket ban on any magazine capable of holding more than 10 rounds of ammunition.

40.     A firearm magazine is a device that stores ammunition.  It is a critical part of delivering a loaded cartridge to the firing chamber for discharge of a projectile.

41.     Americans, including Oregonians, own hundreds of millions of magazines.  And "approximately half of all privately owned magazines in the United States"—roughly 115 million in total—are capable of holding more than 10 rounds of ammunition.  *Duncan*, 19 F.4th at 1097.

42.     Measure 114 nonetheless bans all of these commonplace arms, which it dubs "large-capacity magazines."  *See* §11(d) (defining "'Large-capacity magazine'" as "a fixed or detachable

magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload").

43.     Measure 114 makes it a "crime" for any "person" to "manufacture, import[], possess[], use, purchase, s[ell] or otherwise transfer[] … in Oregon on or after the effective date of this 2022 Act" any such "large-capacity magazine." §11(2); *see also* §11(f) (defining "Person" as "any natural person, corporation, partnership, fire [sic] or association").

44.     The new crime that Measure 114 creates is punishable by up to 364 days in prison and a $6,250 fine, for each offense. *See* §11(6) (classifying the new crime as "a class A misdemeanor"); Or. Rev. Stat. §161.615(1) (setting the maximum prison sentence for class A misdemeanors at 364 days); Or. Rev. Stat. §161.635(1)(a) (setting the maximum fine for class A misdemeanors at $6,250).

45.     Measure 114 gives certain classes of persons a 180-day grace period to come into compliance—by dispossessing, altering, or destroying their lawfully acquired property.

46.     "A licensed gun dealer" that currently possesses "large-capacity magazines" in its stores and warehouses (which is literally all licensed gun dealers) can avoid committing a "crime" under Measure 114 only if, "within 180 days of the effective date of this 2022 Act," it:

> (A) Transfers or sells the large-capacity magazines in the gun dealer's inventory to a non-resident gun dealer or other transferee outside of this state;
>
> (B) Purchases or acquires temporary custody from an owner of any large-capacity magazine for permanent removal from this state within the 180 days of the effective date of this 2022 Act;
>
> (C) Permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a [sic]; or

(D) Permanently disposes of the large-capacity magazines in the gun dealer's custody or inventory.

§11(3)(a). In other words, a licensed gun dealer in Oregon can avoid criminal liability only by sending its "large-capacity magazines" out of state, rendering them inoperable (and thus unsalable), or dispossessing itself of them altogether. And come next June (180 days from December 8, 2022), even those options will be off the table.

47. The dynamic is similar for manufacturers. A "properly licensed" "firearms manufacturer" that "on the effective date of this 2022 Act" (*i.e.*, December 8, 2022) has "a contract … with an entity outside of this state[] for the manufacture of large-capacity magazines" can avoid committing a "crime" under Measure 114 only if:

(A) All manufacturing is completed no later than 180 days after the effective date of this 2022 Act; and

(B) The entity outside of Oregon receiving the large-capacity magazines is made aware in writing on or before the delivery of the ammunition devices of the restrictions pertaining to large-capacity magazines in this state as set forth in this 2022 Act.

§11(3)(b). There is no grace period for orders that cannot be completed before next June.

48. Measure 114's new "crime" does not apply to a "properly licensed" "firearms manufacturer" that "manufactures large-capacity magazines" "for exclusive sale or transfer to the Armed Forces of the United States or a law enforcement agency and solely for authorized use by that entity related to the official duties of the entity," but only if the manufacturer from now on "include[s] a permanent stamp or marking indicating that the large-capacity magazine was manufactured or assembled after the effective date of this 2022 Act" that is "legibly and conspicuously engraved or cast upon the outer surface of the large-capacity magazine." §11(4); *see also* §11(4)(a)(B) ("Except as provided in paragraph (3)(b) of this section"—which gives a 180-day grace period to manufacturers with a "contract … with an entity outside of this state, for

the manufacture of large-capacity magazines"—"no large-capacity magazines without such stamp may be manufactured in this state after the effective date of this Act.").  The same is true for "[a] licensed gun dealer that sells or otherwise transfers "large-capacity magazines" to the Armed Forces of the United States or a law enforcement agency solely for authorized use by that entity," but only if "the large-capacity magazines" in question "have been" "permanent[ly]," "legibly[,] and conspicuously" "engraved or cast upon" to "indicat[e] that the large-capacity magazine was manufactured or assembled after the effective date of this 2022 Act."  §11(4)(b), (4)(a)(B).

