Shawn M. Lindsay
shawn@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KATERINA B. EYRE, TIM FREEMAN, MAZAMA SPORTING GOODS, NATIONAL SHOOTING SPORTS FOUNDATION, and OREGON STATE SHOOTING ASSOCIATION,<br><br>               Plaintiffs,<br><br>   v.<br><br>ELLEN F. ROSENBLUM, Attorney General of Oregon, and TERRI DAVIE, Superintendent of the Oregon State Police,<br><br>               Defendants. | Case No. 3:22-cv-01862-IM<br><br>**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW**<br><br>**Request for Oral Argument**<br><br>**Expedited Hearing Requested**<br><br>**Telephonic Videoconferencing Argument Requested** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

EMERGENCY MOTION ........................................................................................................... 1

MEMORANDUM ...................................................................................................................... 1

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

JURISDICTION ........................................................................................................................ 8

ARGUMENT ............................................................................................................................ 8

I.      Plaintiffs Are Likely To Succeed On The Merits. .............................................................. 9

      A.      The Permit-to-Purchase Regime Is Unconstitutional. ........................................... 9

      B.      The Magazine Ban Is Unconstitutional. .............................................................. 16

II.     The Remaining Factors All Favor Injunctive Relief. ....................................................... 23

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.*,
974 F.3d 237 (3d Cir. 2020) ............................................................. 18

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016).......................................................................... 22

*Cal. Hosp. Ass'n v. Maxwell-Jolly*,
776 F.Supp.2d 1129 (E.D. Cal. 2011) ............................................. 24

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ............................................................. 8

*Cedar Point Nursery v. Hassid*,
141 S.Ct. 2063 (2021)................................................................. 19, 20

*Chi., Burlington & Quincy R.R. Co. v. City of Chicago*,
166 U.S. 226 (1897).......................................................................... 19

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010).......................................................................... 10

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998).......................................................................... 16

*Craig v. Boren*,
429 U.S. 190 (1976).......................................................................... 24

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................................................... 12, 16, 17

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014)........................................................... 24

*Drummond v. Robinson Twp.*,
9 F.4th 217, 224 (3d Cir. 2021)......................................................... 10

*Duncan v. Becerra*,
970 F.3d 1133 (9th Cir. 2020) ..................................................... 17, 18

*Duncan v. Bonta*,
19 F.4th 1087 (9th Cir. 2021)......................................................... 7, 17

*Duncan v. Bonta*,
49 F.4th 1228 (9th Cir. 2022)........................................................... 17

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998)................................................................ 21, 23

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ...................................................... 10

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015)................................................................ 19, 20

*Jackson v. City & Cnty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ...................................................... 16

*Konigsberg v. State Bar of Cal.*,
  366 U.S. 36 (1961).................................................................. 9

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005)................................................................. 21

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)................................................................. 19

*Luis v. United States*,
  578 U.S. 5 (2016)................................................................... 11

*Maryland Shall Issue, Inc. v. Hogan*,
  971 F.3d 199 (4th Cir. 2020) ...................................................... 24

*McCutcheon v. FEC*,
  572 U.S. 185 (2014)................................................................. 15

*McDonald v. Chicago*,
  561 U.S. 742 (2010)................................................................. 12

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ...................................................... 24

*Minneapolis Star Trib. Co. v. Commissioner*,
  460 U.S. 575 (1983)................................................................. 10

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  142 S.Ct. 2111 (2022) ........................................................ *passim*

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50 (1982).................................................................. 22

*Penn Cent. Transp. Co. v. City of N.Y.*,
  438 U.S. 104 (1978)................................................................. 23

*Planned Parenthood Arizona, Inc. v. Humble,*
  753 F.3d 905 (9th Cir. 2014) ........................................................ 24

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency,*
  561 F.2d 1327 (9th Cir. 1977) ................................................. 21, 22

*Rodriguez v. Robbins,*
  715 F.3d 1127 (9th Cir. 2013) ..................................................... 25

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  141 S.Ct. 63 (2020) ....................................................................... 8

*Schad v. Borough of Mount Ephraim,*
  452 U.S. 61 (1981) ....................................................................... 21

*Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
  535 U.S. 302 (2002) ..................................................................... 20

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,*
  554 U.S. 269 (2008) ............................................................... 11, 18

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ....................................................... 10

*Texaco, Inc. v. Short,*
  454 U.S. 516 (1982) ..................................................................... 16

*United States v. Knights,*
  534 U.S. 112 (2001) ..................................................................... 13

*United States v. Miller,*
  307 U.S. 174 (1939) ..................................................................... 17

*Usery v. Turner Elkhorn Mining Co.,*
  428 U.S. 1 (1976) ......................................................................... 22

**Constitutional Provisions**

U.S. Const. amend. II ............................................................... *passim*

U.S. Const. amend. V ..................................................................... 19

**Statutes**

18 U.S.C. §922(t)(1)(B)(ii) ....................................................... 4, 14

28 U.S.C. §1331 ............................................................................. 8

42 U.S.C. §1983 ............................................................................. 8

ORS 161.615(1) ................................................................................................. 8

ORS 161.635(1) ................................................................................................. 8

**Other Authorities**

Maxine Bernstein, *Oregon Gun Sales Skyrocket After Measure 114 Passes*, The
    Oregonian (Nov. 16, 2022), https://bit.ly/3TSh0ar ..................................... 6

Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect
    Even Sooner, State Says*, The Oregonian (Nov. 18, 2022),
    https://bit.ly/3GINalU ............................................................................. 6, 7

Dac Collins, *Oregon Prepares to Freeze Gun Sales in "De Facto Gun Ban,"*
    Outdoor Life (Nov. 23, 2022), https://bit.ly/3gBmQ2f............................... 7

Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System
    Misses the Mark of Constitutional Muster and Effectiveness*,
    99 N.C. L. Rev. 529 (2021)..................................................................... 11

Stephen Gutowski, *Oregon Gun-Control Initiative Faces Immediate Legal peril
    After Slim Victory*, The Reload (Nov. 15, 2022), https://bit.ly/3tWCMzh................................ 5

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History,
    and Policy*, 53 Harv. J. on Legis. 303 (2016) ....................................... 11

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
    78 Alb. L. Rev. 849 (2015) .................................................................... 18

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault
    Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to
    the Nat'l Inst. of Justice, U.S. Dep't of Justice* 96 (2004),
    https://bit.ly/3wUdGRE ......................................................................... 18

Letter from Jason Pollock, Jefferson County Sheriff's Office (Nov. 13, 2022),
    https://bit.ly/3u5mVi2 .............................................................................. 6

*Measure 114 ... Dangerous, Mislead, Extreme* (last visited Nov. 30, 2022),
    https://stop114.com/................................................................................. 6

J. Story, *Commentaries on the Constitution* (5th ed. 1891)......................... 23

Pursuant to LR 7-1(a)(1) and 65, counsel for plaintiffs has conferred with counsel for defendants through telephone conference to resolve the dispute and they have been unable to do so. Counsel for defendants opposes this motion. With respect to plaintiffs' request for expedited hearing, counsel for defendants wishes to address scheduling after the December 2, 2022, 10:00 a.m. hearing in related case 2:22-cv-01815-IM.

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 65 and District of Oregon Local Rules 7-4 and 65, Katerina B. Eyre, Tim Freeman, Mazama Sporting Goods, National Shooting Sports Foundation, and Oregon State Shooting Association (collectively, "Plaintiffs"), by and through their undersigned attorneys, will and hereby do move the Court for a Preliminary Injunction enjoining Ellen F. Rosenbaum, in her official capacity as Attorney General of Oregon, and Terri Davie, in her official capacity as Superintendent of the Oregon State Police (collectively, "Defendants"), as well as Defendants' officers, agents, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Court's Order granting Plaintiffs' Motion for Preliminary Injunction, from implementing or enforcing Oregon Ballot Measure 114 ("Changes to Firearm Ownership and Purchase Requirements Initiative") against Plaintiffs, their members, or their agents and licensees.

**MEMORANDUM**

**INTRODUCTION**

This fall, Oregon voters narrowly adopted Ballot Measure 114, the "Changes to Firearm Ownership and Purchase Requirements Initiative." Measure 114 is slated to take effect next week, on December 8, 2022. Absent an injunction before that date, Measure 114 will soon impose severe, irreparable, sweeping, and unconstitutional burdens on individuals seeking to exercise perhaps the

most basic right guaranteed by the Second Amendment:  the right to lawfully acquire a firearm.  And that is not all.  In addition to creating a Kafkaesque regime that makes it effectively impossible to buy or sell a firearm in Oregon, Measure 114 imposes a flat ban on magazines that hold more than 10 rounds of ammunition, even though millions of Americans own hundreds of millions of these arms for all manner of lawful purposes, including self-defense, sporting, and hunting.

Those problems are inherent in the new law, and they will compel invalidation on the merits at the end of the day.  But there is an unusually urgent need for preliminary injunctive relief here.  The state is rushing to implement Measure 114's new and onerous "permit-to-purchase" regime before the infrastructure necessary to operate that regime—with which individuals must comply to obtain a firearm—is even in place.  As a result, if Measure 114 is allowed to take effect next week, the law will not even operate as appears to have been intended, but instead will operate as a complete bar on gun acquisitions in Oregon.  There is simply no justification for exacerbating so egregiously the problems with a regime that could not pass constitutional muster even if implemented in a manner consistent with the promises its proponents made to secure voter support.

Preliminary injunctive relief is plainly appropriate, as the state is poised to imminently inflict irreparable constitutional injury even though Plaintiffs are overwhelmingly likely to succeed on the merits of their claims.  Measure 114 is profoundly out of step with our Nation's history and tradition of regulating firearms; it violates due process by erecting a permitting regime that is a necessary prerequisite to exercising a fundamental constitutional right but that no one can currently satisfy; and it violates the Takings Clause by requiring individuals and businesses to dispossess themselves of lawfully acquired property or face criminal liability.  The balance of equities and public interest support injunctive relief too, as enforcing an unconstitutional law is always contrary to the public interest, and a state and its officers suffer no cognizable harm by being enjoined from

enforcing such a law.  The Court should enjoin enforcement of Measure 114 forthwith and ensure

that law-abiding Oregonians will not be precluded from exercising their Second Amendment rights

on account of a law that is exceedingly unlikely to survive in the final analysis.

## BACKGROUND

Under Measure 114, an individual cannot lawfully acquire a firearm without a "permit-to-

purchase."  *See* §§6(2)(a), (2)(d), (3)(c), 7(3)(a), (3)(d)(B). 8(2), 9(2).  But individuals must run a

gauntlet before they can obtain the new permit—and when (or if) they finally get one, they are still

not entitled to acquire a firearm:  "A permit-to-purchase issued under this section does not create

any right of the permit holder to receive a firearm."  §4(6)(a).

The first step on the long, winding path to securing a permit-to-purchase is completing a

"firearms training course."  §4(1)(b)(D).  That sounds straightforward, but it is not.  Oregon does

not provide training courses, and Measure 114 does not require it to do so, or even contemplate

the possibility that it ever will.  The state instead apparently expects individuals to obtain training

privately, at their own expense.  And not just any course will suffice.  To secure the requisite state

approval, a course must, among other things, include an "in-person demonstration" of proficiency

with a firearm and "utiliz[e] instructors certified by a law enforcement agency."  §4(8)(a), (c)(D).

