Shawn M. Lindsay
shawn@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475
    *Attorney for Eyre Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM *(Lead Case)* |
| Plaintiffs, | Case No. 3:22-cv-01859-IM *(Trailing Case)* |
| | Case No. 3:22-cv-01862-IM *(Trailing Case)* |
| v. | Case No. 3:22-cv-01869-IM *(Trailing Case)* |
| KATE BROWN, et al., | CONSOLIDATED CASES |
| Defendants. | **CERTIFICATE OF SERVICE TO EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT** |
| MARK FITZ, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| DANIEL AZZOPARDI, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |

CERTIFICATE OF SERVICE TO EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2023, I caused to be served a copy of the attached

**EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT** on the individuals listed below, by

email:

Brian Simmonds Marshall
OREGON DEPARTMENT OF JUSTICE
Trial Division, Special Litigation Unit
100 SW Market Street
Portland, OR 97201
971-673-1880
brian.s.marshall@doj.state.or.us
janice.thompson@doj.state.or.us

*Attorneys for Oregon State Defendants*

Jessica A. Skelton
Kai Smith
Scott Ferron
Zachary J. Pekelis
PACIFICA LAW GROUP, LLP
1191 Second Avenue, Suite 2100
Seattle, WA 98101
206-971-4700
jessica.skelton@pacificalawgroup.com
kai.smith@pacificalawgroup.com
scott.ferron@pacificalawgroup.com
zach.pekelis@pacificalawgroup.com

*Attorneys for Intervenor Defendant*
*Oregon Alliance for Gun Safety*

Leonard W. Williamson
VAN NESS WILLIAMSON
960 Liberty St SE, Suite 100
Salem, OR 97302
503-365-8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

Hannah Hoffman
Harry B. Wilson
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
541-513-2569
hannahhoffman@markowitzherbold.com
harrywilson@markowitzherbold.com

*Attorneys for Oregon State Defendants*

Erin E. Murphy
Matthew Rowen
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Attorneys for Eyre Plaintiffs*

Pete Serrano
SILENT MAJORITY FOUNDATION
5238 Outlet Dr.
Pasco, WA 99301
509-567-7083
pete@silentmajorityfoundation.org

*Attorneys for OFF Plaintiffs*

*(continued on next page)*

CERTIFICATE OF SERVICE TO EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT - 1

Stephen J. Joncus
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, OR 97086
971-236-1200
steve@joncus.net
*Attorneys for OFF Plaintiffs*

William Aaron Sack
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Ste 320
Las Vegas, NV 89149
916-596-3492
wsack@fpclaw.org
*Attorneys for Azzopardi Plaintiffs*

James L. Buchal
MURPHY & BUCHAL LLP
PO Box 86620
Portland, OR 97286
503-227-1011
jbuchal@mbllp.com

*Attorneys for Fitz and Azzopardi Plaintiffs*

Derek Angus Lee
ANGUS LEE LAW FIRM, PLLC
9105a NE Hwy 99, Ste 200
Vancouver, WA 98665
360-635-6464
angus@angusleelaw.com

*Attorneys for Fitz and Azzopardi Plaintiffs*

William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
202-220-9622
wbergstrom@cooperkirk.com

*Attorneys for Fitz Plaintiffs*

Adam Kraut
SECOND AMENDMENT FOUNDATION
12500 N.E. Tenth Place
Bellevue, WA 98005
800-426-4302
akraut@saf.org

*Attorneys for Azzopardi Plaintiffs*

I further certify that on January 5, 2023, I caused to be served a copy of the attached

**EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT** on the individuals listed below, by

email:

C'Zar David Bernstein
Taylor A.R. Meehan
Thomas McCarthy
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Ste 700
Arlington, VA 22209
703-243-9423
czar@consovoymccarthy.com
taylor@consovoymccarthy.com
tom@consovoymccarthy.com

*Attorneys for Gun Owners of America Inc.*

Nicholas Gallagher
Paul D. Clement
Trevor W. Ezell
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
nicholas.gallagher@clementmurphy.com
paul.clement@clementmurphy.com
trevor.ezell@clementmurphy.com

*Attorneys for Eyre Plaintiffs*

CERTIFICATE OF SERVICE TO EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT - 2

Karen Louise Osborne
KOSBORNE LAW, LLC
9721 NE Livingston Mountain Ct
Camas, WA 98607
360-907-2593
karen.osborne@kosbornelaw.com
*Attorneys for OFF Plaintiffs*

Tyler D. Smith
TYLER D. SMITH, PC
181 N. Grant Street, Suite 212
Canby, OR 97013
503-266-5590
tyler@ruralbusinessattorneys.com
*Attorneys for Gun Owners of America Inc.*

DATED: January 5, 2023

s/ Shawn M. Lindsay
Shawn M. Lindsay (OR Bar #020695)
JURISLAW LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
(503) 968-1475
shawn@jurislawyer.com

*Counsel for Eyre Plaintiffs*

Shawn M. Lindsay
shawn@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475

*Attorney for Eyre Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM *(Lead Case)* |
| | Case No. 3:22-cv-01859-IM *(Trailing Case)* |
| Plaintiffs, | Case No. 3:22-cv-01862-IM *(Trailing Case)* |
| | Case No. 3:22-cv-01869-IM *(Trailing Case)* |
| v. | |
| KATE BROWN, et al., | CONSOLIDATED CASES |
| Defendants. | **EYRE PLAINTIFFS'** |
| | **FIRST AMENDED COMPLAINT** |
| MARK FITZ, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, TIM FREEMAN, MAZAMA SPORTING GOODS, NATIONAL SHOOTING SPORTS FOUNDATION, and OREGON STATE SHOOTING ASSOCIATION, | Case No. 3:22-cv-01862-IM |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, Attorney General of Oregon, and TERRI DAVIE, Superintendent of the Oregon State Police, | |
| Defendants. | *(caption continued on next page)* |

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT

Attachment to Certificate of Service
Page 1 of 42

DANIEL AZZOPARDI, et al.,

                              Plaintiffs,

          v.

ELLEN F. ROSENBLUM, et al.,

                              Defendants.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT

In the matter of *Eyre v. Rosenblum*, No. 3:22-cv-01862-IM, consolidated with the above-captioned matter as *Oregon Firearms Federation, Inc*. *v. Brown*, No. 2:22-cv-01815-IM, plaintiffs Katerina B. Eyre, Tim Freeman, Mazama Sporting Goods, National Shooting Sports Foundation, and Oregon State Shooting Association (collectively, "Plaintiffs") bring this amended complaint against Ellen F. Rosenblum, Attorney General of Oregon, and Terri Davie, Superintendent of the Oregon State Police (collectively, "Defendants").  Plaintiffs bring this amended complaint based on personal knowledge as to all Plaintiff facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      The Second Amendment to the U.S. Constitution guarantees "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  Absent judicial intervention, however, law-abiding citizens of Oregon may no longer be able to exercise that right at all.

2.      This fall, Oregon voters narrowly adopted Ballot Measure 114, the "Changes to Firearm Ownership and Purchase Requirements Initiative."  Measure 114 imposes severe and unprecedented burdens on individuals seeking to exercise perhaps the most basic right guaranteed by the Second Amendment:  the right to lawfully acquire a firearm.

3.      Although Measure 114 bills itself as creating a "shall issue" licensing regime that awards applicants a five-year "permit-to-purchase" firearms, in reality it erects a Kafkaesque regime that finds no support in history, tradition, or even modern regulation and that suffers from literally every defect the Supreme Court just identified as antithetical to the Second Amendment.

4.      Under Measure 114, an individual must obtain a "permit-to-purchase" before she may lawfully acquire a firearm.  Obtaining this permit is no mean feat.  To start, before an individual can even submit an application for the new permit, she first must complete a "firearms training course" that satisfies various strict new criteria. §4(1)(b)(D), (8)(a), (c)(A)-(D).  But the state does not provide any such courses, and none that satisfies its demanding new criteria currently exists.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    1

5.      Even if one managed to take this as-yet-non-existent course, there would still be many hurdles yet to clear.  Next up is submitting to fingerprinting and photographing by the sheriff or police chief, who must then ask the Oregon State Police ("OSP") to conduct a criminal background check.  §4(1)(e).  But Measure 114 neither imposes any time constraint on OSP to conduct the check nor creates a mechanism to force OSP to act, which means that an applicant could face indefinite delays in any ability to exercise Second Amendment rights.

6.      And a standard background check is still not enough.  By agreeing to complete the required background check, an individual invites a potential fishing expedition:  The sheriff or police chief not only may demand "any additional information determined necessary by department rules," §4(1)(c), but retains discretion to deny a permit on the back end even if the applicant passes the background check, §§4(1)(b)(C), 5(2).  Even if the sheriff or police chief *does* choose to award the permit required to obtain a firearm, moreover, the permit need not issue for 30 days.  §4(3)(a).  In the meantime, the applicant cannot lawfully obtain a firearm.

