Stephen J. Joncus, OSB #013072
Joncus Law PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
971.236.1200
steve@joncus.net

Leonard W. Williamson, OSB #910020
Van Ness Williamson LLP
960 Liberty St. SE, Ste 100
Salem, Oregon 97302
503.365.8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KATE BROWN, et al.,<br><br>Defendants. | Civil No. 2:22-cv-01815-IM (*Lead Case*)<br>Civil No. 3:22-cv-01859-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01862-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01869-IM (*Trailing Case*)<br><br>CONSOLIDATED CASES |
| MARK FITZ, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>Defendants. | **DECLARATION OF ASHLEY HLEBINSKY** |
| KATERINA B. EYRE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>Defendants. | |

DANIEL AZZOPARDI, et al.,

                              Plaintiffs,

        v.

ELLEN F. ROSENBLUM, et al.,

                              Defendants.

Stephen J. Joncus, OSB No. 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
steve@joncus.net

Leonard W. Williamson, OSB No. 910020
VAN NESS, WILLIAMSON LLP
960 Liberty Road S., Ste 100
Salem, Oregon 97302
Telephone: (503) 365-8800
l.williamson@vwllp.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, INC**., an Oregon public benefit corporation; **BRAD LOHREY**, Sherman County Sheriff; **ADAM JOHNSON**, **CODY BOWEN**, Union County Sheriff; **BRIAN WOLFE**, Malheur County Sheriff; **HAROLD RICHARD HADEN, JR**., <br><br> Plaintiffs, <br><br> v. <br><br> **GOVERNOR KATE BROWN**, Governor of Oregon, and **ATTORNEY GENERAL ELLEN ROSENBLUM**, Attorney General of Oregon, and **TERRI DAVIE**, Superintendent of the Oregon State Police, <br><br> Defendants. | Civil No. 2:22-cv-01815-IM <br><br><br> **DECLARATION OF ASHLEY HLEBINSKY** |

I, Ashley Hlebinsky, declare as follows:

1.      I am a firearms historian and public educator, specializing in material culture

studies, as well as a firearms and ammunition-related museum consultant, expert witness, freelance writer, and guest lecturer. Previously, I served as the Robert W. Woodruff Curator-in-Charge of the Cody Firearms Museum (henceforth to be known as the CFM), where I curated and managed a collection of around 7,000 firearms from the 1200s through modern day, with over 20,000 related artifacts, including ammunition, edged weapons, and accoutrements. I also served as the Project Director on the museum's full-scale multimillion dollar renovation, responsible for every aspect including but not limited to research, content, exhibition, and installation, which reopened in 2019. This summer (2022), I co-founded the University of Wyoming College of Law's Firearms Research Center with Second Amendment Scholar and University of Wyoming Law Professor, George Mocsary.

2.      I have been retained by the Plaintiff's in this matter to provide historical testimony on firearms technology, with an emphasis on the history of technology in relation to repeaters and magazine-fed repeaters, some with capacities greater than ten rounds. I will also provide a brief look into the laws that existed at the time of the United States' Founding and Second Founding Eras to provide reference for any possible analogous comparisons to modern magazine restrictions as defined in the New York State Rifle and Pistol Association, Inc. v. *Bruen* (henceforth to be referred to as *Bruen*) ruling by the Supreme Court. This report was prepared for the *Oregon Firearms Federation, Inc. et al v. Brown et al*, Case No. 22-CV-01815-IM and *Eyre et al v. Rosenblum et al*, Case No. 22-cv-01862-IM. I have been retained to write a declaration at the rate of $450/hour.

**Background and Qualifications**

3.      I have spent the last fifteen years immersed in the study of firearms history, technology, and culture. I earned both bachelor's and master's degrees in American History

from the University of Delaware, during which I studied firearms history and culture and instructed undergraduate students about military weaponry throughout history. Much of my work since then focuses heavily on material culture surrounding the macro-history of firearms and how their developments have affected industry, culture, and society for centuries. I have been fortunate to work in some of the largest collections in the United States, beginning my career as a researcher and fellow in the Smithsonian Institution's National Firearms Collection housed in the National Museum of American History.

4.      Additionally, I spent a decade working with and running the only accredited firearms museum in the United States, the CFM, a part of the Buffalo Bill Center of the West, which receives approximately 200,000 visitors annually. Of the 200,000 people, it is estimated, based on initial survey data for the renovation, that only 50% of those people admit to having a background or specified interest in firearms. During my tenure, I also served as Project Director of the museum's full-scale multimillion-dollar renovation. With the aid of my team, I was responsible for all facets of the renovation including but not limited to concept, content, fundraising, and collections management. Final content for the museum was reviewed internally and by an external panel of experts, including academic historians, museum professionals, teachers, public educators, gun collectors, and people unfamiliar with firearms, as well as people with a range of different political views on guns. The resulting museum, which reopened July 2019, provides a more interpretive space to facilitate productive dialogue on firearms and their roles in history. Throughout this museum, terminology and definitions play a significant role in educating both visitors not familiar with firearms and those who consider themselves aficionados. Because roughly half of the museum's audience is not familiar with firearms, we dedicated an entire gallery at the front

of the museum to understanding the basics of firearms past and present, their features, ammunition, and safety. Since its opening, the museum has received favorable reviews from the Wall Street Journal and National Public Radio for its accessibility to diverse audiences and thoughtful handling of what can be a sensitive topic. It has also been praised for its efforts to educate on and impact firearms safety.[1]

     5.     During my time at the CFM and through my consulting business, I have become nationally known and sought after to provide a material culture perspective on firearms history that is often lacking in much of modern, academic, and legislative discussions on firearms. I guide museums as well other non- and for-profit organizations and government entities on the interpretation and understanding of that history. I have recently prepared declarations regarding the history of magazines and repeaters for Ocean State Tactical et al v Rhode Island, Virginia Duncan v Bonta and State of Washington v Federal Way Discount Guns et al.  In May 2021, I testified in front of the Senate Judiciary Subcommittee on the Constitution's Hearing regarding "Ghost Guns," for which I researched and discussed the long history of privately made firearms and evolution of arms technology from the colonies through the 1960s. Because I have worked in several national collections that have upwards of 10,000 firearms each – collections that range from the earliest through most recent technology – I have developed a broad understanding of how firearms have evolved. Additionally, I have had the rare opportunity to work with, see, study and handle

---

[1] [1] Rothstein, Edward. "Handled With Care" *The Wall Street Journal.* September 27, 2019
<https://www.wsj.com/articles/handled-with-care-11569601047> Accessed December 15, 2022. Kudelska, Kamila.
"Firearms Museum Focuses on Gun Safety, History and Culture." *NPR.* August 25, 2019
<https://www.npr.org/2019/08/25/753448348/firearms-museum-focuses-on-gun-safety-history-and-culture>
Accessed December 15, 2022.

DECLARATION OF ASHLEY HLEBINSKY- Page 4

many of the firearms referenced in this declaration.

6.　　　In addition to my historical scholarship, I also have played a role in public education around firearms. I have been responsible for the education of tens of thousands of students from elementary through college levels, teaching not only firearms safety and basics, but the historical and technical evolution of the firearm. In 2017, I developed the first full-scale symposium in the United States dedicated to the study of firearms as material culture, which reoccurs annually. These symposia were organized to bring together firearms scholars from around the world to discuss their collections but also to create metrics to analyze the quality of scholarship that already has been done in the field. The study of firearms is a complicated one, especially since much of the information about the objects themselves have traditionally been conducted by well-known firearms researchers and collectors. However, not all those people fall under traditional definitions of academic scholarship. On the other side, because of limitations in the study of firearms, academic research often has flaws in terms of a general understanding of the firearms themselves. We have worked to lessen that gap to create more balanced scholarship. To continue that mission, I sit on the Editorial Board for the recently revived, peer-reviewed arms journal, Armax, and I recently co-founded the University of Wyoming College of Law's Firearms Research Center in 2022. Despite its location in the College of Law, this new center intends to encourage research of all types related to arms and ammunition.

7.　　　Currently as a museum consultant, I am in the process of building several museums with heavy emphasis on firearms collections. I also conduct workshops on firearms, survey collections, and curate exhibitions at institutions such as the Houston Museum of Natural Science, CM Russell Museum & Complex, and the Mob Museum. I have

served as a scholar and a panelist for the National Park Service and the Organization of American Historians on a forthcoming Coltsville National Historic Site. I am also an expert witness, freelance writer, guest lecturer, on-camera firearms historian, and television producer. A current copy of my Curriculum Vitae summarizing my education and experience is attached at the end of this document as *Exhibit Hlebinsky-1*.

**Prior Expert Witness Testimony**

> State of Washington v Federal Way Discount Guns et al, December 2022
> Virginia Duncan et al v Bonta, November 2022
> Ocean State Tactical et al v Rhode Island, October 2022
> Senate Judiciary Subcommittee on the Constitution, Stop Gun Violence: Ghost Guns, May 2021
> Franklin Armory et al v Rob Bonta, February 2021
> FN Herstal v Sturm, Ruger & Co, January 2021
> Sturm, Ruger & Co. v American Outdoor Brands Corp., October 2020
> Guedes v BATFE, June 2019
> Miller v Becerra (Bonta), November 2019
> > - Evidentiary Hearing Testimony October 2020
> > - Deposition January 2021
> Regina (Nova Scotia) v Clayton, January 2019
> Garrison v Sturm, Ruger & Company, Inc. 2018
> > - Deposition November 2018

**Scope of Work**

8. This modified version of the report was prepared for several aforementioned cases. Firstly, the report will provide a brief statement on the long history of the interconnectivity between military and civilian arms. It will address how the advancement of technology often was driven by the civilian market; the multi-purpose use of early arms for civilians and the military; the private acquisition of firearms to be used on the battlefield; and the postwar weapons surpluses that have flooded and continue to flood the civilian market.

DocuSign Envelope ID: 29CEE04E-1B09-2B60-A043-8673FX1186D

Secondly, it will provide a history of repeaters and/or magazine-fed repeaters, including firearms with capacities over ten rounds, as well as an overview of some relevant laws during the times in which they were invented and/or used. The second section will be loosely organized into two subsections: the Founding and the Second Founding Eras, with related contextual histories, in chronological order, which also happens to be the order of relevancy to constitutional law as defined in *Bruen*.

