Stephen J. Joncus, OSB #013072
JONCUS LAW PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
971.236.1200
steve@joncus.net

Leonard W. Williamson, OSB #910020
VAN NESS WILLIAMSON LLP
960 Liberty St. SE, Ste 100
Salem, Oregon 97302
503.365.8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Civil No. 2:22-cv-01815-IM (*Lead Case*) |
| | Civil No. 3:22-cv-01859-IM (*Trailing Case*) |
| Plaintiffs, | Civil No. 3:22-cv-01862-IM (*Trailing Case*) |
| | Civil No. 3:22-cv-01869-IM (*Trailing Case*) |
| v. | |
| KATE BROWN, et al., | CONSOLIDATED CASES |
| Defendants. | |
| MARK FITZ, et al., | **DECLARATION OF MASSAD AYOOB** |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |

DANIEL AZZOPARDI, et al.,

                              Plaintiffs,

       v.

ELLEN F. ROSENBLUM, et al.,

                              Defendants.

Steven Joncus, OSB #010372
JONCUS LAW P.C.
13203 SE Ave STE 166 #344
Happy Valley, OR 97086
Telephone: (971) 236-1200
Email: steve@joncust.net

Leonard W. Williamson, OSB #910020
VAN NESS, WILLIAMSON LLP
960 Liberty St. S., STE 100
Salem, Oregon 97302
Telephone: (503) 365-8800
Email: l.williamson@vwllp.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, INC.,** an Oregon public benefit corporation; BRAD LOHREY, Sherman County Sheriff; **ADAM JOHNSON**, **CODY BOWEN**, Union County Sheriff; **BRIAN WOLFE**, Malheur County Sheriff; **HAROLD RICHARD HADEN, JR.**<br><br>Plaintiffs,<br><br>v.<br><br>**GOVERNOR KATE BROWN**, Governor of Oregon, and **ATTORNEY GENERAL ELLEN ROSENBLUM**, Attorney General of Oregon, and **TERRI DAVIE**, Superintendent of the Oregon State Police,<br><br>Defendants. | Civil No. 2:22-cv-01815-IM<br><br>**DECLARATION OF MASSAD AYOOB** |

I, Massad Ayoob, and I am over the age of 18, have personal knowledge of the facts

and events referred to in this Declaration, and am competent to testify to the matters stated

below.

1.      I have been a competitive handgun shooter since the late 1960s, a published writer in the field of defensive firearms since 1971, and a firearms instructor since 1972.  My curriculum vitae is attached as **Exhibit Ayoob-1**.  I have testified in a number of cases that list is attached and referenced in **Exhibit Ayoob-1**.  I have served for more than thirty years each as handgun editor for Guns magazine and law enforcement columnist for American Handgunner magazine.  I served for 19 years as chair of the Firearms and Deadly Force Training Committee for the American Society of Law Enforcement Trainers and have served for 19 years on the advisory board of the International Law Enforcement Educators and Trainers Association.  I have served as an expert witness on firearms, firearms training standards, deadly force training standards, dynamics of violent encounters, and related subject matter areas since 1979.  I have also been an instructor in disarming and firearm retention (i.e., the countering of a disarming attempt) since 1980 and became a trainer of other instructors in those disciplines in 1990.  Served for many years on Board of Trustees of Second Amendment Foundation, named president of SAF in September 2020 and still serve in that capacity.  My opinions expressed herein are mine and mine alone.

2.      I have been retained to provide my opinion by the Plaintiffs in *Oregon Firearms Federation, Inc. et al v. Brown et al*, Case No. 22-CV-01815-IM and *Eyre et al v. Rosenblum et al*, Case No. 22-cv-01862-IM.  I charge $375.00 per hour for professional services.

3.      In my role as a self-defense and weapons expert, including as an expert witness, I have researched incidents of defensive gun uses by law-abiding citizens, including by both private citizens and law enforcement officers.  My opinion about defensive guns uses

provided herein are based, in part, on the information I have learned during such research.

4.      I was called as an expert witness to testify in the United States District Court for the District of Colorado in *Colorado Outfitters et al. v. John W. Hickenlooper, Governor of the State of Colorado*, Case No. 13-CV-1300-MSK-MJW.  Attached is a certified copy of the transcript of my testimony in that matter marked **Exhibit Ayoob-2**.  My testimony appears on pages 331 – 401 of the transcript.  In that proceeding I testified at length regarding the issues of magazine limitation, the value of high-capacity magazines for self-defense and the impacts persons with some type of physical limitation or disabilities defending themselves with high-capacity magazines.  *See* **Exhibit Ayoob-2 at pp 343 - 401**.

5.      Most recently I produced an information and educational video in cooperation with the Wilson Combat YouTube Channel titled "*The necessity of high-capacity magazines. How many rounds are needed?*" discussing the self-defense value for police and civilians of using the high-capacity magazine.  As the world has evolved so have the predatory criminals who are well armed, sometimes wearing body armor, and sometimes on narcotics that numb the suspects' pain receptors.  A single round most likely will not stop a criminal.  The video may be accessed at: https://www.youtube.com/watch?v=_XJzxpn2vuA&t=307s.

6.      Limiting the law-abiding citizen to a magazine of ten rounds or less will clearly limit their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds in order to stop the aggressive actions of offenders.

7.      An illustrative, real-world example is the case of Susan Gonzalez.  She and her husband were attacked by two intruders within their home one night.  The attackers shot both

of them multiple times, but she was able to escape to their bedroom where she located her husband's semi-automatic pistol, while her husband bravely physically fought the attackers off into the front room.  She entered the room where the attackers were struggling with her husband, and, not wanting to shoot her husband, discharged three warning shots in the air, hoping the attackers would flee.  They did not.

8. One attacker charged toward her, causing her to flee back to the bedroom. From an opening in the bedroom, she could see the attacker lying in wait for her in the kitchen.  So, she used her knowledge of the house to exit the bedroom and approach the attacker from behind via another door leading to the kitchen.  She pointed the pistol at the attacker and discharged seven rounds in his direction, gravely wounding him, but not immediately killing him.

9. The wounded attacker was still able to exit the house aided by his accomplice. The other attacker reentered the house and demanded Mr. Gonzalez give him keys to an automobile to escape.  During his search for keys in the bedroom he located Mrs. Gonzalez who was out of ammunition.  He put the gun to her temple and demanded the keys, which she gave him.

10. Fortunately, the attacker decided to spare Mrs. Gonzalez's life, but he could have just as easily pulled the trigger. Had she had more rounds in her magazine, maybe she would not have had to leave her fate to chance.  It is impossible to say how many more cases where victims lost (or almost lost, as in Mrs. Gonzalez's case), due to having an insufficient amount of ammunition readily available in a self-defense firearm.[1]

---

[1] Robert A. Waters, *Guns Save Lives: True Stories of Americans Defending Their Lives with Firearms* 149-59 (2002).

11.    The published account of this shooting has Mrs. Gonzalez firing three shots into the ceiling, then seven at the homicidal intruder, and then running dry.  This would indicate only ten cartridges at her disposal. The gunfight occurred during the ten-year period when the Federal "high-capacity magazine ban" was in force.  The Ruger 9mm pistol she used, designed to hold fifteen cartridges in the magazine and one more in the firing chamber, was sold during the ten-year period of that ban with magazines which could only hold ten rounds. In such a situation, five more shots can make the difference between neutralizing the murderous threat and being rendered helpless with an empty gun at the hands of a law-breaking, homicidal, armed felon.

12.    It is difficult to say exactly how many private citizens have actually fired more than ten rounds in a self-defense shooting, because the amount of rounds fired in self-defense shootings, from my experience in researching such incidents, is very often an omitted fact in written accounts of such defensive gun uses.  Oftentimes the accounts just say, "multiple shots fired."  That could mean more or less than ten, it just cannot be known.  This does not seem to be the case, however, with shootings involving police officers, for which, generally the number of shots that were fired is documented.  In my experience researching such shootings, officers often fire more than ten rounds.  And cases where an individual officer fired less than 10 rounds, but there were multiple officers shooting, can be fairly characterized as involving more than ten rounds, if the multiple officers involved fired over ten rounds in aggregate.

13.    Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection against the exact same criminals the police are armed to deal with.  Tim Gramins of the Skokie, Illinois police

department was in a shootout with an armed robber whose car he had pulled over. The

gunman came out shooting. The gunman was armed with two semiautomatic pistols, one on

his person and one snatched from his car, both of which he fired during the gun battle. He

also had in his possession a semiautomatic rifle in his car, which he did not deploy. Officer

Gramins fired 33 rounds at the gunman, fourteen of which struck the suspect in the body, the

gunman continued to fight back against the officer and the gunfight only ended when

Gramins fatally wounded the attacker by shooting him in the head three times, stopping the

fight. Of the last three rounds fired by Gramins the first two bullets struck his attacker in the

face causing maxilla-facial damage but did not penetrate to the brain. It was the third shot to

the head that ended the fight. Gramins' assailant had absorbed 17 hits by the time he was

neutralized, and the officer had been forced to reload twice. The officer was armed with a

Glock Model 21 .45 caliber pistol, loaded with a magazine containing 12 rounds and a

thirteenth in the firing chamber. He also had two additional magazines containing 12 rounds

each. The officer was down to the last few cartridges in his last magazine at the time he

finally won the gunfight. Gramins was wounded in the shooting. As a result of this incident,

he now carries a higher-capacity handgun with more spare magazines.[2]

   14.  While, as mentioned, the number of rounds fired in a self-defense shoot

involving a private citizen is usually not documented, there are nevertheless a number of

confirmed accounts of private citizens discharging more than ten rounds during a criminal

attack. For example, a Baltimore man discharged sixteen rounds from a handgun he was

---

[2] See https://www.thefreelibrary.com/The+lessons+of+Tim+Gramins.-a0441155756 and Charles Remsberg, *Why One Cop Carries 145 Rounds of Ammo on the Job*, PoliceOne (Feb 21, 2020), http://www.policeone.com/patrol-issues/articles/6199620- Why-one-cop- carries-145-rounds-of-ammo-on-the-job/

licensed to carry when he was physically attacked by three men, one of whom allegedly had

a gun, while in his car carrying thousands of dollars in cash to the bank.  One of the

assailants died, while the other two fled, one of whom was arrested at a nearby hospital with

a bullet wound in the hand.[3]  In a similar situation, a South Carolina gun store owner who

lived in the rear of his shop was awoken by three men, at least one of them armed, crashing a

van into his store.  When going to investigate, one of the robbers yelled to another to kill

him, so the owner opened fire, discharging thirty rounds, hitting all three attackers, mortally

wounding one and causing the rest to flee.[4]

15.     Ronald Honeycutt was delivering pizzas when approached by a man with a

gun from behind.  He turned and fired when he saw a gun in the man's hand, discharging all

of his magazine's fifteen rounds, which still did not immediately stop the threat, as the

attacker remained upright with the gun pointed at him.  But the attacker eventually

succumbed to his wounds before being able to rack a round into the firing chamber of his

pistol, which he had forgotten to do, and is probably why he was pointing the gun at

Honeycutt but never discharged a single round.[5]

16.     Additionally, in California, consider the well-documented multiple gunfights

with armed robbers experienced by Los Angeles watch shop owner Lance Thomas.[6]  More

than one of his five shooting incidents required him to fire more shots than California Penal

---

[3] Gus G. Sementes & Julie Bykowicz, *Documents Detail Cross Keys Shooting* (Mar. 20, 2006), https://www.baltimoresun.com/news/bs-xpm-2006-03-21-0603210220-story.html
[4] *Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV
(Aug. 9, 2012), https://www.wistv.com/story/19236842/gun-shop-owner-shoots-kills-man-during-attempted-robbery/
[5] Chris Bird, *Thank God I Had A Gun: True Accounts of Self-Defense* 251-74 (2007).
[6] **WIS TV**, supra n. 4.

Code section 32310 would allow to be in any one handgun.  California Penal Code section

32310 is California's ten round magazine limit similar to Oregon's Measure 114 magazine

limit of ten rounds.  In one of those incidents, reports have Thomas firing approximately

nineteen shots before the last of his multiple opponents ceased attempting to murder him.[7]

17.    Thomas's strategy was to stage multiple loaded handguns every few feet in his

workspace. He could do this, as a sole proprietor with a small shop, a workspace closed to

the public, and with buzz-in entry.  A pair of brothers used the same strategy in defending

themselves against two violent career criminals robbing their Richmond, Virginia jewelry

store.  They went through multiple firearms staged throughout the store placed in anticipation

for such an event.[8]  The strategy of staging multiple firearms employed by these shopkeepers

is a unique circumstance, however, it would not be practical or safe for most shopkeepers or

for homeowners, due to the danger of unexpected children wandering behind the counter or

unexpectedly arriving at the given home.  Thus, most private citizens could not be expected

to have multiple handguns in multiple locations in their home or on their person in order to

engage in a defensive gun use.

---

[7] *See* Nieson Himmel, *Police Say Watch Shop Owner Kills 4th, 5th Suspects*

(Feb. 21, 1992),  http://articles.latimes.com/1992-02-21/local/me-2663_1_watch-shop-owner ; Massadd Ayoob, *Why Good People Need Semiautomatic Firearms and "High Capacity" Magazines, Part I* (Dec. 29, 2012) https://www.backwoodshome.com/blogs/MassaddAyoob/why-good-people-need-semiautomatic-firearms-and-high-capacity-magazines-part-i/comment-page-1/ ; Massadd Ayoob, *Why Good People Need Semiautomatic Firearms and "High Capacity" Magazines, Part II* (January 31, 2013) https://www.backwoodshome.com/blogs/MassaddAyoob/why-good-people-need-semiautomatic-firearms-and-high-capacity-magazines-part-ii/ ;Massadd Ayoob, *5 Gunfighting Myths Debunked*, Personal Defense World (March 29, 2019), http://www.personaldefenseworld.com/ 2014/10/5-gunfighting-myths-debunked-Massadd-ayoob/#armed-and-ready

[8] *Jewelry Store Burglarized, Scene of Deadly 1994 Robbery Attempt*,

nbc12.com (2012), *available at* https://www.nbc12.com/story/16445849/jewelry-store-burglarized-scene-of-deadly-1994-robbery-attempt/

18.     The homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally do not permit gathering multiple firearms or magazines.  Ideally, one hand would be occupied with the handgun itself, and the other, with a telephone to call the police.  And, assuming they even had time for a magazine change, most people do not sleep wearing clothing that would allow them to stow spare magazines, etc. on their person. They would have only what was in the gun.

19.     Most plainclothes police officers do not find it practical to carry multiple handguns, let alone private citizens. Any suggestion that private citizens simply carry more guns or more ammunition feeding devices would, for the reasons stated above, be impractical.

20.     Criminals bent on causing harm, on the other hand, even assuming they were impeded from obtaining over ten-round magazines by Oregon Measure 114, could simply arm themselves with multiple weapons, and often do.

21.     Criminals have time to assess and plan shootings, whereas victims do not. Whitman, the Texas Tower mass murderer, literally brought a large box of rifles, handguns, a shotgun and ammunition to his sniper perch.[9]  Harris and Klebold had four firearms between them at Columbine.[10]  Holmes in Aurora brought a rifle, shotgun, and pistol into the

---

[9] The UT Tower Shooting, Tex. Monthly, *available at*
 http://www.texasmonthly.com/topics/ut-tower-shooting
[10] Mark Obmascik, Marilyn Robinson & David Olinger, Columbine – Tragedy
*and Recovery: Officials Say Girlfriend Bought Guns*, denverpost.com (Apr. 27, 1999), *available at*
http://extras.denverpost.com/news/shot0427a.htm

theater.[11]  Hassan was armed with a pistol and a revolver at Fort Hood.[12]  Lanza entered the

elementary school in Newtown, Connecticut armed with a rifle and two pistols, leaving a

shotgun in his car.[13]  The mass murderer Cho entered Virginia Tech armed with two pistols

and a backpack full of magazines.[14]  The Isla Vista attack was perpetrated by a man carrying

two knives and three handguns.[15]  The Umpqua Community College shooter carried five

handguns with him.[16]  The San Bernardino terrorists each had a semi-automatic rifle and

handgun.[17] Mateen likewise brought a semi-automatic rifle and handgun with him to

perpetrate the Pulse nightclub Massacre in Orlando.[18]

     22.     None of these murderers' victims had planned to repel an attack by a

perpetrator with multiple firearms.

     23.     The likelihood of the mass murderer arriving on scene with multiple

firearms also largely negates the theory that with fewer rounds in the gun, the killer

---

[11] Rong Gong Lin II, *Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado*, L.A. Times (Jul. 20, 2012), *available at* https://www.latimes.com/nation/nationnow/la-na-nn-dark-knight-shooting-20120720-story.html

[12] Associated Press, *Ft. Hood shooter Nidal Hasan Used Private, Legally-bought Pistol - Not Military Weapon - In Rampage*, N.Y. Daily News (Nov. 7, 2009), *available at* https://www.nydailynews.com/news/national/ft-hood-shooter-nidal-hasan-private-legally-bought-pistol-not-military-weapon-rampage-article-1.414799 and https://www.nbcnews.com/storyline/fort-hood-shooting/fort-hood-shooter-bought-weapon-same-gun-shop-tied-2009-n70971

[13] Steve Almasy, *Newtown Shooter's Guns: What We Know*, cnn.com (last updated Dec. 19, 2012 10:11 a.m. EST), available at http://www.cnn.com/2012/12/18/us/connecticut-lanza-guns

[14] Virginia Tech Review Panel, *Mass Shootings at Virginia Tech 16, 2007: Report of the Review Panel* 89 (Aug. 2007), available at https://scholar.lib.vt.edu/prevail/docs/VTReviewPanelReport.pdf

[15] *2014 Isla Vista Killings*, https://en.wikipedia.org/wiki/2014_Isla_Vista_killings

[16] *Umpqua Community College Shooting*, Wikipedia (last updated May 25, 2017 to undo prior revision), *available at* https://en.wikipedia.org/wiki/Umpqua_Community_College_shooting

[17] Spencer Kimball, *San Bernardino: Guns, Mass Shootings and Fears of Terrorism*, www.dw.com (Apr. 12, 2015), *available at* http://www.dw.com/en/san-bernardino-guns-mass-shootings-and-fears-of-terrorism/a-18894313

[18] Bart Jansen, *Weapons Gunman Used In Orlando Shooting Are High-Capacity, Common*, USA Today (June 14, 216) https://www.usatoday.com/story/news/2016/06/14/guns-used-kill-49-orlando-high-capacity-common-weapons/85887260/

could be more easily disarmed and subdued by unarmed citizens when he first ran empty, before he could reload.  I have written two articles explaining why this theory is of dubious merit titled "*Disarming Mass Murders*" and "*The Brunswick Massacre*."  A true and correct copy of "*Disarming Mass Murders*" is attached and marked as **Exhibit Ayoob-3** and a true and correct copy of "*The Brunswick Massacre*" is attached and marked as **Exhibit Ayoob-4**.  In sum, Hassan, Holmes, Lanza, or Cho simply could have drawn a second (or third) gun that they had on their persons and shot whoever attempted to grab the empty one.  Or in the case of the *Brunswick Massacre* the criminals could simply keep their firearms in a constant state of readiness.

24.     Monroe Phillips, a lone gunman, armed with only with a double barrel Parker ten-gauge shotgun, killed five people and wounded thirty-two others in 1915 in what has been dubbed the *Brunswick Massacre*.  Phillips employed a technique of constantly keeping his shotgun at the ready by only firing one round, breaking the shotgun open, extracting the spent round, while leaving the second barrel loaded.  In this manner he simply needed to snap the shotgun closed if confronted and he would be back in the fight killing and wounding people.  Dr. G.W. Blanton, an eyewitness, told the Brunswick News a few days after the shooting, "that he had been waiting for Phillips to run dry so he or someone else could jump him and disarm him, but Phillips never gave them the opportunity." **Exhibit Ayoob-4** at page 85.  We learned over 100 years ago that realistically there is not natural break in the gunfight that allows for the police or a civilian to intervene during reloading and overpower a gunman.

25.     The virtuous citizen, by contrast, cannot practically be expected to have accessible that many guns or that much ammunition at a moment's notice. The victimized

citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

26.    Virtuous citizens buy their guns to protect themselves from the same criminals, police carry guns to protect the citizens, the public, and themselves from. Therefore, armed citizens have historically modeled their choice of firearms on what police carry. The vast majority of Oregon law enforcement officers carry pistols with double-stack magazines whose capacities exceed those permitted under Measure 114.

27.    The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally, two spare magazines holding more than ten rounds on the uniform belt. He or she will normally be wearing body armor, have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car, and will have instant radio access to fellow officers and dispatch if backup help is needed.

