**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>                         Plaintiffs,<br><br>      v.<br><br>KATE BROWN, et al.,<br><br>                       Defendants.<br><br>MARK FITZ, et al., | Case No. 2:22-cv-01815-IM (lead case)<br>           3:22-cv-01859-IM (trailing case)<br>           3:22-cv-01862-IM (trailing case)<br>           3:22-cv-01869-IM (trailing case)<br><br>**DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI* PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** |

**DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI* PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

|  | Plaintiffs, |
|---|---|
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
|  | Defendants. |
| KATERINA B. EYRE, et al., | |
|  | Plaintiffs, |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
|  | Defendants. |
| DANIEL AZZOPARDI, et al., | |
|  | Plaintiffs, |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
|  | Defendants. |

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

BACKGROUND .................................................................................................. 1

I.      Measure 114...................................................................................... 1

II.     This Case .......................................................................................... 1

III.    Procedural History............................................................................. 3

LEGAL STANDARDS ........................................................................................ 3

ARGUMENT........................................................................................................ 4

I.      Plaintiffs are unlikely to succeed on the merits of their claims. ................ 4

        A.      Measure 114's restrictions on LCMs are consistent with the Second
                Amendment........................................................................... 4

                1.      LCMs are not "arms" protected by the Second Amendment..................... 5

                2.      LCMs are not "in common use" for self-defense. ................................... 6

                3.      Restrictions on LCMs are consistent with this country's
                        "historical tradition" of arms regulation. ........................... 9

                        a.      LCMs are a dramatic technological change and
                                implicate new societal concerns...................................... 9

                        b.      Restrictions on LCMs are consistent with this country's
                                historical tradition of regulating dangerous weapons. ................. 12

                                (1)      Restrictions on LCMs are comparable to historic
                                         restrictions on other dangerous weapons. ........................ 12

                                (2)      Restrictions on LCMs pose a comparable burden
                                         as other historic arms regulations. .................... 14

        B.      Measure 114's restrictions on LCMs do not violate the Takings Clause. ........... 15

        C.      Measure 114's restrictions on LCMs are not unconstitutionally vague. .............. 17

        D.      Measure 114's restrictions on LCMs are not impermissibly retroactive............. 19

        E.      Measure 114's permit-to-purchase requirement complies with the
                Second Amendment. .......................................................... 20

                1.      *Bruen* expressly allows states to enact shall-issue permit
                        regimes. .................................................................. 21

                2.      Measure 114's mental-health-review provision is consistent
                        with *Heller* and *Bruen*............................................. 23

                3.      Measure 114 does not impose unconstitutional delays........................... 26

F.     Once law enforcement is prepared to certify instructors for the in-person demonstration component of Measure 114's training requirement, plaintiffs' as-applied challenge to the implementation of Measure 114's permitting requirement will fail. ................................................... 28

II.     **The remaining factors militate against granting a preliminary injunction.** ............. **31**

A.     Plaintiffs have not shown irreparable harm. ........................................................ 32

B.     The balance of the hardships does not favor an injunction. ................................. 33

**CONCLUSION** ........................................................................................................................ **36**

# TABLE OF AUTHORITIES

Page(s)

Cases

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
   950 F.2d 1401 (9th Cir. 1991) ........................................................................ 4, 32
*Calvary Chapel Bible Fellowship v. Cnty. of Riverside*,
   948 F.3d 1172 (9th Cir. 2020) ....................................................................... 28, 29
*Cf. Fyock v. City of Sunnyvale*,
   25 F. Supp. 3d 1267 (N.D. Cal. 2014) ................................................................. 35
*Cf. United States v. Stewart*,
   451 F.3d 1071 (9th Cir. 2006) ....................................................................... 18, 19
*Chalk v. United States Dist. Court for the Cent. Dist. of Cal.*,
   840 F.2d 701 (9th Cir. 1988) ......................................................................... 34, 35
*Coal. for Econ. Equity v. Wilson*,
   122 F.3d 718 (9th Cir. 1997) ............................................................................... 34
*Concealed Handgun License for Stanley v. Myers*,
   276 Or. App. 321 (2016) ..................................................................................... 24
*Dahl v. HEM Pharms. Corp.*,
   7 F.3d 1399 (9th Cir. 1993) .......................................................................... 34, 35
*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ......................................................................................... 4, 5
*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ............................................................................ 33
*Duncan v. Bonta*,
   19 F.4th 1087 (9th Cir. 2021) ..................................................................... passim
*E. Bay Sanctuary Covenant v. Barr*,
   964 F.3d 832 (9th Cir. 2020) ............................................................................... 4
*Edge v. City of Everett*,
   929 F.3d 657 (9th Cir. 2019) .............................................................................. 17
*Elias v. Connett*,
   908 F.2d 521 (9th Cir. 1990) .............................................................................. 32
*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ........................................................................... 7, 9
*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ............................................................................... 6
*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ............................................................................................. 4
*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ............................................................................. 4
*In re Plant Insulation Co.*,
   734 F.3d 900 (9th Cir. 2013) .............................................................................. 17
*Int'l Bhd. of Elec. Workers Loc. No. 48 v. Oregon Steel Mills, Inc.*,
   168 Or. App. 101 (2000) ..................................................................................... 30

*Jackson v. City & Cnty. of San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ................................................................ 5, 32

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) ...................................................................... 7

*Kuck v. Danaher,*
   822 F. Supp. 2d 109 (D. Conn. 2011) ...................................................... 25

*Landgraf v. USI Film Prod.,*
   511 U.S. 244 (1994) .................................................................................. 19

*Laurel Park Cmty., LLC v. City of Tumwater,*
   698 F.3d 1180 (9th Cir. 2012) ................................................................. 16

*Lopez v. Brewer,*
   680 F.3d 1068 (9th Cir. 2012) ............................................................... 3, 4

*Lucas v. S.C. Coastal Council,*
   505 U.S. 1003 (1992) ................................................................................ 16

*Maryland v. King,*
   567 U.S. 1301 (2012) ................................................................................ 34

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) .................................................................................. 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
   886 F.3d 803 (9th Cir. 2018) ................................................................... 33

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   ___ U.S. ___, 142 S. Ct. 2111 (2022) .............................................. passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ..................................................................... 19

*Nken v. Holder,*
   556 U.S. 418 (2009) .................................................................................... 4

*Ocean State Tactical, LLC v. Rhode Island,*
   No. 22-CV-246 JJM-PAS, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ..................... 7

*Phany Poeng v. United States,*
   167 F. Supp. 2d 1136 (S.D. Cal. 2001) ................................................... 33

*Rodriguez Diaz v. Garland,*
   53 F.4th 1189 (9th Cir. 2022) .................................................................. 26

*S.F. Veteran Police Officers Ass'n v. City & Cnty. of San Francisco,*
   18 F. Supp. 3d 997 (N.D. Cal. 2014) ................................................. 32, 34

*Short v. Brown,*
   893 F.3d 671 (9th Cir. 2018) ............................................... 3, 4, 32, 33

*Silvester v. Harris,*
   843 F.3d 816 (9th Cir. 2016) ...................................................... 26, 27, 28

*State v. Briney,*
   345 Or. 505 (2008) .................................................................................... 18

*Teixeira v. Cnty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ................................................................... 33

*Thomas v. Chi. Park Dist.,*
   534 U.S. 316 (2002) .................................................................................. 27

*United States v. Harris,*
   705 F.3d 929 (9th Cir. 2013) ................................................................... 17

**Page iv -  DEFENDANTS' RESPONSE TO THE *OFF, FITZ, EYRE,* AND *AZZOPARDI*
PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

*United States v. Lucero*,
  989 F.3d 1088 (9th Cir. 2021) ............................................................ 18
*Univ. of Haw. Prof'l Assembly v. Cayetano*,
  183 F.3d 1096 (9th Cir. 1999) ............................................................ 33
*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008)............................................................................ 26
*White v. Illinois State Police*,
  482 F. Supp. 3d 752 (N.D. Ill. 2020) ................................................. 25
*Winter v. Nat'l Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...........................................................................4, 32

Statutes

18 U.S.C. § 921(31) ...................................................................................... 18
Colo. Rev. Stat. Ann. § 18-12-301................................................................ 18
Conn. Gen.Stat. § 53–202w(a)(1) ................................................................ 18
D.C. Code Ann. § 7-2506.01 ........................................................................ 18
Mass. Gen. Laws Ann. ch. 140, § 121 .......................................................... 18
Mo. Ann. Stat. § 571.101(2)(7)..................................................................... 25
Mont. Code Ann. § 45-8-321(2) .................................................................... 25
N.Y. Penal Law § 265.00(23) ....................................................................... 18
Or. Rev. Stat. § 166.293(2) ........................................................................... 25
ORS 181A.040(1) ............................................................................................ 1
R.I. Gen. Laws § 11-47.1-2............................................................................ 18
Vt. Stat. Ann. tit. 13, § 4021 ......................................................................... 18
Wyo. Stat. Ann. § 6-8-104 ............................................................................. 25

Rules

FRCP 25(d) ..................................................................................................... 1

## INTRODUCTION

Last December, this Court ruled that plaintiffs in these consolidated cases had failed to demonstrate a likelihood of success on their facial challenges to Measure 114. The Court should reach the same conclusion again. Plaintiffs have failed to present new evidence sufficient for the Court to reverse its previous decision. The Court should, therefore, deny plaintiffs' motions for preliminary injunctions.

