# TARGETING GUNS
## *Firearms and Their Control*

Gary Kleck



ALDINE DE GRUYTER
New York

Ex. D - Klarevas Decl.
Page 1 of 4

tic weapons cannot be fully exploited in practice, reducing the effective difference between these weapons and revolvers.

Ordinary revolvers can easily fire six rounds in two seconds or less without any special skill on the part of the shooter or modification to the gun. Even if a semiautomatic gun could fire at a 50% higher rate, it would only mean that a shooter could fire six rounds in 1.33 instead of 2 seconds. The issue comes down to this: How many violent incidents occur each year in which a shooter has 1.33 seconds to fire six rounds, but not 2 seconds? Close examination of mass shootings may help shed some light on the significance of high rates of fire and large-capacity magazines, since these incidents involve unusually large numbers of rounds fired and wounded victims.

## Semiautomatic Guns and Mass Shootings

Mass shootings are extreme test cases because, if one were to argue that some victims are killed or wounded who would not have been hurt had the attacker been armed with some type of gun other than a semiautomatic or one with a smaller capacity magazine, mass shootings provide the strongest evidence for the significance of rapid rates of fire and large magazine capacities. James Fox and Jack Levin have specifically based a case for "banning rapid-fire weaponry and oversized ammunition clips" on mass shootings, asserting that "the increased availability of high-powered, rapid-fire weapons like those used by James Huberty is also a *large* part of the reason why the death tolls in mass murders have climbed so dramatically in the recent past" (1994:236, emphasis added).

Oddly enough, mass killings are actually *less* likely to involve the use of guns of any kind than homicides involving small numbers of victims. For all murders and nonnegligent manslaughters covered in *Supplementary Homicide Reports* (about 90% of all U.S. killings) for the period 1976 to 1992, only 48.3% of victims killed in incidents with four or more victims were killed with guns, compared to 62.3% of those killed in incidents with three or fewer victims. This is mainly due to the large share of mass killings committed with arson, which is rarely involved in ordinary homicides.

Nevertheless, it is possible that rapid-fire guns with large magazines might have been essential to some mass murders resulting in as many deaths and injuries as they did. Table 4.2 summarizes information derived from press reports on all fifteen mass shootings known to have occurred during the period of greatest popularity of AWs among criminals, 1984–1993 [cases derived from Duwe (1996) and press reports]. A "mass shooting" is defined here, somewhat arbitrarily, as an incident in which six or more victims were shot dead with a gun, or twelve or more total were

wounded. There is usually much less information available from press accounts about incidents involving fewer victims, and it would be harder to argue for the significance of large magazine capacity in connection with cases with fewer victims, and thus presumably fewer shots fired.

Of the fifteen mass shootings, no more than four involved weapons banned under any existing federal or state AW bans: the Gian Luigi Ferri case, which involved two Intratec DC9 pistols; the Joseph Wesbecker case, involving a gun loosely described as an "AK-47," which might fall within the banned category; the Patrick Purdy case, which involved a Model 56S variant of an AKM-47; and the James Huberty incident, which involved a semiautomatic Uzi carbine. In all four of these cases the killer was also armed with other, non-AW guns, and it is therefore not clear how many of the wounds were inflicted with AWs. For example, it is not known if any of Huberty's victims were killed with the Uzi because he also used an ordinary Browning pistol, which used the same caliber ammunition (9 mm) as the Uzi and at least half of the dead victims were killed with a shotgun. In eleven of the seventeen mass shootings, the killer was armed with multiple guns, and in at least five cases it was known that the killers reloaded their guns at least once (Ferguson, Hennard, Purdy, Sherril, and Huberty). Both of these facts support the assertion that in these cases the killer did not require a single gun with a large magazine to kill or wound so many people.

For those incidents where the number of rounds fired and the duration of the shooting were both reported, the rate of fire never was faster than about one round every two seconds, and was usually much slower than that. Witnesses commonly reported that the killers went about their deadly work in a "calm," "matter-of-fact," or "almost methodical" fashion, taking careful aim at victims and seemingly taking their time (e.g., *Los Angeles Times*, 19 July 1984, p. 1, 18 January 1989, p. 3; *Washington Post*, 15 September 1989, p. A1; *Houston Post*, 17 October 1991, p. A-1). For example, Joseph Wesbecker, who killed seven people and wounded seventeen over a period of thirty minutes, "showed extreme "shooting discipline," . . . firing directly at his human targets and taking few random shots" (*Louisville Courier Journal*, 15 September 1989). None of the mass killers maintained a sustained rate of fire that could not also have been maintained—even taking reloading time into account—with either multiple guns or with an ordinary six-shot revolver and the common loading devices known as "speedloaders." Further, there is no evidence that these killers could not have taken more time than they actually did.

Inflicting the number of casualties in even these extreme and rare cases did not require the large-capacity magazines and/or high rate of fire provided by either AWs or by semiautomatic guns in general. It therefore is highly unlikely that shootings with fewer rounds fired and fewer vic-

tims would require such capabilities. At this point, there is no empirical basis for believing that any wounds, fatal or nonfatal, are inflicted with semiautomatic guns that would not also have been inflicted had the shooters been armed instead with revolvers. Indeed, contrary to Fox and Levin's assertions, there is no evidence that even one death or injury in a mass shooting would have been averted had the killer been armed with guns, such as revolvers, with slower rates of fire or smaller magazines.

Fox and Levin were also mistaken in believing that the "death tolls in mass murders have climbed . . . dramatically in recent years." National *Supplementary Homicide Reports* data covering homicides for the period 1976–1992 indicate that there were seventeen gun homicide incidents with more than six victims, or one a year. It is of doubtful value to describe trends in such rare events, but there clearly was no upward trend in their rate. There were four such cases in each of 1982 and 1984, three in 1991, and zero or one in all other years. Further, the rate of killings with four or more victims was higher in 1976–1982, prior to the popularity of AWs, than in 1983–1992 (Fox 1994). Regardless of the numerical cutoff defining mass shootings, there was no increase in such incidents associated with the increased popularity of AWs after 1984.

### Assault Weapons and Killings of Police Officers

One big-city police official was quoted in the *Los Angeles Times* (25 May 1990) as saying "We're tired of passing out flags to the widows of officers killed by drug dealers with Uzis." Taken literally, the implied claim that many officers were killed by Uzi-wielding drug dealers was clearly false. According to the chief of the FBI's Uniform Crime Reporting Program, from 1980 when the Uzi was first imported into the United States, through 1989, not one police officer in the United States was killed by a drug dealer with an Uzi. Only one case in their files involved an officer killed with an Uzi under any circumstances, but this did not involve a drug dealer (letter from J. Harper Wilson, Chief, FBI Uniform Crime Reporting Program, 20 June 1990).

The police official's claim might, however, be interpreted to broadly refer to all AWs rather than just Uzis, and all criminals, not just drug dealers. For the ten-year period 1980–1989, of 810 officers feloniously killed in the United States and its territories, 33 (4%) were killed by "assault weapon" models covered by federal restrictions either passed or pending as of January 1991, or about three per year for the entire nation. For 1986–1990, of 350 killings, sixteen involved rifles and three involved handguns covered under such restrictions (U.S. Congressional Research Service 1992:11). Thus, 5% involved any kind of AW, averaging less than