Downloaded from https://journals.lww.com/jtrauma by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IIQrHD3XGJuJSDa6kLweJRC9c6lO0Wh8PO+b+Y2WHykD5qYRY= on 01/07/2019

# Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data

Charles DiMaggio, PhD, MPH, Jacob Avraham, MD, Cherisse Berry, MD, Marko Bukur, MD, Justin Feldman, ScD, Michael Klein, MD, Noor Shah, MD, Manish Tandon, MD, and Spiros Frangos, MD, MPH, New York, New York

## AAST Continuing Medical Education Article

### Accreditation Statement
This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education through the joint providership of the American College of Surgeons and the American Association for the Surgery of Trauma. The American College Surgeons is accredited by the ACCME to provide continuing medical education for physicians.

### AMA PRA Category 1 Credits™
The American College of Surgeons designates this journal-based CME activity for a maximum of 1 *AMA PRA Category 1 Credit™*. Physicians should claim only the credit commensurate with the extent of their participation in the activity.

Of the *AMA PRA Category 1 Credit™* listed above, a maximum of 1 credit meets the requirements for self-assessment.

### Credits can only be claimed online



AMERICAN COLLEGE OF SURGEONS
Inspiring Quality:
Highest Standards, Better Outcomes
100+ years

### Objectives
After reading the featured articles published in the *Journal of Trauma and Acute Care Surgery*, participants should be able to demonstrate increased understanding of the material specific to the article. Objectives for each article are featured at the beginning of each article and online. Test questions are at the end of the article, with a critique and specific location in the article referencing the question topic.

### Claiming Credit
To claim credit, please visit the AAST website at http://www.aast.org/ and click on the "e-Learning/MOC" tab. You must read the article, successfully complete the post-test and evaluation. Your CME certificate will be available immediately upon receiving a passing score of 75% or higher on the post-test. Post-tests receiving a score of below 75% will require a retake of the test to receive credit.

### System Requirements
The system requirements are as follows: Adobe® Reader 7.0 or above installed; Internet Explorer® 7 and above; Firefox® 3.0 and above, Chrome® 8.0 and above, or Safari™ 4.0 and above.

### Questions
If you have any questions, please contact AAST at 800-789-4006. Paper test and evaluations will not be accepted.

### Disclosure Information
In accordance with the ACCME Accreditation Criteria, the American College of Surgeons, as the accredited provider of this journal activity, must ensure that anyone in a position to control the content of *J Trauma Acute Care Surg* articles selected for CME credit has disclosed all relevant financial relationships with any commercial interest. Disclosure forms are completed by the editorial staff, associate editors, reviewers, and all authors. The ACCME defines a `commercial interest' as "any entity producing, marketing, re-selling, or distributing health care goods or services consumed by, or used on, patients." "Relevant" financial relationships are those (in any amount) that may create a conflict of interest and occur within the 12'months preceding and during the time that the individual is engaged in writing the article. All reported conflicts are thoroughly managed in order to ensure any potential bias within the content is eliminated. However, if you'perceive a bias within the article, please report the circumstances on the evaluation form.

Please note we have advised the authors that it is their responsibility to disclose within the article if they are describing the use of a device, product, or drug that is not FDA approved or the off-label use of an approved device, product, or drug or unapproved usage.

### Disclosures of Significant Relationships with Relevant Commercial Companies/Organizations by the Editorial Staff
Ernest E. Moore, Editor: PI, research support and shared U.S. patents Haemonetics; PI, research support, Instrumentation Laboratory, Inc.; Co-founder, Thrombo Therapeutics. Associate Editors David Hoyt, Ronald V. Maier and Steven Shackford have nothing to disclose. Editorial staff and Angela Sauaia have nothing to disclose.

### Author Disclosures
The authors have nothing to disclose.

### Reviewer Disclosures
The reviewers have nothing to disclose.

### Cost
For AAST members and *Journal of Trauma and Acute Care Surgery* subscribers there is no charge to participate in this activity. For those who are not a member or subscriber, the cost for each credit is $25.

From the Department of Surgery, Division of Trauma and Critical Care Surgery (C.D., J.A., C.B., M.B., J.F., M.K., N.S., M.T., S.F.), New York University School of Medicine, New York, New York.

Address for reprints: Charles DiMaggio, PhD, MPH, Department of Surgery, New York University School of Medicine, 462 First Ave, NBV 15, New York, NY 10016-9196; email: Charles.DiMaggio@nyumc.org.

77th Annual Meeting of AAST and the World Trauma Congress, Sep 26 - 29, 2018, San Diego, California.

DOI: 10.1097/TA.0000000000002060

*J Trauma Acute Care Surg*
Volume 86, Number 1

Ex. K - Klarevas Decl.
Page 1 of 9
Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

DiMaggio et al.

| | |
|---|---|
| **BACKGROUND:** | A federal assault weapons ban has been proposed as a way to reduce mass shootings in the United States. The Federal Assault Weapons Ban of 1994 made the manufacture and civilian use of a defined set of automatic and semiautomatic weapons and large capacity magazines illegal. The ban expired in 2004. The period from 1994 to 2004 serves as a single-arm pre-post observational study to assess the effectiveness of this policy intervention. |
| **METHODS:** | Mass shooting data for 1981 to 2017 were obtained from three well-documented, referenced, and open-source sets of data, based on media reports. We calculated the yearly rates of mass shooting fatalities as a proportion of total firearm homicide deaths and per US population. We compared the 1994 to 2004 federal ban period to non-ban periods, using simple linear regression models for rates and a Poison model for counts with a year variable to control for trend. The relative effects of the ban period were estimated with odds ratios. |
| **RESULTS:** | Assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8–88.9) in 44 mass-shooting incidents. Mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides (coefficient for year, 0.7; $p = 0.0003$), with increment in year alone capturing over a third of the overall variance in the data (adjusted $R^2 = 0.3$). In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides ($p = 0.03$). Mass-shooting fatalities were 70% less likely to occur during the federal ban period (relative rate, 0.30; 95% confidence interval, 0.22–0.39). |
| **CONCLUSION:** | Mass-shooting related homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004. (*J Trauma Acute Care Surg.* 2019;86: 11–19. Copyright © 2018 American Association for the Surgery of Trauma.) |
| **LEVEL OF EVIDENCE:** | Observational, level II/IV. |
| **KEY WORDS:** | Firearms; mass-shootings; assault weapons; epidemiology. |

