**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants


### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### PENDLETON DIVISION


| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM (lead case) |
| | 3:22-cv-01859-IM (trailing case) |
| Plaintiffs, | 3:22-cv-01862-IM (trailing case) |
| | 3:22-cv-01869-IM (trailing case) |
| v. | **DECLARATION OF BRENNAN G. RIVAS** |
| TINA KOTEK, et al., | |
| Defendants, | |
| and | |
| OREGON ALLIANCE FOR GUN SAFETY, | |
| Intervenor-Defendant. | |


**Page 1 -   DECLARATION OF BRENNAN G. RIVAS**

MARK FITZ, et al.,

                                    Plaintiffs,

            v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants.

KATERINA B. EYRE, et al.,

                                    Plaintiffs,

            v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants,

            and

OREGON ALLIANCE FOR GUN SAFETY,

                            Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

                                    Plaintiffs,

            v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants.

I, Brennan Gardner Rivas, the undersigned, declare as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2.      I have been asked by State of Oregon defendants in this matter to render an opinion on the history of firearms restrictions enacted in the nineteenth century, especially as it relates to large-capacity magazines. I have also been asked to provide information about firearms or other weapons that might have been considered unusual or especially dangerous during that time period.

For my work in this case, I am being compensated at a rate of $175 per hour for research, $225 per hour for writing, and $325 per hour for testimony.

3.      I am an Historian and Independent Scholar.  During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library.  From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University.  From 2019 to 2020, I was a Lecturer in American History at Texas Christian University.

4.      My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

5.      My expertise includes historical weapon regulations in the United States.  I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions:  Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.  I am currently completing a book manuscript based upon my dissertation research.

6.      I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *National Shooting Sports Foundation v. Jennings*, 22-cv-01499 (D. De.); *Hanson v. District of Columbia*, 22-cv-2256 (D.D.C.); and *National Association for Gun Rights v. Campbell*, 22-cv-11431 (D. Mass.).  I am currently working on potential expert witness testimony that may be provided in other jurisdictions.

**Page 3 -   DECLARATION OF BRENNAN G. RIVAS**

7.      A true and correct copy of my current curriculum vitae is attached as Exhibit A.

8.      This Declaration is broken into three parts.  The first section explains historical methods.  The second section addresses certain nineteenth-century weapons, explains the regulation of them, and contextualizes those regulatory policies within American history.  The third section explores the history of magazine capacities of nineteenth- and twentieth-century firearms.

## I.      HISTORICAL METHODOLOGY & SUMMARY OF OPINION

9.      Historians draw on primary sources while also evaluating them in light of relevant peer-reviewed scholarship.  For example, published works on a given time period or subject help an historian interpret news articles, laws, testimony, personal letters, and other primary sources.  Rather than consider such sources in a vacuum, divorced from their context, historians are trained to contextualize them in order to better understand the subject at hand.  For this particular assignment, I relied upon knowledge and research that I have collected over my years working on the history of gun and weapon regulation in the United States.  I have supplemented that with additional research into the development of firearms, cartridge, and magazine technologies during the late nineteenth and early twentieth centuries.  I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century.  In addition to online repositories like Westlaw, Hein Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers.  I have also reviewed archival resources housed at the McCracken Research Library at the Buffalo Bill Center of the West in Cody, Wyoming along with digitally preserved issues of *Gun Digest*.

10.     My exploration of historical weapon regulations for this case, in conjunction with my ongoing research dating back to 2015, shows that Americans have a long tradition of regulating

weapons considered especially dangerous to the peace and safety of their communities. These regulations have taken various forms over the past two centuries and more, but in each instance, the people and their representatives took steps that were necessary and feasible to safeguard their communities. The weapons which nineteenth-century Americans focused on were not repeating firearms with large-capacity, detachable magazines, as we are familiar with today, but newly developed or newly popular weapons that reached American consumers and were associated with unnecessary violence. These weapons were large fighting knives and pocket-sized revolvers. Public outcry at the social cost of these weapons was common, and governments targeted them for regulation. Similar to this nineteenth century experience, in the early twentieth century American state governments, and ultimately the US Congress, prohibited automatic firearms. Finally, across the broad sweep of American history, exceedingly few firearms had a standard magazine capacity higher than ten rounds.

## II.    WEAPONS REGULATION IN THE NINETEENTH CENTURY

### A.    In the antebellum nineteenth century, weapon regulations correlated to rates of interpersonal violence and crime.

11.    Weapon technology did not remain static during the nineteenth century. Far from it—major advancements were made in the design, lethality, manufacturing, marketing, and distribution of guns and other weapons between 1800 and 1900. At the beginning of the century, armies still fought in the Napoleonic style, knives were often more deadly at close quarters than firearms, and pistols tended to be foot-long, muzzle-loading devices used primarily by mounted soldiers. By the end of the century, armies had begun acquiring machine guns, pistols had become an all-too-common tool of criminals, and revolvers carrying anywhere from five to seven rounds could be ordered out of a magazine at very low cost and shipped directly to a buyer's mailing address. The challenges faced by nineteenth-century Americans, driven in large part by

technological innovation, dramatic economic shifts, and the alienating effects of modern life, are similar to those faced by Americans today.   While the weapons were different, just like today, frustration at lives cut short by armed violence was present, as were legislative responses.

12.     Demographic and economic factors had much to do with rising levels of interpersonal violence during the antebellum nineteenth century.   The United States grew tremendously in size, feeding the appetite of a citizenry that was, by and large, dedicated to the idea of spreading their values across the continent of North America.   The Louisiana Purchase added 830,000 square miles and tens of thousands of people to the country, and the Mexican Cession added 525,000 square miles and tens of thousands more people.   These well-known acquisitions were the consequence of a national insistence upon westward expansion, not the beginning of it. Going back to Bacon's Rebellion in the seventeenth century and the buildup to the American Revolution in the eighteenth, British colonists were eager to occupy Native American lands by migrating beyond the boundaries of their organized governments.   As a result of the ever-growing size of the early United States, governing institutions were frequently stretched thin.   For instance, district judges often rode a circuit, visiting the seats of the several counties within their jurisdiction only a few times per year. In between sessions, important civil and criminal cases had to wait.   Visiting the office of the county clerk or treasurer might require overnight travel.   Precinct-level officials, like constables and magistrates, held important positions by being the first point of contact between the people and the representative governments which they relied upon to protect the peace and ensure order.

13.     In these environments of decentralized, agricultural life on the fringes of organized Anglo-American society, hunting knives, rifles, muskets, and shotguns were ubiquitous.   Men used these firearms for militia service and for the occasions when they were required to participate in

local policing efforts through the *posse comitatus*; they would have much more frequently used such weapons for hunting—be it killing predatory animals, driving birds away from their crops, or hunting for meat.

