Shawn M. Lindsay
shawn@jurislawyer.com
Daniel J. Nichols
dan@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475

*Attorneys for Eyre Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> TINA KOTEK, et al., <br><br> Defendants. | Case No. 2:22-cv-01815-IM *(Lead Case)* <br> Case No. 3:22-cv-01859-IM *(Trailing Case)* <br> Case No. 3:22-cv-01862-IM *(Trailing Case)* <br> Case No. 3:22-cv-01869-IM *(Trailing Case)* <br><br> CONSOLIDATED CASES |
| MARK FITZ, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TRIAL BRIEF** <br><br> REQUEST FOR ORAL ARGUMENT |
| KATERINA B. EYRE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | |
| DANIEL AZZOPARDI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TRIAL BRIEF

**LR 7-1 CERTIFICATE**

The parties made a good faith effort through telephone conference to resolve the dispute and have been unable to do so.

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule of Civil Procedure 56, Plaintiffs move for summary judgment of their claims and Defendants' defenses. For the reasons set forth below, including the undisputed material facts and argument, the Court should grant judgment in favor of Plaintiffs. This motion is supported by the accompanying memorandum, declarations filed in this matter, and all other matters properly before the Court.

Plaintiffs Raise Six Constitutional Challenges:

- Count I: Measure 114's permitting provisions violate the Second Amendment.

- Count II: Measure 114's permitting provisions violate the Due Process Clause of the Fourteenth Amendment.

- Count III: Measure 114's prohibitions on magazines with a capacity of more than 10 rounds violate the Second Amendment.

- Count IV: Measure 114's prohibitions on magazines with a capacity of more than 10 rounds violate the Takings Clause.

- Count V: Measure 114's prohibitions on magazines with a capacity of more than 10 rounds violate the Due Process Clause of the Fourteenth Amendment.

- Count VI: Measure 114's prohibitions on magazines with a capacity of more than 10 rounds are void for vagueness.

Plaintiffs are entitled to judgment on all six counts.

Based on the undisputed record in this case, there is no need for a trial and judgment should be entered in favor of Plaintiffs. If the Court denies this motion, in whole or in part, Plaintiffs respectfully submit this memorandum as their trial brief. Plaintiffs do so to avoid unnecessary repetition of the law and the undisputed facts.

# TABLE OF CONTENTS

LR 7-1 CERTIFICATE ...................................................................................................... i

MOTION FOR SUMMARY JUDGMENT ...................................................................... i

TABLE OF CONTENTS ................................................................................................ iii

TABLE OF AUTHORITIES ........................................................................................... v

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 6

SUMMARY OF UNDISPUTED FACTS ..................................................................... 10

ARGUMENT ................................................................................................................ 12

I.      Oregon's Novel Permitting Regime Is Unconstitutional. ................................... 12

        A.      There Can Be No Dispute That Measure 114's Restrictions on Acquiring
                Firearms Regulates Conduct Covered by the Plain Text. ..................... 12

        B.      Defendants Cannot Demonstrate That Measure 114's Novel Restrictions
                on Acquiring Firearms Are Consistent with Any Historical Tradition. ... 13

        C.      Even Assuming "Shall-Issue" Permit-to-Purchase Regimes Are
                Presumptively Constitutional, That Is Not What Measure 114 Is. ........ 16

        D.      Measure 114 Bakes in Exactly the Kinds of Costs and Delays That
                Render Even an Otherwise-Valid Permitting Regime Unconstitutional. ... 18

II.     The Magazine Ban Violates The Second Amendment ........................................ 29

        A.      The Magazines that Measure 114 Bans Are "Arms." ........................... 29

        B.      The Magazines that Measure 114 Bans Are Typically Possessed by Law-
                Abiding Citizens for Lawful Purposes ................................................ 34

        C.      There is No Historical Tradition of Regulating Firing or Ammunition
                Capacity, Let Alone of Banning Feeding Devices Above a Certain
                Threshold. ........................................................................................... 38

        D.      Oregon Cannot Save Its Sweeping Ban on Common Arms by Pointing
                to Any Dramatic Technological Change or Novel Societal Problem .... 42

III.    The Magazine Ban Violates The Fifth And Fourteenth Amendments. .............. 47

A.    The Magazine Ban Violates the Takings Clause. ..................................................... 47

B.    The Magazine Ban's Retroactive Applications Violate the Due Process
      Clause of the Fourteenth Amendment ..................................................................... 51

C.    The Magazine Ban Is Void for Vagueness. ............................................................. 53

CONCLUSION ................................................................................................................................ 55

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*,
   974 F.3d 237 (3d Cir. 2020) ................................................................. 39

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016) ............................................................................. 51

*Barnett v. Raoul*,
   2023 WL 3160284 (S.D. Ill. Apr. 28, 2023) ............................. 31, 35, 44

*Bauer v. Becerra*,
   858 F.3d 1216 (9th Cir. 2017) .............................................................. 19

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ........................................................ 4, 36, 41, 45, 46

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940) ......................................................................... 2, 18

*Cedar Point Nursery v. Hassid*,
   141 S.Ct. 2063 (2021) .................................................................... 48, 50

*Chi., Burlington & Quincy R.R. Co. v. City of Chicago*,
   166 U.S. 226 (1897) ............................................................................. 47

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ............................................................................... 53

*Cnty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ............................................................................. 29

*Cox v. New Hampshire*,
   312 U.S. 569 (1941) ............................................................................. 19

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ....................................................................... passim

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013) ................................................................. 18

*Duncan v. Bonta*,
   19 F.4th 1087 (9th Cir. 2021) .......................................................... 4, 50

*Duncan v. Bonta*,
　49 F.4th 1228 (9th Cir. 2022) ............................................................. 50

*Duncan v. Bonta*,
　970 F.3d 1133 (9th Cir. 2020) ................................... 4, 33, 35, 43, 44, 50

*E. Enters. v. Apfel*,
　524 U.S. 498  (1998) ........................................................................ 52

*Fernandes v. Limmer*,
　663 F.2d 619 (5th Cir. 1981) ............................................................. 19

*Fly Fish, Inc. v. City of Cocoa Beach*,
　337 F.3d 1301 (11th Cir. 2003) .......................................................... 19

*Frese v. Formella*,
　53 F.4th 1 (1st Cir. 2022) .................................................................. 53

*Fyock v. Sunnyvale*,
　779 F.3d 991 (9th Cir. 2015) ......................................................... 13, 33

*Grayned v. City of Rockford*,
　408 U.S. 104 (1972) ......................................................................... 53

*Horne v. Dep't of Agriculture*,
　576 U.S. 350 (2015) ..................................................................... 48, 49

*iMatter Utah v. Njord*,
　774 F.3d 1258 (10th Cir. 2014) .......................................................... 19

*Jackson v. City & Cnty. of S.F.*,
　746 F.3d 953 (9th Cir. 2014) ..................................................... 30, 37, 49

*Kelo v. City of New London*,
　545 U.S. 469 (2005) ......................................................................... 49

*Kolbe v. Hogan*,
　849 F.3d 114 (4th Cir. 2017) ............................................................. 35

*Kolender v. Lawson*,
　461 U.S. 352 (1983) ......................................................................... 55

*Koontz v. St. Johns River Water Mgmt. Dist.*,
　570 U.S. 595 (2013) ......................................................................... 50

*Lingle v. Chevron U.S.A. Inc.*,
　544 U.S. 528 (2005) ......................................................................... 50

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982) .......................................................................... 47, 50

*Luis v. United States*,
   578 U.S. 5 (2016) .................................................................................... 13

*McCutcheon v. FEC*,
   572 U.S. 185 (2014) ................................................................................ 20

*Murdock v. Pennsylvania*,
   319 U.S. 105 (1943) ................................................................................ 19

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ................................................................... 35

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S.Ct. 2111 (2022) ..................................................................... passim

*Parrish v. Mabus*,
   679 F.App'x 620 (9th Cir. 2017) ............................................................ 24

*Peoples Rights Org., Inc. v. City of Columbus*,
   152 F.3d 522 (6th Cir. 1998) ............................................................. 9, 54

*R.J. Widen Co. v. United States*,
   357 F.2d 988 (Ct. Cl. 1966) ................................................................... 49

*Sekhar v. United States*,
   570 U.S. 729 (2013) ................................................................................ 34

*Sentinel Commc'ns Co. v. Watts*,
   936 F.2d 1189 (11th Cir. 1991) .............................................................. 19

*Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002) ................................................................................ 48

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016) ............................................................ 20, 21

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) .......................................................................... 14, 40

*Staples v. United States*,
   511 U.S. 600 (1994) ................................................................................ 40

*Usery v. Turner Elkhorn Mining Co.*,
   428 U.S. 1 (1976) ............................................................................... 51, 52

*Vill. Of Hoffman Estates v. Flipside, Hoffman Estates,*
  455 U.S. 489 (1982) ................................................................. 53

**Statutes**

18 U.S.C. §922(t)(1)(B)(ii) ......................................................... 22

18 U.S.C. §922(w) ...................................................................... 40

1927 Mich. Pub. Acts 887 .......................................................... 39

1927 R.I. Acts & Resolves 256 ................................................... 39

1933 Cal. Stat., ch. 450 .............................................................. 39

1933 Minn. Laws ch. 190 ........................................................... 39

1933 Ohio Laws 189 ................................................................... 39

1934 Va. Acts ch. 96, §§1(a), 4(d) ............................................. 39

1959 Mich. Pub. Acts 249 .......................................................... 39

1959 R.I. Acts & Resolves 260 ................................................... 39

1963 Minn. Sess. L. ch. 753 ....................................................... 39

1965 Cal. Stat., ch. 33 ............................................................... 39

1972 Ohio Laws 1866 ................................................................. 39

1975 Va. Acts, ch. 14 ................................................................. 39

26 U.S.C. §§5801-72 .................................................................. 40

Conn. Gen. Stat. §§29-33, 29-36f – 29-36i, 29-37a, 29-38g – 29-38j ......... 14

Haw. Rev. Stat. Ann. §§134-2, 134-13 ...................................... 14

N.J. Stat. Ann. §2C:39-1(y), -3(j) .............................................. 40

N.J. Stat. Ann. §2C:58-3 ............................................................ 14

Oregon Ballot Measure 114 ................................................. passim

ORS 161.615(1) ......................................................................... 10

ORS 161.635(1)(a) ..................................................................... 10

ORS 166.412(3)(c) ..................................................................... 22

ORS 166.412(3)(c) (repealed) ................................................................. 7, 21

Pub. L. No. 92-544 ...................................................................................... 12

Pub. L. No. 103-322 .................................................................................... 40

Pub. L. No. 72-275 ...................................................................................... 40

Pub. L. No. 73-474 ...................................................................................... 40

**Other Authorities**

2 J. Story, *Commentaries on the Constitution* (5th ed. 1891) ....................... 52

*Black's Law Dictionary* (10th ed. 2014) ................................................... 48

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault
    Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to
    the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), *available at*
    https://bit.ly/3wUdGRE ................................................................. 36, 41

Dan Kidder, *Aguila Mini Shells*, Sportsman's Warehouse, *available at*
    https://bit.ly/44QJR5J  (last visited May 12, 2023) ................................... 54

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History,
    and Policy*, 53 Harv. J. on Legis. 303 (2016) ........................................ 14

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
    78 Alb. L. Rev. 849 (2015) ................................... 37, 38, 39, 40, 43, 44

Dwight B. Demeritt, Jr., *Maine Made Guns And Their Makers* (rev. ed. 1997) ......................... 45

Harold F. Williamson, *Winchester: The Gun That Won The West* (1952) ..................................... 44

*How to Use Your OPSol Mini-Clip 2.0 Flex*, OPSol Texas, *available at*
    https://bit.ly/44RPbWs (last visited May 12, 2023) ................................... 54

Ida B. Wells, *Southern Horrors and Other Writings: The Anti-Lynching Campaign
    of Ida B. Wells, 1892-1900* (1997) ....................................................... 45

Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns
    and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), *available at*
    https://n.pr/3QMJCC1 ............................................................................ 37

Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-
    1894* (1985) .......................................................................................... 43

*Model 1873 Short Rifle*, Winchester Repeating Arms, *available at*
    https://bit.ly/3VV6JNn (last visited May 12, 2023) ................................... 44

Nat'l Shooting Sports Found., *Firearm Production in the United States* 7 (2020), *available at* https://bit.ly/3jfDUMt ................................................................................... 35

Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529 (2021) ............................................................................................................. 14

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* (2d ed. 2018) ................................................................................................................ 43, 44

Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) .................................................................................... 44

*OPSol Mini Clip 2.0 Flex Minishell Adapter Mossberg*, Midway USA, *available at* https://bit.ly/3VTs0qN (last visited May 12, 2023) ............................................. 54

OSP, *2022 FICS [Firearms Instant Check System] Program Overview*, Appendix B, https://bit.ly/3NZ9oUl (last visited May 12, 2023) ......................................... 7

William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 26 (May 13, 2022), *available at* https://bit.ly/3yPfoHw ............................................................................ 34, 35, 37

William Wellington Greener, *The Gun and Its Development* 80-81 (Cassell & Co., 8th ed. 1907) (1881) .......................................................................................... 43

**Rules**

Fed. R. Civ. P. 30(b)(6) ............................................................................................ 2, 3

Fed. R. Civ. P. 56, .......................................................................................................... i, 3

U.S. Const. amend. V ................................................................................ 3, 5, 49, 50

**Constitutional Provisions**

U.S. Const. amend. I ...................................................................................................... 33

U.S. Const. amend. II .... i, 2, 3, 4, 12, 14, 16, 18, 19, 20, 23, 24, 28, 29, 30, 31, 32, 33, 34, 36, 38, 46, 47

U.S. Const. amend. V ................................................................................................... i, 47

U.S. Const. amend. XIV ..................................................................... i, 3, 5, 40, 45, 51

## INTRODUCTION

Last fall, Oregon voters narrowly adopted Ballot Measure 114, the "Changes to Firearm Ownership and Purchase Requirements Initiative." Measure 114 creates a "permit-to-purchase" regime that vests local officials with broad discretion to deny law-abiding citizens the ability to acquire a firearm—even if they have passed a background check. Measure 114 labels this a "shall issue" regime, but it is not. Indeed, it is clear on the face of the law that Oregon's new regime suffers from the very defects that led the Supreme Court to invalidate New York's carry licensing scheme in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022).

