

1  C. D. Michel – SBN 144258
   cmichel@michellawyers.com
2  Sean A. Brady – SBN 262007
   sbrady@michellawyers.com
3  Matthew D. Cubeiro – SBN 291519
   mcubeiro@michellawyers.com
4  MICHEL & ASSOCIATES, P.C.
   180 East Ocean Boulevard, Suite 200
5  Long Beach, CA 90802
   Telephone: 562-216-4444
6  Facsimile: 562-216-4445
7
8  Attorneys for Plaintiffs
9
10              UNITED STATES DISTRICT COURT
11             CENTRAL DISTRICT OF CALIFORNIA
12                   SOUTHERN DIVISION
13
14  STEVEN RUPP, et al.,              Case No.: 8:17-cv-00746-JLS-JDE
15              Plaintiffs,           EXPERT WITNESS REBUTTAL
                                      REPORT OF GARY KLECK
16       vs.
17  XAVIER BECERRA, in his official
18  capacity as Attorney General of the State
    of California,
19
                Defendant.
20
21
22
23
24
25
26
27
28

                             1
     EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

Ex. 11 - Wilson Decl.
Page 1 of 80

**My Qualifications**

1.      I am an emeritus Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology. I was, at the time of my retirement in May, 2016, the David J. Bordua Professor of Criminology at Florida State University, where I served on the faculty from 1978 to 2016. My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime" (Vizzard, 2000, p. 183).

2.      I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which informs and serves as part of the basis of my opinions. I am the author of Point Blank: Guns and Violence in America, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology." I also authored Targeting Guns (1997) and, with Don B. Kates, Jr., The Great American Gun Debate (1997) and Armed (2001) – books that likewise addressed the topic of guns and violence.

3.      I have also published scholarly research articles in virtually all of the leading professional journals in my field. Specifically, my articles have been published in the American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and Delinquency, Journal of Quantitative Criminology, Law & Contemporary Problems, Law and Human Behavior, Law & Policy Quarterly, Violence and Victims, Journal of the American Medical Association, and many other scholarly journals.

4.      I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1  member of the U.S. Sentencing Commission's Drugs-Violence Task Force, and as a
2  member of the Institute of Medicine and National Research Council Committee on
3  Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-
4  Related Violence. I am a referee for over a dozen professional journals, and serve as
5  a grants consultant to the National Science Foundation.

6      5.      Finally, I have taught doctoral students how to do research and evaluate
7  the quality of research evidence, and have taught graduate courses on research
8  design and causal inference, statistical techniques, and survey research methodology.
9  My current curriculum vitae is attached as Exhibit 1.

10     6.      I am being compensated for my work at the rate of $400 per hour.

11  **Response to Lucy Allen Supplementary Expert Report**

12      *Few Mass Shootings Involve Large-Capacity Magazines (LCMs)*

13     7.      Allen claims that there is substantial benefit to banning LCMs because
14  a large share of mass shooting involve the use of LCMs (defined herein as
15  magazines holding more than 10 rounds).  She is only able to sustain this claim by
16  limiting her analysis to a trivially tiny and unrepresentative subset of mass
17  shootings, *public* mass shootings.  She claims she did this because "it is my
18  understanding that the state of California is concerned about public mass shootings
19  and enacted the challenged laws, in part, to address the problem of public mass
20  shootings" (p. 4).  Her "understanding" is both subjective and unsupported by any
21  evidence pertaining to legislative intent behind enactment of California's ban on
22  LCMs and assault weapons (AWs).  Indeed, defense expert Louis Klarevas'
23  description of California's legislative intent (Klarevas 2023, p. 23) indicates that
24  concern about mass shootings was *not* limited to those occurring in public places.
25  The fact that the State of California is concerned about public mass shootings does
26  not mean it is <u>not</u> concerned with all the other shootings that do not fall into this
27  narrow category.  Further, Allen's own statement concedes that California's assault
28  weapons ban (AWB) was enacted only "in part" to address these kinds of shootings,

3

---

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1  and thus must have also been based on concerns about other kinds of gun violence.

2  Thus, her proffered explanation does not justify her narrow focus. It will be shown

3  later that the narrowness of her focus produces some highly misleading results.

4       8.     First, it should be made clear just how narrow her focus is. Less than

5  1% of all U.S. murder victims are killed in *any* kind of a mass shooting, regardless

6  of location or other attributes. A Congressional Research Service (CRS) study

7  covering 1999-2013 found that 1,554 victims were killed in all mass shootings

8  (Krouse and Richardson 2015, p. 14), a period for which FBI data indicated that

9  there were 237,524 persons murdered (U.S. FBI 2013). Thus, only 2/3rds of one

10 percent of murders were part of a mass shooting of any kind

11 (1,554/237,524=0.0065). Second, even within this tiny subset of killings, only

12 20.8% of mass shooting incidents were public mass shootings (Krouse and

13 Richardson 2015, p. 29). The 446 victims killed in public mass shootings therefore

14 accounted for 0.00188 of U.S. murder victims, or just 1 in 533 victims. Thus, public

15 mass shootings contribute an even tinier share of firearms violence than mass

16 shootings as a whole. Allen's focus on this set of killings likewise cannot be

17 justified on the basis of their constituting a significant share of America's violence.

18      9.     The main consequence of this extremely narrow focus is that it allows

19 Allen to make the misleading claim that a large share of killings involve use of

20 LCMs. LCMs are of little or no significance in ordinary gun crimes with few

21 victims and few shots fired (Kleck 1997, pp. 121-128; 2016), so advocates of LCM

22 restrictions claim that their benefit is most likely to lie within the set of mass

23 shootings, where many shots are fired and LCMs supposedly increase the casualty

24 count. However, even within this subset of violent crimes – mass shootings as a

25 whole - LCMs are rarely involved (Kleck 2016). The Violence Policy Center

26 (2023), which advocates bans on LCMs, was able to identify only 29 incidents with

27 four or more dead (excluding the shooter) over the 9 year period from 2014 through

28 2022 that involved LCMs – about 3 per year in the entire United States (note that

4

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1  this organization inflated their numbers somewhat by including incidents involving

2  only three dead victims besides the shooter and by counting shooters in their

3  victims-killed totals; they been excluded here).

4      10.    Over the 38 year period from 1980 through 2017, VPC-identified

5  incidents with four or more dead victims accounted for 534 murdered victims, or

6  about 14 per year.  Over this same period, the FBI (2017)  reports a total of 704,651

7  murders (assuming the same number of murders in 2017 as in 2016).  Thus, mass

8  shootings (4+ dead) known to involve LCMs accounted for just 0.000758 of murder

9  victims, or 1/13[th] of one percent  (Kleck 2016).

10     11.    *Public* mass shootings account for an even tinier fraction of U.S.

11 homicide deaths, and are far more likely to involve "assault weapons" or LCMs.

12 The Congressional Research Service found that only 9.78% of all mass shootings in

13 1999-2013 involved "assault weapons," but in the minority of incidents that were

14 *public* mass shootings, 27.3% (18 or 66) involved use of "assault weapons" (Krouse

15 and Richardson 2015, p. 29).  In sum, it is only within the tiny subset of *public* mass

16 shootings that a nonnegligible share involve use of LCMs.  Thus, arbitrarily limiting

17 her analysis to these extremely rare and unrepresentative public mass shootings

18 thereby allowed Allen to report misleadingly high shares of the incidents as

19 involving AWs or LCMs.

20     12.    LCM use is even less relevant to the vast majority of criminal violence

21 that does not involve large numbers of victims.  Criminals rarely fire large numbers

22 of rounds in a given gun crime incident, so possession of magazines capable of

23 holding more than ten rounds of ammunition  merely provides, in the typical violent

24 gun crime, surplus rounds that are not fired and thus cannot injure additional

25 victims.  A study of Jersey City, NJ, found that offenders did not even fire a single

26 shot in over two-thirds of crimes in which the offender was armed with a handgun

27 (Reedy and Koper 2003, p. 153).  Of all violent crimes in which handguns *were*

28 fired, only 2.5-3.0% involved more than 10 rounds being fired by the offender (p.

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

154).  Even if we consider only incidents in which semi-automatic pistols *were* fired, only 3.6-4.2% of the incidents involved over 10 rounds being fired, which is in turn only 1.7-2.0% of *all* handgun violent crimes (whether the gun was fired or not).  The average number of rounds fired was 3.23-3.68 in semi-automatic pistol incidents in which the gun was fired, and 2.30-2.58 in revolver incidents in which the gun was fired.  Likewise, a study of gun homicides in Philadelphia found even fewer shots fired per incident than in the Jersey City study – only 2.7 shots per semi-automatic pistol killing in 1990 (McGonigal et al. 1993).

13.     The only kind of shootings in which large numbers of rounds are commonly fired are mass shootings, incidents that involve many victims.  Notwithstanding the massive news media attention paid to them, mass shootings are rare in absolute terms.  For the most recent year for which we have complete data, 2022, there were 36 known incidents with or more four persons killed (Gun Violence Archive 2023).

### Mass Shooters Do Not Need LCMs to Inflict Large Numbers of Casualties

14.     Even in the extremely rare mass shootings in which large numbers of victims were shot, and the shooters used LCMs, they virtually never <u>needed</u> LCMs to injure or kill as many victims as they did, because they either (a) possessed multiple guns, (b) possessed multiple magazines, or (c) had ample time and opportunity to reload, using smaller-capacity magazines (Kleck 2016). Therefore, even the hypothetical potential for reducing harm or improving the public's safety by limiting magazine capacity to no more than 10 rounds can be fairly described as being limited to a tiny number of extremely rare events.

15.     One earlier study of 15 mass shootings with more than six victims wounded or killed that occurred in the United States over a ten year period (1984-1993 inclusive) found that offenders possessed multiple guns in thirteen of the fifteen incidents (about 87%). The killers in these mass shootings did not need LCMs to quickly fire large numbers of rounds or wound large numbers of victims –

1    they either just switched loaded guns or reloaded their guns without interference

2    from bystanders (Kleck 1997, pp. 124-126, 144).

3         16.    A more recent study of incidents with more than 6 victims were killed

4    or wounded, covering 1994-2013, found that in *every single case*, the shooters

5    possessed either multiple guns or multiple magazines (Kleck 2016).  Thus, they

6    could continue firing with no significant pause for reloading, either by switching

7    guns or reloading detachable magazines, which takes only 3-4 seconds (Kleck

8    2019).

9         17.    Setting aside Allen's focus on a tiny unrepresentative subset of mass

10   shootings, what share *all* mass shootings involve use of LCMs?  The most

11   comprehensive listing of such incidents has been compiled by the Violence Policy

12   Center (VPC), an advocacy organization that favors strong gun control laws and

13   specifically supports bans on LCMs.  Thus, VPC staff are well-motivated to locate

14   every mass shooting involving the use of an LCM.  VPC bases their data on news

15   media reports, so the only LCM-involved mass shootings they are likely to miss

16   would be those that every single news outlet they searched failed to note LCM

17   involvement.  The most comprehensive listing of *all* mass shootings (regardless of

18   LCM involvement) can be found in the Gun Violence Archive (2023).  Based on

19   these two sources, the following table displays (1) the total number of incidents in

20   which 4 or more victims were killed, and (2) the number of these incidents in which

21   an LCM was known to have been used.  The data cover the most recent years for

22   which data are available, a period when, according to defense expert Louis Klarevas,

23   LCM-involved mass shootings were at their most frequent.

24

25   / / /

26   / / /

27   / / /

28   / / /

7

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

Table 1.    The Share of Mass Shootings in Which LCMs Were Used, 2014-2022

| Year | Total Mass Shootings | LCM-involved Mass Shootings |
|---|---|---|
| 2014 | 16 | 0 |
| 2015 | 21 | 4 |
| 2016 | 25 | 4 |
| 2017 | 18 | 4 |
| 2018 | 15 | 3 |
| 2019 | 30 | 4 |
| 2020 | 19 | 0 |
| 2021 | 22 | 5 |
| 2022 | 35 | 5 |
| 2014-2022 | 201 | 29 |

18.    Thus, even in the period when mass shootings and LCM-use was at its highest, only 14% (29/201=0.14) of all mass shootings involved use of LCMs – a far cry from Allen's 63% (p. 25).  It would be more accurate to say that mass shooters *rarely* use LCMs.

