Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                          Kevin M. Sweeney

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PENDLETON DIVISION

_____

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | ) ) ) Civil No. ) 2:22-cv-01815-IM |
| Plaintiffs, | ) (Lead Case) |
| v. | ) |
| TINA KOTEK, et al., | ) Civil No. ) 3:22-cv-01859-IM ) (Trailing Case) |
| Defendants. | ) |
| _____ | ) Civil No. ) 3:22-cv-01862-IM |
| (Continued) | ) (Trailing Case) ) |
| | ) Civil No. ) 3:22-cv-01869-IM ) (Trailing Case) ) |

_____

\* VIDEOCONFERENCE \*

DEPOSITION UPON ORAL EXAMINATION

OF EXPERT

KEVIN M. SWEENEY
_____

Witness located in:

Greenfield, Massachusetts


\* All participants appeared via videoconference \*

DATE TAKEN:    March 29, 2023
REPORTED BY:   Tia B. Reidt, Washington RPR, CCR #2798
                         Oregon # 22-0001

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 2

```
 1  _____
 2    (continued)                          )
                                           )
 3    MARK FITZ, et al.,                   )
                                           )
 4                    Plaintiffs,          )
            v.                             )
 5                                         )
      ELLEN F. ROSENBLUM, et al.,          )
 6                                         )
                      Defendants.          )
 7   _____        )
                                           )
 8    KATERINA B. EYRE, et al.,            )
                                           )
 9                    Plaintiffs,          )
                                           )
10          v.                             )
                                           )
11    ELLEN F. ROSENBLUM, et al.,          )
                                           )
12                    Defendants.          )
     _____        )
13    DANIEL AZZOPARDI, et al.,            )
                                           )
14                    Plaintiffs,          )
            v.                             )
15                                         )
      ELLEN F. ROSENBLUM, et al.,          )
16                                         )
                      Defendants.          )
17                                         )
     _____
18
19
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 3

```
 1                       APPEARANCES
 2   For Eyre Plaintiffs:
 3            CHRISTIAN CHO
              DAN NICHOLS
 4            JURISLAW, LLP
              Three Centerpointe Drive, Suite 160
 5            Lake Oswego, OR 97035
              (503) 968-1475
 6            Christian@jurislawyer.com
              Dan@jurislawyer.com
 7
 8   For the State of Oregon Defendants:
 9            ERIN DAWSON
              MARKOWITZ HERBOLD
10            1455 SW Broadway, Suite 1900
              Portland, OR 97201
11            (503) 972-5076
              ErinDawson@markowitzherbold.com
12
13
14                    *   *   *   *   *
15
16
17
18
19
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 3 of 19
78f98412-3b27-477f-b651-78e334ff7799

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                   Kevin M. Sweeney

Page 4

1               EXAMINATION INDEX

2  EXAMINATION BY:                              PAGE

3  Mr. Cho                                      5

4

5                  EXHIBIT INDEX

6
   EXHIBIT      DESCRIPTION                     PAGE
7
   EXHIBIT 23   Curriculum Vitae of             7
8               Kevin M. Sweeney.

9  EXHIBIT 24   Declaration of Kevin Sweeney.   13

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 5 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                              Kevin M. Sweeney

Page 9

1   Q.   Okay.
2   A.   It was Harry; right?  Harry -- I can't
3   remember his last name.
4   Q.   That's okay.
5        For what purpose did they ask you to testify?
6   A.   They asked me to testify about what kind of
7   firearms were commonly owned and used by Americans in
8   the 18th century.  That was the primary thing I was
9   asked to testify on.
10       I also became involved in testifying about
11  firearms that were not as common, were rather rare.
12  Questions about these firearms had also come up in my
13  declaration in the Hanson case in DC, and there was
14  similar questions about these firearms in this case.
15  So I was called upon mainly to talk about initially
16  what was in common use and ended up talking about those
17  that were rare, basically.  That was what I was doing.
18  Q.   Were you ever asked to testify about weapons
19  that were considered unusually dangerous at the time?
20            MS. DAWSON:  Mr. Cho, I'm going to object.
21       You're asking about our communications with
22  his office, which isn't a permitted --
23            MR. CHO:  Yeah.  Fair.  Fair --
24            (Speaking simultaneously.  Unreportable
25  crosstalk.)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 5 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 6 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 10

