Jessica A. Skelton, OSB #102714
jessica.skelton@pacificalawgroup.com
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
206-245-1700

*Attorney for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM *(Lead Case)* |
| Plaintiffs, | Case No. 3:22-cv-01859-IM *(Trailing Case)* |
| | Case No. 3:22-cv-01862-IM *(Trailing Case)* |
| v. | Case No. 3:22-cv-01869-IM *(Trailing Case)* |
| TINA KOTEK, et al., | |
| Defendants, | CONSOLIDATED CASES |
| and | |
| OREGON ALLIANCE FOR GUN SAFETY, | **INTERVENOR-DEFENDANT OREGON ALLIANCE FOR GUN SAFETY'S RESPONSE TO PLAINTIFFS' DAUBERT MOTION AND MOTIONS IN LIMINE** |
| Intervenor-Defendant. | |
| MARK FITZ, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants, | |
| and | |

ALLIANCE'S RESPONSE TO PLTF. DAUBERT MOTION AND MIL

OREGON ALLIANCE FOR GUN
SAFETY,

                     Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

                     Plaintiffs,

       v.

ELLEN F. ROSENBLUM, et al.,

                     Defendants.

**TABLE OF CONTENTS**

I.    INTRODUCTION AND RELIEF REQUESTED .................................................. 1

II.   STATEMENT OF ISSUES TO BE DECIDED BY THE COURT ..................................... 2

III.  ARGUMENT ............................................................................ 3

      A.   Legal Standards ............................................................... 3

           1.   *Daubert* ................................................................ 3

           2.   FREs 401 and 403 ........................................................ 5

      B.   Professor Baron's Testimony Is Relevant and Reliable Under *Daubert* ................. 7

      C.   Dr. Cook's Testimony is Relevant and Not Prejudicial ............................. 12

           1.   Dr. Cook's testimony is relevant to the Second Amendment challenge......... 12

           2.   Dr. Cook's testimony is relevant to the Takings Clause challenge ................ 16

      D.   The Remaining Motions In Limine are Meritless.................................... 18

IV.   CONCLUSION .......................................................................... 19

# TABLE OF AUTHORITIES

Federal Cases

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
   738 F.3d 960 (9th Cir. 2013) ................................................................................ 4, 9

*Aranda v. City of McMinnville*,
   942 F. Supp. 2d 1096 (D. Or. 2013) ........................................................................ 5

*Armer v. CSAA Gen. Ins. Co.*,
   No. CV-19-04402-PHX-DWL, 2020 WL 3078353 (D. Ariz. June 10, 2020) .......................... 9

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*,
   910 F.3d 106 (3d Cir. 2018) ................................................................................ 17

*Bevis v. City of Naperville*,
   22 C 4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) .................................... 15, 18

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .................................................................................... 3, 4, 5

*David E. Watson, P.C. v. United States*,
   668 F.3d 1008 (8th Cir. 2012) .............................................................................. 4

*Deal v. Hamilton Cnty. Bd. of Educ.*,
   392 F.3d 840 (6th Cir. 2004) ................................................................................ 5

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
   No. CV 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ............... 13, 14, 15, 18

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................................ 7, 13, 14

*Duncan v. Bonta*,
   19 F.4th 1087 (9th Cir. 2021) .............................................................................. 17

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
   No. 14 C 1859, 2017 WL 3592775 (N.D. Ill. Aug. 21, 2017) ...................................... 7

*Farmer Bros. Co.*,
   31 F.3d 891 (9th Cir. 1994) ................................................................................ 6

*FTC v. BurnLounge, Inc.*,
   753 F.3d 878 (9th Cir. 2014) ................................................................................ 4

*Gibbs v. Gibbs*,
210 F.3d 491 (5th Cir. 2000) ............................................................................. 5

*Gulf States Utils. Co. v. Ecodyne Corp.*,
635 F.2d 517 (5th Cir. 1981) .............................................................................. 6

*Hanson v. District of Columbia*,
CV 22-2256 (RC), 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ........................ 14, 18

*Herrera v. Raoul*, 23 CV 532,
2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) .................................................... 14

*In re Citimortgage, Inc. HAMP Litig.*,
No. ML 11-2274 DSF, 2013 WL 8844095 (C.D. Cal. Oct. 7, 2013) ................... 12

*In re Mushroom Direct Purchaser Antitrust Litig.*,
No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) ................................. 10

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ........................................................................ 11

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........................................................................................ 3, 4

*Lo v. United States*,
No. 2:17-CV-01202-TL, 2022 WL 1014902 (W.D. Wash. Apr. 5, 2022) ............... 4

*Maiz v. Virani*,
253 F.3d 641 (11th Cir. 2001) ........................................................................... 9

*Manpower, Inc. v. Ins. Co. of Pa.*,
732 F.3d 797 (7th Cir. 2013) ........................................................................ 7, 11

*Mass Engineered Design, Inc. v. Planar Sys., Inc.*,
No. 3:16-cv-1510-SI, 2018 WL 3323762 (D. Or. July 6, 2018) ......................... 6

*Mugler v. Kansas*,
123 U.S. 623 (1887) ..................................................................................... 16, 17

