Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

_____

OREGON FIREARMS FEDERATION,       )
INC., et al.,                     )
                                  ) Civil No.
          Plaintiffs,             ) 2:22-cv-01815-IM
     v.                           ) (Lead Case)
                                  )
TINA KOTEK, et al.,               ) Civil No.
                                  ) 3:22-cv-01859-IM
          Defendants.             ) (Trailing Case)
_____    )
                                  ) Civil No.
          (Continued)             ) 3:22-cv-01862-IM
                                  ) (Trailing Case)
                                  )
                                  ) Civil No.
                                  ) 3:22-cv-01869-IM
                                  ) (Trailing Case)
                                  )
_____

* VIDEOCONFERENCE *

DEPOSITION UPON ORAL EXAMINATION

OF EXPERT

BRENNAN N. RIVAS

_____

Witness located in:

Fort Worth, Texas

* All participants appeared via videoconference *

DATE TAKEN:  March 22, 2023
REPORTED BY:  Tia B. Reidt, Washington RPR, CCR 2798
                        Oregon # 22-0001

Page 2

1 _____

2   (continued)                              )
                                             )
3   MARK FITZ, et al.,                       )
                                             )
4                   Plaintiffs,              )
        v.                                   )
5                                            )
    ELLEN F. ROSENBLUM, et al.,              )
6                                            )
                  Defendants.                )
7  _____          )
                                             )
8   KATERINA B. EYRE, et al.,                )
                                             )
9                   Plaintiffs,              )
                                             )
10       v.                                  )
                                             )
11  ELLEN F. ROSENBLUM, et al.,              )
                                             )
12                Defendants.                )
   _____          )
13  DANIEL AZZOPARDI, et al.,                )
                                             )
14                  Plaintiffs,              )
        v.                                   )
15                                           )
    ELLEN F. ROSENBLUM, et al.,              )
16                                           )
                  Defendants.                )
17 _____

18

19

20

21

22

23

24

25

Page 3

1                        APPEARANCES

2    For Oregon Firearms Federation:

3              LEONARD WILLIAMSON
               VAN NESS WILLIAMSON
4              960 Liberty Street SE, Suite 100
               Salem, OR 97302
5              (503) 365-8800
               L.williamson@vwllp.com
6

7    For the State of Oregon Defendants:

8              HARRY WILSON
               MARKOWITZ HERBOLD
9              1455 SW Broadway, Suite 1900
               Portland, OR 97201
10             (503) 972-5076
               HarryWilson@markowitzherbold.com
11

12                     *    *    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 20

1    or someplace else?

2         A.   Yeah.   And especially the HeinOnline, yeah.

3         Q.   Okay.

4              And you also mentioned the Cody Museum.

5              Did you do some work there?

6         A.   I did, yes.

7         Q.   And when was that?

8         A.   In October 2022.

9         Q.   Earlier in your testimony, you mentioned -- I

10   think you said you would have liked the curator let you

11   take a closer look at some of the stuff.   Is that the

12   museum you're talking about?

13        A.   Well, one of them.   I mean, I've been to --

14   I've been to several museums that have collections of

15   historic firearms, and it would be great to get an

16   all-access tour like that, where they could show you

17   some of the functionality of the gun.   Not necessarily

18   fire it, but at least be able to, you know, sort of

19   take you through how the mechanisms worked.   That would

20   be great.

21        Q.   What research did you do at the Cody Museum in

22   October?

23        A.   I was looking at the history and development

24   of mostly the lever-action rifles, especially looking

25   at the Winchester collections.

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Brennan N. Rivas

Page 21

1        Q.  And approximately how much time did you spend
2    there researching?
3        A.  I was there for one full workweek, and I spent
4    most of every day there in the archives looking at
5    various resources.  So I would say about 25 or 30 hours
6    at the archive.
7        Q.  Okay.
8            Did you interact with any of the curators
9    there?
10       A.  I did not interact with curators.  I did
11   interact with the librarians and archivists at the
12   McCracken Research Library.
13       Q.  Okay.
14           The other resource material you cited to was
15   Gun Digest.  Can you tell me a little bit more about
16   using that as a researching tool?
17       A.  Yes.  I bought online a CD collection of
18   digitized issues of Gun Digest.  It runs from the
19   beginning in the 1940s up through pretty recently,
20   through at least, like, 2015 or something like that.
21   And so I have those, and I've looked at -- I've looked
22   at some of the older issues of Gun Digest.
23       Q.  And why is that a particular useful resource?
24       A.  Well, number one, it was a great way to -- it
25   was a great resource in that you can get a lot of

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Page 22

1   material in one place that's fairly easy to go through,

2   you know?  So you've got decades and decades of Gun

3   Digest all in one place at your computer, and it was

4   useful for that.