49.    Measure 114's new "crime" also does not apply to "[a]ny government officer, agent or employee, member of the Armed Forces of the United States or peace officer, as that term is defined in ORS §133.005, that is authorized to acquire, possess or use a large-capacity magazine provided that any acquisition, possession or use is related directly to activities within the scope of that person's official duties."  §11(4)(c).

50.    Measure 114 provides "an affirmative defense" to its new "crime," but it relies on a supposed provision of Oregon law that does not exist.  "As of the effective date of this 2022 Act, it shall be an affirmative defense, as provided in ORS 166.055, to the unlawful possession, use and transfer of a "large-capacity magazine in this state by any person, provided that":

(a) The large-capacity magazine was owned by the person before the effective date of this 2022 Act and maintained in the person's control or possession; or

(b) The possession of a large-capacity magazine was obtained by a person who, on or after the effective date of this section, acquired possession of the large-capacity magazine by operation of law upon the death of a former owner who was in legal possession of the large-capacity magazine; and

(c) In addition to either (a) or (b) of this subsection[,] the owner has not maintained the large-capacity magazine in a manner other than:

(A) On property owned or immediately controlled by the registered owner;

(B) On the premises of a gun dealer or gunsmith licensed under 18 U.S.C. 923 for the purpose of lawful service or repair;

(C) While engaging in the legal use of the large-capacity magazine, at a public or private shooting range or shooting gallery or for recreational activities such as hunting, to the extent permitted under state law; or

(D) While participating in firearms competition or exhibition, display or educational project about firearms sponsored, conducted by, approved or under the auspices of a law enforcement agency or a national or state-recognized entity that fosters proficiency in firearms use or promotes firearms education; and

(E) While transporting any large-capacity magazines in a vehicle to one of the locations authorized in paragraphs (c)(A) to (D) of this subsection, the large-capacity magazine is not inserted into the firearm and is locked in a separate container.

(d) The person has permanently and voluntarily relinquished the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement, prior to commencement of prosecution by arrest, citation or a formal charge.

§11(5).

51.     This provision relies on "ORS 166.055," but there is no such provision.  The proponents of the Measure likely meant to refer to §16*1*.055.  *See* Or. Rev. Stat. §161.055(b) ("When a defense, declared to be an 'affirmative defense' by chapter 743, Oregon Laws 1971, is raised at a trial, the defendant has the burden of proving the defense by a preponderance of the evidence.").

52.     That problem aside, this provision apparently gives individuals who lawfully acquired a now-prohibited magazine before Measure 114's effective date three ways to avoid criminal liability.  First, the individual can "permanently and voluntarily relinquish[] the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement."  §11(5)(a), (d).  In other words, she can give it away.  Second, the individual can keep the magazine on her property and never take it anywhere else.  §11(5)(a), (c)(A).  Third, if the individual wants to take the magazine off her property, she can do so only if she "transport[s]" it "not inserted into the firearm and … locked in a separate container" and only if she goes to

certain enumerated places for certain enumerated purposes: "the premises of a gun dealer or gunsmith licensed under 18 U.S.C. 923 for the purpose of lawful service or repair"; "a public or private shooting range or shooting gallery"; out "hunting, to the extent permitted under state law"; or a "firearms competition or exhibition, display or educational project about firearms sponsored, conducted by, approved or under the auspices of a law enforcement agency or a national or state-recognized entity that fosters proficiency in firearms use or promotes firearms education." §11(5)(a), (5)(c)(B)-(E).

53.    Otherwise, the new law mandates confiscation of covered magazines even from those who already lawfully purchased them before Measure 114 was enacted.