No course that satisfies those stringent requirements presently exists.  Yet only after an individual

manages to someday find and complete an approved course can she even submit an application for

a "permit-to-purchase."  To do so, she must appear in person and submit to fingerprinting and

photographing at her local sheriff's office or police station, where the sheriff or police chief can

demand "any additional information determined necessary by department rules" and can even deny

her application on the spot regardless of the results of the background check if he "conclude[s] that

[she] has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state." §4(1)(b)(C), (1)(c).

Satisfying the permit agent that one is not "a danger" is not the end of the process. Far from it. At that point, after collecting the application fee (which can run as high as $65), the sheriff or police chief must reach out to DSP to conduct a complete background check. §4(1)(e). Unlike federal law, however, *see* 18 U.S.C. §922(t)(1)(B)(ii), Measure 114 imposes no time constraint on DSP's investigation. And if DSP determines at the end of the day that an individual has passed the background check, it can wait another 30 days to issue the permit. §4(3)(a).

Delay is thus baked into the new regime. And so is discretion. Even if an individual passes the DSP background check, the sheriff or police chief to whom she initially applied for the permit retains discretion to exercise on-the-spot judgment about whether to deny the application. §5(2). To repeat: Even if an individual completed a valid training course, passed a background check, and paid the require fee, the permit agent can *still* deny the application—and thus prevent the individual from being able to lawfully obtain a firearm—based on his subjective judgment.

An individual who secures a "permit-to-purchase" despite all of the hurdles and discretion might think that she could now finally go to a licensed dealer and purchase the firearm that the Constitution entitles her to keep and bear. But she would be wrong. Once someone comes to a licensed dealer with a "permit-to-purchase" in hand, the process starts anew. The dealer must take her thumbprint, §§6(2)(c), 10(a), 11; verify that her "permit-to-purchase" is valid by cross-referencing a state database, §6(2)(d); and, finally, ask DSP to perform *another* background check, §6(2)(d). The dealer cannot transfer the firearm until DSP gives the green light, and—again—there is no time limit on DSP or mechanism to force it to act. The same duplicative hurdles apply at gun shows. *See* §§8(2), 9(2). And private parties seeking to transfer a firearm between them in

a non-commercial setting may not do so *at all*; they must appear in person before a licensed gun dealer, where the transferee must present a permit-to-purchase—but, once again, the dealer must ask DSP to conduct another background check and await a "unique approval number"; and if the results are delayed or unknown, the transfer is off. §7(3)(a), (3)(c), (3)(d)(A), (3)(d)(B).

When Measure 114 initially passed, "[s]upporters of the initiative claim[ed] there will be plenty of time, potentially even months, for lawmakers and law-enforcement officials to work out the details." Stephen Gutowski, *Oregon Gun-Control Initiative Faces Immediate Legal peril After Slim Victory*, The Reload (Nov. 15, 2022), https://bit.ly/3tWCMzh. That promise was essential given the many respects in which Measure 114 requires new mechanisms for successful implementation. For example, the law contemplates the need for sheriffs and police chiefs to "adopt rules to carry out the provisions of this section," §4(9), including by developing "department rules" relating to mandatory disclosures, §4(1)(c). DSP, meanwhile, is tasked with developing the forms necessary for individuals to apply for permits and for sheriffs and police chiefs to issue them. §4(4)(a)(A)-(B). Measure 114 likewise tasks DSP with creating an entirely new database that "ensur[es] that new permits are added to the database, renewed permits are assigned a new expiration date, and expired or revoked permits are marked expired or revoked but retained in the database." §4(5)(b). Regulated parties must consistently cross-check that database to comply with the law. *See, e.g.*, §§6(2)(d), 8(2). Then, of course, there is the requirement that DSP create an entirely new background-check system from scratch. *See, e.g.*, §7(3)(d)(B). Finally, there is the need for someone to develop training courses—and have these courses approved by the police—that comply with the law's stringent demands.

But then the Oregon Secretary of States dialed things up. Rather than wait for the necessary systems to be set up, the Secretary set the effective date for the law as *December 8, 2022*—barely

more than a week from the date of this filing, even though the final votes on Measure 114 still have not even been certified. *See* Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect Even Sooner, State Says*, The Oregonian (Nov. 18, 2022), https://bit.ly/3GINalU.

The risk that all this haste will inflict a multitude of burdens on Second Amendment rights is no mere speculation. Press reports document that Measure 114 has already caused "an increased state police backlog in processing the requested background checks and customers waiting longer to walk out of a store with a firearm, according to state police and gun shop owners. The number of people waiting for state police approval on background checks also has doubled in the last two weeks, from 10,000 to about 20,000, as voters cast ballots on one of the nation's strictest gun control measures." Maxine Bernstein, *Oregon Gun Sales Skyrocket After Measure 114 Passes*, The Oregonian (Nov. 16, 2022), https://bit.ly/3TSh0ar. As one sheriff put it, "I do not have the personnel to attempt to permit every gun purchase in Jefferson County." Letter from Jason Pollock, Jefferson County Sheriff's Office (Nov. 13, 2022), https://bit.ly/3u5mVi2. And the sheer difficulty of processing large numbers of applications likely also explains why "[t]here are virtually no facilities that will be available for [firearms] training": "[N]o police have the facilities or manpower to provide classes." *Measure 114 ... Dangerous, Mislead, Extreme* (last visited Nov. 30, 2022), https://stop114.com/ (noting permitting process could cost sheriffs $50 million per year).