7.      With a "permit-to-purchase" in hand, an individual might think that she would (finally) be "permitted" to "purchase" the firearm that the Second Amendment entitles her to keep and bear.  But she would be wrong.  "Once a permit holder wants to buy a gun, state police [then] conduct its usual firearms purchase background check"—"and that check would have to be completed before any gun were sold or transferred, under the measure."  Maxine Bernstein, *Oregon Gun Control Measure 114 Attracts National Attention as One of Strictest in U.S.*, The Oregonian (Oct. 15, 2022), https://bit.ly/3guiU3r.  So while Measure 114 requires an individual to present a permit whenever she seeks to acquire a gun, successfully running the gauntlet required to secure one *does not actually entitle an individual to purchase a firearm*.  Even if an individual comes to a licensed gun dealer with a "permit-to-purchase" in hand, the dealer must take that individual's

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    2

thumbprint again, §§6(2)(c), 10(a), 11, verify that her permit is, in fact, valid by cross-referencing a state database, §6(2)(d), and, finally, ask OSP to perform *another* background check and assign a "unique approval number" if the individual passes, §6(2)(d), which likewise can take an eternity.

8.      One might think that a state bent on imposing such a novel and burdensome permitting regime would at least take the time necessary to implement the new infrastructure, and expend the resources necessary to support them, so that the new regime will operate as smoothly as possible.  But Oregon was not even willing to do that.  Instead, the state rushed the effective date of its new law to December 8, 2022—before the vote on Measure 114 had even been certified, and before the mechanisms to comply with it will be anywhere close to in place.

9.      Had Measure 114 taken effect as originally scheduled, *no one would have been able to lawfully purchase a firearm in Oregon.  See* Dac Collins, *Oregon Prepares to Freeze Gun Sales in "De Facto Gun Ban,"* Outdoor Life (Nov. 23, 2022), https://bit.ly/3gBmQ2f ("Law enforcement leaders are telling local news outlets that *they expect all gun sales in the state to freeze* when a new ballot measure goes into effect early next month." (emphasis added)); *see also id.* ("The ballot measure … introduc[es] the Permit-to-Purchase program, which requires any person who wants to purchase a firearm to obtain a state-issued permit before doing so.… [But] the state is not currently prepared to issue these permits.").  But the Court stayed enforcement of Measure 114's permitting provisions in light of Defendants' concession that they are not ready to implement the new regime.

10.      As of the date of this filing, the Court's stay will remain in place until March 7, 2023.

11.      It should be converted into a preliminary, and ultimately permanent, injunction. Measure 114 is radically out of step with the historical and even modern-day tradition of firearms regulation in this country—not to mention with the Supreme Court's recent and unambiguous pronouncements on what kinds of permitting regimes are and are not consistent with the Second

Amendment. And by erecting a Byzantine regime that is a necessary prerequisite to exercising a fundamental constitutional right but that no one can currently satisfy, Measure 114 violates due process to boot.

12.    In addition to effectively prohibiting people from obtaining firearms, Measure 114 bans commonplace magazines and firearms, and even confiscates them from those who have already lawfully obtained them, turning law-abiding citizens into criminals virtually overnight.

13.    Measure 114 creates the brand-new "crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines." §11(2). This new crime is punishable by up to 364 days in prison and a $6,250 fine. *See* §11(6) (classifying the new crime as "a class A misdemeanor"); Or. Rev. Stat. §161.615(1) (setting maximum prison sentence at 364 days for class A misdemeanors); Or. Rev. Stat. §161.635(1)(a) (setting maximum fine at $6,250 for class A misdemeanors).

14.    Magazines that hold more than 10 rounds of ammunition are commonly owned by millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. These magazines have long come standard-issue with many of the most popular firearms on the market. Today, Americans own roughly 115 million of them, accounting for "approximately half of all privately owned magazines in the United States." *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022).

15.    Under Measure 114, however, magazines capable of holding more than 10 rounds of ammunition will soon be contraband in Oregon, as will firearms that contain them by design.

16.    Unlike other states that have recently tried to adopt similar prohibitions, moreover, Oregon has gone beyond prohibiting *detachable* magazines capable of holding more than 10 rounds of ammunition (a prohibition that itself violates the Second and Fourteenth Amendments)

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    4

and defined "[l]arge capacity magazine" to mean any "*fixed or* detachable magazine … that has an overall capacity of … more than 10 rounds of ammunition." §11(1)(d) (emphasis added). Oregon thus prohibits not only large swathes of magazines, but large swathes of firearms.

17.     That ban on ubiquitous magazines and firearms violates the Second Amendment. Both fixed and detachable magazines are plainly "arms" within the meaning of the Second Amendment; after all, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *see United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century sources recognizing that "[t]he possession of arms also implied the possession of ammunition"). And as the Supreme Court has made clear, the Second Amendment protects arms that are typically possessed today by law-abiding citizens for lawful purposes such as self-defense and hunting, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022), which magazines capable of holding more than 10 rounds of ammunition (and corresponding firearms) unquestionably are.

18.     While the fact that the magazines Oregon has prohibited are commonly owned for lawful purposes suffices to resolve this case, unsurprisingly, there is no historic tradition of regulating these types of arms. That is not because these arms are some sort of newfangled innovation; firearms capable of rapidly firing multiple rounds predate the United States, and they became immensely popular for private, lawful purposes in the nineteenth century as the cost of manufacturing such arms began to decline.

19.     Oregon's magazine ban thus violates the Second Amendment's explicit command that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; *see also Bruen*, 142 S.Ct. at 2131 ("The test … requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                    5

20.     Making matters worse, Measure 114 imposes criminal liability not only on individuals and businesses who use, sell, or manufacture such magazines, but on individuals and businesses who merely possess such magazines—even if the individual or business lawfully acquired them well before Measure 114 was proposed, let alone took effect.

21.     For "licensed gun dealer[s]" in Oregon, nearly all of whom currently possess thousands of the soon-to-be-banned magazines in their stores and warehouses, the only options to avoid criminal liability are to send all of their lawfully acquired magazines out of state, render all of them inoperable (and thus unsalable), or dispossess of them altogether—and to do so within 180 days.  That violates the Takings Clause of the Fifth Amendment as well.

22.     There are many virtues to direct democracy and the referenda process, but the Framers viewed certain rights as too fundamental to be left to shifting majorities.  The Supreme Court has left no doubt that the Second Amendment is among those fundamental rights where the Framers already did all the necessary balancing, and the democratic process must respect that judgment or be swiftly invalidated.  Measure 114 plainly fails to respect fundamental constitutional rights as old as the Republic and reaffirmed by the Supreme Court as recently as this past June.

23.     Plaintiffs thus seek, among other things, declaratory and injunctive relief to prevent Oregon, including Defendants Rosenbaum and Davie and all of their respective agents and assigns, from enforcing Measure 114 against Plaintiffs or any of their members.

## **THE PARTIES**

24.     Plaintiff Katerina B. Eyre is a natural person and a citizen of the United States.  Eyre is a resident of Washington County, Oregon.  She served as an Oregon State Representative from 2011 to 2013.  Before the adoption of Measure 114, Eyre was in the process of obtaining a concealed handgun license ("CHL") in Oregon, and she purchased a number of magazines capable of holding more than 10 rounds of ammunition.  But for Measure 114, Eyre would acquire more in the future.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    6

25.    Plaintiff Tim Freeman is a natural person and a citizen of the United States. Freeman is a resident of Douglas County, Oregon.  He served as an Oregon State Representative from 2009 to 2015; before that he was a member of the Roseburg City Council for five years. Freeman has held a CHL in Oregon since 1995.  Before the adoption of Measure 114, Freeman purchased a number of magazines capable of holding more than 10 rounds of ammunition.  But for Measure 114, Freeman would acquire more in the future.

26.    Plaintiff Mazama Sporting Goods ("Mazama"), d/b/a Sitatunga Services, LLC, is a family-owned sporting goods store that sells firearms, fishing gear, and related products, including ammunition and magazines.  Mazama has only one location, in Eugene, Oregon.

27.    Plaintiff National Shooting Sports Foundation ("NSSF") is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 10,000 individuals and entities, including manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.  NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.  NSSF brings this action on its members' behalf, in light of the injuries Measure 114 is causing and will cause them if allowed to take effect.

28.    Plaintiff Oregon State Shooting Association ("OSSA") is an Oregon not-for-profit corporation.  Its principal place of business is 12210 SW Main Street, Portland, Oregon 97223.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    7

OSSA's organizational objectives include promoting, in every lawful way, all types of legal firearms activities in the State of Oregon; raising the general proficiency in the use of firearms; supporting the Second Amendment to the Constitution of the United States; educationally imparting to the citizens of good repute a better knowledge in the safe handling and proper care of firearms; encouraging the sport of competitive marksmanship and target shooting; and coordinating and encouraging efforts of member clubs and individuals in the field of firearm safety, marksmanship training and all types of recreational shooting.