9.      According to *Heller v District of Columbia* and reiterated in *Bruen* "not all history is created equal…Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[2]  Under *Bruen*, the most relevant time frame in consideration regarding the constitutionality of modern regulations is the Founding Era - when the Second Amendment was ratified. *Bruen* does acknowledge that the period surrounding the creation of the Fourteenth Amendment, known as the Second Founding Era, can be useful, although, as with the *Bruen* case, it is not necessarily relevant when discussing the historical pedigree of regulation.[3]  Subsequent time frames can provide insight, albeit far less significant if relevant at all, including the timeframe leading up to the ratification of the Second Amendment, the time in between the Second and Fourteenth Amendments, and least significant, the twentieth century.[4]

---

[2] The following two paragraphs are summarized from an analysis of relevant history and historical analogues found in Johnson, Nicholas, Kopel, David B., Mocsary, George A, Wallace, E Gregory, & Donald Kilmer. *Firearms Law and the Second Amendment Regulation, Rights and Policy* (3rd ed. 2021) 2022 Supplement (August 2022), pg. 86 – 88

[3] Ibid pg. 86

[4] Ibid pg. 86 According to Johnson et al: some time periods can be used to provide the context of what was available leading up to the formation of the Second Amendment as well. For example, those periods can possibly provide context for the mindset of the Founding Fathers when the Second Amendment was ratified. Additionally, the period directly after can provide insight "to determine *the public understanding* of a legal text in the period after its enactment or ratification." The late nineteenth century history is helpful in instances when it affirms what has been

10.     Important though to consider is "[guarding] against giving post enactment history more weight than it can rightly bear."[5] *Bruen* does provide further guidelines for when each era in history can inform the understanding of the Second Amendment. It also provides guidance for how to determine a historical analogue. While the law does not have to be a twin of a past law, there is some guidance to consider as "courts should not 'uphold every modern law that remotely resembles a historical analogue."[6]

11.     For this report, please note that I will make a distinction between repeater and magazine-fed repeater. A magazine is a vital part of the firearm; it is a container, detachable or fixed, that holds ammunition while it feeds into a repeating firearm. In the periods being discussed, there are repeating firearms that do not use magazines, such as revolvers, which use a rotating cylinder that is as important and integral as a magazine is in order to fire a gun. When I am discussing a repeater that has a magazine, I will qualify it as such. Additionally, I will use capacity to refer specifically to the number of rounds of ammunition that can be held within a firearm. When I am discussing magazine capacity, I will qualify it as such.

**General Statement of the Interconnectivity of Sport and War**

12.     The expression weapon of war is used a lot in modern and historical discussions surrounding firearms. Today, it is used as an umbrella term to describe a range of different firearms that people perceive as being useful to warfare, regardless of whether they

---

established by earlier history. The same can be said about twentieth century history, although significantly less relevant than the other periods. These times do not necessarily provide insight if it contradicts earlier evidence

[5] Johnson et al, pg. 86

[6] Ibid., pg. 88 According to the authors: "the analogue must be "relevantly similar." One measure of these laws to consider according to *Heller and McDonald v. Chicago* (2012) is through "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed defense." The how is defined as "whether modern and historical regulations impose comparable burden on the right of armed self-defense." The why is defined as "whether that burden is comparably justified."

were actually used on or designed for the battlefield. How the expression is used today implies a distinct line between firearms made for the military and firearms made for the civilian market. However, that line for seven hundred years has always been blurred.

13.     Once firearms were developed, technology often advanced too quickly for common battlefield use, finding popularity in the civilian market. Military firearms in a general sense were limited by tactics, government bureaucracy, and expense, while civilian arms until recently were predominantly limited by individual budget. Additionally, civilian arms can be employed for far greater number of uses, including hunting, self-defense, and target shooting. The earliest firearms technology appeared on the battlefield by the thirteenth century. The hand cannon, or handgun, was little more than the name suggests, a cannon for your hands. The user utilized a touchhole and external fire source to ignite powder and fire the gun. This primitive technology may not have been designed for a sporting purpose, but once it was designed, inventors pushed the boundaries, capabilities, and usages of firearms into the future. And while the hand cannon specifically may not have been used for sport, other military weapons of the time such as longbows and crossbows were popularly used for target shooting competitions in fairs during the Middle Ages.

14.     The first true ignition system, the matchlock, was developed around 1400. This firearm, which utilized a burning match cord, was a popular military arm used for centuries around the world. By the end of the 1400s, however, matchlocks and subsequent ignition systems also began appearing in early target shooting competitions.[7] Another example of a firearm being adopted for civilian use dates a century after the matchlock. In

_____

[7] Matchlocks and wheel-locks can be seen depicted in period imagery and in medals for shooting competitions

the first decade of the 1500s, a highly advanced handgun was developed, the wheel-lock.
This gun, developed for use on horseback, was operated by the turning of a spring-loaded
wheel. While it saw some battlefield use, it was expensive and difficult to repair. As a result,
it was used for specialized purpose on the battlefield in Europe, but not as much in the
colonies. However, the technology was considered so advanced, some European countries
made and used wheel-locks for sport into the 1800s. Another example of superior technology
being used by civilians rather than military is rifling. Rifling, the boring out of the inside of a
barrel with spiral lands and grooves to spin a projectile, thus making it more accurate, was
developed at the turn of the sixteenth century and appeared predominantly in civilian arms,
with a few military exceptions from the American Revolution, until just before the turn of the
twentieth century when military tactics finally caught up to the technology.[8]

15.     Before the ability to mass manufacture firearms, guns often were privately
made by gunsmiths. Although two armories did exist in the United States around the time of
the Founding Era, many guns for the battlefield were made or assembled by individuals or
received via foreign aid.[9]  It is estimated that 2,500-3,000 gunsmiths worked in the colonies
alone.[10]  They, as private citizens, were responsible for making guns for both the military and
civilians. While the standard infantry arm during the American Revolution was a smoothbore
(no rifling) musket, there were some regiments during the War that used a common civilian

---

[8] Examples of rifled matchlocks do exist. Rifled wheel-locks are far more common as they were so often used for
hunting. This timeline provides a decent overview of early technological developments: Gun Timeline. PBS History
Detectives. <https://www.pbs.org/opb/historydetectives/technique/gun-timeline/index.html> Accessed 10/22/2022
[9] Springfield Armory was the first armory that began production in 1794
<https://www.nps.gov/spar/learn/historyculture/index.htm> Accessed 10/25/2022. The second armory was Harpers
Ferry Armory and Arsenal, which began construction in 1799
<https://www.nps.gov/hafe/learn/historyculture/harpers-ferry-armory-and-arsenal.htm> Accessed 10/25/2022
[10] Moller, George D. *American Military Shoulder Arms: Volume 1.* University of New Mexico Press, 2011. P.107

firearm at the time, the American long rifle. The long rifle was a modified design from the German Jaeger (Hunting) Rifle that tended to have a longer barrel and a smaller caliber than its German counterpart. The rifle was the superior firearm in terms of accuracy compared to the inaccurate smoothbore musket. However, because of the type of projectile employed at the time – a round musket ball – the process to load was slower for rifles because the ball had to fit snuggly within the lands and grooves of the rifling. There was a trade off in terms of effectiveness for specific purposes.[11] The long rifle in the colonies served as a multi-purpose tool. It was capable of being used for hunting, self-defense, and target shooting. Important to note though that unless being made for large-scale military adoption, such as the smoothbore musket, and/or produced with the use of parts kits ordered from overseas, many civilian arms were made at the behest of individuals or in small runs.

16. Target shooting was a part of American culture before the formation of the United States with colonists taking part in competitions known as "Rifle Frolics."[12] This tradition has continued throughout American history, especially after the Civil War. For example, the National Rifle Association was founded by Union officers in 1871, and its core purpose was "to promote and encourage rifle shooting on a scientific basis." What resulted

---

[11] Until the development of a successful conically shaped bullet (rather than a round musket ball) by Claude Etienne Minie and modified by James Burton at Harpers Ferry, rifling was expensive and slow to load. For a round ball to effectively spin in rifling, it had to fit perfectly which slowed the loading process. However, it was perfect for target shooting as well as hunting and specialized military use. Since tactics by the military were still shoulder-to-shoulder fighting, accuracy was not of prime importance, so militaries used smoothbore (unrifled) barrels for their standard equipment.

[12] This is a tradition kept alive by several historic sites including, Fort Boonesborough Living History Museum and Bardstown, KY's Colonial Days <<https://fortboonesboroughlivinghistory.org/html/rifle_frolic.html> Accessed 10/25/2022 <https://www.prlog.org/11271548-rifle-frolics-18th-century-market-fair-military-drills-displays-and-daniel-boone.html> Accessed 10/25/2022

was the proliferation of international shooting competitions.[13]  Another example is the

Olympic sport of Biathlon, a sport which involves both skiing and target shooting, dating to

1767 in Europe. It was initially created for government use in places like Norway. That

purpose persisted for centuries, even after becoming an international sport. In the 1930s,

Finnish troops still used skis and rifles for patrol. Until recently, the firearms used in

Biathlon and other disciplines of the shooting sports, often used modified versions of center-

fire NATO cartridge firearms.[14]  By the nineteenth century, progress on manufacturing

processes allowed more firearms of more varieties to be available to the US government as

well as civilians. Many of the repeaters of all sorts produced during this century came in

specific models indicating sporting vs military variants.[15]

17.     The line between military and civilian arms was certainly blurred at the

founding of the country and thereafter, as was the role of the civilian and the soldier. In the

colonies and in early America, certain citizens were required to serve in their militias with

firearm and ammunition requirements and some soldiers carried their personal firearms into

battle. By the American Civil War, it was not unheard of for soldiers to privately purchase

firearms that the US government had not adopted or did not issue to them for use in battle.