28.    The off-duty officer and the law-abiding citizen alike are not likely to have that volume of spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

29.    Changing a magazine is a fine motor skill, the type of skill which degrades severely in human beings under stress due to vasoconstriction (loss of blood flow to the

extremities) and also due to tremors induced by internally generated adrenaline (epinephrine). This is a well-known physiological reaction that has been defined as the "fight or flight" response in the medical literature and training literature for a century or longer, by Dr. Walter Cannon at Harvard Medical School before World War I. While a trained marksman or competitive shooter might easily change out a magazine quickly, one to two seconds at most, this is not representative of the average person's skill level. The highly trained marksman and competitive shooter have repeated the physical activity so much that motor function is almost programed or automatic. They don't have to think about the magazine change they can focus on the threat. When the average person has to think about the activity, the changing of the magazine, under stress that is when it can all fall apart. Based on my own experience as a professional trainer and having reviewed countless shooting encounters, I can attest to the fact that most people, the average gun owner, takes considerably longer time to change a magazine; especially someone who is under the mental duress typically experienced during an attack. Perpetrators of violent crimes pick the time, place and arms they will carry to assault and kill their victims. Victims on the other hand are in a reactive defensive posture and can only respond to the threat with what they have on their person or easy access to.

30.    In contrast to the practiced marksmen and competitive shooter when the average person is under stress and required to defend themselves it becomes clear why a standard capacity magazine is so important. When equipped with a full standard capacity magazine of 15 to 20 rounds our victim, by simply pulling the trigger again on a pistol that still has more ammunition in it may do so in a fraction of a second compared to reloading. Forcing our victim to change magazines will cost her time she may not have. In addition, its

fairly common for the average person, who carries a gun in public for self-defense, to only carry the magazine that is in the gun and not a spare magazine. As a trainer I always recommend carrying a spare magazine, but the majority of people do not. Based on my experience in self-defense scenarios, fractions of seconds can mean the difference between the victim successfully repelling an attacker and the victim being subdued. Thus, a magazine change for the person being attacked could be the difference between life and death.[19] The same, however, is not generally true for the attacker. The loss of time for a magazine change is generally of little consequence for the attacker. This is because it is the attacker who gets to choose when, where, how, and whom to attack. So, the attacker is not burdened by the surprise and shock factor that the victim is, as explained above, generally prepared for the confrontation with large amounts of arms and ammunition. This is demonstrated by the multiple mass shootings where the attacker made magazine changes without being subdued. Perhaps the most illustrative example is the Virginia Tech shooting, where the attacker carried with him seventeen magazines for his two semi-automatic pistols, from which he fired 174 rounds.[20] At least five of those magazines had a capacity of only ten rounds and would be legal under Measure 114.[21] While it cannot be said exactly how many magazine changes he made during what was the deadliest mass shooting in the country's history, based on the number of rounds fired and the fact that authorities found seventeen empty magazines at the scene, he had to have made several reloads.[22] Another example is the Orlando Pulse

---

[19] Jacob Sullum, *The Threat Posed by Gun Magazine Limits* (Jan. 13, 2013),
*Available at https://reason.com/2013/01/16/the-threat-posed-by-gun-magazine-limits/*

[20] Virginia Tech Review Panel, *supra* n. 15, at 92.
[21] Id.
[22] Id.

Nightclub shooting, where the attacker carried both a Sig Sauer rifle with a 30-round capacity magazine and a Glock 17 pistol with a 17-round capacity magazine.[23] It has been reported that the shooter fired over 202 rounds during his attack.[24] Assuming the attacker used both firearms, and based upon the number of rounds fired, the attacker would have been forced to reload his firearms (and possibly magazines) on at least 5 separate occasions. Despite being in a confined space surrounded by hundreds of men who he was murdering one-by-one, at no point during the attack did anyone in the night club tackle or otherwise subdue the attacker during the several times when he was forced to reload.

31.     Supporters of the magazine capacity limitation will undoubtedly point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six-shot revolver. It should be noted, however, that the operative term there is "expert." The individual who has spent a lifetime training in shooting and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer, let alone the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

32.     A particular subset of law-abiding citizens who are disparately, negatively impacted by Measure 114 is the physically disabled. This is true of many categories of the physically challenged.  I discuss this at length in my sworn testimony set out in attached **Exhibit Ayoob-2**.

33.     Over recent decades we have seen many war veterans joining the amputee

_____

[23] Jansen, *supra* n. 19

[24] WFTV-Orlando, *Law Enforcement Source: 202 Rounds Fired During Pulse Nightclub Shooting in Orlando*, wscotv.com (Jun. 13, 2016), available at
http://www.wsoctv.com/news/trending-now/law-enforcement-source-202-rounds-fired-during-pulse-nightclub-shooting-in-orlando/340948566

community.  Those who have lost fingers, or a hand will have great difficulty reloading an empty gun if a ten-round magazine does not prove sufficient to defeat an attacker. Work-related injuries such as carpal tunnel syndrome can greatly slow ability to reload. So can many of the infirmities of age: rheumatism, arthritis, bursitis, etc.

34.     The wheelchair-bound individual, and many more mobility-challenged individuals (back issues, ankle issues, knee issues, etc.), cannot run to cover to reload. They will be caught in the open if they have to reload in a fight with one or more armed criminals, and thus will become totally helpless as soon as their Measure 114 mandated ten-shot magazine is depleted.

35.     Thus, in conclusion, study of events in the real world indicates that Measure 114's restriction on magazine capacity can be expected to have little, if any, effect in reducing casualties due to intentional mass murder. However, law-abiding citizens, certain off-duty and retired criminal justice personnel, families of criminal justice personnel, recipients of death threats, stalking victims, and people working in places of business prone to armed robbery, will be severely disadvantaged by Measure 114 in terms of their ability to lawfully protect themselves and others. This impact will be particularly severe upon members of such groups who are physically disabled.

I declare under penalty of perjury that the foregoing is true and correct.
Executed within the United States on January $\frac{5}{\quad}$, 2023.

<div style="text-align:center">

*Massad Ayoob*

_____
Massad Ayoob

</div>

# EXHIBIT AYOOB-1

# *Curriculum Vitae,* **Massad F. Ayoob**

D.O.B. 7/20/48

**Areas of Expertise:** Dynamics of violent encounters, training standards for safe weapons handling (law enforcement/civilian), training standards of firearms and use of force (police/civilian), homicide/use of force investigation, personal and professional security, weapon retention/disarming, law enforcement internal investigation/discipline.

**Teaching Experience:**

Director, Massad Ayoob Group, 2009-present.

Director, Lethal Force Institute, 1981-2009.

Chair of firearms committee, American Society of Law Enforcement Trainers (ASLET), 1987-2007.  Also served on Ethics Committee.  Led annual Panel of Experts on firearms/deadly force issues at ASLET's international seminars.

Special Instructor, Chapman Academy, 1981-88.

International Instructor, PR-24 baton; has lectured several times at annual international seminar. Trains other instructors and trainers of instructors.

Advisory Board member, International Law Enforcement Educators' and Trainers' Association, has lectured there on investigation and management of police use of force cases since the organization's inception.

National Instructor, Weapon Retention & Disarming, National Law Enforcement Training Center. Trains other instructors and trainers of instructors. 1990-2009.

Assistant professor teaching weapons and chemical agents, Advanced Police Training Program of New Hampshire, 1974-77.

Co-instructor (w/former world pistol champion Ray Chapman) of Advanced Officer Survival Seminars through Police Marksman Assn., in the 1980s.

International Instructor, Persuader Mini-Baton, certified by Joe Truncale.

Instructor, Kubotan self-defense, certified by Soke Takayuki Kubota.

National Instructor, Telescoping baton, certified by CASCO.

Instructor, straight baton, certified by COPSTK.

Has taught on relevant topics for National, International, and regional seminars of International Association of Law Enforcement Firearms Instructors; regional seminars for CLE credit on defending deadly force cases (NACDL, MA. CDL Assn); International Homicide Investigators' Seminar (investigation of officer-involved shootings and characteristics of self-defense shootings); McGill University School of Medicine (medico-legal aspects of gunshot and knife wounds); officer survival tactics (Ordnance Expo, Los Angeles; National Tactical Invitational; New England SWAT Seminar; DEA National Academy; Metro-Dade Police Academy; DEA/Miami).

### *Personal Training*

Smith & Wesson Academy:  Advanced Combat Shooting (1st in class), Instructor course; Instructor Update (twice); Officer Survival Course (1st in class); Weapon Retention instructor course; advanced revolver shooting course.

Glock:  Glock Instructor Course; Glock Armorer Course.

Firearms Instructor Courses: National Rifle Association.

Ordnance Expo: Firearms and Ballistic Evidence; Officer Involved Shooting Investigation; Advanced Officer Involved Shooting Investigation; Officer Survival; Management of Barricaded Suspects.

International Police Academy: Defensive Tactics (Unarmed Combat and Restraint) Instructor Course, rated Master Instructor by sensei James Morell.

NYPD: "Hostage Negotiation for Supervisors", "Post Shooting Tactics", "House Clearing Techniques", Off Duty Confrontation Tactics", "Summary of Violent Encounter Patterns", "Police Shotgun Program."

Advanced Homicide Investigator school, by Vern Geberth, NYPD Ret., author of "Practical Homicide Investigation."

International Homicide Investigators' Seminar (2 occasions)

Medical/Legal Death Investigation (Dade County Medical Examiner's Office)

AELE: "Police Civil Liability Seminar"

PPCT: Pressure Point Control Tactics, taught by Bruce Siddle.

**EXHIBIT AYOOB-1 Page 3 of 9**

Federal Law Enforcement Training Center: BOSS program including officer survival, intelligence briefings on outlaw bike gangs, booby traps, counter-ambush tactics, arrest techniques.

Escrima (stick- and knife-fighting), Grandmaster Remy Presas.

Knife/Counter-Knife courses: Master Paul Vunak, Hank Reinhardt, Sensei Jim Maloney, Michael de Bethencourt.

Has studied personally with world handgun champions Ray Chapman, Rob Leatham, Jerry Miculek, and Frank Garcia in advanced shooting programs.

**Has studied special units and their training on-site, including but not limited to:**

NYPD Firearms & Tactics Unit, Emergency Services Unit, Armed Robbery Stakeout Unit.
LAPD SWAT, Firearms Training Unit.
FBI Firearms Training Unit.
Metro-Dade Police Firearms/SWAT Training Unit
Illinois State Police Ordnance Section.
NH State Police SWAT, EVOC, Firearms Training.
Kentucky State Police, Firearms Training and SRT Training.
Arizona Highway Patrol Firearms Training.
London, England Metropolitan Police firearms training and special services unit (D.11, PT-17, SO-19).
Has reviewed or audited numerous other law enforcement firearms training programs.

**Associations**

Served for many years on Board of Trustees of Second Amendment Foundation, named president of SAF in September 2020.

**Publication Credits**

***Books:***

"Fundamentals of Modern Police Impact Weapons," Charles C. Thomas, Publishers, 1978.

"In the Gravest Extreme: the Role of the Firearm in Personal Protection," Police Bookshelf, 1979.

"Hit the White Part," Police Bookshelf, 1982.

"The Truth About Self Protection," Bantam, 1983.

**EXHIBIT AYOOB-1 Page 4 of 9**

"StressFire," Police Bookshelf, 1984.

"StressFire II," Advanced Combat Shotgun," Police Bookshelf, 1992.

"The Semiautomatic Pistol in Police Service and Self Defense," Police Bookshelf, 1988.

"Ayoob Files: the Book," Police Bookshelf, 1995.

"Complete Book of Handguns," Volume 10 (1993) with completely new volume produced annually through 2009, Harris Publications.

"Gun Digest Book of Combat Handgunnery, Fifth Edition," Krause Publications, 2002.

"Gun Digest Book of Combat Handgunnery, Sixth Edition," Gun Digest Books, 2007.

"Gun Digest Book of Combat Handgunnery, Seventh Edition," Gun Digest Books, 2020.

"Gun Digest Book of SIG-Sauer Pistols," Krause Publications, 2004.

"Gun Digest Book of Beretta Pistols," Krause Publications, 2005.

"Gun Digest Book of Concealed Carry," Krause Publications, 2008.

"Massad Ayoob's Greatest Handguns of the World," Krause Publications, 2010.

"Combat Shooting With Massad Ayoob," FW Media, 2011

"Massad Ayoob's Greatest Handguns of the World, Volume II," FW Media, 2012.

"Gun Digest Book of SIG-Sauer, Volume II," FW Media, 2014.

"Gun Safety in the Home," FW Media, 2014.

"Deadly Force: Understanding Your Right to Self-Defense," FW Media, 2014.

"Armed Defense: What the Experts Want You to Know," Gun Digest Publications, 2017.

***Monographs:***

"Gunproof Your Children," Police Bookshelf/Potshot Press
"Handgun Primer," Police Bookshelf/Potshot Press.
"The Police View of Gun Control," Second Amendment Foundation.
"Armed and Alive," Second Amendment Foundation.

***Forewords for Authoritative Texts:***

"Mu Tau: The Modern Greek Karate" by James Arvanitis
"Realistic Defensive Tactics" by John Peters
"Modern Centerfire Handguns" by Stanley Trzoniec
"You Can't Miss" by John Shaw
"MasterTips" by Jon Winokur
"Effective Defense" by Gila May-Hayes
"In Self Defense" by Michael Izumi
"The Tactical Pistol" by David Lauck
"The Tactical Rifle" by David Lauck
"Personal Defense for Women" by Gila Hayes
"Lessons From Armed America" by Mark Walters and Kathy Jackson
"Armed Response" by Dave Kenik
"Rule the Night/Win the Fight" by Ed Santos
"Law of Self-Defense" by Attorney Andrew Branca
"Defend Yourself" by Rob Pincus
"The Newhall Shooting: a Tactical Analysis" by Michael Wood
"Surviving a Mass Killer Rampage" by Chris Bird
"Gun Digest Book of the Revolver" by Grant Cunningham

### *Periodicals*

Handgun Editor, *Guns* magazine
Law Enforcement Editor, *American Handgunner* magazine
Contributing Editor, *Shooting Industry* magazine
Contributing Editor, *On Target* magazine
Firearms Editor, *Backwoods Home* magazine
Associate Editor, *Combat Handguns* magazine
Associate Editor, *Guns & Weapons for Law Enforcement* magazine
Associate Editor, *Gun Week*

     Has published thousands of articles in various professional journals and newsstand periodicals, the overwhelming majority related to law enforcement, weaponry, martial arts and personal defense. Firearms articles have appeared in *Guns, American Handgunner, Handguns, GUNsport, Handgunner, Home Defense, Glock Annual, Colt Annual, Magnum, Gun World, Combat Handguns,* and others. Martial arts/unarmed combat articles have appeared in *Black Belt, Official Karate, Inside Kung-fu, Inside Karate, Warriors, Fighting Stars,* and other such publications. Law enforcement articles have been published in *American Police Beat, Law & Order, Police, Police Product News, Sentinel, Trooper, Patrolman, Police Marksman, Guardian, Guns & Weapons for Law Enforcement, Guns & Ammo Law Enforcement Annual,* and other police professional journals and law enforcement related periodicals. Has also been published in *Car & Driver, Gentlemen's Quarterly, Man's Magazine, Modern Jeweler, New Hampshire Outdoorsman, New Hampshire Times, Prism, Sexology, Sports Afield,* and assorted other general interest publications.

### Training Films

"StressFire Handgun," 2002
"StressFire Shotgun," 2002
"StressFire Rifle," 2002
"Deadly Force Cases," ALI-ABA, 2001
"Judicious Use of Deadly Force," 1990
"Post Violent Event Trauma," 1990
"LFI Handgun Safety," 1990
"Off Duty Survival," 1993
"Shoot to Live," 1986
"How Close is Too Close," 1986
"Cute Lawyer Tricks," 1986
"Physio-Psychological Aspects of Violent Encounters," 1981
Has appeared in various other training films.

### Quoted as authoritative reference in:

FBI Journal
"Law Enforcement Handgun Digest" (Grennell)
"Gun Digest Book of Combat Handgunnery, 1st edition (Lewis & Mitchell), 2nd and 3rd editions (Karwan)
"Shooting Schools: An Analysis" (Winter)
"Street Survival: Tactics for Armed Encounters," (Adams, McTernan, Remsberg)
"Tactical Edge: Tactics for High Risk Patrol" (Remsberg)
"Handgun Retention System" (Lindell)
"The Street Smart Gun Book" (Farnam)
"Police Handgun Manual" (Clede)
"Police Shotgun Manual" (Clede)
"High Tech SWAT Weapons" (Bane)
"PR-24 Baton Manual" (Starrett)
"Police Officers Guide" (Clede)

Cited as authoritative reference in numerous other publications.

### Career Accomplishments

Voted Outstanding American Handgunner of the Year, 1998.

Winner of first annual National Tactical Advocate Award, 1995, awarded by American Tactical Shooting Association.

Winner of the Roy Rogers Award for promotion of firearms safety.

Winner of first George C. Nonte Award for excellence in firearms journalism, 1978.

***Firearms Qualifications and Awards***

Combat Master, NRA Police Revolver

First 5-gun Master, International Defensive Pistol Association

Master, Revolver, National Marksman Sports Society

Master, Automatic, National Marksman Sports Society

Class A, International Practical Shooting Confederation

Grand Mastershot, UK Practical Shooting Association

Master Blaster, Second Chance

Expert, NRA Action Shooting

Honorary Distinguished Expert, Federal Law Enforcement Training Center

Several times top shooter in statewide NH police combat matches, 1973-2003

Five times New England Regional champion in various handgun disciplines

Co-winner with daughter Justine, National Champion Parent/Child Team, National Junior Handgun Championships, 1998

Has won numerous individual/local combat shooting tournaments, has completed successfully in five countries.

***Law Enforcement Experience***

Hooksett (NH) Police Dept.: 1972-73, auxiliary policeman. 1973-1980, fully sworn Police Officer. Duties under four chiefs included patrol, firearms training, community relations and crime prevention assignments, dept. firearms instructor for most of this period. Served in part time capacity with full police authority.

Deerfield (NH) Police Dept.: 1982-1990.  Fully sworn officer, rank of Sergeant ('82-'84) in charge of all police training, and Lieutenant ('84-'90), in charge of police training and crime prevention activities. Served in part time capacity with full police authority.

Grantham (NH) Police Dept.: 1990-2017.  Fully sworn Captain and Police Prosecutor, in charge of training, research, and other administrative functions.  Served in part time capacity with full police authority.

**EXHIBIT AYOOB-1 Page 8 of 9**

***References available upon request.***

Massad Ayoob
PO Box 1477
Live Oak, FL 32064
(386) 688-1932
*massadayoob@aol.com*

# EXHIBIT AYOOB-2

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION,
COLORADO FARM BUREAU,
NATIONAL SHOOTING SPORTS FOUNDATION,
MAGPUL INDUSTRIES,
COLORADO YOUTH OUTDOORS,
USA LIBERTY ARMS,
OUTDOOR BUDDIES, INC.,
WOMEN FOR CONCEALED CARRY,
COLORADO STATE SHOOTING ASSOCIATION,
HAMILTON FAMILY ENTERPRISES, INC.,
d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
DAVID STRUMILLO,
DAVID BAYNE,
DYLAN HARRELL,
ROCKY MOUNTAIN SHOOTERS SUPPLY,
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
BURRUD ARMS INC. D/B/A JENSEN ARMS,
GREEN MOUNTAIN GUNS,
JERRY'S OUTDOOR SPORTS,
SPECIALTY SPORTS & SUPPLY,
GOODS FOR THE WOODS,
JOHN B. COOKE,
KEN PUTNAM,
JAMES FAULL,
LARRY KUNTZ,
FRED JOBE,
DONALD KRUEGER,
STAN HILKEY,
DAVE STONG,
PETER GONZALEZ,
SUE KURTZ,
DOUGLAS N. DARR,

    Plaintiffs,

vs.

JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

    Defendant.
_____

**REPORTER'S TRANSCRIPT**
TRIAL TO COURT - DAY TWO
_____

1          Proceedings before the HONORABLE MARCIA S. KRIEGER,

2     Judge, United States District Court for the District of

3     Colorado, continuing at 8:37 a.m., on the 1st day of April,

4     2014, in Courtroom A901, United States Courthouse, Denver,

5     Colorado.

6

7                              **APPEARANCES**

8          RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
      at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9     Denver, Colorado, 80202, appearing for the Plaintiffs.

10         DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
      555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11    for the Plaintiffs.

12         MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
      P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13    appearing for the Plaintiffs.

14         ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
      Street, Castle Rock, Colorado, 80104, appearing for the
15    Plaintiffs.

16         DAVID BENJAMIN KOPEL, Attorney at Law, Independence
      Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17    appearing for the Plaintiffs.

18         MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
      SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19    General, Colorado Attorney General's Office, Ralph L. Carr
      Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20    80203, appearing for the Defendant.

21

22

23

24              THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

Massad Ayoob – Direct

1            (**MASSAD AYOOB, PLAINTIFFS' WITNESS, SWORN**)

2            *COURTROOM DEPUTY:*  Please be seated.