## BACKGROUND

### I.      Measure 114

The Court's December 6, 2022, Opinion and Order (ECF 39 ("TRO Order")) and defendants' Response to the Emergency Motion for Preliminary Injunction and Supporting Memorandum of Law (ECF 15) summarize Measure 114 and its provisions. Defendants incorporate those summaries here. In sum, Measure 114: (1) prohibits the purchase and restricts the use of large-capacity magazines ("LCMs"); (2) requires a permit to purchase firearms; and (3) closes the so-called "Charleston Loophole" by requiring the completion of a background check before a firearm transfer.

### II.      This Case

This consolidated action involves four lawsuits challenging the constitutionality of Measure 114. Plaintiffs are individuals, businesses, sheriffs, and special interest groups. Defendants are Governor Tina Kotek, Attorney General Ellen Rosenblum, and Deputy Superintendent of the Oregon State Police ("OSP") Casey Codding in their official capacities.[1]

---

[1] The Attorney General and the Superintendent of the Oregon State Police are named as defendants in all four federal cases. The Governor is named as a defendant in *Oregon Firearms*. The OSP Superintendent position is presently vacant; under ORS 181A.040(1), the Deputy acts "as the head of the Department of State Police in the absence . . . of the Superintendent[.]" *See also* FRCP 25(d) (automatically substituting successor).

Across their four complaints, plaintiffs advance fourteen overlapping claims comprising seven distinct legal theories:

- Large-capacity magazines:

    - The LCM provisions violate the Second Amendment (*Oregon Firearms*, *Fitz*, *Eyre*);

    - The LCM provisions violate the Takings Clause (*Oregon Firearms*, *Eyre*);

    - The definition of a "large-capacity magazine" violates the Due Process Clause because it is vague (*Oregon Firearms*, *Eyre*); and

    - The LCM provisions violate the Due Process Clause because they are retroactive (*Oregon Firearms*, *Eyre*).

- Permit-to-purchase:

    - The permit requirement violates the Second Amendment on its face (*Oregon Firearms*, *Eyre*);

    - The permit provisions violate the Due Process Clause as applied because the permitting process is "arbitrary government action" (*Oregon Firearms, Eyre*); and

    - The permit provisions violate the Second Amendment as applied because defendants and Oregon's sheriffs and police chiefs (who are not defendants) cannot presently implement them (*Oregon Firearms*, *Eyre*, *Azzopardi*).

- Charleston loophole:

    - None.[2]

---

[2] Even if plaintiffs challenged this provision, this Court has already correctly found that closing it complies with *Bruen*.  (ECF 70 at 5.)

**Page 2 -   DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI* PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

### III.  Procedural History

Initially, plaintiffs filed motions seeking temporary restraining orders preventing Measure 114 from going into effect.  On December 6, 2022, this Court denied plaintiffs' motions.  As to LCMs, the Court ruled that such magazines did not constitute "arms" within "the plain text of the Second Amendment."  (TRO Order at 20.)  In addition, the Court ruled that LCMs are not in common use for lawful purposes like self-defense "such that they fall within the plain text of the Second Amendment."  (*Id*. at 24.)  Regardless, the Court ruled that LCMs were a "dramatic technological change" not contemplated by the Founders and, further, Measure 114's restrictions on LCMs were consistent with "historical regulations" of arms "[i]n light of the evidence of the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines."  (*Id*. at 26, 31.)

On permit-to-purchase, the Court similarly rejected plaintiffs' challenges.  The Court explained that Measure 114 created an "objective shall-issue licensing regime[]" consistent with the Supreme Court's guidance in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, ___ U.S. ___, ___, 142 S. Ct. 2111 (2022).  (*Id*. at 31 (quoting *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring)).)

In addition, a state circuit court has enjoined Measure 114 in its entirety.  *Arnold v. Kotek*, No. 22CV41008 (Or. Cir. Ct., Harney Cnty.)  On January 13, 2023, the State petitioned the Oregon Supreme Court for mandamus review of the state circuit court's orders enjoining enforcement of Measure 114.  That petition is pending.

### LEGAL STANDARDS

To obtain a preliminary injunction, plaintiffs must establish "by a clear showing," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012), that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance

of equities tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the government is a party, courts consider the last two factors together, because the defendants' equities merge with the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Where a plaintiff's "irreparable injury" is based on an asserted loss of a constitutional right, the plaintiff must establish that they are "likely" to succeed on the merits of the constitutional claim, not merely show "serious questions" going to the merits. *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1411 (9th Cir. 1991).

"[T]he rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). The "burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). If a court issues a preliminary injunction, it must be no broader "than necessary to provide complete relief to the plaintiffs before the court." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855-56 (9th Cir. 2020).

## ARGUMENT

### I.    Plaintiffs are unlikely to succeed on the merits of their claims.

Plaintiffs raise seven distinct legal theories to challenge Measure 114: four against the LCM restrictions, three against the permit provisions, and none against the closure of the Charleston loophole. As the Court preliminarily ruled, none has merit.

#### A.    Measure 114's restrictions on LCMs are consistent with the Second Amendment.

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." But "like most rights, the right secured by the Second Amendment is not unlimited." *Bruen*, 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626

(2008) (alterations omitted)).  To determine whether a regulation passes constitutional muster under *Bruen*, a court first asks whether "the Second Amendment's plain text covers" the regulated conduct.  *Id.* at 2129.  If so, the conduct is "presumptively" protected.  *Id.* at 2130.  The government may rebut that presumption by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," in which case the conduct is outside the scope of the Second Amendment.  *Id.*  Analogizing to historical arms regulations is "neither a regulatory straightjacket nor a regulatory blank check."  *Id.* at 2133.  Thus, the government must only identify a well-established and representative "historical analogue," not a "historical twin."  (*Id.* (emphasis omitted).)  Even if a modern-day regulation is not a "dead ringer" for historical precursors, it still may be analogous enough to pass constitutional muster.  *Id.*

In its December 6, 2022 Order, this Court correctly determined that LCMs are not covered by the Second Amendment's plain text and, regardless, Measure 114's restrictions on LCMs are consistent with the nation's historic tradition of arms regulation.  Plaintiffs' supplemental briefing does not offer any basis for this Court to depart from its prior ruling.

### 1.    LCMs are not "arms" protected by the Second Amendment.

LCMs are not covered by the Second Amendment.  The Second Amendment covers firearms and items "'necessary to use' those firearms."  (TRO Order at 19 (quoting *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)).)  LCMs are not "necessary to use" firearms for self-defense.  (*Id.*)  Copious evidence confirms the Court's conclusion.  For example, according to Jim Yurgealitis, expert on firearm mechanics, "any firearm capable of accepting a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity of ten rounds or fewer."  (Decl. of James Yurgealitis ("Yurgealitis Decl.") ¶ 39.)  Plaintiffs' witness Stephen Helsley also agreed that "most popular handguns [can] function with 10-round magazines."  (Decl. of Rebecca Dodd ("Dodd Decl.") Ex. 1, 1/19/23

Helsley Dep. at 47:2-5.)  In addition, "[m]ost major firearm manufacturers offer models that come 'standard' with 10-round magazines."  (Yurgealitis Decl. ¶ 46.)  Because LCMs are not "necessary to use" firearms for self-defense, Measure 114's restriction on LCMs is not covered by the plain text of the Second Amendment.

In response, plaintiffs contend that any "core component" of a firearm is itself a "bearable arm."  (*Eyre* Supp. Mem. at 21 (ECF 84).)  Plaintiffs are mistaken.  The Ninth Circuit has never held that accessory components constitute an arm; rather, any right to an accessory is a "corollary" to the right to bear arms that is limited to accessories "necessary to render [protected] firearms operable."  *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).  Thus, a ban on all bullets would be covered by the Second Amendment, not because bullets are arms, but because bullets are necessary to operate arms.  Here, by contrast, *large-capacity* magazines are not necessary to operate firearms for self-defense—most firearms can operate with magazines that hold 10 rounds or fewer.  Accordingly, LCMs are not protected by the Second Amendment.

### 2.    LCMs are not "in common use" for self-defense.

LCMs are not protected by the Second Amendment for the separate reason that they are not "in common use for lawful purposes like self-defense."  (TRO Order at 20.)  Under *Heller*, the "arms" covered by the Second Amendment include only weapons "typically possessed by law-abiding citizens for lawful purposes"—in particular, weapons "in common use" for self-defense.  554 U.S. at 625.  By contrast, the "arms" covered by the Second Amendment do not include military-grade weapons, like "M-16 rifles."  *Id.* at 627.  Prohibitions against civilians possessing military weapons is "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons."  *Id.* (quotation marks omitted); *see also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that *Bruen* does not change limitations on "the kinds of weapons that people may possess").