Increases in firearm-related injuries, particularly mass-shooting related fatalities, in the United States have contributed to a polarizing and sometimes contentious debate over gun ownership and limiting weapons characterized as assault weapons.[1,2] Despite the increasing sense that there is an epidemic of indiscriminate firearm violence in our schools and public spaces, there is a paucity of public health evidence on the topic. Among a number of recommendations, a federal Assault Weapons Ban (AWB) has been proposed as a way to prevent and control mass shootings in the United States. In this article, we assess evidence for the effectiveness of such a ban in preventing or controlling mass-shooting homicides in the United States.

While mass shootings occur in other industrialized nations, the United States is particularly prone to these crimes. In a recent 30-year period, the United States had double the number of mass-shooting incidents than the next 24 industrialized nations combined.[3] Any public perception of recent increases in the number of these events is borne out by analysis of available data.[4] By one measure, there have been more deaths due to mass shootings in the United States in the past 18 years than in the entire 20th century.[5] While there is some debate about the role of mental illness in mass shootings,[6–8] many high-profile recent mass shootings (Aurora, CO; Roseburg, OR; San Bernadino, CA; Newtown, CT; Orlando; Las Vegas; Sutherland Springs, TX) have been characterized by the use of semiautomatic assault rifles,[9] leading some to advocate for restrictions on the manufacture and sale of these weapons.

While survey results indicate that researchers in criminology, law and public health rank an assault weapons ban as one of the most effective measures to prevent mass shootings, and that 67% of the US general population support such a ban,[10] the existing evidence on banning assault weapons is scant and sometimes contradictory. Most evidence is related to the Federal AWB of 1994, which made illegal the manufacture and use by civilians of a defined set of automatic and semiautomatic weapons and large capacity magazines. Formally known as "The Public Safety and Recreational Firearms Use Protection Act", the AWB was part of the broader "Violent Crime Control and Law Enforcement Act of 1994. The ban lasted 10 years, expiring in 2004 when the US Congress declined to renew it.

In a study soon following the implementation of the 1994 ban, researchers reported a 55% decrease in the recovery of assault weapons by the Baltimore City Police in the first 6 months of 1995, indicating a statistically significant 29 fewer such firearms in the population.[11] In a 2009 study based on ICD9 external cause of injury codes for patients younger than 18 years in the United States, 11 states with assault and large-capacity magazine bans, as well as other firearm laws, were compared with 33 states without such restrictions. The incidence of firearm injuries per 1,000 total traumatic injuries was significantly lower in states with restrictive laws, 2.2 compared with 5.9.[12] In contrast, a comprehensive 2001 evaluation of the AWB itself concluded that there was "no evidence of reductions in multiple-victim gun homicides or multiple-gunshot wound victimizations". The authors cautioned their results should be "interpreted cautiously" because of the short period since the ban's inception, and that future assessments were warranted.[13] More recent studies, while not primarily addressing the US Federal AWB have found results generally consistent with its effectiveness in preventing mass-shooting fatalities.[14,15]

We believe sufficient time has passed and enough data have accumulated to treat the period from 1994 to 2004 as a naturalistic pre-post observational comparison period for the association of the AWB with changes in mass-shootings in the United States. Because there is no authoritative source or registry, or even a widely agreed upon definition for these incidents, we obtained data from three open source references and restricted our analyses to only those incidents confirmed by all three sources. We assess evidence for the potential effectiveness of such a ban in preventing and controlling mass-shooting homicides in the United States. We hypothesized that the implementation of the Federal AWB contributed to a reduction in mass shooting deaths as measured by the number and rate of mass shooting fatalities before, during, and after the federal AWB.

## METHODS

Mass incident shooting data were obtained from three independent, well-documented and referenced online sources: Mother Jones Magazine, the Los Angeles Times and Stanford

© 2018 American Association for the Surgery of Trauma.

Ex. K - Klarevas Decl.
Page 2 of 9

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

University.[16–18] These sources have each been the basis for a number of previous studies.[19–26] Data from the three online open-source references were combined. Analyses were restricted to incidents reported by all three sources. Entries were further restricted to those for which four or more fatalities (not including the shooter) were reported, which meets the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Yearly homicide data were obtained from the US Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) an online database of fatal and nonfatal injury.[29] Because 2017 data were not yet available in the WISQARS system, data for firearm-related homicide data for that year were obtained from a separate online source.[30]

A variable was created to indicate the 1994 to 2004 period as the federal ban period. We attempted to identify incidents involving assault weapons. An assault weapon has been defined as semiautomatic rifle that incorporates military-style features such as pistol grips, folding stocks, and high-capacity detachable magazines.[31] In this study, assault weapons were identified using the text search terms "AK," "AR," "MCX," "assault," "assault," or "semiautomatic" in a text field for weapon details. These terms were based on descriptions of the federal assault ban legislative language.[32] The total number of mass shooting fatalities and injuries were aggregated by year and merged with the yearly firearm homicide data.