14.     Problems arose, however, when some men began making it a habit to carry large knives or small pistols.   Unlike the ten-pound, five-foot-long (or longer) firearms that were necessary for life in these small, rural communities, fighting knives and pocket pistols could be easily hidden within a pocket or beneath a coat.   Men feeling empowered by their secret weapons could risk violent aggression. A commentator in Texas shortly after its war for independence in 1836 lamented that every man in the street seemed to be armed.[1]   Far from an everyday occurrence, this was a noteworthy and upsetting fact of life—one he expected to see settled by getting rowdy men to leave their weapons at home.   Men who were bent on asserting themselves through the use of knives and pistols tended to be labeled "ruffians," and commentators across the country seem to have believed there were more of them in the southern states than anywhere else.[2] Indeed, the most sophisticated examination of homicide and violence in American history upholds the assertion that southerners tended to be more violent than their northern counterparts, and that carrying weapons as a matter of course was not uncommon.[3]

15.     But the ruffianism and outlawry of frontier society falls far short of telling the full story of this country's encounter with fighting knives and pocket pistols.   Americans did not simply surrender to the bloody dictates of the bowie knife or give in to the idea that respectable people

---

[1] Joseph William Schmitz, *Texas Culture in the Days of the Republic, 1836-1846* (San Antonio: The Naylor Company, 1960), 80.

[2] For example, see "The 'Science of Defence,'" *Public Ledger* (Philadelphia, PA) August 5, 1840 (carrying swords as "refined ruffianism."); "The Ruffian Foote," *Barre Patriot* (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate).

[3] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009).

should defend themselves by preemptively arming themselves. Instead, governments (local and state) across the United States enacted laws that criminalized the carrying of certain "deadly weapons" in most instances.[4]

16.    Weapon regulations were not a uniquely southern or a uniquely frontier phenomenon.   Though rates of violence and homicide were lower in northern areas than slaveholding southern ones during much of the antebellum era, a rise in violence among northerners beginning in the 1840s preceded a tremendous increase in weapon regulations.  Prior to that time, most laws relating to the carrying and taxation of deadly weapons were enacted in the South; Maine's and Indiana's concealed-carry restriction statutes were outliers among Tennessee, Virginia, Kentucky, Georgia, and North Carolina.  But beginning in the 1840s, new enactments regarding the public carrying and taxation of weapons were about as likely to come from jurisdictions outside the slaveholding South as within it.[5] The growing number of northern and midwestern states regulating deadly weapons was likely a result of rising rates of violence and crime in those areas.  The socio-economic and political factors that had caused northern and midwestern rates of violence to diverge from those of the slaveholding South after the War of 1812

---

[4] These ordinances and statutes tended to forbid carrying "concealed" on one's person any prohibited weapon.  Thus they struck at the primary mode of carrying these weapons, which was hidden within a pocket, tucked into a waistband, or obscured by a coat.  On the rarity of openly carrying weapons, see below at Paragraph 18, including n. 11-15.

[5] New enactments during the 1840s regarding public carry and taxation (some of which are municipal ordinances) came from the states: *public carry,* Maine, Alabama, Louisiana, Michigan, Virginia, Wisconsin, California, and Florida; *registration/taxation,* Iowa (Burlington) and Mississippi.  In the 1850s: *public carry,* Massachusetts, Pennsylvania, Minnesota, Delaware, New Mexico, Oregon, Wisconsin, Kansas, Ohio, Indiana, Kentucky, New York (Central Park) and Washington, D.C.; *registration/taxation,* Rhode Island (Newport), California (San Francisco), North Carolina, Alabama, Louisiana,    See Duke Repository of Historical Gun Laws https://firearmslaw.duke.edu/repository/search-the-repository/.    I selected "carry" and "registration/taxation" categories and listed the states with new enactments during each decade of the antebellum nineteenth century.  The number of such enactments grew over the decades, and ceased to be exclusively southern beginning in the 1820s (2 of 3 total states), and by the 1850s, northern/midwestern states accounted for 9 of 15 jurisdictions, western ones accounting for 4, and southern ones (including Washington, D. C.) accounting for 4.

began eroding by 1840.[6] In other words, when northern and midwestern people began experiencing unusually high levels of crime and violence, their reaction was the same as their southern counterparts—enacting regulations designed to prevent people from carrying concealable deadly weapons in public spaces.

### B.    Americans responded to rising rates of crime and violence by regulating weapons considered especially dangerous or problematic.

#### 1.    *Public carry laws*

17.    Most public carry laws of the nineteenth century took the form of concealed-carry statutes.  In 1801, Tennessee enacted a public carry law that made use of longstanding language and phrases that derived from the English common law and the Statute of Northampton.[7] The law provided that anyone who "shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" would be required to post a bond, go to jail, or "be punished as for a breach of the peace,

---

[6] Roth, *American Homicide*, 183-198.

[7] Scholarly historical research has shown that, under common law, courts considered the act of carrying deadly weapons in public spaces to be inherently terrifying and therefore a breach of the peace.  See Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," *Southern Illinois University Law Journal* 43 (2018), 65 ("Those who take a textual approach to interpreting the Statute of Northampton…argue that carrying weapons in populated public places was intrinsically terrifying and that the discussion of public terror in judicial opinions and legal treatises was an explanation for the prohibition, rather than a separate element of the crime."); Patrick J. Charles, "The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters," *Cleveland State Law Review* 64, no. 3 (June 2016), 381-382 ("But those that subscribe to the Standard Model view of the Second Amendment proclaim the Statute of Northampton can only be read as applying to the 'carrying arms in ways that caused public terror.' In making this claim, Standard Model writers have never provided sufficient evidence, at least in total historical context, to support it."); see also Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022, forthcoming), draft pp.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ")

**Page 9 -    DECLARATION OF BRENNAN G. RIVAS**

or riot at common law."[8]  Over the course of the antebellum period, though, states tended to move away from common law language and toward more straightforward statutory language.  An updated Tennessee statute from 1821 read: "Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence."[9]  The language had been simplified substantially, and the list of prohibited weapons (a deviation from the traditional Statute of Northampton and common law phrasing) formed the basis for the statute.  Tennessee was not the first state to adopt this language; weapon restrictions in Louisiana and Kentucky were quite similar.[10]

18.     The existence of concealed carry laws, and indeed the language which some of them employed, invites contemporary readers to recognize the distinction between carrying weapons openly versus concealed.  The 1813 statute from Louisiana, for instance, made it clear that it was illegal for a person to carry weapons "in his bosom, coat, or in any other place about him that do not appear in full open view."[11]  This carving out of legal space to carry pistols and

---

[8] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) available at The Making of Modern Law: Primary Sources.

[9] Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources.

[10] Louisiana (1813): "any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view…"; Kentucky (1813): " any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey… ." See 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1; 813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1.

[11] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…").

knives in "full open view," however, does not mean that such open carriage was customary or commonplace outside of unusual or emergency situations.[12]  In a case from 1840, the defendant argued that he needed to conceal a weapon in order to defend himself from an attack; the court disagreed, stating that, "If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[13]  A Louisiana case from 1856 presented the question of whether a partially visible weapon could be considered a violation of the concealed weapon law.  The opinion held that it did, and its reasoning rested upon the fact that partially exposed weapons were "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[14]  An Arkansas case from 1879 upheld the idea that only partially exposing a weapon constituted an attempt at concealment.[15]

### 2.    *Taxation*

19.    Another mode of regulating weapons during the nineteenth century involved taxation.  Charters issued by state governments bestowed upon American city governments immense power over the lives and economies of their residents.  City leaders often taxed shooting galleries along with other venues of entertainment, and sometimes they taxed dealers in firearms.[16]

---

[12] Mark Anthony Frassetto, "The Myth of Open Carry," *U.C. Davis Law Review* 55 (June 2022).

[13] *State v. Reid*, 1 Ala. 612 (1840).

[14] *State v. Smith*, 11 La. Ann. 633 (1856).

[15] *Carr v. State*, 34 Ark. 448 (1879).