"[T]o be issued a permit-to-purchase" under Measure 114, an applicant not only must satisfy objective criteria—completing a criminal background check and an approved firearm safety course (which is currently impossible), and paying a fee—but also must convince the permitting agent that she is not "reasonably likely to be a danger to self or others, or to the community at large," §§4(1)(b)(C), 5(2). The latter component is a textbook example of "granting licensing officials discretion to deny licenses based on a perceived lack of … suitability." *Bruen*, 142 S.Ct. at 2123. Although states may "require applicants to undergo a background check or pass a firearm safety course" to ensure "that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id*. at 2138 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)), states may not give officers discretion to exercise on-the-spot subjective judgment about applicants' "suitability" to keep or bear arms, *id*. Measure 114 plainly does the latter. As §5(2)—which repeats §4(1)(b)(C) verbatim—makes clear, an officer may deny an application, *even if an applicant has passed a background check* and completed an approved safety course, if he perceives the applicant to be "reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state." §5(2). This is a pure judgment call that requires permitting agents to "apprais[e] … facts" and "form[]" a subjective "opinion"—verboten "features

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TRIAL BRIEF

that typify proper-cause standards like [the] New York[]" regime the Court invalidated in *Bruen*. 142 S.Ct. at 2138 n.9 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).

Allowing officers to deny permits necessary to exercise a fundamental right based on on-the-spot subjective judgments is perhaps the most palpable problem with Oregon's new permit-to-purchase regime, but it is not the only one. Delay is baked into the new regime at every turn. First, Measure 114 makes all firearms transactions contingent on receiving a green light from the Oregon State Police ("OSP")—it is now a crime to transfer a firearm if OSP has not yet returned the results of a background check, *see* §§6(3)(C), (13)(b), (14), 7(3)(d)(B), 8(3)(B)(c)—but it imposes no time constraints on OSP's investigation, and it creates no mechanism to impel OSP to act. Second, even if OSP returns a background check in a timely manner and the applicant satisfies all objective and subjective criteria, the permit agent can sit on the application for 30 days after making a determination, §4(3)(a), during which time the proven-to-be-law-abiding applicant cannot acquire a firearm. Third, after that 30-day clock has run out and the law-abiding citizen has a permit-to-purchase in hand, the process starts over again: Measure 114 requires *another* background check (and requires the transferor to wait for the completed results) before a firearm may be transferred. None of this is consistent with the Supreme Court's teaching that the Second Amendment does not countenance "regimes" that impose "lengthy wait times in processing license applications" and thus effectively "deny ordinary citizens their right to [keep and bear arms]." *Bruen*, 142 S.Ct. at 2138 n.9. Oregon's new permit-to-purchase regime is unconstitutional many times over.

Given those problems, Measure 114's permitting regime could not pass muster even if it worked perfectly as set out in the statute. But undisputed facts developed through discovery—as set forth below—have confirmed that Measure 114's permitting regime does *not* work as intended—not even close. As the state's own Rule 30(b)(6) witnesses have testified, the

technology to administer it does not yet exist, the OSP office charged with administering it is woefully underfunded, and the regime is Kafkaesque.  To take just one example, those whose background checks have been marked "delayed" are given a timeline the state *knows* to be wrong, as well as instructions to direct any questions to a phone number and email that the state has decided not to answer.  Lindsay Decl., Exhibit B, LeJeune Dep. 60:1-62:20; 65:22-67:14. Moreover, the current state of technology for the "database" required by the law is an empty Excel spreadsheet—an obviously unworkable attempt to paper over the problem that the "database" required by the law does not exist.  And to cap it off, the Federal Bureau of Investigation is not cooperating—and for reasons of federal law, will not cooperate—in the administration of the background checks that Measure 114 expressly commands must be conducted by the FBI.

Given those undisputed facts, Plaintiffs maintain that they are entitled to summary judgment on their challenged to the permitting regime.  But in the event the Court disagrees, Plaintiffs will present evidence from the state's 30(b)(6) witnesses, called adversely, and from Oregon sheriffs charged with administering the law that will eliminate any doubt that the state's permitting regime is as constitutionally flawed in practice—and will remain so for the foreseeable future—as it is in theory. *See* Fed. R. Civ. P. 56(a) (permitting summary judgment and pretrial briefing in the alternative).

The undisputed facts developed over the past several months have also confirmed that Measure 114's ban on commonplace arms violates the Second, Fifth, and Fourteenth Amendments. As to the Second Amendment, the Supreme Court just made clear that when a court confronts a flat ban on the possession of a type of arm, the only question is whether the arm at issue is "in common use today," *Bruen*, 142 S.Ct. at 2143—i.e., whether it is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see, e.g.*, *Caetano v. Massachusetts,*

577 U.S. 411, 420 (2016) (Alito, J., concurring).  If the answer to that question is "yes," then the

ban is unconstitutional, because a state cannot prohibit law-abiding Americans from possessing

what the Constitution explicitly entitles them to "keep."

Here again, summary judgment is appropriate, as the answer to that question is plainly

"yes."  Measure 114 makes it a crime to manufacture, sell, use, or even just possess any "fixed or

detachable magazine … that has an overall capacity of … more than 10 rounds of ammunition."

§11(1)(d).  The instruments Measure 114 bans are unquestionably "Arms," as "the Second

Amendment's definition of 'arms'" covers all "modern instruments that facilitate armed self-

defense."  *Bruen*, 142 S.Ct. at 2132.  And they are just as unquestionably in common use, as

millions of law-abiding American citizens own millions and millions of these arms, nearly all of

which are kept and borne for lawful purposes, including self-defense.  Agreed Upon Facts ("AUF")

49-55, Dkt.161; *Duncan v. Bonta*, 970 F.3d 1133, 1142 (9th Cir. 2020) (at least 115 million).[1]

While a small number of bad actors have used similar arms to perpetrate crimes, the *typical* person

who possesses these arms is a law-abiding citizen who keeps and bears them for lawful purposes.

Undisputed facts thus confirm that Measure 114's flat ban on these commonplace arms violates

the Second Amendment.

The state will doubtlessly argue that under *Bruen*, it may try to "justify its regulation" by

"demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearms

regulation."  *Bruen*, 142 S.Ct. at 2126.  But when it comes to bans on arms, *Bruen* already

identified what that historical tradition is:  A state may not ban arms that are "'in common use' …

today" for lawful purposes, as opposed to "'highly unusual in society at large.'"  142 S.Ct. at 2143

---

[1] *Reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

(quoting *Heller*, 554 U.S. at 627, 629). *That* is the relevant tradition here, and it is a tradition with which Measure 114 plainly does not comply. There is thus no need to hold a trial to delve into the historical treatment of these or any other arms. In the event the Court disagrees, however, then testimony from Plaintiffs' witnesses, offered anticipatorily in Plaintiffs own case-in-chief or on rebuttal, as well as Plaintiffs' cross-examination of Defendants' witnesses, will confirm that the state has not met its historical-tradition burden. Though the state offers the bulk of its expert witnesses as to the magazine issue, they speak to inapposite questions (such as whether multi-shot weapons were common at the *founding*); address issues relevant only to the kind of interest-balancing test the Supreme Court has explicitly repudiated; or merely confirm that the most dramatic technological changes in firearms came at the time of the Fourteenth Amendment—precisely when the right to own firearms was reaffirmed.

Measure 114's magazine ban violates the Takings Clause as well. The Measure does more than just ban the manufacture, sale, or use of a "large capacity magazine"; it also bans its mere possession. This prohibition is particularly onerous as to those plaintiffs who are licensed gun dealers, as Measure 114 does not give them the option to retain possession of any of these commonplace, otherwise-salable products. A licensed gun dealer can avoid criminal liability only if, within 180 days, it sends its "large capacity magazines" out of state, renders them inoperable (and thus unsalable), or dispossesses itself altogether. Because none of those options enables the dealer to keep its property, they are not sufficient to evade the state's obligation to provide just compensation. Again, because the only relevant factual question—whether the magazines sold by plaintiffs have some value on the open market—has been stipulated to, *see* AUF.67, summary judgment is appropriate. Likewise—in what are again pure questions of law—Measure 114 violates the Fifth and Fourteenth Amendments because it operates retrospectively and is void for

vagueness. Oregon has gone its entire history without subjecting individuals' ability to exercise fundamental rights to the whims of government officials or taking common arms away from law-abiding citizens. It should not be allowed to start now. This Court should grant partial or complete summary judgment, but to the extent trial remains necessary, Plaintiffs will show that Measure 114 is unconstitutional several times over.

## BACKGROUND

1. Under Measure 114, an ordinary law-abiding citizen cannot lawfully acquire a firearm without a "permit-to-purchase." *See* §§6(2)(a), (2)(d), (3)(c), 7(3)(a), (3)(d)(B). 8(2), 9(2). But individuals must run a gauntlet before they can obtain the new permit—and even if they finally get one, they are still not entitled to acquire a firearm: "A permit-to-purchase issued under this section does not create any right of the permit holder to receive a firearm." §4(6)(a).

The first step on the long, winding path to securing a permit-to-purchase is completing a "firearms training course." §4(1)(b)(D). That sounds straightforward, but it is not. Oregon does not provide training courses, and Measure 114 does not require it to do so, or even contemplate the possibility that it ever will. See Lindsay Decl., Exhibit H, Defendants' Responses to Plaintiffs' First Set of Requests for Admission ("Defendants' RFA Resp.") Nos. 5-7. The state instead apparently expects individuals to obtain training privately, at their own expense. But not just any course will suffice; to secure the requisite state approval, a course must, among other things, include an "in-person demonstration" of proficiency with a firearm and "utiliz[e] instructors certified by a law enforcement agency." §4(8)(a), (c)(D). No course that satisfies those stringent requirements presently exists, because no instructor has been so "certified." *Id.* Yet, again, only after an individual manages to (someday) find and complete an approved course can that individual even submit an application for a permit-to-purchase.

If an individual clears that hurdle—which is currently impossible—she must submit to fingerprinting and photographing at a local sheriff's office or police station, where a permit agent can demand "any additional information determined necessary by department rules" and can even deny her application on the spot if he "conclude[s] that [she] has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state." §4(1)(b)(C), (1)(c).

Satisfying a permit agent that one is not "a danger" is not the end of the process. At that point, after collecting the application fee, the permit agent must reach out to OSP to conduct a background check. §4(1)(e). Oregon law imposes no time constraint on OSP's investigation, and OSP's own statistics show that it typically takes weeks to complete a background check. *See* OSP, *2022 FICS [Firearms Instant Check System] Program Overview*, Appendix B, https://bit.ly/3NZ9oUl (last visited May 12, 2023). Yet, Measure 114 repeals the longstanding Oregon-law provision that allowed dealers to "deliver [a] firearm to [a] purchaser" when OSP "fail[ed] to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check," ORS 166.412(3)(c) (repealed), and replaces it with a blanket ban on transfers unless and until OSP gives the green light. Under Measure 114 §6(3)(c), a "dealer may not transfer the firearm unless the dealer receives a unique approval number from the department," under any circumstances, and it is a crime to "[k]nowingly sell[] or deliver[] a firearm … prior to receiving a unique approval number from the department," even if the purchaser already has a concealed handgun license, §6(14). Measure 114 thus grinds to a halt lawful, constitutionally protected transactions. Indeed, even if OSP expeditiously

determines that an individual has passed the background check, it can wait *another* 30 days to issue the permit, §4(3)(a), without which it is unlawful to purchase (or sell) a firearm, *see* §6(14).

Measure 114 also gives broad discretion to officials to exercise subjective judgments about who is (and is not) suitable to acquire a firearm—transforming what on paper is a "shall-issue" regime (albeit one riddled with impermissible costs and delays) into an impermissible, subjective may-issue regime. Even if an individual passes the OSP background check, the sheriff or police chief to whom she initially applied for the permit retains discretion to exercise on-the-spot judgment about whether to deny the application. To repeat: Even if an individual completed a valid training course, paid the require fee, and passed a complete background check, the permit agent can *still* deny the application—and thus prevent the law-abiding citizen from being able to lawfully obtain a firearm—based on his subjective judgment that the law-abiding citizen "is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state." §5(2).

An individual who secures a "permit-to-purchase" despite all the hurdles and discretion might think that she could now finally go to a licensed dealer and purchase the firearm that the Constitution entitles her to keep and bear. But she would be wrong. Once someone comes to a licensed dealer with a "permit-to-purchase" in hand, the process starts anew. The dealer must take her thumbprint, §§6(2)(c), (10)(a), (11); verify that her "permit-to-purchase" is valid by cross-referencing a state database, §6(2)(d); and, finally, ask OSP to perform *another* background check, §6(2)(d). The dealer cannot transfer the firearm until OSP gives the green light, and—again—there is no time limit on OSP or mechanism to force it to act. The same duplicative hurdles apply at gun shows. *See* §§8(2), 9(2). And private parties seeking to transfer a firearm between them in a non-commercial setting may not do so *at all*; they must appear in person before a licensed gun

dealer, where the transferee must present a permit-to-purchase—but, once again, the dealer must ask OSP to conduct another background check and await a "unique approval number"; and if the results are delayed or unknown, the transfer is off.  §7(3)(a), (3)(c), (3)(d)(A), (3)(d)(B).