19.    One circumstance in which use of an LCM might affect the number of casualties, even if the shooter possessed multiple guns or multiple magazines, is one in which there were bystanders willing to tackle the shooter during his attempt to change magazines or firearms. The use of an LCM prior to that time could affect the number of victims shot, since the killer would have fired more rounds before needing to reload or switch guns, and before being tackled.  There is, however, just one LCM-involved mass shooting in the past 25 years in which intervenors tackled the shooter while he *may* have been reloading a semiautomatic gun – the incident in Tucson, AZ in which a man tried to kill Representative Gabrielle Gifford.

20.    Even regarding this unique incident, however, key details are in dispute, making it unclear whether bystanders intervened while the shooter was reloading, as opposed to dealing with a jammed gun resulting from a defective magazine.  The shooter was indeed tackled by bystanders, but law enforcement examination of the shooter's magazines indicated that a spring in one of his magazines had broken (*New York Times* January 10, 2011, p. A1).  Thus, the shooter may have been struggling

8

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1   with a jam caused by the defective magazine when he was tackled, rather than

2   reloading. The distinction is critical because magazines of any size can malfunction,

3   and this sort of opportunity for bystander intervention therefore could occur

4   regardless of the capacity of magazines used by mass shooters and regardless of

5   whether LCMs were banned. I know of no other mass shootings in the past 25 years

6   in which the shooter was disrupted by bystanders while the shooter was attempting

7   to reload or switch guns. Other cases in which it was claimed that a mass shooter

8   using semi-automatic firearms was tackled by bystanders while reloading turn out to

9   instead involve shooters struggling with a jammed gun.

10      21.    It might also be speculated that, if mass shooters were denied LCMs,

11  and consequently had to reload more often, this would slow the shooter's average

12  rate of fire and extend the time the killer was not shooting, allowing some

13  prospective victims additional time to escape. While this speculation has some *a

14  priori* plausibility, it is nevertheless inconsistent with the rates of fire sustained in

15  actual mass shootings. A change of the box-type magazines used in semi-automatic

16  pistols and rifles takes no more than 3-4 seconds, and possibly even less, depending

17  on the shooter's skill. Virtually all mass shooters, however, fire their guns at an

18  average rate no faster than one round every 2 seconds, and usually fire at even

19  slower rates. That is, the time interval that shooters need to change magazines is

20  shorter than the interval between shots fired by actual mass shooters even when they

21  are *not* reloading (Kleck 2016). Thus the need to switch magazines would almost

22  never slow the rate of fire maintained by mass shooters, and would therefore almost

23  never give victims additional time to escape during pauses in the shooting.

24      22.    Kleck (2016, Table 3) summarized data on all 25 known LCM-involved

25  mass shootings in the U.S. during 1994-2013 for which news media accounts

26  provided information on both the number of shots fired and the time span in which

27  shots were fired, thereby allowing reasonable estimates of rates of fire. Only 3

28  shooters of the 21 total took less than 2 seconds per shot fired, and only 6 took under

9

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

1   4 seconds.  Even with this handful of incidents with unusually rapid fire, however,

2   the difference between (a) the 1.4 or 1.6 seconds average interval between shots

3   observed in the two incidents with the fastest rates of fire, and (b) the 3-4 seconds

4   that it takes to change a detachable magazine is not likely to even be perceptible to

5   would-be intervenors.  That is, they would be unlikely to even be aware of the very

6   slight slowing of the killer's rate of fire necessitated by his changing of magazines.

7   In sum, even if LCM bans forced some mass shooters to use smaller capacity

8   magazines and therefore change magazines earlier and/or more often, it is highly

9   unlikely that it would perceptibly reduce those offenders' rate of fire and thereby

10  allow victims to take additional evasive actions that they otherwise would not have

11  been able to take.

12        23.    While limits on magazine capacity are not likely to affect mass

13  shooters, they could impair the ability of some citizens to engage in lawful self-

14  defense, in those crime incidents necessitating that the victim fire many rounds in

15  order to stop the aggressive actions of offenders.  In contrast to mass shooters,

16  victims of crimes generally cannot plan for or anticipate crimes to occur at a specific

17  time and place since these things are within their control.  Therefore, they ordinarily

18  cannot plan, as mass shooters do, to have many loaded guns and/or numerous

19  magazines with them at the times and places in which particular crimes against them

20  might occur. Victims who wish to defend themselves with firearms – especially if

21  they were carrying their gun in a public place - usually have to make do with a

22  single available gun and its ammunition capacity.  Consequently, if their one gun or

23  magazine's capacity was limited to 10 or fewer rounds, this means they could not

24  fire more than 10 rounds at offenders attempting to harm them.  Further, persons

25  who are law-abiding would be unlikely to simply violate the law and acquire banned

26  LCMs, as criminals do.

27

28  / / /

10

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

***The Number of Defensive Gun Uses with Over 10 round Fired is Far Greater than the Number of Crimes in Which LCM Use by the Offender Increased the Number of Casualties***

24.    Some defensive gun uses (DGUs) are likely to require large numbers of rounds being fired because (a) some crime victims face multiple offender adversaries who will not stop their aggression unless shot or fired upon, and because (b) typical crime victims will, under the stressful conditions of a crime victimization, miss with most of their shots.  Regarding the first point, the 2008 U.S. Department of Justice's National Crime Victimization survey indicated that 17.4% of violent crimes in the United States involved two or more offenders, and that nearly 800,000 violent crimes occurred in 2008 in which the victim faced multiple offenders.  Some of the victims in these 800,000 multiple-offender crimes would need to fire larger numbers of rounds to protect themselves because they would face multiple criminal adversaries.

25.    As to how often victims can hit their intended criminal adversaries, a reasonable upper limit estimate of the marksmanship of crime victims can be inferred from a review of the many detailed studies that have been done of shootings by police officers in which the officers were trying to shoot criminal adversaries.  In many of these shootings, the officers fired large numbers of rounds.  Yet, in 63% of the incidents, the officers failed to hit even a single offender with even a single round (Geller and Scott 1993), implying a 37% "hit rate."  "Hit rate" here means the percent of *incidents* in which the police officer achieved at least one hit on a criminal, not the percent of *shots fired* that hit a criminal.  Since some incidents involved multiple shots being fired, the fraction of shots that hit the criminal would necessarily be even lower that the fraction of incidents in which the shooter achieved at least one hit, i.e. under 37%.  Police officers are more likely than civilians to have the experience, training, and temperament to handle stressful, dangerous situations, so marksmanship among civilians using guns for self-protection is likely to be even poorer than that of police officers.  Certainly there is no reliable empirical evidence

11

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

1  that civilian marksmanship in such situations is better than that of police officers, so

2  civilians are likely to wound a criminal with less than 37% of their shots.  Thus,

3  these data indicate that the typical crime victim would have to fire at least three

4  rounds in order to successfully wound each offender they tried to shoot.  Crime

5  victims facing four offenders, for example, would therefore need, on average, at

6  least 12 rounds or more to wound all four of them.  A ban on magazines with more

7  than 10 rounds would make it impossible to fire this many rounds using a single

8  magazine.

9      26.    Lucy Allen nevertheless claims (p. 6) that virtually no defensive gun

10  uses (DGUs) involve more than 10 rounds being fired.  This claim, however, is

11  based on two unreliable sources that use samples known to be biased and

12  unrepresentative of DGUs in general.  Her first source is the incidents reported in a

13  National Rifle Association magazine, *The American Rifleman*.  Allen concludes that

14  "it is rare for a person, when using a firearm in self-defense, to fire more than ten

15  rounds." She does not confine this conclusion to persons whose defensive gun use

16  (DGU) was reported in the *American Rifleman*, but clearly intends it to apply to

17  American DGUs in general. The NRA's database of "armed citizen" stories is not a

18  representative sample of DGUs, nor does the NRA even claim it to be so. Allen

19  herself does not claim that the NRA sample is representative of all DGUs.  Indeed,

20  her own remarks indicate the opposite—she acknowledges the possibility of bias in

21  selecting cases "in favor of stories that put use of guns in self-defense in the best

22  possible light." Therefore, there is no formal basis for generalizing the results of any

23  analysis of this sample to any larger population of DGUs.

24      27.    The NRA sample of DGUs, however, is even worse than merely being

25  unrepresentative of DGUs in a general way. More specifically, there is strong reason

26  to believe that the sample will largely exclude DGU incidents in which the defender

27  fired more than 10 rounds. NRA staff nonrandomly select these incidents from news

28  media-reported cases of DGU, most of them submitted by readers of the "Armed

12

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

Citizen" feature of *American Rifleman*.  Based on the content of these stories published in the magazine, it is clear that they are selected to convey the impression that DGU is an extremely legitimate and successful activity, engaged in by law-abiding persons, for clearly legally justifiable purposes, carried out in clearly lawful ways. The reality of the full array of DGUs is considerably more diverse, but the NRA has a political agenda to portray DGU in as positive a light as possible.

28.    Allen is quite right to note that the selection practices of NRA staff are likely to favor inclusion of DGU stories that put DGU "in the best possible light." She does not, however, appear to understand how this bias would work regarding stories in which defenders fired large numbers of rounds. It could not serve the NRA's purposes to disseminate accounts of DGUs in which the defenders appeared to indiscriminately "fling lead," firing arguably excessive numbers of rounds at their adversaries. The more seemingly excessive the defender's use of force appears to be, the less likely it is that his actions would appear to a reader to be justifiable.  Instead, NRA staff would better serve their political ends by selecting stories of DGUs in which the defenders faced serious threats, but used the minimum amount of force needed to defend themselves, firing the fewest rounds needed to serve that purpose. This would bias the sample of NRA-selected DGUs in the direction of excluding cases in which many rounds were fired.

29.    Even though the NRA sample is not representative of DGUs in general, Allen's analysis of the NRA sample does nevertheless establish one thing: DGUs in which more than 10 rounds are fired do occur.  Her analysis of the NRA sample of identified two incidents in which over 10 rounds were fired, comprising 0.3% of the defensive incidents - a frequency that Allen characterized as "rare." This is indeed rare in absolute terms, but mass shootings in which the use of a LCM conceivably increased the casualty count are even rarer.  Detailed examination of the way mass shootings actually occur indicates that the number of incidents in which use of LCMs is likely to have increased the number of victims killed or injured in a typical

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1    year may well be zero (Kleck 2016).

2        30.    Allen's second source of information on number of rounds fired in

3    DGUs shares the same fatal bias as her NRA-selected sample – it is likely to exclude

4    cases in which many rounds were fired by a defender.  The second source was a set

5    of news-media reported incidents that Allen or her staff identified using an online

6    search of the Factiva database (Allen 2023, pp. 10-11).  For a case to be uncovered

7    via this method, it would have to be one covered by a news outlet.  News outlets,

8    however, would generally only know about cases known to the police, and DGUs

9    are only likely to become known to the police if the victim/defender chose to report

10   the incident to police.  These defenders therefore face the same dilemma that NRA

11   staff selecting cases for the Armed Citizen column faced – DGUs in which large

12   numbers of rounds are fired are likely to look less legitimate, appearing to involve

13   excessive use of force by the defender.  Defenders who fired over 10 rounds in self-

14   defense have good reason to anticipate police asking them why they fired so many

15   rounds, and thus good reason to refrain from reporting the incident to the police.  In

16   sum, Allen's sample of Factiva-discovered DGUs would tend to omit cases with

17   many rounds fired, just as the NRA-selected sample did.