1                (Reporter asks parties to speak one at a
2  time.)
3                (Reporter clarification.)
4                MS. DAWSON:  -- with our office, which is
5  protected as work product.  However, if you want to ask
6  him about his understanding of the scope of the report
7  or what the actual scope of his report was, that would
8  be fine.
9                MR. CHO:  Okay.  Fair enough.  I'll
10 rephrase.
11 BY MR. CHO:
12     Q.   Dr. Sweeney, can you summarize what
13 specifically your opinions were on the firearms that
14 were in common use in the 18th century?
15     A.   Well, that's best presented in my Table Number
16 1, which is on -- I'm not sure what -- yeah, Table
17 Number 1, which is right before paragraph 19.  This was
18 basically that -- addressing that first question, what
19 was in common possession and in common use, and I
20 looked at that from the standpoint of percentages
21 overall that -- estate inventories of males who had
22 more than just -- who owned more than just livestock,
23 financial instruments or slaves when they died.
24                Individuals owning just those types of
25 personal property often tended to be minors.  They were

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 6 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM    Document 153-4    Filed 05/15/23    Page 7 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 11

1   inheritances -- or older males beyond the age of
2   militia service who, in our terms, would be retired.
3   So I was mainly concerned with, you know, independent
4   males subject to militia service.  So that was what
5   influenced the inventories I took data from.
6           And you can see on the table there are the
7   percentages of inventories in which a firearm was
8   found, a summary, but also broken down by region.  The
9   same for explicit mentions of muskets, rifles, and
10  pistols.  So as I indicate in my text, most colonists
11  preferred lighter narrower bored, cheaper weapons that
12  were often called trade guns or fusees, then muskets,
13  which were heavier, more expensive, essentially
14  perceived as military weapons.
15          And on Table 2, which made use of some
16  surviving, though not inclusive in the reporting,
17  militia tallies from Virginia from the early 1780s that
18  are quite unusual and quite revealing because they do
19  break down muskets, other types of private arms,
20  pistols.  And then based on some marginal comments, I
21  can also tease out the number of rifles.  So I was able
22  to get a sense of that both in terms of private and
23  public ownership of muskets.  So these were the kinds
24  of weapons that were most commonly owned.
25          I then turned to those weapons that were --

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 7 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM  Document 153-4  Filed 05/15/23  Page 8 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)    Kevin M. Sweeney

Page 12

1  that turned up from a search of database called
2  Americans -- America's Historical Newspapers, searching
3  for guns, muskets, pistols, fowlers, blunderbuss, a
4  whole range of references to various kinds of firearms.
5  This database gives access to about 450 different
6  newspapers that were published before 1800.  It's not
7  inclusive.  One gap is newspapers from Charleston,
8  South Carolina, an important publishing hub in the
9  Carolinas, was not included, but there is a lot of
10 representation and inclusion what is in it.  So I used
11 data from that to identify references in advertisement,
12 commercial, personal, lost and found, and in news
13 stories to the kind of weapons that could be classed as
14 repeaters.  And so that was how I approached the more
15 unusual type of weapons, both in terms of getting some
16 overall sense of a percentage of them and also from the
17 advertisement and news stories, the specific kind of
18 context in which they appeared.
19     Q.  Okay.
20     A.  So those were the two kinds of things and the
21 two kinds of sources.
22     Q.  Okay.  Thank you.
23         MR. CHO:  Tia, before we continue, I guess
24 we should probably mark Exhibit 24, since Dr. Sweeney
25 is discussing a number of things from Exhibit 24, which

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 8 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM    Document 153-4    Filed 05/15/23    Page 9 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Kevin M. Sweeney