*Murray v. S. Route Mar. SA*,
870 F.3d 915 (9th Cir. 2017) ............................................................................. 4

*New York Rifle and Pistol Association, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ............................................................................... passim

*Ocean State Tactical, LLC v. Rhode Island*,
2022 WL 17721175 (D.R.I. Dec. 14, 2022) ........................................... 7, 8, 17, 18

*Palmer v. Sisolak*,
    594 F. Supp. 3d 1215 (D. Nev. 2022) ...................................................................... 17

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978) ................................................................................................. 17

*Restore Robotics, LLC v. Intuitive Surgical, Inc.*,
    No. 5:19CV55-TKW-MJF, 2022 WL 19408080 (N.D. Fla. Feb. 7, 2022) ............................. 10

*Schultz v. Butcher*,
    24 F.3d 626 (4th Cir. 1994) ...................................................................................... 6

*Smilovits v. First Solar, Inc.*,
    No. CV12-00555-PHX-DGC, 2019 WL 6875492 (D. Ariz. Dec. 17, 2019) ........................ 11

*Turner v. Univ. of Wash.*,
    C05-1575RSL, 2007 WL 2984682 (W.D. Wash. Oct. 10, 2007) ...................................... 6

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005) ................................................................................. 5

*United States v. Flores*,
    901 F.3d 1150 (9th Cir. 2018) ................................................................................... 4

*United States v. Guzman-Montanez*,
    756 F.3d 1 (1st Cir. 2014) ....................................................................................... 14

*United States v. Haischer*,
    780 F.3d 1277 (9th Cir. 2015) ................................................................................... 5

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ................................................................................... 6

*United States v. Larios*,
    640 F.2d 938 (9th Cir. 1981) .................................................................................... 6

*United States v. Miranda-Uriate*,
    649 F.2d 1345 (9th Cir. 1981) ................................................................................... 5

*United States v. Ruvalcaba-Garcia*,
    923 F.3d 1183 (9th Cir. 2019) ................................................................... 3, 4, 11, 13

*United States v. Skillman*,
    922 F.2d 1370 (9th Cir. 1990) ............................................................................. 15, 16

*Whitcomb v. N. Idaho Coll.*,
    No. 2:19-CV-392-BLW, 2023 WL 2599211 (D. Idaho Mar. 22, 2023) .............................. 6

**Federal Rules**

Federal Rule of Evidence 401 ............................................................................. 5, 6, 14

Federal Rule of Evidence 403 ............................................................................... 5, 6, 7

Federal Rule of Evidence 702 ............................................................................ 1, 3, 9, 11

**Other Authorities**

11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2885 (3d ed.) ....... 6

## I.    INTRODUCTION AND RELIEF REQUESTED

Plaintiffs ignore both the underlying substantive law and the rules of evidence in seeking to exclude nearly all of Defendants' experts—despite their undisputed qualifications as preeminent authorities in the fields of history, linguistics, medicine, and others. No doubt perceiving the asymmetry in qualifications and substance between the highly credentialed and rigorous defense experts and their own more dubious "experts," Plaintiffs hope to level the playing field by excluding large swaths of Defendants' case from this bench trial on the flimsiest of grounds. Plaintiffs' *Daubert* motion, ECF 177, and consolidated motions in limine, ECF 180 (together, the Motions), rest on misunderstandings of *New York Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Federal Rule of Evidence 702, and the very nature of a bench trial. They ignore a critical holding of *Bruen*, which instructs courts to examine whether firearm regulations address "unprecedented societal concerns" and are "comparably justified" as against historical firearm laws. 142 S. Ct. at 2133. The expert opinion of Dr. Mackenzie Cook, a trauma surgeon at Oregon Health & Science University (OHSU) with deep experience and expertise treating victims of gun violence, is directly relevant to both legal questions as they pertain to Measure 114. Yet Plaintiffs fail even to mention those features of the *Bruen* standard.

Plaintiffs also disregard *Daubert* and its progeny, which liberally favor admitting expert testimony so long as it meets basic thresholds of relevancy and reliability, allowing the adversary to test its merits through cross-examination and the presentation of rebuttal evidence. The presumption is all the stronger in a bench trial, where the risk of this Court being unduly influenced by irrelevant or prejudicial evidence is nonexistent. Without questioning linguistics expert Professor Dennis Baron's qualifications or methodology, Plaintiffs' attempt to exclude his

testimony by nitpicking the factual assumptions and the particular lexicographic data on which he relied. Because Professor Baron's assumptions and data are reasonable, and because even questionable assumptions and data provide no basis to exclude an expert under *Daubert*, Plaintiffs' request to preclude his testimony altogether from a bench trial is misguided. Intervenor-Defendant Oregon Alliance for Gun Safety (the Alliance) respectfully requests that Plaintiffs' Motions be denied.[1]

## II.    STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1.      Plaintiffs do not challenge Professor Baron's qualifications as an expert in corpus linguistics, nor the methodology he applied to determine the original public meaning of the word "Arms" in the Second Amendment, nor even his primary conclusion that "Arms" was "a general term for weapons" but did "not include ammunition" or "ammunition containers," which were instead considered "accoutrements." ECF 181, Ex. 1 ¶ 10. Rather, Plaintiffs seek to exclude his testimony because they disagree with his factual assumption that "ammunition containers in the eighteenth and nineteenth centuries . . . are analogous to today's 'magazines,'" *id.* ¶ 11, and because they believe he should have searched for and considered additional historical sources in his analysis. Should the Court exclude Professor Baron?