5         But also, Gun Digest is really useful for

6   seeing what kinds of weapons were available and how

7   they're being described, things of that nature.  And so

8   I used it for that purpose.

9      Q.  Do you find it to be an accurate resource?

10     A.  Insofar as -- insofar as it's a catalog of

11  what is available, I would say yes.  I don't have any

12  reason to think that it was -- that it was wildly

13  inaccurate.

14     Q.  I wasn't trying to imply that.  I'm just

15  trying to gauge your -- your trust of the resource.

16  That's all.

17     A.  Well, like I said, for the purpose I used it

18  for, which was sort of to scan through what kinds of

19  guns are they advertising in it and what is -- what

20  does that catalog show to be available.  That's what I

21  used it for.  Not so much reading the articles or

22  anything like that.

23     Q.  If you relied on any of the articles in the

24  Gun Digest, would you consider that a primary or

25  secondary source?

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)          Brennan N. Rivas

Page 23

1       A.   Well, it would depend on -- it would depend on

2   what the article was about.  If the article was about,

3   you know, the history of flintlock muskets, then that

4   would be a secondary source.  But if it's an article

5   about here is this new model of rifle that just came

6   out, I would consider that a primary source about that

7   item.

8       Q.   Okay.

9            So if you could turn to your declaration

10  again, Exhibit 8, and I'm looking at the top of page 5.

11      A.   Okay.

12      Q.   And the specific language I'm looking at is

13  "America has a long tradition of regulating weapons

14  considered especially dangerous."

15           Is there a definition in your own mind of what

16  is -- what you refer to here as "especially dangerous"?

17      A.   Well, for the context of the 19th century,

18  yes.  They generally called those "deadly weapons" and

19  regulated them in various ways.  Yeah.

20      Q.   So when you just described that, you mean

21  dangerous and unusual as the Supreme Court uses that

22  term?  Or how do you understand that term to be?

23      A.   I -- I would be hesitant to say that I'm

24  aligning everything I'm saying with how the Supreme

25  Court uses the phrases.  I'm speaking as a historian.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Page 24

1    But based on my own research, Americans of the 19th
2    century did consider some weapons to be especially
3    dangerous to the peace and safety of communities, and
4    they generally grouped them together and called them
5    "deadly weapons" and regulated them.
6         Q.   So would you use the phrasing interchangeably,
7    "especially dangerous" equals "dangerous and unusual"?
8         A.   I'm honestly not sure.
9         Q.   Okay.   That's fair.
10            Is it possible that over time something that
11   fits in the category, in your own mind, "especially
12   dangerous" or considered "especially dangerous" by a
13   community moves to a different category, that it's not,
14   and it's not regulated?
15        A.   What's the time frame we're thinking of here?
16   Do you have a time frame here to which you're limiting
17   that?
18        Q.   Sure.
19            So in some of the references here there was --
20   you make some note of pistols, especially, I think, one
21   of them was either described as a horse pistol or a
22   long pistol, and the states regulating such items.
23            So juxtapose that with now in the modern era
24   under Heller, the Supreme Court saying that pistols
25   might have been considered dangerous and unusual then,

Page 25

1   but they're not now, and that they're considered a

2   quintessential self-defense item.

3           So my curiosity is:

4           How do you go from it being dangerous and

5   regulated to now it's not, and it's the quintessential

6   example of self-defense?  So...

7       A.  That's a question I probably would like to

8   know the answer to myself.

9           But as a historian and with Americans' general

10  attitudes towards handguns, especially in the 19th

11  century, which is what my research focuses on, they did

12  consider them to be associated with criminal activity.

13  Even today, you know, handguns are involved in more

14  crimes and more deaths than any kind of firearm; right?

15  So I don't -- I don't know that they're any less

16  dangerous than they used to be.  It's just social -- I

17  guess social attitudes and especially legal

18  interpretation of that has changed.

19      Q.  Well, and that's in part what a historian

20  does; correct?  They look at snapshots and times and

21  try to discover those things?

22      A.  Yeah.

23      Q.  Okay.

24          Would it also be fair to say that any -- any

25  weapon that could be used like a knife or a hatchet or

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Brennan N. Rivas

Page 71

1                              C E R T I F I C A T E

2

3       STATE OF WASHINGTON

4       COUNTY OF PIERCE

5

6            I, Tia Reidt, a Certified Court Reporter in and

7       for the State of Washington, do hereby certify that the

8       foregoing transcript of the deposition of BRENNAN N.

9       RIVAS, having been duly sworn, on March 21, 2023, is

10      true and accurate to the best of my knowledge, skill and

11      ability.  Reading and signing was requested pursuant to

12      FRCP Rule 30(e).

13           IN WITNESS WHEREOF, I have hereunto set my hand

14      and seal this 27th day of March, 2023.

15

16

17

18      _____

19      /S/ Tia B. Reidt
        Tia B. Reidt, RPR, CCR # 22-0001
20      NOTARY PUBLIC, State of
        Washington.
21      My commission expires
        5/15/2026.

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989