**Oregon Rushes to Implement Measure 114, Heedless of the Burdens it Will Impose on Individuals' Constitutional Rights.**

54.    When Measure 114 initially passed, "[s]upporters of the initiative claim[ed] there will be plenty of time, potentially even months, for lawmakers and law-enforcement officials to work out the details." Stephen Gutowski, *Oregon Gun-Control Initiative Faces Immediate Legal Peril After Slim Victory*, The Reload (Nov. 15, 2022), https://bit.ly/3tWCMzh.

55.    That claim was essential given the many respects in which Measure 114 requires new mechanisms for successful implementation. For example, the law contemplates the need for sheriffs and police chiefs to "adopt rules to carry out the provisions of this section," §4(9), including by developing "department rules" relating to mandatory disclosures, §4(1)(c). The DSP, meanwhile, is tasked with developing the forms necessary for individuals to apply for permits and for sheriffs and police chiefs to issue them. §4(4)(a)(A)-(B). Measure 114 likewise tasks the DSP with creating an entirely new database that "ensur[es] that new permits are added to the database, renewed permits are assigned a new expiration date, and expired or revoked permits are marked expired or revoked but retained in the database." §4(5)(b). Regulated parties must consistently

cross-check that database to comply with the law. *See, e.g.*, §§6(2)(d), 8(2). Then, of course, there is the requirement that DSP create an entirely new background-check system from scratch. *See, e.g.*, §7(3)(d)(B). Finally, there is the need for private entities to develop training courses—and have these courses approved by the police—that comply with the law's stringent demands.

56. But then the Oregon Secretary of States dialed things up. The effective date for the law is now *December 8, 2022*—even though the final votes still have not even been certified. *See* Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect Even Sooner, State Says*, The Oregonian (Nov. 18, 2022), https://bit.ly/3GINalU.

57. The risk that this haste will result in confusion or downright abuse, thereby magnifying the already-extreme burdens inflicted on individuals' Second Amendment rights, is no mere speculation. Press reports document that Measure 114 has already caused "an increased state police backlog in processing the requested background checks and customers waiting longer to walk out of a store with a firearm, according to state police and gun shop owners. The number of people waiting for state police approval on background checks also has doubled in the last two weeks, from 10,000 to about 20,000, as voters cast ballots on one of the nation's strictest gun control measures." Maxine Bernstein, *Oregon Gun Sales Skyrocket After Measure 114 Passes*, The Oregonian (Nov. 16, 2022), https://bit.ly/3TSh0ar. As one sheriff put it, "I do not have the personnel to attempt to permit every gun purchase in Jefferson County." Letter from Jason Pollock, Jefferson County Sheriff's Office (Nov. 13, 2022), https://bit.ly/3u5mVi2.

58. The sheer difficulty posed by processing large numbers of applications likely also explains why "[t]here are virtually no facilities that will be available for [firearms] training"— namely, because "no police have the facilities or manpower to provide classes." *Measure 114 ...*

*Dangerous, Mislead, Extreme*, https://stop114.com/ (last visited Nov. 29, 2022) (noting that the new permitting process could cost local police more than $50 million in the first year alone).

59.     These obvious obstacles to implementing Measure 114 in anything approaching a responsible manner will invariably harm protected activity.  On its face, the law already bakes in delay, discretion, and exorbitant costs by design.  But the near total lack of means to comply with the law when it becomes effective next week—and hence has the capacity to prevent individuals from even *acquiring* the firearms that the Constitution entitles them to keep and bear—is a classic illustration of a licensing regime "put toward abusive ends."  *Bruen*, 142 S.Ct. at 2138 n.9.

60.     Oregon's intrusion on Second Amendment rights is, as one firearms advocacy group put it, "insane even by Oregon standards."  Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect Even Sooner, State Says*, *supra*.  Indeed, some Oregon District Attorneys—in Linn, Jefferson, Wallowa, and Union Counties—have announced that they will not even enforce the law.  *See, e.g.*, Ltr. from Sheriff Brad Lohrey, Sherman County Sheriff's Office (Oct. 16, 2022), https://bit.ly/3i3DNTn; Ltr. from Sheriff Michelle Duncan, Linn County Sheriff's Office, Facebook (Nov. 9, 2022), https://bit.ly/3gyqyJW; Steele Haugen, *Central Oregon Sheriff Says He Won't Enforce Measure 114*, Cent. Or. Daily News (Nov. 14, 2022), https://bit.ly/3gDjvjb.