The obvious obstacles to implementing Measure 114 in anything approaching a responsible manner will invariably harm constitutionally protected activity. On its face, the law bakes in delay and discretion by design. And the near total lack of means to comply with the state's new demands means that when the law takes effect just one week from now, *no one will be able to lawfully purchase a firearm in Oregon. See* Dac Collins, *Oregon Prepares to Freeze Gun Sales in "De*

*Facto Gun Ban,"* Outdoor Life (Nov. 23, 2022), https://bit.ly/3gBmQ2f ("Law enforcement leaders are telling local news outlets that *they expect all gun sales in the state to freeze* when a new ballot measure goes into effect early next month." (emphasis added)); *id.* ("The ballot measure … introduc[es] the Permit-to-Purchase program, which requires any person who wants to purchase a firearm to obtain a state-issued permit before doing so.… [But] the state is not currently prepared to issue these permits."). That is the definition of a licensing regime "put toward abusive ends." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2138 n.9 (2022). As one firearms advocacy group put it, Measure 114 is "insane even by Oregon standards." Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect Even Sooner, State Says*, The Oregonian (Nov. 18, 2022), https://bit.ly/3GINalU.

Remarkably, that is not even the only problematic component of Measure 114. In addition to creating a regime that effectively prohibits people from obtaining firearms, the law bans commonplace magazines and even confiscates them from those who lawfully obtained them.

Magazines that hold more than 10 rounds of ammunition are commonly owned by millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. These magazines have long come standard-issue with many of the most popular firearms on the market. Today, Americans own roughly 115 million of these magazines, accounting for "approximately half of all privately owned magazines in the United States." *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022).

Under Measure 114, however, magazines capable of holding more than 10 rounds will soon be contraband in Oregon. Measure 114 creates the brand-new "crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines." §11(2). This new crime is punishable by up to 364 days in prison and a $6,250 fine.

*See* 11(6) (classifying the new crime as "a class A misdemeanor"); ORS 161.615(1) (setting maximum prison sentence for class A misdemeanors); ORS 161.635(1)(a) (setting maximum fine for class A misdemeanors). Making matters worse, Measure 114 imposes criminal liability not only on individuals and businesses who use, sell, or manufacture such magazines, but on individuals and businesses who merely possess such magazines—even if the individual or business lawfully acquired them well before Measure 114 was proposed, let alone took effect.

## JURISDICTION

Plaintiffs challenge the validity of Oregon Ballot Measure 114 under 42 U.S.C. §1983 and the U.S. Constitution. This Court has jurisdiction under 28 U.S.C. §1331.

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs must demonstrate that they are "likely to prevail" on the merits of their claims, that denying an injunction "would lead to irreparable injury," and that "granting relief would not harm the public interest," so "the equities favor injunctive relief." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (per curiam); *id.* at 74 (Kavanaugh, J., concurring); *see also California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) ("Likelihood of success on the merits is the most important factor."). Each of those factors is readily satisfied here. Indeed, the unconstitutionality of Measure 114's Kafkaesque "permit-to-purchase" regime follows directly from the Supreme Court's recent decision in *Bruen*, which explicitly anticipated exactly the kind of "abusive" permitting regime that Oregon has created and made clear that such a regime would not pass Second Amendment muster. *Bruen*, 142 S.Ct. at 2138 n.9. *Bruen* likewise reiterated that the Second Amendment fully protects arms that are in "common use" today, *id.* at 2134, which suffices to invalidate Oregon's effort to ban ubiquitous magazines owned by millions upon millions of law-abiding citizens for all manner of lawful

purposes.  The rest of the preliminary injunction factors follow as a matter of course.  Precluding people from exercising constitutional rights inflicts irreparable injury per se, and the extraordinary haste with which the state has rushed Measure 114 into operation eliminates any doubt that the constitutional injury Plaintiffs and their members stand to suffer is imminent.  And the public interest does not favor enforcing blatantly unconstitutional laws—let alone forcing people to comply with new conditions on the exercise of a fundamental right before the means to do so are in place.  The Court should accordingly pause the state's reckless effort to impose Measure 114 before it has even established the infrastructure necessary to comply with its onerous demands, and ensure that law-abiding individuals are not precluded from acquiring the arms that the Second Amendment entitles them to keep and bear on account of a law that is exceedingly unlikely to survive constitutional scrutiny.

## I.    Plaintiffs Are Likely To Succeed On The Merits.

### A.    The Permit-to-Purchase Regime Is Unconstitutional.

In June of this year, the Supreme Court confirmed once and for all that the Second Amendment means what it says:  It confers an individual right "to keep and bear Arms," whether inside or outside of the home, and it is no "second-class right" subject to a uniquely pro-government set of rules or available only to those with "special need" to exercise it.  *Bruen*, 142 S.Ct. at 2134-35, 2156.  The Court also went out of its way to explicate the proper analysis courts must undertake when evaluating laws that impose burdens on Second Amendment rights:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  In short, under

Supreme Court precedent, a state law that burdens the right to keep and bear arms is unconstitutional unless the state can "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

The first question under *Bruen* is whether the conduct a challenged law burdens is covered by the Second Amendment. *Id.* at 2129-30. The answer here is obviously yes. On its face, Oregon's new permit-to-purchase law restricts an individual's ability "to purchase or acquire a firearm." §3(4); *see id.* §§4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2). The Second Amendment plainly covers the ability to acquire a firearm, just as it protects other predicate activities necessary to keep and bear a firearm for lawful purposes. *See, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."): *Drummond v. Robinson Twp.*, 9 F.4th 217, 224, 227-28 (3d Cir. 2021) (zoning rules barring for-profit shooting ranges and practice with center-fire ammunition); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (access to firing range for training).