29.     Defendant Ellen F. Rosenblum is the Attorney General of Oregon.  She is "the chief law officer for the state and all its departments."  Or. Rev. Stat. §180.210.  Attorney General Rosenblum is a resident of Oregon, and her principal place of business is 1162 Court Street NE, Salem, Oregon.  At all relevant times, Attorney General Rosenblum, as well as those subject to her supervision, direction, or control, are and will be acting under color of state law.

30.     Defendant Terri Davie is the Superintendent of OSP.  As Superintendent, Davie is "the executive and administrative head of the" OSP, Or. Rev. Stat. §181A.030, which is "charged with the enforcement of … all criminal laws," including by "institut[ing] criminal proceedings," *id.* §181A.080(1)(a), (2)(c).  Superintended Davie is a resident of Oregon, and her principal place of business is 3565 Trelstad Avenue SE, Salem, Oregon 97317.  At all relevant times, Superintendent Davie, as well as those subject to her supervision, direction, or control, are and will be acting under color of law.

## BACKGROUND

**Oregon Enacts One of the Strictest Gun Laws in the Country—Measure 114—Adding a Duplicative "Permit to Purchase" Regime and Banning "Large Capacity" Magazines.**

31.     Last June, the Supreme Court confirmed that the Second Amendment means what it says—it confers an individual right "to keep and bear Arms," both inside and outside of the

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                     8

home—and reiterated that this guarantee is no "second-class right" subject to a unique set of rules or available only to those with "special need" to exercise it. *Bruen*, 142 S.Ct. at 2134-35, 2156.

32.    The Court also went out of its way to explicate the proper analysis courts must undertake when evaluating laws that impose burdens on Second Amendment rights:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

33.    The first question under the analysis is thus whether "the Second Amendment's plain text"—"the right of the people to keep and bear Arms shall not be infringed"—"covers an individual's conduct."  *Id.* at 2126; U.S. Const. amend. II.  That plain text "guarantee[s] the individual right to possess and carry weapons in case of confrontation," i.e., the right to own, "wear, bear, or carry" arms "for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person."  *Bruen*, 142 S.Ct. at 2314 (citations omitted).

34.    If a law does burden conduct covered by the plain text of the Second Amendment, then the government must "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2127; *see also id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").

35.    Not long after *Bruen*, advocates in Oregon proposed Measure 114.  Measure 114 turns the *Bruen* decision on its head and adds some of the very restrictions the Supreme Court had

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                     9

just signaled run afoul of the Constitution, including a firearm permitting regime that is "shall-issue" in name only, and that will result in at least weekslong delays in the very best of circumstances, as well as a flat ban on commonplace arms.

36.    Despite these infirmities, Oregon voters approved Measure 114 by a narrow margin on November 8, 2022.  *See Ballot Measures: Measure 114*, Oregonian, https://bit.ly/3U2ZOz4 (last visited Nov. 28, 2022) (50.7% supporting (969,215 votes) versus 49.3% opposed (942,161 votes)); Lillian Mongeau Hughes, *Oregon Gun Access Measure Narrowly Passes, Bringing Joy and Sadness*, OPB (Nov. 11, 2022), https://bit.ly/3F2CoFQ.

**Measure 114 Erects a Kafkaesque Permitting Regime.**

37.    Under Measure 114, an individual cannot lawfully acquire a firearm without a "permit-to-purchase."  Such a permit is always required for an individual to acquire a firearm, whether via a commercial purchase from a licensed gun dealer, §6(2)(a), (2)(d), (3)(c); in a private transfer from one individual to another, §7(3)(a), (3)(d)(B); or at a gun show, §§8(2), 9(2).

38.    To obtain a "permit-to-purchase," an individual must apply to a "county sheriff or police chief with jurisdiction over the [applicant's] residence," §4(1)(a), and pay the required fee, §4(3)(b).  Before she can do that, however, she must complete a "firearms training course." §4(1)(b)(D).  That sounds straightforward, but it is not.  Oregon does not provide these courses itself; instead, it expects individuals to obtain training from private instructors (at their own cost). *See* §4(8)(a).  And not just any training course will suffice; to qualify under Measure 114, a training course must cover federal and state firearms law; safe use, transportation, and storage; and the prevention of firearms abuse, §4(8)(c)(A)-(C); include an "in-person demonstration" of proficiency with a firearm, §4(8)(c)(D); and "utilize[e] instructors certified by a law enforcement agency," §4(8)(a).  Most existing safety courses do not contain live components, so the new law anticipates that individuals may need to take (and pay for) two courses.  *See* §4(8)(c)(D).

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                  10

39.     If an applicant makes it through these hoops, she must then submit to fingerprinting and photographing by the sheriff or police chief, who in turn must ask OSP to conduct a complete criminal background check.  §4(1)(e).

40.     Unlike under federal law, which allows licensed dealers to transfer firearms if they "contact[] the national instant criminal background check system established under [federal law]" for a customer but do not receive "noti[ce]" from the system within "3 business days" that "the receipt of a firearm by such [customer] would violate [federal], or State, local, or Tribal law," 18 U.S.C. §922(t)(1)(B)(ii), Measure 114 imposes no time constraint on OSP's investigation, and it creates no mechanism to force OSP to act.  *Cf.* §§6(3)(b), 7(3)(d)(B).

41.     That is no small concern.  Before Oregon adopted Measure 114, Oregon law was similar to federal law when it came to timing.  Under the preexisting ORS 166.412(3)(c), which Measure 114 amended, gun dealers were permitted to "deliver [a] firearm to [a] purchaser" when OSP "fail[ed] to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check."  *See also* 18 U.S.C. §922(t)(1)(B)(ii) (similar under federal law).  But Measure 114 has now replaced that provision with a blanket ban on transfers unless and until OSP gives the green light.  Under Measure 114 §6(3)(c), a "dealer may not transfer the firearm unless the dealer receives a unique approval number from the department," under any circumstances.  In fact, Measure 114 makes it a crime to "[k]nowingly sell[] or deliver[] a firearm … prior to receiving a unique approval number from the department," even if the purchaser already has a concealed handgun license.  §6(14).

42.     The delay and discretion do not stop there.  By agreeing to complete the background check, an applicant invites a fishing expedition:  The sheriff or police chief can demand "any

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                    11

additional information determined necessary by department rules."  §4(1)(c).  On top of that, the sheriff or police chief retains discretion to exercise on-the-spot judgment about whether to deny a permit, *even if the applicant passes the background check*.  §§4(1)(b)(C), 5(2).

43.    If an individual runs that gauntlet and secures a "permit-to-purchase," the process still is not over.  That is because "[a] permit-to-purchase issued under this section *does not create any right of the permit holder to receive a firearm*."  §4(6)(a) (emphasis added).  If an individual comes to a licensed gun dealer with a "permit-to-purchase" in hand, the process essentially starts all over again.  The dealer must take her thumbprint, §§6(2)(c), 10(a), 11; verify that her permit is, in fact, valid by cross-referencing a state database, §6(2)(d); and, finally, ask OSP to perform *another* background check and assign a "unique approval number" if the individual passes, §6(2)(d).  The dealer cannot transfer the firearm until OSP gives the green light, and—again— there is no time limit for OSP to act.  The same duplicative hurdles apply at gun shows.  *See* §§8(2), 9(2).  And private individuals seeking to transfer a firearm between themselves in a non-commercial setting may not do so on their own *at all*; they must appear in person before a licensed gun dealer, where the transferee must present a permit-to-purchase—but, once again, the dealer must ask OSP to conduct another background check and await a "unique approval number"; and if the results are delayed or unknown, the transfer is off.  §7(3)(a), (3)(c), (3)(d)(A), (3)(d)(B).

**Measure 114 Makes it a Crime to Possess, Sell, or Manufacture Commonplace Arms.**

44.    Measure 114 imposes a blanket ban on any magazine capable of holding more than 10 rounds of ammunition and any firearm with a fixed magazine of such capacity.

45.    A firearm magazine is a device that stores ammunition.  It is a critical part of delivering a loaded cartridge to the firing chamber for discharge of a projectile.  It can either be detachable or fixed.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    12

***The types of arms that Measure 114 bans have long been owned by law-abiding Americans for lawful purposes, including self-defense.***

46.    Firearms with magazines capable of firing more than 10 rounds of ammunition—whether by virtue of a fixed or a detachable magazine—long pre-date the American founding and have been used by Americans throughout history for lawful purposes, including self-defense.

47.    Repeating firearms—i.e., firearms capable of firing multiple shots without needing to manually load a new round of ammunition—have a long history.  In 1645, a Danish gunsmith, developed a wheel-lock repeating rifle, with a magazine capable of holding anywhere from 6 to 30 rounds.  Harold L. Peterson, *The Treasury of the Gun* 229-30 (1962).  This gun and others like it spread across Europe and, eventually, to the American colonies.  By the eighteenth century, American colonists were manufacturing repeating rifles and pistols on this side of the Atlantic. Indeed, in 1777, the Continental Congress considered purchasing rifles capable of holding 20 rounds to assist in the Revolutionary War effort, but John Belton charged prices that were too steep.  *See* Journals of the Continental Congress 1774-1789, at 361 (1907).