After the war, even issued weapons that were used in war were often sold on the civilian

market. After the Civil War, soldiers could buy their firearms and many dealers and

---

[13] The National Rifle Association of America was founded after the National Rifle Association in the United Kingdom (1859). <https://home.nra.org/about-the-nra/> Accessed 10/25/2022

[14] An example of a centerfire modified firearm can be found in the Cody Firearms Museum. Here is a succinct summary of the history of the biathlon <https://minnesotabiathlon.com/about-biathlon/the-history-of-biathlon/> 10/25/2022

[15] Flayderman, Norm. *The Flayderman's Guide to Antique American Firearms…and their Values.* 9th Ed (2019). This book is considered the gold standard in the evaluation of antique American made firearms. It provides not only firearms organized by manufacturer but also by type, such as repeater, military etc. Here is just one example: pgs. 694-695

distributors sold the surplus in mass in their catalogs or at stores for even lower prices. According to Springfield Armory National Historic Site, "many thousands [of] cheap surplus weapons were released into private hands through General Orders 101, providing rifles, pistols, carbines, and muskets that found their ways into the hands of Americans in the decades following the Civil War."[16] The tradition of selling military arms to civilians continues today with firearms such as the Springfield Model 1903 bolt action rifle and even with semi-automatics such as the M1 Garand rifle and the Model 1911 pistol.[17]

18.     There has always been an ebb and flow of civilian and military firearms for centuries, some with clearer lines than others. However, the assertion that a gun, especially during the Founding and Second Founding Eras, could be completely understood as only for war in a time when there was such interchangeability, is presentist at best.

**The Founding Era**

19.     In today's understanding of historical relevance, *Bruen* affirms that the most crucial time for consideration of the constitutionality of modern regulations falls under the Founding Era defined as the time around the ratification of the Second Amendment. By this era, repeating, including magazine-fed, firearms had been around for a long time. Additionally, repeaters, including those with magazines, could have capacities of over ten rounds at least a century before and during the ratification of the Second Amendment. Despite the invention of these technologies, firearms laws during this time were primarily

---

[16] Springfield Armory details this information here <https://www.nps.gov/spar/learn/historyculture/a-springfield-rifle-musket.htm> Accessed 10/24/22

[17] Today, postwar weapon surplus guns including several semi-automatic firearms such as the M1 Garand are sold through the Civilian Marksmanship Unit <https://thecmp.org/sales-and-service/1911-information/> <https://thecmp.org/sales-and-service/services-for-the-m1-garand/> Accessed 11/25/2022

focused on restricting access to enslaved, Native, and free Black peoples as well as other people of color.

***Repeaters***

20.    The concept of a repeating firearm dates to the earliest technology of firearms. Hand cannons even came in repeating variations.[18] While some repeaters were employed or simply attempted on the battlefield, repeating technology would not be widely popular for use in war until the late nineteenth century. That did not mean however that innovation in repeating technology was stymied. In fact, it was quite the opposite. Without the confines of wartime tactics and budget, many repeating firearms were commissioned by civilians who utilized them. The simplest method of producing arms capable of firing more than one round at a time initially was to fit a firearm with more than one barrel. However, due to weight limitations, gunmakers began experimenting with other means of producing repeating arms during the sixteenth century. One of the first methods attempted involved superimposed loads, which were successive charges of powder and ball on top of each other that were separated by wadding or the projectile itself in one barrel. They were fitted with locks that either had multiple cocks and pans or a single lock that could slide upon a rail. One such example was a sixteen-shot firearm made in 1580.[19]

21.    By the 1630s, a Dutch gun making family, Kalthoff, began experimenting with a design that allowed up to fifteen shots to be fired in rapid succession. It utilized a tubular

---

[18] An example can be found in the Cody Firearms Museum Collection

[19] This firearm was on display at the National Firearms Museum's location in Missouri. Winant, Lewis. "A 16-Shot Wheel Lock," *America's 1ˢᵗ Freedom* (2014).

magazine located in a pistol's butt or a fowling piece's stock to hold powder and balls.[20]

This system was so innovative it was reproduced and modified for over 150 years. Also, by

the mid-seventeenth century in Italy, magazine-fed repeaters were being developed.

According to the Royal Armouries (Leeds), the earliest example can be found at the Musée

de l'Armée which was made by Giacomo Berselli of Bolognia in the late 1660s.[21]  However,

more well-known and relevant to the Founding Fathers, is Michele Lorenzoni of Florence.

He developed a magazine-fed repeater, in pistol and rifle form, known as the Lorenzoni

system. This design was copied and modified by numerous designers after its invention with

various configurations and magazine capacities. One such firearm was designed by British

gunsmith, John Cookson in the late seventeenth century. A gunmaker in Boston, also named

John Cookson – it is not clear if this person was the same Cookson from England, a relative,

or a coincidence – published an ad in the *Boston Gazette*, in 1756, advertising a nine-shot

repeating firearm. Around the same time a Cookson-type twelve-shot repeater was made by

gunmaker John Shaw.[22]  Another example from the 1750s in America is the Belton repeating

fusil. This gun was invented by Joseph Belton around 1758. Not a magazine repeater like the

Lorenzoni, the Belton utilized superimposed loads. Notably, he petitioned the Continental

Congress during the American Revolution to adopt his firearm. In 1776, he wrote Congress

saying he designed a firearm that could fire eight shots in three seconds. Benjamin Franklin

---

[20] Some of this research was compiled by the late historian, Herbert G. Houze and was featured in the Houston Museum of Natural Science's *The Art of the Hunt: Decorated European Sporting Arms from 1500-1800* (2019).

[21] For more information, visit: https://royalarmouries.org/stories/our-collection/the-christmas-connection-to-captain-souths-lorenzoni-pistol-our-collection/ Accessed 10/24/2022

[22] An example of this firearm can be found in the National Firearms Museum <https://www.nramuseum.org/the-museum/the-galleries/the-road-to-american-liberty/case-22-the-paper-cartridge/cookson-volitional-repeating-flintlock.aspx> It is also discussed here: < http://firearmshistory.blogspot.com/2014/02/the-cookson-repeater.html> Accessed 10/24/22

wrote to George Washington in support of the idea.[23] Washington ordered one hundred Belton firearms for use in the Continental Army. However, this order was canceled because, as this report has previously stated, cost is often an impediment to battlefield adoption. It is alleged that Belton then sold his firearms to the public.[24] A few decades later around 1779, the Girardoni (also spelled Girandoni) air rifle was developed. It was a repeating arm that could fire twenty-two rounds from a tubular magazine.[25] This design also was copied by gunmakers around the world.[26] The actual Girardoni was used by Meriweather Lewis on the Lewis and Clark Expedition (1804-1806). This air rifle had also been in service with the Austrian military, but light weight examples were produced in sporting variations.[27]

22.     The above text serves merely as an example of the numerous types of repeating firearms, utilizing a range of technologies including magazines, which existed leading up to and at the time of the ratification of the Second Amendment and in some cases had direct ties to Founding Fathers. While these repeaters can be criticized as "one-off

---

[23] These letters can be found here: <https://founders.archives.gov/documents/Washington/03-05-02-0311> Accessed 10/22/22

[24] What is believed to be the prototype of the Belton fusil is in the Smithsonian Institution's National Firearms Collection:< https://americanhistory.si.edu/collections/search/object/nmah_440031> Accessed 10/22/2022. Additionally, Rock Island Auctions, who has sold recently several reproduction Beltons provides a great overview of this history <https://www.rockislandauction.com/riac-blog/assault-weapons-before-the-second-amendment#:~:text=The%20Belton%20%22Roman%20candle%22%20fusil%20is%20the%20first,a%20chained%20charge%20much%20like%20a%20Roman%20candle> Accessed 10/22/2022

[25] Kopel, David. "The History of Firearms Magazines and Magazine Prohibitions." Albany Law Review, Vol. 88, 2015, pg. 853

[26] An example of a Russian copy of a Girardoni Rifle can be found in the Cody Firearms Museum

[27] For more information on Lewis and Clark and the Girardoni, the most comprehensive research on the Girardoni air rifle was done by scholar Michael Carrick. His research is footnoted in this summary article of the Lewis and Clark firearms that can be found here: <http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf> Accessed 10/22/22 Additionally, Ian McCollum, one of the foremost authorities on firearms technology in the United States, has done several videos and articles about the firearm. This is one article he did <https://www.forgottenweapons.com/rifles/girardoni-air-rifle/> Accessed 10/22/2022. A surviving example of a Girardoni can be found: <https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-6-romance-of-the-long-rifle/girardoni-air-rifle-as-used-by-lewis-and-clark.aspx> Accessed 10/22/22 Rock Island sold a sporting variation in 2018: <https://www.rockislandauction.com/detail/75/3293/girandoni-system-repeating-air-gun > Accessed 10/22/22

examples" or in some cases unsuccessful by modern and/or historic standards, it is important to keep in mind that this was typical as they were often made by private gunsmiths and sometimes individually commissioned. Additionally, just because some firearms designs had flaws, imperfections, or issues, does not mean the technology ceases to exist or should be ignored. As manufacturing processes advanced, these concepts evolved into repeaters produced in greater and more standard quantities.

**Laws and Relevance**

23.     In the colonial period, the bulk of firearms laws were centered on restricting access to certain people rather than firearms themselves. Therefore, even if a firearm or weapon was specifically mentioned in a law, the type of weapon is not necessarily relevant, as other civilians were still permitted to own them even if some people were restricted. Each colony developed their own policies. In 1640, Virginia law stated, "that all such free Mulattoes, Negroes and Indians…shall appear without arms."[28]  South Carolina also had similar bans in 1712.[29]  It is generally understood that early laws were largely motivated by race.[30]

24.     The British government also used regulation to control the colonists through access to gunpowder by seizing public powder houses, also referred to as "magazines."