3            Please state your name and spell your first and last

4      name for the record.

5            *THE WITNESS:*  Certainly.  My name is Massad Ayoob,

6      first name is spelled M-A-S-S A-D, last name spelled,

7      A-Y-O-O-B.

8            *MR. COLIN:*  Thank you.

9                      **DIRECT EXAMINATION**

10     *BY MR. COLIN:*

11     *Q.*  Good morning, Mr. Ayoob.

12     *A.*  Good morning, Mr. Colin.

13     *Q.*  Mr. Ayoob, you are a retained expert in this case; is that

14     accurate?

15     *A.*  I am.

16     *Q.*  And you charge for your services?

17     *A.*  I do.

18     *Q.*  Can you advise the Court as to the cost of your services.

19     *A.*  The same as I charge to teach, $2,500 a day and expenses.

20     *Q.*  Is that what you're charging the plaintiffs in this case?

21     *A.*  It is.

22     *Q.*  All right.  Can you describe for the Court your background,

23     training, and experience, please.

24     *A.*  Certainly.  As relates to this case, I've been a firearms

25     instructor since 1972 for police and since 1981 for private

Massad Ayoob - Direct

1  citizens.

2  Q.  And can you describe what you instruct police and private

3  citizens in with regard to firearms, please.

4  A.  We begin with safety, the responsibility that comes with

5  the weapon; the operation of the gun; the efficient use of the

6  gun, in terms of accuracy, speed, sustainability of gunfire;

7  the tactics that accompany it, since the emphasis is on

8  self-defense.  So that will include movement, that will include

9  finding cover, that is, something that could stop opposing

10  gunfire.

11  Q.  And you mentioned that at least some of the training I

12  think you just described is in the context of self-defense; is

13  that accurate?

14  A.  That is virtually all in the context of self-defense.

15  Q.  Can you expand on that and explain what you mean, this

16  training is in the context of self-defense.

17  A.  Sure.  We don't teach how to win a bull's-eye target pistol

18  match.  We're teaching the police officer who is carrying the

19  gun as a tool of protection.  And the private citizen who is

20  carrying a very similar gun for a similar function,

21  essentially, the -- we teach the private citizen to think of

22  himself as a first responder and that his gun should be an

23  analog to a fire extinguisher.

24          The gun, like a fire extinguisher, is a symbol of a

25  public safety professional.  We remind them that possession of

Massad Ayoob – Direct

 1  that symbol does not make them a public safety professional,
 2  does not mean that they don't need public safety professionals.
 3  We make it clear that the gun, like the fire extinguisher, is
 4  an emergency rescue tool to cut a lane of safety for you and
 5  others until the designated professionals can get there to deal
 6  with the crisis.
 7  Q.  Overall, does the self-defense training that you're
 8  describing involve the dynamics of violent encounters?
 9  A.  Oh, it absolutely does.  And the techniques that we teach
10  are built from extensive research and study of dynamics of
11  violent encounters, things such as flight-or-fight response,
12  human action/reaction paradigms, things of that nature.
13  Q.  I'd like to explore your teaching experience for a moment,
14  if I could.  How long have you been engaged specifically in the
15  instruction of self-defense with firearms and dynamics of
16  violent encounters?
17  A.  Forty-two years, sir.
18  Q.  Can you describe your teaching experience.  What is the
19  context in which you have instructed individuals in those
20  areas?
21  A.  Certainly.  I began teaching a local police department in
22  1972, Hooksett, New Hampshire, H-O-O-K-S E-T-T.  Shortly
23  thereafter, I was retained to teach weapons and chemical agents
24  for the advanced police training program of New Hampshire in
25  Nashua, New Hampshire.  Began teaching civilians in 1981 after

1  a pilot program at the Chapman Academy of Practical Shooting in

2  Columbia, Missouri.  And in October of that year, founded

3  Lethal Force Institute.  That organization was geared to

4  provide training to private citizens on a law enforcement level

5  in terms of safety, competence, and responsibility in

6  self-defense with firearms.  Within a year, that became pretty

7  much my full-time occupation, and has been ever since.

8  Q.  Are you still involved in the Lethal Force Institute?

9  A.  No, sir.  I left there in 2009 and now teach through Massad

10  Ayoob Group.

11  Q.  Can you explain briefly the nature of that change.

12  A.  Strictly a business decision.

13  Q.  Are you a member of any committees, training councils, and

14  the like, either nationally or international?

15  A.  Yes, sir.  I've spent -- I've been a member for many years

16  of the International Association of Law Enforcement Firearms

17  Instructors.  I've taught for them at local, regional,

18  national, and two international seminars.  For 19 years, I was

19  chair of the firearms committee for the American Society of Law

20  Enforcement Trainers.  For the last eleven years, I've been on

21  the advisory board for the International Law Enforcement

22  Educators and Trainers Association.  That's where I came from

23  this week, in fact, having taught there last week.

24  Q.  Do you participate in the National Law Enforcement Training

25  Center in any way?

Massad Ayoob - Direct

1   *A.*  Yes, sir.  The National Law Enforcement Training Center is

2   headquartered in Kansas City, Missouri.  It's an institution

3   that focuses on teaching -- well, my side of it, at least, was

4   teaching gun retention and disarming, teaching how to take the

5   gun away from another person, from an offender.  And gun

6   retention is the corollary science to that, how to defeat the

7   man who is trying to take your gun away from you with felonious

8   purpose.

9         I began as an instructor -- certified by them as an

10  instructor in 1980 and as a -- what they called a national

11  instructor, meaning I trained and certified other instructors.

12  I was certified for that in 1990, and I've done a great deal of

13  that over the years.

14  *Q.*  So you've been teaching other instructors how to teach for

15  20 years or more?

16  *A.*  Yes, sir.  Well, for at least that.  I've also done that in

17  the baton training discipline with the PR24 baton, but I didn't

18  think that was relevant to the case at bar.

19  *Q.*  Specifically, you've been engaged in instructing law

20  enforcement and civilians in defensive tactics involving

21  firearms use for the last 40 years; is that fair to say?

22  *A.*  Forty-two, I think.

23  *Q.*  Okay.  You touched upon the training that you have given.

24  Can you touch upon the training that you have received,

25  specific to the areas that you've just been speaking to.

Massad Ayoob – Direct

1    *A.*  Certainly.  At Chapman Academy, I took the advanced pistol

2    course, became involved with them, did our pilot project for

3    armed citizens in 1981.  And until the late 1980s, their head

4    instructor, Ray Chapman, the world pistol champion, he and I

5    taught for the Police Marksman Association, going around the

6    country doing what they called an advanced officer survival

7    program for various police agencies.

8            Let's see.  My own training, six or seven times

9    through Smith & Wesson academy and various instructor or

10   instructor enhancement programs.

11           In the 19 years with American Society of Law

12   Enforcement Trainers, I attended all but two of the five or six

13   day-long annual seminars, and have attended all 11 of the

14   IOEETA seminars, many of the seminars at the International

15   Association of Law Enforcement Firearms Instructors.  1980 or

16   so, I went through the officer safety and survival program at

17   the Federal Law Enforcement Training Center in Brunswick,

18   Georgia.  Numerous other seminars over the years around the

19   country.

20           On the homicide investigation side, the basic and

21   advanced officer-involved investigation school, taught by the

22   commanders and members of the LAPD officer-involved shooting

23   investigation unit.  The advanced homicide school -- advanced

24   homicide investigative school taught by Vernon Geperth,

25   G-E-P-E-R-T-H, the author of the authoritative text in the

Massad Ayoob – Direct

1  field.  And the medical, legal investigation of death course

2  taught at what was then the Metro Dade Medical Examiner's

3  Office.  Twice attended and twice taught at the International

4  Homicide Investigators seminar as well.

5  Q.  Have you been published in the area specific to the

6  expertise that we're discussing now, the areas of self-defense

7  and use of firearms, defensive gun uses, dynamics of gun

8  encounters?

9  A.  Yes, I am.

10  Q.  Can you advise the Court of the nature of those

11  publications, please.

12  A.  Certainly.  The first article in a gun magazine was 1971.

13  Became more extensively involved in writing after that for

14  various law enforcement professional journals, martial arts

15  journals, and gun magazines.  For 30 some years now I've been

16  the law enforcement editor for *American Handgunn*er magazine.

17  My duties there include occasional feature articles, in every

18  issue, the Cop Talk column, which is basically focused on law

19  enforcement handgun trends and training issues.  Also each

20  issue I do a series called Ayoob Files, where we dissect an

21  actual gunfight and determine what lessons were learned from

22  that that could prevent tragedy in the future.

23          I've been handgun editor for *Guns Magazine* for, again,

24  30 some years.  Many of those articles focus on self-defense,

25  though the occasional one will focus on sport or gun

Massad Ayoob – Direct

1    collecting.

2              I've been firearms editor for *Backwoods Home Magazine*

3    since about 1996.  My column there is sometimes self-defense,

4    sometimes recreation or hunting or gun safety.

5              I write in every issue of *Guns & Weapons for Law*

6    *Enforcement* the first responder column, which is geared to the

7    first officer who arrives at the scene, who is often the only

8    one who is there long enough to contain a fast-breaking scene.

9              For many years I've also done the self-defense and the

10   law column for *Combat Handguns Magazine*.  And my work has

11   appeared in various other periodicals over the years.

12             There have also been several books, a dozen or

13   fifteen -- I'd have to count them up -- all of them related in

14   some way to weapons or self-defense.

15   *Q.*  Can you identify a few of these dozen or so books that

16   you've written that focus specifically on the area of defensive

17   use of firearms and the dynamics of violent encounters?

18   *A.*  Certainly.  One would be *In the Gravest Extreme*, subtitled

19   *The Role of the Firearm in Personal Protection*.  That came out

20   in 1980 and has probably been my best seller.  Some were kind

21   enough to call it an authoritative text.

22             Others that would -- there was two in the Stressfire

23   series.  Stressfire is what I named the shooting system we

24   teach, because -- we found most training had been based on the

25   instructors going to the shooting range, timing each other, and

1  scoring their targets, and figuring whatever worked best is the

2  most accurate on the range, we would teach to the officers.

3  And we had found that would break down in the field because it

4  had not taken into account human factors of stress, shaking

5  hands, tunnel vision, and all of that.  So what we attempted to

6  do there was to study what happened to the human being in a

7  near-death experience and backspace developing techniques

8  around that.

9          That led to the *Stressfire Pistol Book* in early 1980s,

10 *Stressfire Shotgun* in the late 1980s.  Other books out today,

11 two editions of the *Gun Digest Book of Combat Handgunnery*,

12 *Ayoob on Combat Shooting*, two editions now of *Gun Digest Book*

13 *of Concealed Carry*, and most recently a book dedicated to

14 firearm safety.

15 *Q.*  Let's move on to training films.  Do you produce or are you

16 involved in the production of training films associated with

17 training civilians and law enforcement how to engage in

18 defensive gun uses in violent encounters?

19 *A.*  Yes, sir.

20 *Q.*  And can you describe for the Court the nature of those

21 training films, please.

22 *A.*  One is titled *Physio-Psychological Aspects of Violent*

23 *Encounters*.  And it explains phenomena such as tunnel vision,

24 auditory exclusion, or tunnel hearing, tachypsychia --

25 T-A-C-H-Y-P-S-Y-C-H-I-A -- the sense of things going into slow

Massad Ayoob – Direct

1  motion.  We explain also what some of the physiological effects

2  are as heart rate increases, vasoconstriction occurs, physical

3  strength increases, but dexterity decreases.

4          Other films in the Stressfire series, we had

5  *Stressfire I*, for the handgun; *Stressfire II*, for the shotgun;

6  and *Stressfire III*, for the semiautomatic rifle and fully

7  automatic weapon.  More recently, Panteao Productions,

8  P-A-N-T-E-A-O, has released my film on home protection and

9  self-defense and a training film on concealed carry.  There are

10  others out there.  For eight seasons I was on Personal Defense

11  TV, touching on self-defense topics of various kinds.

12  *Q.*  How long were you on Personal Defense TV?

13  *A.*  That was eight years.  The series ended early this year.  I

14  don't believe it's going to be renewed for the late 2014

15  season.

16  *Q.*  With regard to the publications that you listed, have you

17  written any articles that deal specifically with the use of

18  firearms by disabled or otherwise infirm, handicapped

19  individuals?

20  *A.*  Yes, I've written a few that touch on that and -- a few

21  that were devoted to that and many that touched on that.

22  *Q.*  Are you familiar with the Wounded Warrior Project?

23  *A.*  Yes, I am.

24  *Q.*  And what is your involvement, if any, in publishing for the

25  Wounded Warrior Project?

Massad Ayoob – Direct

1   A.  I don't publish for Wounded Warrior.  I have written about

2   the programs they have as it relates to firearms.

3          While Wounded Warrior does not advertise it, there are

4   several gun clubs that have, essentially, done benefit shoots

5   for soldiers and Marines who come back from the current

6   conflict seriously injured or as amputees.  It gives them a

7   chance to shoot firearms, something that, you know, most of

8   them identified with based on their careers.  Let them know,

9   yeah, you can get back into hunting, you can get back into

10  target shooting, and here is how to adapt.

11  Q.  Does the training also include how to adapt for defensive

12  gun use purposes?

13  A.  Mine does.  I'm not sure Wounded Warrior goes that far into

14  the tactics.

15  Q.  All right.  Have you ever been retained previous to today

16  to provide expert testimony in any court proceedings?

17  A.  Yes.  I've been an expert witness in weapon-related and

18  deadly force related cases since 1979.

19  Q.  Can you estimate how many cases that involved?

20  A.  It's in the dozens.  I don't know the exact number.

21  Q.  When you say "in the dozens," a couple dozen, more than

22  that?

23  A.  It would be 40 or 50 where I've given sworn testimony; a

24  great many more that I've consulted on and did not take the

25  case; and many were, we would do a report, and it ended in

Massad Ayoob – Direct

1  settlement or dismissal.

2  *Q.*  Thanks for the clarification.  Did any of those cases in

3  which you have rendered expert testimony involve persons with

4  injuries, disabilities, infirmities of some kind that were

5  relevant to the litigation?

6  *A.*  There were none exactly like this case that resulted in

7  legislation that became the focus of the legislation.  Some --

8  there were more than one disparate impact case of female law

9  enforcement officers who have been fired for failure to

10  qualify.  And there were physiological aspects involved,

11  typically, hands that were too small for the male-oriented guns

12  that they had been issued.

13          There have been self-defense cases where injury

14  inflicted on the individual who shot in self-defense had

15  created a disparity of force element that needed to be

16  explained to the juries.  There were -- I can think of at least

17  one case where the victim was a 63-year-old handicapped female,

18  violently attacked by a 1.8 percent blood alcohol 240-pound

19  male and was charged with either murder two or manslaughter

20  because she fired three bullets into an unarmed man, and that

21  needed to be explained.

22  *Q.*  What were you originally asked to evaluate in connection

23  with this case?

24  *A.*  Primarily, the disparate impact of a magazine limit on

25  handicapped individuals in terms of firearms kept for

1  self-defense and home defense, whether carried on the street or

2  whether with a gun permit or whether kept in the home and

3  deployed in the home.

4  *Q.*  You've given us an overall general description of much of

5  your training and experience in the area of firearms defensive

6  gun uses and the dynamics of violent encounters.  Can you tell

7  us what specific training and experience you have that

8  qualifies you to render opinions regarding the impact of

9  magazine limitations on both able and disabled bodied

10  individuals?

11  *A.*  Sure.  From the beginning when I started teaching cops in

12  1972, while they were all able-bodied, except for the

13  occasional case, we'd have the injured officer on light duty

14  who still had to qualify on the range, one of the things that

15  we had to look at was, the very fact that the officer needed to

16  shoot meant he was likely in a gunfight.  He might well be

17  seriously  wounded and might often have been wounded at the

18  very beginning of the fight if he was ambushed.  So we have to

19  look at what I called wounded officer response techniques.

20  What do you do if one hand, one arm has been rendered

21  inoperable?  What do you do if the effect of the first couple

22  of shots have put you on your back, or you started in the

23  patrol car, can't get out of the patrol car because a bullet

24  has broken your hip?  Those techniques served very well in the

25  '80s, when I started teaching civilians, and started getting

Massad Ayoob - Direct

1   students who were physically handicapped to various degrees.

2          There was a great deal of crossover.  There was some

3   things that did not cross over, and we simply analyzed their

4   situation and reached out to others who had dealt with

5   handicapped shooters and worked on finding the most efficient

6   ways to deal with them, both in terms of techniques and in

7   terms of mechanics, in terms of guns that in one way or another

8   might make up for their physical disability.

9   Q.  Did the training that you provided to these able-bodied and

10  disabled individuals, whether they were law enforcement or

11  civilians, include defensive tactics in the use of --

12  apologize, poorly phrased.  Did it include the use of firearms

13  in defensive gun use situations, both inside the home and

14  outside the home?

15  A.  Yes.  The -- virtually all of the training I've done has

16  been focused on the firearm as a defensive instrument, as

17  opposed to a recreational tool or an instrument of sport.

18  Q.  Is there any difference to the training that you provide to

19  civilians, whether able-bodied or disabled, as to defensive

20  tactics inside the home versus outside the home?

21  A.  Yes, there would be.  Situationally, if you're outside the

22  home, by definition, if you're resorting to a firearm, that

23  means you're licensed to carry a gun, and you have one either

24  on your person or immediately within reach.  So we'll work with

25  them on drawing the gun from discreet concealment and being

Massad Ayoob - Direct

1   able to reload.  We strongly emphasize that we feel anyone

2   carrying a gun without spare ammunition is carrying a temporary

3   gun.  So we teach them how to carry a spare magazine or a spare

4   speed loader, if they're carrying a revolver.  But in the home,

5   there are relatively few people who keep their gun on all the

6   time when they're in their own domicile.

7   Q.  You mean on their person when you say "keep the gun on"?

8   A.  No.  What I'm saying is, most people do not keep their gun

9   on when they're at home.  They will typically when they're in

10  their domicile have it stored in one or another fixed, static

11  location.  Perhaps a quick-release gun safe; perhaps a home

12  where you don't have to worry about children running around,

13  simply in the nightstand.

14          For them it's not a matter, when danger comes on them

15  suddenly to simply reach under their coat.  They may have to go

16  into another room to get at where the gun is, they may have to

17  go down the hall to get at where the gun is.  So now their

18  mobility becomes a much more critical factor in their ability

19  to defend themselves.  If when the alarm goes off, or the door

20  kicks off, or the window breaks, every second that they're

21  trying to get the wheelchair down the hall to where the gun is,

22  is going to be more vulnerability.  So we tell them, once they

23  have been able to get their hand on the gun, things are going

24  to be happening fast.  They're going to have to be -- hopefully

25  with a Bluetooth if they have one on already -- communicating

Massad Ayoob – Direct

1   with the police.  But mostly, one hand is going to be occupied

2   with some sort of telephone communication device.

3           They're not going to have time to strap on a gun belt

4   with an ammunition pouch, and they're not going to have time to

5   grab a spare magazine or speed loader.  Essentially, what they

6   have in that gun is going to be probably all they're going to

7   have from the beginning to the end of fight that occurs.  So we

8   tell them, for the home defense gun in particular, it makes

9   sense to have higher cartridge capacity than some other

10  applications.

11  Q.  And the comparison, then, to defensive gun use outside the

12  home, how is your training or -- how is the advice that you

13  give to able-bodied and disabled shooters different, if it is?

14  A.  Well, again, in terms of the magazines and such, we would

15  be advising the person in the wheelchair, for example, to have

16  a higher-capacity gun.  The reason is, the ambulatory person --

17          If I may stand for a moment to demonstrate.

18  Q.  Sure.

19  A.  The ambulatory person can be almost like a uniformed police

20  officer.  If you look at the next cop you see on the street,

21  the duty belt is going to have gear all the way around it, all

22  the stuff they have to carry.  You'll see a lot of people -- a

23  lot of ordinary folks will carry their pager behind their belt

24  or something else behind their belt.  Your guy in a wheelchair

25  is very restricted on that, particularly if he's paralyzed from

Massad Ayoob - Direct

```
 1  the waist down, and most particularly if he's paralyzed from
 2  the chest up.
 3          If I lean back now against some hard object that is
 4  behind my hip --
 5  Q.  Mr. Ayoob, I'm really not getting into wheelchair-bound
 6  individuals right now.  I'd like you to respond to the question
 7  about any difference in the training that you give to students
 8  for defensive gun uses outside the home versus inside the home.
 9  You had spoken to larger firearms magazines, availability and
10  those kinds of things.  Is that any different in terms of
11  outside the home?
12  A.  Well, outside the home, yes, because he's probably going
13  to -- if they're in the wheelchair, again, they're going to
14  have limitations.  There is only so much you can get in that
15  very small space that you're taking around with you.  And as I
16  was saying, you can't put any of it behind your backs.  You've
17  got to put all of it in the front.
18          If you found room for the gun -- that's not that tough
19  to do.  Finding room for the gun and spare ammunition is much
20  more difficult in the more limited waist space.  What I was
21  trying to get at is, that would be one more reason for them,
22  we'd be suggesting they get a higher-capacity gun.  They will
23  have much more difficulty reloading in the wheelchair than
24  would an ambulatory person, as well.
25  Q.  Thank you.  Do students bring their own firearms to your
```

Massad Ayoob - Direct

1  classes?