Page 6 -  **DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI* PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

Persuasive authority from the federal courts of appeals confirms that LCMs are not commonly used for self-defense. In *Kolbe v. Hogan*, the Fourth Circuit held that LCMs are outside the scope of the Second Amendment because they are "most useful in military service." 849 F.3d 114, 137 (4th Cir. 2017) (*en banc*), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022). LCMs "enable a shooter to hit multiple human targets very rapidly." *Id.* (quotation marks omitted). That "uniquely military feature" makes them "most suitable for military and law enforcement applications." *Id.* (quotation marks omitted). In *Friedman v. City of Highland Park*, the Seventh Circuit held that a ban on LCMs left residents with "adequate means of defense." 784 F.3d 406, 411 (7th Cir. 2015). And in *Duncan v. Bonta*, the Ninth Circuit, sitting *en banc*, reasoned that "large-capacity magazines provide significant benefit to soldiers and criminals who wish to kill many people rapidly. But the magazines provide at most a minimal benefit for civilian, lawful purposes." 19 F.4th 1087, 1106 (9th Cir. 2021) (*en banc*), *vacated and remanded*, 142 S. Ct. 2895 (2022).[3]

A week after this Court rendered its decision, a different federal district court denied a preliminary injunction in a challenge to Rhode Island's ban on large-capacity feeding devices. That court concluded that magazines do not constitute arms within the meaning of the Second Amendment and regardless LCMs are not "weapons of self-defense" protected by the Second Amendment. *Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, *14 (D.R.I. Dec. 14, 2022).

The record in this case confirms that LCMs are not in "common use" for self-defense. Lucy Allen, a nationally-recognized expert in the intersection of statistics, economics, and public

---

[3] The Supreme Court vacated *Duncan* for reconsideration in light of *Bruen*, but the *en banc* opinion remains persuasive authority to the extent its reasoning does not conflict with *Bruen*. Nothing in *Bruen* undermined *Duncan*'s discussion of the characteristics of LCMs.

policy, analyzed the National Rifle Association's Armed Citizen database, which compiles stories of private citizens who have successfully defended themselves, or others, using a firearm. (Decl. of Lucy Allen ("Allen Decl.") ¶¶ 8-20.)  Out of 736 reported incidents, there were just two incidents (0.3% of all incidents), in which the defender reported having fired more than 10 bullets.  (*Id.* ¶ 10.)  Dr. Allen also analyzed a random sample of news stories from 2011 to 2017 and found no reported incidents of more than 10 shots being fired in self-defense.  (*Id.* ¶ 12.)  The defensive use of LCMs is exceedingly rare, not "common."

Plaintiffs' evidence is not to the contrary.  Plaintiffs rely on the raw sales numbers of LCMs for the proposition that LCMs are prevalent in society.  (*Eyre* Supp. Mem. at. 16.)  But as this Court correctly concluded: "The Second Amendment . . . requires a court to not only consider the prevalence of a particular firearm, but also the nature of that firearm's use among civilians."  (TRO Order at 21 n.13.)  "[T]he question is whether the weapon is '"in common use" . . . *for lawful purposes* like self-defense.'"  (*Id.* at 21 (quoting *Heller*, 554 U.S. at 624) (alterations and emphasis in original).)  As the Court ruled previously, the answer is "no."

Plaintiffs offer two witnesses on the present-day use of LCMs: Mark Hanish and Massad Ayoob.  Neither provides any basis for concluding otherwise.  Mr. Hanish's source for data on defensive gun use is an unpublished 2021 survey conducted by William English, who is not a witness in this case.  Another of plaintiffs' witnesses conceded that the survey was unreliable, and Mr. Hanish acknowledged he is not qualified to assess its reliability. (*Compare* Dodd Decl. Ex. 3, 1/25/23 Kleck Dep. at 76:5-77:11 *with* Dodd Decl. Ex. 2, Hanish Dep. at 57:16-58:17, 85:7-10, 86:7-10.)

Mr. Ayoob declares that restricting LCMs will limit the ability of citizens to protect themselves from crime "in certain situations."  (Decl. of Massad Ayoob ("Ayoob Decl.") ¶ 6

(ECF 73).)  At his deposition, Mr. Ayoob testified that he is not a statistician and has no opinion

on how "common" it is for a civilian to use a large-capacity magazine in self-defense.  (Dodd

Decl., Ex. 4 (1/15/23 Ayoob Dep. 23:12-24:11; *see also id.* at 76:1-5).)  Mr. Ayoob's declaration

identifies just four anecdotes in which a private citizen fired more than ten rounds in self-

defense.  (Ayoob Decl. ¶¶ 14-15.)  Mr. Ayoob's testimony confirms that the use of LCMs for

self-defense purposes is exceptional, not common.

>            3.    **Restrictions on LCMs are consistent with this country's "historical tradition" of arms regulation.**

>>            a.    **LCMs are a dramatic technological change and implicate new societal concerns.**

Even if the Second Amendment's plain text covers LCMs, Measure 114 would still be

constitutional because it is consistent with the "historical tradition" of arms regulation.  When

faced with "dramatic technological changes or unprecedented societal concerns," the Court is to

consider "historical analogues" to determine whether a given law is consistent with this

country's historical tradition of arms regulation.  (TRO Order at 24 (*citing Bruen*, 142 S. Ct. at

2132).)  LCMs are an example of "dramatic technological changes" that explain the absence of

precise "founding-era historical precedent."  *Bruen*, 142 S. Ct. at 2131-32.  They "were not

common in 1791."  *Friedman*, 784 F.3d at 410.  "Most guns available then could not fire more

than one shot without being reloaded[.]"  *Id.*

The record confirms that in 1791 guns capable of firing ten or more shots were

"experimental" and "vanishingly rare."  (Decl. of Brian DeLay ("DeLay Decl.") ¶ 7.)  These

weapons were not on the market until 1860s, and even then accounted for less than 0.002% of

guns in the U.S.  (*Id.*)  Most gun owners during the 1700s "possessed and used single-shot,

muzzle-loading, flintlock firearms."  (Decl. of Kevin Sweeney ("Sweeney Decl.") ¶ 5.)  A

review of historical records from the eighteenth century confirms that repeating firearms were "extraordinarily rare." (*Id.* ¶ 22; *see* DeLay Decl. ¶ 14.)

These experimental repeating firearms of the 1790s were not only rare, they were dangerous, inaccurate, difficult to use, and unreliable. (DeLay Decl. ¶¶ 14-15, 20-21; Sweeney Decl. ¶ 47; Decl. of Roger Pauly ("Pauly Decl.") ¶¶ 33, 64.) For instance, to refire the Cookson repeating rifle, the user needed to point the gun barrel towards the ground and push on a lever between each shot. (Sweeney Decl. ¶ 26.). The gun was heavy and prone to catastrophic failure. (*Id.*) Similarly, Belton's repeating firearm—which only held seven shots—weighed close to 11 pounds and required the user to cock and prime the gun between each shot. (*Id.* ¶¶ 32-33.) Managing the Belton was a "a three-handed job." (*Id.* ¶ 33.) These weapons bear no resemblance to modern weaponry using LCMs.

Plaintiffs repeatedly misstate their own witnesses' testimony. For example, plaintiffs describe Cookson's nine-shot repeating rifle as "popular among colonists." (*Eyre* Supp. Mem. at 26-27.) But their witness, Ashley Hlebinsky, testified that Cookson's firearm was a "one-off" and "maybe" there were "a few of them" in America at the founding. (Dodd Decl. Ex. 5, 1/20/23 Hlebinsky Dep. at 58:3-4.) More generally, plaintiffs contend that LCMs were "ordinary" and "commonplace" in 1791. (*Eyre* Supp. Mem. at 27.) Ms. Hlebinsky, however, characterized founding-era repeating firearms as "one-off examples" that were "unsuccessful by modern and/or historic standards." (Decl. of Ashley Hlebinsky ("Hlebinsky Decl.") ¶ 22 (ECF 72).) At her deposition, Ms. Hlebinsky could not state how many of these weapons existed in America at the founding but agreed that fewer than ten was a possibility. (Dodd Decl. Ex. 5, Hlebinsky Dep. at 76:22-77:7; *see also id.* at 43:11-24, 50:4-52:10, 60:23-62:24, 72:15-23, 73:24-74:18.)

**Page 10 - DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI*
PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

LCMs also implicate societal concerns that have no founding-era precedent. Mass shootings by a single individual that resulted in 10 or more deaths were unknown in U.S. history until 1949 and rare until 2007. (Decl. of Louis Klarevas ("Klarevas Decl.") ¶¶ 16-19, tbl. 4, figs. 6-7.) LCMs are "often used in public mass shootings." (Allen Decl. ¶ 26; *see also* Klarevas Decl. ¶ 20.) Casualties are also nearly three times higher in mass shootings that involve weapons with LCMs than in other mass shooting: an average of 25 fatalities or injuries with a large-capacity magazine versus an average of 9 without. (Allen Decl. ¶ 27.) Every mass shooting since 1991 that resulted in more than 15 deaths involved LCMs. (Klarevas Decl. ¶ 14.)