The rate of mass shooting fatalities per 10,000 firearm homicide deaths was calculated. For the years covered by the data sources, we calculated (1) the total and yearly number of mass-shooting incidents that met the strictest criteria and were confirmed by all three sources, (2) the number of all weapon (assault and nonassault weapons) mass-shooting fatalities, and (3) the case-fatality ratio of all-weapon mass-shooting fatalities per 100 total mass-shooting fatalities and injuries. The yearly case-fatality ratio was plotted with overlying Loess line for trend and standard error limits. We also plotted the yearly rate of mass shooting fatalities per 10,000 firearm-related homicides with an overlying simple linear model with year as the predictor for (1) the total period, and (2) for preban, ban, and postban periods.

We evaluated assumptions of normality and linearity of the data using graphical methods such as density plots and Q-Q normal plots as well as summary statistics. We tested the hypothesis that the federal ban period was associated with a decrease in the number and rate of mass-shooting fatalities in the United States with a multiple linear regression model, with total homicide-based mass-shooting fatality rate as the outcome variable, a dichotomous indicator variable for the federal ban period as the predictor variable, and year as a control variable for trend over time. We calculated the relative risk of mass shooting fatalities during the federal ban period compared to nonban periods by using the "epitab" function of the R "epitools" package. This estimate is based on the ratio of the fatality rate during the ban period divided by the fatality rate during the nonban period. All results are presented with two-sided $p$ values with a significance level of 0.05 and/or 95% confidence intervals (CI). We conducted subgroup analysis with data restricted to incidents in which an assault-type weapon was explicitly noted.

We conducted analyses to test the sensitivity of our results to the choice of denominator with linear regression models controlling for trend with yearly rates based on (1) CDC WISQARS homicide data ending in 2016, (2) extrapolated CDC WISQARS homicide data for 2017, and (3) population denominator-based rates. We tested the robustness of our underlying modeling assumptions with an alternate mixed-effects generalized linear model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion.

The study was determined to be exempt as nonidentifiable data. The study data and analytic code are available for download at http://www.injuryepi.org/styled-2/.

## RESULTS

The three data sources listed incidents ranging in number from 51 (LA Times) to 335 (Stanford) and in dates from 1966 (Stanford) to 2018 (LA Times). There were a total of 51 reported cases of mass shootings between 1981 and 2017 confirmed by all three sources. Forty-four of these incidents met the strictest criteria for mass shootings (4 or more killed), totaling 501 all-weapon fatalities. In total 1,460 persons were injured or killed over the 37-year period, for a total case-fatality ratio of 34.3% (95% CI, 31.9–36.8). The overall rate of mass shooting fatalities per 10,000 firearm-related homicides was 10.2 (95% CI, 9.4–11.2). There was an increase in the all-weapon yearly number of mass-shooting fatalities in the United States during the study period, (Fig. 1) and evidence of a decrease in case fatality in the post-2010 period (Fig. 2). Incidents in which weapons were characterized as assault rifles accounted for 430 or 85.8% of mass-shooting fatalities (95% CI, 82.8–88.9). Weapons characterized as assault rifles accounted for *all* mass-shooting fatalities in 15 (62.5%) of the 24 (95% CI, 42.6–78.9) years for which a mass-shooting incident was reported, accounting for a total of 230 fatalities in those years.

Between 1981 and 2017, mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides, with increment in year accounting for nearly 32% of the overall variance in the data. During the years in which the AWB was in effect, this slope decreased, with an increase in the slope of yearly mass-shooting homicides in the postban period



**Figure 1.** Mass shooting deaths. United States 1981–2017.

© 2018 American Association for the Surgery of Trauma.

13

Ex. K - Klarevas Decl.
Page 3 of 9

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*DiMaggio et al.*

*J Trauma Acute Care Surg*
*Volume 86, Number 1*



**Figure 2.** Case fatality per 100 total mass-shooting injuries with loess smoothing line for trend and standard error bounds. United States 1981–2017.

(Fig. 3). A similar pattern was evident in data restricted to those incidents characterized as involving assault weapons (Fig. 4).

In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting–related deaths per 10,000 firearm homicides per year (Table 1). The model indicated that year and federal ban period alone accounted for nearly 40% of all the variation in the data (adjusted $R^2$ = 0.37). A subanalysis



**Figure 3.** Mass shooting deaths per 10,000 firearm-related homicides with linear trends for preban, ban, and postban periods. United States 1981–2017.



**Figure 4.** Mass-shooting shooting deaths per 10,000 firearm-related homicides restricted to incidents involving assault weapons with linear trends for preban, ban, and postban periods. United States 1981–2017.

restricted to just those incidents characterized by the use of an assault weapon indicated that seven preventable deaths during the ban period were due to assault weapons alone (Table 2).

The risk of mass shooting fatalities during the federal van period was 53 per 140,515 total firearm homicides compared with 448 per 348,528 during the nonban periods, for a risk ratio of 0.30 (95% CI, 0.22–0.39). The calculated risk ratio for the association of the federal ban period with mass-shooting fatalities as a proportion of all firearm-related homicides was 0.29 (95% CI, 0.22–0.29), indicating that mass shooting fatalities were 70% less likely to occur during the federal ban period.