[16] The Duke Repository of Historical Gun Laws identifies more than one hundred "taxation/registration" laws across the colonial period to 1930.  There are doubtless many more that have not been captured in the database, as evidenced by the personal taxes upon weapons identified by Dave Kopel in his article on bowie knife statues that do not appear in the Repository. Dave Kopel, "Bowie Knife Statutes," *The Volokh Conspiracy* (November 20, 2022), https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/.    My conclusions about

But state and territorial governments also enacted taxes, some of which were prohibitive in nature. Florida, which was a U.S. territory from 1822 to 1845, presents an apt example.  In 1835, the territorial government enacted a concealed weapon law with a steep fine of $50 to $500 for violations; however, it exempted "carrying arms openly, outside of all their clothes."[17]  Just three years later, leaders enacted a taxation law upon dealers in deadly weapons as well as individuals who chose to engage in open carry.  This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay…a tax of ten dollars annually."[18]  In 2023 dollars, the annual open-carry tax would amount to approximately $320.00, and the annual occupation tax to approximately $6,300.00.[19]  Clearly these taxes were designed to discourage trade in and public carry of deadly weapons, and the architects of the statute saw them as intrinsically connected to the previously enacted concealed-carry restriction.  Elsewhere in the South, statutes levied annual taxes ranging from $0.50 to $2.00 on dirks, bowie knives, pistols and

---

antebellum weapon taxes, therefore, are likely to be refined in future when scholars have done more research into the subject.  Some example regulations from the Repository include: Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149-150, Image 149-150 (1856) available at The Making of Modern Law: Primary Sources (taxing shooting batteries within the city); 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement, §§ 1 and 2 (levying an annual tax of no more than $200 on anyone owning rifle galleries or pistol galleries in the city); John W.A. Sanford, The Code of the City of Montgomery, Prepared in Pursuance of an Order of the City Council of Montgomery Page 7-9, Image 12 (1861) available at The Making of Modern Law: Primary Sources (levying an annual tax of unspecified value upon pistol galleries within the city).

[17] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.

[18] 1838 Fla., ch. 24, "An Act in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly.  This tax is not included within the Duke Repository, indicating that that database captures only a portion of the occupation and personal taxes in force, even at the state/territorial level, during the nineteenth century.  More research remains to be done on the subject.

[19] The amounts reach $319.14 and $6,382.73. See: $200 in 1838 → 2023 | Inflation Calculator (in2013dollars.com).

similar weapons just as they levied annual taxes upon carriages, watches, jewelry, and other consumer goods.[20]

### C.    Especially dangerous weapons of the nineteenth century

#### 1.    *Large Knives*

20.    The weapons meriting regulation in antebellum America were those that were perceived as most likely to be used in the commission of a crime.  Statutes did not generally bring rifles, muskets, or fowling pieces under their purview because "ruffians" did not tend to use them to assault neighbors or bully passers-by.  Prior to the wide availability of the revolver near the mid-nineteenth century, large knives were considered the most dangerous weapon around.  Going back to 1801, nineteenth-century weapon restrictions placed knives larger than a regular pocket knife on the prohibited list.[21]  But nineteenth-century Americans had a hard time defining particular knife styles and distinguishing them from one another. The dirk originated in Scotland as a knife carried into battle or for martial ornamentation by soldiers. It has come to be identified as having

---

[20] 1850 NC, ch. 121; 1856 NC, ch. 34; 1866 NC ch. 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources.

[21] See above, Paragraph 17, n. 8, regarding Tennessee statute (1801) as an example of public carry laws that prohibited the concealed carrying of various kinds of knives.  Laws of this nature existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, see 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife…." See also 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue…"; 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun…"; 1821 Miss., ch. 49 ("any dirk pistol, sword in cane, or any other unlawful weapon…"); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons…"); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane…"; 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon,"; Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon…"); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon…"). This is not an exhaustive list.

a straight blade. Dagger is an older word, and generally connotes a double-edged blade. Bowie knives were often associated with long blades that curved and became double-edged near the tip. Arkansas toothpick, on the other hand, was more likely to refer to a knife as long as a bowie, double-edged, and sharply tapered. The narvaja was of Spanish origin and tended to refer to a large folding blade. And these definitions might vary geographically, change over time, and were not set in stone during the nineteenth century. A person arrested under the 1801 Tennessee statute for carrying a "dirk" might argue at trial that the knife he carried was not identical to the Scottish-descended dirk style, and that he should be found not guilty.  To avoid outcomes such as this one, lawmakers added catch-all language, as in the Tennessee statute's inclusion of "large knife."[22]

21.     Controversies over how to classify a particular knife (is it a bowie, a dirk, a dagger, a toothpick?) may seem trivial at first glance, but they reveal to us the lengths to which lawmakers, jurors, and judges went to restrict *all* knives associated with "ruffianism."  A Tennessee appellate case from 1844 revolved around the question of whether a knife found concealed on the defendant was a "bowie" knife or a "Mexican pirate" knife; the jury convicted him, not of carrying a bowie, but of carrying a knife *resembling* a bowie, and the appellate court upheld the conviction.[23]  The moniker "bowie knife" became quite common after 1836, not because large knives posed no public threat prior to that time, and not because such knives did not exist—the label caught on because the death of Jim Bowie at the Alamo in 1836 turned him into a household name.  The mythos of his knife caught on, and large knives modeled after his (or even inspired by assumptions about its style) came to be called "bowie" knives.[24]

---

[22] See supra, n. 21.

[23] *Haynes v. State*, 24 Tenn. 120 (1844).

[24] Excellent scholarship on the history of the bowie knife has been conducted by Arkansas historian and Director of the Historic Arkansas Museum, William B. Worthen.  See William B. Worthen,

### 2.   *Pocket Pistols*

22.     Another weapon that was regulated in the antebellum period was the "pocket pistol."   Prior to the mid-nineteenth century, most of the pistols available on the American consumer market would have been single-shot, muzzle-loading pistols modeled after designs that appeared in the eighteenth century.[25]  The largest pistols were called "horse" pistols and had been adapted to cavalry and dragoon service in the early modern era.  Horse pistols were quite large, measuring a foot or more in length, and were carried in holsters that attached to a saddle; they were not designed to be carried on the person.[26]  Mid-sized pistols were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[27]  The smallest size, measuring approximately five or six inches in length, was the pocket pistol.  As the name suggests, these firearms were purposefully designed to be carried within the pockets of everyday attire.[28]  Eighteenth-century developments in firearms technology led to pistols overtaking swords as the dueling weapon of choice, and gunmakers began designing pistols specifically for the practice.  Dueling pistols were generally larger than pocket pistols, and they were typically sold in pairs.[29]

23.     Prior to the widespread availability of revolvers in the mid-nineteenth century, the foregoing single-shot, muzzle-loading pistols were those available in colonial America and the

---

"Arkansas and the Toothpick State Image," *The Arkansas Historical Quarterly* 53, no. 2 (Summer 1994), 161-190.

[25] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114-116.

[26] Blair, *Pollard's History*, 104, 119.

[27] Blair, *Pollard's History*, 117-118.

[28] Blair, *Pollard's History*, 116-118; ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire," pp.117).