2. In addition to creating a regime that effectively prohibits people from obtaining firearms unless they complete as-yet-nonexistent training courses and satisfy a local officer that they are subjectively suitable to exercise a fundamental constitutional right, Measure 114 outright bans commonplace arms.  Measure 114 creates the brand-new "crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines."  §11(2).  The term "large-capacity magazine" is defined as "a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload."  §11(1)(d).

Unlike most of the small number of other states that have tried to ban magazines capable of holding more than ten rounds, Oregon has not confined itself to prohibiting only detachable magazines.  Under Measure 114, a firearm with a magazine "contained in or permanently attached to [it] in such a manner that the device cannot be removed without disassembly of the firearm action" is now contraband if it "has an overall capacity of, *or that can be readily restored, changed, or converted to accept*, more than 10 rounds of ammunition."  §11(1)(c), (d) (emphasis added).  No guidance is given on what that language means.  *See Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998) (invalidating, as void for vagueness, ordinance using similar language).

Measure 114's new crime is punishable by up to 364 days in prison and a $6,250 fine.  *See* §11(6) (classifying the new crime as "a class A misdemeanor"); ORS 161.615(1) (setting maximum prison sentence for class A misdemeanors); ORS 161.635(1)(a) (setting maximum fine for class A misdemeanors).  And it applies not only to the use, sale, or manufacture of such arms going forward, but to mere possession—even if the individual or business possessing these arms lawfully acquired them well before Measure 114 was proposed, let alone took effect.  Finally, while individuals who acquired these arms before Measure 114 took effect may keep them on their premises and may take them under certain narrow conditions to a few enumerated locations, licensed gun dealers in Oregon have no such "keep" option.  Dealers can avoid criminal liability only by sending these arms out of state, rendering them inoperable, or dispossessing of them altogether.  And come 180 days from the operative date, not even those options will be on the table.

## SUMMARY OF UNDISPUTED FACTS

All parties agree that firearms magazines are devices that are attached to or attachable to a firearm and that store ammunition.  AUF.44.  These devices feed ammunition into firearms.  AUF.45.  They can be detachable or fixed:  A detachable magazine can be loaded while it is detached from a firearm and then readily inserted in a firearm when needed, while a fixed magazine is contained within the firearm or permanently attached to it, such that it cannot be removed without disassembling the firearm itself.  AUF.46-48.

Millions of Americans own detachable magazines that hold more than ten rounds of ammunition.  AUF.49.  Such possession includes possession for lawful purposes, and at least some people carry firearms equipped with magazines to defend themselves.  AUF.50, 55.  Some semiautomatic pistols and rifles currently on the market today in some states come standard with detachable magazines capable of holding more than 10 rounds of ammunition.  AUF.51-52.  For example, the Sig Sauer P365, Smith & Wesson M&P92, and Smith & Wesson M&P AR14 are all

semi-automatic firearms capable of using a magazine with more than ten rounds, though they are also capable of using a magazine with ten or fewer rounds.  AUF.53-54; *see also* AUF.69-71 (similar).

The broad outlines of the historical developments of firearms in this case are also detailed in undisputed facts.  In the eighteenth century, most gun owners owned single-shot, muzzle loading firearms, such as muskets.  AUF.58.  But firearms capable of firing more than one round without reloading existed as well.  The Girardoni air rifle, developed around 1779, had a fixed magazine with a 22-round capacity.  AUF 59.  In 1836, Samuel Colt patented a revolver.  AUF 60.[2]  During the mid-19[th] century, advances in technology transformed ammunition from powder and ball (bullet) inserted loose or in paper cartridges, to metallic cartridges that contained primer, powder, and bullet.  AUF.61.  In 1860, the Henry rifle, which could fire sixteen shots without reloading, came onto the U.S. Market.  AUF.62-63.  A few decades later, in 1896, Mauser developed a semi-automatic pistol.  AUF.64.

The federal government did not regulate the firing capacity of semi-automatic firearms until 1994, and it ceased doing so after 2004.  AUF.56-57.

Oregon voters passed M114 on November 8, 2022, and it was scheduled to take effect on December 8, 2022.  AUF.35-36.  Since then, OSP has adopted administrative rules that govern some procedures for issuing permits to purchase and has prepared an application form.  AUF.37-38.  Organizations representing the state's sheriffs and police chiefs have created working groups that have made recommendations about the process for permit agents to issue permits and certify in-state instructors.  AUF.43.  The state has not issued guidance on what it means to "[p]ermanently

---

[2] Though Plaintiffs and Defendants agree to this fact, Intervenor has not done so.

alter" a magazine "so that it is not capable, upon alteration in the future, of accepting more than 10 rounds of ammunition."  AUF.68.

As of today, OSP is prepared to receive completed applications and fingerprint cards collected by permit agents via fax or United States Mail, AUF.39—but not by any other means. For their part, some permit agents have access to LiveScan equipment that would allow the electronic transmission of fingerprints.  AUF.40. OSP estimates that it would take 30 days for a vendor to set up the LiveScan system for OSP, which does not currently have such access.  AUF.41. But the FBI has informed OSP that it will not perform fingerprint-based criminal background checks for permit applicants based on its determination that Ballot Measure 114 does not meet the requirements of Pub. L. 92-544.  AUF.42.

Murders committed by individuals using firearms, including episodes in which those wielding firearms killed multiple individuals, occurred in the United States in the nineteenth century.  AUF.65-66.

The magazines prohibited from sale under Measure 114 have some monetary value on the open market.  AUF.67.

Facts detailing the identities and interests of the parties in this case can be found at AUF.1-34.

## ARGUMENT

**I.    Oregon's Novel Permitting Regime Is Unconstitutional.**

**A.    There Can Be No Dispute That Measure 114's Restrictions on Acquiring Firearms Regulates Conduct Covered by the Plain Text.**

Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the first question a court must ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts.  *Id.* at 2126.  The

relevant conduct here is acquiring a firearm.  *See* M114 §§3(4), 4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a),

7(3)(d)(B), 8(2), 9(2) (imposing various restrictions on an individual's ability "to purchase or

acquire a firearm").  The Second Amendment's plain text clearly covers that conduct, as one can

neither "keep [nor] bear Arms," U.S. Const. amend. II, if one cannot acquire an arm in the first

place.  *See Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring)

("Constitutional rights … implicitly protect those closely related acts necessary to their exercise.");

*see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).  Measure 114 thus treads on ground

"presumptively protect[ed]" by the Constitution.  This is a pure question of law, and Defendants

have never disputed that it *is* a question of law, or that the answer is "yes."  *See, e.g.*, State.PI.Br.20-

28 (arguing solely on the second prong of the *Bruen* test). Thus, to justify Measure 114's

restrictions on acquiring firearms, Defendants "must demonstrate that the regulation is consistent

with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S.Ct. at 2126.

### B.   Defendants Cannot Demonstrate That Measure 114's Novel Restrictions on Acquiring Firearms Are Consistent with Any Historical Tradition.

Whatever may be said about permits to *carry* firearms, permits to *purchase* firearms have

long been exceedingly rare.  Permit-to-*purchase* regimes did not exist in the eighteenth or

nineteenth centuries.  During the Progressive-Prohibition era, nine states such requirements for the

first time, though almost all (unlike Measure 114) exempted long guns and approximately half

were later repealed:  New York (1911; handguns only),[3] Oregon (1913; handguns only; later

repealed), North Carolina (1919; handguns and pump action guns; later repealed in stages[4]),

---

[3] This, the first state permit-to-purchase regime, was enacted in the same Sullivan Law and whose may-issue regime it overturned in *Bruen*.  *See* Sullivan Dangerous Weapons Act, 1911 N.Y. Laws ch. 195, sec. 1, §1897 (codified as amended at N.Y. Penal Law §§265.01(1), 265.20(a)(3)); *Bruen*, 142 S.Ct. at 2122.

[4] Fully repealed as of 2023.  *See* 2023 N.C. Sess. Laws 2023-8 (S.B. 41).

Missouri (1921; handguns only; later repealed), Connecticut (1923), Michigan (1927; handguns only; later partially repealed), Hawaii (1927), New Jersey (1927), and Texas (1931; handguns only; later declared void).  *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 343-46, 352-55, 358, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021).  Even today, such regulations remain quite rare, particularly when applied to all firearms whatsoever—only three other states go so far.[5]  In all events, this history is too little and "too late to provide insight into the meaning of" constitutional provisions adopted long beforehand.  *Bruen*, 142 S.Ct. at 2137 (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)).  As *Bruen* made clear, the kind of historical tradition the government must prove to justify a burden on Second Amendment rights is "an enduring American tradition of state regulation," not just a handful of late-in-time laws from "outlier jurisdictions." *Id.* at 2155-56; *see id.* at 2138 (rejecting reliance on "a handful of late-19th-century [analogues]").

Defendants' contrary arguments rest on a faulty premise.  In Defendants' telling, "*Bruen* and its predecessor, *Heller*, have already determined that permit requirements are constitutional," full stop.  State.PI.Br.21.  In reality, *Bruen* struck *down* the only permit requirement that was before it, *see Bruen*, 142 S.Ct. 2111, and *Heller* explicitly declined to address the District of Columbia's permitting regime given the Court's holding that the government cannot ban arms typically possessed by law-abiding citizens for lawful purposes, *see Heller*, 554 U.S. at 631.  Defendants thus rely entirely on dicta—and not just any dicta, but dicta on an issue that is orthogonal to this

---

[5] These are Connecticut, *see* Conn. Gen. Stat. §§29-33, 29-36f – 29-36i, 29-37a, 29-38g – 29-38j; Hawaii, *see* Haw. Rev. Stat. Ann. §§134-2, 134-13; and New Jersey, *see* N.J. Stat. Ann. §2C:58-3.

case.  Unlike Oregon's novel "permit-to-purchase" regime, the licensing regime in *Bruen* imposed no burdens on individuals' ability to *acquire* firearms; it imposed burdens on one's ability "to carry a firearm outside [one's] home or place of business."  *Bruen*, 142 S.Ct. at 2123.  The same is true of the "43 States' 'shall-issue licensing regimes'" to which the Court referred in a footnote.  State.PI.Br.20 (quoting *Bruen*, 142 S.Ct. at 2138 n.9).  *All* of those regimes govern public carry; *not a single one of them* requires a permit just to purchase or acquire firearms.

Defendants have argued this distinction makes no difference because "the Supreme Court has not established different tests for keeping and bearing arms."  State.PI.Br.22.  But the test *Bruen* established requires the government to come forward with historical regulations that are actually analogous to the challenged regulation in terms of "two metrics":  "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S.Ct. at 2133. The nature of the burden is thus, indeed, part of the test.  *See id.* (reiterating that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" is a "'central' consideration[]").  And it does not take a doctorate to understand that laws that restrict individuals' right to carry do not impose the same burden on the right of armed self-defense as laws, like Measure 114, that restrict individuals' ability to have a firearm at all.  After all, one who is denied a carry permit can at least still exercise the right of armed self-defense in his home.  One who is denied a permit to purchase under Measure 114 cannot do even that much.

The Supreme Court has therefore said nothing that could be read to "expressly allow[]" permit-to-purchase regimes at all—let alone to sanction the Byzantine permit-to-purchase regime that Oregon has just imposed.  *Contra* State.PI.Br.21.  That means that Defendants must come forward with historical analogues.  Defendants have not even tried to do so.  Neither Defendants nor Intervenors have ever cited a single historical analogue that is not a carry law—and, as

explained, carry laws are not analogous in *how* they burden Second Amendment rights.[6]
Defendants have thus "failed to meet their burden to identify an American tradition justifying"
Measure 114's permit-to-purchase regime.  *Bruen*, 142 S.Ct. at 2138.

    **C.**    **Even Assuming "Shall-Issue" Permit-to-Purchase Regimes Are Presumptively Constitutional, That Is Not What Measure 114 Is.**

Even accepting the premise that the Supreme Court has sanctioned so-called "shall issue"
permitting regimes in the permit-to-purchase context, the state would still have to demonstrate that
Measure 114 actually *is* a "shall issue" regime, not just that it is labeled as such.  *Bruen* proves the
point.  The regime at issue there also called itself a "shall issue" regime—and the Supreme Court
still held it unconstitutional, because it did not actually operate that way in practice.  Under the
New York law struck down in *Bruen*, carry licenses "shall be issued" if applicants meet objective
requirements and have certain kinds of employment, and licenses "shall be issued" for all other
applicants that showed "proper cause."  N.Y. Penal Law §400.00(2)(c)-(f).  Yet the Court saw
through that label and held that a regime under which "authorities have discretion to deny …
licenses even when the applicant satisfies the statutory criteria" as a matter of substance and fact
is actually an unconstitutional "'may issue'" regime that does not comport with our nation's
tradition of firearms regulation.  *Bruen*, 142 S.Ct. at 2123-24, 2156.