18       31.    It is nevertheless worth considering the implications, for example, if

19   just 0.3% of all DGUs really did involve over 10 rounds being fired, as Allen's

20   results indicated.  National surveys that have specifically asked about DGUs have

21   consistently indicated that 0.5-3.5 million DGUs occur per year in the U.S., so it

22   would be reasonable to assume an annual average of around 2 million DGUs (Kleck

23   2021).  At least 21 professionally conducted national surveys have yielded estimates

24   of the national total of DGUs in this range (Kleck 2021). (Extant criticism of survey

25   estimates of DGU frequency has been uniformly uninformative due to critics'

26   exclusively one-sided focus on survey flaws that purportedly make the estimates too

27   large, while ignoring well-established problems in surveys that have the opposite

28   effect.  More comprehensive consideration of the known flaws and limitations of

14

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

survey methods indicates that the vast majority of known problems would tend to make DGU estimates too low [Kleck 2018]).

32.     If the annual number of all DGUs was indeed 2 million, a 0.3% share would imply a number of DGU incidents with over 10 rounds fired that was huge in absolute terms—about 6,000 per year. The share of incidents with over 10 rounds fired does not have to be very large in order for it to imply a huge absolute number of such incidents – one that greatly exceeds the number of crimes in which LCM use increased the harm inflicted on victims. In short, Allen's own results from the "Armed Citizen" analysis, taken at face value, imply that there are far more DGUs each year in which the defender fired over 10 rounds than there are crimes committed in which LCM use increased the harms inflicted.

33.     Given current data limitations, no one, including Lucy Allen, really knows the percent of DGUs by crime victims that involved use of LCMs or the firing of more than 10 rounds, but the number is almost certain to be far larger than the number of crimes in which LCM use caused a larger number of victims to be injured or killed, simply because the latter number is close to zero. Table 1 herein showed that from 2014 through 2022, there were only 29 mass shootings (4 or more victims killed) in which an LCM was even used, whether or not its use increased the casualty count. Thus, there were an average of just 3.2 mass shootings per year (29/9=3.2) in the entire U.S. in which it was even theoretically possible that LCM use increased the casualty count. The number in which this effect actually occurred, however, was even lower. Only a single mass shooting with LCM use (the Giffords incident) *may* have involved bystander intervention due to the shooter's need to reload, potentially supporting the theory that the casualty counts in mass shootings would be lower if shooters denied LCMs would be stopped because they were tackled by bystanders while they tried to reload.

34.     In sum, even a tiny number of DGUs requiring an LCM for effective self-defense would far outnumber criminal uses in which LCM use affected the

15

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

1  number of victims killed or injured.

2      35.    Allen's report ignores the implications of differing rates of compliance

3  between criminals and noncriminal crime victims.  By definition, criminals obey

4  laws at a lower rate than non-criminals, so violation of legal limits on magazine

5  capacity are likely to occur at a higher rate among criminals than among non-

6  criminals. Thus, a law like California's ban on LCMs will reduce possession of

7  LCMs more among non-criminal victims and prospective victims than among

8  criminal offenders.  That is, a law like this will reduce DGUs by victims who needed

9  to fire large numbers of rounds to effectively defend themselves more than it will

10  reduce the number of crimes in which offender use of LCMs caused larger numbers

11  of victims to be killed or injured.

12      36.    Victim DGU is generally effective (Tark and Kleck 2004).  That is, it

13  makes it less likely the victim will be injured or lose property, and it does so to a

14  greater degree than other methods of victim self-protection.  Analyses of data

15  generated by the U.S. Census Bureau's National Crime Victimization Survey

16  (NCVS) indicate that crime victims who use guns for self-protection are less likely

17  to be injured or lose property than victims who do not (Kleck 1988; Kleck and

18  DeLone 1993; Southwick 2000; Kleck 2001, Chapter 7; Tark and Kleck 2004).

19  More specifically, DGU is more effective in preventing serious injury than any other

20  victim self-protection strategy, among the 16 strategies covered in the NCVS (Tark

21  and Kleck 2004, pp. 891-894).

22      37.    Consequently, a law such as California's ban on "assault weapons" and

23  LCMs not only reduces the number of DGUs that required an LCM to be effective,

24  but also reduces the average effectiveness of victim self-protection by forcing crime

25  victims who needed LCMs for effective self-protection to substitute some less

26  effective non-firearms defensive strategy once they expended the ammunition of

27  their lower-capacity firearm.  This would in turn increase the likelihood of the

28  victims suffering injury or property loss.

---

16

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

38.     These facts in combination logically lead to the conclusion that a law limiting magazine capacity to no more than ten rounds will do more harm than good, because it will reduce (a) the harm-*preventing* effects of victim DGU more than it will reduce (b) the extremely rare harm-*causing* effects of offender use of LCMs.

39.     This conclusion is also supported by actual experience with the federal ban on LCMs (defined as holding over 10 rounds) that was in effect nationwide from 1994 to 2004.  A U.S. Department of Justice-funded evaluation found that there was "no discernible reduction in the lethality or injuriousness of gun violence during" the period when the ban was in effect (Koper 2013, p. 165; see also Koper 2004, p. 96).

***Allen Cannot Know if Use of AWs or LCMs Causes Higher Casualty Counts***

40.     Allen accurately notes that casualty counts tend to be higher in incidents in which AWs or LCMs are used by the offenders.  In the absence of any caveats, this is likely to suggest to unwary readers that AW/LCM use caused the higher number of victims hurt.  Certainly, Allen's discussion (pp. 24-28) leaves that impression, even though she does not explicitly assert a causal effect.  The problem is that one would expect higher casualty counts in incidents with AW or LCM use even if use of such weapons had no actual causal effect of its own.  Offenders more intent on hurting many people would be more likely to do so (lethal intentions cause lethal outcomes) but are also more likely to use weaponry they believe – correctly or not – will help them achieve this goal (lethal intentions cause use of purportedly more lethal weaponry.  Unless the analyst controls for offender lethality, it is impossible to establish that the association between AW/LCM use and casualty counts is anything other than a spurious, noncausal correlation.  Allen did not do this, and thus has no basis for ruling out the possibility that there is no causal effect.

41.     Details about how mass shootings occur support the proposition that LCM use has no causal effect of its own, since there is no known mechanism by which such a causal effect could operate that is supported by information on how mass shootings occur.  Allen herself offered no explanation of how or why use of

17

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

1  LCMs cause higher casualty counts.  She just presented the crude bivariate
2  association between the two and let readers "draw their own conclusions."

3      42.     Some advocates of LCM bans, on the other hand have offered theories
4  of how LCM use could affect casualty counts (Kleck 2016).  They have proposed
5  two potential mechanisms by which a causal effect could occur.  First, they argue
6  that because use of LCMs allows shooters to fire many rounds before they have to
7  reload, this means that there are fewer opportunities for bystanders to tackle a
8  shooter who was using a gun equipped with a LCM.  Conversely, if an LCM ban
9  like California's actually blocked a would-be mass shooter from obtaining an LCM
10  and he had to attack without one, bystanders would have more chances to tackle the
11  shooter, and might do so earlier because the shooter would have to reload earlier.
12  This proposed mechanism is plausible only to the extent that mass shootings are
13  actually stopped by bystanders tackling the shooter while he is reloading.
14  Unfortunately, this virtually never happens in U.S. mass shootings.  In the past 25
15  years, there are no mass shootings in which bystanders clearly tackled the shooter
16  while he was reloading, as distinct from struggling to clear a jammed gun, plus a
17  single ambiguous case where it is possible this happened (Kleck 2016).

18      43.     The second causal mechanism proposed by advocates of LCM bans
19  also involves pauses to reloads, but is supposed to be due to the time it takes to
20  reload.  Advocates argue that additional potential victims could escape or hide due to
21  the time the shooter devotes to reloading.  Any harm prevention due to this
22  mechanism is thus a function of how long a reload takes and how much additional
23  time becomes available for victim evasive action, above and beyond what would
24  otherwise be available.  Virtually all mass shootings involve pauses in firing, when
25  victims might take evasive action, even when the shooter is not reloading.  The
26  relevant question is whether reloading creates *additional time*, beyond pauses not
27  due to reloading, which is sufficient for prospective victims to (a) realize that the
28  shooter is reloading, (b) appreciate that this means it is relatively safer to take

18

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

1    evasive action, and (c) then escape or hide.

2       44.    Unfortunately, changing a detachable magazine of the type used with

3    semi-automatic firearms takes only 3-4 seconds (Kleck 2019), too brief a span for

4    these things to happen (Kleck 2016).  A 3-4 second reload does not even slightly

5    slow shooters from the pace of shooting that mass shooters usually maintain.  They

6    typically take well over 4 seconds between rounds even when not reloading, so a 3-

7    4-second reload would not extend the take available for victim evasive action,

8    beyond what would have been available anyway in the absence of reloading.  Kleck

9    (2016) identified 25 mass shootings in which it was possible to determine the

10   shooter's rate of fire and found that only six averaged under 4 seconds per shot,

11   usually only slightly under.  It is unlikely that prospective victims would even be

12   able to perceive a slowing of the rate of fire from, say, 2 seconds between shots to 4

13   seconds between shots while the shooter reloaded.

14      45.    Advocates of LCM bans have, to my knowledge, only cited a single

15   mass shooting in which they assert that additional victims escaped or hid while the

16   shooter reloaded, and that citation turns out to be erroneous.  The December 14,

17   2012 Sandy Hook elementary school shooting involved a pause during which

18   several students escaped, and an early report in the Hartford Courant cited an

19   unnamed police officer who speculated that these escapes occurred while the shooter

20   was reloading.  A later article from the same newspaper (Hartford Courant 4-10-13),

21   however, revised this and reported that the shooter paused "either because the

22   Bushmaster jammed or he made an error reloading it."   Thus, even in this single

23   supposedly supportive case, it is unclear whether additional victims escaped due to

24   the shooter reloading.

25      46.    In sum, few mass shooters use LCMs, and in the few LCM-involved

26   mass shootings (which occurred only 3.2 times per year in the entire U.S. in 20140-

27   2022 – see Table 1) there is no affirmative evidence that any casualties were

28   prevented because of shooters reloading.

19

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

**Response to Klarevas Supplemental Expert Report**

47.     Louis Klarevas addresses the violence-related effects of "assault weapons" (AWs) as well as the effects of LCM use.  He is not nearly as cautious as Lucy Allen in making unsupportable claims about the causal effect of LCM or AW use in violence, or the effect of LCM bans on the frequency and deadliness of mass shootings.  He also makes extraordinary claims about the magnitude of the effect of mass shootings on the safety of Americans.

***Mass Shootings Do Not Constitute the Most Serious Threat to the Safety of Americans***

48.     Klarevas makes the remarkable claim (p. 5) that "mass shootings presently pose the deadliest threat to the safety of American society in the post 9/11 era." His own data indicate otherwise.  He documented 113 "gun massacres" (which he defines as incidents involving 6 or more dead), in which 1,009 people were killed, over the period from 1968 through September 2017. This is a period of 49 and ¾ years, so his own figures imply that an average of 20.3 Americans have been killed in "gun massacres" per year (1009/49.75=20.28). To put this number in perspective, 17,250 Americans were killed in criminal homicides of all types in 2016 (FBI 2017). Thus, only 1/10th of 1% of all murder victims are killed in "gun massacres."