Page 47

1  A.  If a student had presented that kind of
2  historical reasoning to me in a research paper in my
3  seminar The American Revolution, I might have given it
4  a B plus if I was in a generous mood.  If I wasn't, no.
5  So, yeah.
6  Q.  Okay.
7      So would it be fair to say, then, that you
8  believe that the Second Amendment as written at the
9  time applies strictly to these state militias, as it
10 were?
11 A.  Yes.  It was answering fears by the
12 anti-federalists that the -- the militias, which were
13 state militias, would just become decrepit.  They would
14 fall into -- they basically would just cease to
15 function.  Let me say that, yeah.
16 Q.  Okay.
17     Do you believe that the Second Amendment
18 provides a private right to bear arms in the US?
19 A.  That was not the intention, I believe, when it
20 was adopted.  If they wanted to say that, they could
21 have just said what the almost simultaneously adopted
22 clause in the Pennsylvania state constitution said.  It
23 provided for the militia and the private ownership.  I
24 mean, if they were interested in private ownership,
25 these were intelligent men.  They understood English.

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 9 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 10 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 62

1  they hadn't sworn before a JP, they would swear before
2  the probate judge that it was, you know, true and
3  complete.
4       Q.  Let me pause you there real quick.
5       A.  Certainly.
6       Q.  When you mentioned "true and complete," can
7  you describe to me how was it that they ensured, I
8  guess, that all of the deceased person's possessions
9  were included in this inventory?
10      A.  They would go through the house, the barns,
11 and the whole thing, and presumably see it.  It is also
12 clear that they asked family members and survivors is
13 there something that's not here.  Again, the
14 assumption -- and it's kind of surprising of what
15 people knew about their neighbor's business in these
16 small towns at this time.  Presumably, these
17 individuals who were the appraisers would have some
18 insight into that type of thing:  Oh, yeah, there are
19 20 cows down in the north -- you know, north 40 or
20 something that's 10 miles from here.  That kind of
21 thing.
22          But, no.  One is ultimately dependent at the
23 time, if you were a creditor with a claim on the
24 estate, that these folks were honest.  And as a
25 historian, I'm dependent upon that as well.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 10 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 11 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                Kevin M. Sweeney

Page 67

1  is different from a living population.  Of course,
2  they'd say, yeah, they're dead.  But by that, I mean in
3  terms of its composition.  They're disproportionately
4  older males.  And in terms of just owning just about
5  everything, and that's including firearms through their
6  60s, older males were just more likely to own more
7  stuff.  So there is an age bias because any group of
8  probated individuals is going to have more older people
9  than guys who died in their 20s or 30s.  So it drops
10 off again if you get to the 70s or the 80s.  They're
11 not hunting anymore.  They're not serving in militias.
12 So there is that age bias, and you know that that tends
13 to probably, in most cases, overestimate the ownership
14 of firearms by a group of men.  That's particularly
15 critical when thinking about the militia because one in
16 six militiamen would be from 16 to 20.  They probably
17 aren't owning it, their own firearms.  It doesn't mean
18 they don't have access to it.  But what happens is
19 they're often disproportionately -- particularly the
20 guys in their early 20s and late teens -- who end up
21 serving in the field when the militia gets mobilized.
22 So somehow, you've got to get guns to these guys.
23 They're also more likely to end up in the Continental
24 Army, so they'll show up at the Continental Army
25 without their own firearm unless an older brother or,

BUELL REALTIME REPORTING, LLC
206.287.9066   l   800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 11 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 12 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Kevin M. Sweeney

Page 68

1  you know, grandfather has given it to them.  So that's
2  a probate inventory bias.
3           More striking, and easier to determine because
4  it's often hard to find -- it's particularly hard in
5  the south to find ages.  There just aren't.  But you
6  can rank them by wealth, and it's pretty striking.  You
7  know, wealthier individuals were more likely to own
8  firearms than poor individuals, but we know poorer
9  individuals made up a larger portion of the population.
10 So take Georgia -- if I remember, I did it fairly
11 recently.  The lower third of the population, people
12 with estate inventories of 20 pounds of sterling or
13 less, probably subsistence level or below, only half of
14 them had firearms.  That's actually pretty high.  You
15 go to other areas, it's about a third only having
16 firearms.
17          Both South Carolina and Georgia, from their
18 inventories, seem to be pretty well-armed.  They were
19 in what was a dangerous neighborhood:  Creeks,
20 Cherokees -- who they'd angered -- French, Spanish, and
21 then a large enslaved population.  So the guys who end
22 up in the militia were even just -- they were
23 well-armed.
24          So this shows that, you know, the probate
25 inventories, again, as through the age, if there is a