2.      *Bruen* instructs the Court to examine, among other things, (1) whether LCMs are dangerous and unusual, (2) if Measure 114 implicates unprecedented societal concerns, (3) why the law burdens the right to armed self-defense (if it does at all), and (4) what justifications exist for any such burden. Dr. Cook's testimony addresses the challenges faced by medical providers when they treat patients with multiple gunshot wounds and when they treat multiple gunshot-

---

[1] The Alliance also joins State Defendants' responses to Plaintiffs' Motions. ECF 200, 201.

wound patients simultaneously—both scenarios are more likely in shootings involving LCMs. Does this testimony pose a risk of misleading the Court such that it should be excluded?

3.    Plaintiffs also contend that evidence regarding public safety concerns and mass shootings are not relevant to a *Bruen* analysis and will mislead the Court. Should such evidence be excluded?

## III.    ARGUMENT

### A.    Legal Standards

#### 1.    *Daubert*

A witness who is qualified as an expert "may testify in the form of an opinion or otherwise" if (1) the expert's knowledge "will help the trier of fact," (2) the testimony is "based on sufficient facts or data," (3) the testimony "is the product of reliable principles and methods," and (4) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Accordingly, "[b]efore admitting expert testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable' under Rule 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (per curiam) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993)).

*Daubert*'s "relevancy" prong "simply requires that the evidence logically advance a material aspect of the party's case." *Id.* (cleaned up). "Reliability," in turn, "requires that the expert's testimony have 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* at 1188–89 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). The "reliability" determination also "asses[es] whether 'the reasoning or methodology underlying the testimony is scientifically valid,' and 'properly can be applied to the facts in issue.'" *Id.* at 1189 (quoting *Daubert*, 509 U.S. at 592–93). The "goal" is to "ensur[e] that the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 152). The Federal Rules of Evidence

favor admissibility of expert testimony, and this reliability inquiry is "a flexible one." *Daubert*, 509 U.S. at 594; *see also Murray v. S. Route Mar. SA*, 870 F.3d 915, 922–23 (9th Cir. 2017) (quoting *Kumho Tire*, 526 U.S. at 152–53) (The reliability analysis is "a malleable one tied to the facts of each case," and "district courts are vested with 'broad latitude' to 'decide how to test an expert's reliability' and 'whether or not an expert's relevant testimony is reliable.'") (quoting *Kumho Tire*, 526 U.S. at 152–53).[2]

The very "purpose of a *Daubert* motion (challenging the admissibility of expert testimony) is to 'protect *juries* from being swayed by dubious [expert] testimony.'" *Lo v. United States*, No. 2:17-CV-01202-TL, 2022 WL 1014902, at *2 (W.D. Wash. Apr. 5, 2022) (quoting *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). At a bench trial, by contrast, the concerns motivating *Daubert*-exclusions are at their nadir: "When the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for [her]self." *Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012)). For this reason, courts across the country have recognized that *Daubert* offers little support to a party seeking to exclude expert testimony from a bench trial. *See, e.g.*, *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be unduly impressed by the expert's

---

[2] *Daubert* identifies several factors that may be considered for evaluating an expert's reliability— whether the scientific theory or technique has been (1) tested, (2) peer reviewed, (3) identified as having a particular rate of error, and (4) generally accepted in the scientific community. 509 U.S. at 592–94. But "district courts are not required to consider all (or even any) of these factors," and Plaintiffs have not asked this Court to consider any of them. *Ruvalcaba-Garcia*, 923 F.3d at 1189.

testimony or opinion in a bench trial."); *United States v. Brown*, 415 F.3d 1257, 1268–69 (11th Cir. 2005) (*Daubert* "barriers are even more relaxed in a bench trial situation."); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

## 2. FREs 401 and 403

Federal Rules of Evidence 401 and 403, which undergird all of Plaintiffs' motions in limine, set low thresholds for admissibility. Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The bar for relevance is not high. *See Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1102 (D. Or. 2013) (finding evidence "sufficient to satisfy the low threshold for relevancy under Rule 401."); *United States v. Miranda-Uriate*, 649 F.2d 1345, 1354 (9th Cir. 1981) ("The standard of relevancy is not strict.").

Rule 403 provides that, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Importantly, Rule 403 is not designed to exclude all prejudicial evidence, only evidence where the probative value is *substantially* outweighed by danger of *unfair* prejudice. "Application of Rule 403 must be cautious and sparing because the Rule's major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Haischer*, 780 F.3d 1277, 1282 (9th

Cir. 2015) (quoting *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (cleaned up). The balancing of the unfair prejudice and probative value lies within the court's discretion. *See United States v. Larios*, 640 F.2d 938, 941 (9th Cir. 1981).