61.     But licensed dealers, like Plaintiff Mazama and many of Plaintiff NSSF's members in Oregon, have no luxury to ignore Measure 114.  They cannot lawfully sell any firearm without a permit-to-purchase, and a permit-to-purchase depends on the state police.  And the state's decision to press full steam ahead with an early effective date—even while the mechanisms necessary to enable compliance with the law remain wholly absent—lays to rest any suggestion that Oregon does not actually intend to enforce Measure 114 post haste.

## JURISDICTION AND VENUE

62.     Plaintiffs' causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

63.     This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

64.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendants are located in and perform their official duties in the District of Oregon and are therefore considered to reside within this District as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Second Amendment — "Permit-to-Purchase" Regime)

65.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

66.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125.

67.     On its face, Oregon's new permit-to-purchase law restricts a person's ability "to purchase or acquire a firearm." §3(4); *see id.* §§4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2).

68.     Because the Second Amendment plainly entitles the people to acquire the firearms that it guarantees them the right to keep and bear, Measure 114 treads on ground "presumptively protect[ed]" by the Constitution, and Oregon "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S.Ct. at 2126.

69.     Oregon cannot do so because there is no "well-established and representative historical analogue" of the new permit-to-purchase regime.  *Id.* at 2140.

70.     Only six states have ever had a permit-to-purchase for any substantial period of time—and all of those came in the twentieth century:  New York (1911), Oregon (1913, repealed 1925), North Carolina (1919), Missouri (1921, repealed 2007), Connecticut (1923), Michigan (1927, partially repealed by several steps in early twenty-first century), Hawaii (1927), New Jersey (1927), and Texas (1931, later declared void).  *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021).  As the Supreme Court made crystal clear in *Bruen*, laws enacted for the first time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]."  *Bruen*, 142 S.Ct. at 2137 (alteration in original) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting reliance even on "a handful of late-19th-century [laws]" similar to the challenged restriction).

71.     To be sure, a *traditional*, purely objective and time-limited background-check regime may be consistent with the right to keep and bear arms.  *See Bruen*, 142 S.Ct. at 2138 & n.9; *McDonald v. Chicago*, 561 U.S. 742, 786 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008).  But the Supreme Court recently went out of its way to underscore that the Second Amendment does not countenance "regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."  *Bruen*, 142 S.Ct. at 2138 n.9.

72.     Measure 114 ticks all of these problematic boxes and more.  It gives "licensing officials" discretion to "exercise … judgment"; it allows the application or verification process to create "lengthy" delays; and it imposes "exorbitant" fees and costs.  *Id.*

73.     First, the new law affords officials discretion unbecoming a proper "shall issue" regime—namely, DSP may demand "any additional information" it wants before deciding whether to issue the permit.  §4(1)(c), (2)(c).  This opens unbounded discretion for the department to add additional criteria for the permit to issue.  Indeed, the new law contemplates that the sheriff or police chief may deny a permit both before an individual applies, *see* §4(1)(b)(C), *and after*—that is, even if DSP determines that the applicant passes the state's new background check, the sheriff or police chief can still deny the permit application, *see* §5(2).  Such unbounded discretion means that Measure 114 operates functionally as a constitutionally impermissible may-issue, rather than a valid shall-issue, regime, with licensing agents free to make their own judgments about who seems "reasonably likely" to misuse one.