That all accords with principles that apply in other areas of constitutional law. In the news media context, for example, the government cannot get around the First Amendment by saying that ink and paper are just predicates to the exercise of "the freedom … of the press." *Minneapolis Star Trib. Co. v. Commissioner*, 460 U.S. 575, 592-93 (1983) (state tax on ink and paper impermissibly burdened Press Clause freedoms). Nor can the government exempt restrictions on the expenditure of money from constitutional scrutiny by labeling them mere predicates to exercising "the freedom of speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336, 339 (2010) (restrictions on campaign contributions impermissibly burdened Speech Clause

freedoms). "Constitutional rights implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) (collecting examples). The Second Amendment likewise protects those "acts necessary to the[] exercise" of the right to keep and bear firearms, with none more essential than acquiring a firearm.

Because it imposes burdens on acts necessary to exercise Second Amendment rights, Measure 114 treads on ground "presumptively protect[ed]" by the Constitution. *Bruen*, 142 S.Ct. at 2126. That means Defendants "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Defendants cannot make such a showing.

Only six states had a permit-to-purchase for any substantial period of time—and all of those came in the twentieth century: New York (1911), Oregon (1913, later repealed), North Carolina (1919), Missouri (1921, later repealed), Connecticut (1923), Michigan (1927, later partially repealed), Hawaii (1927), New Jersey (1927), and Texas (1931, later declared void). *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021). That is far too little and far "too late to provide insight into the meaning of [the Constitution]." *Bruen*, 142 S.Ct. at 2137 (alteration in original) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting reliance on "a handful of late-19th-century [analogues]"). As *Bruen* made clear, the kind of historical tradition the government must prove to justify a burden on Second Amendment rights like Measure 114's is "an enduring American tradition of state regulation," not just a handful of laws in "outlier jurisdictions." *Id.* at 2155-56. A few modern laws from a few jurisdictions

hostile to Second Amendment rights does not "an enduring American tradition" make. *Id.* at 2140.[1]

Defendants may respond that Measure 114's permit-to-purchase regime does not facially prohibit anyone from obtaining a firearm. That is a non-sequitur, and it is flatly inconsistent with *Bruen*'s instructions. Whether a law is subject to Second Amendment scrutiny does not turn on how "severe" a burden it imposes on Second Amendment rights, with some burdens escaping any scrutiny at all. It turns on whether the plaintiff's "proposed course of conduct" is covered by "the plain text of the Second Amendment"—*i.e.*, whether the law burdens constitutionally protected conduct in any way. *Id.* at 2134. If it does, then the state must prove that "historical regulations impose[d] a comparable burden on the right of armed self-defense," both in terms of "how and why the regulations burden" the right. *Id.* at 2133. The state cannot short-circuit that analysis by observing that it has not yet prevented people from keeping or bearing arms altogether.

Defendants also may respond, as the state defendants did in their recently filed Response to Plaintiffs' Emergency Motion for Preliminary Injunction in Case No. 2:22-cv-01815-IM, that the Supreme Court has blessed background-check regimes and "shall-issue" permitting systems. To be sure, the Supreme Court noted in *Bruen* that a traditional, purely objective, and time-limited background-check regime may be consistent with the constitutional right to keep and bear arms. 142 S.Ct. at 2138 & n.9; *see also McDonald v. Chicago*, 561 U.S. 742, 786 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). But the types of regimes the Court suggested may pass muster look nothing like what Oregon has just enacted. Indeed, the Court went out of

---

[1] Even if these regimes were analogous to Measure 114's, that would not matter. *Bruen* made clear that reasoning by analogy is appropriate only when "unprecedented societal concerns or dramatic technological changes" make the search for a dead-ringer futile. 142 S.Ct. at 2132. That alone presents an insuperable obstacle for the state, as there is nothing novel or unique to the twenty-first century about the problem it claims it seeks to address.

its way in *Bruen* to underscore that the Second Amendment *does not countenance* "regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." 142 S.Ct. at 2138 n.9. Measure 114 ticks all of these problematic boxes and many more.

First, the new law affords discretion unbecoming a proper "shall issue" regime. Under Measure 114, not only may a permit agent demand "any additional information" it wants before deciding whether to issue the permit, §4(1)(c), (2)(c), but the sheriff of police chief may deny a permit regardless of whether the applicant passes the state's new background check, based on his subjective determination that the applicant nevertheless poses a "danger." *See* §§4(1)(b)(C), 5(2). In practice, then, Measure 114 operates not as a valid shall-issue regime, but as a constitutionally impermissible *may*-issue regime, with licensing agents free to make their own judgments about who seems "reasonably likely" to misuse a firearm. Indeed, given that the law's requirements apply every time someone seeks to acquire a firearm, no matter how many times or how recently background checks have proven otherwise, the regime is arguably most akin to a form of probation, under which the state engages in constant supervision of anyone who seeks to exercise their Second Amendment rights, assuming always and everywhere that any such person must be "more likely … to violate the law" than follow it. *United States v. Knights*, 534 U.S. 112, 120 (2001).

Second, delay is baked into the new regime. Under Measure 114, there is no limit on how long DSP can take to complete its background checks. *See generally* §4. Nor are there penalties if the State Police fail to complete them. That means that DSP can delay completion of the background check, and thus the issuance of a permit, indefinitely. Such delays are inevitable given Oregon's plans to rush implementation of the law before any of the necessary infrastructure can even be put in place—not to mention the fact that there is an approximately $70-million shortfall

between the anticipated annual cost of administering the system and the revenue currently provided to do so. And even if an applicant were to successfully run this veritable gauntlet and convince the state to issue a permit, Measure 114 gives OSP a 30-day clock to do so. That 30-day deadline for issuance of the permit when (or if) the background check is completed and passed, *see* §4(3)(a), is unconstitutionally long all by itself. *Cf.* 18 U.S.C. §922(t)(1)(B)(ii) (deeming four days too long to force law-abiding citizens to wait even without background-check results).