48.    Repeating firearms of similar capacities were not just billed for military use during their era; they were openly advertised for use by the general public.  In 1756, for example, a gunsmith named John Cookson advertised in the *Boston Gazette* that his repeater—both "made … and … sold at his house in Boston"—was "a handy gun" that would easily "hold 9 Bullets" and "fire 9 Times distinctly, as quick, or as slow as you please."  Harold L. Peterson, *Arms and Armor in Colonial America* 215 (1956).  John Pimm, another Boston gunsmith, sold a repeater in 1722 capable of "discharg[ing] eleven times."  Samuel Niles, *A Summary Historical Narrative of the Wars in New England*, *in* 5 Massachusetts Historical Society Collections 347 (1837).

49.    In 1804, one famous repeater—the Girardoni air rifle—accompanied a famous American across the vast expanse of this country, all the way to Oregon.  The Girardoni air rifle

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                              13

contained "22 rounds in a gravity-fed, tubular magazine. After firing, the marksman simply tipped the gun to drop the next round, then a lever opened to chamber the lead ball into the action." K.J. Houtman, *Lewis and Clark's Girardoni Air Rifle: The Gun That Helped Discover the West*, Outdoor Hub (Mar 12, 2015), https://bit.ly/3IevgYZ; *see* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 2206-07 (3d ed. 2021). It was "powerful enough to take an elk." *Firearms Law*, *supra*, at 2206. Although this rifle had origins as a military weapon in Europe (for the Austrian army), American gunsmiths began manufacturing similar models here for broader use. *See id.*; Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, Buffalo Bill Center of the West (Aug. 3, 2014), https://bit.ly/3G2XJ2d. So, when Meriwether Lewis set out on the Lewis and Clark Expedition, he took his Girardoni rifle with him, which he mentioned in his journal *39 times*, commenting that "although the expedition was usually outnumbered, the smaller group could defend itself" in large part because of the rifle. *Firearms Law*, *supra*, at 2206-07; *see, e.g.*, Journal Entries of Meriwether Lewis (Jan. 24 and Aug. 11, 1806), *in* Meriwether Lewis & William Clark, *Journals of the Lewis and Clark Expedition* (2005). And while the expedition may have been a military expedition, they purchased their supplies from private smiths and merchants in the same manner that ordinary citizens would have bought them.

50.    The period between the ratification of the Bill of Rights and the Civil War saw several advances in manufacturing that increased the availability of repeating firearms. In the 1820s, Isaiah Jennings developed a repeater capable of firing 20 rounds. *See Newly Invented Muskets*, N.Y. Evening Post (Apr. 10, 1822), *in* 59 Alexander Tilloch, The Philosophical Magazine and Journal (1822). In the 1830s, some firearms were outfitted with multiple barrels, like pepperbox handguns, which could fire up to 24 rounds, and the Bennett and Haviland rifle, which could fire up to 12. Samuel Colt's revolver managed to reach a firing capacity of 21 rounds by

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                    14

pairing a single barrel with a revolving cylinder.  The 1850s welcomed the Walch 12-shot Navy revolver and the 15-round Hall rifle, the 38-shot Porter Rifle in 1851, the 42-shot Ferris Wheel pistol in 1855, and in 1866 the 20-round belt-fed chain pistol.  *See* David Kopel, *Magazines Over 10 Rounds Were Well-known to the Founders*, Reason (Feb. 11, 2020), https://bit.ly/3uZRHJF.

51.    "By 1866, the first Winchester rifle, the Model 1866, could hold 17 rounds in the magazine and one in the chamber, all of which could be fired *in nine seconds*."  *Duncan*, 19 F.4th at 1097 (Bumatay, J., dissenting) (emphasis added).

52.    Lever action guns, which took the mid-nineteenth century by storm, often had a capacity greater than 10 rounds, including the 1859 Volcanic rifle (30 rounds), the 1861 Henry rifle (16 rounds), the 1866 Winchester (18 rounds), the 1873 Winchester (25 rounds), the 1873 Evans Repeating Rifle (34 rounds), the 1886 Winchester (15 rounds), and the 1892 Winchester (15 rounds).  Kopel, *Magazines Over 10 Rounds*, *supra*.

53.    These rifles were no mere curios.  They were commonly owned by law-abiding citizens from coast to coast.  The Winchester company alone "made over 170,000 copies of the [1861] from 1866 to 1898," and produced another 720,000 of its next iteration, the 1873, which held up to 11 rounds.  *Duncan*, 19 F.4th at 1097 (Bumatay, J., dissenting); *see* Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 306-12 (9th ed. 2007).

54.    By the end of the nineteenth century, Americans were using other kinds of firearms with capacity to fire more than 10 rounds, including, most notable, the 1884 Colt Lightning pump action rifle (up to 15 rounds), and handguns utilizing detachable magazines like the Luger M1899 (up to 32 rounds).  *See* Kopel, *supra*.  Many of these firearms had obvious use for military operations.  But they were also commonly kept and borne by civilians, including for self-defense.  Indeed, civil rights advocates in the latter half of the nineteenth century urged that "a Winchester

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    15

rifle should have a place of honor in every black home" because "the only case where [a] proposed lynching did *not* occur, was where the men armed themselves."  Ida B. Wells, *Southern Horrors and Other Writings: The Anti-Lynching Campaign of Ida B. Wells, 1892-1900*, at 70 (1997).

### *The types of arms that Measure 114 bans are owned today by millions of law-abiding Americans for lawful purposes, including self-defense.*

55.    Today, firearms capable of firing more than 10 rounds—whether by virtue of a fixed or a detachable magazine—are standard-issue for many of the most popular firearms on the market, and they are commonly owned by millions of Americans for all manner of lawful purposes.

56.    Of the 10 most popular pistols in America through the first quarter of 2022, *all of them* come standard issue with magazines holding 10 rounds or more.  *See 10 Highest Selling Pistols of 2022 (So Far)*, Refactor Tactical (Apr. 21, 2022), https://bit.ly/3FBEH1K (listing top 10 pistols across all calibers).

a.    The Glock 43X 9mm comes standard with a 10-round magazine, and with optional magazines capable of holding 12, 15, 17, 19, 24, 31, or 33 rounds.  *See* Glock, *G43X*, https://bit.ly/3G1mfRv (last visited Dec. 18, 2022).

b.    The Taurus G3C 9mm comes standard with a "12+1" magazine—i.e., a magazine capable of holding 12 rounds while an additional round sits in the chamber of the firearm—for a total capacity of 13 rounds.  *See* Taurus, *Taurus G3C*, https://bit.ly/3W49nQ2 (last visited Dec. 18, 2022).

c.    The Glock 19 Gen 5 9mm comes standard with a 15-round magazine, and with optional magazines capable of holding 17, 24, 31, or 33 rounds.  *See* Glock, *G19 Gen5*, https://bit.ly/3YyQLcr (last visited Dec. 18, 2022).

d.    The Taurus G2C 9mm comes standard with a "12+1" magazine—i.e., a magazine capable of holding 12 rounds while an additional round sits in the chamber of the

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                        16

firearm—for a total capacity of 13 rounds. *See* Taurus, *Taurus G2C*, https://bit.ly/3BLlLMM (last visited Dec. 18, 2022).

e.    The Glock 44 .22LR comes with a standard 10-round magazine, or an optional magazine capable of holding 18 rounds. *See* Glock, *G44*, https://bit.ly/3hHRJT8 (last visited Dec. 18, 2022).

f.    The Glock 43X MOS 9mm comes standard with a 10-round magazine, and with optional magazines capable of holding 12, 15, 17, 19, 24, 31, or 33 rounds. *See* Glock, *G43X MOS*, https://bit.ly/3FBRsJp (last visited Dec. 18, 2022).

g.    The Glock 19X 9mm comes standard with a 17-round magazine, and with optional magazines capable of holding 19, 24, 31, or 33 rounds. *See* Glock, *G19X*, https://bit.ly/3uWtFiF (last visited Dec. 18, 2022).

h.    The Smith & Wesson M&P 2.0 .45 ACP comes standard with a "10+1" magazine— i.e., a magazine capable of holding 10 rounds while an additional round sits in the chamber of the firearm—for a total capacity of 11 rounds. *See* Smith & Wesson, *M&P M2.0*, https://bit.ly/3Wc0h3Y (last visited Dec. 18, 2022).

i.    The Glock 20 10mm comes standard with a "15+1" magazine—i.e., a magazine capable of holding 15 rounds while an additional round sits in the chamber of the firearm—for a total capacity of 16 rounds. *See* Glock, *G20 Gen4*, https://bit.ly/2MN8TxK (last visited Dec. 18, 2022).

j.    The Glock 26 Gen 5 9mm comes standard with a 10-round magazine, and with optional magazines capable of holding 12, 15, 17, 19, 24, 31, or 33 rounds. *See* Glock, *G26 Gen5*, https://bit.ly/3FDq3XB (last visited Dec. 18, 2022).