---

[28] One of the best resources to search all firearms laws is the Repository of Historical Gun Laws, Duke University School of Law. <https://firearmslaw.duke.edu/> Accessed 10/25/2022. However, a concise summary of these laws is also broken down by: Ekwall, Steve. *The Racist Origins of US Gun Control.* <https://www.sedgwickcounty.org/media/29093/the-racist-origins-of-us-gun-control.pdf> Accessed 10/22/22 Here he references: 7 The Statues at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, p. 95 (W.W. Henning ed. 1823) (GMU CR LJ, p. 67)

[29] Eckwall, 7 Statutes at Large of South Carolina, p. 353-54 (D.J. McCord ed. 1836-1873). (GMU CR LJ, p. 70)

[30] The abstract of Cramer, Clayton E. "Colonia Firearms Regulation" (April 6, 2016) puts it fairly succinctly: "Firearms regulation in Colonial America was primarily focused on encouraging gun ownership for defense against external threats (Indians, pirates, non-British European powers) and internal threats (slave rebellions)"

Although it is not to be confused or conflated with the mechanical devices discussed throughout this declaration. They achieved this because, due to fire hazard, large stocks of black powder were kept in a communal powder house, which was a repository for both individuals and merchants to store their powder. It also provided powder for people who were unable to afford it.[31]  In one instance of disarmament, Royal Governor Thomas Gage, in 1774, seized remaining powder in Charleston, causing a flurry of responses, known as the Powder Alarm, from the colonists that was considered preparation for the Battles of Lexington and Concord.[32]  Shortly thereafter, King George III enacted a restriction to "prohibit the Exportation of Gunpowder."[33]  As a result, Revolutionary leaders, such as Paul Revere, required possession of arms and ammunition by militiamen and many required powder and projectiles in quantities greater than ten pounds and rounds respectively.[34]

25.     While the ownership of gunpowder was outright encouraged, there were still very real concerns about the instability of gunpowder. It is important to note that modern gunpowder is far more stable than historic black powder. Even so, it is still recommended to be stored separately from firearms in the home even today.[35]  As a result of instability, fire prevention laws were enacted, not to disarm individuals but to provide them a safe place to store their powder while also reducing the potential for fire within communities. Philadelphia in 1725 enacted a law "for the better securing of the city of Philadelphia from the Danger of

---

[31] Johnson et al. Firearms Law and Second Amendment Regulation, Rights, and Policy (3rd ed. 2021), pg. 271

[32] Ibid., pg. 271

[33] Ibid, pg. 272

[34] *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1150 (S.D. Cal. 2019)

[35] According to the Sporting Arms and Ammunition Manufacturer's Institute, "ammunition should be stored in a cool, dry location away from solvents and other chemical heat sources, or open flames…ammunition should be stored separately from firearms" < https://saami.org/wp-content/uploads/2018/01/SAAMI_AmmoStorage.pdf> Accessed 10/25/22

DocuSign Envelope ID: 29CEF8AF-39D94B50-D9B5-62749AF18097

Gunpowder." Under this Act, safety was also defined as the distance of beyond two miles outside of town limits.[36]   Similarly, Boston in 1783 also made a storage law citing the instability of black powder. "In the houses of the town of Boston, [it] is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in town."[37]  The idea of a required distance in which it was safe to use black powder for firearms and also for fireworks, was echoed in these laws. While in the above example it considered distance within town limits, some places legislated a safe distance from the powder house itself. For example, in 1762, Rhode Island enacted "that no person whatsoever shall fire a gun or other fireworks within one hundred yards of the said powder house."[38] Additionally, Rhode Island in 1798, provided guidance on how to safely store powder in the home. They also provided a safe space to store anything over twenty-eight pounds[39]  These laws strongly focused on safety from a perspective of fire prevention rather than a position of regulating the amount of powder one could have since powder houses were built for large quantities of chemically unstable and combustible material.

26.    In summary, at the time of the Founding Era, laws about firearms restriction were regularly directed towards groups of people rather than the firearms themselves. Within these laws, repeating and firing capacity are not mentioned. In some cases, the militia

---

[36] 1725 Pa. Laws 31, An Act for the Better Securing of the City of Philadelphia from the Danger of Gunpowder <https://firearmslaw.duke.edu/laws/1725-pa-laws-31-an-act-for-the-better-securing-of-the-city-of-philadelphia-from-the-danger-of-gunpowder-%c2%a7-2/> Accessed 10/25/22

[37] Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston <https://firearmslaw.duke.edu/laws/thomas-wetmore-commissioner-the-charter-and-ordinances-of-the-city-of-boston-together-with-the-acts-of-the-legislature-relating-to-the-city-page-142-143-image-142-1834-available-at-the-making-of/> Accessed 10/25/2022

[38] 1762 R.I. Pub. Laws 132 <https://firearmslaw.duke.edu/laws/1762-r-i-pub-laws-132/> Accessed 10/25/22

[39] 1798-1813 R.I. Pub Laws 85 < https://firearmslaw.duke.edu/laws/1798-1813-r-i-pub-laws-85-an-act-relative-to-the-keeping-gun-powder-in-the-town-of-providence-%c2%a72/> Accessed 10/25/22

required arms and ammunition to be in civilian possession partially due to British attacks on public powder houses. Additionally, laws concerning the private possession of gunpowder were centered around fire prevention within and near town's limits or proximity to a powder house.

**The Second Founding Era**

27.    According to *Bruen*, under certain circumstances the Second Founding Era, surrounding the Fourteenth Amendment, can be used to provide insight into historical analogues. As mentioned in the previous section, repeaters, including magazine-fed firearms, were known, and becoming increasingly popular at the time of the Fourteenth Amendment. Capacities over ten rounds existed before and during this time. Laws yet again did not concern capacity. They continued to center around restrictions against groups of people. They also centered around carry. Ironically, though some firearms regulated in carry laws were still legal, despite having the same or even greater capacity, as long as they were physically larger in size, or in some cases more expensive.

*Repeaters*

28.    The period before and after ratification of the Fourteenth Amendment saw changes in the landscape of design and technology outside of just firearms. The transition of firearms being made by private gunmakers began shifting to factories by the mid-nineteenth century. Inline manufacturing, interchangeable parts, and mass production impacted not only the types of firearms that were available, but also quantity and quality. Prior to the American Civil War, there were many makers and manufacturers of repeating firearms, however, the tradition of individual gunmakers was still prominent. While repeating firearms, magazine-fed or not, exceeded ten-rounds centuries prior, the number of distinct types of repeaters by

the middle of the nineteenth century was staggering. It is important to note that while this report references the ceiling of ten rounds, that number is historically arbitrary as it is unfair to assume that a person during that time would make a distinction between capacities under and over ten rounds, especially considering to my knowledge, the federal government itself did not until the 1990s.[40]

29.    After the ratification of the Second Amendment, repeating technology continued to evolve as it had for centuries. During this time frame, especially leading up to the Industrial Revolutions and standardization of interchangeability and in-line manufacturing processes, designs were very much a trial-and-error process. One such repeater was designed in 1821 and was known as the Jennings repeating flintlock. It was capable of firing twelve rounds before having to reload.[41]  Pepperbox pistols, a revolving pistol with multiple barrels that were manually rotated on a central axis, were popular in the United States by the 1830s, some were even taken out west with California gold miners. One maker of pepperboxes alone, Ethan Allen, between the 1840s and 1850s made over forty variations of this style of firearm.[42]  While many pepperbox pistols typically fired four to six shots, some were capable of firing twelve, eighteen, or twenty-four rounds.[43]  It becomes difficult to quantify the number of repeaters on the market though because makers were so plentiful. In 1836, a year before Samuel Colt's first patent in England of his revolving

---

[40] This date is referencing the Public Safety and Recreational Firearms Use Protection Act (1994). Additionally, there are many resources that can showcase the number of repeaters available in this time frame in the United States, but the place that aggregates them the best is Flayderman, Norm. *The Flayderman's Guide to Antique American Firearms…and their Values.* 9th Ed.

[41] Flayderman, Pg 683

[42] Ibid pg. 56-61

[43] Kopel, pg. 854. Additionally, pinfire pistols and long guns can be found in museum collections with capacities greater than ten rounds

mechanism, the patent process was standardized through the United States Patent Act. That year, Samuel Colt took out two patents for five or six-shot revolving rifles and pistols. As a result, he owned the legal right to produce, essentially the revolver, until it expired in the mid-1850s. This Act created a flurry of production, innovation, and design especially towards repeaters and magazines to varying degrees of success. The fact though that so many people were trying to design the next great repeater shows the desire to capitalize on this technology.[44]

30.    It has been cited and challenged that the Winchester Model 1866 was the first magazine-fed repeater that held more than ten rounds to achieve commercial success.[45]  The Winchester Model 1866 lever action rifle was the first firearm sold using the Winchester name. Between 1866 and 1898, approximately 170,101 Model 1866s, in .44 Rimfire, were produced. Of that model alone, around ten variations existed. It was hoped that the Winchester Model 1866 would see successful adoption by the US military, however, it did not. Only a small percentage, roughly 1/3 of total production, were made ultimately for use by foreign militaries.[46]  In reference to his Model 1866, Oliver Winchester referred to it as "one of [the company's] best sporting guns" in a letter, dating 1871, to prominent gunmaker R.S. Lawrence.[47]  In a Winchester testimonial from 1865, W.C. Dodge, Late Examiner of the

---

[44] Examples of these patented repeaters include Volcanic lever actions, the Jarre Harmonica pistol and rifle, Porter and Genhart turret rifles, Josselyn Chain Revolvers etc. More successfully were revolvers and repeaters by Smith & Wesson, Remington, Merwin & Hulbert, Henry, Winchester etc.

[45] Kopel, pg. 869

[46] Flayderman's also provides the number of Mexican contract firearms there were. The records are not complete for the Model 1866. The Records can be found in the Cody Firearms Museum's Records Office. Here is a breakdown of what has survived through the Winchester collector. https://winchestercollector.org/models/model-1866/ This article also provides a breakdown of other military contracts. < https://www.americanrifleman.org/content/winchester-lever-actions-go-to-war/> Accessed 10/22/22

[47] Oliver F. Winchester's letter to R.S. Lawrence, dated 10 February 1871. McCracken Research Library, MS20, Box 51, Folder 6

US Patent Office, boasted that Winchester's "Magazine Rifle, with the recent improvement, is superior to any other arm ever presented to the public."[48]  In the beginning, Winchester did lean into its previous involvement with the Henry rifle as a marketing tool because it was a known commodity, however, within a decade after the company's founding, Winchester catalogs detailing their sporting models and diverse product lines were interspersed with testimonies from hunters and civilians about their love of the technology.[49]  The categories for their 1875 catalog reads: "Winchester's Repeating Fire-Arms, Rifled Muskets, Carbines, Hunting and Target Rifles, &c…"[50]  One such testimonial was from famous performer, William F. Cody, who proclaimed, "I have tried and used nearly every kind of gun made in the United States, and for general hunting or Indian fighting, I pronounce your improved Winchester the *boss*."[51]  Despite the ways that Winchester chose to frame and market their firearms though, it should be noted that while advertising can influence a consumer, a consumer also has agency to purchase and use the product they want for their own purposes.