2  A.  The students normally will bring their own firearms,

3  correct.

4  Q.  And do you give them direction on what firearms to bring to

5  class, or do they select those on their own?

6  A.  Unless they ask, we simply tell them to bring the guns they

7  use for personal protection.

8  Q.  Have the -- has the equipment or the firearms that have

9  been most popular with your students changed over the years?

10  A.  Yes, they have.

11  Q.  Can you describe that, please.

12  A.  Over the last ten, twenty years, we've seen a much stronger

13  trend towards semiautomatic pistols and, particularly, the

14  pistols with relatively higher magazine capacity.

15  Q.  When did that take place?

16  A.  We started seeing it in the 1980s, and it was actually kind

17  of concurrent with the law enforcement switch from the old

18  service revolver to the semiautomatic service pistol.  And we

19  saw it more still in the '90s.  And today, the polymer-framed

20  pistol, usually 9 millimeter, occasionally larger calibers, is

21  by far the most popular type that we'll see in a civilian

22  course.

23  Q.  Can you estimate the percentage of students annually that

24  bring semiautomatic pistols to your class these days, in the

25  last ten years?

349

Massad Ayoob – Direct

1  *A.*  If we cover all semiautomatics, it would be in the high

2  90th percentile.  We do see the occasional revolver, but in

3  many classes there's not a revolver on the firing range.

4  *Q.*  Does the shift that you just described, the change in

5  popularity of handguns from revolvers to semiautomatics, affect

6  your training?

7  *A.*  We have to put more emphasis on avoiding what is called

8  colloquially spray and pray.  When someone suddenly goes from a

9  six-shot gun to an eighteen-shot gun, it's -- particularly if

10  fire power was the reason for the decision, it's real easy to

11  get the idea that the fire power was the *raison d'être*.  And

12  that means, if I ever have to pull this thing out, I better

13  hose all 18 rounds and hope something sticks; hence, spray and

14  pray.

15       And we told them, no, shoot it as if you had the

16  old-fashioned six shooter and you just have a greater reservoir

17  of ammunition.  The reservoir of ammo is not to hose the area;

18  it's to allow you to stay in the fight longer if the fight gets

19  particularly complicated and ugly.

20  *Q.*  Can you provide examples of the most commonly used firearms

21  brought by civilians and law enforcement officers to your

22  training classes in the last ten years.

23  *A.*  Yeah.  Some of the most popular brands will be the Glock,

24  the Smith & Wesson military and police semiautomatic, and to a

25  slightly lesser extent, but I'm seeing it increase, the

Massad Ayoob - Direct

1  Springfield Armory XD series.

2  *Q.*  As to the Glock series, can you identify the most popular

3  Glock model that you see in your classes.

4  *A.*  The most popular I see in the class is the Glock 17.  It's

5  their service-sized 9-millimeter pistol with 17-round magazine.

6  *Q.*  You also mentioned the M&P, the military and police?

7  *A.*  Yes, sir.

8  *Q.*  How many rounds is that?

9  *A.*  Again, 9 millimeter, that would be a 17-round magazine.

10  *Q.*  And then you also mentioned the Springfield XD series.

11  *A.*  Yes, the original XD, full-sized service pistol with the 15

12  or 16 -- I'd have to go back and look.  What we're seeing more

13  is the updated version of that gun, the XDM, which in full size

14  is a 19-shot magazine, in the 9 millimeter.  Of course, all of

15  them would have one more cartridge in the firing chamber when

16  kept loaded.

17  *Q.*  What percentage of students these days, in the past ten

18  years, bring revolvers to self-defense class?

19  *A.*  It's tiny percent.  As I've said, I see classes where there

20  is not a revolver in sight.  I think in the last year, the most

21  revolvers I ever saw in a class was three or four, in classes

22  of 20 to 40 people.

23  *Q.*  I want to move into some mechanical discussions regarding

24  the differences between a semiautomatic firearm or handgun and

25  a revolver.  All right.

351

Massad Ayoob – Direct

1          Your Honor, we have brought some dummy firearms into

2    the courtroom.  I'd like the clerk to provide those to the

3    witness at this time for this demonstration.

4          *THE COURT:*  Have they been marked as demonstrative

5    exhibits?

6          *MR. COLIN:*  They have not at this time, Your Honor.

7    We brought them in this morning, didn't --

8          *THE COURT:*  Well, let's get them marked.

9          *MR. COLIN:*  We'll do that.  I think we're at 93.

10         There is a semiautomatic you want to use?

11         *THE WITNESS:*  The blue one.

12         *MS. MORRILL:*  Your Honor, we have not seen this

13    demonstrative.  We'd ask to see it before it is handed to the

14    witness.

15         *THE COURT:*  I'm sorry?

16         *MS. MORRILL:*  We have not seen this demonstrative

17    exhibit before.  We would like to see it before it is handed to

18    the witness.

19         *MR. COLIN:*  Sure.

20         *THE COURT:*  Fine, you can see it.

21         *MR. COLIN:*  The blue revolver and the blue

22    semiautomatic.

23         *THE WITNESS:*  Yes, I think there is only one revolver,

24    should be blue, as I recall, blue semiautomatic.

25         *THE COURT:*  Mr. Keech, would you present those to

Massad Ayoob – Direct

 1  defense counsel, please, so that they can see them.

 2          *COURTROOM DEPUTY:*  Yes, Your Honor.

 3  *BY MR. COLIN:*

 4  *Q.*  Okay.  Can you describe how semiautomatic firearms,

 5  semiautomatic handguns in specific, are similar to or different

 6  from a revolver, mechanically.

 7  *A.*  Certainly.  The dummy here in my left hand is apparently

 8  produced by Odin Press, O-D-I-N.  But they're designed

 9  originally for handgun retention and disarming instruction, for

10  obvious safety reasons.

11          This is a cast dummy of the gun in battery.  When I

12  say "in battery," the parts are in alignment for firing.

13  Because it's cast, there are, obviously, no moving parts.  So

14  bear with me, because that compounds the difficulty of the

15  demonstration.

16          Once the gun is loaded, the part I'm indicating here

17  is the cylinder.  Essentially, a rotary drum that rotates on an

18  axis.  The pulling of the trigger straight back over a long

19  pull that would go from the at-rest position I'm indicating

20  here to the back of the trigger guard will inside the gun cause

21  a part called the cylinder hand to engage a ratchet inside the

22  gun at the back of the cylinder.  That will turn the cylinder,

23  rotating it.  As the mechanism brings the hammer back, the

24  hammer -- which I'm indicating here -- will rise before it

25  falls.  The next cartridge in the cylinder, which in this sized

Massad Ayoob - Direct

1    gun there would be six chambers with six cartridges, will
2    rotate under that hammer.  When the trigger pull is completed,
3    the hammer falls, the firing pin strikes the primer and the
4    cartridge, and the bullet is propelled through -- out of the
5    chamber through the barrel and toward the target.
6         To unload the gun, the part I'm indicating here, the
7    cylinder release latch, would have to be pressed in a certain
8    direction.  This is a dummy copy of a Smith & Wesson combat
9    magnum, and that brand is pressed forward.
10        Simultaneously, the other hand or some force has to
11   push the cylinder to the left to bring it out of the frame.
12   The cylinder assembly will now swing out and will be located
13   where I'm indicating here to the Court with my hand.  The
14   ejector rod of -- the stick-like projection in front of the
15   frame that I'm indicating here, is a part of the cylinder
16   assembly and will swing out with it.
17        To eject the spent -- the six spent empty casings that
18   will be in the chamber located at the back of the cylinder,
19   that rod has to be pressed or struck toward the cylinder.  The
20   ejector star, which is part of the ratchet, now comes back out
21   of the cylinder and drives those cartridges out, and they'll
22   fall to the ground.
23        So get it reloaded, visualize the cylinder was still
24   outside the frame.  If we had just loose ammunition in a pouch,
25   most people would have to reload one cartridge at a time,

Massad Ayoob – Direct

1   chamber per chamber, so six separate complicated motions of

2   getting the -- a small, narrow cartridge into the chamber.  A

3   dexterous, experienced shooter can load them two at a time.

4           There is a device called a speed loader, which holds

5   all six cartridges in a circle, that allows them to be loaded

6   at once.  Because it's the diameter of the cylinder, it's very

7   bulky and relatively few people find they can comfortably,

8   discreetly carry them concealed.

9           Once those are in, if it's a speed loader, the loader

10  has to be released, and it will then be allowed to fall away.

11  The firing hand will come back to the grip, and the other hand

12  will close the cylinder of the revolver.  And as we've noted,

13  it's a fairly complicated procedure.

14          The semiautomatic pistol, demonstrated here with a

15  Ring's brand, R-I-N-G apostrophe S, blue gun.  This one is cast

16  with polymer.  The primary parts will be the frame -- which I'm

17  indicating here -- in which the magazine -- which I'm

18  indicating here -- would be housed.  The barrel would be inside

19  the slide -- which I'm indicating here -- riding on a spring

20  guide rod with a recoil spring inside the gun.  The trigger --

21  which I'm indicating here -- is pulled, the pistol fires.  The

22  recoil force of that shot going off will drive this whole slide

23  assembly back on the frame.  The extractor -- which I'm

24  indicating here -- is a hook that will catch the inside edge of

25  the cartridge, the spent casing, and drag it back until it is

1    punched out through the eject port -- which I'm indicating

2    here -- by the ejector, which is a little stub that is inside

3    the gun.  In other words, the cartridge is dragged back by this

4    by the extractor hook and is then bumped by the fixed ejector

5    to kick it out.

6           At that point, the slide will have reached its

7    rearward point of movement.  It will no longer be blocking the

8    spring-loaded magazine in which the remaining cartridges are

9    stacked, and the spring will now drive the next cartridge up in

10   front of the slide.  As the recoil spring does its reciprocal

11   movement, brings the slide back forward, it will carry that

12   cartridge back into the firing chamber.  It happens in an

13   instant, and the gun is ready to fire.  If you watch it happen,

14   most people can't actually see the slide moving; they just see

15   the spent casing sticking out of the gun.

16          To unload -- to reload once it's run empty, most

17   pistols will usually lock their slides to the rear when they're

18   empty to signal to the shooter that it's time to reload.

19          To -- may I stand?

20          *THE COURT:*  Sure.

21          *THE WITNESS:*  Okay.  To get the -- we have to do what

22   we did with the revolver, get the old empty stuff out and the

23   new fresh stuff in.  With the semiautomatic, we now have an

24   empty magazine that will be released by pressing the magazine

25   release button.  This, as in most guns, it's in the form of a

Massad Ayoob - Direct

1   button behind the left side of the trigger guard.  The magazine

2   will now fall away, or if it's stuck, the shooter will flip it

3   out.  The shooter will grasp a fresh magazine, insert it in one

4   motion.  The difference is, here, we were inserting six tiny --

5   six exact size objects into six exact size holes, and with a

6   speed loader, trying to do it all simultaneously.  Here, it's

7   more of a gross motor skill than a fine motor skill.  We have

8   one relatively larger object going into one relatively larger

9   area.

10          The magazine is inserted until it clicks and seats.

11   If the slide is locked to the rear, either tugging back on it

12   will release it forward, or just coming up with the thumb and

13   touching the part I'm indicating here, the slide release lever,

14   will allow the slide to close, chamber the round, and complete

15   the reloading cycle.

16          The difference would be, reloading the revolver would

17   look in sequence like this.  Reloading the semiautomatic would

18   be a much simpler sequence that would look like this.

19   *BY MR. COLIN:*

20   *Q.*  During the course of your comparative testimony, you

21   mentioned trigger pull and trigger distance with regard to the

22   revolver, but not the semiautomatic.  Are they the same between

23   the two?

24   *A.*  No.  There are two different issues, and they do tend to be

25   different between the two types of guns.

Massad Ayoob - Direct

1   Q.  What are the differences on those?

2   A.  On the revolver, we have a long, heavy pull.  The reason

3   is, mechanically, the index finger, the trigger finger,

4   bringing the trigger back is performing multiple functions.

5   It's driving the cylinder hand upward to rotate the cylinder

6   against resistance; it's bringing the hammer back against the

7   resistance of a very strong main string that will be located

8   inside the grip frame.  And, typically, your double-action

9   service revolver will have a trigger pull weight of 9 to

10  12 pounds.  I've seen some that ran 14 pounds.  It's also a

11  longer stroke, because to get all of that mechanical work done,

12  basically, we need some distance for the lever-shaped trigger

13  to move.

14          With the semiautomatic, it -- you can get -- most

15  designs will have a lighter, easier trigger pull, at least for

16  most shots.  In this pistol, the M&P, it's striker fired, so

17  there is no hammer that needs to be raised and lowered.  It's a

18  much shorter trigger stroke that tends to be lighter.  The

19  factory spec for trigger pull weight on this gun for a duty or

20  defense pistol is 6.5 pounds.

21  Q.  You've done a demonstration for us, you've given us a

22  mechanical description of the differences between a revolver

23  and firearm, have you performed any tests to determine which

24  is -- which can be reloaded more quickly and efficiently?

25  A.  Yes.

Massad Ayoob - Direct

1   Q.  And can you describe those for the Court, please.

2   A.  Yeah, over the years, I've lost count of how many thousands

3   of people I've observed reloading both revolvers and

4   semiautomatics in 40 some years of shooting competition and

5   shooting training.  It is inarguable that the same individual

6   is going to be able to reload the semiautomatic faster than he

7   is the revolver.  It's simply a less complicated task with

8   fewer movements involved.

9   Q.  Why does the amount of time required for reload matter?

10  A.  Because it -- assuming real world and not sport, every

11  second the defender cannot fire is a second of absolute

12  helplessness.  The longer the reload process takes, the longer

13  they are helpless against an armed opponent.

14          That becomes magnified in a situation where the hands

15  are trembling, fine motor skill is being lost.  The revolver is

16  more dependent on fine motor skill than is the semiautomatic.

17  And, overall, when you're reloading, you're vulnerable.

18          I think the easiest way to explain it is, if it was a

19  boxing match, if someone said for X numbers of seconds you have

20  to lower your arms and not punch or block while your opponent

21  is allowed to punch, you would have just turned into a punching

22  bag, and for that period of seconds would take blow after blow

23  until they finally got the knockout blow, and you are going to

24  be unconscious on the mat.

25          That same -- that same dynamic occurs in the reloading

Massad Ayoob – Direct

 1   process.  While you're unable to fire the gun, since it's not

 2   been reloaded yet, you are the equivalent of the boxer with his

 3   hands at the side.  The opponent does now have you turned into

 4   a target instead of a threat to flee.  And with impunity, he

 5   can be sending his blows with a gun or knife at you until he

 6   gets the knockout blow that leaves you dead.

 7            MR. COLIN:  Thank you.  Your Honor, this would be a

 8   good time for the noon break.

 9            THE COURT:  All right.  Then we'll stand in recess,

10   and we'll stand in recess until 1:30 this afternoon.

11            Is there anything we need to take up before our noon

12   break?

13            MR. COLIN:  No.  Not from the plaintiff.

14            THE COURT:  Okay.  All right.  Then we'll stand in

15   recess until 1:30.

16            (Recess at 11:56 a.m.)

17            (Hearing continued at 1:33 p.m.)

18            THE COURT:  Please resume.

19            MR. COLIN:  Thank you, Your Honor.

20   BY MR. COLIN:

21   Q.  Mr. Ayoob, we've gone through your knowledge of the

22   mechanical functioning of both revolver and semiautomatic

23   pistol.  I'd like to move now on to how that's applied.

24            Do you teach civilian shooters and law enforcement

25   officers, both able-bodied and not, how to perform magazine

1    exchanges swiftly, efficiently?

2    A.  We do.

3    Q.  For how long have you been providing that kind of

4    instruction?

5    A.  For 42 years.

6    Q.  Can you estimate how many students you've taught how to do

7    tactical, standard, or any other kind of magazine exchanges

8    involving semiautomatic firearms?

9    A.  Countless thousands.

10   Q.  And did you say law enforcement since 1970 something, and

11   civilians after that?

12   A.  Law enforcement since '72; private citizens since '81.

13   Q.  Based upon that experience, can you tell us how long it

14   take an average shooter, able-bodied, to perform a magazine

15   exchange?

16   A.  With some proper training fresh in their mind, they'll

17   probably average around four to six seconds.  Of the more

18   dexterous, the more expert, the naturals, if you will, the ones

19   with more experience, will probably go two to three seconds.

20   Q.  Can you provide an average time for disabled shooters?

21   A.  We cannot.  The reason is the range of disabilities is

22   simply too far to figure out an average.

23   Q.  Describe what kind of considerations you have to take into

24   account when dealing with developing a training program for a

25   disabled shooter to effect a magazine exchange swiftly and

Massad Ayoob - Direct

1    effectively.

2    *A.*   Sure.   The first thing that we have to do is analyze what

3    the shooter's disabilities are, and just as important, what

4    abilities he or she still has.   The disabilities may range from

5    the guy who is palsied due to age or neurological problems or

6    nerve damage.   The very rapid insertion of the magazine that

7    would be easy for an able-bodied person sitting in here becomes

8    a nightmare for him, because both the feeding hand and the

9    receiving hand are shaking.   It's going to take him much

10   longer, and proportionately longer still with the revolver,

11   with smaller cartridges going into smaller receptacles.

12            Overall, we look at, where is the disability?   The

13   upper body disabilities, the upper limbs, whether it's hands,

14   arms, upper body strength issues, I see that when I'm

15   teaching the shooting of the gun, use of the guns, as a

16   profound disability in that respect.

17            The other element we have to look at is the lower

18   body, disabled knees, ankles, perhaps someone who has no

19   feeling at all in their legs.   That becomes an issue of

20   tactical mobility.   We can --

21   *Q.*   Before we get to that, I want to -- I certainly want to

22   speak to that issue.   I want to get there by laying foundation

23   before we can talk about it.

24            I'd like you to explain why -- if we're only talking

25   about two to three seconds for an expert or four to six seconds

1   for a typical civilian, an average civilian shooter -- if we're

2   only talking about two to six seconds, what is the big deal?

3   Why does it make a difference?

4   *A.*  Remember, we're teaching them on the range to operate

5   life-saving emergency rescue equipment.  When they actually

6   need the skill, it will be during an ongoing attack.  Every

7   second that they are unable to respond is a second of absolute

8   total helplessness.  We often -- when we're looking at time on

9   one side, we always have to look at time on the other.  The

10  opponent is up and running.  It has been well established in

11  firearms training literature for decades now that the average

12  person can pick up one of these guns -- here, I'm holding the

13  dummy revolver.  And even with its long trigger stroke back and

14  its long stroke forward to reset, if you start timing from the

15  first shot, the average person can fire four shots in about --

16  four shots in about one second.

17          The semiautomatic pistol, the majority of models which

18  have the shorter trigger stroke, like this M&P I'm now

19  demonstrating with, shorter back, shorter forward, less

20  distance equals less time and more output.  The average

21  person -- not the expert, not the master, the average person,

22  will get off five shots in the first second.  Some people if

23  they're fast will get off six.  That means the other person has

24  six chances to kill you or six chances to kill the people

25  you're protecting if you are unable to stop them.

Massad Ayoob – Direct

```
 1              If, instead of having to take that -- that, whether
 2      it's two-second, four-second, or ten-second reload, if you had
 3      enough cartridges in the gun that it had not run dry, that you
 4      could simply keep shooting, average break time -- that is, the
 5      elapsed time between shots -- is going to be a fourth to a
 6      fifth of a second.  So we're balancing several seconds,
 7      multiple whole seconds of vulnerability for you and those
 8      within the mantle of your protection against the ability to
 9      return a shot and hopefully end the danger in a quarter of a
10      second.
11  Q.  Now I want to get to the area you were about to speak to
12      with regard to upper and lower body disabilities if we could.
13      You have instructed, have you not, over the last 40 years,
14      individuals with both kinds of disabilities, meaning upper body
15      disabilities and lower?
16  A.  I have.
17  Q.  Can you tell us how many physically challenged, disabled,
18      infirm shooters that you have instructed over the last 40
19      years?
20  A.  It will go maybe one out of twenty with what I would
21      consider a profound disability in terms of shooting, the really
22      severe tremors in the hands, an arm that does not work, missing
23      digits from the hands, missing whole fingers from the hands,
24      and the occasional missing hand or missing arm.
25  Q.  Is --
```

1    *A.*  It's at least twice that for the lower body disabilities.