Plaintiffs offer evidence is unpersuasive. Plaintiffs' declaration on the history of mass murder, submitted by Clayton Cramer, was so error-laden that he later disavowed it during his deposition. (Second Decl. of Clayton Cramer (Magazine Issue) (ECF 75).) When questioned, Mr. Cramer admitted that his quantitative analysis was "clearly wrong." (Dodd Decl. Ex. 6, 1/19/23 Cramer Dep. at 87:18-20.) He testified that he would need to "lure" an actual "expert to assist me to verify the accuracy of the results." (*Id.* at 165:22-166:2.) He agreed that this Court should be "reluctant to accept the data" he presented given his errors and lack of expertise. (*Id.* at 106:13-17.)

Plaintiffs subsequently filed a "corrected" declaration. (Corrected Decl. of Clayton Cramer (Magazine Issue) (ECF 111).) But the "corrected" analysis also has serious flaws: It is "incomplete" after 1960 (*id.* at 20-21) when LCMs became more available to the general public and it relies on a non-standard definition of "mass murder" that uses a smaller number of deaths. (*Id.* at 7.) The Court should disregard Mr. Clayton's analysis.

**b.    Restrictions on LCMs are consistent with this country's historical tradition of regulating dangerous weapons.**

The social concern of massacres perpetrated by single shooters has no precedent in 1791 or even in 1868.  In such cases, *Bruen* instructs the courts to look for "a well-established and representative historical *analogue*, not a historical *twin*."  142 S. Ct. at 2133 (emphasis in original).  Although analogical reason is not a "regulatory blank check," it also is not a "regulatory straightjacket."  *Id*.  What matters is not how comparable a modern law is to historical analogues in form or substance, but how comparable it is in "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.*  "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."  *Id.* (quotation marks, citation, and emphasis omitted).

**(1)    Restrictions on LCMs are comparable to historic restrictions on other dangerous weapons.**

Under this framework, restricting LCMs is analogous to well-established prohibitions against unusually dangerous weapons that are associated with unlawful activities rather than lawful self-defense.  The historical record reveals at least five types of dangerous weapons that were restricted in the 18th and 19th centuries due to their association with violent crimes.  First, Bowie knives were widely prohibited in the 1800s.  (TRO Order at 28 n.19; Decl. of Brennan Rivas ("Rivas Decl.") ¶ 15.)  Bowie knives increased in notoriety and sales in the 1830s.  (Decl. of Robert Spitzer ("Spitzer Decl.") ¶ 56.)  In the 1830s, at least six states enacted laws barring the carrying of Bowie knives.  (*Id.* ¶¶ 62.)  By the end of the century, every state plus the District of Columbia (with the exception of New Hampshire) restricted Bowie knives.  (*Id.*)  Second, restrictions on blunt weapons were well-known at the founding.  Seven states enacted laws barring the carrying of clubs in 1600s and 1700s.  (*Id.* ¶ 68.)  Twelve state laws restricted

bludgeons in the 1700s and 1800s.  (*Id.* ¶ 66.)  Similarly, 14 states enacted anti-billy club laws in the 1800s.  (*Id.* ¶ 67.)  Third, slungshots were created in the 1840s and became widely used by criminals.  (*Id.* ¶ 69.)[4]  Anti-slungshot laws were enacted by 43 states in the 1800s and 1900s. (*Id.*; Rivas Decl. ¶ 32 n.46.)  Fourth, trap guns (*i.e.*, guns fired by trip wire) were associated with the loss of innocent life.  (Spitzer Decl. ¶¶ 74-76.)  Sixteen states enacted anti-trap gun laws between the 1700s and 1900s, the earliest in 1771.  (*Id.* ¶ 77.)  Fifth, with one exception, every state in the country enacted one or more gunpowder law from the 17th century through the start of the 20th century.  (*Id.* ¶ 78.)  At the founding, it was common for states to restrict weapons associated with loss of innocent life even where those weapons had defensive uses as well.

Repeating firearms slowly entered the market in the late 1800s, but they were different than the semiautomatic weapons of today.  "While there are a handful of examples of . . . fixed tubular magazines capable of holding more than ten cartridges during" the period after the Civil War, the operator had to engage a lever "between each shot . . . to discharge the spent shell and load a fresh cartridge from the magazine into the chamber."  (Rivas Decl. ¶ 52.)  Measure 114 does not apply to these sorts of lever-action weapons.  (Measure 114 § 11(1)(d)(C).) Furthermore, these weapons were slow to reload: "Winchester lever-action rifles and their high-capacity competitors in the last third of the nineteenth century had fixed magazines. Once the magazine was empty, the shooter had to reload each round, one by one."  (DeLay ¶ 63.)  "[T]his round-by-round reload process put a ceiling on the damage a single shooter could inflict on a group of people."  (*Id.*)

---

[4] A slungshot is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle.  (Decl. of Robert Spitzer ¶ 69.)

Automatic and semiautomatic firearms appeared in the early 1890s. (*Id.* ¶ 71.) A practical, lighter-weight, reliable, handheld, fully automatic weapon, the "Tommy gun," began to circulate in American society until the early 1920s. (*Id.* ¶ 72.) In response, between 1925 and 1933, 28 states passed laws against fully automatic firearms. (DeLay ¶ 73.) In 1934, Congress passed the National Firearms Act, regulating fully automatic weapons along with several other kinds of guns. (*Id.*) In short, regulating unusually dangerous weapons, up to and including LCMs, is consistent with this nation's "historic tradition."

### (2) Restrictions on LCMs pose a comparable burden as other historic arms regulations.

Any burden on the right of armed self-defense posed by Measure 114's restriction on LCMs is comparable to the burden posed by founding-era regulations. Ten-round magazines that comply with the limits of Measure 114 are widely available and most firearms manufacturers offer models that come standard with 10-round magazines. (Yurgealitis Decl. ¶ 46.) Firearms that accept magazines with a capacity exceeding 10 rounds can also accept a magazine with capacity of 10 or fewer. (*Id.* ¶ 39.) Furthermore, firearms incorporating magazines that already comply with the restriction are widely available. (*Id.* ¶¶ 46-50.) And nearly all self-defense uses of firearms involve fewer than ten shots. (Allen Decl. ¶¶ 10, 12.) In addition, Measure 114 also allows permanent alterations to reduce magazine capacity. (Measure 114 § 11(1)(d)(A).) Owners who decline to alter their LCMs will be permitted to use them in restricted ways and can avoid those restrictions if they use a lower capacity magazine in situations where a high-capacity magazine is unlawful. (Measure 114 § 11(5).)

This is a "minimal burden" on plaintiffs' use of firearms. *Duncan*, 19 F.4th at 1104. As explained by the Ninth Circuit: "The law has no effect whatsoever on which firearms may be owned; as far as the challenged statute is concerned, anyone may own any firearm at all. Owners

of firearms also may possess as many firearms, bullets, and magazines as they choose." *Id*.  By contrast, founding era prohibitions completely disallowed certain weapons with particularly dangerous features, while leaving other arms available for self-defense.

Plaintiffs' countervailing argument is unconvincing.  They contend that there is no historical analogue to Measure 114's LCM restrictions because, according to Ms. Hlebinsky, "repeating and firing capacity are not mentioned" in founding-era regulations.  (Hlebinsky Decl. ¶ 26.)  But this testimony is of minimal probative value.  As this Court already found, multi-shot firearms "were experimental, designed for military use, rare, defective, or some combination of these features" during the founding era.  (TRO Order at 25.)  It is therefore unsurprising that founding-era regulations did not regulate rare, one-off weapons.

Founding-era regulations restricted the use of weapons associated with violence and criminality.  Measure 114's restrictions on LCMs, which are associated with mass shootings, are analogous.  Accordingly, Measure 114 is consistent with the nation's historic tradition of arms regulation.

* * *

For all of those reasons, plaintiffs' Second Amendment challenge to Measure 114's restrictions on LCMs fails: LCMs are not "arms" covered by the Second Amendment.  LCMs are also analogous to dangerous weapons that have historically been restricted without infringing on the core right of self-defense.  Plaintiffs are unlikely to succeed on the merits of their Second Amendment claim.

**B.    Measure 114's restrictions on LCMs do not violate the Takings Clause.**

The Takings Clause of the Fifth Amendment states that private property shall not be taken "for public use, without just compensation."  As this Court has already ruled, "property seized pursuant to the police power is not taken for public use and is not compensable under the

Fifth Amendment." (TRO Order at 33.) Furthermore, this Court explained that an injunction is not an appropriate remedy to a Takings Clause claim "because the appropriate remedy for a Fifth Amendment takings violation is ordinarily not injunctive relief, but rather damages." (*Id.* at 35.) In their supplemental motions, plaintiffs do not acknowledge, let alone respond to, this Court's correct disposition of their Takings Clause claims. Their new briefing does not offer any reason for this Court to revisit its prior ruling.