The results of our sensitivity analyses were consistent with our main analyses for total mass shooting fatalities. In a linear regression analysis controlling for yearly trend and restricted to the period ending in 2016 using just CDC WISQARS homicide data as the denominator, the effect of ban period was associated with a statistically significant eight fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.0; $p$ = 0.05). In a similar model using extrapolated CDC WISQARS homicide data for 2017 instead of Online Gun Violence Archive data as the denominator, the effect of ban

**TABLE 1.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | *t* | *p* |
|---|---|---|---|---|
| (Intercept) | −1409.4 | 333.0 | −4.2 | 0.0002 |
| Year | 0.7 | 0.2 | 4.3 | 0.0001 |
| Ban Period | −8.6 | 3.9 | −2.2 | 0.03 |

14

© *2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

J Trauma Acute Care Surg
Volume 86, Number 1

DiMaggio et al.

TABLE 2. Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths Characterized by Use of Assault Weapon per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | t | p |
|---|---|---|---|---|
| (Intercept) | −1219.7 | 333.9 | −3.7 | 0.0009 |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.6; $p = 0.03$). A model based on the total yearly US population as the denominator, the effect of ban period was associated with a statistically significant 0.4 fewer mass shooting related deaths per 10,000,000 population (coefficient for ban period, 0.4; $p = 0.02$).

The results of a mixed-effects generalized linear Poisson model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion were very similar whether the offset variable was the number of total firearm deaths or the population size. In either case, the assault weapons ban period was associated with an approximately 85% reduction in mass shooting fatalities (Table 3).

## DISCUSSION

Recently, 75% of members of the American College of Surgeons Committee on Trauma endorsed restrictions to "civilian access to assault rifles (magazine fed, semiautomatic, i.e., AR-15),"[33] and 76% of the Board of Governors were in favor of a limit to "… civilian access to ammunition designed for military or law enforcement use (that is, armor piercing, large magazine capacity)."[34] In 2015, the American College of Surgeons joined seven of the largest most prestigious professional health organizations in the United States and the American Bar Association to call for "restricting the manufacture and sale of military-style assault weapons and large-capacity magazines for civilian use."[35] This analysis adds evidence to support these recommendations.

No observational epidemiologic study can answer the question whether the 1994 US federal assault ban was causally related to preventing mass-shooting homicides. However, this study adds to the evidence by narrowly focusing our question on the potential effect of a national assault weapon ban on mass shootings as measured through the lens of case fatality. While the data are amenable to a number of additional analyses, such as stratification by location (e.g. school vs. nonschool) or by characterization of large-capacity magazines versus non large-capacity magazine, we chose to focus only on year of occurrence and total number of fatalities. In this way, we relied on the least subjective aspects of the published reports. We believe our results support the conclusion that the ban period was associated with fewer overall mass-shooting homicides. These results are also consistent with a similar study of the effect of a 1996 ban on assault type weapons in Australia after which mass-shooting fatalities dropped to zero.[36]

While the absolute effects of our regression analyses appears modest (7 to 9 fewer deaths per 10,000 firearm-homicides),

it must be interpreted in the context of the overall number of such fatalities, which ranges from none to 60 in any given year in our data. However, if our linear regression estimate of 9 fewer mass shooting–related deaths per 10,000 homicides is correct, an assault weapons ban would have prevented 314 of the 448 or 70% of the mass shooting deaths during the nonban periods under study. Notably, this estimate is roughly consistent with our odds ratio estimate and Poisson model results.

Our results add to the documentation that mass shooting–related homicides are indeed increasing, most rapidly in the postban period, and that these incidents are frequently associated with weapons characterized as assault rifles by the language of the 1994 AWB. We did not find an increase in the case fatality ratio of mass-shooting deaths to mass-shooting injuries. This might at first seem counterintuitive and paradoxical. The destructive effect of these weapons is unequivocal. They are engineered to cause maximum tissue damage rapidly to the greatest number of targets. However, it may be that the use of these kinds of weapons results in indiscriminate injury with additional rounds more likely to injure more people increasing the denominator in a case-fatality ratio. By contrast, the use of nonassault weapons may result in more precise targeting of victims. It is also possible that improvements in trauma care are driving down case fatality.[37] Also, it is worth noting that in absolute terms, there were many more fatalities outside the ban period and that survivable injury comes with its own physical, emotional, and economic costs, which have been estimated at US $32,237 per hospital admission.[38]

Despite US federal funding restrictions on firearm-related research dating to 1996,[39,40] there is a small but growing number of analyses of mass shooting violence in the United States. Many articles have focused on the mental health aspects of these incidents,[41–43] or on social effects like increased firearm acquisition following mass shootings.[44,45] However, fewer studies have taken a strictly public health or clinical approach. Among these, an autopsy-based study of the incidence and severity of mass-shooting casualties concluded the wound patterns differed sufficiently from combat injuries to require new management strategies, indicating there is much to be learned from a systematic epidemiological perspective.[46] Recently, there have been calls to remove such funding restrictions from both academics and elected officials from across the political spectrum.[47,48]

Our choice of data and analytic approach may reasonably be debated. We chose to base our analyses on the yearly rate of mass shooting fatalities per 10,000 overall firearm homicides. This is not a population-based risk estimate, but is in fact a risk as commonly used in the epidemiologic literature which is essentially a probability statement, that is, the number of events

TABLE 3. Exponentiated Coefficients Generalized Linear Poisson Model

| | Homicide Offset | | Population Offset | |
|---|---|---|---|---|
| Variable | Estimate | 95% CI | Estimate | 95% CI |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

Effect of 1994–2004 federal assault weapon ban on mass-shooting death counts. United States, 1981–20017.