[29] Blair, *Pollard's History*, 118-119.

early United States.  The deadly weapon restrictions prohibiting the concealed carrying of "pistols" would have referred to any pistol concealed on one's person—whether it be a larger model or a smaller one.[30]  The open-carry exception may have applied to pistols carried on the belt that were immediately visible, perhaps tied onto a hook or ring attached to the firearm itself.  Some multi-shot pistols were in existence prior to the patenting of Samuel Colt's revolver in 1836, but they were not widely available in the United States.[31]  Members of the South's elite had a proclivity for dueling, and it is much more likely that such men would have acquired well-made dueling pistols rather than pepper-boxes.[32]  Even prior to the invention of the revolver, Americans bemoaned the loss of life attributable to "the useless and foolish practice of constantly wearing arms," and the "foolish and ridiculous" decision to treat pistols and knives "as an article of dress."[33]

### 3.    *Revolvers*

24.    The invention of the revolver by Samuel Colt eventually led to that weapon overtaking dirks and bowie knives as the one considered most problematic in American communities.  Colt obtained his patent in 1837 and commanded the market in revolvers through the mid-1850s.  His first company, Patent Arms Manufacturing Company, was not a financial success and ceased production in 1842.  The US-Mexican War gave Colt his first military contract, breathing life back into his invention.  He subsequently established Colt's Patent Fire Arms

---

[30] Pistols tended to be included in deadly weapon restrictions alongside bowie knives and various other kinds of knives. For examples, see supra, n. 21.

[31] For instance, multi-barreled pistols called "pepperboxes" were in existence.  Blair, *Pollard's History*, 210.  Advertisements for multi-barreled pocket pistols can be found in historical newspapers, though the advertisement of them points toward them as rarities and curiosities. See *The Madisonian* (Washington, D.C.), December 22, 1838, 1 (available through *Chronicling America*: https://chroniclingamerica.loc.gov/).  This particular example emphasizes the use for travelers, a category of gun-carriers that was generally exempted from public carry regulations during the nineteenth century.

[32] Pepperbox pistols had multiple rotating barrels. See Blair, *Pollard's History*, 210.

[33] *Alabama State Intelligencer* (Tuscaloosa, Alabama), October 22, 1831, 3.

Manufacturing Company, which became a highly successful enterprise for more than a century. Colt lobbied Congress for a patent extension, citing his inability to capitalize on the initial twenty-year term; but the effort failed, and in 1857 other manufacturers rushed into the market. Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

25.    Colt revolvers (and subsequent manufacturers after 1857) produced pistols that fell into the historical categories of "horse," "belt," and "pocket" pistols. By Colt's era, the largest models tended to be called "army" or "holster" pistols because they were used by mounted soldiers and kept in saddle holsters. In the 1840s, Colt received a government contract to deliver dragoon revolvers, and one of the most famous models the company produced was the "Walker"—designed by and for a famous Texas Ranger who promoted revolvers for use in mounted warfare. The Colt Walker was an exceptionally large pistol, and was indeed the largest model that Colt produced; the 0.45-caliber weapon weighed upwards of four pounds when loaded and measured more than a foot in length.[34] Most Colt "army" pistols were smaller than the Walker, though still the largest revolvers in the company lineup after production of the Walker ceased. Army pistols became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, and they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras.[35] Some jurisdictions carved out regulatory exceptions for these army pistols

---

[34] Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver: and Other Mars Making by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 47-49.

[35] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

**Page 17 - DECLARATION OF BRENNAN G. RIVAS**

during the nineteenth century, primarily because they were designed for military use and were therefore suitable militia arms.

26.     The belt or midsized pistol would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened;[36] during the period in which statutes with army/navy exceptions were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military.  The sales bans discussed below sometimes included "belt" pistols, so it remains unclear whether and to what extent the Colt's navy pistol (which was technically a "belt" model) would have received exemption on the basis of its name and/or its use by the military forces.

27.     Colt did not produce a pocket pistol right away, and the first model was a 0.31-caliber, five-shot revolver released in 1848.  These pocket pistols could measure anywhere from eight to eleven inches, depending on the barrel length (some barrels were only three inches, and others were six inches), and updated models arrived at regular intervals thereafter.[37] After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the

---

[36] See supra, n. 35.

[37] Haven and Belden, *Colt Revolver*, 63-73.

infamous murder of the robber baron Jim Fisk in 1872.[38]  The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[39] These cheap revolvers could be had for a few dollars, with used ones selling for even less.[40]

28.     The Colt revolver diverged from pistols then widely available in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and functionality of ammunition meant that later models of Colt's could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more swift—a boon on the battlefield, but a new danger in other contexts.

### D.     Contextualizing the dramatic impact of revolvers upon American social life

29.     Though Colt's revolver was a revolutionary device that represented a paradigmatic shift in firearm technology, his company struggled to reach its potential.  The expiration of Colt's patent in 1857 opened the door for other manufacturers to enter the market without having to

---

[38] For example, see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[39] See supra, n. 35.

[40] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367). Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).    For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

endure the same decades-long startup cost.  Meanwhile, the growing crisis over slavery and its looming prospect of war gave Colt what he had always wanted—substantial government patronage.  Southern states ordered as many revolvers as they could in the lead-up to the Battle of Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than willing to deliver.  But the far more important contracts came from the United States military, whose orders for pistols like Colt's revolver skyrocketed during the course of the Civil War.[41]  Wartime production by Colt, in addition to the new entrants into the market (like Smith & Wesson), created an unprecedented infrastructure to manufacture staggeringly large quantities of pistols.  As production capacity increased and the U.S. military demobilized, more of these weapons became available to and affordable for American consumers; by the 1870s, the net result was more and cheaper pistols spread throughout the country,[42] introducing the United States to its first experience with rampant gun violence.

30.    The central three decades of the nineteenth century (1840-1870), marked a sharp departure for the United States in terms of violence and homicide in comparison to other Western nations.  Distrust in governing institutions and economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history.  In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime.  Though military victory and a renewed faith in

---

[41] On the life of Samuel Colt and the history of his firearm manufacturing companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

[42] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).    For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

American government reduced homicide in northern states after the 1860s, the rates of homicide for the 1870s and 1880s in the North remained higher than those from the more peaceful era prior to the 1840s. By the close of the 1890s, northern homicide rates began ratcheting upward yet again.[43] Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for crime. That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past.

31.    In the southern states, the consequences of emancipation and Reconstruction created an atmosphere of distrust of government and one's neighbor, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching violence suffered primarily by Black Americans and their political allies. The disruption of war, military occupation, and frequent changes in state government and constitutional structure bred attitudes of vigilantism and disregard for the judicial process. Rates of violence and homicide remained high in the southern states across the nineteenth century.[44] The proliferation of deadly weapons, and especially easily concealable pistols, to a point of near ubiquity in American communities (North and South) rendered the interpersonal conflicts that erupted as a result of urbanization, Reconstruction, economic hardship, and social dislocation all the more deadly.

---

[43] On homicide in American history, particularly as broken down into northern and southern regions, see Roth, *American Homicide*, 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[44] Roth, *American Homicide*, 411-434.