That describes Measure 114's regime to a T.  Under Measure 114, permit agents may deny
an application for a permit-to-purchase even if the applicant has already passed a background
check and completed an approved safety course, if they determine that the applicant is "reasonably
likely to be a danger to self or others, or to the community at large, as a result of the applicant's

---

[6] Indeed, Plaintiffs did not even ask their experts to investigate the existence of such analogues.
*See* Lindsay Decl., Exhibit E, DeLay Dep. 10:11-14 and Exhibit F, Rivas Dep. 10:16-11:14; *see
also* Exhibit G, Spitzer Dep. 55:21-56:2.  When given a chance to identify one anyway, Defense's
expert Dr. Rivas could not.  *See* Rivas Dep. 10:16-11:14.

mental or psychological state."  M114 §§4(1)(b)(C), 5(2).  This provision on its face allows permit agents to deny permits based on the exercise of judgment and formation of an opinion about the applicant's suitability to own a firearm.  Defendants have never denied this.  Instead, they argue that because a "permit agent must have 'reasonable grounds' to believe that the person is 'a danger to self or others'" and "must explain [her] reasons for a denial in writing" and a denied applicant may appeal to a state court, this exercise of judgment is constitutionally permissible.  State.PI.Br.24.  But, again, those same arguments were rejected in *Bruen*.  New York's regime "require[d] consideration of all relevant factors," looked only to "objective circumstances," "afford[ed] applicants 'ample opportunity to submit evidence' and 'to respond to all factors considered and issues raised by' the licensing officer," and allowed "applicants [to] challenge the licensing decision by appeal" to a state court.  Resp. Br. 8-9, 35, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. filed Sept. 14, 2021).  Yet the Court still invalidated New York's regime because it "grant[ed] licensing officials discretion to deny licenses based on a perceived lack of need or suitability," and such discretion is inconsistent with our nation's historical tradition of firearms regulation.  *Bruen*, 142 S.Ct. at 2123, 2135-56.  Because Measure 114 gives permit agents the same leeway to deny licenses based on a perceived lack of suitability, it too is unconstitutional.

Defendants have asserted that this "mental-health review provision is substantively identical to" various laws "[t]he *Bruen* Court endorsed."  State.PI.Br.24-25.  They are wrong. Setting aside the problem that *Bruen* considered only public-carry laws, not permit-to-purchase regimes, "the mental-health review provision in Measure 114" is manifestly not "the type of objective inquiry explicitly endorsed in *Bruen*."  State.PI.Br.25.  In the *Bruen* footnote Defendants have repeatedly invoked throughout this litigation, the Court made two things clear:  First, the Court was not casting doubt on the validity of public-carry "licensing regimes, under which 'a

general desire for self-defense is sufficient to obtain a [permit].'" *Bruen*, 142 S.Ct. at 2138 n.9 (alteration in original) (quoting *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)).  Second, the Court very much *was* casting doubt on the validity of licensing regimes that "requir[e] the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.'" *Id.* (quoting *Cantwell*, 310 U.S. at 305).  Indeed, the Court described the essence of a "shall issue" regime as a regime "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need *or suitability*."  *Id.* at 2123 (emphasis added).  Measure 114's so-called "mental-health review provision" plainly falls in the latter camp.  And as black-letter law makes clear, it is the substance of a restriction, not the label that a state affixes to it, that matters under the Constitution.

### D. Measure 114 Bakes in Exactly the Kinds of Costs and Delays That Render Even an Otherwise-Valid Permitting Regime Unconstitutional.

Oregon's regime also runs afoul of *Bruen's* admonition that even an otherwise-valid licensing regime violates the Second Amendment if it is "put toward abusive ends," such as employing "lengthy wait times in processing license applications or exorbitant fees" that impede the ability to obtain the necessary permit or license.  *Bruen*, 142 S.Ct. at 2138 n.9.

a.    To start with costs, no one even knows at this point just how expensive it will be to do everything necessary to obtain a firearm consistent with Measure 114, because the means to do so do not even exist.  Defendants assert that these costs—$65 for the first license, $50 to renew every five years thereafter, *see* M114 §4(3)(b), (7)(c), and untold costs in terms of the price of completing a safety course and live-fire training, *see* M114 §§4(1)(b)(D), (8)(c)(D)—are all permissible because they merely "shift[] the cost of compliance to plaintiffs."  State.PI.Br.28 n.11. But Oregon has never denied that there is an upper limit on what compliance-related costs a state

may constitutionally shift to individuals as a prerequisite for exercising fundamental rights. Nor could it given that both the Supreme Court and the Ninth Circuit have long held exactly that. *See Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (constitutionally protected conduct may be singled out for special monetary exactions only to the extent necessary "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed"); *Murdock v. Pennsylvania*, 319 U.S. 105, 114 (1943) (fees must be limited "to defray[ing] the expenses of policing the activities in question"); *iMatter Utah v. Njord*, 774 F.3d 1258, 1270 (10th Cir. 2014); *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1314 (11th Cir. 2003); *Fernandes v. Limmer*, 663 F.2d 619 (5th Cir. 1981). That critical limitation ensures that the government is "prohibited from raising revenue under the guise of defraying its administrative costs," *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1205 (11th Cir. 1991), or from using special fees to try "to suppress the[] exercise" of rights guaranteed by the Constitution, *Murdock*, 319 U.S. at 114. And lest there be any doubt about whether those principles apply in the Second Amendment context, *see Bauer v. Becerra*, 858 F.3d 1216, 1224 (9th Cir. 2017) (refusing to answer that question), *Bruen* explicitly noted that "exorbitant fees" would be a hallmark of an "abusive" "permitting scheme" that "den[ied] ordinary citizens their [Second Amendment] rights." 142 S.Ct. at 2138 n.9.

Yet Oregon likewise has never denied that, even as of this writing, it remains a mystery just how high Measure 114's nowhere-limited costs will be. While Measure 114 requires classes, it makes no provision for offering them, and the state has not yet certified any privately offered classes. Oregon has thus tasked law-abiding citizens with paying unknown amounts for non-existent courses, all just to exercise a fundamental right.

b. Making matters worse, Measure 114 imposes unconstitutional delays on law-abiding citizens' ability to acquire firearms. Defendants' own briefing confirms this. Defendants have not denied that, under Measure 114, individuals must undergo two[7] background checks every time they want to purchase a firearm: one "to acquire a permit," and another "to purchase a firearm." State.PI.Br.27. Defendants insist there is nothing problematic about this duplicative, prophylaxis-upon-prophylaxis approach. *But cf. McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) (plurality op.). But their defense is wrong both factually and legally, as it is premised on an incorrect description of how Measure 114 works and depends on precedent that has been abrogated by the Supreme Court.

At the outset, there is no dispute that Measure 114 allows permit agents to take as long as 30 days to conduct the background check that is necessary to obtain a permit. That right there is a constitutional problem under *Bruen*, as there is simply no historical tradition whatsoever of allowing the government to impede the exercise of Second Amendment rights for anything close to that long. While Defendants have argued that "[t]he Ninth Circuit upheld th[is] exact scheme in *Silvester* [*v. Harris*, 843 F.3d 816, 818 (9th Cir. 2016)]." State.PI.Br.27, that is both wrong and irrelevant. The only thing *Silvester* upheld was a ten-day cooling off period to purchase a firearm. It did not even consider a permit-to-purchase regime, let alone one that involved a 30-day delay. Nor did it purport to hold that there is no limit to how long a state may delay the exercise of Second Amendment rights. And even if it had, that would not matter, as *Silvester* is no longer good law

---

[7] At a minimum. If the background check required federally by ATF Form 4473 is delayed past 30 days and then clears, the firearms dealer is required to call the Oregon FICS unit on the phone when the purchaser shows up to pick up their firearm and the FICS unit runs yet another background check while the firearms dealer is on the phone. *See* LeJeune Dep. (CLEAN) 50:3-53:9; *see also* U.S. Dep't of Jus., Firearms Transaction Record (ATF Form 4473), https://bit.ly/3Bkchr3 (last visited May 12, 2023) (noting that Form 4473 is only good for 30 days).

(at least) twice over.  For one thing, *Silvester* applied the exact same type of "two-step inquiry" that the Supreme Court has since abrogated.  *Compare Silvester*, 843 F.3d at 827, *with Bruen*, 142 S.Ct. at 2127 (rejecting two-step test as "one step too many").  Under *Bruen*, the state must "identify a well-established and representative historical analogue" for a law, like Measure 114, that restricts conduct protected by the Second Amendment.  *Bruen*, 142 S.Ct. at 2127, 2133.  And to the extent *Silvester* really did suggest that no delay in the exercise of Second Amendment rights is too long, *Bruen* explicitly rejected exactly that proposition, emphasizing that "lengthy wait times in processing … applications" would be a hallmark of an "abusive" "permitting scheme" that "den[ied] ordinary citizens their [Second Amendment] rights."  142 S.Ct. at 2138 n.9.  *Silvester* is thus of no aid to the state here.

Moreover, even assuming that making someone wait 30 days to exercise a fundamental right were permissible, that is not the only delay that the new regime countenances.  Measure 114 also requires a dealer to obtain a *second* background check before it may transfer a firearm, and there is no time limit at all on how long on OSP may take to complete that check.  *See* M114 §§6(3)(C), (13)(b), (14), 7(3)(d)(B), 8(3)(B)(c) (imposing no time limit on OSP).  Making matters worse, Measure 114 "repeals the longstanding Oregon-law provision that allowed dealers to 'deliver [a] firearm to [a] purchaser' when OSP 'fail[ed] to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check,' ORS 166.412(3)(c) (repealed), and replaces it with a blanket ban on transfers unless and until OSP gives the green light," *Eyre*.Supp.PI.Br.5,.  Thus, even 30 days is not the "outer … limit" under Measure 114.  State.PI.Br.26.  The outer limit is infinite, because—as Defendants

have not denied and cannot deny—OSP is not required to perform the background check necessary to the *transfer* in *any* particular period of time, and there is no mechanism to compel it to do so.

Defendants do not meaningfully engage with that glaring problem in Oregon's new regime, apparently because they believe that Plaintiffs have not challenged it. Pretrial Order ("PTO") 12-13, Dkt. 161; *see also* State.PI.Br.2. Defendants contend that "Plaintiffs have not challenged Measure 114's revisions to Oregon's existing background check statutes in their complaints," because "[t]he complaints request that the Court find the 'permitting provisions' unconstitutional, not the revisions to Oregon's existing background check provisions." PTO.12 (citing *Eyre* 1st Am. Compl. ¶ 98 (Dkt. 67); *OFF* 3rd Am. Compl. ¶ 133 (Dkt. 133)). In reality, Plaintiffs' complaints plainly challenge M114 in its entirety—including *both* the need to obtain a permit-to-purchase *and* the inability to obtain a firearm until OSP has completed a background check that it has infinite time to complete. *See Eyre* First Amended Complaint, Dkt. 67 at ¶¶5-11, 37-43, 73-77, 88-97, 101[8]; *OFF* Third Amended Complaint, Dkt. 158 at ¶¶6-7, 123-131, 136. Indeed, Plaintiffs cite *by*

---

[8] E.g., ¶7 ("Even if an individual comes to a licensed gun dealer with a 'permit-to-purchase' in hand, the dealer must … ask OSP to perform another background check and assign a 'unique approval number' if the individual passes, §6(2)(d), which likewise can take an eternity." (emphasis omitted)), ¶43 ("'[A] permit-to-purchase issued under this section *does not create any right of the permit holder to receive a firearm*.' §4(6)(a) (emphasis added). If an individual comes to a licensed gun dealer with a 'permit-to-purchase' in hand, the process essentially starts all over again. The dealer must … ask OSP to perform *another* background check and assign a 'unique approval number' if the individual passes, §6(2)(d). The dealer cannot transfer the firearm until OSP gives the green light, and—again—there is no time limit for OSP to act."), ¶75 ("Press reports document that Measure 114 has already caused "an increased state police backlog in processing the requested background checks and customers waiting longer to walk out of a store with a firearm, according to state police and gun shop owners."), ¶92 ("Before Measure 114, Oregon law mirrored federal law. Until the adoption of Measure 114, ORS 166.412(3)(c) provided as follows: 'If the department fails to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check, the gun dealer may deliver the firearm to the purchaser.' *See also* 18 U.S.C. §922(t)(1)(B)(ii) (similar under federal law). But now, under Measure 114, a 'dealer may not transfer the firearm unless the dealer receives a unique approval number from the department.' §6(3)(c); *see also* §6(13)(b) & (14) (making it a

*section number* the background check provisions they are challenging, *see Eyre* First Amended Complaint, Dkt. 67 at ¶85 (citing M114 §§3(4), 4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2)); *OFF* Third Amended Complaint, Dkt. 158 at ¶120 (same), and then concluded by contending that "Measure 114's permitting *provisions* violate the Second Amendment," *see Eyre* First Amended Complaint, Dkt. 67 at ¶98 (emphasis added); *OFF* Third Amended Complaint, Dkt. 158 at ¶133 (same).  That is presumably why this Court has already acknowledged that Plaintiffs' amended complaints "raise … substantive challenges to Measure 114's background check requirements."  Dkt. 70 at 5 n.1.  Plaintiffs' challenge to M114's permitting regime therefore applies to M114's permitting regime in its entirety, including both the permit-to-purchase requirements and the second background check requirement, as alleged in their operative complaints.

That makes Defendants' refusal to meaningfully defend these provisions both inexplicable and inexcusable.  Yet in the Pretrial Order, Defendants offer (yet again) only one conclusory sentence in defense of these background-check provisions:  "As this Court has already held, "background checks,' like [Measure 114's revisions to Oregon's background check statutes], are constitutionally permissible.'" PTO.13 (quoting Dkt. 70) (brackets in original).   But the Order of this Court which defendants quote explicitly addressed only older pleadings that the Court deemed not to raise the background-check issue at that time—as opposed to the current pleadings, which the Court noted "raise more substantive challenges to Measure 114's background check requirements."  Dkt. 70 at 5.  This Court plainly did not definitively resolve the constitutionality

---

crime to '[k]nowingly sell[] or deliver[] a firearm … prior to receiving a unique approval number from the department,' even if the purchaser already possesses a concealed handgun license); M114 §§7(3)(d)(B), 8(3)(B)(c) (extending this amendment to person-to-person transfers and gun shows).").

of this aspect of the regime in that preliminary Order; indeed, if all of this Court's preliminary rulings were definitive, it would not have scheduled this matter for trial. Defendants must therefore now actually defend these requirements on their own merits—as they have thus far signally failed to do. Referring generally to "background checks" does not explore why or how *these* set of background checks, featuring "lengthy wait times" and "exorbitant fees," *Bruen* 142 S.Ct. at 2138 n.9, can be defended under *Bruen*. *See id.* (These are hallmarks of an "abusive" "permitting scheme" subject to "constitutional challenge"). This is exactly why more than a single sentence is needed. *See, e.g. Parrish v. Mabus*, 679 F.App'x 620, 621 (9th Cir. 2017) ("A bare assertion … with no supporting argument, or an argument made only in passing, is insufficient …").