49.     Alternatively, we can state the seriousness of the threat to the safety of American by computing the fraction who will be killed in a "gun massacre" in a given year. Since there were about 323,127,513 Americans in 2016, the annual average of 20.3 deaths implies that the probability of an American dying in a "gun massacre" is about 0.000000063, or 0.0063 per 100,000 population—about 1 in 15.9 million. As a point of comparison, defense expert Lucy Allen calculated (for an expert report in a previous case) that the risk of Americans dying because they were struck by lightning is 0.09 per 100,000 population (Allen 2017, p. 16). Thus, the risk of an American being killed in a "gun massacre" is less than 1/14th of the risk of

20

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

being killed by a bolt of lightning—itself a freakishly rare event. However horrific individual mass shootings may be, it is absurd to describe their threat to the safety of Americans as "the greatest threat … to the … safety of American society in the present era." This sort of overheated rhetoric is appropriate to propagandists, not to serious scholars.

***Mass Shootings are not a Growing Threat to Americans' Safety***

50.    Klarevas claims that the level of threat from mass shootings is growing (p. 6).  There actually is no clear trend in recent years in the frequency of mass shootings.  Table 1 in this report shows that the national total of mass shootings (4 or more victims killed) increased from 2014 to 2016, but decreased from 2016 to 2018. It then increased from 2018 to 2019, but declined from 2019 to 2020, followed by an increase from 2020 to 2022.  It would be foolhardy to describe this up-and-down pattern as reflecting any clear upward trend.  Indeed it shows no meaningful trend of any kind.

51.    Klarevas, however, creates an appearance of an upward trend by narrowing his focus to just a tiny subset of mass shootings – cases in which 10 or more victims were killed.  There was indeed an upward trend in this subset, but the numbers involved are so small that any statements about trends are trivial and not indicative of any increase in the aggregate level of threat to Americans' safety.  His Table 5 documents just 538 deaths over a period of 74 years, averaging just 7.3 deaths in "double-digit" mass shootings per year.

52.    Even regarding this tiny subset of killings, Klarevas' claim of an upward trend is dubious regarding recent years, since it is almost entirely due to a brief increase from one such killing in 2016 to four in 2018.  Since 2018 his own data show either no trend or a downward trend, from 4 in 2018 to 1 in 2019, 0 in 2020, 1 in 2021, and 2 in 2022.   Making claims about trends in events this rare is, however, foolhardy regardless of the numbers.  One could, with equal validity, claim that double-digit mass shootings declined by 50% from the 4 in 2018 to the 2 in

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

2022, but this would be no more meaningful than Klarevas' claims of an upward trend.

### How Often AWs Are Used to Stop Mass Shootings is Irrelevant to the Debate about the Merits of Restrictions on AWs

53.     Klarevas believes that it is an "important" unanswered question how often AWs are used to stop a mass shooting (p. 21).  Prior to reading Klarevas' expert report I had never heard of any expert on firearms and violence who considered this an important issue.  Certainly Klarevas does not cite any.  This may well be why no one has answered the question – no one thought it was worth answering.  To be sure, the issue of people using guns *in general* to disrupt crimes *in general* is certainly an important question, but whether AWs in particular are used to disrupt the tiny share of crimes that are mass shootings in particular is not.  The numbers of mass shootings in which AWs are used, by either offenders or victims, are just too small for the issue to be important.  Many Americans use guns to prevent injury in ordinary violent crimes, so this is where the benefit of defensive gun use lies, not in connection with mass shootings.  A focus on the latter is simply a red herring that serves to distract from where the actual defensive benefit lies.

### Use of Assault Weapons is Not Known to Be a Major Causal Factor in the Supposed Increase in Mass Shootings

54.     Klarevas claims (pp. 12-16) that the growing use of AWs is a major factor in the supposed increase in mass shootings, especially "high fatality" mass shootings.  His only evidence for this claim, however, is the increasing share of mass shootings that involve AWs and the ambiguous fact that death counts are higher in AW-involved shootings.  As to the former, Klarevas presents no relevant evidence that increased AW use by mass shooters is any greater than one would expect based on the increasing popularity of semi-automatic firearms (some that would qualify as AWs under California law) in the general, noncriminal population (more on this point later).  Thus, he provides no basis for an assertion of a greater preference for

22

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

1    using AWs among mass shooters than among noncriminal gun owners.

2        55.    This is not to say he did not *try* to support this claim.  His p. 12

3    discussion purports to be a comparison of mass shooter use of AWs with the

4    prevalence of AWs in the population as a whole.  Unfortunately, none of the sources

5    he cites allow one to establish the latter.  Given the way that California and other

6    states define AWs, to establish numbers of guns that are AWs one would need data

7    on numbers of guns by specific makes and models, as well as even more specific

8    data on numbers of guns with features that can (in combination with other attributes)

9    qualify a semi-automatic firearm for status as an AW, such as foldable stocks, flash

10   suppressors, thumb-holes in the stocks, and so on.  No such data exist, either for

11   California or the U.S. as a whole.  No such data are contained in any of the sources

12   cited by Klarevas, including the data from the National Shooting Sports Foundation

13   and from the Bureau of Alcohol, Tobacco, Firearms, and Explosives cited in his fn.

14   6.  Consequently, Klarevas has no evidentiary foundation for any claims about the

15   prevalence or trends in the general population's ownership of AWs as defined under

16   California law, and consequently no foundation for a claim that use of AWs by mass

17   shooters were any more common than one would expect based on the popularity of

18   semi-automatic firearms by members of the general public.

19       56.    Klarevas' claims on this point rely on tricky apples-and-oranges

20   comparisons.  Regarding mass shooter use of AWs, he applies his definition of AWs

21   that apparently corresponds to the definition specified in California statutes.  In

22   sharp contrast, when he cites data on "all firearms in circulation in American

23   society" (p. 12), he shifts to numbers of "modern sporting rifles" (MSRs), a set of

24   firearms that does not correspond to the set of AWs at all.  Establishing that the

25   share of mass shooter guns that are AWs is greater than the share of general public

26   guns that are MSRs would not in any way establish that a disproportionately large

27   share of mass shooter guns are AWs.

28       57.    Defense expert Lucy Allen's own data (Allen 2023, Exhibit C) indicate

23

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

1   that mass shooters usually use semi-automatic *pistols* rather than rifles, while

2   Klarevas' claims about the supposed relative rarity of AWs in the general population

3   actually apply only to *rifles,* and a subset of rifles at that.  None of his figures

4   compare the prevalence of semi-auto *pistols* in the general public with the

5   prevalence of  semi-auto *pistols* among mass shooter guns.  The comparisons he

6   does make are meaningless apples-and-oranges comparisons that do not establish a

7   disproportionate preference of mass shooters for using AWs.

8        58.    Klarevas also suggests that the rise in mass shooter use of AWs

9   corresponds in time to the growing popularity of AWs or similar semi-automatic

10  firearms (pp. 17-20).  This is false.  While we have no reliable data on trends in

11  production or ownership of AWs in particular, we do know that the growth in

12  popularity of semi-automatic firearms as a whole began long before the increase in

13  double-digit mass shootings that Klarevas cites, certainly long before the post-1993

14  increases.  Industry data indicate that in 1978 just 25% of handguns produced by

15  U.S. manufacturers were semi-automatic pistols, but that by 1993 this share had

16  risen to 80%.  After 1993 there was no further increase in the relative popularity of

17  semi-automatic pistols.  Their share of the total handguns manufactured remained

18  around 80% thereafter – 75% in 2000, 75% in 2005, 80% in 2010, and 80% in 2015

19  (Kleck 1997, p. 118; BATFE 2020, Exhibit 1).   In sum the rising popularity of

20  semi-auto firearms began way back in the 1970s and had ended by 1993.  In

21  contrast, Klarevas' Table 5 indicates that in the 31-year period from 1976 through

22  2006, there just 7 double-digit mass shootings, or 0.23 per year, but that this rose to

23  20 such incidents in the 17-year period from 2007 through 2022, or 1.18 per year.  In

24  short, the rise in double-digit mass shootings did not occur until after 2007, long

25  after the increase in popularity of semi-auto firearms had ended.  Klarevas'

26  suggested assertion that the rise in double-digit mass shootings corresponded in time

27  to the rising popularity or availability of semi-auto guns is wrong.

28  / / /

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

***Klarevas Does Not establish that the Use of AWs <u>Causes</u> an Increase in the Casualty Counts of Mass Shootings.***

59.     Klarevas accurately notes the higher casualty counts in mass shootings committed with AWs, but presents no other evidence that AW use actually *causes* the higher casualty counts.  He leaves the impression that merely citing this crude bivariate association is sufficient to establish a causal effect.  It is not.  This does not meet professional or scientific standards for establishing a causal effect.  As with Lucy Allen's work on the same topic, the association he reports may be entirely due to the common effect of the lethality of offender intentions on both the number of people the offender shoots and the choice of using a gun type or magazine perceived (accurately or not) to be especially useful for hurting large numbers of people.

60.     There is in fact no sound scientific basis for the claim that there are features AWs that actually cause more deaths in mass shootings – or any other kinds of violence.  More specifically, (1) Klarevas provides no evidence that AWs are more accurate than other kinds of guns and thus more likely to deliver bullets to an intended victim (nor am I aware of any such evidence).  (2) Klarevas provides no evidence that an average round fired from an AW is more likely to inflict a fatal wound than a round fired from other guns (nor am I aware of any such evidence).  In fact, the most common ammunition used in so-called "assault rifles" are .223 caliber and .556 millimeter rounds – both very narrow bullets that create correspondingly narrow wound cavities in the victim.  Consequently, such rounds are *less* likely to cause the victim's death than the ammunition used in civilian-style hunting rifles.  Likewise, (3) Klarevas provides no evidence that a shooter can fire an AW any faster than semiauto firearms not banned under AW restrictions like those of California (nor am I aware of any such evidence).  In sum, there is no credible evidence that the kinds of firearms banned by California as AWs are any more accurate, lethal, or rapid-firing than their unbanned semi-automatic counterparts (see evidence reviewed in Kleck 1997, pp. 121-126).

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

61.     In the absence of such evidence of any causal mechanism by which AW use could affect the death count in attacks, there is no scientific basis for Klarevas' claims that use of AWs *causes* higher death counts in mass shootings, as distinct from being nothing more than a spurious correlate.

***Klarevas' Research Does not Provide Any Serious Evidence that Bans on LCMs Reduce the Incidence of Mass Shootings***

62.     Klarevas cites an article that he co-authored (Klarevas, Connor, and Hemenway 2019) that concerned the effect of LCM bans on the "frequency and lethality of high-fatality mass shootings in the United States."  Unlike Lucy Allen, Klarevas makes explicit and strong claims that his research estimated the *causal effect* of LCM bans, rather than just establishing a possibly spurious association. The cited study does not come anywhere near meeting the scientific standards needed to establish causation.

63.     The main task that a person conducting nonexperimental research must carry out in order to estimate a causal effect is to somehow control for confounding variables – other factors whose effects might be confused with the effect of the variable on which the researcher is focusing.   In this case, confounding variables would be antecedent variables that possess both of two properties: (1) they affect the frequency or lethality of high-fatality mass shootings, and (2) they are correlated with the presence/absence of laws banning LCMs.  The authors of this article plainly made no serious effort to control for confounding variables and thus had no basis for interpreting their association between LCM bans and the frequency of mass shootings as anything but spurious.  The association is spurious if there are antecedent factors that affect both (1) legislators enacting LCM bans and (2) the rate of mass shootings.  One likely antecedent factor is the average level of disapproval of violence in the population – where it is higher there will be more support for anti-violence legislation (such as LCM bans) and also less violence (such as mass shootings).  Klarevas et al. appear to believe that controlling for any old variables is

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1    sufficient to separate out the effect of LCM bans from other factors, boasting that

2    they controlled for "10 independent variables" (p. 1754).  At no point do the authors

3    show any awareness of the need to control specifically for confounders, or even

4    understand what a confounder is.  The word does not appear in the article and the

5    concept is not discussed.  In fact, controlling for variables that are not confounders

6    does absolutely nothing to help isolate the causal effect of LCM bans or to rule out

7    the possibility that the association is totally spurious.  None of the 10 independent

8    variables controlled by Klarevas et al. were confounders.