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 12 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 13 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)    Kevin M. Sweeney

Page 69

1    bias, it's probably going to give a higher proportion
2    of -- give a sense that a larger proportion of the male
3    population had a firearm than in reality may have.
4         And we know from militia musters that there
5    were men who showed up unarmed. You know, it happened.
6    And this was one reason why during the American
7    Revolution a number of states bought muskets in such
8    quantity that they could arm at least each sort of
9    militia class as they were mobilized. They had enough
10   arms for them. They would deliver them, and then the
11   guys would turn them in when they -- you know, their
12   two-month or three-month service was ended.
13        Q.  So I take it that if a man mustered for the
14   militia and they gave him a firearm and then he was
15   killed in combat, they would not count that gun as part
16   of his probate inventory?
17        A.  No. And one thing -- and I have picked up on
18   this, and I've tried to deal with it.
19             If someone used their own personal arm in
20   battle and left it on the field or he was dead and it
21   was left on the field, it would not be in the estate
22   inventory. However, a number of colonies --
23   Massachusetts was one of them -- reimbursed for these
24   losses. So in some cases, you can find out that
25   so-and-so did have a firearm because he got reimbursed

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 13 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 14 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 70

1  for it.
2          One thing I try to do is I always isolate,
3  regardless of what decade they fall into, periods of
4  intense military activity like King Philip's War in the
5  1670s in New England, the French and Indian War, the
6  American Revolution.  They have very distinctive
7  patterns.  During these wars, the proportion overall of
8  inventories with firearms really dips because of loss
9  on battlefield, impressment, loaning it to people who
10 are serving.  And certainly, during the American
11 Revolution, they go around disarming people who they
12 suspect the loyalty of, both sides.
13         So those have to be treated differently.  I've
14 seen it in the 1640s in England during the English
15 civil wars.  It's, you know, just something that
16 happens.  So it's kind of atypical --
17    Q.  Did you --
18    A.  -- at this time.
19    Q.  -- make the adjustments that you just
20 referenced in terms of rectifying for, like, weapons
21 lost in the battlefield that were then later
22 compensated for in your table?
23    A.  I do not in the tables.  I mention them where
24 I have data in the text itself.  I may in appendices
25 put this kind of thing in.

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 14 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 15 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                Kevin M. Sweeney

Page 71

1    Again, it's part of the relative comparisons
2    because some of these wars -- like King Philip's War
3    only involved New England -- can be very localized.  So
4    what I tend to do is, you know, the whole period of
5    that war is just treat it as a part of New England
6    where I deal with these things and don't compare it to
7    what is going on in Virginia.  I mean, that's sort of
8    how I deal with it, by isolating the wars and treating
9    them specially.  So that's not something that factors
10   into Table 1 in here.
11        Q.   Okay.
12        A.   It's whatever was there.  And it could be,
13   yes.
14             In the Carolinas, because of what happened
15   during the Revolution, it could be maybe a couple of
16   points higher for what happened.  Maybe during the
17   French and Indian War, it could be a point higher in
18   New England.
19        Q.   Okay.
20             So it's fair to say --
21        A.   (Speaking simultaneously.)
22             (Reporter clarification.)
23   BY MR. CHO:
24        Q.   Okay.  So it's fair to say, then, that Table 1
25   only reflects purely the probate inventories that

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 15 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 16 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 72