The bars to admissibility set by Rules 401 and 403 are even lower for a bench trial, to the extent they exist at all. *See Mass Engineered Design, Inc. v. Planar Sys., Inc.*, No. 3:16-cv-1510-SI, 2018 WL 3323762, at *4 (D. Or. July 6, 2018) ("Concerns of relevance and prejudice are different in a bench trial and Rule 403 has a limited role, if any."); *EEOC. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) ("[I]n a bench trial, the risk that a verdict will be affected unfairly and substantially by the admission of irrelevant evidence is far less than in a jury trial."). This is because the Rules are designed to protect the jury from considering improper evidence. *See Turner v. Univ. of Wash.*, C05-1575RSL, 2007 WL 2984682, at *1 (W.D. Wash. Oct. 10, 2007) ("As the Advisory Committee Note to Rule 104(a) states, the technical evidentiary rules are generally viewed as 'the child of the jury system,' and therefore there is no need to apply those rules when the judge is the factfinder.") (quoting Edward J. Imwinkelried, *Evidentiary Foundations* § 1.03[2] (6th ed. 2005)); 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2885 (3d ed.) ("In nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence."). For these reasons, judges conducting bench trials regularly relax the already-low standards of admissibility under these Rules. *See, e.g.*, *Whitcomb v. N. Idaho Coll.*, No. 2:19-CV-392-BLW, 2023 WL 2599211, at *2 (D. Idaho Mar. 22, 2023) (reasoning that in a bench trial, "the dangers of unfair prejudice, irrelevancy, and confusion are minimal, so motions in limine are less important than in a jury trial."); *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) (in civil bench trials, "evidence should not be excluded under [Rule] 403 on the ground that it is unfairly prejudicial"); *Gulf States Utils.*

*Co. v. Ecodyne Corp.,* 635 F.2d 517, 519 (5th Cir. 1981) ("Rule 403's weighing of probative value against prejudice . . . has no logical application to bench trials").

**B.        Professor Baron's Testimony Is Relevant and Reliable Under *Daubert***

Professor Baron is a Professor of English and Linguistics at the University of Illinois, the author of multiple books on language and the law, and a foremost authority in the field of legal corpus linguistics. ECF No. 181, Ex. 1 ¶¶ 4, 6. A professor for over 47 years, Professor Baron was the primary author of an important amicus brief in *District of Columbia v. Heller*, which the four dissenting Justices favorably cited multiple times. 554 U.S. 570, 646–47, 647 n.9 (2008).[3] Professor Baron has written ten books and served as an expert witness in more than 20 cases, including at least five cases involving post-*Bruen* Second Amendment challenges to state laws restricting LCMs. ECF No. 181, Ex. 1 ¶ 7. In one of those cases, *Ocean State Tactical, LLC v. Rhode Island*, the Court expressly credited Professor Baron's research, principally relying on it for the Court's conclusion that the plaintiffs "failed to meet their burden of establishing that LCMs are 'Arms' within the textual meaning of the Second Amendment." No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *13 (D.R.I. Dec. 14, 2022).

Similarly, in this case, the Alliance relies on Professor Baron's expert opinion to support its textual argument that "*detachable* LCMs are not 'Arms' within the meaning of the Second Amendment." ECF 176 at 17 (emphasis added). Based on his review and linguistic analysis of the

---

[3] The majority opinion also cited Professor Baron's amicus brief several times, including once in the course of disagreeing with its view that the phrase "bear arms" had a military connotation in the late 18th century. *Heller*, 554 U.S. at 577, 586, 588 (majority). But the majority did not question Professor Baron's qualifications as an expert or the reliability of his methodology. *See Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *11 (N.D. Ill. Aug. 21, 2017) ("[T]he proper subject of a *Daubert* motion to exclude expert testimony is the reliability of the *methodology*, not the reliability of the data inputs, assuming there is a 'rational connection between the data and the opinion.'") (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 797, 809 (7th Cir. 2013)).

"corpora"—*i.e.*, the repositories of historical documents reflecting the "original public meaning" of 18th- and 19th-century language—Professor Baron developed an expert opinion that may be summarized succinctly in two parts. ECF 181, Ex. 1 ¶¶ 10, 14. First, Professor Baron found that, "during the Founding Era and the Reconstruction Era, 'arms' [was] used as a general term for weapons," but "d[id] not include ammunition" or "'accoutrements.'" *Id.* ¶ 10. Second, "ammunition storage containers such as cartridge boxes" were "usually classified as 'accoutrements'" rather than "arms" themselves. *Id.* ¶ 24. Professor Baron logically understood the "cartridge box" or "cartouch box" to be "a sort of precursor to today's 'magazine,'" *id.* ¶ 32— as both are boxes that store ammunition. *See, e.g.*, ECF 161 ¶ 44 (Agreed Upon Facts) ("A firearm magazine is a device attached or attachable to a firearm that stores ammunition."); ECF 178, Ex. 5 at 9–10 (Baron Dep. Tr. 26:25–27:1) (noting the "functional similarity" between magazines and cartridge boxes; "[b]oth hold ammunition"). This latter inference is not a separate linguistic opinion offered by Professor Baron, but rather a factual assumption he made about the obvious functional similarities of firearm accessories to help put his opinions in context.