74.     Second, delay is baked into the new regime.  Under Measure 114, there is no limit on how long DSP can take to complete the background check.  *See generally* §4.  Nor are there penalties if the State Police fail to complete the check.  That means that DSP can delay completion of the background check, and thus the issuance of a permit, indefinitely.  And such delays are inevitable given Oregon's plans to rush implementation of the law before any of the necessary infrastructure can even be put in place—not to mention the fact that there is an approximately $70 million shortfall between the anticipated annual cost of administering the system and the revenue currently provided to do so.  And even if an applicant were to successfully run this veritable gauntlet and convince the state to issue a permit, Measure 114 gives DSP a 30-day clock to do so.  That 30-day deadline for issuance of the permit when (or if) the background check is

completed and passed, *see* §4(3)(a), is unconstitutionally long all by itself. *Cf.* 18 U.S.C. §922(t)(1)(B)(ii) (deeming four days too long to force law-abiding citizens to wait).

75. Third, Oregon's regime creates significant costs and barriers to compliance. Oregon may suggest that the sticker price is just $65 for the first license and then $50 to renew every five years thereafter. But that masks other costs embedded in the regime. Those amounts, after all, cover only the license fee. They do not account for the price an applicant must pay to complete a safety course and then live-fire training. *See* §§4(1)(a)(D), (8)(c)(D). And while Oregon may argue that no one yet knows exactly what those expenditures will be, that just underscores the problem. While Measure 114 requires classes, it makes no provision for offering such classes itself, and the state has not yet certified any privately offered classes. Oregon has thus tasked law-abiding individuals with paying unknown amounts for non-existent courses, and all just to exercise a fundamental constitutional right.

76. Finally, and compounding all the other constitutional concerns, the state is rushing to implement Measure 114 before it has set up the systems by which it can be administered. The law's effective date is currently December 8, 2022, but Oregon has not yet even provided the necessary funding for, let alone set up the systems required to administer its new and onerous permitting scheme. As of right now, there is no firearms training course that has been certified by the state, which means that no one can lawfully obtain a permit-to-purchase. Even if there were approved courses, moreover, the DSP has not put in place the background check system necessary to process applications, which (again) means that no one can lawfully obtain a permit-to-purchase. When it comes down to it, to purchase a firearm in Oregon, a citizen will need to comply with a regime that does not exist.

77.     None of that is remotely consistent with the Second Amendment.  Oregon's regime marks a radical departure even from the most restrictive state regimes in place today.  That is not owing to some "dramatic technological change[]" or "unprecedented societal concern."  *Bruen*, 142 S.Ct. at 2132.  As the Supreme Court articulated just this past June, there is nothing remotely novel about the concern that firearms might fall into the wrong hands, and background-check regimes have been used to address that concern for decades.  *See id.* at 2156.  The only thing novel here is Oregon's attempt to use a not-so-thinly-veiled "permitting" regime to frustrate the ability of law-abiding citizens to obtain the arms that the Constitution guarantees them the right to keep and bear.

78.     Oregon's permit-to-purchase regime violates the Second Amendment.

## COUNT TWO
### (Due Process Clause — "Permit-to-Purchase" Regime)

79.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

80.     The Due Process Clause protects against arbitrary government action, especially when the result of that arbitrary government action is to deprive individuals of the ability to exercise a fundamental substantive right secured by the Constitution.

81.     As things stand now, when Measure 114 takes effect on December 8, 2022, it will be impossible to comply with the new law.  Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme.  No training courses are approved. And DSP has no background check system in place.  Add it all up, and Oregon will soon require Oregonians looking to purchase a firearm to comply with a regime that does not exist and cannot be satisfied.  That is the very definition of arbitrary government action in violation of due process.

**COUNT THREE**
**(Second Amendment — Magazine Ban)**

82.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

83.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125.

84.     The Supreme Court has made clear that when a court confronts a flat ban on possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.  If the answer is "yes," then the ban is unconstitutional, because a state cannot prohibit ordinary law-abiding Americans from possessing what the Constitution explicitly entitles them to "keep."  *See* U.S. Const. amend. II.

85.     The magazines that Measure 114 bans are indisputably "arms" within the meaning of the Second Amendment.  The right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate.  *See Miller*, 307 U.S. at 180 (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition").  As the Ninth Circuit has put it, "without bullets, the right to bear arms would be meaningless." *Jackson*, 746 F.3d at 967.