Third, Oregon's regime creates significant costs and barriers to compliance. Oregon may suggest that the sticker price is just $65 for the first license and then $50 to renew every five years thereafter. *See* §4(3)(b), (7)(c). But that masks other costs embedded in the regime. Those amounts, after all, cover only the license fee. They do not account for the price of completing a safety course and live-fire training. *See* §§4(1)(a)(D), (8)(c)(D). And while Oregon may argue that no one knows what those expenditures will be, that just underscores the problem. While Measure 114 requires classes, it makes no provision for offering them, and the state has not yet certified any privately offered classes. Oregon has thus tasked law-abiding citizens with paying unknown amounts for non-existent courses, and all just to exercise a fundamental right.

Compounding all the other constitutional concerns, the state is rushing to implement Measure 114 before it has set up the systems by which it can be administered. The law's effective date is currently December 8, 2022, but Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme. As of right now, there is no firearms training course that has been certified by the state, which means that no one can lawfully obtain a permit-to-purchase. Even if there were approved courses, moreover, DSP has not put in place the background check system necessary to process applications, which (again) means that no one can

lawfully obtain a permit-to-purchase. When it comes down to it, to acquire a firearm in Oregon, a citizen will need to comply with a regime that does not exist.

None of that is remotely consistent with the Second Amendment. Oregon's regime marks a radical departure even from the most restrictive state regimes in place today. That is not owing to some "dramatic technological change[]" or "unprecedented societal concern." *Bruen*, 142 S.Ct. at 2132. As the Supreme Court articulated just this past June, there is nothing novel about the concern that firearms might fall into the wrong hands. *See id.* at 2156. And while *traditional* background-check regimes have been used to address that concern for decades, no other jurisdiction has seen fit to layer background check upon background check, unconstrained by any time limits to conduct them, along with a command to take a not-yet-existent firearms course that the jurisdiction has no intention of ever providing, all the while reserving to permitting officials discretion to ignore the results of the background check and deny a permit based on their own subjective assessment of whether someone seems too dangerous to trust with a firearm. Such government efforts to pile "prophylaxis-upon-prophylaxis" are fundamentally inconsistent with the very notion of a fundamental right. *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) (plurality op.). In short, the only thing novel here is Oregon's attempt to use a not-so-thinly-veiled "permitting" regime to frustrate the ability of law-abiding citizens to obtain the arms that the Constitution guarantees them the right to keep and bear. To countenance such an extraordinary incursion on Second Amendment rights would be to impermissibly convert the Second Amendment into a "second-class right" all over again. *Bruen*, 142 S.Ct. at 2156.

Precisely because of the haste with which the state has rushed to impose its novel regime, Measure 114 violates not one, but two constitutional provisions. The Due Process Clause protects against arbitrary government action, especially when the result of that arbitrary action is to deprive

individuals of the ability to exercise a fundamental substantive right secured by the Constitution. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998); *Texaco, Inc. v. Short*, 454 U.S. 516, 554 (1982) (Brennan, J., dissenting) ("[T]he Due Process Clause of the Fourteenth Amendment was designed to guard owners of property from the wholly arbitrary actions of state governments."). Yet, as things stand now, when Measure 114 takes effect on December 8, 2022, it will be impossible to comply with it. Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme; no training courses are approved; and DSP has no background check system in place. Add it all up, and Oregon will soon require Oregonians looking to acquire a firearm to comply with a regime that does not exist and cannot be satisfied. That is the very definition of arbitrary government action in violation of due process.

### B. The Magazine Ban Is Unconstitutional.

The analysis for Measure 114's magazine ban is, if anything, even more straightforward. The Supreme Court has made clear that when a court confronts a flat ban on the possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. If the answer to that question is "yes," then the ban is unconstitutional, because a state cannot prohibit ordinary law-abiding Americans from possessing what the Constitution explicitly entitles them to "keep."

The answer here is plainly yes. First, magazines are "arms" within the meaning of the Second Amendment. The textual right to keep and bear arms necessarily includes the right to keep and bear ammunition and related products that render ammunition capable of being fired by a firearm, for self-defense and other lawful purposes; after all, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms for protection implies a corresponding right to obtain

the bullets necessary to use them."); *see also United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century sources recognizing that "[t]he possession of arms also implied the possession of ammunition"). Second, the specific types of magazines that Measure 114 bans are plainly in "common use" today. *See Heller*, 553 U.S. at 624-25 (the "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" today). That is not a close call. Magazines capable of holding more than 10 rounds come standard with many of the most popular guns and long guns on the market; millions of Americans (including Oregonians) collectively own roughly 115 million of these magazines; and these magazines account today for "approximately half of all privately owned magazines in the United States." *Duncan v. Becerra*, 970 F.3d 1133, 1142 (9th Cir. 2020); *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021).[2] Millions of Americans own hundreds of millions of these magazines for lawful purposes, including self-defense, sporting, and hunting.

Because magazines capable of holding more than 10 rounds are arms in common use, they are protected by the Second Amendment. *Bruen*, 142 S.Ct. at 2134. The state's flat ban on their use, manufacture, sell, or possession therefore violates the Second Amendment, full stop.