57.     The numbers are similar when it comes to America's top-selling rifles.  The most popular rifle sold in America is the AR-15, which comes standard with a magazine of either 20 rounds or 30 rounds.  Americans own millions upon millions of these rifles, which they use for hunting, target shooting, and self-defense.  Matthew Loh, *America has 20 million AR-15 style rifles in circulation, and more guns than people in the country*, Business Insider (May 30, 2022) https://bit.ly/3Vu2S84.  These firearms are popular precisely because of the benefits they offer for self-defense for law-abiding citizens of all ages and sexes, including adjustability and low recoil.

58.     Sales figures for detachable magazines tell a similar story.  From 1990 to 2018, American consumers purchased more than 304 million magazines across both pistols and rifles.  Of that total, 52% (almost 160 million) had a capacity larger than 10 rounds.  NSSF, *Firearm Production in the United States* 7 (2020), https://bit.ly/3jfDUMt.

59.     Americans, including Oregonians, own hundreds of millions of detachable magazines, and millions more firearms with fixed magazines.  And "approximately half of all privately owned magazines in the United States"—roughly 115 million in total—are capable of holding more than 10 rounds of ammunition.  *Duncan*, 19 F.4th at 1097.

60.     Measure 114 nonetheless bans all of these commonplace arms, which it dubs "large-capacity magazines."  *See* §11(d) (defining "'Large-capacity magazine'" as "a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload").

61.     Measure 114 makes it a "crime" for any "person" to "manufacture, import[], possess[], use, purchase, s[ell] or otherwise transfer[] … in Oregon on or after the effective date

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                    18

of this 2022 Act" any such "large-capacity magazine." §11(2); *see also* §11(f) (defining "Person" as "any natural person, corporation, partnership, fire [sic] or association").

62.     The new crime that Measure 114 creates is punishable by up to 364 days in prison and a $6,250 fine, for each offense. *See* §11(6) (classifying the new crime as "a class A misdemeanor"); Or. Rev. Stat. §161.615(1) (setting the maximum prison sentence for class A misdemeanors at 364 days); Or. Rev. Stat. §161.635(1)(a) (setting the maximum fine for class A misdemeanors at $6,250).

63.     Measure 114 gives certain classes of persons a 180-day grace period to come into compliance—by dispossessing, altering, or destroying their lawfully acquired property.

64.     "A licensed gun dealer" that currently possesses "large-capacity magazines" in its stores and warehouses (which is literally all licensed gun dealers) can avoid committing a "crime" under Measure 114 only if, "within 180 days of the effective date of this 2022 Act," it:

> (A) Transfers or sells the large-capacity magazines in the gun dealer's inventory to a non-resident gun dealer or other transferee outside of this state;
>
> (B) Purchases or acquires temporary custody from an owner of any large-capacity magazine for permanent removal from this state within the 180 days of the effective date of this 2022 Act;
>
> (C) Permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a [sic]; or
>
> (D) Permanently disposes of the large-capacity magazines in the gun dealer's custody or inventory.

§11(3)(a).  In other words, a licensed gun dealer in Oregon can avoid criminal liability only by sending its "large-capacity magazines"—which includes both detachable magazines and firearms with fixed magazines that hold more than 10 rounds—out of state, rendering them inoperable (and thus unsalable), or dispossessing itself of them altogether.  And come next June (180 days from

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    19

December 8, 2022), even those options will be off the table.

65.    The dynamic is similar for manufacturers.  A "properly licensed" "firearms manufacturer" that "on the effective date of this 2022 Act" (i.e., December 8, 2022) has "a contract … with an entity outside of this state[] for the manufacture of large-capacity magazines" can avoid committing a "crime" under Measure 114 only if:

> (A) All manufacturing is completed no later than 180 days after the effective date of this 2022 Act; and

> (B) The entity outside of Oregon receiving the large-capacity magazines is made aware in writing on or before the delivery of the ammunition devices of the restrictions pertaining to large-capacity magazines in this state as set forth in this 2022 Act.

§11(3)(b).  There is no grace period for orders that cannot be completed before next June.

66.    Measure 114's new "crime" does not apply to a "properly licensed" "firearms manufacturer" that "manufactures large-capacity magazines" "for exclusive sale or transfer to the Armed Forces of the United States or a law enforcement agency and solely for authorized use by that entity related to the official duties of the entity," but only if the manufacturer from now on "include[s] a permanent stamp or marking indicating that the large-capacity magazine was manufactured or assembled after the effective date of this 2022 Act" that is "legibly and conspicuously engraved or cast upon the outer surface of the large-capacity magazine."  §11(4); *see also* §11(4)(a)(B) ("Except as provided in paragraph (3)(b) of this section"—which gives a 180-day grace period to manufacturers with a "contract … with an entity outside of this state, for the manufacture of large-capacity magazines"—"no large-capacity magazines without such stamp may be manufactured in this state after the effective date of this Act.").  The same is true for "[a] licensed gun dealer that sells or otherwise transfers "large-capacity magazines" to the Armed Forces of the United States or a law enforcement agency solely for authorized use by that entity," but only if "the large-capacity magazines" in question "have been" "permanent[ly]," "legibly[,]"

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                      20

and conspicuously" "engraved or cast upon" to "indicat[e] that the large-capacity magazine was manufactured or assembled after the effective date of this 2022 Act." §11(4)(b), (4)(a)(B).

67.    Measure 114's new "crime" also does not apply to "[a]ny government officer, agent or employee, member of the Armed Forces of the United States or peace officer, as that term is defined in ORS §133.005, that is authorized to acquire, possess or use a large-capacity magazine provided that any acquisition, possession or use is related directly to activities within the scope of that person's official duties." §11(4)(c).

68.    Measure 114 provides "an affirmative defense" to its new "crime," but it relies on a supposed provision of Oregon law that does not exist. "As of the effective date of this 2022 Act, it shall be an affirmative defense, as provided in ORS 166.055, to the unlawful possession, use and transfer of a "large-capacity magazine in this state by any person, provided that":

(a) The large-capacity magazine was owned by the person before the effective date of this 2022 Act and maintained in the person's control or possession; or

(b) The possession of a large-capacity magazine was obtained by a person who, on or after the effective date of this section, acquired possession of the large-capacity magazine by operation of law upon the death of a former owner who was in legal possession of the large-capacity magazine; and

(c) In addition to either (a) or (b) of this subsection[,] the owner has not maintained the large-capacity magazine in a manner other than:

(A) On property owned or immediately controlled by the registered owner;

(B) On the premises of a gun dealer or gunsmith licensed under 18 U.S.C. 923 for the purpose of lawful service or repair;

(C) While engaging in the legal use of the large-capacity magazine, at a public or private shooting range or shooting gallery or for recreational activities such as hunting, to the extent permitted under state law; or

(D) While participating in firearms competition or exhibition, display or educational project about firearms sponsored, conducted by, approved or under the auspices of a law enforcement agency or a national or state-recognized entity that fosters proficiency in firearms use or promotes firearms education; and

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                    21

(E) While transporting any large-capacity magazines in a vehicle to one of the locations authorized in paragraphs (c)(A) to (D) of this subsection, the large-capacity magazine is not inserted into the firearm and is locked in a separate container.

(d) The person has permanently and voluntarily relinquished the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement, prior to commencement of prosecution by arrest, citation or a formal charge.

§11(5).

69. This provision relies on "ORS 166.055," but there is no such provision. The proponents of the Measure likely meant to refer to §16*1*.055. *See* Or. Rev. Stat. §161.055(b) ("When a defense, declared to be an 'affirmative defense' by chapter 743, Oregon Laws 1971, is raised at a trial, the defendant has the burden of proving the defense by a preponderance of the evidence.").

70. That problem aside, this provision apparently gives individuals who lawfully acquired a now-prohibited magazine before Measure 114's effective date three ways to avoid criminal liability. First, the individual can "permanently and voluntarily relinquish[] the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement." §11(5)(a), (d). In other words, she can give the offending magazine or firearm away. Second, the individual can keep the offending magazine or firearm on her property and never take it anywhere else. §11(5)(a), (c)(A). Third, if the individual wants to take the offending magazine off her property, she can do so only if she "transport[s]" it "not inserted into the firearm and … locked in a separate container" and only if she goes to certain enumerated places for certain enumerated purposes: "the premises of a gun dealer or gunsmith licensed under 18 U.S.C. 923 for the purpose of lawful service or repair"; "a public or private shooting range or shooting gallery"; out "hunting, to the extent permitted under state law"; or a "firearms competition or exhibition, display or educational project about firearms sponsored, conducted by, approved or under the

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    22

auspices of a law enforcement agency or a national or state-recognized entity that fosters proficiency in firearms use or promotes firearms education."  §11(5)(a), (5)(c)(B)-(E).  This final option obviously does not work for firearms with a fixed magazine.

71.    Otherwise, the new law mandates confiscation of covered magazines even from those who already lawfully purchased them before Measure 114 was enacted.