31.     While Winchester would provide the United States smaller runs of their firearms designs modified for military service around the turn of the twentieth century, Winchester would not truly be seen as a full-scale military manufacturer until their involvement in World War I when government owned armories could no longer meet the demand for military arms. Winchester and other manufacturers such as Remington stepped in

---

[48] Dodge is most likely referencing the 1865 King's Patent Improvement which incorporated a side loading gate to improve the speed of loading the firearm. Winchester's Repeating Firearms Rifled Muskets, Carbines, Hunting, and Target Rifles, &c…Metallic Cartridges of all Kinds, manufactured by the Winchester Repeating Arms Company." Catalogues Vol. 1 (1865-1881). McCracken Research Library TS 533.5.W5431991v1c2

[49] McCracken Research Library TS 533.5.W5431991v1c2

[50] Ibid

[51] Ibid, pg. 28-29

initially producing firearms – sometimes not even associated with their brands - invented by other designers, companies, and/or armories, such as the British Pattern 1914 Enfield and the American version, the U.S. Model 1917. These military contracts however would ultimately be the financial demise of the company as it went into receivership in 1931.[52]

32.     Outside of those early small contracts, Winchester continued designing guns for the civilian market. The Winchester Model 1873 boasted a production of around 720,610 manufactured in at least twelve variations, including almost 20,000 in .22 caliber rimfire – a caliber used for target shooting and varmint hunting. Model 1873 rifles were chambered in .32-20, .38-40, .44-40, and .22 caliber. The Model 1876 had a manufacturing run of 63,871 firearms with around fifteen variations. This Model was a larger version of the Model 1873 and chambered in heavier calibers (.40-60, .45-60, .45-75, .50-95), which made the firearm more desirable for hunters, including President Theodore Roosevelt.[53]  At one point, they produced an exclusive line of high-level sporting arms of the Models 1873 and 1876 known as the "1 of 100" and "1 of 1,000" models. Between the start of the company until 1898, Winchester released fourteen repeating models. Those models would eventually be produced in over one hundred variations, chambered for around thirty different cartridges.[54] Winchester continued mass producing repeating firearms throughout the rest of the nineteenth century and beyond. Considering the diversity within models, variations and especially calibers, these guns were developed for specific and sometimes divergent purposes

---

[52] This information can be found in pretty much any book about Winchester. The author also knows this information for the decade she spent running the Cody Firearms Museum, formerly known as the Winchester Museum, which is home to Winchester's firearms collection as well as archives from the company
[53] Flayderman, pg 309
[54] Ibid pg 306-322

and cannot not be reduced into one category of simply being a Winchester repeater.

33.     In fact, while Winchester may be most recognized for their lever action, they also made other repeaters, such as double barrel shotguns, straight pull and standard bolt action rifles, slide action rifles and shotguns, semi-automatic rifles and shotguns, and even machine guns. In terms of the handgun market, Winchester attempted to make revolvers in the 1870s and during World War I received a commission late in the war to make Model 1911 semi-automatic pistols. Winchester even is credited of having designed what is considered one of the earliest if not the earliest "assault rifles" per the Defense Intelligence Agency's definition from 1970.[55]  Winchester, in 1917, designed a selective fire (meaning capable of switching between semi-automatic and automatic functions), single person portable rifle with twin top-mounted twenty-round detachable magazines, chambered for an intermediate cartridge. Not only did Winchester designer, Frank Burton, develop this firearm, he also invented an accompanying intermediate cartridge, the .345 WSL with a spitzer bullet.[56]

34.     Winchester wasn't the only manufacturer though of repeating firearms in the mid to Dlate 19th century. Other companies were producing competitive repeaters, such as the Evans Repeating Rifle, which was made between 1873 and 1879. Approximately, 12,200

---

[55] Not to be confused with assault weapons, according to the Defense Intelligence Agency: "Assault rifles are short, compact, selective-fire weapons that fire a cartridge intermediate in power between submachinegun and rifle cartridges." Johnson, Harold E. *Small Arms Identification and Operation Guide – Eurasion Communist Countries.* An Army Intelligence Document. US Army Foreign Science and Technology Center November 1970, pg. 68.
[56] While there are some texts on this firearm, including Forgotten Weapons:
<https://www.forgottenweapons.com/burton-1917-light-machine-rifle/> The only known example is in the Cody Firearms Museum. It is accompanied by field testing notes and ammunition, providing a more accurate picture of the rifle than what has been previously published. Accessed 12/19/2022

were made and they came in three variations, Sporting (approximately 4,350 made), Military

(approximately 3,200), and Carbine (not specified as either sporting or military,

approximately 4,700 made). The Evans held magazine capacities at twenty-eight, thirty-four,

and thirty-eight rounds.[57] The Evans as well as other companies such as the Spencer

Repeating Rifle, Fogerty Repeating Rifle, Adirondack Firearms, Bullard Repeating Arms,

Burgess Gun, and the Whitney Arms Companies were making repeaters. However, they are

lesser known, partially because Winchester realized the value in their designs and the threat

of them as a competitor, so they acquired the companies.[58] Other major manufacturers, such

as Marlin, quickly popped up as well by the 1880s as a direct competitor to the Winchester

lever action. Additionally, by the end of the 19th century, major manufacturers were making

fixed and detachable magazines in quantities greater than ten that were not only lever actions

rifles. In fact, between 1887 and 1904, Colt manufactured an estimated 186,185 Colt

Lightning slide action rifles, in small, medium, and large frames. While they came in several

calibers, they also had fixed tubular magazines greater than ten rounds.[59] In all, there were

over one hundred manufacturers or makers in the United States alone producing some type of

repeating firearm leading up to and decades after the Civil War.[60]

    35.    As plentiful as variations in Winchester firearms are though, the above

information does not take into account the gargantuan amount of ammunition Winchester

manufactured. In general, not enough is said about Winchester's innovation in cartridge

---

[57] Flayderman, pg. 694-695

[58] An entire exhibit at the Cody Firearms Museum is dedicated to the many repeating arms companies that Winchester acquired. Examples are archived in the Winchester Arms Collection.

[59] Flayderman, page 122-123

[60] Ibid, Chapters V: A-F pages 50-299; Chapter VII: A, B, C Pages 351-387; Chapter VIII: A Pg458-524; Chapter XIII pages 691-697; Chapter XV: pages 709-733

design and the fact that ammunition production was responsible for much of the financial success of the company. According to David Kowalski, author of the *Standard Catalog of Winchester*: *The Most Comprehensive Price Guide Ever Published,* "cartridges played a larger role in the business operations of the Winchester Repeating Arms Company (W.R.A. Co.) than most collectors realize. Because ammunition is a high-volume, high profit product, it literally carried the W.R.A. Co. for most of its existence."[61]  Their cartridge designs were so popular that other companies, such as Colt, would offer variations of their iconic firearms, such as the Colt Single Action Army revolver, to accommodate Winchester developed cartridges, such as the .44-40. Ammunition production was so vital to Winchester that the company who bought them out of receivership, the Olin Corporation, was their ammunition competitor. Today, the only surviving thread of the company is Olin's Winchester Ammunition. The various firearms brands that bear the Winchester name, are produced by companies that license the name from Olin.

Magazines

36.    In addition to the developments in repeating innovation, magazines began to be patented as well. Even though tubular magazines existed long before, the tubular magazine was first patented in the US in the 1840s, notably with the Hunt Volitional Rifle, the oldest direct ancestor to the Winchester rifle. Magazines though came in many shapes and sizes and became prevalent around this time. For example, not all tubular magazines are fixed to the firearm, some such as the Spencer lever action repeating rifle which utilized a detachable tubular magazine from the buttstock capable of holding seven rounds. A speed

---

[61] Kowalski, David D. Ed. Standard Catalog of Winchester: The Most Comprehensive Price Guide Ever Published. Krause Publications 2000, pg. 159.

loader even existed for that magazine. In the 1850s, the Genhart turret rifle had a detachable circular magazine with an externally visible shot/round counter. Between 1859 and 1862, the Jarre Harmonica Pistol and Rifle received several patents. This gun has a horizontally seated magazine that slides after each round is fired like a typewriter. It is also detachable.

37.    In terms of box magazines specifically, early ones were patented by designers including Rollin White in 1855.[62] A detachable version was patented in 1864 by Robert Wilson.[63] A vertically stacked box magazine was patented by James Paris Lee in 1879 which was applied to several rifles including the Mannlicher Model 1886 rifle.[64] In terms of early semi-automatic pistols, the Mauser C-96 had a fixed magazine, and the Borchardt C-93 had a detachable one. Semi-automatic models of Winchester utilized various types of magazines, including the Winchester Model 1907, a centerfire rifle capable of firing up to twenty rounds from a box magazine and the Winchester Model 1903 which was also fixed with a lesser-known Sabo ninety-six round detachable magazine. By the end of the nineteenth century, the earliest versions of semi-automatic pistols such as the Borchardt C-93 contained eight rounds from a detachable magazine (1893) and the Mauser C-96 had a ten-round magazine (1895) but also came in configurations as high as twenty rounds.[65] Even certain Luger semi-automatic pistols in the early 1900s had the option of thirty-two round snail drum magazines.[66]

**Laws and Relevance**

---

[62] White, Rollin. US Patent No 12648 (1855)

[63] Wilson, Robert. US Patent No 45105 (1864)

[64] Lee, James Paris US Patent No 221328 (1879)

[65] Kopel, 857 referencing *Standard Catalog of Firearms.* (2014), Gun Digest Books, pg. 708-709

[66] A version of this section on magazines was initially completed by author for Miller et al v Bonta

38.     Racial firearm bans continued into the nineteenth century. States including but not limited to Louisiana, South Carolina, Florida, Delaware, Maryland, North Carolina, and Mississippi enacted race bans between ratification and the American Civil War.[67] Some states, for a time, would permit African Americans to carry guns with court approval, but they were eventually repealed.[68] Several laws upheld their justification for race-based regulation on the fact that Black people were not considered citizens, which was upheld in the 1857 case of Dred Scott v Sandford.