2    A few times a year, every year, in civilian classes, we'll have

3    someone who is in a wheelchair.  There are many more whose

4    lower body disabilities don't show up until I ask them to shoot

5    from a cover position.  And most of the cover positions are

6    low, such as a kneeling position or a deep-cover crouch.  The

7    guy who you don't notice any disability when he's just walking

8    around casually, now in his bad knee, his replacement hip, his

9    fused ankle, whatever come into play, he can't do it.  He can't

10   get down behind that cover.  He doesn't have that protective

11   place, that safe harbor, that safe haven where he's going to

12   have the few seconds to reload the gun.  He may be caught in

13   the open, and the only thing he can stop the opposing fire with

14   is his own return fire.

15   *Q.*  So it sounded to me like you have two categories of

16   disabilities, at least in your mind.  You used the term

17   "profoundly disabled."

18   *A.*  From my perspective as a firearms instructor, yeah.  I'm

19   not looking at what a doctor would call profoundly disabled;

20   I'm looking at what me teaching the student this particular

21   skill is a profound handicap to overcome.

22   *Q.*  And you said, roughly 5 percent of your students over the

23   last 40 years have fallen into that category?

24   *A.*  Roughly 5 percent, yeah.

25   *Q.*  And then you said there is another category.  Can you give

Massad Ayoob – Direct

1   us an estimate of how many students fall into this other
2   disability category.
3   *A.*   What I would call the tactically disabled.  The people who
4   move very slowly, the people who may not be able to move at all
5   if they're in a manually operated wheelchair, or the people
6   with lower limb injuries or disabilities that are in positions
7   where they cannot take cover behind something like an engine
8   block or a heavy stove during a home invasion or something like
9   that.  And that would be about twice as many.
10  *Q.*   So another 5 to 10 percent?
11  *A.*   Probably, yeah.
12  *Q.*   Okay.  Do you provide separate training classes for
13  disabled shooters, infirm shooters?
14  *A.*   I do not.  The reason is, there is such a wide range of
15  disabilities, there is no one curriculum that will fit them
16  all.  So we integrate them often with special needs assistance
17  into our regular programs.
18  *Q.*   In the regular programs in which you allow disabled
19  shooters to participate, is there training to able-bodied
20  students in those classes that is similar to the training that
21  is received by these disabled folks?
22  *A.*   Yes.  In the first level in police training and the second
23  level in our civilian training, we'll get into the wounded
24  defender techniques.  The situation where you walked into the
25  thing able-bodied, a gunshot went off, now one of your arms no

Massad Ayoob - Direct

1   longer works, now your leg has crumpled under you and no longer

2   works.  How do you transition from this hand to that hand,

3   let's say, for the police officer?  How do you shoot from the

4   ground and stabilize the shot, whether you're on your butt, on

5   your back, on your side, whatever?  If you only have one hand

6   to shoot back with, how do you maximize your ability to deliver

7   accurate rapid fire when 50 percent of your upper shooting

8   platform has just been shot away?

9   Q.  Am I accurately hearing that your training, then, for the

10  disabled shooter is pretty much the same as the training that

11  you give to able-bodied citizens on how to deal with injuries

12  during a gunfight?

13  A.  There is a lot of crossover, but it's not identical.  For

14  example, shooting from a seated position.  If we had a police

15  officer who's ambushed from the front, and he's seat-belted

16  into his cruiser, the car is in park, there is no time to

17  escape, he's literally got to shoot through the windshield.

18  From his seated position -- I will be visible from your

19  perspective -- he could jackknife his upper body forward, get

20  his upper body weight under the gun, and deliver very accurate

21  rapid fire, recovering from the recoil almost as quickly as he

22  can reset the trigger.

23        The person in the wheelchair very often will not be

24  able to do that.  The reason is, if you jackknife forward from

25  the hips, your legs become V springs that are holding your

Massad Ayoob - Direct

1  upper body upright as your upper body weight goes forward.  The

2  paraplegic, particularly the paraplegic who is paralyzed from

3  the chest down -- I've seen some who have to be strapped into

4  the wheelchairs.  If they try to lean their upper bodies

5  forward, it's going to overbalance, and they fall out of the

6  chair.  So we teach them different techniques.

7          For example, I teach them, since they're going to have

8  to lean back to stay in the chair, to shoot with what is called

9  the Weaver stance.  It's an isometric position in which both

10 elbows are bent, the gun hand pushes, the support hand pulls.

11 That allows recoil to -- it, essentially, turns the arms into

12 tense skeletomuscular shock absorbers.  The recoil is forced

13 between the gun and torso.  If they had tried to shoot in the

14 more modern technique that the officer could do jackknifed

15 forward, the locked arms will become levers.  The first shot

16 may go through the windshield.  The second shot will go into

17 the roof, unless they consciously take time to bring the gun

18 back down, which would greatly slow their rate of return.  So

19 in areas like that, there might be some difference.

20         In many of the others, we teach them exactly the same,

21 because so many wheelchair victims, when they're mugged, the

22 attacker's first thing is to tip them out of the wheelchair on

23 the ground, thinking they're going to be helpless like an

24 upside down turtle.  We emphasize with the wheelchair students

25 how to shoot from the ground a little more than we would with

Massad Ayoob – Direct

1    the average civilian student.

2    *Q.*  Okay.  I'd like you to describe for the Court the process

3    that you use when a disabled individual comes to you, somebody

4    with an infirmity, a handicap of some kind.  Describe the

5    process that you use to develop training that will allow them

6    to overcome that disability.

7    *A.*  Sure.  Well, we'll start with, at the risk of repeating

8    from the last question, assessing, what is their disability?

9    What are their abilities?  We know now what they can't do;

10   let's see what they can do.  It may be more important for them

11   than for a perfectly able-bodied shooter to have a gun that

12   perfectly fits their hand.  And lets them apply maximum

13   mechanical damage to compensate for any upper body weakness

14   they might have.  We may have to place the gun differently.

15   Most people, police or civilian, who carry concealed handguns

16   will carry on or just behind the strong side hip.

17            If I may stand for one more moment.

18            It's a natural, easy place for the dominant hand to

19   simply come back to and access the gun.  If we have someone in

20   a wheelchair, it's going to be much more difficult.  The gun

21   tends to be pinned between the arm of the wheelchair and the

22   torso of the patient.  And as they reach down here, they've

23   about run out of range of movement, so they're going to have to

24   rock significantly to the side.  So people like that, we'll

25   suggest, you know, may be a little slower for the standing guy,

369

Massad Ayoob - Direct

1    but we'll have you place your gun cross body.  That would be

2    the opposite hip, but forward.  Gives them much better range of

3    movement across the body, and we just show them how to safely

4    do it on the firing range in a way not to cross any other

5    shooter so they can practice and build their skills.

6             We will try to adapt the gun.  The person who is going

7    to have particular difficulty reloading for whatever reason is

8    obviously that much more a candidate for a gun that has a

9    higher reservoir of ammunition.

10   Q.  All right.  So you analyze the disability, you address how

11   they might carry it, where they might carry it, where they

12   might carry ammunition, drawing and aiming the weapon?

13   A.  Right.

14   Q.  Is there any identification -- and maybe that's what you

15   were getting to a moment ago with regard to mechanical changes

16   that might be made to the firearm itself.  So, do you study the

17   mechanical operation of the firearm in conjunction with the

18   disability to try to figure out how the mechanical function of

19   the firearm might be modified or how the shooter might modify a

20   more typical approach in firing?

21   A.  We do.  A classic example of that would be the person with

22   very short fingers.  We have a lot of people, particularly in

23   foreign countries, that have had industrial farming accidents,

24   so they're missing a fingertip or something.  I had one student

25   who was a Thalidomide baby in adulthood, and all of his fingers

Massad Ayoob – Direct

```
 1  were about as long as the median joints are of mine here.  One
 2  of the things you want is going to be a pistol with shorter
 3  trigger reach.  The trigger reach dimension on the gun is
 4  measured from the back strap under the grip tag, of the part
 5  that I'm indicating here, to the center of the face of the
 6  trigger, which I'm indicating here.
 7            On the hand, it would be measured from the center, the
 8  web of the hand, in line with the long bones of the forearm,
 9  from this point I'm indicating here, to the contact point on
10  the trigger finger.
11            Someone with one digit shorter than what my finger is
12  here is barely going to be able to touch the trigger, but will
13  not have the left leverage to pull it.  My finger only went to
14  here on a longer trigger gun.  If you've got something with a
15  shorter trigger reach, as you can see here, they'll be able to
16  get at least -- where the joint -- with the distal joint of my
17  finger sits here, is where their fingertip will sit, and they
18  will be able to operate the gun effectively.
19  Q.  You've gotten into -- a little ahead of us in terms of the
20  missing shortened finger issue.
21  A.  I'm sorry.
22  Q.  I want to walk through the methodology you apply when
23  attempting to develop what I'm going to call the work-around or
24  a method by virtue of which someone with a disability can
25  overcome that disability.  And what I understood you to say,
```

Massad Ayoob – Direct

1  you start out by figuring out what the disability is, figuring

2  out what aspects of carrying, firing, reloading a firearm those

3  disabilities are going to affect; is that a fair beginning?

4  A.  Correct.

5  Q.  And then what's the next step in the process?

6  A.  The next step in the process is get the student out

7  actually shooting, and, basically, diagnose, how is he hitting?

8  How is his hand interfacing with the firearm?  What's his speed

9  of recoil control, et cetera?  And we adapt accordingly in

10  terms of technique and equipment.

11  Q.  So you develop ways for the disabled, injured, or infirm

12  shooter, whether able-bodied or not, to overcome whatever the

13  disability or injury presents?

14  A.  Correct.

15  Q.  Is that fair?

16  A.  Yes.

17  Q.  All right.

18  A.  Whether by technique or equipment or combination of both.

19  Q.  Can you advise the Court regarding the impact of upper body

20  disabilities on a shooter's ability to reload.  And whether

21  it's a disability or injury, let us know if there is a

22  difference.  Otherwise, if the same is true for able-bodied

23  injured shooters as it might be to a disabled person with a --

24  an extremity that is either missing or rendered useless,

25  paralyzed?

Massad Ayoob - Direct

1   *A.*  Sure.  You have to take each of them, basically, as they

2   come.  For every student who is going to have the super short

3   fingers or the hand injury or partial or complete amputation,

4   you're going to have several who are my age.  The age is

5   getting along, you're seeing arthritis manifestations in the

6   hand, and they don't have the range of movement that they might

7   have had when they were 20 or 30 or 40.

8         I'm kind of losing track here -- repeat the question.

9   *Q.*  Sure.  I'm asking you to explain how the ability to reload

10  is adversely affected by a disability.

11  *A.*  Thank you.  Let's say that I had a shortened thumb, and we

12  are reloading the semiautomatic pistol.  With an average length

13  thumb, it's no problem for me, being right-handed, to simply

14  press this button inward and dump the magazine.  If my thumb

15  only came to where my median joint is, I would have to turn my

16  hand on the gun, bring the proximal joint of my index finger

17  under the grip tag, which would somewhat weaken my grasp of the

18  pistol, to get that part of the thumb -- where my median joint

19  is would be the tip of his stump, basically -- to make that

20  press.

21        Or we could simply have him do it with the other hand,

22  but that's going to slow him down too.  Because the

23  conventional reload, the shooting hand is dumping the magazine

24  simultaneously with the support hand grabbing a fresh magazine

25  to reload.  Now, with the left hand, in my case, doing the

Massad Ayoob – Direct

1  right hand's job, that support hand is going to get much later

2  to the spare magazine and will slow down the reload and

3  lengthen that window of absolute helplessness.

4  Q.  You anticipated my next question.  I was going to ask why

5  time was a problem.  Thank you.  How can that be overcome, the

6  time element that you just described?

7  A.  The simplest and most logical way is to have that person

8  carry a gun, or have access to a gun if it's home defense, that

9  has that many more cartridges in it.  The more cartridges there

10 are, the less often he will have to reload.  The more

11 cartridges there are, the longer he can stay in the fight

12 before he has to reload.

13 Q.  How, then -- taking everything you just testified to into

14 account, how, then, did you arrive at your opinion that the

15 ability of a disabled, infirm, or injured person to protect

16 themselves will be adversely protected by a magazine capacity

17 limitation?

18 A.  Well, certainly, through a lifetime of study, through

19 observation.  When you look at the lower-capacity gun versus

20 the higher-capacity gun in fully skilled hands, it becomes

21 pretty stark.  There is an organization that conducts what you

22 might call simulated gunfighting, called IDPA, International

23 Defensive Pistol Association.

24       At their national championships last year, the top

25 revolver shooter in the world, a guy named Jerry Miculek,

Massad Ayoob – Direct

1    M-I-C-U-L-E-K, was shooting against the top semiautomatic

2    pistol shooter in the world, Rob Vogel.  They're shooting the

3    exact same course of fire, the exact same number of hits

4    required.  The rules limit Miculek with the revolver to six

5    shots, then he has to reload again, six shots, then he has to

6    reload again, et cetera.  Their rules, to keep a level playing

7    field for semiautomatics in states that have ten-round magazine

8    limits, is ten in the magazine, one in the chamber.  So the

9    semiautomatic shooter in that case had eleven rounds to six the

10   other man had.

11          When you figure the time it takes to reload and the

12   number of times you have to reload, at the end, Vogel's score

13   was 28 percent faster than the revolver shooter.  So,

14   essentially, comparing like with like, the greatest world

15   champions in the sports at this time, it was a 28 percent

16   deficit to have the gun with less capacity.

17   Q.  We've already done this to a certain degree, so I want to

18   skip over anything that you have already covered in your

19   testimony.  Now is about the time I wanted to get into

20   particular disabilities that present specific problems for

21   handicapped or injured able-bodied shooters which adversely

22   affect their ability to address a threat due to a magazine

23   limitation.  And you had started to talk about shortened or

24   missing fingers, and you actually effected the demonstration of

25   some of the issues for the Court.

375

Massad Ayoob - Direct

1          Are there any other points that you'd like the Court

2   to consider with regard to how individuals with missing or

3   shortened fingers are impacted by capacity limit on detachable

4   box magazines?

5   A.  Well, the missing or shortened fingers, if it reduces their

6   ability to shoot fast and straight, means that a shot that had

7   they had perfect hands and had lined up, might have struck

8   center and ended the fight, might hit off center, leave the

9   opponent up and running and trying to kill them and others and

10  require them to shoot again.  If you don't have any ammunition

11  left with which to shoot again, you're back in that window of

12  utter helplessness.

13  Q.  You mentioned possible design -- mechanical design

14  modifications to a firearm to address a problem associated with

15  missing or shortened fingers.

16  A.  One that has been suggested in some of the plaintiffs' --

17  I'm sorry, the defendant's reports and depositions that I've

18  read has been simply putting an extended magazine release on

19  the semiautomatic pistol.  That would work to some degree,

20  certainly, on the range.  Your problem with it is if the gun is

21  going to be carried.  The magazine button tends to extend --

22  it's going to be generally the same diameter, a bit larger, but

23  it will extend out away from the pistol.  That means we have a

24  protuberance that in a right-handed person's holster, coming

25  from the left side of the gun, is going to be pressing against

Massad Ayoob – Direct

1  the left side.

2         Apart from discomfort, any time that person bumps into

3  a door or simply leans to the right side in a wheelchair when

4  the armchair hits it, the weight of the gun will now drive the

5  button against the body, it will press the release, and the

6  magazine will pop out.  This means the gun is no longer

7  functional.  On some guns, if they need to draw and fire in

8  self-defense, they will get one shot before the gun ceases to

9  fire.  Some others have a feature called a magazine

10  disconnector safety, which means that when a magazine drops out

11  of place, even the live round in the chamber cannot be fired.

12  In that situation, they'd be totally helpless.

13         Carrying on the left side, since most of the pistols

14  have the button protruding to the left, that would allow any

15  time the edge of the chair -- the wheelchair strikes the hip,

16  once again, the magazine is going to be released, and it will

17  turn the whatever-many-shot pistol into a one-shot pistol, or

18  if it has the disconnector safety, a nonfunctional,

19  nonshootable pistol.

20  Q.  All right.  I want to move on, if we've covered everything

21  dealing with adverse effects of missing or shortened fingers on

22  the mechanical operation of the firearm, and talk about either

23  a completely paralyzed arm or missing arm or hand and whether

24  or not, first of all, you've trained people with those

25  disabilities.

Massad Ayoob - Direct

1   *A.*  I have.

2   *Q.*  Secondly, when you're training those folks, is that similar

3   to teaching an able-bodied person how to shoot one-handed, for

4   example?

5   *A.*  It is.  It is very much the same, I'd say high 90th

6   percentile commonality.  What you've got there -- with only one

7   hand on the gun, you've literally lost 50 percent of the flesh

8   and bone that your opponent might have to control his gun.

9   You've got to remember with even a 6 1/2 pound trigger pull,

10  this is going to be only about a -- about a 2-pound gun once

11  it's loaded, give or take a few ounces.  Putting 6 1/2 pounds

12  pressure suddenly on something that weighs only 2 pounds,

13  something a third of its weight, it's very easy for that to be

14  tripped off target.  If you have a two-handed grasp, it's much

15  easier to keep it stable on target and make those shots.  So

16  if --

17  *Q.*  So just so I understand, what you're saying, it potentially

18  affects accuracy?

19  *A.*  Potentially affects accuracy.  It will also dramatically

20  affect recoil recovery.  That is, the speed -- the time it's

21  going to take from one accurate self-defense shot to the next

22  accurate self-defense shot.  Two hands could control the

23  recoil, which takes the form of what is colloquially called

24  kick, the gun coming back into your hand, and includes also

25  muscle rise or muscle jumps, as the muscle levers up against

Massad Ayoob - Direct

1  the axis of the wrist.

2  Q.  So one-handed shooting affects accuracy in two ways that

3  you just described?

4  A.  It affects accuracy, and it affects speed.

5  Q.  Let's talk about the speed component.  When you're talking

6  about speed, are you talking about the speed to reload or

7  replace a magazine?

8  A.  No, that would be the speed to get multiple hits.

9  Q.  All right.  Let's talk about that, and then we'll talk

10  about the other issue.  Tell me about the speed to get multiple

11  hits.

12  A.  Okay.  The speed of shooting is going to be the same one or

13  two hands, because the same index finger is controlling the

14  trigger.  The delivery of accurate hits is what changes.  Given

15  the fact that, again, we only have half the flesh and bone to

16  stabilize against the trigger pull weight against the

17  trigger's -- excuse me, to stabilize the gun against the weight

18  of the trigger pull, and we're going to have more muscle rise

19  between shots, it's going to take longer between shots to

20  align, hold and squeeze, bring the muscle back down from the

21  recoil of shot one to align it for shot two.

22       You could put -- one-handed, I could shoot as fast as

23  I can shoot two-handed.  One-handed, none of us are going to be

24  able to hit accurately as fast as we could two-handed.

25  Q.  So what's a work-around?  What -- what are ways that you

Massad Ayoob - Direct

1   have developed to overcome the problem with hit potential here

2   that you've just described, or accuracy?

3   *A.*  We teach very hard grasp, very aggressive stances.

4          May I stand?

5          *THE COURT:*  You may.

6          *THE WITNESS:*  It's like throwing a punch.  If you're

7   standing upright, like, on the target range, and the pistol

8   recoil is one-handed, the gun comes up and toward your weak

9   hand side like a lever.  It's following the line of least

10  resistance.  It goes upward because the axis of the barrel is

11  above the wrist, and it goes inward because that's where the

12  hand is open and, therefore, the weakest.  That would be

13  happening much less if that side was closed.

14         By getting the upper body forward, we're getting body

15  weight into it, and we can recover faster.  These are fixes,

16  but they're not perfect fixes.

17         I referred a minute ago to IDPA, International

18  Defensive Pistol Association.  In their current rules, the

19  matches cannot put the target more than 7 yards away from the

20  shooter when he's firing non-dominant hand or weak hand only.

21  They cannot put the targets more than 10 yards away in a stage

22  that requires strong hand only shooting.  And the stages where

23  two-handed shooting is allowed, the distances go to three or

24  more times that distance.  That gives you an idea of how much

25  the one-handed versus two-handed shooting affects accuracy and

Massad Ayoob - Direct

1   speed.

2   BY MR. COLIN:

3   Q.  What is the most effective way to address diminished

4   accuracy?

5   A.  Diminished accuracy means you're going to need more makeup

6   shots.  If you get clumsy in the golf game, you're going to

7   need more strokes.  If something has kept you from getting the

8   bullet exactly where it needs to go, you're going to need a

9   Mulligan, a do-over.  Given that that is highly predictable,

10  particularly for the physically handicapped individual, that

11  means you're going to need more cartridges in the firearm.