Plaintiffs have since amended their complaints to include a new regulatory takings theory. But this theory also fails. Exercises of police power are not compensable under the Takings Clause. *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless[.]"). And a damages suit is an adequate remedy for a regulatory takings claim.

Regardless, to establish a regulatory taking, a plaintiff must establish "the economic impact of the regulation on the claimant and, particularly . . . the extent to which the regulation has interfered with distinct investment backed expectations." *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012) (quotation marks, citation omitted; alteration in original). In addition, plaintiffs must demonstrate that a regulatory taking "necessarily occurred with respect to every owner of a large-capacity magazine." *Duncan*, 19 F.4th at 1112.

Plaintiffs cannot make that showing. Measure 114 allows the current owner of an LCM to keep or modify it rather than to surrender it. (Measure 114 § 11(1)(d)(A).) Firearms dealers similarly have a 180-day transition period to transfer unsold LCMs out of state. (*Id.* § 11(3)(a)(A).) Plaintiffs, therefore, have not demonstrated that anyone has suffered an

interference with "investment backed expectations," let alone that such an interference occurs in every case. *See Duncan*, 19 F.4th at 1112 (rejecting a similar facial Takings Clause challenge).

### C.    Measure 114's restrictions on LCMs are not unconstitutionally vague.

Measure 114's restrictions on LCMs are not unconstitutionally vague.  As a preliminary matter, although the *Eyre* plaintiffs include a claim for relief alleging that Measure 114's LCMs restrictions "violate[] the constitutional requirement that a law give fair warning of that which it prohibits," plaintiffs do not move to enjoin Measure 114 on the grounds that it is unconstitutionally vague.  (*Eyre* First Am. Compl. ("*Eyre* FAC") ¶¶ 130-37 (ECF 67) (quotation marks omitted).)  The only reference to a vagueness challenge in their motion papers is a citation to a Sixth Circuit opinion in the Background section of the *Eyre* plaintiffs' supplemental brief. (*Eyre* Supp. Mem. at 13.)  An undeveloped legal citation is insufficient to present a legal theory. *In re Plant Insulation Co.*, 734 F.3d 900, 908 n.5 (9th Cir. 2013).  Accordingly, the Court need not address the merits of this undeveloped theory at this stage.

If the Court reaches the merits, it should hold that Measure 114 is not impermissibly vague.  In a facial challenge, a statute is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited.  *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013).  A law is not void for vagueness merely because "there will be close cases requiring some degree of law enforcement subjectivity" when enforcing the law.  *Edge v. City of Everett*, 929 F.3d 657, 666 (9th Cir. 2019).  Instead, a law is unconstitutionally vague only if people "must necessarily guess at its meaning."  *Id.* at 665 (quotation marks and citation omitted).

Here, the definition of "large-capacity magazine" is not impermissibly vague.  Section 11(1)(d) of Measure 114 defines "[l]arge-capacity magazine" as:

> [A] fixed or detachable magazine, belt, drum, feed strip,
> helical feeding device, or similar device, including any such device
> joined or coupled with another in any manner, or a kit with such
> parts, that has an overall capacity of, or that can be readily
> restored, changed, or converted to accept, more than 10 rounds of
> ammunition and allows a shooter to keep firing without having to
> pause to reload….

Plaintiffs contend that the definition is vague because "[n]o guidance is given on what" the phrase "can be readily restored, changed, or converted to accept" means. (*Eyre* Supp. Mem. at 13.) But this phrase does not require Oregonians to guess at its meaning. Measure 114 restricts magazines that can be quickly altered to accept more than 10 rounds. *State v. Briney*, 345 Or. 505, 517 (2008) (holding that a "readily capable" firearm is one "operational or promptly able to be made so"). Magazines are legal if they have a capacity of 10 rounds or fewer and cannot "readily" be converted to hold more. The Constitution does not require "meticulous specificity" if "it is clear what the ordinance as a whole prohibits." *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quotation marks and citation omitted).

Further, like Measure 114, the former federal assault weapons ban defined "large capacity ammunition feeding device" as "any magazine, belt, drum, feed strip, or similar device . . . that has the capacity of, or that can be *readily restored or converted to accept*, more than 10 rounds of ammunition."[5] The District of Columbia, Massachusetts, Colorado, New York, Connecticut, Vermont, and Rhode Island similarly define magazine and firearm restrictions to include items that can be "readily" converted to include a large number of rounds.[6] These laws have been on the books for decades, and plaintiffs do not identify any history of widespread

---

[5] Former 18 U.S.C. § 921(31) (emphasis added).

[6] Colo. Rev. Stat. Ann. § 18-12-301; N.Y. Penal Law § 265.00(23); Conn. Gen.Stat. § 53–202w(a)(1); Mass. Gen. Laws Ann. ch. 140, § 121; R.I. Gen. Laws § 11-47.1-2; D.C. Code Ann. § 7-2506.01; Vt. Stat. Ann. tit. 13, § 4021.

**Page 18 - DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI* PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

confusion about their meaning.  *Cf. United States v. Stewart*, 451 F.3d 1071, 1072 (9th Cir.

2006) (affirming conviction for possessing kit "readily" convertible into banned firearm).

The only federal court of appeals to have addressed this issue rejected the same

vagueness argument that plaintiffs make here.  In their complaint, plaintiffs contend that

Measure 114 is vague because it does not specify whether the magazine must be "readily"

convertible by the person in possession or instead "by a master gunsmith using the facilities of a

fully-equipped machine shop."  (*Eyre* FAC ¶ 135.)  In *New York State Rifle & Pistol Ass'n, Inc.*

*v. Cuomo*, the Second Circuit considered and rejected this gunsmith hypothetical, holding that

plaintiffs' reading of statute was "implausible" and could be resolved in an as-applied challenge

if such a prosecution ever arose.  804 F.3d 242, 266 (2d Cir. 2015).  Plaintiffs' reliance on a

Sixth Circuit case addressing Ohio law is inapposite because that case interpreted a different

statutory phrase—"may be restored" without the modifier "readily."  *See id.* (so holding).  The

phrase "readily restored, changed, or converted" is not unconstitutionally vague.

### D.     Measure 114's restrictions on LCMs are not impermissibly retroactive.

Contrary to plaintiffs' assertion, Measure 114 does not have "retrospective aspects" that

"violate due process."  (*Eyre* Supp. Mem. at 32.)  The law does not punish past purchases, only

future conduct (*e.g.*, possession, sales) after Measure 114's effective date.  Measure 114 does not

attach new legal consequences to any conduct completed before Measure 114 is in effect.

*Landgraf v. USI Film Prod*., 511 U.S. 244, 269-70 (1994) (discussing legal standard for

retroactivity).  It is therefore not retroactive, and it does not violate the Due Process Clause.

Regardless, Measure 114 allows current owners of LCMs to keep and continue to use

their existing magazines for certain purposes.  (Measure 114 § 11(5).)  This Court has already

concluded that "Measure 114 is not retroactive: it does not render Plaintiffs' already-possessed

large-capacity magazines illegal, allows Plaintiffs to retain possession of these large-capacity

magazines on their property, and allows Plaintiffs to use these large-capacity magazines in limited situations." (TRO Order at 37.) Plaintiffs do not respond to this Court's correct disposition of this claim in their supplemental briefing.

    **E.**    **Measure 114's permit-to-purchase requirement complies with the Second Amendment.**

Measure 114 establishes a "shall issue" permit-to-purchase system that creates few new limitations on firearms acquisition. *Bruen* made clear that it did not prohibit "shall issue" permit systems:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which a general desire for self-defense is sufficient to obtain a [permit.] . . . [I]t appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens. And they likewise appear to contain only narrow, objective, and definite standards guiding licensing officials, . . . rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion[.]

142 S. Ct. at 2138 n.9 (quotation marks and citations omitted). Measure 114 provides for precisely what *Bruen* allows. It:

1. Requires a person to present a permit to acquire a firearm;

2. Requires the person to pass background check to obtain the permit;

3. Requires the person to provide fingerprints to OSP for its use in the background check;

4. Requires the person to complete a firearm safety course;

5. Requires the person to pay a fee, capped at $65; and

6. Requires law enforcement to determine whether there are reasonable grounds to conclude that the applicant's mental state or behavioral history makes the applicant a risk to self, others, or the community.

As this Court correctly ruled, "Measure 114's permit-to-purchase requirements track squarely with the objective regime outlined in *Bruen*: they require applicants to undergo a background check, fingerprinting, a mental health check, and training in firearms." (TRO Order at 32.) In their supplemental briefing, plaintiffs offer several responses to the Court's preliminary conclusion. None is availing.

### 1. *Bruen* expressly allows states to enact shall-issue permit regimes.

*Bruen* expressly allows states to enact shall-issue permit regimes that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." 142 S. Ct. at 2138 n.9 (quotation marks and citations omitted). Plaintiffs wrongly contend that the Court should disregard *Bruen*'s express words and, instead, determine whether Measure 114's permit requirement "is consistent with this Nation's historical tradition of firearm regulation." (*Eyre* Supp. Mem. at 14 (quoting *Bruen*).) But *Bruen* and its predecessor, *Heller*, have already determined that permit requirements are constitutional.