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

15

Ex. K - Klarevas Decl.
Page 5 of 9

that occurred over the number of times that event could occur. It is the risk of a homicide occurring as a result of a mass shooting. It may be considered a strong assumption to build mass shooting death rates based on the overall firearm homicide rate. The demographics of most homicide victims may differ appreciably from those of mass shooting victims. We selected this approach from among a number of imperfect potential denominators, believing that basing the rates on the number of firearm-homicides partly controls for secular trends in overall homicides and firearm availability. Our sensitivity analyses indicate that our results were robust to most any choice of denominator. We chose linear regression as our primary model because it was straightforward, accessible to most readers, accounted for linear trends in the data, and returned results in the metric in which we were most interested, that is, changes in the rate of fatalities. Our comparative Poisson model results were essentially consistent with the primary model.

These analyses are subject to a number of additional limitations and caveats, primary among which is that there is no authoritative source of data on mass shooting, and any one source may be biased and incomplete. It was for this reason that we chose to combine three independent sources of data, each with its own strengths and weaknesses, and base our analyses only on those numbers that were verified by all three sources. We further restricted our analyses to only the number of fatalities and the year in which the incident occurred, and to the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Even with this approach, the data remain imprecise and subject to differing definitions. We attempted to compensate for this by framing our questions as precisely as possible, following the advice of the scientist and statistician John Tukey to pursue, "… an approximate answer to the right question ...(rather) than the exact answer to the wrong question..."

In this study, we failed to falsify the hypothesis that the AWB was associated with a decrease in mass shooting fatalities in the United States. However, it is important to note that our model did not include important and potentially confounding factors like state-level and local differences in assault weapon laws following the sun downing of the federal AWB. Additional analyses including such variables and using approaches like propensity score matching and regression discontinuity[49] with data further aggregated to state and local levels are necessary to test the strength and consistency of our results.

Federally referenced denominator data were not available for the last year of the study. We chose to use data from the Online Gun Violence Archive to account for firearm homicide in 2017. This resource is a nonpartisan not-for-profit group founded and maintained by a retired computer systems analyst and gun advocate.[50] The alternative would have been to extrapolate from the CDC data, but the 15,593 firearm-related homicides reported by the Online Gun Violence Archive in 2017 was more consistent with the 14,415 reported by CDC in 2016 compared with the 11,599 predicted by an extrapolation and returned more conservative estimates of the increased rate of recent mass shootings. We note there were many years in which the number of mass-shooting fatalities is listed as zero. There were, in fact, fatalities and incidents in those years that could meet a definition of mass shooting, but they were not reported by all three sources, or did not meet the strict criteria we set for this analysis.

An assault weapon ban is not a panacea, nor do our analyses indicate that an assault weapon ban will result in fewer overall firearm-related homicides. It is important to recognize that suicides make up the majority of firearm-related deaths in the United States, accounting for 60.7% of 36,252 deaths from firearms in 2015.[51] However, while this is a critically important issue in its own right, suicides differ fundamentally from mass-shootings, and are unlikely to be affected by an assault weapons ban. Also, compared with the 501 mass-shooting fatalities we counted, there were 489,043 firearm-related homicides in the United States. Public health efforts should be directed at reducing all gun violence and must be multipronged, including targeted initiatives to address mental illness and reducing access to weapons in those with a propensity for violence. However, taken in the context of the increase in mass shootings in the United States, these results support the conclusion that the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States.

## DISCLOSURE

The authors have no conflicts of interest to declare.
There are no federal or nonfederal funding sources associated with this study.

## REFERENCES

1. Wolchover N. Why gun control is so contentious in the US. *LiveScience*. 20 July 2012 https://www.livescience.com/21741-gun-control-second-amendment.html. Accessed 10 August 2018.
2. Bond S. Students take the lead in US gun control debate. *Financial Times*. 23 February 2018. https://www.ft.com/content/9341021e-1818-11e8-9376-4a6390addb44. Accessed 10 August 2018.
3. Lemieux F. 6 things to know about mass shootings in America. *Scientific American*. 13 June 2016. https://www.scientificamerican.com/article/6-things-to-know-about-mass-shootings-in-america/. Accessed 6 June 2018.
4. Webster DW. The true effect of mass shootings on Americans. *Annals of Internal Medicine*. 16 May 2017. The http://annals.org/aim/fullarticle/2624992/true-effect-mass-shootings-americans. Accessed 6 June 2018.
5. Katsiyannis A, Whitford DK, Ennis RB. Historical examination of United States intentional mass school shootings in the 20th and 21st centuries: implications for students, schools, and society. *Child Fam Stud*. (19 April 2018). https://doi.org/10.1007/s10826-018-1096-2.
6. Follman M. Mass shootings: maybe what we need is a better mental-health policy. *Mother Jones*. 9 November 2012. https://www.motherjones.com/politics/2012/11/jared-loughner-mass-shootings-mental-illness/. Accessed 11 August 2018.
7. Carey B. "Are mass murderers insane? Usually not, researchers say". *New York Times*. 8 November 2017. https://www.nytimes.com/2017/11/08/health/mass-murderers-mental-illness.html. Accessed 11 August 2018.
8. Duwe G, Rocque M. Actually, there is a clear link between mass shootings and mental illness. *Los Angeles Times*. 23 February 2018. http://www.latimes.com/opinion/op-ed/la-oe-duwe-rocque-mass-shootings-mental-illness-20180223-story.html. Accessed 11 August 2018.
9. Gillin J, Greenberg J, Jacobson L, Valverde M. The facts on mass shootings in the United States. *Politifact*. 8 November 2017. http://www.politifact.com/truth-o-meter/article/2017/nov/08/facts-mass-shootings-united-states/. Access 6 June 2018.
10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. 5 October 2017. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed 6 June 2018.

11. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. *Am J Public Health*. 1997;87(2):297–298.
12. Safavi A, Rhee P, Pandit V, Kulvatunyou N, Tang A, Aziz H, Green D, O'Keeffe T, Vercruysse G, Friese RS, et al. Children are safer in states with strict firearm laws: a national inpatient sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150; discussion 150–1.
13. Koper CS, Roth JA. The impact of the 1994 Federal Assault Weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001; Vol. 17, No. 1.
14. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Applied Economics Letters*. 2015;22(4):281–284.
15. Lemieux F, Bricknell S, Prenzler T. Mass shootings in Australia and the United States, 1981-2013. *Journal of Criminological Research, Policy and Practice*. 1(3):131–142.
16. Follman M, Aronsen G, Pan D, Caldwell M. US mass shootings, 1982-2018: data from mother Jones' investigation. *Mother Jones*. 2012; https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. Accessed 3 June 2018.
17. The Los Angeles times staff. "Deadliest U.S. mass shootings", 1984-2017. *Los Angeles Times*. Oct 1, 2017, timelines latimes.com/deadliest-shooting-rampages/. Accessed 29 August 2018.
18. Stanford mass shootings in America, courtesy of the Stanford Geospatial Center and Stanford libraries. 2016. Available at: https://library.stanford.edu/projects/mass-shootings-america. Accessed 29 August 2018.
19. Fox JA, Levin J, Fridel EE. *Extreme Killing: Understanding Serial and Mass Murder*. Sage Publications; 2018.
20. Dillon L. *Mass Shootings in the U.S.: An Exploratory Study of the Trends from 1982–2012*. PhD thesis; 2014.
21. Lankford A. Public mass shooters and firearms: a cross-national study of 171 countries. *Violence Vict*. 2016;31(2):187.
22. Lowe SR, Galea S. The mental health consequences of mass shootings. *Trauma Violence Abuse*. 2017;18(1):62–82.
23. Fox JA, Fridel EE. The tenuous connections involving mass shootings, mental illness, and gun laws. *Violence Gend*. 2016;3(1):14–19.
24. Luca M, Malhotra DK, Poliquin C. The impact of mass shootings on gun policy. *Harvard Business School NOM Unit Working Paper No*. 2016;1:16–126.
25. Buchholtz LK. Command-directed mental health evaluations and mental health related discharges from the U.S. military: an argument for command authority. *J Health Care Finance*. 2016.
26. Bradley K. Code blue: the expanding field of tactical/battlefield medicine. *J Law Enforcement*. 2017;6(2).
27. Smart R. Mass shootings: definitions and trends. RAND Corporation. https://www.rand.org/research/gun-policy/analysis/supplementary/mass-shootings.html. Accessed 2 June 2018.
28. Krouse WJ, Richardson DJ. *Mass Murder with Firearms: Incidents and Victims, 1999–2013*. Washington, D.C.: Congressional Research Service, R44126 2015.
29. Centers for Disease Control and Prevention. CDC's WISQARS (web-based injury statistics query and reporting system). https://www.cdc.gov/injury/wisqars/fatal.html. Accessed 12 February 2018.
30. The online gun violence archive: past summary ledgers. http://www.gunviolencearchive.org/past-tolls. Accessed 12 February 2018.
31. Studdert DM, Donohue JJ, Mello MM. Testing the immunity of the firearm industry to tort litigation. *JAMA Intern Med*. 2017;177(1):102–105.
32. Public Safety and Recreational Firearms Act. P.L. 103-322, Title XI. 103rd Cong. (1994).
33. Kuhls DA, Campbell BT, Burke PA, Allee L, Hink A, Letton RW, Masiakos PT, Coburn M, Alvi M, Lerer TJ, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury: consensus and opportunities. *J Trauma Acute Care Surg*. 2017;82(5):877–886.
34. Puls M, Kuhls D, Campbell B, Burke P, Michelassi F, Stewart R. Survey of the American College of Surgeons Board of governors on firearm injury prevention: consensus and opportunities. *Bull Am Coll Surg*. 2017; 102(10):30–36.
35. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, Wilkerson D, Benjamin GC, Hubbard WC. Firearm-related injury and death in the U.S.: a call to action from 8 health professional organizations and the American Bar Association. *Ann Intern Med*. 2015;162(7):513–516.
36. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3): 291–299.
37. DiMaggio C, Ayoung-Chee P, Shinseki M, Wilson C, Marshall G, Lee DC, Wall S, Maulana S, Leon Pachter H, Frangos S. Traumatic injury in the U.S.: in-patient epidemiology 2000-2011. *Injury*. 2016;47(7):1393–1403.
38. Peek-Asa C, Butcher B, Cavanaugh JE. Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the U.S. *Inj Epidemiol*. 2017; 4(1):20.
39. Wexler L. "gun shy: how a lack of funds translates to inadequate research on gun violence in America". *Hopkins Bloomberg Public Health Fall*. 2017; https://magazine.jhsph.edu/2017/fall/features/cassandra-crifasi-hopkins-moderate-gun-owner-gun-policy-researcher/how-the-dickey-amendment-affects-gun-violence-research.html. Access 5 June 2018.
40. Greenberg J. Spending bill's gun research line: does it nullify dickey amendment? *Politifact*. 27 March 2018. http://www.politifact.com/truth-o-meter/article/2018/mar/27/spending-bills-gun-research-line-does-it-matter/. Accessed 6 June 2018.
41. Pinals DA, Anacker L. Mental illness and firearms: legal context and clinical approaches. *Psychiatr Clin North Am*. 2016;39(4):611–621.
42. Leiner M, De la Vega I, Johansson B. Deadly mass shootings, mental health, and policies and regulations: what we are obligated to do!. *Front Pediatr*. 2018;6:99.
43. Swartz MS, Bhattacharya S, Robertson AG, Swanson JW. Involuntary outpatient commitment and the elusive pursuit of violence prevention. *Can J Psychiatry*. 2017;62(2):102–108.
44. Studdert DM, Zhang Y, Rodden JA, Hyndman RJ, Wintemute GJ. Handgun acquisitions in California after two mass shootings. *Ann Intern Med*. 2017; 166(10):698–706.
45. Stroebe W, Leander NP, Kruglanski AW. The impact of the Orlando mass shooting on fear of victimization and gun-purchasing intentions: not what one might expect. *PLoS One*. 2017;12(8):e0182408.
46. Smith ER, Shapiro G, Sarani B. The profile of wounding in civilian public mass shooting fatalities. *J Trauma Acute Care Surg*. 2016;81(1):86–92.
47. Behrman P, Redding CA, Raja S, Newton T, Beharie N, Printz D. Society of Behavioral Medicine (SBM) position statement: restore CDC funding for firearms and gun violence prevention research. *Transl Behav Med*. 2018.
48. Wong S. "GOP chairman: congress should rethink CDC ban on gun violence research". *The Hill*. 15 February 2018 http://thehill.com/homenews/house/374149-gop-chairman-congress-should-rethink-cdc-ban-on-gun-violence-research. Accessed 5 June 2018.
49. Basu S, Meghani A, Siddiqi A. Evaluating the health impact of large-scale public policy changes: classical and novel approaches. *Annu Rev Public Health*. 2017;38:351–370.
50. Drange M. The Kentucky gun owner who developed his own count of gun violence in the US. *The Guardian*. 23 April 2016. https://www.theguardian.com/world/2016/apr/23/kentucky-gun-owner-gun-violence-archive-mark-bryant. Accessed 5 June 2018.
51. Murphy SL, Xu J, Kochanek KD, Curtin SA, Elizabeth Arias E. *National Vital Statistics Reports*. Volume 66, Number 6 November 27, 2017. Deaths: Final Data for 2015. Centers for Disease Control and Prevention.