E.     **Gun Regulations after the Civil War**

32.     The response to this gun violence varied across the United States.  The most popular

approach was to enact or strengthen public carry laws.  Jurisdictions that did not already have such

laws were likely to enact them, and those using the older mechanism of sureties to keep the peace

were likely to transition toward the implementation of criminal statutes mandating fines and/or jail

time for violators.[45]  These public carry regulations targeted concealable items like pistols, sword

canes, and daggers that were used in the commission of crimes and generally referred to as deadly

weapons.  The closing third of the nineteenth century saw a flurry of this activity as states and

municipalities tried new penalties, added new weapons to the lists of prohibited weapons, and

generally attempted to eliminate small, easily concealable weapons from the public sphere.[46]

33.     Another strategy employed by state governments to reduce gun violence and gun

crime was to tax certain types of firearms.  In 1894, Georgia enacted a new occupation tax law that

applied to "dealers in pistols and other weapons."  A dealer in "pistols, toy pistols shooting

cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five

---

[45] The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[46] In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes. For example, see 1883 Ariz., ch. 36 ("dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol…"); 1882 W. V., ch. 85 ("revolver or other pistol, dirk, bowie knife, razor, slung-shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of the like kind or character…"); 1871 Tex., ch. 34 ("any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense…"); 1886 Mar., ch. 375 ("any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted)…"); 1873 Penn., ch. 810 ("any pistol, dirk-knife, slung-shot or deadly weapon…"); 1879 N. C., ch. 127 ("any pistol, bowie-knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or other deadly weapon of like kind…"); 1866 N. Y., ch. 716 ("any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun…"). This is not an exhaustive list.

dollars per place of business.[47]  In 1907, the Texas legislature placed a fifty-percent sales tax upon

pistols; dealers had to report their sales and pay the required tax to the state comptroller's office

on a quarterly basis.[48]  Sales and occupation taxes like these tended to be less about generating

revenue than regulating an activity that was frowned upon by society more generally.  Occupation

tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as

well as peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent sales

tax (over loud complaints by dealers), the judge described the business of selling pistols as one

"hurtful to the welfare of society" and among that class of occupations "detrimental to the health,

morals, or good order of society."  As a result, the court reasoned that the legislature "would have

the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go

further and absolutely prohibit any one from engaging therein."[49]

1.   *Sales prohibitions in Arkansas, Tennessee, and Florida*

34.   Arkansas and Tennessee adopted a two-pronged approach that displayed attributes

of both public carry laws as well as dealer regulations.  The first prong was to prohibit the public

carrying of pistols.[50]  Courts in both states struck down early versions of the laws because they

applied to all revolvers, including those being issued to certain classes of soldiers by the United

---

[47]  Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia;  see  https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text  and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.   Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet.

[48]  An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).   See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

[49] *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

[50] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

States military.[51]  But they were quickly amended to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand.  By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the Second Amendment jurisprudence of their day, which held that militia arms enjoyed special protection from certain forms of regulation.

35.    Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite.  Case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited.  This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic and select-fire weapons for military use.

36.    When the Tennessee high court struck down the initial statute, which prohibited the carrying of *all* pistols, lawmakers swiftly wrote a replacement statute that, "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[52]  It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or

---

[51] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

[52] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

hip holster; the only way to carry legally exempted pistols was to hold them in one's hand. The purpose of this additional phrase was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency. Arkansas's replacement statute was similar to that of Tennessee.[53] The Tennessee Supreme Court upheld that state's replacement statute against constitutional challenge.[54] The revised Arkansas statute received no notable challenge.

37.     The second prong which these states employed was a prohibition on the sale of certain pistols. Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[55] Arkansas followed suit but went even further by prohibiting the sale of pistol cartridges as well. "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[56]

---

[53] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[54] *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[55] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[56] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

**Page 25 - DECLARATION OF BRENNAN G. RIVAS**

38.     Throughout the nineteenth century, Americans voiced their displeasure with the practice of carrying weapons in public spaces.[57]  Condemnations of such behavior and calls for regulations became increasingly common during the late nineteenth century when economic and technological developments had made them easier to produce and cheaper to purchase.  Arkansas and Tennessee were no exception to this national rule, and commentators there engaged in the same discourse as their counterparts elsewhere.  The "shocks and violent convulsions which have been so fatal to law and order in the South" were well known, as was the fact that "the pistol, the knife, the shotgun and the bludgeon too often do their bloody work."[58]  After the 1875 statute went into effect in Arkansas, news editors began praising it as "about the best law that has ever been enacted in this state," and one that, had it been in effect since statehood in 1836, "would have saved the lives of thousands of good men who have fallen victim to the vice of carrying deadly weapons, or from the results and natural consequences thereof."[59]  Some judges in Tennessee began handing down penalties of a fifty-dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that] county."[60]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who viewed it as a social benefit that in Tennessee "men who

---

[57] For example, see Patrick Charles, *Armed in America* 152 (2018) (noting the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874)).

[58] "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

[59] *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[60] The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.  Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'" *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

for years converted themselves into walking arsenals discover that they can pursue their ordinary vocations without fear that they may at any moment be called upon to defend their persons against assault."[61]   From their perspective, the distrust of one's fellow community members that went along with habitual gun-toting was a burden of fear that could only be lifted by prohibiting deadly weapons in the public sphere.  Middle-class Americans, white southerners included, held the view that carrying deadly weapons was not honorable, and that such behavior should be stopped.[62]

39.   Arkansas and Tennessee were not alone in adopting sales restrictions.  In 1893, Florida lawmakers passed two weapon regulations.  One modified the penal code sections relating to carrying concealed weapons that applied to any dirks, pistols or weapons "except a common pocket knife."[63]   That same piece of legislation completely banned the sale or manufacture of "any instrument or weapon of the kind usually known as slung shot, or metallic knuckles."[64]   Another created a licensing system for the public carrying of Winchester rifles.[65]   These firearms were an evolution from the Henry rifle, which was used by some few US Army soldiers during the Civil War.  The guns had a fixed, tubular magazine directly beneath the barrel, and by engaging a pull-down lever on the underside of the firearm, a user could quickly move a cartridge from the magazine into the action.  Older models, such as the Henry and the Winchester Model 1866, could hold upwards of ten cartridges (depending on what caliber the firearm was chambered for, and how long the magazine was).  With the development of centerfire cartridges, which were larger

---

[61] *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

[62] For an example from Arkansas and Tennessee, see *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (reporting that a Tennessee district judge stated "that only ruffians carried pistols and it gave them an unfair advantage over other citizens,").  See also Mark Anthony Frassetto, "The Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-2519.

[63] 1893 Fla. 4124. Sec 1

[64] 1893 Fla. 4124. Sec 3

[65] 1893 Fla. 4147.

than the older rimfire ones, magazine capacities fell below ten.  The Florida licensing law treated Winchesters as unique firearms that posed a special danger to the community, and made an attempt to limit the sale and possession of them.

### 2.   *Nineteenth-century Appellate Courts on Weapon Sales Restrictions*

40.   The sales restrictions in Tennessee and Arkansas were not the first ones in American history. In 1837, Florida Territory had enacted an occupation tax on weapon dealers that was prohibitively high.[66] And the same year, Georgia lawmakers enacted a sweeping public carry law that included a prohibition against selling certain kinds of deadly weapons. The relevant portion stated: "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep…any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols, &c."[67] The legislature clearly intended to prohibit the sale of deadly weapons as much as the concealed carrying of them.

41.   This particular law was not challenged until 1844, when a man named Hawkins Nunn appealed his conviction. Nunn had been seen carrying a pistol (not a horseman's pistol) openly in his hand, and a grand jury issued a presentment against him. His appeal involved procedural as well as constitutional claims, and the conviction was reversed because he had been carrying the pistol in an open, visible manner. The Georgia Supreme Court ultimately struck down the portions of the law in question that prohibited keeping certain kinds of weapons, holding that

---

[66] See supra, Paragraph 19, n. 18.