In the absence of any substantive defense by Defendants, Plaintiffs are left where they began: Even assuming *arguendo* that "[a] 30-day deadline by which to complete the permitting process would not deny anyone their Second Amendment rights," State.PI.Br.27, Measure 114 would still be unconstitutional because Measure 114 on its face countenances the imposition of interminable delays—on Oregonians who have already passed one background check, no less.

c. All of that already suffices to demonstrate that Oregon's novel permit-to-purchase regime is unconstitutional. But discovery has proven that the permitting system is, in every respect, shaping up to be an even bigger disaster in practice than in theory:

1. To start with the permit-to-purchase application, the state's 30(b)(6) witnesses testified that OSP can receive applications only via fax, (snail) mail, "or courier." Lindsay Decl., Exhibit A, Landers Dep. 8:7-22. OSP can receive fingerprints only by mail or courier. *Id.* at 8:23-25. Once a permit-to-purchase application is received, an employee must manually process the background check every step of the way. *Id.* at 14:12-24 (noting "at this time we don't have a system that we would use. We have been very open about that. It would be a manual process.").

The employee must also manually enter the permit-to-purchase information into an Excel spreadsheet. *Id.* 20:9-18. That bare list of information regarding those who apply for a permit is presently the sum total of what Defendants maintain constitutes a "database" sufficient to satisfy the requirements of Measure 114 §4. *See* Lindsay Decl. Exhibit I, Defendants' Response to Plaintiffs' First Set of Interrogatories, No. 11. To be clear, at the moment, this "database" is literally an empty Excel spreadsheet with some column headers. *Id.* The state has not even begun to think about how more than one (much less twenty) employees could work simultaneously on it, and the answer for now appears to be yet more manual inputting. *See* Landers Dep. 22:2-12. No special physical, administrative, or security safeguards exist for this "database." *Id.* 22:13-24:17.

At least Defendants are using an Excel spreadsheet as a fig leaf when it comes to the "database" requirement. When it comes to Measure 114's requirement that OSP "conduct a criminal background check ... through the Federal Bureau of Investigation," §4(1)(e), Defendants do not even have a pretense of compliance. Under Measure 114, "the criminal background check" that is required (1) "shall ... includ[e] ... a fingerprint identification, through the Federal Bureau of Investigation," and (2) is not considered "complet[e]" until after the FBI has "return[ed] the fingerprint cards used to conduct the criminal background check." M114 §5(e). Yet it is undisputed that the FBI "will not perform fingerprint-based criminal background checks for permit applicants" submitted by OSP. AUF.42; *see* Decl. of Commander Rebecca David ¶7. And for reasons of federal law, the FBI will not do so going forward. *See* AUF.42; Defendants' Response to Plaintiffs' First Set of Interrogatories, No. 13. OSP has thus been forced to effectively rewrite the law: It is instructing its employees to process fingerprints through the Oregon system rather than through the FBI. Landers Dep. 10:9-11:21. This workaround not only is unauthorized by Measure 114; it is also causing significant delay. Collecting the (paper) fingerprint cards and

running them manually through the *Oregon* system (which is, again, not required by Measure 114) is a novel addition to Oregon's background check system that is creating a significant bottleneck. *See id.* 36:15-22 (testifying that "if fingerprints weren't involved .… it would be the same background as what our FICS currently does."). The state does not have the authority to add this requirement to the law simply because the FBI will not do something *else* the law requires.

Making matters worse, permit agents do not even have authority under Measure 114 to issue a permit based on an OSP background check alone. Defendants have claimed, first in a footnote and subsequently at 30(b)(6) deposition, that permit agents "should issue the permit" where "OSP determines that an applicant passes its background checks, and reports that determination, along with the FBI's refusal to conduct a check." State.PI.Br.29 n.12; *see* Landers Dep. 10:9-13:9. But, in making this assertion, they did not cite anything in Measure 114 that supports it, likely because nothing in Measure 114 does. And the evidence in this case refutes the notion that permit agents will grant permits on terms that Measure 114 does not allow. Defendants note that "Kevin Campbell, Executive Director of the Oregon Association of Chiefs of Police ('OACP'), was clear in deposition that his members will implement Measure 114." State.PI.Br.30. But what Mr. Campbell actually said is that chiefs of police will implement Measure 114 *as written*. *See id.* (quoting Mr. Campbell saying, "When a law is passed, we implement the law."). There is thus no reason to think that permit agents will implement anything other than the law that was actually passed, which requires cooperation from the FBI before permit agents can validly issue a permit. 2d Decl. of Kevin L. Campbell ¶8; 2d Decl. of Jason Myers ¶14.

2. Even if citizens could secure the permits-to-purchase, the OSP process for the second background check is an even bigger mess. As a reminder, once a citizen has her permit-to-purchase and goes to a store, she must ask the dealer to request a second background check at the point of

sale.  When the dealer submits the background-check request to OSP online, as the state's 30(b)(6) witnesses testified, it is automatically approved only approximately 40% of the time.  Lindsay Decl., Exhibit B, LeJeune Dep. (CLEAN) 16:20-17:4; 26:9-24.  The rest of the applications—the majority—are kicked to the "web queue."  *Id.*  Though this is occasionally owing to actual concerns about whether someone is prohibited from possessing a firearm, much of this is due to issues having nothing to do with any legitimate basis to withhold a firearm, like having a "common name."  *Id.* 32:22; *see id.* 29:4-36:18.  The wait time once in the "web queue" has been typically above 45 days and going well above.  *See* Lindsay Decl., Exhibit D, LeJeune Dep. (ROUGH) 61:12-62:20.  And for those whose background checks are marked "pending or delayed," OSP's processes become truly Kafkaesque.  OSP always informs firearms dealers that such "pending or delayed" background checks will take 45 days to process—a figure that does not reflect reality, but that OSP provides because giving honest answers generated too many complaints.  *See id.* 60:1-62:20; *see also id.* 54:4-55:13.  And while OSP provides both a phone number and an email for those whose background checks have been delayed to try to obtain more information, OSP has made the intentional decision, at a management level, *not to respond* to voicemails or emails citizens leave at this number or email address.  *Id.* 65:22-67:14.  Moreover, "the FICS unit does not currently have a deadline on when" it must resolve a pending or delayed applicant's status.  *Id.* 69:13-15.  Meanwhile, for those customers who purchase from a dealer willing to submit their background check requests via the phone in the first instance, rather than submit to this digital labyrinth, wait times just to speak to someone are typically 1-to-3 hours, while others are disconnected and have to start over again—and it is the *dealer*, not the customer, who has to agree to devote all of this time to processing a transaction for just a single customer.  LeJeune Dep. (CLEAN)  25:13-16, 58:23-59:9.

The state's witnesses candidly acknowledged that a major reason for all of these problems is that the state has woefully underfunded the regime it seeks to interpose between Oregonians and their constitutional rights. As to the revamped general background check, the state's representative testified that OSP needs significantly more staff than it is currently allotted. *See* LeJeune Dep. (CLEAN) 59:13-60:10 (agreeing that "[i]n a perfect world … it would happen in a short time frame," but testifying that in this world, the FICS unit needs "additional resources or additional money from the budget" or to "hire additional people"). Meanwhile, to administer the permit-to-purchase regime, OSP would need to hire (at least) 20 more employees, yet it currently has no budget or authority to do so. Landers Dep. 17:7-19:25. Until OSP could hire more employees and get them trained, it will be forced to try to run the program with only its current already-overwhelmed staff, with current employees "split[ting] responsibilities between permit to purchase applications and background checks." *Id*. 15:4-18:5, 20:5-8. And while OSP has identified a vendor it would like to work with to receive LiveScan fingerprints, it has no money to do so. *See id.* 33:12-24; 38:8-10.

*    *    *

As the foregoing illustrates, both on its face and in its present form, Oregon's onerous and duplicative permitting regime cannot pass muster. Defendants have offered no historical analogue for *any* of its novel features, let alone all of them. Yet each is unconstitutional even standing alone, and Defendants' own evidence has confirmed that the combined effect of them is even more obviously incompatible with the Second Amendment. Because Defendants have come up far short of meeting their burden of justifying Measure 114's novel and severe burdens on citizens' ability to acquire firearms, summary judgment should issue for Plaintiffs.

But to the extent the Court disagrees, Plaintiffs are prepared to prove up all of the law's defects at trial through both the testimony discussed above and other witnesses. At a minimum, all of that evidence confirms the regime cannot be allowed to take effect at this time, as Defendants have effectively conceded that they are not currently able to implement it. Indeed, every argument Defendants have made in their briefs in this case on what they style as Plaintiffs' "as-applied challenges" to the new regime has been couched in the conditional, future tense: "*Once law enforcement is prepared*," Defendants assure the Court, the new regime will pass muster. State.PI.Br.28 (emphasis added). But law enforcement is not prepared *now*—and, as far as anyone can tell, will not be anytime soon. *See supra*, pp.24-28. Accordingly, at the very least, the Court should bar Defendants from enforcing the law until such time as they can both represent and prove that they can actually implement the new regime in a manner that will allow ordinary Oregonians to acquire firearms in a timely manner. That is hardly too much to ask when the exercise of a fundamental right is a stake. Simply put, the state cannot "require Oregonians looking to acquire a firearm"—*i.e.*, to exercise a fundamental right—"to comply with a regime that does not exist and cannot be satisfied." *Eyre*.Supp.PI.Br.13-14; *see Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).

## II. The Magazine Ban Violates The Second Amendment.

### A. The Magazines that Measure 114 Bans Are "Arms."

As noted at the outset, under the Supreme Court's recent *Bruen* decision, the first question to ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. 142 S.Ct. at 2126. If it does, then, that conduct is "presumptively protect[ed]" by the Second Amendment. *Id*. In the context of a law like Measure 114 that prohibits ordinary law-abiding citizens from acquiring, using, or even possessing magazines and other ammunition feeding devices capable of accepting more than ten

rounds, *see* M114 §11, the answer to that question turns on whether ammunition feeding devices fall within "the Second Amendment's definition of 'arms.'" *Bruen*, 142 S.Ct. at 2132.  After all, the Second Amendment's plain text guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II.  If magazines and other ammunition feeding devices are "Arms," then "the Constitution presumptively protects th[e] conduct" that Measure 114 restricts.  *Bruen*, 142 S.Ct. at 2130.

This is a legal question, and the Supreme Court has made clear what the answer is.  The Supreme Court has definitively interpreted the term "Arms" as used in the Second Amendment. The scope of "the Second Amendment's definition of 'arms,'" the Court has held, is restricted *neither* to "only those arms in existence in the 18th century" *nor* to only those arms that the government deems necessary for self-defense.  *Id.* at 2132; *Heller*, 554 U.S. at 582.  Rather, "the Second Amendment's definition of 'arms'" covers all "modern instruments that facilitate armed self-defense," "'even those that were not in existence at the time of the founding,'" and regardless of whether they are strictly "necessary" for self-defense.  *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).  In short, "[t]he 18th-century meaning is no different from the meaning today…. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"  *Heller*, 554 U.S. at 581.

Magazines fit comfortably within that settled definition.  After all, it is not the gun, but bullets *fed by the magazine*, that "strike another."  *See id.* at 581.  Citizens carry firearms equipped with magazines and other ammunition feeding devices for the same reason they carry firearms loaded with ammunition:  "[W]ithout bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014).  It is undeniable that magazines and other ammunition feeding devices facilitate armed self-defense.  That point is not even

disputed.  As one of Defendants' witnesses has explained, the first step in the "process" by which all "firearms, no matter the type, operate" is "[f]eeding," and nearly all modern pistols and rifles "utilize[] a 'box' magazine" that "is inserted into the firearm" "to contain *and feed* multiple rounds of ammunition" to the firing chamber.  Decl. of James Yurgealitis ¶¶11, 20.  Thus, unless "a loaded magazine" is "insert[ed]" into such a firearm, the firearm will not operate as intended.  *Id.* ¶20; *see also* Decl. of Mark Hanish ¶22 (magazines form "an integral part" of what makes modern semiautomatic firearms operate as semiautomatic firearms).  The point is undisputed because it is not disputable:  Measure 114 itself defines "large-capacity magazine" by reference to what such "device[s]" *do*, namely, "allows a shooter to keep firing without having to pause to reload" by "feeding" ammunition into the firing chamber of a firearm.  M114 §11(1)(d).  In short, magazines are instruments that facilitate armed self-defense, and therefore "Arms" within the meaning of the Second Amendment, regardless of how many rounds of ammunition they hold.  *See Barnett v. Raoul*, 2023 WL 3160284, at *8 (S.D. Ill. Apr. 28, 2023).