9        64.    We know for certain that Klarevas et al. completely failed to control for

10   any confounding factors because their own results reported in their Tables 3 and 4

11   indicate that none of their control variables were significantly related to either the

12   number of high-fatality MS incidents or the number of MS fatalities, with the single

13   dubious exception of % age 25-34 in one of their 4 models.  This single result is

14   dubious because it indicated that this variable had a negative association with the

15   number of mass shootings, indicating that places with more people of the ages

16   typical of mass shooters have *fewer* mass shootings.  All the other control variables

17   showed no statistically significant association with either the number of incidents or

18   number of deaths and thus were not confounders.  Even regarding this one

19   significant control variable, however, the authors do not present any evidence that %

20   age 25-34 is correlated with the presence or absence of LCM bans, so there is no

21   evidence that it possessed the second property needed to qualify as a confounder.

22   Thus, the authors did not control for even a single known confounder.  They could

23   scarcely have done a poorer job in controlling for known confounders, but this did

24   not prevent Klarevas from boasting about the quality of his work by citing (p. 3 of

25   his report) the opinion of two amateurs that it was "the perfect gun policy study."

26       65.    The only rationale the authors offered for their disastrously poor

27   selection of control variables was that their list was "consistent with the suggestions

28   and practices of the literature on firearm homicides and mass shootings," citing in

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1  support a haphazard selection of poor quality prior studies that also used one or more

2  of the same badly chosen control variables (p. 12).  They did not even bother to

3  claim that any of these variables significantly affected rates of MS or MS-related

4  deaths, or that they were known to be correlated with the presence of LCM bans.

5  They seemed to think that it is sufficient reason to include them in their analysis that

6  others had done so..

7       66.  The authors insisted that "LCMs are indeed more effective at killing

8  many people" because LCMs "facilitate the ability to fire many rounds without

9  having to stop to reload" (p. 1759), even though had read the Kleck (2016) article

10 (see their source 29), which demonstrated precisely the opposite - that the necessity

11 of reloading does *not* lead to either bystanders tackling the shooter during reloading

12 or increasing the time for prospective victims to hide or escape.  The authors did not

13 refute any of the evidence presented in that article or even try to do so, but

14 nevertheless insisted that pauses to reload "provide opportunities for people to

15 intervene and disrupt a shooting" and that "they provide individuals in harm's way

16 with a chance to flee or hide" (pp. 1754-1755).  They simply ignored the contrary

17 evidence and clung to their preferred belief that the need to reload results in

18 bystander disruptions of shooters and increased time for victims to escape or hide.

19      67.  Klarevas tried to buttress his claim that LCM bans reduce mass

20 shootings by noting that the frequency of these shootings increased after the federal

21 ban on LCMs (and AWs) expired in 2004.  Changes in virtually any violence-related

22 factor might have accounted for this increase, but Klarevas chose to arbitrarily

23 attribute it to the end of the LCM ban.  This is highly implausible in light of the

24 results of detailed research on the impact of this law on violence while it was in

25 effect.  The most extensive and detailed analysis done to date was conducted by

26 Christopher Koper (2004).  That study concluded (p. 165) that there was "no

27 discernable reduction in the lethality or injuriousness of gun violence" while the ban

28 was in effect.  If the ban had no impact on violence while it was in effect, it is

1    illogical to assert that its removal would cause an increase in violence.

2    ***Klarevas Did Not Provide Any Reliable Evidence that Double-digit Mass***
3    ***Shootings are Limited to the Post-WWII Period***

4        68.    Klarevas asserted (p. 17) that mass shootings with high fatality counts
5    are unique in American history to the post-WWII period, a pattern he attributes to
6    the growing availability of AWs and LCMs.  He even believes that he used a sound
7    body of evidence to establish trends in such killings going back as far as 1776.
8    There is no such source of evidence.  Klarevas did not count up the number of such
9    crimes tha occurred each year, but rather counted up the number of such crimes in
10   each year that *were reported in newspaper stories* about such crimes, as recorded in
11   an archive of newspaper stories.  The problem with this source is that the number of
12   newspaper stories about mass shooters would increase as newspaper coverage of the
13   nation's events increased, even if the number of mass shootings remained constant.
14   The  coverage of newspapers certainly did increase over most of U.S. history,
15   especially prior to WWII.  Thus, Klarevas' source can tell us nothing about trends in
16   mass killings during most of U.S. history, especially the 1776-1941 period, and
17   therefore cannot be relied upon for comparing post-WWII periods with pre-WWII
18   periods.

19       69.    Klarevas claimed that mass shootings were nonexistent prior to WWII
20   but rendered this claim trivial by the way he limited which mass shootings qualified
21   to be counted.  Buried in his footnote 17, Klarevas states that he did not count
22   killings of large numbers of victims if they were connected with "large-scale, inter-
23   group violence such as mob violence, rioting, combat or battle skirmishes, and
24   attacks initiated by authorities acting in their official capacity."  This limitation
25   conveniently eliminates mass killings of Native Americans by members of the U.S.
26   cavalry (combat violence), employer-initiated violence by state militias against
27   strikers (violence initiated by authorities acting in their official capacity), and white
28   mob violence aimed at African Americans such as the 1863 draft riots in New York

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

City, among other mass killings.  The exclusions thereby create the false impression that there were no mass shootings prior to WWII.  Klarevas offers no justification for these exclusions other than the fact that other, unspecified, analyses also applied them (footnote 17, p. 17).  Consequently, Klarevas' claim amounts to saying "there were no mass shootings in the U.S. prior to WWII, except the many mass shootings that did occur prior to WWII."  The historical reality is that there were many mass shootings in the U.S. long before either AWs or LCMs were available (for historical overviews, see Graham and Gurr 1969).

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on February 3, 2023.

Gary Kleck

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

1

**References**

2  Allen, Lucy. 2017. <u>Expert Report of Lucy P. Allen.</u>  Duncan v. Becerra.

3  Allen, Lucy.  2023.  <u>Supplementary Expert Report</u>.  Rupp v. Bonta

4
Braga, Anthony, and Phillip J. Cook. 2018. "The association of firearm caliber with
5  likelihood of death from gunshot injury in criminal assaults" <u>JAMA Network Open</u>
(released July 27, 2018). At https://jamanetwork.com/journals/jamanetworkopen/
6  fullarticle/2688536?resultClick=1.

7  Bureau of Alcohol, Tobacco, Firearms and Explosives. 2020.  <u>Firearms Commerce
in the United States - Annual Statistical Update 2020</u>.
8

9  Geller, William A. and Michael S. Scott. 1993. <u>Deadly Force: What We Know</u>.
Washington, D.C.: Police Executive Research Forum.
10

Graham, Hugh David, and Ted Robert Gurr (eds.). 1969.  <u>Violence in America:
11  Historical and Comparative Perspectives</u>.  Report of the National Commission on the
Causes and Prevention of Violence.  NY: Signet.
12

13  Gun Violence Archive. 2023.  Compilation of mass shootings, available online at
https://www.gunviolencearchive.org/past-tolls
14

15  Klarevas, Louis. 2023.  <u>Supplementary Expert Report</u>.  Rupp v. Bonta.

16  Klarevas, Louis, Andrew Connor, and David Hemenway. 2019.  <u>American Journal
of Public Health</u> 109:1754-1767.
17

18  Kleck, Gary. 1997. <u>Targeting Guns: Firearms and their Control.</u> NY: Aldine de
Gruyter.
19

Kleck, Gary. 2001a. "The frequency of defensive gun use: evidence and
20  disinformation." Chapter 6 in <u>Armed</u>, by Gary Kleck and Don B. Kates. NY:
Prometheus Books.
21

Kleck, Gary. 2001b. "The nature and effectiveness of owning, carrying, and using
22  guns for self-protection." Chapter 7 in <u>Armed</u>, by Gary Kleck and Don B. Kates.
NY: Prometheus Books.
23

24  Kleck, Gary. 2016.  "Large-capacity magazines and the casualty counts in mass
shootings: the plausibility of linkages."  <u>Justice Research and Policy</u> 17:28-47.
25

26  Kleck, Gary. 2018. "Response errors in survey estimates of defensive gun use."
<u>Crime & Delinquency</u> 64(9):1119-1142.
27

Kleck, Gary. 2019.  <u>Field Test of Magazine Change Times on Two Semi-automatic
28  Pistols</u>.  Unpublished report of test conducted on January 26, 2019.

31

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

Kleck, Gary. 2021. "What do CDC's surveys say about the prevalence of defensive gun use?"    American Journal of Criminal Justice  46:401-421.

Kleck, Gary, and Miriam DeLone. 1993. "Victim resistance and offender weapon effects in robbery." Journal of Quantitative Criminology 9(1):55-81.

Kleck, Gary, and Marc Gertz. 1995. "Armed resistance to crime: the .prevalence and nature of self- defense with a gun." Journal of Criminal Law and Criminology 86:150-187.

Koper, Christopher. 2004. An Updated Assessment of the Federal Assault Weapons Ban. Report to the National Institute of Justice. Philadelphia: Jerry Lee Center of Criminology. Available at https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

Koper, Christopher. 2013. "America's experience with the federal assault weapons ban, 1994-2004." Pp. 157-171 in Reducing Gun Violence in America, edited by Daniel W. Webster and Jon S. Vernick. Baltimore: Johns Hopkins University Press

McGonigal, M.D., Cole, J., Schwab, C.W., Kauder, D.R., Rotondo, M.F., and Angood, P.B. 1993. "Urban firearm deaths: a five-year perspective." The Journal of Trauma 35:532-537.

Reedy, D. C., and C. S. Koper. 2003. "Impact of handgun types on gun assault outcomes." Injury Prevention 9:151-155.

Southwick, Lawrence. 2000. "Self-defense with guns: The consequences." Journal of Criminal Justice 28:351-370.

Tark, Jongyeon, and Gary Kleck. 2004. "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42:851-908.

U.S. Bureau of Justice Statistics, 2013. Data from the 2008 National Crime Victimization Survey, on the BJS website at http://bjs.gov/content/pub/pdf/cvus08.pdf, Table 37.

U.S. Federal Bureau of Investigation. 2013. Crime in the United States, 2012 (Uniform Crime Reports). Available online at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/tables/1tabledatadecoverviewpdf/table_1_crime_in_the_united_states_by_volume_and_rate_per_100000_inhabitants_1993-2012.xls.

Violence Policy Center 2011. "High-capacity ammunition magazines: the common thread that runs through mass shootings." Press release dated January 11, 2011, available online at http://www.vpc.org/press/1101az2.htm.

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

Violence Policy Center. 2023.  <u>Mass Shootings in the United States Involving High-Capacity Ammunition Magazines</u>.  Washington, D.C.: Violence Policy Center. Available online at http://www.vpc.org/fact_sht/VPCshootinglist.pdf.

Vizzard, William J.  <u>Shots in the Dark: The Policy, Politics, and Symbolism of Gun Control</u>.  NY: Rowman & Littlefield<u>.</u>

Zimring, Franklin E. 1972. "The medium is the message: firearm caliber as a determinant of death from assault." <u>Journal of Legal Studies</u> 1:97-123.