1  you -- that there are records of?
2       A.  Oh, yes.  Yeah.  Again, not all.  It does not
3  include women.  It does not include men, as I've said,
4  who -- whose possessions were limited to livestock,
5  financial instruments or slaves because those are
6  probably not individuals maintaining a household or,
7  you know, serving in the militia.
8       Q.  Okay.
9           In paragraph 18, you mention that Philippe --
10 and I apologize.  I don't know how to pronounce this
11 name.
12 Guillaume Chion?
13      A.  Yeah, Guillaume Chion.  We can just call him
14 Philip Williamson.
15      Q.  All right.  Philip Williamson.
16      A.  Yeah.
17      Q.  He had an air gun in his probate inventory.
18      A.  Yes.
19      Q.  Is there any record of what he used -- whether
20 he used this weapon in combat?
21      A.  No.  But it was lumped together with three
22 fowlers, which were probably used for hunting.  That
23 was one reason I could not put an individual price on
24 it because it's three fowlers and one air gun, 5 pounds
25 or something like that.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 16 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 17 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 73

1    So from the context -- and, you know, context
2  is one thing we can use in interpreting inventories --
3  I would say it was for hunting in his situation.  He
4  lived in the lowlands of the Carolinas.  There was a
5  lot of birding that went on there in the marshes in
6  that area.  So that would be my guess.  This was not a
7  military weapon.
8       Q.  Okay.
9           You said it was lumped together with three --
10 what was that word?
11      A.  Fowlers.
12      Q.  Fowlers?
13      A.  Fowlers.  F-O-W-L-E-R-S.  They were
14 sharpshooting fowl.  You know, it's a birding gun.
15      Q.  Okay.
16      A.  It's a birding gun.  So I would say it was
17 probably used for hunting.
18      Q.  All right.
19          Moving down to paragraph 22 of your
20 declaration.
21      A.  Certainly.
22      Q.  Here, you mention --
23      A.  Yes.
24      Q.  You mention here that you conducted a search
25 in America's Historical Newspapers, which is a database

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 17 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM   Document 153-4   Filed 05/15/23   Page 18 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 74

1  that contains many newspapers.
2       A.  Yeah.
3       Q.  Can you explain to me which of these -- which
4  newspapers were missing from this database because I
5  remember you said earlier that there was a notable
6  paper from South Carolina that's not included in this
7  database, and I was wondering what that was and then
8  what other papers may be missing.
9       A.  Yes.  It's the South Carolina Gazette is not
10 in it.  It was the paper in Charleston from the 1730s
11 into the era of the American Revolution.  That is part
12 of another database called Accessible Archives that I
13 have purchased access to and am working through it now.
14          Despite its name, it's unfortunately not
15 terribly accessible.  And I'm limited to only 500
16 printouts a month or something.  So -- but I am working
17 through that.  It will be kind of an interesting
18 experiment and comparison, actually, methodologically
19 between what I found in the two databases in terms of
20 proportions and things like that.  So it's -- so
21 it's -- it's the Charleston Gazette.
22          Also missing from both -- I probably won't be
23 able to -- it's hard to get at, are the -- it's the
24 1770s from -- I think it's the Savannah Gazette.  It's
25 another paper.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 18 of 19
78f98412-3b27-477f-b651-78e334ff7799

Case 3:22-cv-01862-IM    Document 153-4    Filed 05/15/23    Page 19 of 19

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Kevin M. Sweeney

Page 93

C E R T I F I C A T E

STATE OF WASHINGTON

COUNTY OF PIERCE

    I, Tia Reidt, a Certified Court Reporter in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of Kevin M. SWEENEY, having been duly sworn, on March 29, 2023, is true and accurate to the best of my knowledge, skill and ability.  Reading and signing was requested pursuant to FRCP Rule 30(e).

    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 3rd day of April, 2023.

_____

/S/ Tia B. Reidt
Tia B. Reidt, RPR, CCR Oregon # 22-0001
NOTARY PUBLIC, State of Washington.
My commission expires 5/15/2026.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Exhibit 4 - Lindsay Decl. (Sweeney Depo.)
Page 19 of 19
78f98412-3b27-477f-b651-78e334ff7799