Plaintiffs "do not challenge Professor Baron's qualifications" as an expert in corpus linguistics. ECF 177 at 20. Instead, they attack his opinions' relevance or reliability on three grounds, each of which falls far short of a proper *Daubert* challenge—particularly in a bench trial.

**First**, Plaintiffs challenge Professor Baron's assumption that cartridge boxes and magazines are functionally analogous, asserting that the analogy "does not bear weight" because modern magazines do not "merely hold ammunition" but also "actually feed ammunition into a firearm." *Id.* at 22. Plaintiffs dramatically overstate the significance of the magazines-to-cartridge box analogy, calling it "the foundation of Barons' [sic] report." *Id.* In reality, the analogy was an *assumption* he made about firearm components (a subject outside his expertise) to contextualize

his opinions regarding historical language usage (a subject very much within it). Professor Baron's linguistic opinion is *not* that *detachable magazines* were considered "accoutrements" during the Revolutionary or Reconstruction eras—for such devices were not invented until the late 1880s and not popularized until the 1900s. ECF 120 ¶ 74; ECF 118 ¶ 71. Rather, Professor Baron's opinion is that, "during the Founding Era and the Reconstruction Era, 'arms' [was] a general term for weapons . . . , but 'arms' d[id] not include ammunition, ammunition containers," etc., "which are included in the category 'accoutrements.'" ECF 181, Ex. 1 ¶ 10. Whether modern detachable magazines are functionally closer to historical "arms" or "accoutrements"—including "cartridge boxes"—is ultimately a question for the finder of fact. To contextualize his opinion in the facts of this case, Professor Baron assumed that cartridge boxes were "a sort of precursor to today's 'magazine.'" *Id.* ¶ 32. But it was just that—an assumption—which even Plaintiffs themselves acknowledge. *See* ECF 177 at 20 (Professor Baron "simply *assumed* that 'cartridge box' is an appropriate 18th century linguistic analogue for 'magazine.'").

What Plaintiffs fail to acknowledge is that it is "perfectly permissible for an expert to rely on assumptions when formulating opinions," and "[d]isagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony." *Armer v. CSAA Gen. Ins. Co.*, No. CV-19-04402-PHX-DWL, 2020 WL 3078353, at *9 (D. Ariz. June 10, 2020) (citing Fed. R. Evid. 702, advisory committee notes to 2000 amendments and collecting cases); *see also Alaska Rent-A-Car*, 738 F.3d at 968–70 (expert's "assumptions and comparisons" were not basis for exclusion of his opinion but instead "go to the weight of the testimony and its credibility, not its admissibility"); *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001) (expert is "entitled to state

reasonable assumptions . . . in order to put his opinions in context.").[4] Plaintiffs appear to believe that ramrods or other 18th- or 19th-century devices are more analogous to modern detachable magazines than are cartridge boxes. *See* ECF 177 at 21 (arguing that the detachable magazine "combines the functions of the cartridge box, powder horn, ramrod, *and* individual loading the weapon"). They are entitled to press for their preferred analogues at trial, but their quibble with Professor Baron's assumption is not a basis for excluding his testimony under *Daubert*.

**Second,** Plaintiffs appear to contend that Baron did not thoroughly search the corpora for 19th-century uses of the word "magazine" in "its modern sense" of ammunition holder. *Id.* at 22. There are multiple flaws in this argument. While Plaintiffs have located isolated and esoteric examples of "magazine" being used in the 1860s to refer to an internal ammunition container, this does not undercut Baron's conclusion that "[t]he word magazine was not *typically* used to refer to a container of ammunition until late in the nineteenth century.'" ECF 181, Ex. 1 ¶ 25 (emphasis added). Moreover, the examples Plaintiffs cite refer to single-shot firearms or those with *fixed* magazines—not the *detachable* magazines to which Professor Baron's opinion is singularly relevant. *Compare* ECF 177 at 22 (referring to "patents for the Henry, Sharps, and Winchester repeating rifles"), *with* ECF 120 ¶ 56 (describing Sharps rifles as "single-shot," "breechloading rifles"), *and* ECF 118 ¶¶ 58, 63 (describing Henry and Winchester rifles as having fixed magazines). Finally, in contending that Professor Baron should have more thoroughly searched for the word "magazine" in Reconstruction-era sources—presumably to determine whether they

---

[4] *See also Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2022 WL 19408080, at *8 (N.D. Fla. Feb. 7, 2022) ("Experts are generally entitled to render opinions under a set of stated assumptions, so long as they are reasonable and have some foundation in the factual record."); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) ("Courts have found that most contentions that [expert] assumptions are unfounded go to the weight, not the admissibility, of the testimony, and a district court has discretion to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.") (cleaned up).

treated it as an "arm" or an "accoutrement"—Plaintiffs criticize not his methodology but his *data*. Under *Daubert*, however, "[r]eliability 'is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced.'" *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) (quoting *Manpower, Inc.*, 732 F.3d at 806). A "district court must admit expert testimony as long as it is based on a reliable methodology" applied by one qualified in the field, and it is for the finder-of-fact "to evaluate the reliability of the underlying data, assumptions, and conclusions." *Id.*; *see also Ruvalcaba-Garcia*, 923 F.3d at 1189 ("The test is not the correctness of the expert's conclusions but the soundness of his methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony.") (cleaned up). Plaintiffs' criticisms of Professor Baron's source material fall far short of undercutting the reliability of his methodology.