86.     The magazines that Measure 114 bans are also indisputably in "common use" today. *See Heller*, 553 U.S. at 624-25 (the "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" today).  That is not a close call. As noted, magazines capable of holding more than 10 rounds come standard with many of the most popular handguns and long guns on the market; Americans own roughly 115 million of them; and they account today for "approximately half of all privately owned magazines in the United

States." *Duncan,* 19 F.4th at 1097. Millions of Americans own hundreds of millions of these magazines for lawful purposes, including self-defense, sporting, and hunting.

87.   Because magazines capable of holding more than 10 rounds are arms in common use, they are protected by the Second Amendment, full stop, *Bruen*, 142 S.Ct. at 2134, rendering Oregon's effort to ban them blatantly unconstitutional.

88.   At a bare minimum, such arms are "presumptively protect[ed]" by the Second Amendment, so Oregon would have to "affirmatively prove that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126.

89.   Oregon cannot come close to making that showing. There were no restrictions on firing or magazine capacity when either the Second Amendment or the Fourteenth Amendment was ratified. The first state to restrict magazine capacity did not do so until *1990*, and laws enacted for the first time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]." *Id.* at 2137 (alteration in original) (quoting *Sprint*, 554 U.S. at 312 (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]").

90.   Indeed, Oregon cannot even identify a "well-established" tradition of restricting magazine capacity *today*. *Id.* at 2133. Only a handful of jurisdictions have laws analogous to Measure 114's flat ban on possessing magazines capable of holding 10 or more rounds. As for the federal government, it did not restrict magazine capacity until 1994—and Congress allowed that law to expire in 2004 after a study by the Department of Justice revealed that the law had produced "no discernable reduction" in gun violence. Christopher S. Koper et al., U.S. Dep't of Justice, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice* 96 (2004), https://bit.ly/3wUdGRE.

91.     The absence of historical laws restricting firing capacity is not the result of some "dramatic technological change[]" that came about in the past few decades or some "unprecedented societal concern[]" that did not exist until 1990.  *Bruen*, 142 S.Ct. at 2132. Firearms capable of firing more than 10 rounds long predate the Founding.  *See Duncan*, 970 F.3d at 1147.  They were marketed to and bought by civilians from the start.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. of N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, C.J. dissenting). Indeed, the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market.  *Duncan*, 970 F.3d at 1148.  In short, "magazines of more than ten rounds ha[ve] been well established in the mainstream of American gun ownership" for a very long time.  David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions,* 78 Alb. L. Rev. 849, 862 (2015).

92.     Defendants have not identified and cannot identify any "enduring American tradition of state regulation" forbidding the purchase and/or possession of magazines capable of holding more than 10 rounds by law-abiding citizens for lawful purposes.  *Bruen*, 142 S.Ct. at 2135.  Because Oregon cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127, the magazine ban unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

## COUNT FOUR
### (Takings Clause — Magazine Ban)

93.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

94.     The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (applying Takings Clause to the states).

95.     The Takings Clause protects against two kinds of governmental takings: (1) "physical appropriation[s]" of "interest[s] in property"; and (2) "restriction[s] on the use of property" (known as "regulatory takings"). *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015).

96.     A physical taking occurs whenever the government "dispossess[es] the owner" of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). That is true of both real property and personal property; the "categorical duty" the Takings Clause imposes applies "when [the government] takes your car, just as when it takes your home." *Horne*, 576 U.S. at 358; *see Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner."). It is true even if the dispossession arises from a regulation, rather than from the use of eminent domain: "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). And it is true, finally, even when the government-authorized "invasion" is only partial. *Id.* at 2072.

97.     Oregon's confiscatory ban plainly runs afoul of these settled principles. The new law makes it a crime for licensed gun dealers to continue to possess in Oregon magazines that they lawfully acquired and that, but for the new law, they would lawfully sell to law-abiding citizens.

98.     "A licensed gun dealer" that currently possesses "large-capacity magazines" in Oregon can avoid committing a "crime" under Measure 114 only if, "within 180 days of the effective date of this 2022 Act," it:

(A) Transfers or sells the large-capacity magazines in the gun dealer's inventory to a non-resident gun dealer or other transferee outside of this state;

(B) Purchases or acquires temporary custody from an owner of any large-capacity magazine for permanent removal from this state within the 180 days of the effective date of this 2022 Act;

(C) Permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a [sic]; or

(D) Permanently disposes of the large-capacity magazines in the gun dealer's custody or inventory.