At a bare minimum, such arms are "presumptively protect[ed]" by the Second Amendment, so Oregon would bear the burden to "affirmatively prove that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126. Oregon cannot come close to making that showing. There were no restrictions on firing or magazine capacity when either the Second Amendment or the Fourteenth Amendment was ratified. The first state to restrict magazine capacity did not do so until *1990*, and laws enacted for the first

---

[2] All orders and opinions in *Duncan* have since been vacated. *See* 49 F.4th 1228 (9th Cir. 2022). The case is now back before the district court.

time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]." *Id.* at 2137 (alteration in original) (quoting *Sprint*, 554 U.S. at 312 (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]" analogous to the challenged law). Indeed, Oregon cannot even identify a "well-established" tradition of restricting magazine capacity *today*. *Id.* at 2133. Only a handful of jurisdictions have laws analogous to Measure 114's flat ban on possessing magazines capable of holding 10 or more rounds. As for the federal government, it did not restrict magazine capacity until 1994—and Congress allowed that law to expire in 2004 after a study by the Department of Justice revealed that the law had produced "no discernable reduction" in gun violence. Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice* 96 (2004), https://bit.ly/3wUdGRE.

The absence of historical laws restricting firing capacity is not the result of some "dramatic technological change[]" that happened in the past few decades or some "unprecedented societal concern[]" that did not exist until 1990. *Bruen*, 142 S.Ct. at 2132. Firearms capable of firing more than 10 rounds long predate the Founding. *See Duncan*, 970 F.3d at 1147. They were marketed to and bought by civilians from the start. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, C.J., dissenting). Indeed, the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market. *Duncan*, 970 F.3d at 1148. In short, "magazines of more than ten rounds ha[ve] been well established in the mainstream of American gun ownership" for a very long time. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 862 (2015).

Defendants have not identified and cannot identify any "enduring American tradition of state regulation" forbidding magazines capable of holding more than 10 rounds by law-abiding citizens for lawful purposes. *Bruen*, 142 S.Ct. at 2135. Because Oregon cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127, the magazine ban unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

Measure 114's magazine ban also violates the Fifth and Fourteenth Amendments. The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (applying Takings Clause to the states). It protects against both "physical appropriation[s]" of property and "restriction[s] on the use of property" (known as "regulatory takings"). *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015).

A physical taking occurs whenever the government "dispossess[es] the owner" of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). This rule applies to both real property and personal property; the "categorical duty" the Takings Clause imposes applies "when [the government] takes your car, just as when it takes your home." *Horne*, 576 U.S. at 358. The rule likewise applies if the dispossession arises from a regulation, rather than from the use of eminent domain: "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). And it applies regardless of whether the government-authorized "invasion" of private property is partial. *Id.* at 2072. "When the government physically takes possession of *an interest in property* for some public purpose, it has a categorical duty to compensate the former

owner," even if the government has not taken the entire bundle of sticks. *Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (emphasis added).

**As to firearms dealers.** Oregon's confiscatory ban runs afoul of these settled principles. The law makes it a crime for licensed firearms dealers to continue to possess in Oregon magazines that they lawfully acquired and that, but for the new law, they would lawfully sell to law-abiding citizens. Under Measure 114, "licensed gun dealer[s]" that lawfully acquired and currently possess "large-capacity magazines" in Oregon can avoid committing a "crime" only if, "within 180 days of the effective date of this 2022 Act," they transfer or sell the magazines to a dealer out of state, render the magazines inoperable (and thus unsalable), or dispossess themselves of them altogether. §11(2), (3)(a). And come June 7, 2023, not even those options will be on the table. By forcing dealers to physically surrender, destroy, or send away their lawfully acquired property, Measure 114 effects a physical taking. Oregon thus must provide just compensation. After all, courts assess physical takings "using a simple, per se rule: The government must pay for what it takes." *Cedar Point*, 141 S.Ct. at 2071. Yet Measure 114 offers no compensation for the lawfully acquired property that it turns into unlawful contraband. It therefore violates the Takings Clause.

Defendants may argue that the magazine ban does not effect a taking because it allows sales within 180 days, as long as the buyer is out of state. *See* §11(3)(a). That is not how the Constitution works. Selling property to avoid having it taken is an option in almost every takings case. *See Horne*, 576 U.S. at 358. But "property rights 'cannot be so easily manipulated,'" and that option does not transform a taking for which just compensation must be paid into a minor burden that the government may impose scot-free. *Id.* It likewise makes no difference that dealers can transfer products out of state. For one thing, the option of transferring a magazine out of state exists only if the property owner has some out-of-state location to store the magazine—which

Plaintiff Mazama Sporting Goods does not, *see* Compl. ¶23; Decl. of Adam Braatz ¶3, to take just one example. For another thing, that option depends on other states continuing to permit possession of the magazines, something over which Oregon obviously has no control. Oregon may not enact an unconstitutional law simply because other states have not. *Cf. Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76-77 (1981) ("One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

To the extent Measure 114 somehow does not effect a physical taking, it effects an unconstitutional regulatory taking. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-39 (2005) (a regulation that "goes too far"—by, for example, depriving a property owner of economically beneficial use or otherwise "interfer[ing] with legitimate property interests"—also constitutes a taking that requires just compensation). Absent Measure 114, these magazines would be salable and in demand (as evidenced by the fact that Americans have purchased hundreds of millions of them and counting). Because of Measure 114, however, they are now worthless to any dealer in Oregon. That violates both the Takings Clause and due process. *See Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330-31 (9th Cir. 1977) (finding a taking where the property in question had been "rendered unsaleable in the open market; its uses were severely limited by [the] Agency; … and [the property owner's] peaceful enjoyment and its right to all rents and profits from the property were substantially impaired"); *E. Enters. v. Apfel*, 524 U.S. 498, 536-37 (1998) (plurality op.) (A law that imposes a "disproportionate and severely retroactive burden" upon particular individuals or companies violates "fundamental principles of fairness underlying the Takings Clause."); *id.* at 549 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("[D]ue process protection for property must be understood to incorporate our settled

tradition against retroactive laws of great severity."); *cf. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 87-88 (1982) (refusing to give retroactive effect to a decision declaring statute unconstitutional where to do so "surely would visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts").