**Oregon Rushes to Implement Measure 114, Heedless of the Burdens it Will Impose on Individuals' Constitutional Rights.**

72.    When Measure 114 initially passed, "[s]upporters of the initiative claim[ed] there will be plenty of time, potentially even months, for lawmakers and law-enforcement officials to work out the details."  Stephen Gutowski, *Oregon Gun-Control Initiative Faces Immediate Legal Peril After Slim Victory*, The Reload (Nov. 15, 2022), https://bit.ly/3tWCMzh.

73.    That claim was essential given the many respects in which Measure 114 requires new mechanisms for successful implementation.  For example, the law contemplates the need for sheriffs and police chiefs to "adopt rules to carry out the provisions of this section," §4(9), including by developing "department rules" relating to mandatory disclosures, §4(1)(c).  OSP, meanwhile, is tasked with developing the forms necessary for individuals to apply for permits and for sheriffs and police chiefs to issue them.  §4(4)(a)(A)-(B).  Measure 114 likewise tasks the OSP with creating an entirely new database that "ensur[es] that new permits are added to the database, renewed permits are assigned a new expiration date, and expired or revoked permits are marked expired or revoked but retained in the database."  §4(5)(b).  Regulated parties must consistently cross-check that database to comply with the law.  *See, e.g.*, §§6(2)(d), 8(2).  Then, of course, there is the requirement that OSP create an entirely new background-check system from scratch.  *See, e.g.*, §7(3)(d)(B).  Finally, there is the need for private entities to develop training courses—and have these courses approved by the police—that comply with the law's stringent demands.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                    23

74.     But then the Oregon Secretary of States dialed things up, setting December 8, 2022, as the effective date—even though the final votes would not be certified by then.  *See* Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect Even Sooner, State Says*, The Oregonian (Nov. 18, 2022), https://bit.ly/3GINalU.

75.     The risk that this haste will result in confusion or downright abuse, thereby magnifying the already-extreme burdens inflicted on individuals' Second Amendment rights, is no mere speculation.  Press reports document that Measure 114 has already caused "an increased state police backlog in processing the requested background checks and customers waiting longer to walk out of a store with a firearm, according to state police and gun shop owners.  The number of people waiting for state police approval on background checks also has doubled in the last two weeks, from 10,000 to about 20,000, as voters cast ballots on one of the nation's strictest gun control measures."  Maxine Bernstein, *Oregon Gun Sales Skyrocket After Measure 114 Passes*, The Oregonian (Nov. 16, 2022), https://bit.ly/3TSh0ar.  As one sheriff put it, "I do not have the personnel to attempt to permit every gun purchase in Jefferson County."  Letter from Jason Pollock, Jefferson County Sheriff's Office (Nov. 13, 2022), https://bit.ly/3u5mVi2.

76.     The sheer difficulty posed by processing large numbers of applications likely also explains why "[t]here are virtually no facilities that will be available for [firearms] training"— namely, because "no police have the facilities or manpower to provide classes."  *Measure 114 ... Dangerous, Mislead, Extreme*, https://stop114.com/ (last visited Nov. 29, 2022) (noting that the new permitting process could cost local police more than $50 million in the first year alone).

77.     These obvious obstacles to implementing Measure 114 in anything approaching a responsible manner will invariably harm protected activity.  On its face, the law already bakes in delay, discretion, and exorbitant costs by design.  But the near total lack of means to comply with

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    24

Measure 114's new regime—and hence the law's capacity to prevent individuals from even *acquiring* the firearms that the Constitution entitles them to keep and bear—is a classic illustration of a licensing regime "put toward abusive ends."  *Bruen*, 142 S.Ct. at 2138 n.9.

78.    Oregon's intrusion on Second Amendment rights is, as one firearms advocacy group put it, "insane even by Oregon standards."  Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect Even Sooner, State Says*, *supra*.  Indeed, some Oregon District Attorneys—in Linn, Jefferson, Wallowa, and Union Counties—have announced that they will not even enforce the law.  *See, e.g.*, Ltr. from Sheriff Brad Lohrey, Sherman County Sheriff's Office (Oct. 16, 2022), https://bit.ly/3i3DNTn; Ltr. from Sheriff Michelle Duncan, Linn County Sheriff's Office, Facebook (Nov. 9, 2022), https://bit.ly/3gyqyJW; Steele Haugen, *Central Oregon Sheriff Says He Won't Enforce Measure 114*, Cent. Or. Daily News (Nov. 14, 2022), https://bit.ly/3gDjvjb.

79.    But licensed dealers, like Plaintiff Mazama and many of Plaintiff NSSF's members in Oregon, have no luxury to ignore Measure 114.  They cannot lawfully sell any firearm without a permit-to-purchase, and a permit-to-purchase depends on the state police.  And the state's decision to press full steam ahead with an early effective date—even while the mechanisms necessary to enable compliance with the law remain wholly absent—lays to rest any suggestion that Oregon does not actually intend to enforce Measure 114 post haste.

## JURISDICTION AND VENUE

80.    Plaintiffs' causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

81.    This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                      25

82.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendants are located in and perform their official duties in the District of Oregon and are therefore considered to reside within this District as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Second Amendment — "Permit-to-Purchase" Regime)

83.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

84.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125.

85.     On its face, Oregon's new permit-to-purchase law restricts a person's ability "to purchase or acquire a firearm." §3(4); *see id.* §§4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2).

86.     Because the Second Amendment plainly entitles the people to acquire the firearms that it guarantees them the right to keep and bear, Measure 114 treads on ground "presumptively protect[ed]" by the Constitution, and Oregon "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S.Ct. at 2126.

87.     Oregon cannot do so because there is no "well-established and representative historical analogue" of its new permit-to-purchase regime. *Id.* at 2140.

88.     Only nine states have ever required individuals to obtain a permit just to *purchase* a handgun; all of those came in the twentieth century, and most were short-lived:  New York (1911), Oregon (1913, repealed 1925), North Carolina (1919), Missouri (1921, repealed 2007), Connecticut (1923), Michigan (1927, partially repealed by several steps in early twenty-first century), Hawaii (1927, deemed invalid in 2021, *see Yukutake v. Conners*, 554 F.Supp.3d 1074 (D.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    26

Haw. 2021), now on appeal), New Jersey (1927), and Texas (1931, later declared void).  *See* David

B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv.

J. on Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase*

*Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529,

543 (2021).  As the Supreme Court made crystal clear in *Bruen*, laws enacted for the first time in

the twentieth century "come too late to provide insight into the meaning of [the Constitution]."

*Bruen*, 142 S.Ct. at 2137 (alteration in original) (quoting *Sprint Commc'ns Co., L.P. v. APCC*

*Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting reliance

even on "a handful of late-19th-century [laws]" similar to the challenged restriction).

89.    To be sure, a purely objective and time-limited background-check regime may be

consistent with the right to keep and bear arms.  *See Bruen*, 142 S.Ct. at 2138 & n.9; *McDonald v.*

*Chicago*, 561 U.S. 742, 786 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008).

But even in the carry (as opposed to purchase) context, the Supreme Court went out of its way to

underscore that the Second Amendment does not countenance licensing or permitting "regimes

where, for example, lengthy wait times in processing license applications or exorbitant fees deny

ordinary citizens their right to public carry."  *Bruen*, 142 S.Ct. at 2138 n.9.

90.    Measure 114 ticks all of these problematic boxes and more.  It gives "licensing

officials" discretion to "exercise … judgment"; it allows the application or verification process to

create "lengthy" delays; and it imposes "exorbitant" fees and costs.  *Id.*

91.    First, the new law affords officials discretion unbecoming a proper "shall issue"

regime—namely, OSP may demand "any additional information" it wants before deciding whether

to issue the permit.  §4(1)(c), (2)(c).  This opens unbounded discretion for the department to add

additional criteria for the permit to issue.  Indeed, the new law contemplates that the sheriff or

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                27

police chief may deny a permit both before an individual applies, *see* §4(1)(b)(C), *and after*—that is, even if OSP determines that the applicant passes the state's new background check, the sheriff or police chief can still deny the permit application, *see* §5(2).  Such unbounded discretion means that Measure 114 operates functionally as a constitutionally impermissible may-issue, rather than a valid shall-issue, regime, with licensing agents free to make their own judgments about who seems "reasonably likely" to misuse one.

92.      Second, delay is baked into the new regime.  Under Measure 114, there is no limit on how long OSP can take to complete the background check.  *See generally* §4.  Nor are there penalties if the State Police fail to complete the check.  That means that OSP can delay completion of the background check, and thus the issuance of a permit, indefinitely.  This was not the case before Measure 114 was adopted.  Before Measure 114, Oregon law mirrored federal law.  Until the adoption of Measure 114, ORS 166.412(3)(c) provided as follows:  "If the department fails to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check, the gun dealer may deliver the firearm to the purchaser."  *See also* 18 U.S.C. §922(t)(1)(B)(ii) (similar under federal law).  But now, under Measure 114, a "dealer may not transfer the firearm unless the dealer receives a unique approval number from the department."  §6(3)(c); *see also* §6(13)(b) & (14) (making it a crime to "[k]nowingly sell[] or deliver[] a firearm … prior to receiving a unique approval number from the department," even if the purchaser already possesses a concealed handgun license); §§7(3)(d)(B), 8(3)(B)(c) (extending this amendment to person-to-person transfers and gun shows).