39.     During this period in between ratifications of the Second and the Fourteenth Amendments, some laws emerged restricting carry by any person. According to Professor of Sociology at Wake Forest University David Yamane, one of the earliest examples was in Kentucky in 1813. The General Assembly of the Commonwealth stated: "That any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or a sword cane, concealed as a weapon…shall be fined in any sum, not less than one hundred dollars." However, nine years later in 1822, the Kentucky Supreme Court ruled that ban violated their 1792 Constitution.[69] Other states adopted similar carry regulations, some still only for certain groups of people.

40.     In Oregon, two laws enacted prior to being established as a state prohibited the "sale of arms and ammunition to Indians" like the laws dating before the federal

---

[67] Ekwall

[68] Ibid, referring to Act of Nov. 17, 1828, Sec. 9, 1828 Fla. Laws 174, 177; Act of Jan. 12, 1828, Sec. 9, 1827 Fla. Laws 97, 100; Referring to Act of Jan. 1831, 1831, Fla. Laws 30

[69] Yamane, David. *Concealed Carry Revolution: Expanding the Right to Bear Arms in America*. A New Press (2021), pg. 17-18. David Yamane is a Sociology Professor at Wake Forest. This book was just a small portion of his larger research on gun culture that he calls, "Gun Culture 2.0." More of his research can be found at gunculture2point0.com

government's Founding Era, and also, concerned carry but not licensure.[70]  The earliest act that discusses licensing (1872) relates to the sale of gun powder under the "Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations" similar to fire prevention laws previously mentioned.[71]

41.      Despite the abolition of slavery, discriminatory laws that included firearms regulation continued. One such way that could be legally achieved was through the Black Codes. While there were many aspects of discrimination in the various state "Codes," many included challenges to Black Second Amendment rights. For example, Alabama in 1866 not only banned Blacks from owning firearms and other weapons, but also made it illegal to lend or sell to a black person.[72]  The Civil Rights Act of 1866, the Fourteenth Amendment and the Second Freedmen's Bureau Act in 1866 attempted to dispel a variety of these issues.[73]  In February 1866, the House of Representatives amended the Second Freedmen's Bureau Act to explicitly state that people had the "full and equal benefit of all laws and proceedings for the security of person and estate *including the constitutional right to bear arms*."[74]  Following the passage of these acts, however, southern states then passed laws, known as Army/Navy Laws, in which certain firearms, such as Colt Army and Navy model revolvers were permitted while cheaper versions were not legal.[75]  Prohibiting the proliferation of

---

[70] Repository of Historical Gun Laws, Duke University School of Law < https://firearmslaw.duke.edu/laws/1853-or-laws-220-proceedings-to-prevent-commission-of-crimes-ch-16-%c2%a717/> < https://firearmslaw.duke.edu/laws/1853-or-laws-257/> Accessed December 19, 2022

[71] Ibid < https://firearmslaw.duke.edu/laws/charter-of-the-city-of-portland-street-and-fire-department-laws-ordinances-regulations-c-page-225-227-image-226-228-1872-available-at-the-making-of-modern-law-primary-sources/> Accessed December 19, 2022

[72] Ekwall

[73] A detailed explanation of this can be found in: Johnson et. al pg. 465-471

[74] Ibid, pg. 466

[75] Eckwall

inexpensive handguns on the market, whether intentionally or unintentionally imposed a classist restriction on those who could no longer afford to arm themselves– a trend that has continued well into the modern era.

42.     The Enforcement Acts of 1870 and 1871 were meant to protect the rights of free men under the Fourteenth and Fifteenth Amendments. Yet these seemingly positive changes were short lived. During the 1872 election for Louisiana governor, President Ulysses S. Grant sent troops to support the Republican candidate. In response, a group of white supremacists began harassing Black and White Republicans. These tensions culminated in Black and White Republicans taking up defense in a local courthouse in Colfax, LA. In 1873, 150 white men surrounded the courthouse and at one point, would fire a cannon at the building. Note: White Republicans were given the opportunity to leave before the massacre ensued. Black Republicans were left to fight with inferior weaponry. In the end, Black Republicans would surrender to the mob, led by a man named William Cruikshank. After surrender, somewhere between sixty to one hundred and fifty African Americans were killed.[76] Although Cruikshank and around ninety-six white vigilantes were charged for violating the Enforcements, only a few were convicted.[77] Even then, the Supreme Court, in *United States v Cruikshank* (1875), overturned the conviction ruling that the federal government could not prevent private citizens, in this case KKK members, from disarming Blacks and that the matter must be relegated to the states.[78]

43.     Another example concerning disarmament of a group of people occurred

---

[76] Johnson et al, pg. 471

[77] Ibid, pg. 471 as well as summarized in <https://www.smithsonianmag.com/smart-news/1873-colfax-massacre-crippled-reconstruction-180958746/> Accessed 10/25/22

[78] Ibid, pg. 471

DocuSign Envelope ID: 29C5EF84E-39C924B59-013862-1M-F18FD

leading up to the American Civil War. Violent confrontations broke out in Kansas, known as Bleeding Kansas, between 1854 and 1859. At one point an anti-slavery movement of "Free Soilers" decided to arm themselves with single-shot Sharps rifles by smuggling them into the territory. However, the pro-slavery segments, under the command of a deputy federal marshal, attempted to disarm these settlers, most notably during the Sacking of Lawrence.[79] In response to the situation in Kansas, abolitionist Charles Sumner gave his famous speech on the floor of the United States Senate on May 19, 1856, "The Crime Against Kansas." During which, South Carolina Senator A.P. Butler, supposedly stated that the people of Kansas should no longer possess their arms. During Sumner's speech, he attacked Butler and affirmed the right of individuals to bear arms:

> "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector…Never was this efficient weapon [referring to the single shot Sharps Rifle] more needed in self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached…"[80]

This speech culminated in violence against Sumner, who was beaten with a cane on the Senate floor for advocating against disarmament. Yet, even after a Civil War and thirty-five years later government disarmament would lead to the largest mass murder in American history. On December 29, 1890, Colonel James Forsyth, commander of the 7th Cavalry, ordered the Lakota to surrender their firearms leading up to their removal from the land they inhabited. It is debated exactly what happened to pull the trigger on the slaughter, but in the end, hundreds of Lakota were killed.[81]

44.     After a long history of government related violence as well as private

---

[79] Johnson et al, pg. 456

[80] Ibid, pg. 456

[81] Utley, Robert M. *The Last Days of the Sioux Nation.* 2nd Ed. Yale University Press, pg. 211

vigilantism, Black people, particularly in the South, called for their personal armament to protect themselves. Much research has been done focusing on violence against people of color as a justification for firearms restrictions, however, less explored is the fact that Black people used and relied on firearms for protection from violence. These two ideologies conflict with one another. On one side, it is argued that restrictive laws would reduce violence, specifically on marginalized communities. On the other, it is argued that gun ownership allows those communities the best ability to protect themselves. In this circumstance, a restriction would take away rights of the latter, putting them again at risk of violence. This desire to protect oneself with the best technology available was echoed amongst the Black community in the late nineteenth century through prominent leaders. For example, John R. Mitchell, Jr., Vice President of the National Colored Press Association, encouraged Black people to buy Winchesters to protect their families from the 'two-legged animals…growling around your home in the dead of the night."[82]  Ida B Wells, an activist and journalist in the South, wrote in 1892, "that a Winchester rifle should have a place of honor in every black home, and it should be used for the protection which the law refuses to give."[83]  These activists also encouraged Black Americans to move to Oklahoma where they formed self-defense organizations. One Black journalist reported that in Oklahoma he "found in every cabin [he] visited a modern Winchester oiled and ready for use.'"[84]

---

[82] Johnson et al., p 521 referencing Giddings, Paula J. *Ida: A Sword Among Lions* (2008), pg. 153-154

[83] Ibid, pg. 521 referencing Wells, Ida B. *Southern Horrors.* N.Y. Age June 25, 1892. Reprinted in Wells, Ida B. *The Light of Truth: Writings of an Anti-Lynching Crusader*, pg. 84

[84] While this reference is obviously anecdotal for the number of Winchesters in circulation in a given area, Michael Vorenberg's declaration in *Duncan* claims as little as 8,000 Winchesters were in circulation in the post-Civil War South. However, this number is based on an order of 6,000 from Governor Scott for the South Carolina Militia, 1,000 for the Metropolitan Police Force in Louisiana, and 1,000 potentially stolen firearms. It has been stated though that the government was slow to adopt this technology, despite still being produced into the hundreds of thousands.

45. To summarize: in Kansas, pro-slavery government backed officials sought to disarm Free Soilers of their high-quality single-shot Sharps rifles. Sumner denounced this effort and started a fight with Senator Butler, who himself would backtrack and claim he never supported disarmament. In the Colfax massacre, Black Republicans were outgunned by a mob with superior weapons. The Wounded Knee Massacre started because of a government sanctioned disarmament of the Lakota, who had in some cases, superior weaponry. The firearms confiscated at Wounded Knee included Winchester rifles, though it did not serve them any good considering what transpired. And Black southerners particularly sought to have the best weapons available for a government they believed was not there to protect them.

46. Some scholars argue that the passage, despite the repeal in many instances, of state laws regulating the carry of specific types of weapons serve as sufficient evidence to support a modern magazine ban. However, it is important to reiterate that these regulations regarding specific types of weapons have occurred in some cases to take away the rights of some but not others. For laws that did include everyone, weapons typically on that list had some sort of larger counterpart, as in the Army/Navy laws, which would have at least equal capacity or were still permitted via licensure. Furthermore, these laws did not explicitly concern themselves with capacity or magazines but more often the size and/or other criteria of concealment. Other laws during this period, had more to do with whether or not the government could protect you and your rights resulting in unfortunate outcomes. In the case

---

Therefore, it is misleading to infer these orders would be the only way to measure the number of Winchesters in the South at that time. The footnoted quote is from: Johnson et al., p 521 referencing Giddings, pg. 198

of disarmament and the need for defense, it seems that citizens often affected by these tragedies were less concerned about a discourse on the morality of firearms technology, but instead protecting themselves with the best technology available.

**Conclusion**

47.     According to *Bruen*, time frames outside of the Founding and Second Founding Eras can be considered informative, providing context for the mindset and knowledge behind designs and legal decisions, although it does not hold the same weight. This report has provided an outline of repeaters and magazine-fed repeaters with a capacity of over ten rounds in the previous two sections establishing the existence and use of these types of firearms. The proliferation of such technology in the twentieth and twenty-first centuries is astounding. As such and coupled with the tertiary importance according to *Bruen*, I will not dive into a comprehensive look at all repeaters developed into the modern era.