12  Q.  And then I had referenced time to reload.  Is there an

13  adverse effect on an individual who has been injured in a hand

14  or an arm or if the arm is disabled, the hand is disabled, is

15  there an adverse effect on their ability to reload?

16  A.  Yes.  The one-handed reload can be done; but it takes so

17  much longer.  It's not just increasing the time, it's literally

18  multiplying the time.

19          It would probably be best if I demonstrated the

20  mechanics really quick.

21          MR. COLIN:  Your Honor, may he demonstrate from the

22  witness stand?

23          THE COURT:  He may.

24          MR. COLIN:  Thank you.

25          THE WITNESS:  Okay.  We discussed before two-handed

Massad Ayoob - Direct

1  with the revolver, simply open the cylinder, support hand slaps

2  out and grabs, loads go in, other hand closing cylinder, we're

3  back in business.

4        But now if, let's say, all I have is my left hand only

5  on this revolver, last shot has been fired.  I can't flip it

6  around like this without dropping it, so I've got to bring it

7  back to my chest and let the back of the butt touch here to

8  stabilize.  Now my left hand can go under the trigger guard,

9  and that's the only way this thumb can reach the cylinder.  The

10  fingers of this hand simultaneously have to push the cylinder

11  out of the frame.  At this point my fingers would go through

12  the now open frame, and the thumb would hit the ejector rod to

13  clear the shells.

14        I don't have another hand to hold it with, so I have

15  to put it somewhere.  If I had a holster on the left-hand side,

16  I'd stick it in the holster with the cylinder up.  If not, I'd

17  shove it in the waistband.  But either way, I would have to

18  remember to hold my thumb on that ejector star we talked about,

19  because when the ejector rod touched the clothing where the end

20  of the holster would come up, it blocks the insertion of any

21  fresh cartridges.

22        Once that's there, now this hand has to go to the

23  ammunition, one cartridge at a time, if we have a pouch or

24  maybe the speed loader.  If it's the most popular type of speed

25  loader, with a release knob that turns clockwise, as I turn

```
1   clockwise, the cylinder will turn with it.  So now I've got to
2   remember to hold the finger to stabilize the cylinder.  And
3   that's a whole lot of fine motor dexterity and a whole lot of
4   dancing going on.
5            Finally, the rounds are in the chamber, I've got to
6   draw the gun again, use the trigger finger now to close the
7   cylinder and come back.  It takes multiple times longer than
8   the two-hand reload.
9   BY MR. COLIN:
10  Q.  What is the most effective way to address that problem?
11  A.  The most effective way is not to have to reload because you
12  had enough cartridges in your pistol to end the fight.
13  Q.  Are you aware of any statistical data regarding the number
14  of rounds in which a defensive shooter has had to fire more
15  than 15 rounds under those circumstances?
16  A.  No.  To the best of my knowledge -- believe me, I've looked
17  for it -- no such data exists.  The reason being, there is no
18  central repository where that kind of empirical data is
19  gathered.  We don't even have it for police nationwide.  What
20  we do have is FBI's officers killed, several every year, but
21  that's only the officers who are murdered in the line of duty.
22  It's not at all applicable to all gunfights, which would
23  encompass the victory by the good guys that we hope we're
24  looking for.
25            What we do have on the police side is, there are a
```

Massad Ayoob - Direct

1    couple of large departments that every year analyze and detail

2    every shooting involving their officers.  Now, if one accepts

3    the extrapolation, the private citizens are going to be

4    shooting in self-defense at the exact same people the police

5    are going to be shooting in self-defense, I think it's a

6    reasonable extrapolation.

7            Insofar as high round counts, the last year I can find

8    for the New York City Police Department, the largest in the

9    country, 3 percent of the shootings that year went over 16

10   shots fired by police.  On the West Coast, Los Angeles Police

11   Department, the third largest, it was 5 percent.

12   Q.  So if we're only talking about 3 to 5 percent, help me

13   understand why that's significant.

14   A.  It is significant because in a life-or-death issue,

15   Mr. Colin, it's not about the odds, it's about the stakes.  I

16   think the best analogy I could give is, probably everyone in

17   this room has fire insurance on their home.  If the judge would

18   ask for a show of hands, okay, how many of you have ever had

19   your house burn down, you probably wouldn't see more than one

20   or two hands go up.  Those people would be awfully glad they

21   have the fire insurance.  Would the rest of us look at each

22   other and say, darn, we've been cheated by the insurance

23   company and all of those premiums because our house didn't burn

24   down?

25            What we have for every premium, the value we got was

Massad Ayoob - Direct

1  the peace of mind.  And that is, in essence, exactly what we're

2  looking at when police or civilians select the firearm they're

3  going to carry.  The odds say, none of us, even the police, are

4  ever going to need to shoot anyone during our career.  The odds

5  say, the cops should be able to be Andy of Mayberry and go out

6  and do their duty without a gun at all.  But in those moments

7  when you become the 3 percent, the 5 percent, it's like the

8  fire extinguisher -- it's like the fire insurance, the cost of

9  not being prepared for it is so absolutely catastrophic, it is

10  simply unacceptable.

11  Q.  Thank you.

12       I'd like to move on to your training of individuals

13  who, either due to age or some other infirmity, have

14  experienced, perhaps not the level of disabilities to which you

15  previously -- those profound disabilities, but nonetheless fall

16  into that other 5 to 10 percent of your category of your

17  students who you've had to develop work-arounds similar to the

18  work-around for an injured shooter.  Can you describe the

19  nature of the infirmities, if you will, caused by age or

20  illness that you've had to address in your instruction.

21  A.  I'm not sure if they're caused by age or just come with it,

22  but I'm at an age experiencing it.  Essentially, there, we see

23  more the tactical disability elements, the -- they can't move

24  to cover or get in behind cover as effectively.  The current

25  protocol that's being put forth by the authorities for active

Massad Ayoob - Direct

1  murder attempt responses is run, hide, fight.  First try to run

2  and get away, get out of range.  Second, if you can't do that,

3  hide someplace and hope they can't see you or hope you're

4  hiding behind something so solid they can't shoot through it

5  and kill you.  And fight only as a last resort.  The person who

6  cannot move quickly, the run part and the hide part are off the

7  table from when the killer's first shot goes off.  Their only

8  chance is to fight.

9  Q.  Stop there.  So these folks with these lower-body problems

10  that you've just described, are those similar to folks with

11  lower-body disabilities that you've talked about, folks in

12  wheelchairs, missing legs?

13  A.  Correct.  It's a matter of degree.

14  Q.  Well, then, to save a little bit of time, let's combine

15  those discussions, if we could.  You talked about infirmities

16  that affect this run, hide, fight situation.  Same true of

17  lower-body disabilities?

18  A.  Yes.

19  Q.  All right.  And so can you describe to the Court the

20  adverse effect of being unable to run and hide and the methods

21  that you've developed to try to address those adverse effects.

22  A.  Basically, there, you become a sitting duck, once again,

23  that window of helplessness that we've been speaking of.  I can

24  teach them to shoot while they're moving.  One of the few

25  advantages of the slow-moving guy is he'll be able to hit

Massad Ayoob – Direct

1  better than the fast-running guy when he shoots while he's

2  moving.  But, in essence, if you cannot escape the line of fire

3  with the opponent, if you cannot outrun the guy coming at you

4  with a knife, the only chance you have left is to use your

5  weapon to neutralize his threat.  And that means you need

6  enough punches to be able to throw to finish the knockout blow

7  to end the fight.

8  Q.  I've heard the word in a different context in law

9  enforcement called cover fire; is that what you're talking

10  about?

11  A.  No.  If you shoot -- the object you're shooting is to hit,

12  particularly in a crowd situation.  Again, we want -- don't

13  want to jump into that spray and pray.  The whole purpose of

14  the gun is to deliver accurate fire, perhaps rapid fire, if

15  necessary, that will stop the threat.  Shooting while you're

16  moving, you will have to slow down your rate of fire to get

17  accurate hits.

18  Q.  So the -- your ability to return cover fire -- or to

19  provide the kind of defensive fire that you're talking about,

20  is that impacted by the number of rounds that you have

21  available to you before you reload?

22  A.  Certainly, the more punches you have to throw, the more

23  likely you are to land the punch that ends the fight.  The

24  opponent very often is behind heavy cover.  You look at

25  situations like the Trolley Square Mall mass shooting in Salt

Massad Ayoob - Direct

1    Lake City, Utah.  The killer was shooting people in the Von

2    Maur mall -- I'm sorry, I'm not sure if it was Von Maur or not

3    -- the Trolley Square Mall.  The first responder was an

4    off-duty police officer who only had a seven-shot pistol.

5             He sees the shooter, fires the shot at him.  The

6    shooter ducks in behind the cover of a store that everybody has

7    run out of.  And every time he ducks his head out, the officer

8    takes another shot.  Doesn't hit him, but comes close, and pins

9    him down.  Everyone is stampeding to the exits.  But during

10   those moments, the killer has been diverted.  He claims no more

11   victims from then on.

12            As the young officer is -- he either ran out of

13   ammunition or had one cartridge left, the accounts of that

14   vary.  At that moment, the second responding officer arrived,

15   joined in the fight, pinned the guy down until the SWAT team

16   arrived.  And it took the SWAT team 14 rounds of submachine

17   gunfire and M16 rifle fire to finally kill the killer.  But it

18   wasn't about posing, it was about sustaining fire that kept him

19   in position.  And I gather that's what you were talking about

20   when you spoke of cover fire.

21            We saw it earlier in the classic 20th century mass

22   murder, back in '66, the Texas tower.  Charles Whitman had

23   climbed that tower with literally a footlocker full of guns and

24   ammunition that he rolled up on a dolly on the elevator.  He

25   opens fire from the top of the tower, more than 330 feet up.

Massad Ayoob - Direct

 1  The police with .38 caliber revolvers, short-range buckshot,
 2  were helpless to stop him.  Once the people down on the streets
 3  figured out what was going on and saw people falling around
 4  them, hunting rifles started coming out of pickup trucks.
 5          One of the guys who returned fire was a civilian rifle
 6  competitor who had been issued a national match at 14.  And if
 7  you look at the news cam footage of what happened then at the
 8  tower, you see puffs of dust coming off the parapets behind
 9  which Whitman was shooting.  At that point, the last civilian
10  victim had been killed, once he came under return fire.  The
11  ability of those multiple people from the ground to pin him
12  down stopped the killing until another citizen with a rifle
13  could lead two policemen to the roof and end the whole thing.
14          Those are examples of the appropriate use of cover
15  fire, not spray and pray, nothing that endangers the public,
16  but something that can hold -- if it can't neutralize the
17  threat, can at least contain the threat in one spot until
18  society's forces can be marshaled to close in on it and deal
19  with it.
20  Q.  Well, we heard at the outset of this case a list of four or
21  five indents in which I think -- we're calling the mass
22  shootings where multiple individuals were shot.  I'd like to
23  ask the reverse question, in the context that you've just been
24  talking about.  Are you aware of incidents where law
25  enforcement officers, as you've previously described, fired

Massad Ayoob - Direct

1  more than 15 rounds?  Did those involve multiple assailants, is

2  that usually the case when law enforcement officer is firing

3  more than 15 rounds?

4  A.  Not necessarily.  There are any number of things that could

5  make a law enforcement officer or, for that matter, the private

6  citizen have to go to a high round count.

7       Let's say the opponent is firing at you from a

8  vehicle.  A solidly built automobile is pretty solid cover.

9  Most pistol bullets are going to have difficulty getting

10  through a car door, particularly on an angle.  Heavy window

11  safety glass has the same effect.  So it's going to take a lot

12  of shots to chew into that car, make the killer inside stop

13  shooting from there.  He's not in a tank, it's only an

14  automobile, but we don't have bazookas or antitank rockets

15  either, so it kind of balances with small arms.

16       We see today probably more criminals wearing soft body

17  armor during their crimes than during the time of John

18  Dillinger in the 1930s.  It's very standard among the cocaine

19  cowboys.  You saw it here in Colorado at the Aurora theater

20  with Holmes.  The actual videotape exists from 1997 of the

21  North Hollywood bank robbery at the Bank of America.  The

22  suspects, Phillips and Matasareanu -- M-A-T-T-S-E-A-R-A-N-U, I

23  think -- had got old military surplus flak vests.  They had

24  disassembled them prior to their robberies with tape strips and

25  wrapped the bullet-resistant Kevlar around each other's upper

390

Massad Ayoob – Direct

1   arms, forearms, leaving the joints uncovered so they could flex

2   their limbs, thighs and calves, and heavy armor around the

3   torsos.  They put on these big coveralls.

4          And if you look at the action news cam footage of the

5   44 minutes of that shooting, they look like the Michelin tire

6   men.

7          Police, once again, were limited to medium-caliber

8   pistols, 9 millimeter and .38 and shotguns with buckshot.  You

9   can see these guys jerking and flinching as the bullets hit

10  them, but they have absolutely no effect.  They are using

11  totally illegal machine guns, for which they have a four-figure

12  round count of ammunition with them.  They lay 13 good people,

13  cops and civilians, down on the street before the SWAT team

14  gets there and it's over.  I do not recall what the round count

15  was, but the round count was huge.

16         The running opponents or running and shooting, it's a

17  more difficult marksmanship problem.  It will take more shots

18  to hit them.  The guy who knows how to take cover, that is

19  going to take more shots to keep him there or maybe shoot

20  through the cover.

21         Multiple opponents.  We look at the typical hit ratio

22  on the street.  New York City Police tends to run in the mid

23  30th percentile.  That is about 34, 35 percent of the shots

24  they fire in actual combat will hit the suspect.  Let's, for

25  the sake of argument, assume the private citizen has the same

Massad Ayoob – Direct

1   hit potential, hits with the same ratio.  We have three home

2   invaders kick down the door.  You're going to need three shots

3   apiece to get one bullet into each of them.  And you ask

4   yourself, how many rounds do I have?  How many rounds will it

5   take to stop them?

6          We have cases, one out of Cook County, Illinois.  A

7   heroin addict doing a liquor store robbery.  Took 33 rounds, 33

8   hits from 9 millimeter pistols.  Stayed on his feet until

9   finally one or two shotgun blasts put him down.  We have case

10  after case where these guys just turn into bullet sponges.

11         The medical examiners tell us that since they are

12  going through the same fight-or-flight response as the

13  defenders, the -- the adrenaline release will leave no artifact

14  in the body.  There is no postmortem artifact to test for

15  adrenaline like you can test for cocaine or heroin.  If there

16  was, we could never tell how much that particular person was

17  affected by that particular internally generated substance.

18         Then you start looking at the drug use.  If your

19  assailant is on cocaine -- let's say, crack cocaine, which is

20  an intensified form of flake cocaine -- one of the ways cocaine

21  gives its rush is adrenaline release in the body.  So he is,

22  essentially, that much more supercharged, that much stronger,

23  that much more capable of absorbing pain and trauma before you

24  put him down.

25         So when you read about these situations where many,

Massad Ayoob - Direct

 1  many shots were fired at the criminal before the criminal goes
 2  down, you have to remember, that's not necessarily spray and
 3  pray.  It may well be any number of any combination of
 4  circumstances that kept him up and running.  Real life is not
 5  like TV, where one shot is fired, and the bad guy goes flying
 6  through a plate glass window like he's scooped up by an
 7  invisible giant.
 8  Q.  Which he may have been on TV.
 9      You've talked about a number of events where multiple
10  rounds were fired.  I'd like you to focus just for a minute on
11  events of which you are aware in which multiple rounds, more
12  than 15 rounds, were necessary for a civilian defensive gun
13  use.  And I'd like you to tell us whether or not you are aware
14  of any such incidents.
15  A.  The largest one I'm aware of was a man I became friends
16  with, Harry Beckwith, in Micanopy, Florida, M-I-C-A-N-O-P-Y.
17      Harry ran a gun shop in Alachua County.  There had
18  been robberies, so he had a lot of security in place, and he
19  lived next door to the gun shop.  One night the alarm -- he
20  hears a crash, and, of course, the alarms are going off.  And
21  he looks out, and multiple carloads of perpetrators have driven
22  through the door and window to run in and scoop all the guns
23  and stuff.
24      Harry is not about to put up with that, and he figures
25  he will interject, yell at them, "stop or I'll shoot,"

Massad Ayoob – Direct

1    something like that.  Harry has on a pistol.  He is a licensed

2    machine gun dealer, and he grabs a fully automatic M16 and a

3    fully automatic 9 millimeter submachine gun.  He also after the

4    stop sees a gun in their hand coming up toward him, and he

5    starts shooting.  By the time that was over, Harry had fired

6    more than 100 rounds.  One of the perpetrators was killed, one

7    or more wounded, all of them captured and convicted, and he was

8    cleared by the grand jury.

9          Others I'm aware of, there was a string of I think

10   five gunfights involving a man named Lance Thomas.  He owned a

11   watch shop and Rolex repair center in Los Angeles.  After the

12   first gunfight, he started staging multiple handguns.  He had a

13   very small workplace, not a heck of a lot bigger than this

14   witness stand, and he had barred doors.  And he would buzz in

15   people after he looked through the window and was comfortable

16   with their look.  And a few of them got through anyway.  He had

17   a pistol staged probably every 3 or 4 feet behind the counter.

18   It was safe in there because it was a secured workplace, and

19   there was no chance of little kids getting at them or anything.

20         In the course of five gunfights, at least one of his

21   went beyond 16.  It was either 17 or 19 shots before the last

22   of the multiple perpetrators was either down or had fled.

23         There was another where I debriefed the survivors.

24   Two brothers owned a jewelry store.  They called it the Beverly

25   Hills Jewelry Store, but it was located in Richmond, Virginia.

Massad Ayoob - Direct

1  They had done something very similar.  They had bought a large

2  number of five-shot .38 revolvers and staged them behind the

3  counter, so if there was a robbery at any point, the person

4  behind the counter would be within a few steps of a gun to

5  fight back with.

6        Their shootout was with two old gangster type guys,

7  both members of the Dixie Mafia.  They walked in, one with a

8  sawed-off shotgun, one with a .45.  And in the course of the

9  firefight, I actually lost count of how many guns one brother

10  emptied, pinning one of them down.  The other brother shot and

11  killed the perpetrator with the .45, then went to the shotgun.

12  And between the two, they were able to finally put both of them

13  down.

14  Q.  So these multiple staged firearms seem to be a fairly --

15  even low-capacity firearms, seem to be a fairly effective

16  method of home defense, then, would it not?

17  A.  No, not at all.  What you had, particularly in the Lance

18  Thomas case, and to a significant degree in the Beverly Hills

19  Jewelers case, is these were in secured areas.  Lance Thomas

20  worked alone.  He did not have employees, to my knowledge.  The

21  jewelry store, only trusted employees were allowed behind

22  there.

23        In the home, I think it would be madness staging a

24  loaded gun in instant reach every few feet.  Because what are

25  you going to do when the neighbors or the relatives come by

Massad Ayoob – Direct

1   unexpectedly with their little kids?  What are you going to do

2   when -- you know, when the burglar walks into the house while

3   you're gone and finds, there is ten guns laying around waiting

4   for, you know, quick draw?  I would consider it not only

5   totally impractical, but a little bit reckless to have that

6   many loaded guns staged in plain sight and easy reach in

7   anyone's home.

8   Q.  Does the law enforcement exemption in 18-12-302 provide law

9   enforcement officers with an advantage over armed criminals?

10  A.  Only if the armed criminals obey that law.

11  Q.  What about civilians, meaning, do --

12  A.  I'm not sure I understand --

13  Q.  Do criminals have an advantage over civilians with regard

14  to the capacity limitations of the magazine?

15          MS. MORRILL:  Objection, Your Honor.  Foundation.

16          THE COURT:  Sustained.

17  BY MR. COLIN:

18  Q.  Have you reviewed report of a Dr. Jeffrey Zax?

19  A.  I have.

20  Q.  And in his report, Dr. Zax opines, "The use" -- and I'm

21  quoting, "The use of firearms for purposes of assault seems to

22  far exceed the use for the purposes of self-defense."

23          Do you agree with that proposition?

24  A.  I do not.

25  Q.  Why not?

Massad Ayoob - Direct

1  *A.*  As I read Dr. Zax's report, he is comparing all criminal

2  assaults with firearms to only justifiable homicides committed

3  by private citizens.  What is called in the trade DGUs,

4  defensive gun usages, by private citizens are very much like

5  the police.  Overwhelmingly, the great majority of the time,

6  when the gun comes out, the fight is over.  The criminals

7  submit to the officer, may even submit to a homeowner,

8  citizen's arrest, or runs away.

9          There are a number of cases where the victim shoots

10  the attacker, the attacker does not die, he either runs away

11  and is arrested later or collapses at the scene.  Of course,

12  when he stops attacking, the citizen stops shooting.  And none

13  of those figure into the report that I read by Dr. Zax.

14  *Q.*  Dr. Zax also opines that "mass shootings are more

15  lethal" -- more lethal -- "Mass shootings are more lethal when

16  executed using large-capacity magazines.  If these magazines

17  become less widely available, there is some chance that mass

18  shootings will become somewhat less horrific."