In *Heller*, the Supreme Court invalidated a District of Columbia law that prohibited the possession of handguns, either at home or in public. 554 U.S. at 574. In doing so, the Supreme Court held that the Second Amendment historically protected "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. But the Court also stated that its opinion did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id.* at 626.

In *Bruen*, the Supreme Court confirmed that firearm permits do not violate the Second Amendment because they are consistent with the historic tradition of limiting firearm usage to "law-abiding, responsible" citizens. 142 S. Ct. at 2138 n.9. Justice Kavanaugh, joined by Chief Justice Roberts, in a concurrence emphasized that shall-issue permit programs are constitutional: "[T]he Court's decision does not prohibit States from imposing licensing requirements for

carrying a handgun for self-defense." *Id.* at 2161 (Kavanaugh, J., concurring). Justice Kavanaugh explained that "43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162. And he reiterated that, "shall-issue licensing regimes are constitutionally permissible." *Id.* As such, this Court need not determine whether permit requirements are consistent with the nation's historical tradition; the Supreme Court has already clearly stated that they are.

Plaintiffs also unconvincingly argue that Measure 114's permit requirement is unconstitutional because it implicates a person's right to keep arms, while the concealed carry licensing requirements discussed in *Bruen* implicate the right to bear arms. (*Eyre* Supp. Mem. at 15-16.) But the Supreme Court has not established different tests for keeping and bearing arms and plaintiffs offer no reason why the distinction is constitutionally meaningful. Clayton Cramer, a witness for plaintiffs, testified that licenses to "possess" and "carry" firearms were "scarce" before 1868. (First Decl. of Clayton Cramer (Permit System) at 9 (ECF 74).) But if plaintiffs are correct that the absence of permits and background checks at the founding barred them today, that would necessarily mean that permit requirements for the concealed carrying of firearms are unconstitutional as well, a proposition the *Bruen* Court explicitly rejected. As the *Heller* Court made clear, the Second Amendment does not forbid "longstanding prohibitions on the *possession* of firearms by felons and the mentally ill." 554 U.S. at 626 (emphasis added). Permit requirements are constitutional under *Bruen* and *Heller*.

2.   **Measure 114's mental-health-review provision is consistent with** *Heller* **and** *Bruen*.

Measure 114's mental-health-review provisions also comport with the Second

Amendment.[7]  Plaintiffs argue that once a criminal background check confirms that a person is

"law-abiding," it is unconstitutional to require any further assessment of whether it is safe to

allow an individual to possess a firearm.  (*Eyre* Supp. Mem. at 10-11 (stating that Measure 114 is

unconstitutional because it would "deny *law-abiding citizens* a permit" (emphasis in original)).

Plaintiffs are mistaken.

The Second Amendment protects "the right of law-abiding, *responsible* citizens" to keep

and use arms.  *Bruen*, 142 S. Ct. at 2118 (*quoting Heller*, 554 U.S. at 635) (emphasis added).  All

three of the Supreme Court's major Second Amendment decisions since 2008 note that

governments may prohibit persons suffering from mental illness from possessing firearms.

*Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill"); *Bruen*, 142 S. Ct. at

2162 (Kavanaugh, J. concurring) (reemphasizing *Heller*'s circumspection regarding "felons and

the mentally ill"); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (same).

Measure 114's mental-health review is an objective inquiry permissible under *Heller* and

*Bruen*.  Measure 114 states that a person "is qualified" to obtain a permit-to-purchase if, among

other things, the person:

> Does not present reasonable grounds for a permit agent to
> conclude that the applicant has been or is reasonably likely to be a
> danger to self or others, or to the community at large, as a result of
> the applicant's mental or psychological state or as demonstrated by
> the applicant's past pattern of behavior involving unlawful
> violence or threats of unlawful violence.[8]

---

[7] Measure 114 § 4(1)(a)(C).

[8] Measure 114 § 4(1)(b)(C).

Consistent with *Bruen*, the permit agent then "shall issue" a permit if the applicant is so qualified.

This is not a "pure judgment call" that subjects Second Amendment rights to "the whims of government officials." (*Eyre* Supp. Mem. at 1, 3.) The permit agent must have "reasonable grounds" to believe that the person is "a danger to self or others." The permit agent must explain the reasons for a denial in writing, and an applicant can immediately pursue an expedited appeal of any denial in Oregon Circuit Court. (Measure 114 § 5(8).) On appeal, the circuit court reviews *de novo* the evidence on which the permit agent relied in denying the application and any countervailing evidence offered by the applicant to determine if the denial was appropriate. (*Id.* § 5(10)); *cf. Concealed Handgun License for Stanley v. Myers*, 276 Or. App. 321, 332 (2016) (describing evidence and procedure for appeal of denial of concealed handgun license under identical mental-health grounds).

Measure 114's mental-health review provision is substantively identical to Oregon's concealed carry licensing statute's mental-health-review provision. *See* Or. Rev. Stat. § 166.293(2) (providing basis for revocation). *Bruen* cited Oregon's concealed carry statute as an example of a "'shall-issue' licensing regime[]" that does "not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." 142 S. Ct. at 2138 n.9 (quotation marks omitted); *see id*. at 2123 n.1 (citing Oregon law). Similarly, like Oregon, concealed carry statutes in Missouri, Montana, North Dakota, and Wyoming all allow for permit denial if a permit agent reviews available evidence and forms a "reasonable" belief

that the applicant is a danger to himself or others.[9]  The *Bruen* Court endorsed each of these statutes as permissible as well.  *Id*.

By contrast, plaintiffs do not cite, and defendants have not found, a single case striking down a similar mental-health-review provision as facially unconstitutional.  Instead, federal courts uphold mental health reviews by permit agents against Second Amendment challenges, even in states with more broadly worded statutes.  *See Kuck v. Danaher*, 822 F. Supp. 2d 109, 128 (D. Conn. 2011) (upholding statute that required permitting agent to determine whether applicant was "suitable" to carry a handgun in public); *White v. Illinois State Police*, 482 F. Supp. 3d 752, 764-65 (N.D. Ill. 2020), *aff'd as modified*, 15 F.4th 801 (7th Cir. 2021) (upholding statute that required permitting agent to determine whether concealed-carry applicant "pose[d] a danger"); *see also Bruen*, 142 S. Ct. at 2123 n.1, 2138 n.9 (endorsing constitutionality of the Connecticut and Illinois statutes upheld in *Kuck* and *White*).  In sum, the mental-health review provision in Measure 114 is not a "pure judgment call":  It is the type of objective inquiry explicitly endorsed in *Bruen*.

---

[9] See, Mo. Ann. Stat. § 571.101(2)(7) (requiring license to issue if applicant has "not engaged in a pattern of behavior, documented in public or closed records, that causes the sheriff to have a *reasonable belief* that the applicant presents a danger to himself or others") (emphasis added); Mont. Code Ann. § 45-8-321(2) ("The sheriff may deny an applicant a permit to carry a concealed weapon if the sheriff has *reasonable cause* to believe that the applicant is mentally ill, mentally disordered, or mentally disabled or otherwise may be a threat to the peace and good order of the community . . . .") (emphasis added); N.D. Cent. Code Ann. § 62.1-04-03 (West) ("The bureau may deny approval for a license if the bureau has reasonable cause to believe that the applicant or license holder has been or is a danger to self or others as demonstrated by evidence . . . ."); Wyo. Stat. Ann. § 6-8-104 ("The written report shall . . . establish reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state, as demonstrated by a past pattern or practice of behavior, or participation in incidents involving a controlled substance, alcohol abuse, violence or threats of violence as these incidents relate to criteria listed in this section.").

### 3.    Measure 114 does not impose unconstitutional delays.

Contrary to plaintiffs' assertion, Measure 114 does not impose an unconstitutional delay to obtain a firearm.  In *Bruen*, the Supreme Court recognized that a shall-issue permitting scheme could be unconstitutional if it subjected applicants to "lengthy wait times" or "exorbitant fees." 142 S. Ct. at 2138 n.9.  Plaintiffs assert that Measure 114's permit-to-purchase requirement is unconstitutional because "[d]elay is baked into the new regime at every turn."  (*Eyre* Supp. Mem. at 8, 17.)  But plaintiffs' argument is wrong: Measure 114 requires permit agents to render a decision within 30 days—a constitutionally permissible length of time—and provides applicants an avenue to challenge longer delays.

A "facial challenge is a claim that the legislature has violated the Constitution, meaning that the plaintiff must show that no set of circumstances exists under which the statute would be valid."  *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1203 (9th Cir. 2022) (internal quotation marks and citation omitted).  In determining whether the law is facially invalid, this Court must be careful not to go beyond Measure 114's facial requirements and speculate about "hypothetical" or "imaginary" cases.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008).

Measure 114 states that the permit agent "shall issue" a permit to any individual determined to be eligible "[w]ithin 30 days of receiving an application for a permit."[10]  There is nothing constitutionally unreasonable about setting an outer, 30-day limit within which a permit agent "shall issue" permits to qualified candidates.  As the Ninth Circuit has explained, wait times for firearm purchases are not constitutionally suspect, in large part because they were common at the founding:

---

[10] Measure 114 § 4(3)(a).