## DISCUSSION

**Ernest E. "Gene" Moore, MD** (Denver, Colorado): Thank you, Dr. Rotondo and Dr. Reilly. Can I please have the discussion video. [sounds of a gun shooting]. Well, that is the AR15 rifle. Literally, 30 potential lethal shots delivered within 10 seconds. Is this safe to have in our society?

I congratulate Dr. DiMaggio and his colleagues from NYU for their superb presentation on a very timely issue. The AAST has had a long-term interest in reducing gun violence in the United States, and has recently published our 14-point approach. Access to assault rifles is one of them. At a reductionist level, mass shootings are the net result of (1) a deranged person intending to kill random individuals in a populated area, and (2) the use of an assault rifle. Since we seem to be unable to identify

Ex. K - Klarevas Decl.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Page 7 of 9

Case 3:22-cv-01862-IM    Document 100-11    Filed 02/06/23    Page 8 of 9

DiMaggio et al.                                                                                                 J Trauma Acute Care Surg
                                                                                                                 Volume 86, Number 1

the active shooter preemptively, we are left with the alternative solution of eliminating the weapon.

The presentation today provides evidence that a federal assault weapon ban can reduce mass shootings. According to our recent national trauma surgeon surveys, three-fourths of us in the audience, including me, would like to believe the analysis; but I think we need to consider some of the potential limitations.

Many of these issues relate to the fact that research support for gun violence control in the United States remains frustratingly suppressed and fundamentally inadequate. The general lack of information, low quality of data, and need to merge data sets from diverse sources – medical, coroner, police, legal, and behavioral – compounded by scarce funding and public controversy, undermine research to inform policy and enlighten the public. The fact that you had to compare three open-access databases to be certain that the reported mass shootings occurred underscores this deficiency.

Furthermore, there is no definition of a mass shooting, although you employed perhaps the most acceptable at the moment – the FBI's definition. Could you explain for us the rationale for this definition?

You present an analysis of 44 events with four or more deaths, including the shooter, from 1981 to 2017 – a 36-year period; whereas, others suggest a much higher incidence, such as Klaveras, who reported 69 shootings of six or more over the past 27 years.

Identifying all known mass shootings per year during a study period would be useful to appreciate the overall trends, as your data somewhat understates the magnitude of mass shootings in the United States.

You employed the Gun Violence Archive to estimate homicides in 2017. Why did you not use this source for mass shootings? The Archive has reported an alarming 261 mass shootings – defined as six or more shot – thus far in 2018. Nonetheless, in the sample you studied, assault rifles accounted for greater than 85 percent of the fatalities, and this is the key issue.

You have evaluated the impact of the federal assault rifle ban by analyzing the rate of mass shootings per 10,000 firearm homicide deaths per year to adjust for confounders. This would assume that the factors influencing mass shootings are the same as those for homicides, which seems very unlikely. You have idicated that you analyzed mass-shooting fatalities per population per year; perhaps you could elaborate more about this analysis.

Another confounder as acknowledged in the presentation is the impact of individual state limitations on magazine capacity. The first state to enforce these limitations was New Jersey in 1990, and now at least eight states and Washington, D.C., have these restrictions in effect. How can we distinguish the effects of this policy? And could this be a potential bridge to ultimately reestablish a national assault rifle ban?