[67] William A. Hotchkiss, *Codification of the Statute Law of Georgia* (Savannah: J. M. Cooper, 1845), 739 ("Offenses against the Public Peace," Sec. III, Art. 73-76).

the legislature could go no further than to prohibit the concealed carrying of deadly weapons out of concern for public safety.[68]

42.     The Georgia Supreme Court never specifically addressed the portion of the statute that prohibited the sale of deadly weapons.[69] The *Nunn* decision, which has been held up as a resounding defense of nearly limitless gun rights, in fact reiterated states' authority to prohibit the concealed carrying of deadly weapons and set no precedent regarding sales bans. Thus, when Tennessee judges evaluated their state's sales restriction, they neither overturned *Nunn* nor even engaged it at all.[70] It seems as though, where sales restrictions went into effect in the nineteenth century, they were less controversial than the limits of public carry policy.

### 3.     *Sales restrictions were not inherently racist*

43.     Some commentators have argued that the above-mentioned sales restrictions were enacted with white supremacist motives in mind—that lawmakers created systems whereby Confederate veterans and elite whites received automatic exemptions while Black residents fell within the purview of the regulations.[71] But a careful examination of relevant primary sources indicates that these laws were not enacted for overtly racist purposes or universally enforced in a racially discriminatory manner.

44.     My research shows that the Tennessee and Arkansas statutes were enacted as a public safety measure rather than an attempt to disarm Black residents.  The argument made by

---

[68] *Nunn v. State*, 1 Ga. 243 (1846).

[69] *Nunn v. State*, 1 Ga. 243 (1846).

[70] *State v. Burgoyne*, 75 Tenn. 173 (1881).

[71] On Arkansas and Tennessee statutes, see, Stefan B. Tahmassebi, "Gun Control and Racism," George Mason University Civil Rights Law Journal 2, no. 1 (Summer 1991), 74-75; Robert Leider, "Our Non-originalist Right to Bear Arms," Indiana Law Journal 89, no. 4, 1619-1620; on Florida's licensing program, see Robert J. Cottrol and Raymond T. Diamond, "Never Intended to Be Applied to the White Population: Firearms Regulation and Racial Disparity—the Redeemed South's Legacy to a National Jurisprudence," *Chicago Kent Law Review* 70, no. 3 (1995), 1307-1335.

some, based on little more than inference, has been that most white men served in the Civil War or had the means to purchase an "army/navy" pistol, and that the army/navy exception was tantamount to a whites-only exception to this policy.[72]  Civil War soldiers on both sides of the conflict were unlikely to be issued a revolver unless they were officers, cavalry, or artillery; a great number of enlisted soldiers who possessed revolvers during the conflict had purchased them on their own, and at times their carrying of the weapons caused sufficient trouble within the ranks that officers confiscated them.  Others discarded heavy and seemingly unnecessary pistols on long, grueling marches.[73]  Confederate service did not automatically correlate to white possession of an exempted pistol.

45.    Rather than impute racism to these laws simply because of their occurrence during Reconstruction, we should view them within their appropriate political and cultural context.  The fact that Tennessee's legislature amended the public carry law so swiftly to add the army/navy exception could indicate to the casual observer that white residents were dissatisfied with the original statute; however, when the statutes and their constitutional challenges are placed in chronological order and interpreted in light of the other primary sources of the era (particularly newspapers and the widespread social contempt for publicly carrying deadly weapons), it is clear that racism was not behind the army/navy exemption.  Instead, it represented the best effort of Tennessee lawmakers to emulate the kind of comprehensive public carry prohibition that was in

---

[72] Tahmassebi, "Gun Control and Racism," 74-75.

[73] On pistols and other arms issued during the Civil War, see Katelyn Brown, "Armed to the Teeth," Military Images 33, no. 4 (Autumn 2015), 32-36; Joseph G. Bilby, Civil War Firearms: Their Historical Background and Tactical Use (Conshohcken, PA: Combined Books, 1996); Graham Smith, Civil War Weapons (New York: Chartwell, 2011); Jack Coggins, Arms and Equipment of the Civil War (New York: Fairfax Press, 1982); Arms and Equipment of the Union (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, Arming the Suckers: A Compilation of Illinois Civil War Weapons (Dayton, OH: Morningside House, 1989).

force in Texas[74] while also respecting the parameters set forth by the state supreme court in *Andrews v. State*. The amendatory statute did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand. Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.[75]

46.    Florida's licensing program has similarly been described as inherently racist.[76] These critiques are based primarily upon the concurring opinion of Justice Rivers H. Buford in a 1941 appellate case. The court overturned a conviction for carrying a pistol in a glovebox without a license—not because the court interpreted licensing as unconstitutional, but because the statute had not been modified in light of the growth of automobiles as a primary mode of transportation.[77] Contrary to the majority and dissenting opinions, neither of which questioned the constitutionality of licensing, Buford stated that he knew from personal experience that licensing had been a purposefully racist enterprise, and that it was unenforceable against whites.[78] But Buford was a teenager in 1893 and unlikely to have been aware of any covert legislative intent. He served in

---

[74] Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." General Laws of Texas, ch. XXXIV, §1 (1871). The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in Wilson and Andrews, respectively, prevented them from doing so; in Texas, on the other hand, cases English and Duke upheld the constitutionality of the deadly weapon law without requiring an army/navy exception. See *English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke*, 42 Tex. 455 (1874).

[75] See supra, Paragraph 18, n. 11-15.

[76] See, for example, Cottrol and Diamond, "Never Intended," 1307.

[77] *Watson v. Stone*, 148 Fla. 516.

[78] *Watson v. Stone*, 148 Fla. 516; concurring opinion of J. Burford.

the state legislature when the statute was modified in 1901, but by that time the licensing program for Winchesters had already been in place for nearly a decade.  The sitting chief justice in 1941 was James B. Whitfield, a man who served in state government throughout the 1890s and early 1900s, and he did not endorse Burford's view.[79]

47.     If we turn to readily accessible newspaper sources, it is clear that Florida jurisdictions issued licenses to publicly carry Winchester rifles during the 1890s.  Even a cursory examination shows numerous applicants receiving such licenses.  In November 1893, less than six months after the passage of the original statute, a man named Hat Barnett successfully obtained a license to carry a Winchester for self-defense; he cited an instance in which someone shot at him on the road.[80]  In the summer of 1899, J. F. Carlton and Washington Hill both received licenses to carry Winchesters.[81]  The following year, James Dodge also obtained a permit.[82] If the state's licensing program was "never intended to be applied to the white population"[83] and was designed with racist purposes in mind, there would be no evidence of permits issued to applicants, be they white or Black.  No doubt, the financial assets required to obtain a license (a $100 bond) placed a greater burden upon Black applicants, but a racially inequitable outcome is not the same as racist intent aforethought.

### 4.     *Additional Regulatory Approaches of the Late Nineteenth Century*

48.     In addition to occupation taxes, sales taxes, sales bans, and public carry restrictions, American governments enacted yet more point-of-sale regulations upon deadly weapons.  A fairly

---

[79]  On Justices Buford and Whitfield, see their biographies at: https://supremecourt.flcourts.gov/Justices/Former-Justices.

[80]  The Florida Agriculturalist (DeLand, Florida), November 1, 1893, 703.

[81]  Ocala Evening Star (Ocala, Florida), August 9, 1899, 1.