Under *Bruen*, that is the end of the inquiry into whether the magazines that Measure 114 bans come within the Second Amendment's plain text and are presumptively protected by the Constitution.  Defendants argued previously that there is still more work to do because "[t]he Ninth Circuit has never held that accessory components constitute an arm."  State.PI.Br.6.  That is a non-sequitur; whether the Ninth Circuit has answered this question has no bearing at all on what the answer is.  It is also wrong twice over.  First, regardless of what the Ninth Circuit has or has not done, *the Supreme Court* has instructed what "the Second Amendment's definition of 'arms' is," *see Bruen*, 142 S.Ct. at 2132, and ammunition feeding devices indisputably (and undisputedly) fit that definition.  Second, feeding devices are not mere accessories; they are integral to what makes semiautomatic firearms work as intended.  As the text of Measure 114 itself illustrates, these

devices are part of the mechanism by which ammunition is fed to the firing chamber and then fired through the barrel. *See* §11(1)(d) ("'Large-capacity magazine' means" a "device … that has an overall capacity of … more than 10 rounds of ammunition *and allows a shooter to keep firing without having to pause to reload*…." (emphasis added)). When a user pulls the trigger, the round in the chamber fires, and the spring in the magazine and semiautomatic action combine to feed a new round into the firing chamber. Without magazines, firearms cannot operate semiautomatically—or in some cases, at all.

Defendants' position makes particularly little sense given that Measure 114 applies not just to detachable magazines, but also to "fixed magazines." Fixed magazines, as Measure 114 notes, "cannot be removed without disassembly of the firearm action." M114 §11(1)(c); *see* AUF.48; *see also* Yurgealitis Decl. ¶¶25, 27, 31. A ban on "fixed magazines" is thus a ban *on firearms themselves*. Defendants have offered no argument that firearms that come standard with "fixed magazines" capable of accepting more than ten rounds are somehow not "Arms." Nor could they, as any such argument would be as frivolous as arguing that firearms that come factory standard with triggers are somehow not Arms. In reality, the fact that some firearms come standard with a fixed ammunition feeding device confirms that these devices are not mere accessories. Something that is not just integral to the firing mechanism of a firearm, but literally part of it, is obviously an arm, not an accessory. *See* Hanish Decl. ¶24 ("[M]agazines are so critical to the firearm, engineers often start the design of a new firearm around the magazine."). And nothing in law or logic supports the notion that a component integral to the functioning of a mechanical object ceases to be integral just because engineers figure out how to make it detachable.

In all events, even if the ammunition feeding devices themselves were not literal "Arms" within the meaning of the Second Amendment, that would not mean they are not protected. Just

as a ban on the ink used to print newspapers would squarely implicate the First Amendment, a ban on triggers, barrels, magazines, or any other operable component of a firearm squarely implicates the Second, as it is just a roundabout way of prohibiting an Arm equipped with that component. That is precisely why the Ninth Circuit recognized even before *Bruen* that "case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock*, 779 F.3d at 998. So too did the Third Circuit, explaining that "[b]ecause ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC*"). In short, the clear purpose and effect of Measure 114's magazine ban is to functionally ban firearms capable of firing more than ten rounds without reloading. *See, e.g.*, Preamble to Measure 114 (noting that "large-capacity magazines are often associated with semiautomatic assault rifles, and can also be used with many semiautomatic firearms including shotguns and pistols"). And firearms capable of firing more than ten rounds without reloading are unquestionably "bearable arms."

Defendants have argued that circuit precedent holds that the Second Amendment protects only those components that are "necessary to render [protected] firearms operable," and that the ammunition feeding devices that Measure 114 bans "are not 'necessary to use' firearms for self-defense." State.PI.Br.5 (alteration in original) (quoting *Fyock*, 779 F.3d at 998). Under Defendants' view, in other words, because a firearm can fire (albeit not semiautomatically) with only a single round in the chamber, magazines do not come within the Second Amendment's embrace. That is plainly not what *Fyock* held—as evidenced by the fact that neither the *Duncan* panel nor the en banc panel read it that way. *See* 970 F.3d at 1152; 19 F.4th at 1101. But even if

the Ninth Circuit had ever embraced such a rule, the Supreme Court has since explicitly rejected it. *Bruen* made clear once and for all that the Second Amendment "covers modern instruments that *facilitate* armed self-defense," not just what (the government says) is *necessary* for self-defense. 142 S.Ct. at 2132 (emphasis added). Necessity thus has nothing to do with the test the Supreme Court has articulated. That makes sense, as the plain text of the Constitution guarantees a right "to keep and bear arms," full stop—not a right to keep and bear only what the government deems necessary. *See* U.S. Const. amend. II; *Heller*, 554 U.S. at 635 (the Second Amendment leaves to "the people," not the government, the choice of how best to defend themselves).

Defendants' view, by contrast, would strip the Second Amendment of all content. After all, even an unloaded firearm can aid in self-defense. *See* William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 26 (May 13, 2022), https://bit.ly/3yPfoHw ("[I]n most defensive gun uses the gun was not fired."). So, under Defendants' logic, no one would have a right to keep ammunition at all. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). And, thankfully, it is not the law. Devices that play an integral role in the firing mechanism by feeding ammunition to the firing chamber—which not only is what distinguishes firearms from clubs, but is what allows the semiautomatic pistol, the "quintessential self-defense weapon," to work as intended (or at all), *see Heller*, 554 U.S. at 629—plainly facilitate armed self-defense. The ammunition feeding devices that Oregon has banned are therefore "Arms."

### B. The Magazines that Measure 114 Bans Are Typically Possessed by Law-Abiding Citizens for Lawful Purposes.

Because the feeding devices that Measure 114 bans fit "the Second Amendment's definition of 'arms,'" Oregon's ban is "presumptively invalid," and the state bears the burden of "affirmatively proving" that it is "consistent with this Nation's historical tradition of firearm

regulation." *Bruen*, 142 S. Ct. at 2126-27.  And when it comes to efforts to ban arms, the historical

work has already been done.  As *Bruen* explained, historical tradition protects arms that are "in

common use today," as opposed to those "'highly unusual in society at large.'"  *Bruen*, 142 S.Ct.

at 2143 (quoting *Heller*, 554 U.S. at 627); *see also Barnett*, 2023 WL 3160284, at *11 ("[T]he

commonality of 'arms' banned under [the law challenged there] is dispositive.").  Accordingly, the

only question after *Bruen* is whether arms are "typically possessed by law-abiding citizens for

lawful purposes."  *Heller*, 554 U.S. at 625.  If they are, then they are not "dangerous *and* unusual,'"

*Bruen*, 142 S.Ct. at 2128 (emphasis added), so the state may not ban them.

The answer to that question here is not even close.  Court after court has acknowledged the

ubiquity of these products in modern America.  *See, e.g.*, *Duncan v. Bonta*, 970 F.3d 1133, 1142

(9th Cir. 2020) ("One estimate based in part on government data shows that from 1990 to 2015,

civilians possessed about 115 million LCMs out of a total of 230 million magazines in

circulation."); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc) ("46% of all magazines

owned"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("[A]bout

25 million large-capacity magazines were available in 1995" and another "nearly 50 million such

magazines … were approved for import by 2000[.]").  Government and industry statistics confirm

the point.  *See, e.g.*, Nat'l Shooting Sports Found., *Firearm Production in the United States* 7

(2020), https://bit.ly/3jfDUMt (finding, based on industry sales data, that American consumers

purchased more than 304 million magazines across both pistols and rifles from 1990 to 2018, 52%

of which—almost 160 million—had a capacity larger than ten rounds); English, *2021 National

Firearms Survey*, *supra*, at 22-23 (estimating that 39 million Americans, or more than 15% of all

American adults, own or have owned a magazine that hold more than ten rounds); Christopher S.

Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun*

*Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 65-57 (2004), *available at* https://bit.ly/3wUdGRE.  Simply put, as the D.C. Circuit put it more than a decade ago, while "[t]here may well be some capacity above which magazines are not in common use[,] … that capacity surely is not ten."  *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

Defendants have never contested *either* "the raw sales numbers of LCMs," which show that tens of millions of Americans own hundreds of millions of magazines that hold more than ten rounds, *or* "that LCMs are prevalent in society."  State.PI.Br.8.  Instead, they have argued that the feeding devices the state has banned are not "in common use" because law-abiding citizens rarely need to expend more than ten rounds of ammunition in a self-defense situation.  *Id.* at 6-8.  But that how-many-do-you-really-need view of the fundamental right the Second Amendment protects is fundamentally at odds with *Bruen*, which explicitly "confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry … for the purpose … *of being armed and ready* for offensive or defensive action in a case of conflict with another person.'"  142 S.Ct. at 2134 (first ellipsis in original; emphasis added) (quoting *Heller*, 554 U.S. at 584).  That fundamental right does not turn on how frequently people actually confront such situations or how many rounds they typically fire when they do.  Instead, "the pertinent Second Amendment inquiry is whether" the arms in question—here, magazines that can hold more than ten rounds—"are commonly *possessed* by law-abiding citizens for lawful purposes."  *Caetano v. Massachusetts*, 577 U.S. 411, 420 (Alito, J., concurring in the judgment) (emphasis added); *accord Heller*, 554 U.S. at 625 ("typically *possessed* by law-abiding citizens for lawful purposes" (emphasis added)); *see also id.* at 720 (Breyer, J., dissenting) (begrudgingly admitting that, under "[t]he majority" opinion in *Heller*, the "[Second] Amendment protects those weapons 'typically possessed by law-abiding citizens for

lawful purposes'"); *Bruen*, 142 S.Ct. at 2143 (reiterating that "Arms" fall outside the Second Amendment's protection only if they are "highly unusual in society at large" (quoting *Heller*, 554 U.S. at 627 (majority op.))).

There is no question that the *typical* individual who possesses these commonplace arms does so for lawful purposes.  In the vast majority of states, these devices are perfectly lawful.  *See* Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://n.pr/3QMJCC1.  And the reasons most frequently cited by the millions of Americans who own magazines capable of holding more than ten rounds are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%).  English, *2021 National Firearms Survey*, *supra*, at 23.  This makes sense:  "When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm."  David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015); *see Jackson*, 746 F.3d at 967.

Of course, as with any arms, there are some who misuse these arms for unlawful—indeed, awful—purposes.  But that was equally true of the handguns at issue in *Heller*.  The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting).  The majority did not dispute these points; it just found them irrelevant to whether handguns are constitutionally protected, because that question does not turn on whether arms are misused by criminals; it turns on whether law-abiding citizens commonly own and use them for lawful purposes.  That is why it was enough in *Heller* that handguns are *typically* possessed for lawful purposes.  *See id.* at 624-25 (majority op.).  And what was true in *Heller* is no less true here, given the millions of law-abiding Americans who lawfully own the arms that Oregon has banned.

Finally, the state has posited that Measure 114 does not seriously burden Oregonians' Second Amendment rights because the people to whom the Second Amendment refers may still possess as many sub-eleven-round-capacity magazines as they please and have other means of defending themselves that the state deems sufficient.  But the Supreme Court rejected this we-have-not-banned-everything-yet argument in *Heller* itself.  "It is no answer to say … that it is permissible to ban the possession of ['large-capacity' magazines] so long as the possession of other [magazines] is allowed."  *Heller*, 554 U.S. at 629.  Just as in *Heller*, the people have spoken, choosing to arm themselves in overwhelming numbers with ammunition feeding devices capable of holding more than ten rounds.  Because the arms it bans are typically possessed by law-abiding citizens for lawful purposes, section 11 of Measure 114 violates the Second Amendment.

### C.  There is No Historical Tradition of Regulating Firing or Ammunition Capacity, Let Alone of Banning Feeding Devices Above a Certain Threshold.

On Count III, the Court can and should end its analysis there.  "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S.Ct. at 2131, and the tradition here is that law-abiding citizens may keep and bear arms that are commonly possessed for self-defense.  That *is* the historical test—*i.e.*, the key inquiry under *Bruen*—and it forecloses the state's effort to ban these commonly possessed arms.  Summary judgment can and should issue on this basis alone.  Nevertheless, even if further historical inquiry were necessary, Defendants have not come close to meeting their burden of demonstrating any historical tradition of prohibiting firearms capable of firing more than ten rounds without reloading.  To the contrary, the historical record reveals a long tradition of welcoming technological advancements that enable civilian firearms to fire more rounds more accurately and efficiently.

1. "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity."  Kopel, *supra*, 78 Alb. L. Rev. at 864.  That did not change anytime soon:

Laws regulating firing capacity did not come around for another hundred-plus years.  As for ammunition feeding devices in particular, not a single state restricted the manufacture, sale, or possession of magazines or other ammunition feeding devices *until the 1990s*.

Defendants have never argued otherwise.  Indeed, they have not cited even a single restriction on firing or magazine capacity from the 1700s or the 1800s.  That is because no such restriction was enacted until the twentieth century.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 974 F.3d 237, 258 (3d Cir. 2020) (Matey, C.J., dissenting) ("[H]istory reveals a long gap between the development and commercial distribution of magazines, on the one hand, and limiting regulations, on the other hand."), *cert granted, vacated*, 142 S.Ct. 2894 (2022).  Even then, moreover, such laws were rare and typically short-lived:  While a few states enacted laws restricting firing capacity of semiautomatic weapons in the 1920s and 1930s,[9] each was either repealed outright or replaced with a law that restricted only fully automatic weapons, *i.e.*, machine guns—which, unlike *semi*automatics, were not widely adopted by law-abiding citizens for lawful purposes.[10]  And none of them was ever understood to apply to feeding devices, as opposed to the firearms themselves.  *See* Kopel, *supra*, 78 Alb. L. Rev. at 864-66.  Only the District of Columbia restricted magazines qua magazines before 1990.[11]  That explains why the Supreme Court, when

---

[9] Three states briefly prohibited semiautomatic firearms that could discharge a certain number of rounds without reloading.  *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I. Acts & Resolves 256, 256-57; 1933 Minn. Laws ch. 190.  California and Ohio enacted licensing laws for certain semiautomatic firearms that could fire more than a certain number of rounds without reloading, but did not prohibit their possession.  *See* 1933 Cal. Stat., ch. 450; 1933 Ohio Laws 189, 189.  And a Virginia law enacted in this era could be read to include semiautomatics that hold more than 16 rounds, but it too was not a general ban; it applied only to the use of such a weapon in a "crime of violence" or "for offensive or aggressive purpose."  1934 Va. Acts ch. 96, §§1(a), 4(d).