33

EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK

# EXHIBIT 1

CURRICULUM VITAE

GARY KLECK

(Updated December 2, 2022)

PERSONAL

Place of Birth:                    Lombard, Illinois

Date of Birth:                     March 2, 1951

Address:                     College of Criminology and Criminal Justice

                             The Florida State University
                             314B Eppes Hall
                             112 S. Copeland Street
                             Tallahassee, FL 32306-1273

Telephone Number:             Home:        (850) 894-1628


e-mail Address:             gkleck@fsu.edu

## CURRENT POSITION

David J. Bordua Emeritus Professor of Criminology, Florida State University

## COURTESY APPOINTMENT

Professor, College of Law, Florida State University

## PROFESSIONAL MEMBERSHIPS

American Society of Criminology

Academy of Criminal Justice Sciences

1

EDUCATION

A.B.        1973 - University of Illinois, with High Honors and with Distinction

in Sociology

A.M.        1975 - University of Illinois at Urbana, in Sociology

Ph.D.       1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in

Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of

Criminology, for the book that made "the most outstanding contribution to

criminology"        (for <u>Point Blank: Guns and Violence in America</u>).

Awarded Named Professorship, Florida State University, 2012.

Nominated for University Teaching Award, Florida State University, 2014.

TEACHING POSITIONS

May 2016 to present      Emeritus Professor, College of Criminology and Criminal

Justice, Florida State University

Fall, 1991 to           Professor, College of Criminology and Criminal Justice,

May 2016                Florida State University

2

| | |
|---|---|
| Fall, 1984 to | Associate Professor, School of Criminology, |
| Spring, 1991 | Florida State University. |
| Fall, 1979 | Assistant Professor, School of  Criminology, |
| to Spring, 1984 | Florida State University. |
| Fall, 1978 to | Instructor, School of Criminology, |
| Spring, 1979 | Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

3

BOOKS

1991,   <u>Point Blank: Guns and Violence in America</u>.  Hawthorne, N.Y.: Aldine de

2005  Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American

Society of Criminology.  Republished in 2005 in paperback by Transaction

Publishers.

Reviewed in <u>Contemporary Sociology</u>, <u>American Journal of Sociology</u>,

<u>Social Forces</u>, <u>Journal of Criminal Law and Criminology</u>, <u>The

Criminologist</u>, <u>The Public Interest</u>, <u>Criminal Law Forum</u>, <u>Social

Science Review</u>, <u>Criminal Justice Abstracts</u>, <u>Crime, Criminal Justice and

Law Enforcement</u>, <u>Newsletter of Public Policy Currents</u>, <u>Commonweal</u>,

<u>Choice</u>, and others.

1997  <u>Targeting Guns: Firearms and their Control</u>. Hawthorne, N.Y.: Aldine de

Gruyter.

1997  <u>The Great American Gun Debate: Essays on Firearms and Violence</u> (with Don

B.

Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001  (with Don B. Kates) <u>Armed: New Perspectives on Gun Control</u>.  N.Y.:

Prometheus Books.

Selected to <u>Choice: Current Reviews for Academic Libraries</u>' 39th annual

"Outstanding Academic Title List," awarded for "excellence in scholarship and

presentation, the significance of their contribution to their field, and their value

4

as

an important treatment of their topic."  Awarded to less than one percent of

books.

2017  (with Brion Sever) Punishment and Crime.  NY: Routledge.   In press.


RESEARCH MONOGRAPH

1979  Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms

Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law En-

force

ment Commission, Springfield, Illinois.


ARTICLES IN PEER-REVIEWED JOURNALS

1979  "Capital punishment, gun ownership, and homicide."  American Journal of

Sociology 84(4):882-910.

1981  "Racial discrimination in criminal sentencing: A critical evaluation of the

evidence with additional evidence on the death penalty." American Sociologi-

cal

Review 46(6):783-804.

1982  "On the use of self-report data to determine the class distribution of criminal

behavior." American Sociological Review 47(3):427-33.

1983  (with David Bordua) "The factual foundation for certain key assumptions of

Ex. 11 - Wilson Decl.
Page 39 of 80

gun

control." <u>Law and Policy Quarterly</u> 5(3):271-298.

1985   "Life support for ailing hypotheses:  modes of summarizing the evidence on

racial discrimination in criminal sentencing." <u>Law and Human Behavior</u>

9(3):271-285.

1986   "Evidence that 'Saturday Night Specials' not very important for crime."

<u>Sociology and Social Research</u> 70(4):303-307.

1987   "American's foreign wars and the legitimation of domestic violence."

<u>Sociological Inquiry</u> 57(3):237-250.

1988   "Crime control through the private use of armed force." <u>Social Problems</u>

35(1):1-21.

1988   "Miscounting suicides." <u>Suicide and Life-Threatening Behavior</u> 18(3):219-

236.

1990    (with Susan Sayles) "Rape and resistance." <u>Social Problems</u> 37(2):149-162.

1991   (with Karen McElrath) "The effects of weaponry on human violence." <u>Social</u>

<u>Forces</u> 69(3):669-92.

1993   (with Miriam DeLone) "Victim resistance and offender weapon effects in

robbery." <u>Journal of Quantitative Criminology</u> 9(1):55-82.

1993   (with E. Britt Patterson)  "The impact of gun control and gun ownership levels

on

violence rates." <u>Journal of Quantitative Criminology</u> 9(3):249-287.

6

1993  "Bad data and the 'Evil Empire': interpreting poll data on gun control."

<u>Violence</u>

 and Victims 8(4):367-376.

1995  "Guns and violence: an interpretive review of the field."  <u>Social Pathology</u>

1(1):12-47.

1995  "Using speculation to meet evidence."  <u>Journal of Quantitative Criminology</u>

11(4):411-424.

1995  (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of

self-

defense with a gun."        <u>Journal of Criminal Law & Criminology</u> 86(1):150-

187.

1996  "Crime, culture conflict and sources of support for gun control: a multi-level

application of the General Social Surveys."  <u>American Behavioral Scientist</u>

39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun

law:

some cautionary notes on the use of interrupted time series designs for policy

impact assessment." <u>Law & Society Review</u> 30(2):361-380.

1996  (with Chester Britt III and David J. Bordua) "Avoidance and

misunderstanding."

<u>Law & Society Review</u> 30(2):393-397.

7

1997   (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the

defensive gun use estimate down."  <u>Journal of Criminal Law and Criminology</u>

87(4):1446-1461.

1997    (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful

vigilante imagery vs. reality: results from the National Self-Defense Survey."

<u>Journal of Criminal Justice</u> 26(3):251-258.

1998  (with Marc Gertz) "Carrying guns for protection: results from the National

Self-

Defense Survey." <u>Journal of Research in Crime and Delinquency</u> 35(2):193-

224.

1998  "What are the risks and benefits of keeping a gun in the home?"  <u>Journal of the</u>

<u>American Medical Association</u> 280(5):473-475.

1998  (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing

of

habitual offenders." <u>Criminology</u> 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending

and

gun ownership." <u>Social Problems</u> 46(2):275-293.

1999  "BATF gun trace data and the role of organized gun trafficking in supplying

guns

to criminals."  <u>St. Louis University Public Law Review</u> 18(1):23-45.

8

2001     "Can owning a gun really triple the owner's chances of being murdered?"

Homicide Studies 5:64-77.

2002     (with Theodore Chiricos) "Unemployment and property crime: a target-

specific

assessment of opportunity and motivation as mediating factors." Criminology

40(3):649-680.

2004   "Measures of gun ownership levels for macro-level crime and violence

research."

Journal of Research in Crime and Delinquency 41(1):3-36.

2004   (with Jongyeon Tark) "Resisting crime: the effects of victim action on the

outcomes of crimes." Criminology 42(4):861-909.

2005   (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general

deterrence research." Criminology 43(3):623-660.

2006   (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently

used in research in criminology and criminal justice?" Journal of Criminal

Justice

34(2):147-152.

2007   "Are police officers more likely to kill African-American suspects?"

Psychological Reports 100(1):31-34.

2007   (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the

faculty of criminology and criminal justice doctoral programs, 2000-2005."

Journal of Criminal Justice Education 18(3):385-405.

2008  (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime

victimization and divorce." International Review of Victimology 15(1):1-17.

2009  "The worst possible case for gun control: mass shootings in schools."

American Behavioral Scientist 52(10):1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking and the

overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009    (with Tomislav Kovandzic)  "City-level characteristics and individual

handgun

ownership: effects of collective security and homicide." Journal of

Contemporary

Criminal Justice 25(1):45-66.

2009   (with Marc Gertz and Jason Bratton)  "Why do people support gun control?"

Journal of Criminal Justice 37(5):496-504.

2011   (with James C. Barnes)  "Article productivity among the faculty of

criminology

and criminal justice doctoral programs, 2005-2009."  Journal of Criminal

Justice

Education 22(1):43-66.

2011   (with Tomislav Kovandzic, Mark Saber, and Will Hauser).  "The effect of

perceived risk and victimization on plans to purchase a gun for self-

protection." <u>Journal of Criminal Justice</u> 39(4):312-319.

2013  (with Will Hauser)  "Guns and fear: a one-way street?"  <u>Crime and</u>

<u>Delinquency</u>

59:271-291.

2013  "Gun control after Heller and McDonald: what cannot be done and what ought

to

be done." <u>Fordham Urban Law Journal</u> 39(5):1383-1420.

2013  (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment

risks: is there a "collective wisdom?"  <u>Crime and Delinquency</u> 59(7):1006-

1035.

2013  (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of

gun prevalence on homicide rates: A local average treatment effect

approach." <u>Journal of Quantitative Criminology</u> 28(4):477-541.

2014  (with Jongyeon Tark) "Resisting rape: the effects of victim self-protection on

rape completion and injury." <u>Violence Against Women</u> 23(3): 270-292.

2014   (with J. C. Barnes) "Do more police generate more crime deterrence?"

<u>Crime and Delinquency</u> 60(5):716-738.


2015  "The impact of gun ownership rates on crime rates:  a methodological review

of the evidence." <u>Journal of Criminal Justice</u> 43(1):40-48.

2016  (with Tom Kovandzic and Jon Bellows)  "Does gun control reduce violent

11

crime? Criminal Justice Review 41:488-513.

2016 "Objective risks and individual perceptions of those risks." Criminology & Public Policy 15:767-775.

2016 (with Dylan Jackson) "Adult unemployment and serious property crime: A national case-control study." Journal of Quantitative Criminology 32:489-513.

2016 "The effect of large-capacity magazines on the casualty count of mass shootings." Justice Research and Policy 17:28-47.

2016 (with Will Hauser) "Confidence in the police and fear of crime: do police force size and productivity matter?" American Journal of Criminal Justice. Published online 2-12-16.

2016 (with Bethany Mims) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014." Journal of Criminal Justice Education. Published online 3-11-16.

2016 (with Dylan Jackson) "Does crime cause punitiveness?" Crime & Delinquency. Published online 3-27-16.

OTHER PUBLISHED ARTICLES

1985 "Policy lessons from recent gun control research." Law and Contemporary Problems 49(1):35-62.

12

1992    "Assault weapons aren't the problem."  <u>New York Times</u> September 1, 1992, p.

A15.  Invited Op-Ed page article.

1993    "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-

6.

Invited article.

1994    "Guns and self-protection."  <u>Journal of the Medical Association of Georgia</u>

83:42.

Invited editorial.

1998    "Using speculation to meet evidence: reply to Alba and Messner."  <u>Journal on</u>

<u>Firearms and Public Policy</u> 9:13-49.

1998    "Has the gun deterrence hypothesis been discredited?"  <u>Journal on Firearms</u>

<u>and Public Policy</u> 10:65-75.