**Third,** and in similar vein, Plaintiffs argue that Professor Baron should have "analyze[d] the several thousand instances of the use of 'arms' on its own in his corpora to see if they, in context, covered ammunition and accoutrement also." ECF 177 at 23 (cleaned up). Once again, this argument does not challenge Professor Baron's methodology but rather the data he selected in applying his methodology, which is not a basis to exclude expert testimony under *Daubert*. *See Urethane Antitrust Litig.*, 768 F.3d at 1263; *Manpower, Inc.*, 732 F.3d at 806; *Ruvalcaba-Garcia*, 923 F.3d at 1189; *see also Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion.") (cleaned up). Moreover, Professor Baron reasonably

chose to focus his lexicological research on documents containing the words "arms" and "accoutrements" together because a search for either word alone yielded an enormous number of results (over 47,000 in just one of his three databases). ECF No. 181, Ex. 1 ¶ 49. Particularly given the accelerated case schedule here, Professor Baron's decision to focus on the documents he deemed most likely to contain probative contextual evidence of linguistic meaning does not undercut his conclusions one bit—and certainly provides no basis to exclude his testimony altogether. *See, e.g.*, *In re Citimortgage, Inc. HAMP Litig.*, No. ML 11-2274 DSF, 2013 WL 8844095, at *3 (C.D. Cal. Oct. 7, 2013) (expert's "failure to deal with the entire universe of documents is not a reason for exclusion").

For all those reasons, Plaintiffs fail to give a single valid reason under *Daubert* to preclude Professor Baron from offering his relevant and reliable linguistics expertise in this bench trial.

### C.    Dr. Cook's Testimony is Relevant and Not Prejudicial

#### 1.    Dr. Cook's testimony is relevant to the Second Amendment challenge

Plaintiffs' arguments to exclude Dr. Cook's testimony are based on obvious misreadings of *Bruen* and the relevant rules of evidence. Plaintiffs' arguments rely fundamentally on their position that medical testimony regarding the harms addressed by Measure 114 is irrelevant. *See* ECF 177 at 15–18; ECF 180 at 7–8. That position flies in the face of *Bruen*, which instructs courts to assess, among other things: (1) whether weapons and their accessories are dangerous and unusual; (2) whether a regulation implicates an unprecedented societal harm; (3) why a regulation burdens the right to self-defense (if Plaintiffs meet their burden of demonstrating such a burden exists); and (4) whether any burden is comparably justified to historical analogs. Dr. Cook's testimony is relevant to all four of these issues.

*Bruen* requires a two-step analysis. At the first step, Plaintiffs must demonstrate that the plain text of the Second Amendment covers the conduct at issue. *Bruen*, 142 S. Ct. at 2126. That

textual inquiry comes with several limitations. For example, the text of the Second Amendment does not apply to arms that are not "in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143. Relatedly, the Second Amendment's protections do not extend to "dangerous and unusual weapons." *Id.*; *Heller*, 554 U.S. at 627; *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. CV 22-951-RGA, 2023 WL 2655150, at *4 (D. Del. Mar. 27, 2023). Only if Plaintiffs succeed in demonstrating that the Second Amendment applies to the regulated conduct does the analysis proceed to the second step.

In the second phase of *Bruen*'s analysis, the law still withstands scrutiny if it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Supreme Court acknowledged that this analysis may not always be straightforward. *Id.* at 1231. In particular, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. This approach requires examining "how *and why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133 (emphasis added). The Court observed that a "central" component of this analysis is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and *whether that burden is comparably justified*." *Id.* (emphasis added).

Dr. Cook's testimony concerns the difficulties that medical professionals face in treating (1) individuals with multiple bullet wounds; (2) multiple individuals with bullet wounds, which may occur in the event of a mass shooting or multiple concurrent shootings; and (3) the increased number of patients being hospitalized as a result of shootings in recent years. ECF 129. That testimony bears on both steps of the *Bruen* analysis and easily clears the low bar for relevance.

Addressing the textual prong, Dr. Cook's testimony is relevant to whether LCMs are "dangerous and unusual weapons" that are not protected by the text of the Second Amendment.

*See Del. State Sportsmen's Ass'n*, 2023 WL 2655150, at *4 ("[T]he Second Amendment does not create a right to keep and carry "'dangerous and unusual weapons.'"") (quoting *Heller*, 554 U.S. at 627). Dr. Cook's expertise does not extend to evaluating the firearms used to shoot his patients, and he will not opine on that subject. But when taken in combination with the testimony of other experts, who can discuss the relationship between LCMs and increased numbers of bullet wounds and shooting victims, there is no doubt that Dr. Cook's testimony addresses the dangers posed by LCMs. *See United States v. Guzman-Montanez*, 756 F.3d 1, 7 (1st Cir. 2014) ("Evidence may be relevant under Rule 401's definition, even if it fails to prove or disprove the fact at issue—whether taken alone or in combination with all other helpful evidence on that issue.").