§11(3)(a). In other words, a licensed gun dealer in Oregon can avoid criminal liability only by sending its large-capacity magazines out of state, rendering its large-capacity magazines inoperable (and thus unsalable), or dispossessing itself of its large-capacity magazines altogether. And come June 7, 2023, not even those options will be on the table.

99.     By forcing licensed gun dealers to physically surrender, destroy, or send away their lawfully acquired property, Measure 114 effects a physical taking.

100.     Courts assess physical takings "using a simple, per se rule: The government must pay for what it takes." *Cedar Point*, 141 S.Ct. at 2071.

101.     Because Measure 114 offers no compensation for the lawfully acquired property it turns into unlawful contraband, it violates the Takings Clause.

102.     To the extent Measure 114 does not effect a physical taking, it effects an unconstitutional regulatory taking as to both dealers and manufacturers and individuals. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-39 (2005) (a regulation that "goes too far"—by, for example, depriving a property owner of economically beneficial use or otherwise "interfer[ing] with legitimate property interests"—also constitutes a taking that requires just compensation). But for Measure 114, these magazines would be salable and in demand (as evidenced by the fact that

Americans have purchased hundreds of millions of them and counting).  And but for Measure 114, individuals who already possess them would be able to continue putting them to all the same uses to which they put any other lawfully acquired and possessed arm.  Measure 114 has deprived them of the value they had when they were lawfully acquired.

### COUNT FIVE
### (Due Process Clause — Magazine Ban)

103.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

104.    Under the Due Process Clause, U.S. Const. amend. XIV §1 cl. 4, the government may deprive individuals of their property only when doing so furthers a "legitimate governmental objective."  *Lingle*, 544 U.S. at 542.  Due process protections are particularly acute when a law applies retroactively to change the consequences of conduct that was lawful at the time.  *See E. Enters. v. Apfel*, 524 U.S. 498, 547-50 (1998) (Kennedy, J., concurring in part and dissenting in part).

105.    By making it a crime to continue to possess property that they lawfully acquired, Measure 114 deprives persons of protected property interests without due process of law, as prohibiting the possession and full use of lawfully acquired and commonly owned magazines based solely on their ability to accept more than 10 rounds does not further a "legitimate governmental objective" in a permissible way.  *Lingle*, 544 U.S. at 542.

106.    For largely the same reasons that it violates the Takings Clause, Measure 114's confiscatory ban violates the Due Process Clause.

107.    Moreover, Measure 114 violates law-abiding citizens' due process rights by treating all magazines capable of holding more than 10 rounds of ammunition as contraband even if individuals lawfully acquired them, and by requiring individuals who lawfully acquired such products to "affirmative[ly] defen[d]" themselves in a criminal prosecution.  §11(2), (5).

## PRAYER FOR RELIEF

Plaintiffs pray for the following relief from the Court:

1.  a declaratory judgment under 28 U.S.C. §2201 that Oregon Measure 114 is unconstitutional;

2.  a temporary injunction enjoining Defendants and their officers, agents, and employees from enforcing Oregon Measure 114 against Plaintiffs and their members;

3.  a permanent injunction enjoining Defendants and their officers, agents, and employees from enforcing Oregon Measure 114 against Plaintiffs and their members;

4.  any attorneys' fees, costs, and expenses to which Plaintiffs may be entitled by law;

5.  nominal damages; and

6.  any further relief the Court deems just and proper.


DATED: December 1, 2022

Respectfully submitted,

Paul D. Clement[*]
Erin E. Murphy[*]
Matthew D. Rowen[*]
Trevor W. Ezell[*]
Nicholas M. Gallagher[*]
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

s/ Shawn M. Lindsay
Shawn M. Lindsay (OR Bar #020695)
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
(503) 968-1475
shawn@jurislawyer.com

[*] *pro hac vice* application forthcoming

*Counsel for Plaintiffs*