*As to individuals.* The analysis is much the same as to individuals like Plaintiff Eyre. Measure 114 subjects to criminal punishment any person who possesses even a single "large-capacity magazine" on or after December 8, 2022, regardless of when or how it was acquired. An individual can escape criminal punishment only by affirmatively proving that she obtained her property before Measure 114 took effect, which will be very difficult for many people to do. It is hard to imagine a greater invasion of property rights than a prohibition on keeping the property. "[T]o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights." *Richmond Elks*, 561 F.2d at 1330 (alteration in original). And there is arguably no greater "disturbance" than having mere possession *turned into a crime* against which one must affirmatively defend oneself.

For similar reasons, even if the ban's prospective components somehow passed muster, *but see supra*, its retrospective aspects would violate due process as well. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976) (explaining that "the justifications for" "the prospective aspects" of a law "may not suffice for" a law's "retrospective aspects"). Due process "protects the interests in fair notice and repose that may be compromised by retroactive legislation" and prevents Congress from enacting retroactive laws that would infringe those protected interests without adequate justification. *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016). And "in accordance

with 'fundamental notions of justice' that have been recognized throughout history," "[r]etroactivity is generally disfavored in the law." *E. Enters.*, 524 U.S. at 532 (plurality op.); *see also id.* at 549 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("[D]ue process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity."); 2 J. Story, *Commentaries on the Constitution* §1398 (5th ed. 1891) ("Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact."). Consistent with these fundamental commitments, "the Court has given careful consideration to due process challenges to legislation with retroactive effects" and "treat[ed] due process challenges based on the retroactive character of the statutes in question as serious and meritorious." *E. Enters*, 524 U.S. at 547-48 (Kennedy, J., concurring in the judgment in part and dissenting in part).

Retroactive legislation also raises serious concerns under the Takings Clause, of course, as government action that has significant "economic impact … on the claimant" and "has interfered with distinct investment-backed expectations" may constitute a taking that requires just compensation even if it does not mandate dispossession. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978); *see, e.g.*, *E. Enters*. 524 U.S. at 533-37 (plurality op.).  Thus, whether analyzed under the Due Process Clause, the Takings Clause, or both, the outcome is the same: Oregon's effort to transform the possession of lawfully obtained property into a crime against which otherwise law-abiding citizens must affirmatively defend themselves cannot be squared with the Constitution.

## II.      The Remaining Factors All Favor Injunctive Relief.

There is no question that the constitutional injuries Measure 114 will inflict on Plaintiffs and their members are imminent, as the law and its impossible-to-comply-with permitting regime

are scheduled to take effect in just one week. And the injuries the law will inflict are irreparable by definition. *See Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury."). Those injuries are enough in and of themselves to satisfy the second injunctive relief factor. But they do not stand alone. It is indisputable that Plaintiff Mazama Sporting Goods (and the Oregon retailers among Plaintiff NSSF's 10,000+ members) will lose revenue if Measure 114 takes effect. See Decl. of Adam Braatz ¶¶9-14; Decl. of Matthew G. French ¶¶12-18. Allowing Measure 114 to take effect will result in "the constriction of [Plaintiffs'] buyers' market," which is a textbook economic "injury." *Craig v. Boren*, 429 U.S. 190, 194 (1976); *see Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 205 (4th Cir. 2020) (applying *Craig*'s logic to a gun dealer challenging a Maryland handgun licensing law). And while economic injuries typically are not irreparable because they can be remedied after the fact, economic injuries *are* irreparable when—as here— the defendants are cloaked in Eleventh Amendment immunity. *Cal. Hosp. Ass'n v. Maxwell-Jolly*, 776 F.Supp.2d 1129, 1140 (E.D. Cal. 2011) ("[I]rreparable harm is established" "where the party seeking injunctive relief is legally precluded from pursuing damages—for example, if a claim is barred by the Eleventh Amendment."). Every single cent lost as a result of Measure 114 is unrecoverable as a matter of law, thanks to the Eleventh Amendment.

The equities and the public interest favor an injunction as well. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, [the public interest and equities] factors merge."). Measure 114 tramples on fundamental constitutional rights—the right to keep and bear arms, the right to private property, and more. And, as the Ninth Circuit has long held, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The public interest does not favor in the slightest keeping in place

a statute that poses such a grave threat to fundamental constitutional rights. Nor can Defendants make any serious argument that they (or the state) will suffer harm as a result of an injunction. That is true as a general matter, as government defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And it is particularly obvious here. For one thing, the state has not set up the systems necessary for individuals to comply with Measure 114, which means that no resources will need to be expended to implement the injunction. For another thing, enjoining Measure 114 will have no effect on the preexisting background-check requirements that Measure 114 supplements and with which law-abiding Oregonians have complied for decades. There is thus everything to be gained and virtually nothing to be lost by hitting the pause button before Oregon can begin inflicting mass chaos and irreparable constitutional injury on countless law-abiding individuals who seek nothing more than to exercise the fundamental rights that the Second Amendment guarantees.

## CONCLUSION

For the reasons set forth above, this Court should grant a preliminary injunction.


DATED: December 1, 2022

Paul D. Clement[*]
Erin E. Murphy[*]
Matthew D. Rowen[*]
Trevor W. Ezell[*]
Nicholas M. Gallagher[*]
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900


[*] *pro hac vice* application forthcoming

Respectfully submitted,

s/ Shawn M. Lindsay
Shawn M. Lindsay (OR Bar #020695)
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
(503) 968-1475
shawn@jurislawyer.com

*Counsel for Plaintiffs*