93.      This is critically important.  According to OSP's own published statistics, over the past five years, more often than not it has taken OSP more than 10 days to complete a background

check.  *See* Oregon State Police, Criminal Justice Information Services Division, *2020 FICS Program Overview*, Appendix B, https://bit.ly/3BNMSGT.  Some years, the wait has been even longer.  *See id.*  Before Measure 114, that wait did not prevent law-abiding citizens from acquiring a firearm, as explained above.  And nearly all of them were indeed law-abiding:  Between 2015 and 2020, OSP approved 99.5% of the 1.5 million transactions that came across it, approving 1,497,293 transactions, and denying only 7,124.  But, as a result of Measure 114 §6(3)(c), (13)(b), & (14), most individuals will have to wait more than 10 days to acquire a firearm from a licensed dealer, on the off chance that they are among the tiny fraction of individuals unable to lawfully acquire a firearm.  And as a result of §§7(3)(d)(B) & 8(3)(B)(c), most other forms of transfers (person-to-person or at gun shows) will take too long to be completed at all.

94.    Even if an applicant were to successfully run this veritable gauntlet and convince the state to issue a permit and return a background check with a unique approval number in a timely manner, Measure 114 gives OSP a 30-day clock to issue the permit even after satisfying itself that the individual has passed the background check.  That 30-day deadline for issuance of the permit when (or if) the background check is completed and passed, *see* §4(3)(a), is unconstitutionally long all by itself.  *Cf.* 18 U.S.C. §922(t)(1)(B)(ii) (deeming four days too long to force law-abiding citizens to wait if no background check is returned).

95.    Third, Oregon's regime creates significant costs and barriers to compliance. Defendants may suggest that the sticker price is just $65 for the first license and then $50 to renew every five years thereafter.  But that masks other costs embedded in the regime.  Those amounts, after all, cover only the license fee.  They do not account for the price an applicant must pay to complete a safety course and live-fire training.  *See* §§4(1)(a)(D), (8)(c)(D).  And while Defendants may argue that no one yet knows exactly what those expenditures will be, that just underscores the

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                    29

problem.  While Measure 114 requires classes, it makes no provision for offering such classes, and the state has not yet certified any privately offered classes.  Oregon has thus tasked law-abiding individuals with paying unknown amounts for non-existent courses, and all just to exercise a fundamental constitutional right.

96.    Finally, and compounding all the other constitutional concerns, the state is rushing to implement Measure 114 before it has set up the systems by which it can be administered. Oregon has not yet even provided the necessary funding for its new and onerous permitting scheme—there is an approximately $70-million shortfall between the anticipated annual cost of administering the system and the revenue currently provided to do so—let alone set up the systems required to administer it.  As of right now, not one in-person firearms training course has been certified by the state, which means that no one can lawfully obtain a permit-to-purchase—and thus no citizen can obtain a firearm.  Even if there were approved courses, moreover, OSP has not put in place the background check system necessary to process applications, which too means that no one can lawfully obtain a permit-to-purchase (and thus a firearm).  When it comes down to it, to purchase a firearm in Oregon, a citizen will need to comply with a regime that does not exist.

97.    None of that is remotely consistent with the Second Amendment.  Oregon's regime marks a radical departure even from the most restrictive state regimes in place today.  That is not owing to some "dramatic technological change[]" or "unprecedented societal concern." *Bruen*, 142 S. Ct. at 2132.  As the Supreme Court articulated last June, there is nothing remotely novel about the concern that firearms might fall into the wrong hands, and background-check regimes have been used to address that concern for decades. *See id.* at 2156.  The only thing novel here is Oregon's not-so-thinly-veiled attempt to use a "permitting" regime to frustrate the ability of law-abiding citizens to obtain the arms that the Constitution guarantees them the right to keep and bear.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    30

98.    Measure 114's permitting provisions violate the Second Amendment.

## COUNT TWO
**(Due Process Clause — "Permit-to-Purchase" Regime)**

99.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

100.    The Due Process Clause protects against arbitrary government action, especially when the result of that arbitrary government action is to deprive individuals of the ability to exercise a fundamental substantive right secured by the Constitution.

101.    As things stand now, if Measure 114 is allowed to take effect, it will be impossible to comply with the new law.  Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme.  No live-fire training courses are approved.  And OSP has no background check system in place.  Add it all up, and Oregon will soon require Oregonians looking to purchase a firearm to comply with a regime that does not exist and cannot be satisfied. That is the very definition of arbitrary government action in violation of due process.

## COUNT THREE
**(Second Amendment — "Large-Capacity Magazine" Ban)**

102.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

103.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."  *Bruen*, 142 S.Ct. at 2125.

104.    The Supreme Court has made clear that when a court confronts a flat ban on possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625.  If the answer is "yes," then the ban is unconstitutional, because a state cannot prohibit ordinary law-abiding Americans from possessing what the Constitution explicitly entitles them to "keep."  *See* U.S. Const. amend. II.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                          31

105.    The magazines that §11 of Measure 114 bans are indisputably "arms" within the meaning of the Second Amendment.  *See* U.S. Const. amend. II.  The right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate.  As the Ninth Circuit has put it, "without bullets, the right to bear arms would be meaningless."  *Jackson*, 746 F.3d at 967.  And §11 of Measure 114 does more than just ban detachable magazines; it defines the term "large capacity magazine" to include *fixed* magazines as well, thus effectively banning commonplace firearms themselves.

106.    The first question under *Bruen* is whether "the Second Amendment's plain text covers an individual's conduct."  142 S.Ct. 2426.  The text of the Second Amendment guarantees "the people" the right "to keep and bear Arms."  U.S. Const. amend. II.  Thus, the Supreme Court has made clear that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Bruen*, 142 S.Ct. at 582.  And the word "arms" meant at the Founding the same thing it "mean[s] today"—namely, "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" not just those things that are necessary for self-defense.  *Heller*, 554 U.S. at 581 (quoting 1777 dictionary).  The magazines and firearms that §11 of Measure 114 prohibits are therefore "arms."

107.    To be sure, not all arms are constitutionally protected, in the same way that that the First Amendment does not protect fighting words and obscenity even though they are literally "speech."  But the Supreme Court has made clear—three times—that the Second Amendment protects all bearable arms that are "in common use today."  *Bruen*, 142 S.Ct. at 2142; *see also Caetano*, 577 U.S. at 411-12 (rejecting idea that modern inventions are unprotected); *Heller*, 554 U.S. at 624-25 (Second Amendment protects arms "typically possessed by law-abiding citizens for

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    32

lawful purposes," as opposed to those typically possessed by criminals for criminal purposes).

108.   The magazines and firearms that §11 of Measure 114 prohibits plainly satisfy that test.  As noted, magazines capable of holding more than 10 rounds come standard with many of the most popular handguns and long guns on the market.  Indeed, *every single one* of the 10 highest-selling pistols in 2022 comes standard with such a magazine.  Americans own more than 100 million of these arms, which today account for "approximately half of all privately owned magazines in the United States." *Duncan,* 19 F.4th at 1097.  In short, millions of Americans own millions of these arms for lawful purposes, including self-defense, sporting, and hunting.  This is more than enough to satisfy the common-ownership test.  *See* Caetano, 577 U.S. at 420 (Alito, J. concurring) (noting that "approximately 200,000 civilians owned stun guns" as of 2009).

109.   Because magazines capable of holding more than 10 rounds and firearms with fixed magazines of such capacity are arms typically possessed by law-abiding citizens for lawful purposes, they are protected by the Second Amendment, full stop.  *Bruen*, 142 S.Ct. at 2134.  Oregon's effort to ban them is thus blatantly unconstitutional.

110.   At a bare minimum, the arms that §11 of Measure 114 ban are "presumptively protect[ed]" by the Second Amendment, so Oregon would have to "affirmatively prove that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126.

111.   Oregon cannot come close to making that showing.  There were no restrictions on firing or magazine capacity when either the Second Amendment or the Fourteenth Amendment was ratified.  The first state to restrict magazine capacity did not do so until *1990*, and laws enacted for the first time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]." *Id.* at 2137 (alteration in original) (quoting *Sprint*, 554 U.S. at 312 (Roberts, C.J.,

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                             33

dissenting)); *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]").

112.    Indeed, Oregon cannot even identify a "well-established" tradition of restricting magazine capacity *today*.  *Id.* at 2133.  Only a handful of jurisdictions have laws analogous to Measure 114's flat ban on possessing magazines capable of holding 10 or more rounds.  As for the federal government, it did not restrict magazine capacity until 1994—and Congress allowed that law to expire in 2004 after a study by the Department of Justice revealed that the law had produced "no discernable reduction" in gun violence.  Christopher S. Koper et al., U.S. Dep't of Justice, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice* 96 (2004), https://bit.ly/3wUdGRE.