48.     This report has looked at two timeframes relevant to this case as it pertains to *Bruen*. It has provided a snapshot account of several repeaters and magazine-fed repeaters of capacities over ten rounds throughout history. It has also examined corresponding laws from those time periods rebutting similarities to twentieth and twenty-first century legislation on capacity. It has stated that innumerable magazine-fed repeaters have been developed since the 1600s. At the time of the Founding Era repeaters and magazine-fed firearms, with a capacity over ten rounds had been in existence for over a century. To my knowledge, there are no laws during this period that restrict access to firearms magazines or strict firing capacity. By the time of the Second Founding Era, there were exponentially more repeaters and magazine-fed firearms with capacities greater than ten. According to scholarship outside of this particular declaration, the first laws referencing capacity, primarily for machine guns,

only date to the 1920s, and all except one implemented during this period were repealed.

Laws regulating detachable magazines date to the last decade of the twentieth century, and

the ten round magazine limit was imposed through federal law for the first time in 1994,

making the relevant conversation in this case much more recent history rather than the

historical precedent *Bruen* requires.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the

United States on December 29 ____, 2022.


_____
Ashley Hlebinsky
Declarant

# EXHIBIT HLEBINSKY-1

# CURRICULUM VITAE
**Ashley Hlebinsky Curriculum Vitae**
Ashley Hlebinsky, President, The Gun Code, LLC
2124 E Kerry Lane, Phoenix, AZ 85024
Email: theguncode@gmail.com
Phone: 412-491-2493

**Education:**

Master of Arts, American History, University of Delaware, 2013

Bachelor of Arts, American History, University of Delaware, 2011

## Selected Professional Experience:

Co-Founder and Senior Fellow, University of Wyoming College of Law's Firearms Research Center, Laramie, WY, 2020 (Current)

Consulting Director, Craig Boddington Wildlife and Firearms Museum, Independence, KS, 2022 (Current)

Consulting Curator, LA Police Museum, Pasadena, 2021 (Current)
Senior Consulting Specialist. Cowan's Auctions, Cincinnati, OH, 2021 (Current)
Consultant, National Museum of Law Enforcement and Organized Crime (Mob Museum), Las Vegas, NV, 2016 (Current)

Guest Curator, C.M. Russell Museums and Complex, Great Falls, MT 2021 (Current)

Adjunct Scholar of Firearms History, Technology & Culture, Firearms Policy Coalition, 2020-2021

Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, Buffalo Bill Center of the West, 2020 – 2021.

Robert W. Woodruff Curator, Cody Firearms Museum, Buffalo Bill Center of the West, Cody, WY, 2015-2020

Project Director, Cody Firearms Museum Renovation, Buffalo Bill Center of the West, Cody, WY, 2015-2019

Consulting Curator, Houston Museum of Natural Sciences, 2018

Consultant. Adirondack Experience. November 2019

Consultant. Winchester Mystery House, August 2019.

Consulting Scholar. National Park Service & Organization of American Historians, March 2019.

Consultant/Curator. Daniel Defense, Black Creek, Georgia. 2017

Associate & Acting Curator, Cody Firearms Museum, Buffalo Bill Center of the West, Cody, WY, 2015

Guest Curator. C.M. Russell Museums and Complex, 2015-2016

Guest Curator. Cody Firearms Experience, 2015

Assistant Curator, Cody Firearms Museum, Buffalo Bill Center of the West, Cody, WY, 2013-2014

Teaching Assistant, The Jewish Holocaust: 1933-1945, University of Delaware, 2013
Teaching Assistant, Introduction to Military History, University of Delaware, 2012

Teaching Assistant, History Education, University of Delaware, 2011

Researcher/Fellow, National Museum of American History, Smithsonian Institution, 2010-2013

Archival Assistant, University of Delaware Special Collection, 2010-2011

 Firearm Intern, Soldiers and Sailors National Memorial Hall, 2008

## Expert Witness Testimony:

Virginia Duncan et al v Rob Bonta, November 2022

Ocean State Tactical et al v Rhode Island, October 2022
Senate Judiciary Subcommittee on the Constitution, Stop Gun Violence: Ghost Guns, May 2021

Franklin Armory et al v Bonta, February 2021

FN Herstal v Sturm, Ruger & Co, January 2021

Sturm, Ruger & Co. v American Outdoor Brands Corp., October 2020

Guedes v BATFE, June 2019

Miller v Becerra (Bonta), November 2019

> 1. Evidentiary Hearing Testimony October 2020

2. Deposition January 2021

Regina (Nova Scotia) v Clayton, January 2019

Garrison v Sturm, Ruger & Company, Inc. 2018

1. Deposition November 2018

## Recent Honors/Awards:

Second Amendment Foundation's Defender of the Constitution, 2022

National Shooting Sports Foundation and Women's Outdoor Media Association's
Top Five Finalist, Top Woman of the Gun Industry, 2022

National Shooting Sports Foundation's SHOT Business's Top 40 under 40, 2020

Wyoming Business Report's Top 40 Under 40, 2017

National Shooting Sports Foundation & Professional Outdoor Media Association's Shooting
Sports Communicator of the Year Award, 2017

Wyoming's Non-Profit Woman of the Year Nominee, 2017

## Selected Media Work:

Writer/Producer. Mountain Men: Ultimate Marksman. History Channel, May 2022 (Current)
Regular Contributor. *Our American Stories* Podcast, 2022 (Current)
Co-Host. History Unloaded Podcast. Various platforms with Wyoming Public Media, 2018-
2022, 6 seasons (Current)

Producer & On Camera Expert. *Gun Stories with Joe Mantegna*, Outdoor Channel, 2015-2022, 8
seasons (Current)

Producer & On Camera Expert. *Man vs History*, History Channel & Matador Productions, 2020
(aired 2021)

Co-Host. *Master of Arms*, Discovery Channel & Matador Productions, 2018. 1 season

Consulting Producer. *Brothers in Arms*. History Channel, 2018. 1 season.

On Camera Expert. *Rob Riggle: Global Investigator*. Discovery Channel, 2020.

Recurring Expert. *Mysteries at the Museum.* Travel Channel. 2017-2019

Casting Consultant. *Gun Shop Project,* Vice Media & Cineflix Productions, 2020

On Camera Expert. *American Genius Colt V. Wesson*. National Geographic. 2015

*Also appears on:* Public Broadcasting Service, National Public Radio, Travel Channel, National Geographic, Popculture.com, Media, Entertainment, Arts, Worldwide (MEAWW), Women's Outdoor News, Outdoor Life, Shooting USA, Gun Talk Media, National Shooting Sports Foundation, various firearms related podcasts.

*Has been profiled by: The Bourbon Review, Recoil Magazine, Outdoor Life Magazine, Guns.com, Blue Press Magazine, and others*

## Selected Lectures/Panels:

Guest Speaker. Gun Rights Policy Conference, October 2022

Guest Speaker. Second Amendment Foundation Legal Scholars Forum, September 2022

Guest Lecturer and Panelist. AmmCon. Second Amendment Foundation, October 2021

Guest Lecturer. Armed for Revolution. Royal Armouries, September 2021

Guest Speaker. Preserving Firearms Heritage. Gun Rights Policy Coalition, 2020

Guest Lecturer. Art of Collecting. Nevada Museum of Art. January 2020

Panelist. Firearms and Museums in the 21st Century. National Council for Public History. March 2019.

Scholars Roundtable. Coltsville National Historic Site. Organization of American Historians & National Park Service, March 2019.

Forum Speaker. The Art of the Hunt: Embellished Sporting Arms in America. New Orleans Antique Forum, August 2018

Guest Lecturer. Unloading the Gun: Firearms, History, and Museums. Yakima Valley Museum, June 2018

Guest Lecturer. Perpetrators and Protectors: The Mob, The Law and Firearms, National Museum of Law Enforcement and Organized Crime (Mob Museum), September 2017

Organizer. Arsenals of History: Firearms and Museums in the 21st Century, Buffalo Bill Center of the West, July 2017

Lecturer. The Cody Firearms Museum, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

Moderator. Addressing the Press: Firearms and the Media, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

Moderator. Forming an Association: Legitimizing Firearms in Academic Study, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

Guest Lecturer. Displaying the "Politically Incorrect," C.M. Russell Museums and Complex, May 2017

Guest Lecturer. Displaying the "Politically Incorrect," Blackhawk Museum, March 2017

Panelist. Curator Roundtable, Firearms and Common Law Symposium, Aspen Institute, September 2016

Guest Lecturer. Displaying the "Politically Incorrect," Canadian Guild of Antique Arms Historians, April 2016

Guest Lecturer. The Cody Firearms Museum Renovation, American Society of Arms Collectors, September 2016

Guest Lecturer. From Protector to Perpetrator: Demystifying Firearms in History, Art Institute of Chicago, November 2015

Guest Lecturer. Winchester '73: The Illusion of Movie Making, Winchester Arms Collectors Association, July 2014

Guest Lecturer. Unloading the Six Shooter: Disassembling the Glamorization and Demonization of Firearms in the Arts, Buffalo Bill Center of the West, 2011

## Selected Firearms Exhibitions:

Curator/Project Director. *Cody Firearms Museum Renovation*. Buffalo Bill Center of the West. 2019

Co-Curator. *The Art of the Hunt: Embellished Sporting Arms from 1500-1800.* Houston Museum of Natural Sciences. March 2019

Curator. *Glock Makes History: The Birth of the Polymer Handgun Market*. Buffalo Bill Center of the West. June 2016

Guest Curator. *Designing the American West: The Artist and the Inventor*. C.M. Russell Museum & Complex. February 2016

Curator. *The Greatest Gun Designer in History: John Moses Browning.* Buffalo Bill Center of

the West. December 2015

Curator. *Journeying West: Distinctive Firearms from the Smithsonian Institution.* Buffalo Bill Center of the West. December 2015

Curator. *The Forgotten Winchester: Great Basin National Park*. Buffalo Bill Center of the West. June 2015

Curator. Western Firearms Gallery, including *Shoot for the Stars: The Tradition of Cowboy Action Shooting*. Buffalo Bill Center of the West. April 2015.
Curator. *Steel Sculptures: Engraving Individuality from Mass Production*. Buffalo Bill Center of the West. Winter 2014.