19          Do you agree with that proposition?

20          *MS. MORRILL:*  Objection, Your Honor.  Foundation.

21          *THE COURT:*  Response.

22          *MR. COLIN:*  Your Honor, the foundation for his

23  response to Dr. Zax's opinions has been, we believe, adequately

24  established throughout his testimony here.  He is an expert

25  in -- well, let me withdraw that.  Let me build a foundation.

Massad Ayoob – Direct

1          *THE COURT:*  Thank you.

2   *BY MR. COLIN:*

3   *Q.*  Do you know the basis upon which Dr. Zax rendered that

4   opinion?

5   *A.*  I would have to go back and review his report.  I do not

6   recall as I sit here.

7   *Q.*  Then let me move on to a different topic area.  Defendant

8   suggested that the delay associated with a suspect's need to

9   reload gives potential victims an opportunity to intervene.

10         My understanding is that you actually instruct

11  individuals on disarming suspects; is that right?

12  *A.*  I do.

13  *Q.*  Do you believe that intervention is an appropriate method

14  by virtue of which to deal with an armed suspect who has a

15  lower magazine capacity firearm.

16  *A.*  Well, first, let's clarify for the record, attempting to

17  disarm is something we would only recommend if the -- if it's

18  obvious the guy is going to kill somebody.  He's just said, I'm

19  going to kill this person, I'm going to do a countdown, or the

20  killing has already begun.  At that point, the -- any officer,

21  any armed citizen with a gun, their best recourse would be to

22  go to their own gun.

23         For the many who do not, it would be at that point

24  that it would make sense to attempt to intervene.  But to wait

25  until he has expended -- okay.  Let's say he's only got a

Massad Ayoob - Direct

1    15-shot magazine -- heck, let's say he's only got a ten-shot

2    magazine.  I'm standing behind him, I've heard a shot, I turn

3    around, here is this guy behind me shooting into the crowd.  Am

4    I supposed to wait and let him shoot nine more, let him shoot

5    fourteen more?  If you're going to disarm him, disarm him now.

6          The whole concept of disarming with a firearm, why

7    it's actually easier than with a knife, is the firearm only

8    directs its force in one very specific direction.  If you can

9    get in behind the muzzle of the gun and you know how to apply

10   leverage, you have a very good fighting chance of disarming him

11   now.  The recoiling slide of the pistol as he pulls the trigger

12   might give you minor cuts on your hands.  You could fix that

13   with a bandaid.  The very hot barrel of, let's say, a machine

14   gun, there is going to be a burn on your hand that is going to

15   heal.

16         The rationale of waiting until he runs dry allows him

17   to kill numerous victims.  And what's to say during that

18   period, he won't kill you.  If you're close enough to grab him

19   and disarm him, you're close enough to be one of the primary

20   targets.

21   Q.  Are you aware of circumstances where that's occurred?

22   A.  Yes.

23   Q.  Can you describe that, please.

24   A.  Let's look at one of the most recent.  Sparks, Nevada,

25   last year.  A 12-year-old kid brings a gun to school, starts

Massad Ayoob – Direct

1   shooting.  The math teacher attempts to get the gun away from

2   him.  He didn't -- my reading of it is, he didn't jump him.  He

3   was approaching him and trying to talk to him down.  He never

4   got there.  The kid shot him in the chest and killed him, then

5   committed suicide.

6            Your classic sample, Sandy Hook.  You look at the

7   first victim, Dawn Hochsprung.  She's about 5 feet 2 inches

8   tall.  Lanza literally shoots his way through that front door.

9   She charged him.  She charged him, clearly going for an attempt

10  to disarm.  Going from the front on a guy who has got the gun

11  up is hopeless.  She was the first to die, and the dominoes

12  fall from there.

13           Where you'll see the successful disarm will be the

14  very physically strong person who is in a position.  The -- I

15  want to say it was the Barry Loukaitis mass shooting,

16  L-O-U-K-A-T-I-S.  Loukaitis was a 14-year-old boy who went to

17  school and opened fire.  A large male gym teacher jumps him,

18  diverts the muzzle of the gun, and wrestles him down and gets

19  the gun away.  If you can get onto the gun without being shot,

20  you're a large male gym teacher against an average-sized kid,

21  God bless that man for doing that.  But most people will not

22  have that physical advantage.

23           In New Hampshire, 1997, the Carl Drega murder spree.

24  Drega had murdered two state troopers.  He had hunted down the

25  local judge that he hated, Judge Vickie Bunnell, and shot her

Massad Ayoob - Direct

 1   in the back.  A man named Dennis Joos, J-O-O-S, a physically

 2   small man, a newspaper publisher whose office was next door to

 3   Judge Bunnell's, jumped him and tried to get the gun away from

 4   him.  Drega, who was 6-foot 3, 240 pounds, and rock solid, just

 5   knocked him to the ground, said, Mind your own F-ing business,

 6   and shot him dead.

 7         What that tells us is, there are the occasional

 8   successful disarms.  If we tell the public, hey, we're going to

 9   try to give you a little opening here so it will be safe for

10   you to jump the guy and get the gun away, that means nobody is

11   going to try to disarm him until all of those rounds have been

12   fired and X number of those victims have been claimed.  So in

13   the end, I don't think there is going to be a whole lot of

14   change in the victim count based on round count, particularly

15   because the great majority of these things have involved guns

16   that were not the so-called high-capacity magazines under

17   discussion today.

18   Q.  Thank you.

19         I have no further questions of this witness.

20         THE COURT:  I think this might be a good time to take

21   our afternoon recess.  The court clock is showing about 2:40,

22   and we'll reconvene at 2:55.  We'll stand in recess until then.

23         (Recess at 2:39 p.m.)

24         (In open court at 3:04 p.m.)

25         THE COURT:  Are we ready for cross-examination?

Massad Ayoob - Direct

 1           *MS. MORRILL:*  Thank you, Your Honor.  We have no
 2    cross-examination for this witness.
 3           *THE COURT:*  Thank you.
 4           Can this witness step down and be excused?
 5           *MR. COLIN:*  He may.  I would ask to withdraw Exhibits
 6    93 and 94, please.
 7           *THE COURT:*  Any objection?
 8           *MS. MORRILL:*  No objection.
 9           *THE COURT:*  All right.  Then, thank you very much,
10    sir.  You may step down.  You are excused.
11           And Exhibits 93 and 94 are withdrawn.  I think that
12    means they go back into the briefcase.
13           *MR. COLIN:*  I'm hoping.  The person who brought them
14    is here to take them.
15           *THE COURT:*  Would you call your next witness, please.
16           *MR. COLIN:*  Sorry?
17           *THE COURT:*  Next witness.
18           *MR. FABIAN:*  Thank you, Your Honor.  Plaintiff would
19    call Dave Gill.
20           *THE COURT:*  Thank you.
21              (**DAVE GILL, PLAINTIFFS' WITNESS, SWORN**)
22           *COURTROOM DEPUTY:*  Please be seated.
23           Please state your name and spell your first and last
24    name for the record.
25           *THE WITNESS:*  Dave Gill, D-A-V-E, Gill, G-I-L-L.

475

John Cooke – Direct

1          THE COURT:  You either admit the documents or we don't

2     admit the documents.

3          MR. GROVE:  Okay.

4          THE COURT:  So, again, I would be real mindful of how

5     you want to use these particular documents.

6          MR. GROVE:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Anything else we need to address before we recess for

9     the afternoon?

10          MR. WESTFALL:  No.

11          THE COURT:  Okay.  I'll look forward to seeing you all

12     at 8:30 tomorrow morning.  We'll stand in recess until then.

13          (Recess at 4:51 p.m.)

14                    REPORTER'S CERTIFICATE

15

16          I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled matter.

17

18          Dated at Denver, Colorado, this 22nd day of May, 2014.

19                              s/Therese Lindblom

20                    _____

21                    Therese Lindblom,CSR,RMR,CRR

22

23

24

25

476

John Cooke – Direct

1                                    **INDEX**

2     **Item**                                                       **Page**

3

      TERRY MAKETA
4          Direct Examination By Mr. Kopel                    245
           Cross-examination By Ms. Spaulding                 259
5          Redirect Examination By Mr. Kopel                  278
      ELISA DAHLBERG
6          Direct Examination By Mr. Westfall                 280
           Cross-examination By Ms. Spalding                  291
7     DYLAN HARRELL
           Direct Examination By Mr. Westfall                 307
8          Cross-examination By Ms. Morrill                   324
      MASSAD AYOOB
9          Direct Examination By Mr. Colin                    332
      DAVE GILL
10         Direct Examination By Mr. Fabian                   403
           Cross-examination By Ms. Scoville                  415
11         Redirect Examination By Mr. Fabian                 424
           Examination By Mr. Fabian                          427
12         Examination By Ms. Scoville                        428
      DOUGLAS HAMILTON
13         Direct Examination By Mr. Fabian                   429
           Cross-examination By Ms. Scoville                  449
14    JOHN COOKE
           Direct Examination By Mr. Kopel                    464

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT AYOOB-3



## Disarming Mass Murderers

By Massad Ayoob

### Situation:

Some gun grabbers seek magazine capacity limits, citing the theory it'll force mass murderers to reload sooner — allowing them to be disarmed by citizens and thus reducing potential death toll.

### Lesson:

There are faster ways to stop mass murderers; disarming is a risky strategy at best. In most cases, mass murderers and spree killers carry multiple guns — and they're not going to give them up to unarmed citizens.

When legislation is introduced to ban or criminalize so-called "high-capacity magazines," one argument always cited by gun grabbers is it will force mass-murderers to reload sooner — creating a window of opportunity in which some heroic citizen can disarm them and stop the killing. There are, of course, several things wrong with this hypothesis. One is the unrealistic assumption someone who's willing to commit mass murder won't be willing to access and use an illegal magazine.

Tactically, how likely is it there will be someone close enough to jump a gunman caught at slide-lock without the rescuer already (being in such close proximity to the murderer) shot before he could even make the disarming attempt? To find the answer, we have to look deeply into the history of such incidents.

### Disarms During Reloading … or Not?

Two incidents seem to be most often cited by those who demand reduced magazine capacity. One is the capture of Jared Loughner after the murder spree in Tucson in which he killed six people and wounded a dozen more, including US Representative Gabrielle Giffords. The other is the capture of Colin Ferguson, which ended the Long Island Railroad train massacre, which claimed six lives and left 19 more people wounded. In each case, multiple people were able to overpower the killer at a point when his weapon was no longer shootable. It should be noted, however, accounts of how it

Exhibit Ayoob-3 Page 2 of 8

happened seem to differ among the witnesses. In the case of Loughner, we know Patricia Maisch ended up holding one of his magazines. Some of Ms. Maisch's accounts make it sound as if she ripped it from his hand, while in others, she seems to say he dropped it and she picked it up.

However, Loughner was carrying multiple magazines, and at least one witness insists he had already reloaded a fresh magazine — but had somehow jammed the Glock 19 while attempting to complete the reload. In the Long Island Railroad massacre, Ferguson reloaded at least once and sustained fire. His Ruger P89 had apparently run dry at the time he was rushed and overpowered by unarmed citizens. Accounts differ as to whether Ferguson was attempting to reload a third full magazine at this time, or had shot all his magazines empty and was trying to insert loose cartridges into one of the empty mags.

Thus, it remains possible Loughner was successfully disarmed, not because he was reloading per se, but because he had jammed his already-reloaded gun. If in fact Ferguson had run out of loaded magazines, he was de facto more "out of ammunition" than he was "reloading" at the time he was overpowered and disarmed. Details, details …

There have been successful disarms in public shootings; let's take a look.

## Successful Disarms

In Moses Lake, Wash., 14-year-old Barry Loukaitis opened fire at the middle school he attended. Armed with a .30-30 rifle, .357 Magnum revolver, .25 auto and 78 rounds of ammunition, he killed three victims and wounded a fourth before a gym coach was able to wrestle the rifle away from him and hold him down. Note: the courageous gym teacher didn't let the murderer keep shooting and killing until he ran empty — he got the .30-30 away from the young murderer while it was still loaded. If you're going to attempt a disarm, this strategy would seem likely to save the most lives.

In June 2014, Aaron Ybarra, 26, opened fire at Seattle Pacific University. He killed one and injured three, and was then pepper-sprayed and overpowered by student monitor Jon Meis. According to one report, the killer's weapon was a double-barrel shotgun, in poor repair and capable of firing only one barrel — for all practical intents and purposes, a single-shot weapon. While this in no way detracts from the courage displayed by the heroic Jon Meis, it's not common for mass murderers to use single-shot weapons.

Another young hero to emerge from a mass murder atrocity is Jacob Ryker. Kip Kinkel, 15, murdered his parents and gained control of a Ruger 10/22 rifle, Ruger MK II .22 pistol and 9mm Glock 19. He took them to his school in Springfield, Ore., with an ample supply of ammunition and opened fire. His barrage had killed four people and wounded 25 more when one of those wounded students, young Mr. Ryker, jumped him as the killer reloaded the rifle.

However, Kinkel had armed himself with multiple weapons. During the struggle, he drew the 9mm and fired, wounding Ryker again and also another student. Then according to accounts, Ryker, now joined by six other students, was able to finally disarm him and gain physical control. By then, Kinkel had fired a total of 51 rounds, 37 of which struck human targets.

## When It Goes Wrong

Getting a gun away from a killer isn't easy. Good people have died in the attempt. In the Luby's Cafeteria massacre in Killeen, Texas, George Hennard drove his pickup truck through the plate glass window of the restaurant and stepped out with a Ruger P89 and a Glock 17. He shot 43 people, 23 fatally. In the midst of the slaughter, Al Hupp attempted to disarm the madman.

He wasn't successful. Hennard shot him in the chest with one of the pistols, mortally wounding him. As Hupp's wife cradled her dying husband, Hennard shot her dead too. When police arrived and he tasted return fire, Hennard killed himself.

This atrocity occurred before the passage of shall-issue concealed carry in Texas. Suzanna Gratia-Hupp, the murdered couple's daughter, had left her S&W .38 in her parked vehicle according to Texas law. She was certain she could have neutralized Hennard early in the encounter had her gun been within reach. Instead, she endured the horror of watching her parents murdered. Ever since, Suzanna Gratia-Hupp has been one of our most eloquent and poignant spokespersons for armed citizens and lawful concealed carry.

Perhaps the most glaringly conspicuous failure to disarm occurred during the mass murder that most tore at America's heart: Sandy Hook. The first to die was petite school principal Dawn Hochsprung. As quintessential loser Adam Lanza blasted his way through the locked door of the school, she ran at him in what could only be construed as an attempt to disarm and restrain.

She apparently never got within touching distance before he shot her down. Later, with 20 helpless children and six brave but helpless adults dead at his hands, he blew his brains out as soon as police arrived.

In Colebrook, N.H., a bitter old man named Carl Drega went on a murder rampage, assassinating two state troopers and a female judge he hated. As he left the latter murder scene, newspaper editor Dennis Joos attempted to get his rifle away from him. Drega reportedly snarled, "Mind your own f—ing business," threw Joos to the sidewalk, and killed him with multiple gunshots. After a manhunt in which multiple lawmen were wounded, Drega was shot and killed by police.

What about verbally convincing the gunman to just put down the gun? This strategy doesn't have a promising history. In 2013, a 12-year-old boy came to school with a gun in

Sparks, Nev. Teacher Michael Landsberry tried to "talk him down." The boy shot and killed the teacher, and then committed suicide.

## Physical Mismatches

If you're close enough to grab the offender as soon as he starts shooting — and actually know how to do it — you have a reasonable chance of succeeding. Unfortunately if you're close, you'll very likely be one of the first victims of his criminal gunfire, perhaps before you can act. There is also the matter of relative physical strength. In the Loukaitis incident, an adult male gym teacher was able to overpower a 14-year-old boy who, judging by his photos, was physically unintimidating.

In the Drega murders, Dennis Joos wasn't a physically large or especially strong man, and was up against a rugged, muscular killer who stood over 6' tall and weighed well over 200 pounds. This disparity made Joos all the more a hero in his last moments, but at the end, a dead hero.

And let's not forget, the opponent may have multiple guns; it's going to be awfully hard to disarm him if he's not in surrender mode. Though most accounts of the Drega murders have him killing Joos with the same .223 he used on his first three victims, the Wikipedia story on the case as of this summer states, "During the struggle Drega shot and killed Joos with a second firearm." And we recall Jacob Ryker was wounded in the Kinkel incident when the punk he was disarming drew a second gun and shot him and another boy.

## Multiple Guns

Ron Borsch is a retired career lawman and SWAT cop, whose second career was as head of the Southeast Area Law Enforcement Academy in Bedford, Ohio. A pioneer in the concept of lone-officer response to active mass murder incidents, he's one of the nation's leading authorities on this sort of terrible event. When he and I were both instructing at the International Law Enforcement Educators and Trainers Association (ILEETA) conference earlier this year, I asked him how many of the mass killers he studied had been armed with multiple guns. "Well over half," he answered.

This isn't new. One of the worst mass murderers in American history goes back to Civil War times, "Bloody Bill" Anderson, a senior officer in Quantrill's Raiders. The trademark of these guerrillas was carrying multiple revolvers, usually .36-caliber Navy Colts. When he was killed in a shootout with Union troops, an eyewitness to Anderson's death said, "Bloody Bill had four revolvers buckled around him and two very large ones across the saddle."

In 1966, Charles Whitman ascended the Texas Tower in Austin with so many guns and ammunition he had them in a footlocker, which he rolled into the elevator on a dolly. He murdered 17 people and wounded 32 more from his lofty perch immune to .38-caliber revolver fire and 12-ga. buckshot from police, until rifle fire from armed citizens on the

ground pinned him down. Another armed citizen led police to his sniper's nest atop the tower, where they killed him.

The term "going postal" came in large part from Patrick Sherrill's death orgy in the Edmond, Okla., Post Office (14 dead, six wounded, perpetrator took own life). Sherrill was armed with two 1911 .45's he had been issued by the National Guard, and a .22 target pistol of his own.

The list goes on. James Holmes in the Aurora, Colo., theater: AR-15 with high-capacity magazine which jammed early on, 12-ga. Remington 870 and two Glock 22 pistols, one on his person and one in his car. He surrendered as soon as police confronted him. By then, he had shot 82 helpless people in his chosen "Gun-Free Zone," a dozen of them fatally. He, like the other multiple-armed perpetrators discussed here, would have been tough to disarm.

## A Better Strategy

When a monster with a lethal weapon attempts wholesale murder of the innocent, what's a better strategy than expecting untrained potential victims to grapple with them?

Quite simply, have a trained, armed person in place to suppress them.

A few months before the Aurora theater atrocity, another incident happened in the same city, which the national media chose to virtually ignore. On April 22, 2012, Kiarron Parker opened fire outside a church in Aurora, killing the pastor's mother. Instantly, one member of the congregation — an off-duty Denver Police officer named Antonio Milow — drew his own handgun and shot and killed Kiarron before he could wreak any more mayhem.

In 2007, also in Colorado, psycho loser Matthew Murray shot multiple people at one church then went to another, where he opened fire and shot more victims. Then, Jeanne Assam — a former cop, working as volunteer church security — ran at him with a Beretta 92 in her hands, firing as she went. She hit him with bullet after 124-gr. 9mm JHP bullet, and he went down with just enough life force left to shoot himself. The pastor of the church later credited Assam with saving 100 or more lives. A detailed account of this incident can be found in the Ayoob Files archives here at American Handgunner.

Luke Woodham, 16, stabbed and bludgeoned his mother to death to get the keys to his estranged father's gun cabinet, where he took a Marlin .30-30 rifle and headed to his high school in Pearl, Miss. He shot nine of his teenage schoolmates, killing two.

As he drove out of the parking lot — on course to a nearby junior high school, and still armed with the rifle and more ammunition — Woodham was taken at gunpoint by Vice Principal Joel Myrick, who had sprinted to the parking lot to retrieve a Colt .45 auto from his truck. The killer stopped his car, exited and went to the ground in front of the armed teacher squealing, "The world has wronged me, Mr. Myrick!" A detailed account of this event is also in the Ayoob Files archives.

## Lessons

Waiting for the gunman to run empty and then jumping him for the gun, no matter how many rounds it was loaded with, is simply not as viable of a strategy as it sounds. History teaches us another strategy works much better.

This strategy is born in reality: In almost every one of these highly-publicized mass murder/killing spree incidents, as soon as the gunman is met with return fire he ceases shooting innocent people and either is killed, kills himself or surrenders soon thereafter. Unarmed, untrained people attempting disarms sometimes actually prevailed, but oftentimes were hurt or killed in the attempt.

Those who would commit the most rigidly prohibited crimes in the history of civilization are certainly not likely to be deterred by a law limiting magazine capacity. The only people who can be realistically expected to obey such laws are, by definition, the law-abiding and not the law-breakers.