> There is. . . nothing new in having to wait for the delivery
> of a weapon. Before the age of superstores and superhighways,
> most folks could not expect to take possession of a firearm
> immediately upon deciding to purchase one. As a purely practical
> matter, delivery took time.  Our 18th and 19th century forebears
> knew nothing about electronic transmissions.

*Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016).  Furthermore, the Supreme Court has

countenanced similar wait times to exercise First Amendment rights.  *See Thomas v. Chi. Park

Dist.*, 534 U.S. 316, 324 (2002) (upholding a 28-day period to process application for permit to

hold rally in a public park).  A 30-day deadline by which to complete the permitting process

would not deny anyone their Second Amendment rights.

Plaintiffs further raise the specter of delay by positing unlikely hypotheticals.  Plaintiffs

speculate that rogue permit agents will intentionally "sit on the application" for the full 30 days

"on a whim," even for clearly eligible applicants.  (*Eyre* Supp. Mem. at 17.)  This assumption

that public officials will act capriciously ignores the pertinent analytical inquiry and is not a

proper basis for striking down a facially constitutional statute.  Plaintiffs also contend that

Oregon law provides "no mechanism to impel OSP to act" and, thus, OSP could delay

background checks "indefinitely."  But Measure 114 provides that "[i]f no decision is issued [on

a permit application] within 30 days, the person may seek review" from a circuit court.

(Measure 114 § 5(1).)

Finally, plaintiffs contend that requiring a background check both to acquire a permit and

to purchase a firearm is "duplicative" and, therefore, facially invalid.  (*Eyre* Supp. Mem. at 19.)

Not so.  The permit remains valid for five years; a second background check at the point of

purchase thus determines whether a disqualifying event has occurred in the intervening time

since the purchaser acquired their permit.  The Ninth Circuit upheld that exact scheme in

*Silvester*, 843 F.3d at 818, where a California statute required both a permit-to-purchase, which

**Page 27 - DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI*
PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

included an initial background check, and then a subsequent background check at the point of purchase.[11]  *Id.*

**F.    Once law enforcement is prepared to certify instructors for the in-person demonstration component of Measure 114's training requirement, plaintiffs' as-applied challenge to the implementation of Measure 114's permitting requirement will fail.**

Defendants have requested, and the Court has granted, a temporary stay of enforcement of Measure 114's permitting requirement, running through March 7, 2023.  (Defs.' Mot. to Continue Postponement (ECF 69); Order (ECF 70).)  Defendants stated in their motion requesting a stay of enforcement that "[l]aw enforcement agencies have not yet certified instructors for the in-person demonstration component of the firearms safety course that is required for individuals to obtain a permit."  (Defs.' Mot. to Continue Postponement at 6.)  Within a reasonable time after law enforcement agencies certify instructors, however, defendants will be prepared to implement and enforce Measure 114's permitting requirement.  Accordingly, plaintiffs' as-applied challenges will fail.

Three of the four consolidated cases raise as-applied challenges to the implementation of Measure 114.  The *Eyre* and *Oregon Firearms* plaintiffs contend that Measure 114 cannot be implemented because "Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme[.]"  (*Eyre* Supp. Mem. at 20; *Oregon Firearms* Second Am. Compl. ¶ 138 (ECF 68).)  Because their argument is grounded on the State's alleged inability to administer the permitting requirement under the current circumstances, not the text of Measure 114, it is an as-applied challenge.  *See Calvary Chapel Bible Fellowship v. Cnty. of Riverside,*

---

[11] Plaintiffs also assert that it is unconstitutional to require them to pay for firearms training.  But as long as the underlying requirement is constitutional, shifting the cost of compliance to plaintiffs is also constitutional.  *See Kwong v. Bloomberg*, 723 F.3d 160, 165-66 (2d Cir. 2013) (upholding $340 handgun license fee).

948 F.3d 1172, 1177 (9th Cir. 2020) ("[W]hen reviewing a facial challenge, we are limited to reviewing the text of the ordinance itself…. How the statute has been interpreted and applied by local officials is the province of an as-applied challenge[.]"). The *Azzopardi* plaintiffs assert only an as-applied challenge, similarly arguing that "implementation problems" will make it "a certain violation of Plaintiffs' Second Amendment rights if the permit-to-purchase system is allowed to go into effect." (*Azzopardi* Supp. Mem. at 3-4 (ECF 82).)

Measure 114's permitting provisions require state and local officials to each perform functions to process and issue permits. OSP runs background checks. Sheriffs or police chiefs—"permit agents"—provide and collect applications, take photographs and fingerprints, and determine whether applicants are "reasonably likely to be a danger to self or others, or to the community at large."

OSP is prepared to implement its functions under Measure 114. (Decl. of Commander Rebecca ("David Decl.") ¶ 3.) As plaintiffs point out, it is true that the Federal Bureau of Investigation ("FBI") has stated that it will not process fingerprint background checks from OSP for permits due to certain federal statutory requirements. (*Id.* ¶ 7.) But that does not present an impediment to implementing Measure 114. If OSP's background check, including a search of the applicant's fingerprints in an Oregon database, finds no disqualifiers, OSP will report back that fact to the permit agent. (*Id.* ¶ 8.) The FBI's determination that it cannot process fingerprint background checks—federal agency action that Oregon voters do not have the authority to compel—is not a basis for permit agents to refuse to issue permits.[12]

---

[12] Measure 114 requires permit agents to request that OSP conduct a background check, including requesting the FBI conduct a fingerprint-based background check. (Measure 114 § 4(1)(e).) OSP must then determine whether the applicant is qualified to acquire a firearm. (*Id.* §§ 4(1)(b)(A).) Finally, OSP must report its determination to the permit agent, including the outcome of the FBI's fingerprint-based criminal background check. (*Id.*) OSP's plan complies with Measure 114's requirements. It also provides permit agents sufficient information to issue permits. Permit agents "shall issue" a permit if an applicant "successfully complet[es]" a

OSP's other functions are ready.  It has created an application form for local law enforcement to use.  (*Id.* ¶ 3.)  OSP can receive completed applications collected by local law enforcement by fax or United States Mail.  (*Id.*)  Although OSP's electronic fingerprint transmission system is not yet operational for permit applications, OSP expects that it will be ready before March 8.  (*Id.* ¶ 4.)  Furthermore, the electronic transmission system is not necessary to process applications: OSP can receive fingerprints on fingerprint cards through the United States mail.  (*Id.* ¶ 5.)  Once OSP receives applications, it will run background checks on applicants using existing state and federal systems.  (*Id.* ¶ 6.)

Local law enforcement will also be able to issue permits after they certify instructors for the in-person demonstration component.  Kevin Campbell, Executive Director of the Oregon Association of Chiefs of Police ("OACP"), was clear in deposition that his members will implement Measure 114: "When a law is passed, we implement the law."  (Dodd Decl. Ex. 7, 1/17/23 Campbell Dep. at 16:4).)  In fact, other than the FBI fingerprinting issue, Mr. Campbell could not identify any other "legal obstacle to implementing" Measure 114.  (*Id.* at 32:12-13; Dodd Decl. Ex. 8, 2/1/23 Myers Dep. at 75:24-76:1 (identifying fingerprint issue as only legal impediment).)  Although Mr. Campbell testified that some police departments could face resources challenges, he was not aware of any particular police department that would flatly refuse to implement Measure 114.  (Dodd Decl. Ex. 7, Campbell Dep. at 104:13-14.)

---

background check to obtain a permit.  (*Id.* §§ 4(1)(b)(A); 4(3)(a).)  If OSP determines that an applicant passes its background checks, and reports that determination, along with the FBI's refusal to conduct a check, to the permit agent, the permit agent should issue the permit.  The FBI's refusal to conduct a fingerprint background check does not disqualify an applicant from obtaining a permit, it simply means that background check was not used.  To interpret "successfully complet[e]" to require OSP to obtain the results from a background check system controlled by a federal entity that refuses to run the check would render the statute a nullity.  Oregon law does not allow such interpretations.  *See Int'l Bhd. of Elec. Workers Loc. No. 48 v. Oregon Steel Mills, Inc.*, 168 Or. App. 101, 106 (2000) ("Settled principles of statutory construction counsel against" an interpretation that makes a statutory provision a nullity).

Sheriff Jason Myers, Executive Director of the Oregon State Sheriffs Association ("OSSA") testified that a joint OSSA-OACP workgroup developing a "process map" for implementing Measure 114 at the local level was "very close to finishing their work product." (*Id.* at Tr. 31:22-32:2.) When their work is finished, the workgroup will present a recommendation to OSSA and OACP leadership "as soon as possible." (*Id.* at 39:18-20.) Another OSSA-OACP workgroup focusing on plans to certify instructors for the in-person demonstration component "has finalized their work product" and is "very close" to making its recommendation to OSSA and OACP leadership. (*Id.* at 45:18-21.) OSSA and OACP will vote on the workgroup recommendations and, if approved, promulgate them to their member departments for implementation. (*Id.* at 54:24-55:4.) Individual departments will then make decisions about certifying instructors. (*Id.* at 55:5-9.) OSSA and OACP will also provide technical assistance, education, training, and technical assistance to departments to implement Measure 114. (*Id.* at 41:4-10.)