You have also calculated the case fatality of all weapons in mass shootings per 100 total shootings, finding a decrease since 2010. While you conjecture this may be due to indiscriminate injury from assault rifles or possibly attributed to better trauma care, I am uncertain how this is relevant to the issue of banning assault rifles. The Las Vegas shooting is a cogent example of how these data may be misleading.

Finally, there is the issue of so-called falsification that could be addressed by examining other causes of trauma mortality during this time period.

In sum, this study adds to overwhelming evidence that assault rifles are an essential component in the dramatic escalation of mass shootings in the United States. While the scientific data to support a federal ban on civilian assault rifles is imperfect due to inadequate research support, I submit collectively the existing information argues strongly for enactment of this measure, and compliment the authors for their timely contribution.

**Sheldon H. Teperman, MD** (Bronx, New York): Dr. DiMaggio, your home institution, Bellevue, plays a seminal role in the trauma center safety of our nation.

In fact, right now, your trauma medical director is not present with us, but he is at home on guard for the U.N. General Assembly. But in New York, we don't see long-gun injuries. New York has the Safe Act, and there is an assault weapons ban. So why is it so important to America's trauma center – Bellevue – that we see a national ban on assault rifles?

**Charles E. Lucas, MD** (Detroit, Michigan): Thank you for your nice presentation. How many of these incidents occurred in an inner-city environment, where most of the victims that we treat have received multiple wounds which were purposely inflicted in order to compete competitively for the distribution of heroin and other drugs? Also, how many of the assailants were African-American?

**Martin A. Croce, MD** (Memphis, Tennessee): Thank you. I want to commend the authors for an excellent study, and really, not so much to ask any questions but I rise to put out a plea to the membership that this issue is a public health problem.

This is not a right versus left problem, this is not a Second Amendment problem. This is a public health problem.

And to quote Wayne Meredith at one of the recent Board meetings, "Our primary goal is to reduce the number of bullet holes in people." So I implore the Membership to correct this dearth of research that is going on about gun violence in order to promote a public health approach, so that we can reduce the number of bullet holes in people.

**Deborah A. Kuhls, MD** (Las Vegas, Nevada): And to carry on that thought, I would urge the authors to incorporate the public health data from the CDC when it is available, because part of the methodological issues for this paper is that one data set was used for a certain period of time.

But for the last year, the CDC data was not used because it was not available, so I would urge you to not only do that analysis, but I would also urge the Journal of Trauma to consider an update to that article when that is available. Thank you.

**Charles DiMaggio, MPH, PhD** (New York, New York): Thank you very much for all these comments and questions.

Dr. Moore, so with regard to your observation about the reductionist approach to looking at this particular issue, that puts me in the mind very much of the traditional epidemiologic triad of agent, host, and environment, and if you break one link in that connection, you can break the transmission. In this case, we could call assault weapons one link, whether it's agent or host, we can decide.

With regards to the rationale for the definition, I think it's reflective of the lack of research in this area.

A case definition is an essential and critical first step in any epidemiologic investigation, and you can see that we are barely there. I think the FBI definition makes sense, I think it's the oldest one, I think it's informed by expert consensus.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

And I think all the other definitions are based in some form on that, which is why we chose it. And I would urge that if we are going to be doing this research going forward, probably it would be best if we all had the consensus that that be the definition.

Why did we not use the Gun Violence Archive to estimate some of these results, and why are our numbers so much smaller than some of the other numbers? I have to agree, our numbers are very much an under-count.

We restricted our analysis to these three databases. And so the limiting factor was the one database. And I can tell you it was the LA Times – they had the fewest number. And if it wasn't in the LA Times, then the other databases didn't contribute to this data set.

We felt that the important aspect of this particular study was to demonstrate the relative effects, merits or associations with the assault weapon ban as opposed to documenting the absolute numbers.

So the Gun Archive, for example, defines mass shootings as four or more deaths or injuries. That really raises the number of deaths that can be included. We didn't include it, but I think going forward we absolutely should.

With regard to the analysis using population denominators, we agree, actually, that gun homicides are an imperfect denominator. We also felt that population was an imperfect denominator. And again, as we keep on circling around, it has to do with the data in this case.

We did feel that gun homicides captured something about gun availability and criminality in the United States, although homicides themselves differ very much from these mass shooting fatalities.

We do note that our population-based results essentially mirrored the gun homicide results, indicating that, at least for the relative effects and benefits of the assault weapons ban, the results are robust and invariant to the choice of denominator in this case.

Can we distinguish local effects, and could this possibly be a bridge to reestablishing an assault rifle ban? The short answer is yes and yes. We can distinguish local effects.

We took a very broad approach on this particular study as a first pass on the data. But, there are data sources (and even within the data sources we used) where you can tease out local, municipal and state policies.

Also, we can link our data to other sources that have those variables. There are statistical methods available that will not only account for those variables, but also allow us to measure or estimate in some way the contribution of local or regional variation in these policies to the overall effectiveness.

The issue of the case fatality rate is very interesting and challenging. I want to note that there was a paper in JAMA on September 11th – just a couple of weeks ago – looking at mass shooter fatalities, that came essentially to the same conclusion – that there has been this recent decrease.

In our paper, in this write-up, we look at three potential explanations, and one of them is, first of all, it's just a matter of denominator. These are indiscriminate weapons.

You have someone shooting at a large group of people, and there are going to be more injuries and more casualties, and it just inflates the denominator in this case.

The second thing is, the obverse of that, is single-fire weapons, guns, are very personal weapons. They're usually characterized by someone who knows who they want to kill. And finally, we feel that perhaps there may be some improvement by the folks in this room in treating these.

I'm going to close at this point, given the time constraints.

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.