[82]  The Florida Star (Titusville, Florida), October 12, 1900, 5.

[83]  Watson v. Stone, 148 Fla. 516; dissent of J. Burford.

common one beginning in the mid-nineteenth century was to prohibit the sale of certain weapons to minors.[84]

F.   **Summary: Nineteenth-century weapon regulations are part of American tradition of protecting communities from gun violence.**

49.   Similar to this nineteenth century experience, in the early twentieth century Americans acted swiftly to regulate fully automatic weapons.   Successive generations of nineteenth-century Americans confronted political instability, civil war, rising crime rates, and waves of knife and gun violence, and many of those who lived through the Reconstruction era were alive in the 1920s to see automatic firearms reach American consumers.   States responded to the threat by banning the manufacture, sale, and possession of such weapons.   By the 1930s, though, state regulation was not sufficient to stop the traffic, and the federal government became involved.

50.   Americans of the nineteenth century were not immune from gun violence.   In fact, they faced a crisis in the second half of the century when small, cheap, easily concealable revolvers flooded consumer markets.   Their handling of that crisis was influenced by how their representative governments had dealt with previous problems posed by the popularity of carrying deadly weapons such as fighting knives and pocket pistols earlier in the century.   Communities condemned the practice of carrying knives, pistols, metal knuckles, sword canes, and other concealable weapons in public; their regulatory policies addressed the public carry of such weapons (which was very likely to involve the full or partial concealment of the weapon), taxed the ownership and sale of them, restricted the sale of them to minors, and banned the sale of certain

---

[84] See the Duke Repository of Historical Gun Laws, which includes a classification for "Possession by, Use of, and Sale to Minors and Others Deemed Irresponsible." https://firearmslaw.duke.edu/repository/search-results/?_sft_subjects=possession-by-use-of-and-sales-to-minors-and-others-deemed-irresponsible.

models that were deemed the most dangerous.  Importantly, courts consistently upheld these regulations, and in doing so condemned the carrying of weapons as an everyday accessory, and affirmed the police power of state and local governments to take reasonable measures to protect the public from the bloody consequences of gun (and knife) violence.  Government action to regulate weapons that have become newly dangerous to the community is a part of nineteenth-century American history.

## III.    LARGE-CAPACITY MAGAZINES

51.    As explained below, the modern large-capacity magazine as we know it today was not widely distributed in the United States until quite recently.  The semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century.  Nineteenth-century magazines capable of storing more than ten rounds of ammunition at a time were not usually detachable (which made for slower reloading time) or were designed for large, military-grade firearms that were not capable of being used or carried for personal use.

### A.    Most lever action rifles had a magazine capacity of less than ten rounds

52.    In the decades following the Civil War, lever-action rifles became commercially available to American consumers for the first time.  Lever-action rifles permitted the user to fire multiple shots without reloading.  The lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm.  While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[85] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh

---

[85] Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.

cartridge from the magazine into the chamber.  And when all rounds had been expended, the user

had to individually load cartridges back into the magazine by inserting them through the loading

port.

53.     In fact, developments in cartridge design in the second half of the nineteenth

century led to a shift toward smaller, not larger, magazine capacities, to accommodate larger and

more powerful cartridges. The Winchester 1883 Hotchkiss Repeater was chambered for the newer

45-70 US Government cartridge and featured a magazine in the butt stock that held 6 rounds.[86]

And the Winchester Model 1894 Repeating Rifle was chambered for various center-fire cartridges

and its maximum magazine capacity was only 8 rounds.[87]

**B.     Early semiautomatic rifles generally had a magazine capacity of less than ten rounds**

54.     Around the turn of the twentieth century, John M. Browning began working on the

design of a semi-automatic firearm that functioned through a "blowback" method in which "[t]he

recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh

cartridge into the chamber."[88]  This design was sometimes referred to as "automatic," though its

function aligns with our current definition of "semi-automatic;" it was also referred to as "auto-

loading" or "self-loading."

55.     Shortly after Browning's developments, Winchester released its Model 1903

Automatic Rifle, which employed this method, and featured a 10-round, fixed, tubular magazine

for .22 caliber cartridges.  According to its product description, "…all that is necessary to do to

---

[86] Henshaw, *Winchester Firearms*, 23-24. On cartridges, see Frank C. Barnes and Stan Skinner, *Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges* 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97.

[87] Henshaw, *Winchester Firearms*, 41.

[88] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

**Page 35 - DECLARATION OF BRENNAN G. RIVAS**

shoot the ten cartridges that the magazine holds is to pull the trigger for each shot."[89]  Winchester

did not release a semi-automatic rifle featuring a detachable magazine until its Model 1905 Self-

Loading Rifle, and that detachable box magazine held only five cartridges in a single column.[90]

The next semi-automatic model, called the Model 1907 Self-Loading Rifle, featured a 5-round

detachable box magazine.

56.    A major rival of Winchester at the time was Marlin Firearms, a company that

became a highly popular producer of lever-action rifles.  Marlin did not begin manufacturing semi-

automatic rifles until 1931 when the company (under new leadership) released the "22 Caliber

Autoloading Rifle," also called the Model 50 / 50E.[91]  It came with a six-round detachable clip

magazine.[92]

57.    As the twentieth century wore on, both Marlin and Winchester featured semi-

automatic rifles as a part of their regular lineup of sporting firearms, though lever-action, pump

action, and bolt action designs tended to be more popular.[93]  The magazine capacities of their semi-

automatic models with detachable magazines remained at or below 10 rounds with very few

exceptions.  In 1948, Marlin released the Model 89C chambered for .22 caliber long rifle rounds,

which was sold with a standard 7-shot clip magazine.  Beginning in 1953, new models were sold

with two 5-shot clip magazines.  In 1957, that changed once again when standard magazines for

---

[89] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[90] Henshaw, *Winchester Firearms*, 61-61.

[91] William S. Brophy, *Marlin Firearms: A History of the Guns and the Company that Made Them* (Harrisburg, PA: Stackpole Books, 1989), 300-301.

[92] Brophy, *Marlin Firearms*, 301.

[93] See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s.  Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

new manufactures was a 12-shot clip magazine.[94]   The last year in which Marlin featured the Model 89C was 1961; for the next two decades or more, the company's standard magazine sizes tended to max out at 7 rounds.[95]

58.   Even though Winchester produced semi-automatic rifles before Marlin, the company did not sell rifles with a standard clip magazine capacity over 10 rounds to civilians through at least 1996.[96]   For a brief period in the 1970s (1974-1978), the company produced the Model 490 Repeating (Autoloading) 22 Rim Fire Rifle.   These firearms came with a standard 5-round clip magazine and were shown with that magazine in Winchester catalogs; customers who wished to purchase magazines holding 10 or 15 rounds had to do so as accessories.[97]

59.   Records relating to the production and advertisement of rifles manufactured by two of the most popular brands shows that even though detachable clip/box magazines have been in existence since the early twentieth century, they were not generally sold with a capacity of more than 10 rounds until recently.   In fact, these records show that during most of the twentieth century standard clip/box magazine sizes usually ranged from 3 to 7 rounds.[98]

---

[94] Brophy, *Marlin Firearms*, 306-307.