[10] *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263; 1963 Minn. Sess. L. ch. 753, at 1229; 1965 Cal. Stat., ch. 33, at 913; 1972 Ohio Laws 1866, 1963; 1975 Va. Acts, ch. 14, at 67.

[11] That law was even more of an outlier than the handful of state laws just mentioned.  In 1932, Congress passed a local D.C. law prohibiting the possession of firearms that "shoot[] automatically

discussing modern semiautomatic rifles that come standard with 20- or 30-round detachable magazines, correctly observed that such arms "traditionally have been widely accepted as lawful possessions" in the United States. *Staples v. United States*, 511 U.S. 600, 612 (1994). In all events, given the indisputable ubiquity of firearms with a capacity of more than ten rounds by the Prohibition Era, *see infra* pp.43-46, these few, late-breaking state laws do not an enduring tradition make. *See Bruen*, 142 S.Ct. at 2137-38 (rejecting reliance on "a handful of late-19th-century [laws]" allegedly similar to the challenged restriction, because laws first enacted long after ratification "come too late to provide insight into the meaning of [the Constitution]" (first alteration added) (quoting *Sprint*, 554 U.S. at 312 (Roberts, C.J., dissenting))).

Indeed, outside the District of Columbia, the first state law restricting magazine capacity did not come *until 1990*—two centuries after the founding and well over a century after the ratification of the Fourteenth Amendment. *See* 1990 N.J. Laws 217, 221, 235 (codified at N.J. Stat. Ann. §2C:39-1(y), -3(j)). And the vast majority of states still today allow ordinary law-abiding citizens to choose for themselves what ammunition capacity they believe best suits their needs. As for the federal government, it did not regulate magazine capacity until 1994, when Congress adopted a nationwide ban on ammunition feeding devices with a capacity of more than ten rounds. *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)). Unlike Oregon's ban, that federal law was time-limited and operated only prospectively,

---

or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 652. (1932), repealed via 48 Stat. 1236 (1934), currently codified as amended at 26 U.S.C. §§5801-72. This law was not understood to sweep up ammunition feeding devices as an original matter. Indeed, when Congress enacted the National Firearms Act just two years later, it chose not to impose any restrictions on magazines, despite imposing stringent regulations on machine guns. Pub. L. No. 73-474, 48 Stat. 1236 (1934). Nevertheless, after the District achieved home rule in 1975, the new D.C. government interpreted the 1932 law "so that it outlawed all detachable magazines and all semiautomatic handguns." Kopel, *supra*, 78 Alb. L. Rev. at 866. (The handgun ban is what the Court struck down in *Heller*.)

Page 40    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE
            ALTERNATIVE, TRIAL BRIEF

allowing people who had already lawfully acquired such magazines to keep them.  *Id.*  And Congress allowed it to expire in 2004 after a study by the Department of Justice revealed that it had produced "no discernable reduction" in violence with firearms across the country.  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), *available at* https://bit.ly/3wUdGRE.

In short, there is no longstanding national tradition of government regulation of these commonplace arms—let alone of outright bans.  *See Heller*, 670 F.3d at 1260 ("We are not aware of evidence that prohibitions on … large-capacity magazines are longstanding[.]").

2. Defendants' arguments to the contrary depend on ignoring—or at least blue-penciling—Supreme Court precedent.  According to Defendants, "[r]estrictions on LCMs are consistent with this country's historical tradition of regulating dangerous weapons."  State.PI.Br.12.  But the Supreme Court has specifically rejected this crabbed view of our nation's historical tradition.  Instead, as the Supreme Court has now (twice) explained, the only "historical tradition" of outright bans of arms in this country is "of prohibiting the carrying of 'dangerous *and* unusual weapons.'"  *Bruen*, 142 S.Ct. at 2128 (emphasis added) (quoting *Heller*, 554 U.S. at 627).  "[T]his is a conjunctive test:  A weapon may not be banned unless it is *both* dangerous *and* unusual."  *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment).  Dangerousness, in other words, *is not enough*; states may ban only those arms "highly unusual in society at large" *in addition to being unusually dangerous*.  *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

Because the ammunition feeding devices that Oregon has banned are the furthest thing from highly unusual, and instead are overwhelmingly popular among law-abiding gun owners, they cannot be deemed "dangerous and unusual" and thus cannot be banned outright.  This is the

historical tradition of our country. "Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156. They instead confined themselves to prohibiting only those arms that are "*not* typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). It therefore makes no difference whether these or similar arms would have been understood as "dangerous and unusual" in olden days. As *Bruen* made clear, "even if … colonial laws prohibited the carrying of [certain types of arms] because they were considered 'dangerous and unusual weapons' [*then*], they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S.Ct. at 2143 (emphasis added) (quoting *Heller*, 554 U.S. at 627). And that conclusion applies *a fortiori* to a law that bans not just "the public carry" of arms in common use today, but *even their private possession*. No tradition supports such a sweeping prohibition.

> **D.     Oregon Cannot Save Its Sweeping Ban on Common Arms by Pointing to Any Dramatic Technological Change or Novel Societal Problem.**

The state has claimed that its ban is necessitated by both "dramatic technological changes" and "unprecedented societal concerns." *See Bruen*, 142 S. Ct. at 2132. It is wrong on both counts. Whatever room there may be for "a more nuanced approach" to analogical reasoning when it comes to new modes of *regulation*, *Bruen* made clear that no such nuance is necessary when it comes to bans on arms, for the "dangerous *and* unusual" test that this Court must apply already accounts for technological changes and the nature of modern arms. *See id.* at 2143 ("[E]ven if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."). And under that test, if arms are in common use, they are protected even if they may differ considerably from arms of old.

In all events, even if "dramatic technological changes" and "unprecedented societal concerns" were relevant, Defendants cannot establish either. The lack of any historical (or even modern-day) tradition supporting the state's ban is certainly not owing to any "dramatic technological changes." *See id.* at 2132. Firearms capable of firing more than ten rounds of ammunition without reloading are nothing new, and neither are ammunition feeding devices up to that task. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580." *Duncan*, 970 F.3d at 1147; *see also* William Wellington Greener, *The Gun and Its Development* 80-81 (Cassell & Co., 8th ed. 1907) (1881).

As for "cartridge-fed" "repeating" firearms in particular, they came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, which was a full-size lever-action rifle capable of carrying 17 rounds" that "could fire 18 rounds in half as many seconds." *Duncan*, 970 F.3d at 1148; *see* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 1148 (2d ed. 2018); Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894*, at 128 (1985); *see also* Kopel, *supra*, 78 Alb. L. Rev. at 854-55 (discussing the advent of the "first metallic cartridge … similar to modern ammunition" in the 1850s). These multi-shot arms were not novelties; they were ubiquitous among civilians by the end of the Civil War. Indeed, as one of Defendant's experts who was self-confessedly not knowledgeable on firearms remarked, "this is the famous Winchester." Lindsay Decl., Exhibit C, Baron Dep. 52:21. "[O]ver 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the Model 73 and Model 92, sold more than ten times that amount in the ensuing decades. *Duncan*, 970 F.3d at 1148. And Winchester rifles, while certainly the most popular, were by no means unique. *See, e.g.*, AUF.62-63; Harold F. Williamson, *Winchester: The*

*Gun That Won The West* 28-31 (1952) (discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) (noting that 14,000 Henry rifles were sold between 1860 and 1866).

As for the semiautomatic rifles and pistols for which box-style magazines were invented, they too were *nineteenth*-century inventions, *see* Johnson, *Firearms Law and the Second Amendment* at 463, 519, and by the 1890s Luger was retailing a semi-automatic pistol with a detachable box-style magazine. *See Duncan*, 970 F.3d at 1148. Indeed, the Colt *Model 1911*, which had a "detachable magazine," is still one of the most sought-after handguns in use today, which itself is proof positive that detachable magazines are nothing new. Decl. of Brian DeLay, at 36, *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill. Mar. 2, 2023), Dkt.37-13. "The most copied and influential of all modern handguns, several million M1911s have been sold in the past century, and the gun is still in production today." Decl. of Brian DeLay at 71. Technology that a member of the Taft Administration would recognize cannot be deemed a "dramatic technological change" in 2023.

To be sure, feeding devices capable of holding more than ten rounds were not as common in the nineteenth century as they are today. But the same could be said of pretty much any modern arm. The more relevant point is that history refutes any notion that there is something novel about what Oregon has banned. What fed ammunition into the chamber of these firearms were magazines and other ammunition feeding devices capable of holding more than ten rounds. "The Winchester M1873 and then the M1892 were lever actions holding ten to eleven rounds in tubular magazines." Kopel, *supra*, 78 Alb. L. Rev. at 855; *see, e.g.*, *Model 1873 Short Rifle*, Winchester Repeating Arms, https://bit.ly/3VV6JNn (last visited May 12, 2023). Similarly, the Evans

Repeating Rifle, which first hit "the market in 1873," came standard with a fixed magazine located in the buttstock that "held thirty-four rounds."  Kopel, *supra*, 78 Alb. L. Rev. at 856; *see also* Dwight B. Demeritt, Jr., *Maine Made Guns And Their Makers* 293-95 (rev. ed. 1997).  In short, semiautomatic firearms and ammunition feeding devices capable of holding more than ten rounds have been part of the fabric of American life for well more than 150 years, yet no tradition has developed even today of laws prohibiting law-abiding citizens from possessing them.

Defendants have never denied any of this.  Defendants have not disputed, for instance, that the first firearm that could fire more than ten rounds without reloading was invented around 1580, or that 11-shot repeaters were sold in the United States as early as the 1720s, or that the 1820s saw the invention of a repeater whose "number of charges may be extended to fifteen or even twenty" and which was marketed for "private use," or that the leading air rifle of the mid-1800s could shoot upwards of 20 rounds via a gravity-fed, tubular magazine, or that nineteenth-century civil rights leaders urged citizens who were formerly enslaved to keep a Winchester rifle (which came standard with a 17-round magazine) "in every Black home."  *See Eyre*.Supp.PI.Br.20-22.  In fact, Defendants' own witnesses admit that repeating rifles were at least as widespread at the time of the Fourteenth Amendment as stun guns were at the time of *Caetano*.  For instance, one defense witness admits that the Union government's "War Department bought almost 112,500 Spencer repeaters," which "employed a magazine tube" and "could be reloaded much quicker than a Henry [rifle] by use of special pre-loaded cartridge tubes," "for use in the Civil War."  Decl. of Roger Pauly ¶72.  Nor were these just military arms:  Another defense witness explained that the Spencer repeater was "destined for military *and commercial success*."  Decl. of Brian DeLay ¶58 n.56 (emphasis added).  That should come as no surprise:  Far from treating technological advancements aimed at improving the accuracy, firing capacity, and functionality of firearms as nefarious

developments that made firearms "too dangerous," history establishes time after time that those are precisely the kinds of things people have consistently looked for when determining how best to protect self, others, and home. Simply put, the notion that arms of the sort Oregon has now banned represent something wholly new is not just anachronistic; it is patently untrue.

To be sure, modern firearms equipped with magazines like the ones Oregon has banned are more accurate and capable of quickly firing more rounds than their founding-era predecessors. But that does not make them any less descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified. *Heller*, 554 U.S. at 624-25; *see also Caetano*, 577 U.S. at 416-17 (Alito, J., concurring in the judgment). After all, it would be particularly perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists. *See Bruen*, 142 S.Ct. at 2156. Moreover, much of what Defendants have said in this case about why the magazines Oregon now deems too "large" are supposedly different from arms long in common use could be said equally of the handguns *Heller* held protected. Yet the Supreme Court eschewed a test focused on which arms are capable of doing the most damage in the hands of the small number of people bent on misusing them, in favor of a test grounded in the historical tradition of *protecting* the right of law-abiding citizens to possess those arms that people commonly conclude best serve their needs.

Finally, to the extent Defendants seek to excuse the relative novelty of banning commonplace arms by pointing to some "unprecedented societal concern[]" heretofore unseen, *see Bruen*, 142 S.Ct. at 2132, that argument fails too. Even accepting the dubious proposition that there is some causal link between the arms Oregon has banned and the horrific acts on which the state's briefing has focused, the unfortunate reality is that mass murder has been a fact of life in

the United States for a very long time.  *See* AUF.66.  Nevertheless, before the 1990s, there were almost no efforts to restrict the firing capacity of semiautomatic arms or so-called large-capacity magazines.  Nor, more importantly, has there ever been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they could inflict in the hands of someone bent on misusing them.  To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm.  *See Bruen*, 142 S.Ct. at 2132; *Heller*, 554 U.S. at 627.  Because Measure 114 flies in the face of that longstanding historical tradition, it violates the Second Amendment.

*    *    *

The magazines and firearms Measure 114 bans are covered by the Second Amendment's plain text and are typically possessed by law-abiding citizens today for lawful purposes.  That is enough to doom Measure 114.  But even if resort to further historical analysis were necessary, there simply is not any "enduring American tradition of state regulation" prohibiting law-abiding citizens from possessing magazines and firearms capable of holding more than ten rounds.  *Bruen*, 142 S.Ct. at 2135.  The magazine ban violates the Second Amendment.