1999    "There are no lessons to be learned from Littleton."  <u>Criminal Justice Ethics</u>

18(1):2, 61-63.  Invited commentary.

1999    "Risks and benefits of gun ownership - reply."  <u>Journal of the American</u>

<u>Medical</u>

<u>Association</u> 282(2):136-136.

1999    "The misfire that wounded Colt's."  <u>New York Times </u>October 23, 1999.

Invited

Op-Ed page article.

13

1999  "Degrading scientific standards to get the defensive gun use estimate down."

Journal on Firearms and Public Policy 11:77-137.

2000  "Guns aren't ready to be smart." New York Times March 11, 2000.  Invited

Op-Ed page article.

2000  (with Chester Britt III and David J. Bordua) "The emperor has no clothes:

Using

interrupted time series designs to evaluate social policy impact." Journal on

Firearms and Public Policy 12:197-247.

2001  "School lesson: armed self-defense works." Wall Street Journal March 27,

2001. Invited opinion article.

2001  "Impossible policy evaluations and impossible conclusions: a comment on

Koper

and Roth." Journal of Quantitative Criminology 17(1):75-80.

2001  "Absolutist politics in a moderate package: prohibitionist intentions of the gun

control movement." Journal on Firearms and Public Policy 13:1-43.

2002  "Research agenda on guns, violence, and gun control." Journal on Firearms

and

Public Policy 14:51-72.

2006  "Off target." New York Sun January 5, 2006.  Invited opinion article.

2009  "How not to study the effect of gun levels on violence rates." Journal on

Firearms

14

and Public Policy 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control

measures to common crimes, not aberrant catastrophes."  Wall Street Journal,

January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking."  Wall Street Journal May 21, 2011.

Invited opinion article.

2015   "Defensive gun ownership is not a myth: why my critics still have it wrong."

Politico Magazine, February 17, 2015.  Online at Politico.Com.

2016   Kleck, Gary.  "The impact on crime of state laws allowing concealed weapon

carrying among 18-20 Year-olds."  To appear in the Journal on Firearms and

Public Policy.


BOOK CHAPTERS

1984   (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in

Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambrid-

dge,

Mass.: Ballinger.

(Also appeared in Federal Regulation of Firearms, report prepared by the

Congressional Research Service, Library of Congress, for the Committee on

the Judiciary, United States Senate, 1982).

1984   "The relationship between gun ownership levels and rates of violence in the

15

U.S."               Pp. 99-135 in Kates, above.

    1984  "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in

        Kates, above.

    1996  "Racial discrimination in criminal sentencing."  Pp. 339-344 in <u>Crime and</u>

        <u>Society</u>, Volume III – Readings: Criminal Justice, edited by George Bridges,

        Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine

        Forge Press.

    1996  "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in

        <u>Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs</u>, edited by

        Martha R. Plotkin.  Washington, D.C.: Police Executive Research Forum.

    2000  "Firearms and crime."  Pp. 230-234 in the <u>Encyclopedia of Criminology and</u>

        <u>Deviant Behavior</u>, edited by Clifton D. Bryant.  Philadelphia: Taylor

        & Francis, Inc.


    2001  (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114

in

        <u>What is Crime?: Controversy over the Nature of Crime and What to Do About</u>

        <u>It</u>, edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and

        Littlefield.

    2003  "Constricted rationality and the limits of general deterrence."  Chapter 13 in

        <u>Punishment and Social Control: Enlarged Second Edition</u>, edited by Thomas G.

16

Blomberg.  New York: Aldine de Gruyter.

2004   "The great American gun debate: what research has to say."  Pp. 470-487 in The

Criminal Justice System: Politics and Policies, 9th edition, edited by George F.

Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008   "Gun control." Article in The Encyclopedia of Social Problems, edited by

Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009   "Guns and crime." Invited chapter.  Pp. 85-92 in 21st Century Criminology: A

Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence,

homicide rates and causality: A GMM approach to endogeneity bias."  Chapter

6, pp. 76-92 in The Sage Handbook of Criminological Research Methods,

edited

by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks,

CA:

Sage.

2012   (with Kelly Roberts) "What survey modes are most effective in eliciting

self-reports of criminal or delinquent behavior?"  Pp. 415-439 in Handbook of

Survey Methodology, edited by Lior Gideon.  NY: Springer.

2013    "An overview of gun control policy in the United States."  Pp. 562-579 in The

17

Criminal Justice System, 10th edition, Edited by George F. Cole and Marc G.

Gertz. Wadsworth.

2014  "Deterrence: actual vs. perceived risk of punishment.  Article in Encyclopedia

of

Criminology and Criminal Justice. Berlin: Springer Verlag.

BOOK REVIEWS

1978  Review of Murder in Space City: A Cultural Analysis of Houston Homicide

Patterns, by Henry Lundsgaarde.  Contemporary Sociology 7:291-293.

1984  Review of Under the Gun, by James Wright et al. Contemporary Sociology

13:294-296.

1984  Review of Social Control, ed. by Jack Gibbs.  Social Forces 63: 579-581.

1985  Review of Armed and Considered Dangerous, by James Wright and Peter

Rossi,

Social Forces 66:1139-1140.

1988  Review of The Citizen's Guide to Gun Control, by Franklin Zimring and

Gordon

Hawkins, Contemporary Sociology 17:363-364.

1989  Review of Sociological Justice, by Donald Black, Contemporary Sociology

19:261-3.

1991  Review of Equal Justice and the Death Penalty, by David C. Baldus, George G.

Woodworth, and Charles A. Pulaski, Jr.  Contemporary Sociology 20:598-9.

18

1999   Review of <u>Crime is Not the Problem</u>, by Franklin E. Zimring and Gordon

Hawkins.  <u>American Journal of Sociology</u> 104(5):1543-1544.

2001   Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig.

<u>Criminal Law Bulletin</u> 37(5):544-547.

2010   Review of  <u>Homicide and Gun Control: The Brady Handgun Violence</u>

<u>Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u>

35(1):118-120.

## LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987   "Accidental firearm fatalities."  <u>American Journal of Public Health</u> 77:513.

1992   "Suicide in the home in relation to gun ownership." <u>The New England Journal</u>

<u>of</u>

<u>Medicine</u> 327:1878.

1993   "Gun ownership and crime."  <u>Canadian Medical Association Journal</u> 149:1773-

1774.

1999   "Risks and benefits of gun ownership."  <u>Journal of the American Medical</u>

<u>Association</u> 282:136.

2000   (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide

rates."

<u>Journal of the American Medical Association</u> 284:2718-2719.

2001   "Violence, drugs, guns (and Switzerland)."  <u>Scientific American</u> 284(2):12.

2002   "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u>

(September 19, 2002). Published online at

http://ip.bmjjournals.com/cgi/eletters /8/3/252.

2005  "Firearms, violence, and self-protection."  <u>Science</u> 309:1674. September 9,

2005.

UNPUBLISHED REPORT

1987  <u>Violence, Fear, and Guns at Florida State University: A Report to the</u>
<u>President's</u>

<u>Committee on Student Safety and Welfare</u>. Reports results of campus crime

victimization survey and review of campus police statistics on gun violence (32

pages).

RESEARCH FUNDING

1994   "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime

Rates."

$9,500 awarded by the U.S. Sentencing Commission.

1997  "Testing a Fundamental Assumption of Deterrence-Based Crime Control

Policy."

$80,590 awarded by the Charles E. Culpeper Foundation to study the link

between

actual and perceived punishment levels.

PRESENTED PAPERS

20

1976  "Firearms, homicide, and the death penalty:  a simultaneous equations analysis."

> Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979  "The assumptions of gun control."  Presented at the Annual Meetings of the American Sociological Association, New York City.

1980  "Handgun-only gun control:  A policy disaster in the making."  Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1981  "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial

> discrimination."  Presented at the Annual Meetings of the American Society of Criminology, Toronto.

1984  "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985  "Policy lessons from recent gun control research." Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1986  "Miscounting suicides."  Presented at the Annual Meetings of the American Sociological Association, Chicago.

1987  (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Annual

21

meetings of the American Society of Criminology, Montreal.

1988  "Suicide, guns and gun control."  Presented at the Annual Meetings of the

Popular

Culture Association, New Orleans.

1988   (with Susan Sayles)  "Rape and resistance."        Presented at the Annual
Meetings of

the American Society of Criminology, Chicago, Ill.

1989  (with Karen McElrath)  "The impact of weaponry on human violence."

Presented at the

Annual Meetings of the American Sociological Association, San Francisco.

1990  (with Britt Patterson)  "The impact of gun control and gun ownership levels on

city violence rates."  Presented at the Annual Meetings of the American
Society

of Criminology, Reno.

1991  "Guns and violence: a summary of the field."  Presented at the Annual

Meetings

of the American Political Science Association, Washington, D.C.

1992  "Interrupted time series designs: time for a re-evaluation."  Presented at the

Annual Meetings of the American Society of Criminology, New Orleans.

1993  (with Chester Britt III and David J. Bordua) "The emperor has no clothes:

Using interrupted time series designs to evaluate social policy impact."

22

Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1993  "Crime, culture conflict and support for gun laws: a multi-level application of the

General Social Surveys."  Presented at the Annual Meetings of the American Society of

Criminology, Phoenix.

1994  (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of

self-defense with a gun."  Presented at the Annual Meetings of the American

Society of Criminology, Miami.

1995  (with Tom Jordan) "The impact of drug enforcement and penalty levels on

urban drug use levels and crime rates."  Presented at the Annual Meetings of

the American Society of Criminology, Boston.

1996  (with Michael Hogan) "A national case-control study of homicide offending

and gun ownership." Presented at the Annual Meetings of the American

Society of Criminology, Chicago.

1997  "Evaluating the Brady Act and increasing the utility of BATF tracing data."

Presented at the annual meetings of the Homicide Research Working Group,

Shepherdstown, West Virginia.

1997  "Crime, collective security, and gun ownership: a multi-level application of the

General Social Surveys."  Presented at the Annual Meetings of the American

23

Society of Criminology, San Diego.

1998   (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of deterrence-based crime control policy."  Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1998   "Measuring macro-level gun ownership levels." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1999   "Can owning a gun really triple the owner's chances of being murdered?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2000   "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Presented at the Annual Meetings of the American Society of Criminology, San Francisco.

2001   (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001   "Measures of gun ownership levels for macro-level violence research." Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001   "The effects of gun ownership levels and gun control laws on urban crime rates." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

2003  (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends on who has them." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2003  (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2004  (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?" Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004  (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2005  (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."
Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004  (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2005  (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2005  (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at

the Annual Meetings of the American Society of Criminology, Toronto.

2006  (with Shun-Yang Kevin Wang) "Organized gun trafficking, 'crime guns,' and

crime rates."  Presented at the Annual Meetings of the American Society of

Criminology, Los Angeles.

2006  "Are police officers more likely to kill black suspects?"  Presented at the

Annual

Meetings of the American Society of Criminology, Los Angeles.

2007  (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking.

"Presented at the Annual Meetings of the American Society of Criminology,

Atlanta.

2007  (with Marc Gertz and Jason Bratton)  "Why do people support gun control?"

Presented at the Annual Meetings of the American Society of Criminology,

Atlanta.


2008  (with J.C. Barnes)  "Deterrence and macro-level perceptions of punishment

risks: Is there a "collective wisdom?"  Presented at the Annual Meetings of the

American Society of Criminology,  St. Louis.

2009  "The myth of big-time gun trafficking."  Presented at <u>UCLA Law Review</u>

Symposium, "The Second Amendment and the Right to Bear Arms After DC

v. Heller."  January 23, 2009, Los Angeles.