Dr. Cook's testimony is also relevant to *Bruen*'s history prong. This Court, along with several others, has recognized that LCMs implicate an unprecedented societal concern: mass shootings. ECF 39 at 27; *see also Del. State Sportsmen's Ass'n*, 2023 WL 2655150, at *10 (concluding that LCM regulation implicated "unprecedented societal concerns"); *Hanson v. District of Columbia*, CV 22-2256 (RC), 2023 WL 3019777, at *13 (D.D.C. Apr. 20, 2023) (same); *Herrera v. Raoul*, 23 CV 532, 2023 WL 3074799, at *7 (N.D. Ill. Apr. 25, 2023) (same). Dr. Cook's testimony provides an expert medical perspective that supports that conclusion. *E.g.*, ECF 129 ¶¶ 10–11 (describing the challenges faced by hospitals in the event of a mass shooting).

Dr. Cook's testimony also bears on the Court's analysis of historical analogs. Plaintiffs' objections on this point completely ignore the Supreme Court's instruction to evaluate both "why the regulations burden a law-abiding citizen's right to armed self-defense" and "whether that burden is comparably justified" to historical analogs. *Bruen*, 142 S. Ct. at 2133. Dr. Cook's testimony is relevant both to why Measure 114 was enacted and to the justifications for any burden imposed by the law. Measure 114 was enacted by the People of Oregon to reduce "horrific deaths

and devastating injuries due to mass shootings" and because "the availability of firearms . . . with accompanying large-capacity ammunition magazines, pose a grave and immediate risk to the health, safety, and well-being of the citizens of this State." Measure 114, Preamble. Assuming, as Plaintiffs' argue, that Measure 114 constitutes any burden on the right to self-defense, the Court will need to analyze the harms Measure 114 addresses. Dr. Cook's testimony directly address those harms from the perspective of someone who deals with them on the operating table daily.

Plaintiff's misreading of *Bruen* is further belied by the fact that multiple district courts have relied on the statements of medical experts in reviewing (and rejecting) post-*Bruen* challenges to LCM regulations. *See Bevis v. City of Naperville*, 22 C 4775, 2023 WL 2077392, at *14 (N.D. Ill. Feb. 17, 2023) (citing statements from trauma surgeons in post-*Bruen* analysis of whether governments can "regulate highly dangerous arms (and related dangerous accessories)"); *Del. State Sportsmen's Ass'n,* 2023 WL 2655150, at *10 (citing testimony of medical experts in analysis of whether assault weapons and LCMs "implicate unprecedented societal concerns"). These courts examined strikingly similar challenges and concluded it was proper to consider the testimony of medical experts like Dr. Cook. Plaintiffs offer no compelling reason to disagree with those decisions.

Plaintiffs' Rule 403 arguments regarding Dr. Cook's medical testimony are also off base. They contend that Dr. Cook's testimony is "precisely the kind of prejudicial evidence that 'arouses [a] sense of horror.'" ECF 180 at 7 (quoting *United States v. Skillman*, 922 F.2d 1370, 1374 (9th Cir. 1990). But their quotation conveniently excises (and misleadingly replaces) important considerations from the analysis. The full quote describes unfairly prejudicial evidence as "evidence which appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the

established propositions in the case." *Skillman*, 922 F.2d at 1374 (cleaned up). Here, there will be no *jury* whose sense of horror or instinct to punish could be aroused. And, as established above, the "propositions in the case" require an analysis of the harms that Measure 114 was enacted to reduce. If testimony about the effects of gunshot wounds "arouse a sense of horror," that is because Measure 114 is a law intended to reduce the risk of that horror being inflicted on Oregonians. In this bench trial, there is no risk of unfair prejudice as a result of Dr. Cook's testimony, let alone a risk of unfair prejudice that substantially outweighs the probative value of his testimony.

Plaintiffs' arguments regarding a waste of time are also unavailing. The Alliance anticipates that the direct examination of Dr. Cook will take less than an hour. *See* ECF 181 at 2. If Plaintiffs believe his testimony is as wholly irrelevant to the questions before the Court as their motion suggests, their cross-examination will presumably be brief as well.

### 2.  Dr. Cook's testimony is relevant to the Takings Clause challenge

Plaintiffs' motions to exclude medical evidence of the harms addressed by Measure 114 also appear to forget that they bring claims under the Takings Clause. *Compare* ECF 177 & 180 (focusing only on Second Amendment challenges), *with* ECF 165 at 58–62 (addressing takings claims). In addition to its role in the *Bruen* test, Dr. Cook's testimony is also relevant to the Court's analysis of Plaintiffs' takings claims.

Whether an item is dangerous to society is a key consideration in a Takings Clause analysis. The Supreme Court has long recognized that the Takings Clause does not apply when states exercise their police power to regulate certain property to protect public health and safety. *See Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887) ("A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property

for the public benefit"); *Palmer v. Sisolak*, 594 F. Supp. 3d 1215, 1226 (D. Nev. 2022) (citing

*Mugler* in support of conclusion that Nevada's ban on ghost guns did not constitute a taking).