113.    The absence of historical laws restricting firing capacity is not the result of some "dramatic technological change[]" that came about in the past few decades or some "unprecedented societal concern[]" that did not exist until 1990.  *Bruen*, 142 S.Ct. at 2132.  Firearms capable of firing more than 10 rounds long predate the Founding.  *See Duncan*, 970 F.3d at 1147.  They were marketed to and bought by civilians, for self-defense, hunting, and other lawful purposes, from the start.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. of N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, C.J. dissenting).  Indeed, the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market.  *Duncan*, 970 F.3d at 1148.  In short, "magazines of more than ten rounds ha[ve] been well established in the mainstream of American gun ownership" for a very long time.  David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions,* 78 Alb. L. Rev. 849, 862 (2015).

114.    Defendants have not identified and cannot identify any "enduring American tradition of state regulation" forbidding the purchase and/or possession of magazines capable of

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                                34

holding more than 10 rounds by law-abiding citizens for lawful purposes. *Bruen*, 142 S.Ct. at 2135. Because Oregon cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127, §11 of Measure 114 unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

## COUNT FOUR
### (Takings Clause — "Large-Capacity Magazine" Ban)

115.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

116.    The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (applying Takings Clause to the states).

117.    The Takings Clause protects against two kinds of governmental takings: (1) "physical appropriation[s]" of "interest[s] in property"; and (2) "restriction[s] on the use of property" (known as "regulatory takings"). *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015).

118.    A physical taking occurs whenever the government "dispossess[es] the owner" of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). That is true of both real property and personal property; the "categorical duty" the Takings Clause imposes applies "when [the government] takes your car, just as when it takes your home." *Horne*, 576 U.S. at 358; *see Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner."). It is true even if the dispossession arises from a regulation, rather than from the use of eminent domain: "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). And it is true, finally,

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    35

even when the government-authorized "invasion" is only partial. *Id.* at 2072.

119.    Oregon's confiscatory ban in §11 of Measure 114 plainly runs afoul of these settled principles. The new law makes it a crime for licensed gun dealers to continue to possess in Oregon magazines and firearms that they lawfully acquired and that, but for the new law, they would lawfully sell to law-abiding citizens.

120.    "A licensed gun dealer" that currently possesses "large-capacity magazines" in Oregon can avoid committing a "crime" under Measure 114 only if, "within 180 days of the effective date of this 2022 Act," it:

> (A) Transfers or sells the large-capacity magazines in the gun dealer's inventory to a non-resident gun dealer or other transferee outside of this state;

> (B) Purchases or acquires temporary custody from an owner of any large-capacity magazine for permanent removal from this state within the 180 days of the effective date of this 2022 Act;

> (C) Permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a [sic]; or

> (D) Permanently disposes of the large-capacity magazines in the gun dealer's custody or inventory.

§11(3)(a). In other words, a licensed gun dealer in Oregon can avoid criminal liability only by sending its "large-capacity magazines" out of state, rendering them inoperable (and thus unsalable), or dispossessing itself altogether. And come June 7, 2023, not even those options will be on the table.

121.    By forcing licensed gun dealers to physically surrender, destroy, or send away their lawfully acquired property, Measure 114 effects a physical taking.

122.    Courts assess physical takings "using a simple, per se rule: The government must pay for what it takes." *Cedar Point*, 141 S.Ct. at 2071.

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    36

123.    Because Measure 114 offers no compensation for the lawfully acquired property it turns into unlawful contraband, it violates the Takings Clause.

124.    To the extent Measure 114 does not effect a physical taking, it effects an unconstitutional regulatory taking as to both dealers and manufacturers and individuals. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-39 (2005) (a regulation that "goes too far"—by, for example, depriving a property owner of economically beneficial use or otherwise "interfer[ing] with legitimate property interests"—also constitutes a taking that requires just compensation). But for Measure 114, these magazines and firearms would be salable and in demand (as evidenced by the fact that Americans have purchased hundreds of millions of them and counting). And but for Measure 114, individuals who already possess them would be able to continue putting them to all the same uses to which they put any other lawfully acquired and possessed arm. Measure 114 has deprived them of the value they had when they were lawfully acquired.

## COUNT FIVE
### (Due Process Clause — "Large-Capacity Magazine" Ban)

125.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

126.    Under the Due Process Clause of the Fourteenth Amendment, government may deprive individuals of their property only when doing so furthers a "legitimate governmental objective." *Lingle*, 544 U.S. at 542. Due process protections are particularly acute when a law applies retroactively to change the consequences of conduct that was lawful at the time. *See E. Enters. v. Apfel*, 524 U.S. 498, 547-50 (1998) (Kennedy, J., concurring in part and dissenting in part).

127.    By making it a crime to continue to possess property that they lawfully acquired, Measure 114 deprives persons of protected property interests without due process of law, as prohibiting the possession and full use of lawfully acquired and commonly owned magazines

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                    37

based solely on their ability to accept more than 10 rounds does not further a "legitimate governmental objective" in a permissible way. *Lingle*, 544 U.S. at 542.

128.    For largely the same reasons that it violates the Takings Clause, Measure 114's confiscatory ban violates the Due Process Clause.

129.    Moreover, Measure 114 violates law-abiding citizens' due process rights by treating all magazines capable of holding more than 10 rounds of ammunition and firearms with fixed magazines of such capacity as contraband even if individuals lawfully acquired them, and by requiring individuals who lawfully acquired such products to "affirmative[ly] defen[d]" themselves in a criminal prosecution. §11(2), (5).

## COUNT SIX
### (Vagueness — "Large-Capacity Magazine" Ban)

130.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

131.    Measure 114 defines "large-capacity magazine" to mean "a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, *or that can be readily restored, changed, or converted to accept*, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload[.]" §11(1)(d) (emphasis added).

132.    The highlighted clause—"or that can be readily restored, changed, or converted to accept"—is unconstitutionally vague.

133.    To satisfy "[t]he due process clause of the Fourteenth Amendment," all state laws "must be intelligible, defining a 'core' of proscribed conduct that allows people to understand whether their actions will result in adverse consequences." *Forbes v. Napolitano*, 236 F.3d 1009,

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                         38

1011 (9th Cir. 2000). "[V]agueness review is even more exacting" when "a statute subjects transgressors to criminal penalties, as this one does." *Id.* "In addition to defining a core of proscribed behavior to give people constructive notice of the law, a criminal statute must provide standards to prevent arbitrary enforcement." *Id.* (citing *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999)). "Without such standards, a statute would be impermissibly vague even if it did not reach a substantial amount of constitutionally protected conduct, because it would subject people to the risk of arbitrary deprivation of their liberty." *Id.* at 1011-12.

134.    In light of these principles, the Sixth Circuit has held that a provision of a municipal ordinance defining "assault weapon" to mean "any firearm which *may be restored* to an operable assault weapon as defined in [other provisions]" was "unconstitutionally vague in its own right" (i.e., not just in combination with the other provisions) because "the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998) (emphasis added).

135.    The same conclusion obtains here. Measure 114 provides no guidance as to what "readily restored" means. Does it mean able to "be restored by the person in possession, or [simply that it] may be restored by a master gunsmith using the facilities of a fully-equipped machine shop"? *Id.* Nothing in Measure 114 directs citizens where to look to determine the answer.

136.    That is all the more problematic given that Measure 114 lacks any sort of knowing requirement or other mens rea element. Even an individual who concededly does not know that an arm she possesses can be "readily restored" is still subject to criminal punishment under Measure 114. That is not consistent with due process.

137.    In short, "the provision, which imposes strict liability, violates the constitutional requirement that a law give fair warning of that which it prohibits." *Id.*

EYRE PLAINTIFFS' FIRST AMENDED COMPLAINT                                              39

**PRAYER FOR RELIEF**

Plaintiffs pray for the following relief from the Court:

1.    a declaratory judgment under 28 U.S.C. §2201 that Oregon Measure 114 is unconstitutional;

2.    a temporary injunction enjoining Defendants and their officers, agents, and employees from enforcing Oregon Measure 114 against Plaintiffs and their members;

3.    a permanent injunction enjoining Defendants and their officers, agents, and employees from enforcing Oregon Measure 114 against Plaintiffs and their members;

4.    any attorneys' fees, costs, and expenses to which Plaintiffs may be entitled by law;

5.    nominal damages; and

6.    any further relief the Court deems just and proper.


DATED: January 4, 2023                    Respectfully submitted,

Paul D. Clement[*]                     s/ Shawn M. Lindsay
Erin E. Murphy[*]                      Shawn M. Lindsay (OR Bar #020695)
Matthew D. Rowen[*]                    JurisLaw LLP
Nicholas M. Gallagher[*]               Three Centerpointe Drive, Suite 160
Clement & Murphy, PLLC                 Lake Oswego, OR 97035
706 Duke Street                        (503) 968-1475
Alexandria, VA 22314                   shawn@jurislawyer.com
(202) 742-8900

[*] admitted *pro hac vice*


*Counsel for Eyre Plaintiffs*