## Certifications:

Certified Firearms Instructor, Basic Pistol, 2016

Certified Firearms Instructor, Personal Protection Inside the Home, 2016

Well-Armed Woman Instructor Certification, 2016

Museum Studies Certification, University of Delaware, 2013

## Grants:

National Endowment for the Humanities, 2017

Institute of Museum and Library Services, 2017

Gretchen Swanson Family Foundation, 2015, 2016, 2017, 2018, 2019, 2020

Kinnucan Arms Chair Grant, 2012

## Fellowships:

Firearms Curatorial Resident, Buffalo Bill Center of the West, 2013

Edward Ezell Fellowship, University of Delaware, 2012

Buffalo Bill Resident Fellowship, Buffalo Bill Center of the West, 2011

## Committees and Memberships:

Board Member – Walk the Talk America

Founding President – Association of Firearms History and Museums
- Academic association for the study of firearms history in United States

Founder – Arsenals of History Symposia Series
- First international symposia series on the academic study of firearms

Spokesperson – NSSF/AFSP Suicide Prevention and Project ChildSafe Programs
American Alliance of Museums – Member

American Society of Arms Collectors – Member

Winchester Arms Collectors Association – Honorary

Remington Society of Arms Collectors – Member

Weatherby Collector's Association –Life Member

## Publication History

Editorial Board – Armax Journal

## Selected Articles:

Author. "Guns and Mental Health." *Recoil Magazine,* Upcoming

Author. "Colt Single Actions and Safety." *Armax Journal,* October 2021

Author. "Guns and Partisan Politics." *Recoil Magazine*, January 2021

Author. "Feminism & Firearms." *Recoil Magazine*, Summer 2020

Author. "Burton Light Machine Rifle." *Recoil Magazine*. October, 2019

Founder/Editor/Author. Arsenals of History Journal, Annual Publication, 2018 - Present

Author. "It's Complicated: The Short Answer to Firearms, Museums and History. *Journal of the Early Republic – The Panorama*, September 2018.

Contributor. "Firearms Curator Roundtable" *Technology & Culture Journal*, August 2018

Author. "Displaying the 'Politically Incorrect.'" *CLOG X Guns*: Chicago, IL, September 2017
Author. "Does History Repeat Itself? The Smith & Wesson LadySmith." *CLOG X Guns:*

Chicago, IL, September 2017

Author. "Renovating the Cody Firearms Museum." *International Committee of Museums and Collections of Arms and Military History Magazine.* Issue 17, May 2017. Pg. 38 - 41

Author. "Renovating the Cody Firearms Museum." *American Society of Arms Collectors Journal*. Fall 2016.

Author. "Glock Exhibit Opening." *Glock Magazine.* Bang Media. Annual 2017

Author. "The 28 Most Notable Guns from Remington's 200-Year History." *Outdoor Life Magazine*. Bonnier Corporation, 2016

Author. "Cassie Waters: Businesswoman of the Old West." *Guns of the Old West.* Harris Publications, Spring 2016

Author. "Making History: GLOCK Pistols at the Cody Firearms Museum" *Glock Magazine.* Harris Publications. Annual 2016

Author. "Pocket Pistols: 10 Seminal Guns from the Past 300 Years." *Pocket Pistols.* Harris Publications. 2016

Author. "The Gun that Won the Western and the Unforeseen Stars of *Winchester '73*" *Guns of the Old West.* Harris Publications.

Author. "Frontier Profile: Jedediah Strong Smith" *American Frontiersman*. Harris Publications

Author. "Frontier Legend John Johnston." *American Frontiersman.* Harris Publications

Author. "The Guns of John Johnston." *American Frontiersman.* Harris Publications

Author. "Annie Oakley VS Lillian Smith: A Female Sharpshooter Rivarly." *Guns of the Old West.* Harris Publications, Spring 2015

Author. "Icons and Has-beens." *American Handgunner*. FMG Publications, 2014

Author. "Triggering Memory: American Identity in *Cowboys and Aliens*." *Points West.* Spring 2012 Author

Author. "Unloading the Six-Shooter: Disassembling the Glamorization and Demonization of Firearms in the Arts." *Points West*, Fall 2011.

## Columns:

Author. Old School Series. *Recoil Magazine*

Author. Flashback. *Concealment Magazine*

Author/Brand Ambassador. *The Bourbon Review.*

Author. *American Association for State and Local History*. Summer 2019

Author. "Weird West: Fact or Fiction" *Guns of the Old West*. Athlon Outdoors (formerly Harris Publications)

1ˢᵗ Assault Rifle

Colt VS Winchester Revolver

Did Winchester Really Win the West?

Oliver Winchester's Lever Action Shotgun

Remington Cane Gun

Author. "Cowboy Action Round Up." SHOT Show New Products. *Guns of the Old West*. Athlon Outdoors (formerly Harris Publications). 2015, 2016, 2017

## Reviews:

Reviewer: Edited by Jonathan Obert, Andrew Poe, and Austin Sarat. Oxford: Oxford UniversityPress, 2018. *Journal of Technology & Culture*, Fall 2019

Author. "Everybody Loves an Outlaw: Taylor's Outlaw Legacy Revolver Series." *Guns of the Old West.* Harris Publications

Reviewer: Richard Rattenbury. *A Legacy in Arms: American Firearms Manufacture, Design and Artistry, 1800-1900*. *Chronicle of Oklahoma*, Spring 2016

## Selected Blogs & Vlogs:

Recoil Magazine

Weekly video series beginning October 2017 to Present

Dillon Precision
                    Historical Videos on Ammunition (Upcoming)

Outdoor Life
         Top 10 Guns in American History
         Guns of the Old West: 10 Iconic Firearms and the Legendary Men (and Women)

Who Shot Them
    13 of the Biggest Gun Fails in Recent Firearms History
    Gun of the Week:
    John Martz Luger
    Apache Revolver
    German Frei Pistol
    King Louis XV Embellished Blunderbuss
    Armalite AR-17 Shotgun
    Getting the Christmas Goose with a Goose Rifle & Cutaway Suppressor
    Mossberg Brownie
    Wesson & Leavitt Belt Revolver
    William Harnett and the Faithful Colt 1890
    Winchester Model 1894 Lever Action Rifle
    Ruger Semi-Automatic Pistol, 1 of 5,000
    Herb Parson's Winchester Model 71 Lever Action Rifle
    Lincoln Head Hammer Gun
    American Trap Gun
    Browning Brother's Single Shot Rifle Patent
    Feltman Pneumatic Machine Gun
    U.S. Springfield-Allin Conversion Model 1866 Trapdoor Rifle
    Winchester Wetmore-Wood Revolver
    Webley-Fosbery Automatic Revolver
    Hopkins & Allen XL3 Double Action Revolver
    DuBiel Modern Classic Rifle
    Colt Model 1877 "Thunderer" Double Action Revolver
    Tom Tobin's Colt Model 1878 Frontier Revolver
    Walch 10-Shot Double Hammers Pocket Revolver
    Winchester Model 1887, Serial No. 1
    Deringer vs Derringer
    The Forgotten Winchester 1873 of Great Basin National Park
Range 365
To the One Who Got Away
Gun Review: New Glock 19 Gen 5
Ain't She a Pistol? 10 Historic Gun Ads Featuring Women
National Shooting Sports Foundation
The Gun Vault:
Winchester 1873 Found in Great Basin National Park
Col. Jeff Cooper's Colt MK IV Series 80
500+ Year Old Firearms, Matchlocks, Flintlocks
U.S. Presidents Guns
Cross Dominance Shotgun
Herb Parson's Winchester Model 71 Rifle
Audie Murphy's Colt Bisley Revolver
4 Gauge Winchester Wildfowler
Pocket Pistols
Henry Ford's Winchester Model 1887 Lever Action Shotgun

Tom Knapp's First Gun
Buffalo Bill Cody's Winchester 1873
Colt Model 1861 Navy Serial No. 1
Cassie Waters' Hopkins & Allen XL3 Revolver
Glock 17

The Truth About Guns
 Presidential Presentation Rifles
 Factory Cut-Away M16A1
 1854 Smith & Wesson Repeating Rifle (Serial Number 8)
 Winchester World's Fair Model 1866 Deluxe Sporting Rifle
 Raymond Wielgus Collection
 Gastinne-Renette Muzzleloading Percussion Target Pistols
 Oliver Winchester's Jennings Repeater
 Henry Ford's Winchester Model 1887
 Winchester Model 1866 Musket in .44 Rimfire
 English Wheellock
 Southern Belle American Longrifle
 Annie Oakley's Model 1892 Smoothbore Rifle
 Catherine the Great of Russia's Blunderbuss Gift to King Louis XV of France
 Color Case-Hardened GLOCK 43: Merging the Old West with the New
 Buffalo Bill Center of the West – Unloading the Myth
 The Cody Firearms Museum – Yesterday, Today, and Tomorrow
 Guns of the Week – Christmas List
 Guns of the Week: December 15-19
 Guns of the Week – The Cody Firearms Museum
 Guns of the Week – German Firearms
 Guns of the Week – Scheutzenfest
 Guns of the Week – Air Guns
 Guns of the Week – Early Firearms Law
 Guns of the Week – October 13-17
 Guns of the Week – Ingenious Engineering
 Guns of the Week – Remington – Smoot
 Guns of the Week – September 22-26; 15-19; 8-12
 CSI: Firearms Museum Edition
 Confessions of a Gun Historian
 Art Guns: Aesthetics Over Function?
 What Good's a Gun Without a Firing Pin?
 Gun Installations, Trials & Tribulations
 A True Test of Marital Trust and Love
 Remembering Tom Knapp
 Cody Firearms Museum Goes Hollywood
 When Will My Firearms Go On Display
 What's Your Cody Firearms Museum
 To Vlog or Not to Vlog
 We Don't Just Have Old Guns in Our Museum: SHOT Show 2014

Taking a Staba at Displaying More Guns
"Hi Yo Silver" Cook Away! Lone Ranger Display
The Shooting Wire
Winchester's 150th Anniversary Website
Remington's 200th Anniversary Website