When in the wake of the Sandy Hook atrocity, NRA spokesman Wayne LaPierre said the only thing capable of stopping a bad guy with a gun was a good guy with a gun, he was shouted down and excoriated by the mass media. Yet, history and reality combine to show he spoke the absolute truth.

After the Ma'alot Massacre, Israel put armed good guys into their schools; many of them school personnel and student family members who volunteered to be trained for the job by Mishmar Ezrachi, the Israeli civil guard. Terrorist attacks on schoolchildren plummeted.

Here in the US, intended mass school shootings have been short-circuited by armed SRO's, school resource officers from local law enforcement agencies. An increasing number of school systems are, to the horror of the gun grabbers, quietly arming and training volunteer personnel to perform the same function as the Israeli model. Discreet arming of church volunteers for the protection of the congregation seems to have become even more widespread.

We can only wonder what might have happened if the courageous principal of Sandy Hook Elementary School, Dawn Hochsprung, had been armed and capable of dealing with Adam Lanza on that terrible day in December 2012. She died courageously, trying to defend the little children and the adult staff for whom she was responsible. Her empty hands rendered her brave spirit futile, and we all know what happened next.

If instead those empty hands had held Jeanne Assam's Beretta 92 with the same skill. If …

**9**

5/25/2017

## Browse

Advertising          American Handgunner Photo Gallery          Archives          Digital Version

CD-Rom Digital Editions          Classic Handgunner Editions          Columns          Contact Us

Exclusive Web Extra          Features          Find Us On Facebook          FMG Publications Videos

Handgunner Merchandise          Service          Special Editions          Store          Subscribe

Visit Us On YouTube          Web Blast          Home

## Publications

American COP          American Handgunner          GUNS Magazine          FMG Publications

FMG Resource Center          Shooting Industry

American Handgunner is an FMG Publication. © 2017 Copyright by Publishers Development Corporation. All rights reserved. American Handgunner is a registered Trademark of Publishers Development Corporation.



# EXHIBIT AYOOB-4



Exhibit Ayoob-4 Page 2 of 7

# THE AYOOB FILES

**MASSAD AYOOB**

# THE BRUNSWICK MASSACRE

**SITUATION:** A madman shoots dozens of people — until a citizen with a gun drops him in his tracks.

**LESSON:** When NRA's Wayne LaPierre famously said, "The only way to stop a bad guy with a gun is a good guy with a gun," he had the weight of history behind him.

Monroe Phillips was a big man physically who had always hoped to be a big man socially, but it hadn't turned out well. His business interests in timber and real estate had failed, probably because people found him surly and unpleasant. He'd always spoken of many people conspiring against him, and paranoia doesn't attract customers or business associates. On May 6, 1915, he and his lawyer had an appointment to sit down with a judge and the attorney for some of his creditors, Col. Harry Dunwoody, who was what Phillips had long wanted to be: one of the most prominent men in their town of Brunswick, Ga.

Phillips' wife informed him of a phone conversation she'd just had with lawyer Dunwoody. The man had insulted her, she reported. She'd sold a lighter (a type of barge) for a $75 down payment, and the lawyer said property was attached, in essence accusing her of trying to steal the money.

"I'll go and speak with Dunwoody," Phillips told his wife. When she heard those words, she couldn't have realized she would never see her husband alive again.

## The Murders Begin

Dunwoody's secretary, Ila Lee, was at the reception desk of Dunwoody's second-floor law office at the corner of Newcastle and Gloucester Streets in Brunswick when the hulking Phillips strode through the front door and demanded to see Dunwoody. She told him the lawyer was busy and couldn't see him. Phillips simply brushed past her.

She watched him kick open the door to her boss's office, and then saw the shotgun he was raising to his shoulder. She heard a deafening blast and fled from her desk into the office legal library. Behind her, another shotgun blast exploded.

She heard Phillips leave and emerged from the library to peek into Dunwoody's office. She saw her employer in his chair, what was left of his head lolling backward; he had taken a full 10-gauge charge of buckshot in the face, killing him instantly. On the floor lay the man he had been in conference with, A.M. Way, his face a bloody mask with a ruined eyeball hanging out of its socket. She didn't know the killer was just outside the door in the second-floor hallway, reloading.

## Death in the Stairwell

The roar of the powerful 10-gauge had been heard in the street, and passersby were gathering at the floor-level door and entryway to see what was going on. At this point, Phillips — who had thumbed two more big shells into the twin barrels of his huge Parker shotgun — looked down the staircase he had just ascended and saw his next victims.

The men below were caught in a fatal funnel. Phillips threw the shotgun to his shoulder and fired both barrels. One of the men he aimed at collapsed instantly, while the other, though visibly hit, remained on his feet.

On the floor, riddled with buckshot and dying, was C.L. Padgett. Padgett had been a Brunswick police officer. He was not on-duty at this time, having taken a job as a motorman, and historical accounts conflict as to whether he was associated with the BPD at the time Phillips shot him. However, Padgett was well known in town, and it's reasonable to assume Phillips recognized him as "a cop." The other man, whom Phillips had only wounded in the right leg, was attorney Eustace Butts.

It must have been an interesting tableau in the long seconds which followed: Phillips perhaps realized if the downed Padgett had a gun on him, Butts could reach it and shoot him before he could reload his empty shotgun. And Butts probably realized he couldn't make it up the stairs and attempt a disarm with a wounded leg.

*Continued on page 82*

Exhibit Ayoob-4 Page 3 of 7



## INVESTIGATOR PEN

A COMPACT SIZE TACTICAL PEN THAT IS READY FOR THE LARGEST TASKS!



**SPECS**
4.25" OVERALL
3/8" DIAMETER

**MATERIALS**
ALUMINUM
BRASS
COPPER
STAINLESS STEEL
TITANIUM

ACTUAL SIZE

MADE IN THE USA!

PLEASE VISIT OUR WEBSITE FOR:
TACTICAL KNIVES, PENS,
TOOLS, ACCESSORIES,
PERSONAL DEFENSE ITEMS

www.rickhindererknives.com



**NITESITERS**
Photo Luminescent Handgun Night Sights

An Inexpensive Alternative To Messy Paints And Expensive Tritium Sights!  **$11.98**

Call 602-327-0152 Now
Or Place Your Order Online!
Use coupon code 'Nitesiters' for 10% off your entire order!

www.NiteSiters.com
1809 West Main St #187 • Carbondale • IL • 62901

# AYOOB FILES
*Continued from page 46*

Instead, Phillips broke open his Parker to reload from his pocket, and Butts and other citizens quickly dragged Padgett back out the door and out of the line of fire.

### The Rampage Continues

Phillips, having reloaded, now proceeded down the staircase to the office door of another nemesis, prominent businessman and real estate magnate Albert Fendig, whom Phillips had publicly accused of swindling him out of $25,000 in a real estate deal. He discovered the target of his hatred was not in, but Phillips did confront one W.K. Boston. "I'm not going to kill you," he said to Boston. "You've been my friend."

It was a courtesy the killer would extend to no one else.

Bursting out the front door of the office building, Phillips blindly fired a shotgun blast into Kaiser's Store across the street, where a number of women were shopping. The buckshot shattered the display window, sending lead and glass flying through the store. No one was hit, but the customers fled in panic.

On the sidewalk, Phillips ran his big shotgun like an automaton. His sequence was fire once, open the action, pluck out the empty, replace it with another long shotshell pulled from his pocket, close the gun and fire again.

His eye fell upon a long-time local cop, George Asbell, who was moving across the street. Asbell had also left the police department to become a motorman, but the killer either didn't know or didn't care. Phillips carefully aimed at him and fired. The buckshot charge caught Asbell in the back of the head, killing him instantly.

As pedestrians realized what was happening and ran, the madman had fewer targets, but his spreading shot patterns were able to hit more victims at once at the greater distances. Evidence would later show when he filled his pockets with shells, Phillips had, perhaps inadvertently, included some small birdshot rounds in with the buckshot. This likely changed many victims who would have been "dead" to "wounded."

Some of the wounded were also hit at distances far enough to render even Phillips' buckshot impotent. "Several persons standing blocks away were struck by stray shots," the New York Times would report the next day. The first L.E. officer to return fire on the mass murderer was special agent S.A. Ellard of the Southern Railway police. Shot from the front, "A number of buckshot (sic) lodged in Ellard's face.

"When Phillips backed down the street loading and firing his gun Ellard



Get our latest
**FMG PUBLICATIONS**
**SPECIAL EDITIONS**
for $9.95 each! Order online today!
americanhandgunner.com
gunsmagazine.com
americancopmagazine.com
Toll Free: 1-888-732-2299
or by mail,
P.O. Box 502610
San Diego, CA 92150-2610

Exhibit Ayoob-4 Page 4 of 7

ducked behind a telephone post, whipped on (sic) his revolver and joined in the fusillade which was being rained upon the madman," the Atlanta Constitution reported two days after the shooting. If Ellard was far enough away buckshot pellets "lodged" in his face from the front, it is understandable his revolver fire took no effect.

By all accounts other than the Constitution's, there was no "fusillade being rained" upon Phillips as yet.

But it was about to come.

## Citizens Arm Themselves

Almost simultaneously, two citizens took it upon themselves to get guns. Both of them made their way to the nearest gun shop, the United Supply Company hardware store. One was Eustace Butts, still bleeding from his wounded leg, the lawyer who had dragged the dying ex-cop from the foot of the office building stairs minutes before. The other was a young man named Ralph Minehan.

Minehan got a .32-caliber revolver and cartridges to hastily shove into its five chambers; reports indicate he had to pay for it. Butts demanded a shotgun, and specifically requested #3 birdshot for it because, he said, he didn't want to kill the gunman, just stop him. The counterman, either in a hurry or a helluva lot smarter than Butts, gave him buckshot. The record does not show whether cash was demanded for the scattergun.

## Armed Citizens End It

It wasn't far from where the shooting started to Branch's Pharmacy, where the mass murderer next made entry. It was at this point the first uniformed Brunswick Police officer was able to run to the shooting scene. Young Rexford Deaver saw the gunman, and opened fire. It's believed he hit Phillips. However, the bulky gunman didn't go down. Instead, he was seen to aim his gun at the rookie cop and fire. The 10-gauge blast caught Deaver, only 60 days on the job, in the chest. He fell, mortally wounded.

Meanwhile, the two armed citizens had entered the drug store from behind the madman and pinpointed his location. Minehan fired first, emptying his revolver as fast as he could pull the trigger. It's believed at least one of his bullets struck the gunman, but Monroe Phillips was big and .32-caliber bullets are small, and the raging mass murderer was still on his feet and armed.

It was then Butts discharged a single round. He said later he was trying to shoot the gun out of the big man's hands, but his shotgun blast hit Phillips in the kidneys. Phillips dropped his gun and collapsed.

It was over. "Well, you've just about got me," witnesses heard the murderer say. "Finish it up."

No one fired again. It was already



# C.H.A.M.P.™
Patents Pending

**Compact • Holster • Ambidextrous • Multi • Position**

MSRP $39.99
Style 128

MADE IN THE USA

Paddle Available Separately

*We didn't invent concealment, we just perfected it!*

## De Santis GUNHIDE®

800-GUNHIDE
631-841-6300
Dept #AH95
431 Bayview Avenue
Amityville, NY 11701
www.desantisholster.com




**CALL 1(800)SA2-1911** *"the MAG GUIDE people"™*
when only the *BEST* will do!
## ORDER DIRECT and SAVE!

$95.95 **AL**
**Full Para Mag Guide**
(For P14/P16 only)
Available in:
Flat/Arched-SS/BL 20 LPI

$36.95 **AL**
**Mainspring Housing**
Available in:
Gov't Model, Officers' Model, all Para-Ordnance. 20 LPI
Flat/Arched-SS/BL
(P10/P12 flat only)
(flat smooth available for all of the above)

$36.95
**"E-Z Fit Hi Grip"™ Safety**
.250 radius-Series 70 & 80 .220 radius S70 for Springfields
"PalmSwell"/Standard (jig available)

$78.95 **AL**
**Government Model/ Officers' Model Mag Guide**
Available:
Flat/Arched
SS/BL 20 LPI
**NEW:** Flat now available in Smooth
Also Available:
Grizzly Flat-SS/BL $89.95

**Prices starting at $17.50**
**S & A Custom 1911 Grips**
Exotic Woods & Micarta
Standard & Slim Line
DD, FC & Smooth

**NEW**–Slim Line
Mag Guides & Grips w/screws & bushings

**L** available with Lanyard Loop add $10
**A** available in Aluminum

Color Catalog Available
Same Day Shipping
Appropriate shipping charges
Dealers Welcome
100% Customer Satisfaction

VISA    MasterCard

## SA SMITH & ALEXANDER, Inc.
P.O. Box 299 • Copeville, Texas USA 75121
(800) SA2-1911 • Fax (972) 853-0526
www.smithandalexander.com
Hours: M-F, 9am-5pm CST









WANT MORE? **WEB BLAST**
MORE INFO, MORE PHOTOS AND EVEN VIDEOS!
WWW.AMERICANHANDGUNNER.COM

Exhibit Ayoob-4 Page 5 of 7



Tactical - Hunting - Survival

PAPA BEAR
-THICKNESS -.25 IN.
- B.L.- 6.0 IN.
- B.W.- 2.39 IN.
- O.A.L.-12.37 IN.
1095 HIGH CARBON
Differentially heat-
Treated

AVAILABLE IN
MULTIPLE COLOR
COMBINATIONS

-DEALER INQUIRIES
WELCOME

SCAR
BLADES

At SCAR Blades we pour our Strength,
Sweat, and Blood into knives that are
designed and used as rugged tools for:
- Military
- Law Enforcement
- Avid Outdoorsmen
and
- Tactically Minded Civilians

Our knives survive in the field no matter
how harsh the conditions.

Just Remember....
a SCAR is
for LIFE!

(208)716-1212
More Designs Available, check us out at:
www.scarblades.com

100% Hand-Crafted in the Rocky Mountains    Real Men with Real Scars carry SCAR Blades!    Custom Hand-Molded Sheaths

SCAR Blades are Guaranteed to last as long as your scars... Forever !

Proudly Made in the USA    Lifetime Guarantee

finished. The murderer quickly bled out and died on the drug store floor.

## Aftermath

Five innocent people died at the scene from Monroe Phillips' mad dog shooting spree. Mr. Way, the second shooting victim, amazingly survived, though he lost an eye and suffered horrendous facial injuries from the point-blank buckshot blast: remember, a 10-gauge dispenses about a "double dose" compared to a 12-gauge.

A total of 32 people were reported to be wounded by the killer's fire, two of whom would die from their injuries, and at least one, many years later, would be said to have died sooner than he should have, at least in part from the old wounds inflicted on him during what became known as the Brunswick Massacre.

This atrocity occurred a century ago. We have to remember forensic investigation, then, was primitive compared to our standards today. Once the investigators knew "who killed who," the case was closed and no further resources were wasted on research.

To this day, the records don't seem to show what make, model, gauge or type of shotgun the hastily-armed citizen Eustace Butts used to stop Monroe Phillips. We do know from contemporary newspaper reports of the autopsy Butts' shotgun blast was indeed the fatal shot, shredding the gunman's kidneys. (The Glynn County Coroner's Office did not return multiple phone calls, and we can't be sure the autopsy report even exists today.)

Nor do we know what make and model of revolver Ralph Minehan used in his courageous attempt to stop the killer, but all reports agree it was .32-caliber and apparently 5-shot. Early accounts had Phillips murdering Padgett and wounding Butts outside the building, but later newspaper articles with info gathered after everything calmed down indicated the sequence described here.

## A Mystery Solved

One mystery in all of this is no revolver bullet larger than .32-caliber was recovered, according to newspaper descriptions of Phillips' autopsy report in 1915. Local Brunswick history and the lore of the Brunswick PD hold the heroic rookie cop Rex Deaver shot Phillips before the killer slew him. Yet it has been written Brunswick cops carried .38's back then, which would have made it impossible for Deaver to shoot his killer before being murdered.

We found the answer, thanks to Captain Kevin Jones of the Brunswick PD, who among other achievements could be described as his agency's resident historian. When I visited there researching this case a century later,

Captain Jones told me in the early days of the department, cops bought their own guns and often went with whatever was cheapest. A grandson of the slain hero cop, also bearing the name Rex Deaver, was chief of the department in the mid-20th century.

Captain Jones was able to put me in touch with a still-living descendant, Kirk Quarterman. Quarterman, a career lawman himself, oddly enough, tells me the hero rookie's privately-owned service revolver used on the fateful day is still in the family's possession. He has seen it, a 4" S&W Hand Ejector, with ivory grips — in .32.

Therefore, it would appear to be entirely possible slain hero cop Rex Deaver, and armed citizens Ralph Minehan and Eustace Butts, all had a part in putting bullets into the madman who finally stopped hurting innocent people when enough good guys with guns put enough lead into him. It remains uncontested it was the shotgun blast fired by armed citizen Butts which decisively dropped Monroe Phillips and ended his rampage.

## Lessons

We're reminded why American cops don't carry .32's anymore, even though they were quite common in the late 19th century, at least on the East Coast for this purpose, and fairly common well into the 20th. They use something bigger — ideally, something a lot bigger — to stop rampaging psychos. Brunswick, Ga., cops today carry Glock .40's and have more substantial weaponry in their patrol cars for just such emergencies.

We learn "copycat mass murders" aren't unique to the late 20th and early 21st centuries. One historian reports another mass murder was committed in Macon, Ga., 10 days after the Brunswick Massacre by an unbalanced young man who was reportedly obsessed with what had just happened in Brunswick.

We're reminded of why first responders armed and ready to shoot back at a moment's notice is important. If the courageous lawyer Eustace Butts had been armed when Phillips ran his shotgun empty in the stairwell, the toll in Brunswick could have stopped at only two victims killed and two wounded. Instead, Butts had to drag his wounded leg to a hardware store to get a gun, while a merciless clock was ticking and an equally merciless killer's trigger finger was working.

Today, Georgia is a "shall-issue" state. In 1915, it would have taken a relatively significant amount of money to get a permit to carry a handgun. It's not prohibitively expensive to carry there; had it been this way then, a citizen with his own gun might have been more likely to be present, and able to stop Phillips sooner.

Ex-cops who've served enough time

Exhibit Ayoob-4 Page 6 of 7

877.255.6433
SHEATH & HOLSTER MAKERS SUPERSTORE
HOLSTER MOLDING PRESS $84.95
12" MODEL
NEW
KYDEX® KRYPTEK
YETI™
TYPHON™
NOMAD™
MANDRAKE™
HIGHLANDER™
CAMO PATTERNS
SAME-DAY SHIPPING
www.KNIFEKITS.com

ADVANTAGE TACTICAL SIGHT
The Probelm Solving Sight
310-316-6413
advantagetactical.com

MISSED AN ARTICLE?
FIND IT AT
WWW.AMERICANHANDGUNNER.COM

on the job can carry guns under the Law Enforcement Officers Safety Act of 2004. It wasn't so back then. Had it been, former policemen Padgett and Asbell would've been legal to carry, and either might have been able to stop the rampage before Monroe Phillips could rack up the death toll he did. Instead, both ex-cops apparently died unarmed and helpless.

Today, gun-banners insist law-abiding citizens shouldn't have "high-capacity magazines" in the name of preventing mass murders, and citizens don't need guns at all because they can just jump mass murderers and disarm them when they're reloading. A hundred years ago, the madman Monroe Phillips showed both ideas to be false. He shot some three dozen people with a 2-shot 19th century vintage Parker 10-gauge shotgun.

**"We're reminded why American cops don't carry .32's anymore, even though they were quite common in the late 19th century, at least on the East Coast for this purpose, and fairly common well into the 20th."**

No one was able to disarm him because, as eyewitness Dr. G.W. Blanton told the Brunswick News a few days after the shooting, Phillips was running the double-barrel with what we would call today a "tactical reload." Having been caught flat-footed with an empty gun in his second barrage when he stood at the top of a stairwell, the crafty murderer thereafter kept one live shell in one chamber, ready to fire with a quick movement — which simply closed the action. Dr. Blanton told the newspaper he had been waiting for Phillips to run dry so he or someone else could jump him and disarm him, but Phillips never gave them the opportunity. Never underestimate your opponent!

Let me close this history lesson with deepest thanks to Captain Kevin Jones of the Brunswick PD for his assistance. This article is dedicated to the memory of the courageous armed citizens and law enforcement personnel who ended this murderous rampage a century ago, an incident from which more should have been learned in the intervening years.

Dan Wesson
DAN WESSON FIREARMS
Bridging the gap from production to custom since 1968.
RZ-45 Heritage
MSRP $1298
CCO
MSRP $1558
With zero MIM, fully machined parts, hand-fit components and exceptional quality standards, Dan Wesson 1911s are custom grade without the custom price tag.
www.danwessonfirearms.com