Defendants will continue to advise the Court of the status of implementation, including progress towards certifying instructors for the in-person demonstration component of Measure 114's training requirement. But following a reasonable period after instructors are certified, state and local officials will be prepared to issue permits and enforce Measure 114. Accordingly, plaintiffs are unlikely to succeed on the merits of their argument that the State's implementation of Measure 114 will inevitably violate their Second Amendment and Due Process rights.

## II.      The remaining factors militate against granting a preliminary injunction.

Because plaintiffs have not shown likelihood of success on the merits, this Court should deny their motions for preliminary injunction. To receive a preliminary injunction, plaintiffs must also demonstrate that they are likely to suffer irreparable harm in the absence of

preliminary relief and that an injunction is in the public interest. *Short*, 893 F.3d at 675 (citing *Winter*, 555 U.S. at 20). Plaintiffs cannot make this showing, either.

### A.    Plaintiffs have not shown irreparable harm.

Plaintiffs argue they will suffer irreparable harm, because "[t]he injuries Measure 114 will inflict are irreparable by definition." (*Eyre* Supp. Mem. at 33.) But that argument fails because plaintiffs are unlikely to succeed on the merits of their constitutional claims. *See Associated Gen. Contractors of Cal., Inc.*, 950 F.2d at 1412; *see also Jackson*, 746 F.3d at 970 (affirming denial of preliminary injunction because Second Amendment claim was unlikely to succeed without considering other preliminary injunction factors); *S.F. Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997, 1006 (N.D. Cal. 2014) ("'serious questions' do not translate to a violation severe enough to trigger a presumption of irreparable harm").

In addition, plaintiffs do not offer evidence that they will suffer an injury absent an injunction. The "irreparable harm" standard must be satisfied with evidence, not unsubstantiated allegations. *See, e.g.*, *Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990) (denying injunctive relief where movant "offer[ed] no evidence to support his allegations of irreparable harm"). Plaintiffs have not submitted evidence that they intend to purchase firearms while this case is pending. Nor have plaintiffs submitted evidence that they intend to acquire new LCMs after Measure 114 goes into effect or, further, to use existing LCMs in ways barred by Measure 114. Three individual plaintiffs in *Oregon Firearms*, for example, submitted nearly identical declarations testifying that they already own LCMs and would like to "retain possession of them." (Decls. of Adam Johnson, Brad Lohrey, and Kevin Starrett (ECFs 6-8).) But as this Court already found, Measure 114 permits LCM-owners to keep them. Thus, plaintiffs have not demonstrated any deprivation of their constitutional rights.

**Page 32 - DEFENDANTS' RESPONSE TO THE *OFF*, *FITZ*, *EYRE*, AND *AZZOPARDI* PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

Two plaintiffs run gun stores and testified that they will suffer lost revenue from
magazine sales if their customers cannot purchase LCMs.  (Decl. of Adam Braatz ¶¶ 9-12, (*Eyre*
ECF 6); Decl. of Matthew French ¶¶ 13-16, (*Eyre* ECF 7).)  But lost revenue from sales is not a
Second Amendment violation.  *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 686-87 (9th Cir.
2017) ("[N]o historical authority suggests that the Second Amendment protects an individual's
right to *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms.") (emphasis
in original).

At most, these gun store owners have testified that unnamed, future customers may
experience a constitutional violation.  But the irreparable harm inquiry looks to the irreparable
harm to *plaintiffs*, not absent third-parties.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803, 822 (9th Cir. 2018) ("Plaintiffs seeking injunctive relief must show that they
themselves are likely to suffer irreparable harm absent an injunction."); *see also Phany Poeng v.
United States*, 167 F. Supp. 2d 1136, 1142 (S.D. Cal. 2001) (holding that store owner could not
base irreparable harm analysis on harm to customers).  The gun store owners have not alleged
that Measure 114 violates *their* constitutional rights.

### B.    The balance of the hardships does not favor an injunction.

The balance of hardships tips in the State's favor.  When the government is a party, the
public interest factor merges with the consideration of the balance of the equites.  *Drakes Bay
Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  "To determine which way the
balance of the hardships tips, a court must identify the possible harm caused by the preliminary
injunction against the possibility of the harm caused by not issuing it."  *Univ. of Haw. Prof'l
Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999).

On one side of the balance, the burden on plaintiffs' ability to engage in self-defense is
minimal.  Plaintiffs can continue to "keep and bear arms" while the Court decides the merits of

their claims.  They can continue to keep the LCMs they already own in their home and use them

outside the home for limited purposes.  They can also use their existing firearms with a

compliant magazine.  Their ability to lawfully defend themselves is not impaired even outside

the home: The National Rifle Association's database of the defensive uses of firearms between

January 2011 and May 2017 shows that more than 10 rounds are fired in 0.3% of such instances.

(Allen Decl. ¶ 10; *see also Duncan*, 19 F.4th at 1104.)  It is highly improbable that an LCM will

be necessary for plaintiffs to defend themselves.  "In assessing the balance of equities, those rare

occasions must be weighed against the more frequent and documented occasions when a mass

murderer with a gun holding eleven or more rounds empties the magazine and slaughters

innocents. One critical difference is that whereas the civilian defender rarely will exhaust the up-

to-ten magazine, the mass murderer has every intention of firing every round possible and will

exhaust the largest magazine available to him."  *S.F. Veteran Police Officers Ass'n*, 18 F. Supp.

3d at 1005 (emphasis omitted).

     On the other side of the balance, "a state suffers irreparable injury whenever an

enactment of its people or their representatives is enjoined."  *Coal. for Econ. Equity v.

Wilson,* 122 F.3d 718, 719 (9th Cir. 1997); *Maryland v. King*, 567 U.S. 1301 (2012).  Delay

particularly impedes the State's policy here because any firearms purchased before Measure 114

becomes effective can be retained, even by individuals who never obtain a permit-to-purchase.

And LCMs can be retained on an individuals' own property and in other settings.  Extending this

transition period for the length of the litigation would mean that tens of thousands more firearms

and magazines would be grandfathered.

     In addition, "[p]ublic safety should be considered by a court when granting equitable

relief."  *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1404 (9th Cir. 1993) (citing *Chalk v. United*

*States Dist. Court for the Cent. Dist. of Cal.*, 840 F.2d 701, 711 (9th Cir. 1988)).  In 2020, 593 Oregonians died by firearm.  (Decl. of Brian Marshall, Ex. 7, Oregon Health Authority's Oregon Vital Statistics 2020 Annual Report (ECF 17-7).)  Of the 80 shootings nationally since January 1, 1990, resulting in six or more victims killed, in which LCM use can be determined, 62 involved LCMs, resulting in 713 deaths.  (Klarevas Decl. ¶ 15.)  The average death toll for these incidents is 11.5 fatalities per shooting.  (*Id.*)  By contrast, the average death toll for the 18 incidents in which it was determined that LCMs were not used is 7.3 fatalities per shooting.  (*Id.*)  In the past 33 years, LCMs were used in 94% of all mass shootings resulting in more than 10 deaths and 100% of all mass shootings resulting in more than 15 deaths   (*Id.* ¶ 14.)

LCM bans and permit requirements protect public safety.  According to a review of the scientific literature, "state-level bans on large-capacity magazines . . . reduce both the incidence and severity of mass shootings."  (Decl. of Michael Siegel ¶ 33.)  Indeed, one study identified two policies associated with reductions in fatal mass shootings: LCM restrictions and permits to purchase.  (*Id.* ¶ 31.)  Furthermore, the scientific literature shows that "there is overwhelming evidence that state-level gun permitting laws are effective in reducing rates of firearm homicide."  (*Id.* ¶ 48.)  The equities disfavor a preliminary injunction that would forestall Oregon's effort to protect its people.  *Cf. Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1282 (N.D. Cal. 2014), *aff'd*, 779 F.3d 991 (9th Cir. 2015) ("[T]he risk that a major gun-related tragedy would occur is enough to at least balance out the inconvenience to Plaintiffs in disposing of their now-banned magazines.").

**CONCLUSION**

The Court should deny plaintiffs' motions for preliminary injunctions.

DATED this 6th day of February, 2023.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:    *s/ Harry B. Wilson*

Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Hannah K. Hoffman, OSB #183641
HannahHoffman@MarkowitzHerbold.com

*Special Assistant Attorney General for Defendants*

Brian Simmonds Marshall
brian.s.marshall@doj.state.or.us
*Of Attorney for Defendants*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(b)(2)

I certify that this brief complies with the applicable word-count limitation under L.R. 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,969 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

DATED this 6th day of February, 2023.

*s/ Harry B. Wilson*
Harry B. Wilson, OSB #077214
Special Assistant Attorney General for Defendants

1391927

**CERTIFICATE OF SERVICE**