[95] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[96] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[97] Henshaw, *Winchester Firearms*, 174. Winchester Catalogs 1970-1975, Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[98] See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

### C.    Early semiautomatic pistols generally had a magazine capacity of less than ten rounds

60.    The technological developments that produced automatic and semi-automatic rifles and shotguns also made possible the automatic and semi-automatic pistol.  A German engineer designed the first fully functional semi-automatic pistol, but its unusual size and shape prevented it from being the financial success its manufacturers wanted.[99]  The company commissioned Georg Luger to redesign it, which he did over the course of the 1890s.[100]  Meanwhile, the American gun designer, John Moses Browning, developed various semi-automatic pistol designs.  One, which promised US military contracts, was purchased by Colt's.[101]  The company's developments began with a series of handguns chambered for .38 Auto, then .45 caliber rounds, each of which had a magazine capacity of less than ten rounds.[102]  Efforts culminated in the development of the Colt Government Model .45 1911 Automatic—the standard-issue sidearm for American armed forces until the 1980s, which featured a magazine capacity of seven rounds.

61.    Browning's other semi-automatic pistol design was purchased by Fabrique Nationale d'Armes de Guerre (FN), a Belgian arms manufacturer.  The FN Browning M1900 was released at the turn of the twentieth century and sold quite successfully in Europe.  It was chambered for .32 caliber cartridges and had a magazine in the hand-grip which held seven rounds. These "Browning pistols" were associated with tremendous rises in crimes, accidents, and deaths related to firearms, and particularly the anarchist movement that carried out numerous

---

[99] Nathan Gorenstein, *The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World* (New York: Scribner, 2021), 119-120.

[100] The company was Deutsche Waffen- und Munitionsfabriken (DWM), which owned a controlling interest in the Belgian armsmaker Fabrique Nationale d'Armes de Guerre (FN).  See Gorenstein, *The Guns of John Moses Browning*, 128.

[101] Gorenstein, *The Guns of John Moses Browning*, 123-125.

[102] Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 205-207, 209, 210-213.

assassinations on the Continent.[103]  Like its closest European competitor, the Luger 9mm handgun, its magazine capacity remained below ten rounds.

    **D.**    **The Browning M35 was an outlier that was more popular in Europe than the US**

    62.    FN subsequently approached Browning to design another semi-automatic handgun that might be purchased in large numbers by the French army.  One of the requirements for consideration was that the firearm have a magazine capacity greater than ten rounds. Browning was initially reluctant to participate in the endeavor but soon changed his mind.  An engineer from FN, Dieudonne Saive, developed a functional "double-stacked" magazine prototype, which offset cartridges in two separate columns to double the capacity.[104]  The resulting hand-grip was significantly wider than those of previous models, but it held thirteen 9mm cartridges.[105]  The FN Browning M35 Hi-Power pistol went into production after John M. Browning passed away in the 1930s, but FN produced the weapon (even though it was not initially selected by the French military) until 2018.  When the Nazis occupied Belgium, they took over the FN factory and produced some of these pistols for their own use during World War II.[106]

    63.    Even though American companies and designers proved to be trailblazers in the development of semi-automatic handguns, American consumers were not quickly won over by them.  Through at least the World War II era, Americans seem to have preferred revolvers to semi-automatic designs; this was in sharp contrast to Europe, where semi-automatic pistols were favored over revolvers.[107]  Browning M35 Hi-Power pistols were sold in the United States and some

---

[103] Gorenstein, *The Guns of John Moses Browning*, 130-133.

[104] Gorenstein, *The Guns of John Moses Browning*, 209-210.

[105] Henry M. Stebbins, Albert J. E. Shay, and Oscar R. Hammond, *Pistols: A Modern Encyclopedia* (Harrisburg, PA: The Stackpole Company, 1961), 140.

[106] Stebbins, Shay, and Hammond, *Pistols*, 139-140.

[107] Gorenstein, *The Guns of John Moses Browning*, 130-133.

Americans purchased them with magazine capacities greater than ten rounds, but by far most semi-automatic firearms on the American market maxed out at ten. Brands like Colt's and Smith & Wesson produced several semi-automatic models for target shooting, police, military, and personal defense, and these firearms generally had a capacity of six to ten rounds.

64.    By 1940, Colt's still had not produced a handgun with a magazine capacity greater than ten,[108] and by 1944 the inaugural issue of *Gun Digest* (which published advertisements for the best-selling American handguns) did not feature one.[109]  By 1951, *Gun Digest* included the Browning Hi-Power in its lineup of "military small arms," but it was an outlier among the other sixteen semi-automatic handguns with magazine capacities of ten or less.[110]  The section featuring foreign handguns included two models with magazine capacities over ten out of a total of nine semi-automatic models.[111]  By 1969, the selection of handguns featured in *Gun Digest* had grown substantially, but only two models had a capacity of more than ten rounds.[112]

---

[108] Haven and Belden, *A History of the Colt Revolver*, 219-225.

[109] *The Gun Digest: Complete Guide to American Rifles, Shotguns, Handguns and Accessories, The Encyclopedia for Shooters, 1944 First Annual Edition* (Chicago: Follett Publishing Company, 1944, repr. 1963), 155-127.

[110] John T. Amber, ed., *The Gun Digest: 5th Edition—1951* (Northfield, IL: DBI Books, Inc., 1950, repr. 1977), 131-132.

[111] These were the Ranger 22 Automatic with a magazine capacity of 11 shots and the Starr Automatic Target Pistol with a magazine capacity of 11 shots.  See Amber, ed., *The Gun Digest: 5th Edition*, 146-147.

[112] The two models with magazine capacities greater than ten were the Browning M35 Hi-Power (13 rounds) and the Universal Enforcer Auto Carbine (30 shot magazine).  All other handguns maxed out at 10 round magazine capacities.  See John T. Amber, ed., *Gun Digest: World's Greatest Gun Book, The Shooter's Encyclopedia of Handguns, Rifles, Shotguns and Accessories, Twenty-Third Anniversary DeLuxe Edition, 1969* (Chicago: The Gun Digest Company, 1968), 294-306.  That year's selection of foreign-made handguns featured only two models that could come with a standard magazine capacity greater than ten rounds.  The Luger 22 Auto Pistol had "a 12-shot capacity with one round in the chamber," and the MAB Autoloading Pistol could be purchased with a magazine capacity of either 8 or 15 rounds.  See Amber, ed., *Gun Digest 1969*, 345, 344-351.

**Page 40 - DECLARATION OF BRENNAN G. RIVAS**

65.     The production history of mainstream American companies (like Colt's and Smith & Wesson) in addition to the enthusiasts' literature of the time shows that most semi-automatic handguns from the late-nineteenth and early twentieth centuries did not typically have magazine capacities larger than ten.  Even though the technology existed, American producers did not manufacture them in significant numbers until the post-World War II period.  And even then, the vast majority of handguns available for purchase (including semi-automatic pistols) had a magazine capacity of less than ten rounds. There is, then, a long tradition among American gunmakers and gun-owners to use rifles and handguns with magazine capacities at or below ten rounds.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this  _6_  day of February, 2023.

*Brennan G Rivas*
Brennan G. Rivas

## ATTORNEY CERTIFICATE OF SERVICE

I hereby certify that on _____, 2023, I have made service of the foregoing _____ on the party/ies listed below in the manner indicated:

☐ U.S. Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email
☐ Electronically via USDC CM/ECF system

DATED this _____ day of _____, 2023.

_____
Harry B. Wilson
OSB #077214
Attorney for

OREGBR\1402627

**CERTIFICATE OF SERVICE**