## III.    The Magazine Ban Violates The Fifth And Fourteenth Amendments.

### A.    The Magazine Ban Violates the Takings Clause.

The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation."  U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (incorporating against the states).  A physical taking occurs whenever governments "dispossess [an] owner" of lawfully obtained property.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982).  That is true of personal property no less than real property; the "categorical duty" imposed by the Takings Clause applies

"when [the state] takes your car, just as when it takes your home." *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015). The same rule applies if the dispossession arises from a regulation, rather than from the use of eminent domain: "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). And it applies regardless of whether the state-authorized "invasion" is only partial. *See id.* (temporary visit by union organizers). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner," even if the government has not taken the entire bundle of sticks. *Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

Measure 114 plainly runs afoul of those settled principles. First, the statute makes it a crime for licensed dealers to continue to possess magazines that they lawfully acquired and that, but for Measure 114, they would lawfully sell to law-abiding citizens. "[L]icensed gun dealer[s]" in Oregon that lawfully acquired and currently possess "large-capacity magazines" can avoid committing "a class A misdemeanor" only if, "within 180 days of the effective date of [the Act]," they transfer or sell the magazines to a dealer out of state, render the magazines inoperable (and thus unsalable), or dispossess themselves of them altogether. M114 §11(2), (3)(a), (6). And come "180 days following the effective date," not even those options will be on the table. By forcing dealers to surrender, destroy, or send away their property, Measure 114 effects a physical taking.

There can be no question that selling a magazine to a third party requires physical dispossession. The owner must literally hand the property over to someone else if they want to avoid becoming a criminal. That is the definition of a taking. *See Black's Law Dictionary* (10th ed. 2014) (defining "taking" to include the "transfer of possession"). The fact that the transfer in these circumstances may be to a private party rather than the state does not change things. In *Kelo*,

for instance, it made no difference that the law allowed Ms. Kelo to sell her property to a "private nonprofit entity." *Kelo v. City of New London*, 545 U.S. 469, 473-75 (2005). That makes sense: Whether the government edict forces the owner to hand the property over to the government or to a third party, there is still a taking—and still an obligation for the state to pay just compensation.

The option to move the lawfully acquired property out of Oregon is no less a taking. First of all, Oregon cannot invoke the permissive laws of another state to validate its own unconstitutional restriction. *See Jackson*, 746 F.3d at 967 ("That Jackson may easily purchase ammunition elsewhere is irrelevant."). But even putting that problem aside, requiring someone to remove property from the state is no less a dispossession than a forced confiscation. Like a mandatory sale or a surrender to the government, a mandatory transfer out of state directly interferes with a dealer's right to possess (and sell) the property. And as the Supreme Court has long held, "to constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word …; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights." *R.J. Widen Co. v. United States*, 357 F.2d 988, 993 (Ct. Cl. 1966) (citing cases).

The option to alter the magazines to accept fewer than ten rounds does not eliminate the taking either. As an initial matter, the only way a dealer could be sure that they had "[p]ermanently alter[ed]" a magazine "so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds"—or at least had done so sufficiently to law enforcement's liking—would be if they literally destroyed the magazine. *See infra* pp.53-55. In all events, even if some magazines and other feeding devices can be altered in the way the statute contemplates without being destroyed, that option does not take the statute outside the Takings Clause. Once again, recent Supreme Court precedent is on point. In *Horne*, for instance, it made no difference that the raisin

growers could have avoided the taking by "plant[ing] different crops" or selling "their raisin-variety grapes as table grapes or for use in juice or wine." 576 U.S. at 365. Likewise in *Loretto*, it made no difference that the owner could have avoided the taking by converting her building into something other than an apartment complex. 458 U.S. at 439 n.17. This case is no different.

Oregon must therefore provide just compensation. After all, courts assess physical takings "using a simple, per se rule: The government must pay for what it takes." *Cedar Point*, 141 S.Ct. at 2071. Yet Measure 114 offers no compensation at all for the lawfully acquired property that it turns into unlawful contraband. It therefore violates the Takings Clause.[12]

Plaintiffs recognize that, if the *Duncan* en banc decision had not been vacated post-*Bruen*, their Takings challenge would be foreclosed by Ninth Circuit precedent. *See Duncan v. Bonta*, 19 F.4th 1087, 1113 (9th Cir. 2021) (en banc) ("Mandating the sale, transfer, modification, or destruction of a dangerous item cannot reasonably be considered a taking akin to a physical invasion of a rental building or the physical confiscation of raisins."). But the en banc decision, which Plaintiffs continue to believe was wrong when it was decided and has only gotten more wrong since, *was* vacated—and it was vacated in its entirety. *Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022) (en banc) ("The judgment in this case is vacated[.]"). This Court is therefore bound to follow the Supreme Court precedent discussed above.

To the extent that Measure 114 somehow does not effect a physical taking, it effects an unconstitutional regulatory taking. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-39 (2005) (a regulation that "goes too far," by, e.g., "interfere[ing] with legitimate property interests, "also constitutes a taking that requires just compensation). Absent Measure 114, the magazines that it

---

[12] At a minimum, forcing citizens to sell their property, move it out of state, or permanently alter it places an unconstitutional condition on constitutionally protected possession, which thereby effects a taking. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604-07 (2013).

deems contraband would be salable and in demand (as evidenced by the fact that Americans have purchased hundreds of millions of them and counting). Because of Measure 114, however, they are now effectively worthless to any dealer in Oregon. Yet Oregon offers dealers who find themselves in this situation exactly zero compensation. That violates the Takings Clause.

The analysis is much the same as to individuals. Measure 114 subjects to criminal punishment any person who possesses even a single "large-capacity magazine," regardless of when or how it was acquired. An individual can escape criminal punishment only by affirmatively proving that she obtained her property long ago, which will be very difficult for many people to do. It is hard to imagine a greater invasion of property rights than a prohibition on keeping the property against which one must "affirmative[ly] defen[d]" oneself. *See* M114 §11(5).

The only factual matter bearing at all on this claim has been stipulated: The magazines banned by M114 have value on the open market. AUF.67. Plaintiffs' remaining contentions are pure arguments of law, as are Defendants' defenses. The Takings claim therefore can and should be resolved as a matter for summary judgment.

   **B.    The Magazine Ban's Retroactive Applications Violate the Due Process Clause of the Fourteenth Amendment.**

For similar reasons, even if the ban's prospective components somehow passed muster, its retrospective aspects would still violate due process. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976) (explaining that "the justifications for" "the prospective aspects" of a law "may not suffice for" a law's "retrospective aspects"). Due process "protects the interests in fair notice and repose that may be compromised by retroactive legislation" and prevents Congress from enacting retroactive laws that would infringe those protected interests without adequate justification. *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016). And "in accordance with 'fundamental notions of justice' that have been recognized throughout history," "[r]etroactivity is

generally disfavored in the law." *E. Enters. v. Apfel*, 524 U.S. 498 at 532 (1998) (plurality op.); *see also id.* at 549 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("[D]ue process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity."); 2 J. Story, *Commentaries on the Constitution* §1398 (5th ed. 1891) ("Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact."). Consistent with these fundamental commitments, "the Court has given careful consideration to due process challenges to legislation with retroactive effects" and "treat[ed] due process challenges based on the retroactive character of the statutes in question as serious and meritorious." *E. Enters.*, 524 U.S. at 547-48 (Kennedy, J., concurring in the judgment in part and dissenting in part).

Oregon's retroactive ban cannot satisfy that high bar. To be sure, the state asserts an interest in public safety, which is generally considered compelling. But applying a criminal prohibition retroactively against licensed dealers, who have complied with the law at every turn, does not meaningfully further that interest. There is no reason to think that applying a criminal prohibition to federally licensed individuals and enterprises who lawfully possessed the now-banned magazines for decades before the statute took effect will have any tangible public safety benefit. The state's effort to "change the legal consequences of transactions long closed," *E. Enters.*, 524 U.S. at 548, cannot "meet the test of due process," *Usery*, 428 U.S. at 17.

There is perhaps no clearer instance of a pure question of law in this case than the retroactivity claim, which asks only if M114's provisions operate on transactions that have already happened (a matter of statutory interpretation), and if so, what the constitutional consequences of that are. The Court should resolve this issue at the threshold, as there are no facts left to dispute at trial.

**C.    The Magazine Ban Is Void for Vagueness.**

Putting the retroactivity issue aside, Measure 114 violates due process because it is impermissibly vague.  Measure 114 exempts from liability the possession of an ammunition feeding device that *was* capable of holding more than ten rounds if, after the 180-day grace period, the device has been "[p]ermanently alter[ed] … so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition."  M114 §11(3)(c).  But it does not define what it means by either "[p]ermanent[] alter[ation]" or "ammunition," leaving dealers wishing to comply without sufficient direction, and leaving law enforcement with a vast degree of discretion.

This is no small deal.  Due process requires the government to define what it requires with sufficient definiteness that people of ordinary intelligence can understand whether their actions will result in adverse consequences.  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  "[I]f criminal penalties may be  imposed for violations of a law," as is the case here, "a stricter standard is applied in reviewing the statute for vagueness."  *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022).  And the standard is ratcheted up even further when, as here, a criminal law not only lacks any "mens rea requirement," *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999), but regulates conduct implicating fundamental constitutional rights, *see Vill. Of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99 (1982).

Yet the language Oregon has deployed here is anything but clear.  While the words "permanent" and "alter" are understandable enough on their own, in the context of what the statute actually requires, they beg more questions than they resolve.  For instance, what would happen if manufacturers next year developed smaller ammunition than what is currently on the market?  Would a feeding device that had already been modified so that it cannot accept more than ten rounds of the standard ammunition that existed on the date the statute was enacted all of a sudden

become contraband because eleven of the new, smaller rounds may fit?[13]  Does "permanently alter" mean that the magazine has to have been rendered unable to be restored to full capacity by a master gunsmith using the facilities of a fully equipped machine shop, or will it suffice that "the person in possession" cannot restore it to its initial capacity?  The statute does not say, leaving dealers and citizens to guess as to what, if anything, will be enough to allow them to keep their (modified) property without winding up in prison.  *See Peoples Rights Org.*, 152 F.3d at 537 (holding "unconstitutionally vague" a municipal ordinance that banned "assault weapons" and defined that term in part to mean "any firearm which may be restored to an operable assault weapon as defined in [other provisions]," in part because "the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited").

This provision is all the more problematic because ammunition does not come in a single shape or size, yet nothing in Measure 114 defines "ammunition," except to clarify that the term "'[l]arge capacity magazine' … does not include … [a]n attached tubular device designed to accept, and capable of operating only with 0.22 caliber rimfire ammunition."  M114 §11(1)(d)(B). As written, then, it is anyone's guess whether a feeding device is legal or illegal if more than ten of some fire-able projectiles (other than .22 caliber rimfire ammunition), even if not designed to be used in or typically associated with the device in question, will fit.

"This provision is a trap for the unwary."  *Peoples Rights Org.*, 152 F.3d at 536.  It gives law enforcement vast discretion to prosecute ordinary citizens who had no reason to know they

---

[13] This question is not hypothetical.  Mossberg 500 and 590 shotguns with 20-inch barrels can be adapted with a $15 item that allows them to shoot 12-gauge mini shells.  *See OPSol Mini Clip 2.0 Flex Minishell Adapter Mossberg*, Midway USA, https://bit.ly/3VTs0qN (last visited May 12, 2023).  This allows the fixed tube magazine to hold 12 to 13 rounds.  *See* Dan Kidder, *Aguila Mini Shells*, Sportsman's Warehouse, https://bit.ly/44QJR5J (last visited May 12, 2023).  The conversion takes seconds.  *How to Use Your OPSol Mini-Clip 2.0 Flex*, OPSol Texas, https://bit.ly/44RPbWs (last visited May 12, 2023).

had done anything wrong.  *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (most "important

aspect of vagueness doctrine" is "the requirement that a legislature establish minimal guidelines

to govern law enforcement").  The inevitable result is obvious:  Oregonians will see no real option

to comply other than to dispossess themselves entirely.  Due process demands far more.  Moreover,

yet again, summary judgment is the appropriate way to resolve this pure question of law.

## CONCLUSION

The Court should enter judgment for Plaintiffs on all Counts.

Respectfully submitted,


DATED:  May 13, 2023                    JURISLAW LLP

Paul D. Clement[*]                       s/ Shawn M. Lindsay
Erin E. Murphy[*]                        Shawn M. Lindsay (OSB No.: 020695)
Matthew D. Rowen[*]                      Daniel J. Nichols (OSB No.: 101304)
Nicholas M. Gallagher[*]                 Three Centerpointe Drive
Clement & Murphy, PLLC                    Suite 160
706 Duke Street                          Lake Oswego, OR 97035
Alexandria, VA 22314                     (503) 968-1475
(202) 742-8900                           shawn@jurislawyer.com

[*] admitted *pro hac vice*                *Counsel for Eyre Plaintiffs*


s/ Stephen Joncus                        s/ Leonard W. Williamson
Stephen J. Joncus, OSB #013072           Leonard W. Williamson, OSB #910020
JONCUS LAW PC                            VAN NESS WILLIAMSON LLP
13203 SE 172nd Ave Ste 166 #344          960 Liberty St. SE, Ste 100
Happy Valley, OR  97086                  Salem, OR 97302
(971) 236-1200                           (503) 365-8800
steve@joncus.net                         l.williamson@vwllp.com

                                         *Counsel for OFF Plaintiffs*


                                         s/ James L. Buchal
                                         James L. Buchal, OSB #910020
                                         MURPHY & BUCHAL LLP
                                         PO Box 86620
                                         Portland, OR 97286
                                         (503) 227-1011
                                         jbuchal@mbllp.com

                                         *Counsel for Fitz and Azzopardi Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(B)(2)

Pursuant to the parties' stipulation and the Court's allowance to grant an extension of the page count, this brief complies with the applicable page-count limitation under LR 7-2(b) because it contains fewer than 70 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 12th day of May, 2023.

s/ Shawn M. Lindsay
Shawn M. Lindsay (OSB No.: 020695)
Counsel for Eyre Plaintiffs