26

2009  (with Shun-Yung Wang) "Employment and crime and delinquency of working

youth: A longitudinal study of youth employment."  Presented at the Annual

Meetings of the American Society of Criminology, November 6, 2009,

Philadelphia, PA.

2009  (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at

the

Annual Meetings of the American Society of Criminology, November 4, 2009,

Philadelphia, PA.

2010  (with J. C. Barnes) "Article productivity among the faculty of criminology and

criminal justice doctoral programs, 2005-2009."  Presented at the annual

Meetings of

the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010  (with Will Hauser) "Fear of crime and gun ownership."  Presented at the

annual

Meetings of the American Society of Criminology, November 18, 2010, San

Francisco, CA.

2010   "Errors in survey estimates of defensive gun use frequency: results from

national

Internet survey experiments."  Presented at the annual Meetings

of the American Society of Criminology, November 19, 2010, San Francisco,

CA.

27

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal

victimization, and prospective gun ownership."  Presented at the annual

Meetings

of the American Society of Criminology, November 19, 2010, San Francisco,

CA.

2011    (with Shun-young Wang) "The impact of job quality and career commitment

on

delinquency: conditional or universal?"  Presented at the annual Meetings

of the American Society of Criminology, November 17, 2011.

2011    (with Moonki Hong) "The short-term deterrent effect of executions on

homicides

in the United States, 1984-1998."  Presented at the annual Meetings

of the American Society of Criminology, November 16, 2011.

2011    (with Kelly Roberts)  "Which survey modes are most effective in getting

people

to admit illegal behaviors?"  Presented at the annual Meetings of the American

Society of Criminology, November 17, 2011.

2011    (with Will Hauser)  "Pick on someone your own size: do health, fitness, and

size

influence victim selection?" Presented at the annual Meetings

of the American Society of Criminology, November 18, 2011.

28

2011  (with Tomislav Kovandzic) "Is the macro-level crime/punishment association

spurious?"  Presented at the annual Meetings of the American Society of

Criminology, November 18, 2011.

2012  (with Dylan Jackson) "Adult unemployment and serious property crime: a

national case-control study."  Presented at the annual Meetings of the

American

Society of Criminology, November 15, 2012.


2013  (with Will Hauser) "Confidence in the Police and Fear of Crime: Do Police

Force

Size and Productivity Matter?"  Presented at the annual Meetings of the

American

Society of Criminology, November 22, 2013.

2013. (with Dylan Jackson) "Adult unemployment and serious property crime: a

national case-control study."  Presented at the annual Meetings of the

American

Society of Criminology, November 22, 2013.

2014      (with Dylan Jackson) "Does Crime Cause Punitiveness?"  Presented at the

annual

Meetings of the American Society of Criminology, November 20, 2014.

2015          "The effect of large capacity magazines on the casualty counts in mass

29

shootings."  Presented at the annual Meetings of the American Society of
Criminology, November 18, 2015.

2015  (with Bethany Mims) "Article productivity among the faculty of criminology
and

criminal justice doctoral programs, 2010-2014."  Presented at the annual
Meetings of the American Society of Criminology, November 20, 2015.

CHAIR

1983  Chair, session on Race and Crime.  Annual meetings of the American Society
of Criminology, Denver.

1989  Co-chair (with Merry Morash), roundtable session on problems in analyzing
the National Crime Surveys.  Annual meetings of the American Society of
Criminology, Reno.

1994  Chair, session on Interrupted Time Series Designs. Annual meetings of the
American Society of Criminology, New Orleans.

1993  Chair, session on Guns, Gun Control, and Violence. Annual meetings of the
American Society of Criminology, Phoenix.

1995  Chair, session on International Drug Enforcement. Annual meetings of the
American Society of Criminology, Boston.

1999  Chair, Author-Meets-Critics session, More Guns, Less Crime.  Annual
meetings of the American Society of Criminology, Toronto.

2000  Chair, session on Defensive Weapon and Gun Use.  Annual Meetings of the

30

American Society of Criminology, San Francisco.

2002  Chair, session on the Causes of Gun Crime. Annual meetings of the American

Society of Criminology, Chicago.

2004  Chair, session on Protecting the Victim.  Annual meetings of the American

Society of Criminology, Nashville.

DISCUSSANT

1981  Session on Gun Control Legislation, Annual Meetings of the American Society

of Criminology, Washington, D.C.

1984  Session on Criminal Sentencing, Annual Meetings of the American Society of

Criminology, Cincinnati.

1986  Session on Sentencing, Annual Meetings of the American Society of

Criminology, Atlanta.

1988  Session on Gun Ownership and Self-protection, Annual Meetings of the

Popular

Culture Association, Montreal.

1991  Session on Gun Control, Annual Meetings of the American Statistical

Association, Atlanta, Ga.

1995  Session on International Drug Enforcement, Annual Meetings of the American

Society of Criminology, Boston.

2000  Session on Defensive Weapon and Gun Use, Annual Meetings of the American

Society of Criminology, San Francisco.

31

2004  Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson.  Annual meetings of the American Society of Criminology, Nashville.

2007  Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On The Economics of Crime, March 26-28, 2009.

2012  Panel discussion of news media coverage of high profile crimes Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the    Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

Editorial consultant -

American Sociological Review

American Journal of Sociology

Social Forces

Social Problems

Law and Society Review

Journal of Research in Crime and Delinquency

Social Science Research

Criminology

32

Journal of Quantitative Criminology

Justice Quarterly

Journal of Criminal Justice

Violence and Victims

Violence Against Women

Journal of the American Medical Association

New England Journal of Medicine

American Journal of Public Health

Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene LeCarte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami,

November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in

Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in

33

Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of

Justice

Quarterly, 2007.

Outside reviewer of Dr. J. Pete Blair for promotion to Full Professor in the School of

Criminal Justice at Texas State University, San Marcos, 2014.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology,

1979-

1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice

Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and

Welfare,

1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for

Science and

Public Affairs, and Departments of Physics and Economics, 1986.

34

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of

   Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of

   Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and

   1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall,

   1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring,

   1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology, Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

35

Member, School of Criminology and Criminal Justice Teaching Incentive Program

award

committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice,

1994-

1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods,

School of

Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to

1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of

Criminology

and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000- .

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-

2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal

36

Justice,

     2000-.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of

     Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice,

     2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student

     Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal

     Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit

     Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to .

Director of Graduate Studies, School (later College) of Criminology and Criminal

Justice,

    April 2004 to May 2011.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal

Justice,

    2005-2006

Served as major professor on Area Paper by Christopher Rosbough, completed in

2012.

Served as member of dissertation committee of Kristen Lavin, dissertation completed

in

    2012.

Served as member of dissertation committee of Elizabeth Stupi, dissertation

completed in

    2013.

Served as outside member on two dissertation committees in 2014-2015: Brian

Meehan

    in the Department of Economics and Adam Weinstein in the English

Department.

    Both dissertations were completed.

Served as major professor on Area Paper on legalization of marijuana for Pedro Juan

    Matos Silva, Spring 2015.  Paper completed.

Served as major professor for doctoral student Moonki Hong, who finished his

38

dissertation. .

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun

control,

racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other

kinds of news media contacts include <u>Newsweek</u>, <u>Time</u>, <u>U.S. News and World</u>

<u>Report</u>,

<u>New York Times</u>, <u>Washington Post</u>, <u>Chicago Tribune</u>, <u>Los Angeles Times</u>, <u>USA</u>

<u>Today</u>,

<u>Boston Globe</u>, <u>Wall Street Journal</u>, <u>Kansas City Star</u>, <u>Philadelphia Inquirer</u>,

<u>Philadelphia News</u>, <u>Atlanta Constitution</u>, <u>Atlanta Journal</u>, <u>Arizona Republican</u>,

<u>San</u>

<u>Antonio Express-News</u>, <u>Dallas Morning News</u>, <u>Miami Herald</u>, <u>Tampa Tribune</u>,

<u>Jacksonville Times-Union</u>, <u>Womens' Day</u>, <u>Harper's Bazaar</u>, <u>Playboy</u>, CBS-TV (60

Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV

(Nightly

News), Cable News Network, Canadian Broadcasting Company, National Public

Radio,

Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's

Advisory

      Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and

      Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the

      Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department,

      Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University

      College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico,

      October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and

      Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12,

      1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18,

      1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada,

      March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of

      Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University,

      Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy,        Quantico, Virginia, June 29,

      1995.

Speech to personnel in research branches of crime-related State of Florida agencies,

      Research and Statistics Conference, sponsored by the Office of the State Courts

      Administrator, October 19, 1995.

41

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison

Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice

research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice

Journalists organization, at the American Society of Criminology annual

meetings in          Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective

Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21,

2000.

Speech on deterrence to the faculty of the Florida State University School of Law,

February

10, 2000.

Invited address on links between guns and violence to the National Research Council

Committee on Improving Research Information and Data on Firearms,

November 15-

16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research

Council

Committee on Improving Research Information and Data on Firearms, January

16-

42

17, 2002, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama,

> Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of

Pennsylvania,

> March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal

Justice

> Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety,

Tallahassee,

> Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western

Carolina

> University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second

> Amendment,"   New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment,"

> sponsored by the Tallahassee Democrat.

Invited address at University of West Florida, Department of Justice Studies, titled

43

"Guns,

      Self-Defense, and the Public Interest," April 12, 2013.

Member, National Research Council Committee on Priorities for a Public Health

      Research Agenda to Reduce the Threat of Firearm-related Violence, May 2013.

Invited address at Davidson College, Davidson, NC, April 18, 2014.  Invited by the

      Department of Philosophy.

OTHER ITEMS

      Listed in:
            Marquis Who's Who
            Marquis Who's Who in the South and Southwest
            Who's Who of Emerging Leaders in America
            Contemporary Authors
            Directory of American Scholars
            Writer's Directory
      Participant in First National Workshop on the National Crime Survey, College Park,
            Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the
            American Statistical Association.
      Participant in Second National Workshop on the National Crime Survey,
      Washington, D.C.,
            July, 1988.
      Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.
      Debater in Intelligence Squared program, on the proposition "Guns Reduce
      Crime." Rockefeller University, New York City, October 28, 2008.  Podcast
distributed
            through National Public Radio.  Further details are available at
            http://www.intelligencesquaredus.org/Event.aspx?Event=36.
      Subject of cover story, "America Armed," in Florida State University Research in
            Review, Winter/Spring 2009.
      Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.
      Named one of "25 Top Criminal Justice Professors" in the U.S. by Forensics
Colleges
            website (http://www.forensicscolleges.com/), 2014.

**Expert Testimony in Past Five Years**

Maryland Shall Issue v. Hagan.  Maryland.  Deposition 5-18-18.

Association of New Jersey Rifle and Pistol Clubs v. Grewel.  New Jersey. Deposition 8-2-18.

Rupp v. Becerra, California.  Deposition 12-12-18.

NRA v. Swearingen, Florida.  Deposition via Zoom 8-13-20.

Maryland Shall Issue v. Anne Arundel County, Maryland.  Deposition via Zoom 9-29-22.

OFF v. Brown, Oregon.  Deposition via Zoom 1-25-23.

45

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE
### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

Case Name: *Rupp, et al. v. Becerra*
Case No.: 8:17-cv-00746-JLS-JDE

IT IS HEREBY CERTIFIED THAT:

     I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

     I am not a party to the above-entitled action. I have caused service of:

**EXPERT WITNESS REBUTTAL REPORT OF GARY KLECK**

on the following party by electronic mail.

Xavier Becerra
Attorney General of California
Anna Ferrari
Deputy Attorney General
Email: anna.ferrari@doj.ca.gov
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

     I declare under penalty of perjury that the foregoing is true and correct.

Executed February 3, 2023.

Laura Palmerin

CERTIFICATE OF SERVICE