Indeed, the Ninth Circuit previously rejected Plaintiffs' takings arguments for precisely this reason

in *Duncan v. Bonta*, 19 F.4th 1087, 1113 (9th Cir. 2021) (en banc), *cert. granted, judgment

vacated*, 142 S. Ct. 2895, and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). In rejecting

the plaintiffs' takings challenge to California's (more stringent) LCM restriction, the majority

reasoned: "we do not read *Loretto* and *Horne* as requiring a government to pay whenever it

concludes that certain items are too dangerous to society for persons to possess without a modest

modification that leaves intact the basic functionality of the item." *Id.* (citing *Ass'n of N.J. Rifle &

Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 124 n.32 (3d Cir. 2018), *abrogated

on other grounds by Bruen*, 142 S. Ct. 2111 (2022)).[5] Dr. Cook's testimony goes directly to the

dangers to society posed by the accessories regulated by Measure 114. *See* ECF 129; *see also*

Measure 114, Preamble (concluding that "the availability of firearms . . . with accompanying large-

capacity ammunition magazines, pose a grave and immediate risk to the health, safety, and well-

being of the citizens of this State"). Those dangers, in turn, go directly to whether Measure 114 is

a legitimate exercise of Oregon's police power such that it does not effect a compensable taking.

    *Ocean State Tactical*, 2022 WL 17721175, underscores the relevance of medical expert

testimony to a takings analysis. In analyzing a Taking Clause challenge to Rhode Island's

restrictions on LCMs, the court examined whether the law was "a reasonable response to the public

safety interest of the state." *Id.* at *19 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S.

104, 138 (1978)). In concluding that the law was a valid exercise of the state's police power, the

---

[5] Although the en banc panel's decision in *Duncan* was vacated and remanded in light of *Bruen*,
nothing in *Bruen* affected the en banc panel's Takings Clause analysis. *See* ECF 39 at 34 n.28.

court cited extensively the testimony of an emergency medicine physician. *Id.* at *20. In particular, the court credited the physician's testimony regarding the effects of multiple gunshot wounds on victims and the effects of multiple gunshot victims on hospitals trying to treat those victims. *Id.* Dr. Cook's testimony accords, and is equally relevant to whether Measure 114 is related to the promotion of general welfare.

### D.    The Remaining Motions In Limine are Meritless

The Alliance agrees with and joins State Defendants' position on Plaintiffs' remaining motions in limine. *See supra* note 1. The Alliance writes separately to briefly underscore that motions in limine 4 and 5, in particular, suffer from the same key flaw as Plaintiffs' objections to Dr. Cook's testimony. Plaintiffs' objections to evidence regarding public safety and mass shootings ignore that *Bruen* specifically calls for analysis of whether a law addresses an unprecedented societal problem or a dramatic technological change. 142 S. Ct. at 2132. And when conducting an analysis of historical analogs, the Supreme Court instructed lower courts to examine both why the law was enacted and what justifications exist for any potential burdening of the right to armed self-defense. *Id.* at 2133. As many courts have concluded, evidence of public safety concerns and mass shootings are relevant to this analysis, and are not unfairly prejudicial. In *Bevis,* the court included in its *Bruen* analysis the fact that "researchers examining almost thirty years of mass-shooting data determined that high-capacity magazines resulted in a 62 percent higher death toll." 2023 WL 2077392, at *15. In *Delaware State Sportsmen's Association*, the court considered the evidence that the rate of mass shootings is increasing in the United States and mass shootings involving LCMs "result in more fatalities and injuries than those that do not." 2023 WL 2655150, at *10. The *Hanson* court included evidence of mass shootings and public safety in its examination of historical analogs for a restriction on LCMs. *See* 2023 WL 3019777, at *15 ("Just as states and the District enacted sweeping laws restricting possession of high-capacity weapons in an attempt

to reduce violence during the Prohibition era, so can the District now.") As this Court previously concluded, the Court "may consider the public safety concerns of today" when "considering whether Defendants are comparably justified in imposing Measure 114 as were this Nation's earlier legislatures in imposing historical regulations." ECF 39 at 31. Plaintiffs' objections offer no reason to depart from this conclusion.

## IV.    CONCLUSION

For the reasons set forth above, the Court should decline to exclude the testimony of Professor Baron or Dr. Cook and deny Plaintiffs' Motions.

DATED this 22nd day of May, 2023.

PACIFICA LAW GROUP LLP

*s/ Zachary J. Pekelis*

Jessica A. Skelton, OSB #102714
Zachary J. Pekelis, *Pro Hac Vice*
Kai A. Smith, *Pro Hac Vice*
W. Scott Ferron, *Pro Hac Vice*

*Attorneys for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

**CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(B)(2)**

This brief complies with the applicable page-count limitation under LR 7-2(b) because it contains fewer than 35 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 22nd day of May, 2023.

PACIFICA LAW GROUP LLP

*s/ Zachary J. Pekelis*

Jessica A. Skelton, OSB #102714
Zachary J. Pekelis, *Pro Hac Vice*
Kai A. Smith, *Pro Hac Vice*
W. Scott Ferron, *Pro Hac Vice*

*Attorneys for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of May, 2023, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

DATED this 22nd day of May, 2023.

                        _____
                               Erica Knerr